IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION, ) ) ) ) | |
| Plaintiff, ) ) ) | Civil Action No. 3:15-cv-3851 (DCG) |
| v. ) ) | |
| UNITED STATES OF AMERICA, *et al.*, ) ) | |
| Defendants. ) ) | |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S
APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

Dated: December 4, 2015

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
JOHN R. PARKER
United States Attorney
JOSEPH H. HUNT
Director
SHEILA M. LIEBER
Deputy Director
ANTHONY J. COPPOLINO
Deputy Director
JAMES J. GILLIGAN
Special Litigation Counsel
STUART J. ROBINSON
MICHELLE R. BENNETT
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, D.C. 20530
Tel: (202) 514-9239
Fax: (202) 616-8470
Email: stuart.j.robinson@usdoj.gov

*Attorneys for the Federal Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

ARGUMENT ............................................................................................................................. 6

    A.    Plaintiff Has Not Established a Likelihood of Success on the Merits .......................... 7

    B.    Plaintiff Has Made No Showing of Irreparable Harm ................................................ 11

    C.    The Balance of Equities and the Public Interest Also Mandate Against a Temporary Injunction. ................................................................................................................. 13

CONCLUSION ........................................................................................................................ 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION, ) ) ) ) Plaintiff, ) ) v. ) ) UNITED STATES OF AMERICA, *et al.*, ) ) Defendants. ) ) | Civil Action No. 3:15-cv-3851 (DCG) |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

Decisions as to resettlement of refugees within the United States are committed to the Federal Government as part of its exclusive constitutional and statutory authority over immigration. Plaintiff Texas Health and Human Services Commission (the "Commission") seeks to transform a general statutory directive for two federal agencies to consult periodically with State and local governments about sponsorship procedures and the distribution of refugees among the States into an unwarranted veto power over individual federal refugee resettlement decisions. And it would do so in order to prevent refugee families with small children from entering the State. The Commission has made no showing of statutory right, or of imminent irreparable injury, that would justify such interference with the Federal Government's authority in this realm, and Plaintiff's motion for a temporary restraining order should be denied.

First, Plaintiff's claim that it has been denied a statutory right to "consult" with the Government about these refugees before they are settled in Texas is without merit. In its own words, Plaintiff seeks "specific refugee case information" about each of these individuals,

whereas the statute Plaintiff relies on, the Refugee Act of 1980, imposes only a requirement that the Government consult on a regular basis with the States about the "sponsorship process" and "the distribution of refugees among the states." It does not create any obligation to provide advance consultation regarding individual resettlement decisions. In any event, the Government has met its consultation obligations under the Act, as discussed below; and in the final analysis the Refugee Act creates no enforceable legal right to consultation that must be complied with before the Government may exercise its authority to resettle particular refugees.

Second, Plaintiff has not demonstrated an imminent threat of irreparable harm. As discussed below, the Syrian refugees who are currently scheduled to for resettlement in Texas within the next two weeks (and none sooner than Monday, December 7) consist of displaced Syrian families—children, their parents, and in one case their grandparents—and a single woman who seeks to be reunited with her mother. Plaintiff has made no showing that these refugees pose any threat, much less an imminent one, to the safety or security of Texas residents or any other Americans.

Finally, the harm to the national interest as determined by the President, and to the interests of the individual refugee families in question, outweigh Plaintiff's speculative and uninformed fears about security. For these reasons, discussed in greater detail below, Plaintiff's motion for a temporary restraining order should be denied.

**BACKGROUND**

The Constitution allocates to the Federal Government the exclusive authority to establish and implement immigration policy. This authority "derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' its power '[t]o regulate Commerce with foreign nations,' and its broad authority over foreign affairs." *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (citations omitted) (alterations in original).

Pursuant to this authority Congress has enacted the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, which empowers various federal agencies to enforce and administer immigration law.  The Refugee Act of 1980, Pub. L. No. 96-21, amended the INA to establish policies and procedures for the admission and resettlement of refugees in the United States.

As amended, the INA provides that the number of refugees annually shall generally be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultations, is justified by humanitarian concerns or is otherwise in the national interest."  8 U.S.C. § 1157(a)(2).  Pursuant to this authority, the President has determined, after appropriate consultations with Congress, that "[t]he admission of up to 85,000 refugees to the United States during Fiscal Year (FY) 2016 is justified by humanitarian concerns or is otherwise in the national interest."  White House, *Presidential Determination – Presidential Determination on Refugee Admissions for Fiscal Year 2016*, *at* https://www.whitehouse.gov/the-press-office/2015/09/29/presidential-determination-presidential-determination-refugee-admissions (last visited Dec. 2, 2015).  The President recently announced that the United States will increase the number of Syrian refuges admitted to the United States to at least 10,000 in fiscal year 2016.

Under the Refugee Act, the State Department Bureau of Population, Refugees, and Migration ("PRM") works with displaced persons and maintains a program in cooperation with private nonprofit refugee assistance organizations to resettle refugees in the United States. 8 U.S.C. § 1522(b)(1); U.S. Department of State, *Refugee Admissions*, *at* http://www.state.gov/j/prm/ra/index.htm (last visited Dec. 3, 2015).  The Act charges the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") with responsibility for funding and administering, in consultation with the Secretary of State, programs to aid refugee resettlement.  8 U.S.C. § 1521.  ORR administers and disburses federal funds to States and nonprofit organizations for assistance in resettlement of refugees within the

United States. 8 U.S.C. § 1522. In most cases, States receive grants directly from ORR to provide for medical screening and initial medical treatment of refugees, and to provide certain eligible refugees with cash assistance. *Id.* They also receive grants of federal funds that are to be passed through to nonprofit agencies to assist refugees in obtaining self-sufficiency and job-preparation skills, to provide English training if necessary, and to provide other services. 8 U.S.C. § 1522(c). Additionally, refugees and their families are potentially eligible for eight months of cash and medical assistance. ORR provides grants to States to pay for such assistance. 8 U.S.C. § 1522(e). In order to receive any of these federal grant funds, a state must submit a state plan that meets the requirements imposed by the INA. 45 C.F.R. § 400.4.

The Refugee Act directs that ORR and PRM, in carrying out their delegated functions, "consult regularly (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement in those States and localities. 8 U.S.C. § 1522(a)(2)(A).

On November 17, 2015, the Governor of Texas directed the Plaintiff Commission, and Director of the Texas Department of Public Safety, to cease participation in the resettlement of Syrian refugees in Texas, citing "the recent deadly terrorist attacks in Paris." Exh. A, hereto. On November 19, 2015, the Commission sent a letter to the private refugee resettlement organizations operating in Texas, including defendant International Rescue Committee, Inc. ("IRC"), instructing them to submit to the Commission their plans for resettling Syrian refugees in Texas, and requesting them to discontinue any such plans immediately. *See* Compl. Exh. A. According to the Complaint, in a subsequent telephone call IRC staff informed the Commission that the IRC "intends to resettle six Syrian refugees in Dallas, Texas on Friday, December 4." *Id.* ¶ 14. Thereafter on December 1, 2015, the Commission sent a letter to PRM requesting

4

"specific refugee case information" about all Syrian refugees to be settled in Texas within the following 90 days. *Id.* Exh. B, at 1. In particular, the Commission sought "[a]ll demographic, medical, security, and other case information relating to Syrians slated or scheduled for resettlement in Texas" during that time period. *Id.* The Commission filed this lawsuit the next day, on December 2, 2015.

To clarify, the six Syrian refugees referred to in the Complaint, ¶ 14, are now scheduled to be resettled in Texas on Monday, December 7, 2015. They are a family including two children, ages 3 and 6, their parents, and the children's grandparents, and are scheduled to be resettled in Dallas. They intend to resettle with relatives who already live in the area. A second family of Syrian refugees also consisting of six individuals, four children ages 2-13, and their parents, is scheduled for resettlement on December 7 in Houston.[1] These admissibility of these refugees did not depend on the discretionary "material-support" exemption referred to in the Complaint, ¶ 11.[2]

---

[1] These two families arrived by plane in New York, respectively, on December 3 and 4, 2015. The Federal Defendants intend to assist the families through the necessary entry requirements, including customs, and lodge them in a nearby hotel until December 7, at which point the Federal Defendants intend to provide the families transportation to Texas. As with any similarly situated refugees, once they arrive in the United States, these families are free to travel throughout the country. They are not in detention and are not required to travel to Texas if they decline to do so. By the same token, they may leave for any destination at any time if they so wish, albeit without the assistance of the Federal Government.

[2] In February 2014, following consultations with the Attorney General, the Secretaries of Homeland Security and State determined that certain grounds of inadmissibility relating to providing material support to terrorist organizations bar certain aliens who do not pose a national security or public safety risk from admission to the United States and from obtaining immigration benefits or other status. *See* 79 Fed. Reg. 6,913 (Feb. 5, 2014). Accordingly, consistent with prior exercises of their exemption authority, the Secretaries exercised their discretion under 8 U.S.C. § 1182(d)(3)(B)(i), as amended, to waive certain inadmissibility grounds with respect to aliens who provided insignificant material support without any intent of furthering the terrorist or violent activities of the organization or individual and who, among other criteria, have undergone and passed all relevant background and security checks and pose no danger to the safety and security of the United States. *See id*. at 6913-14.

In addition, the Federal Defendants intend to resettle a family of eight Syrian refugees, including six children ages 6-15, in Houston on Thursday, December 10, 2015. Also scheduled for resettlement on that date in Houston is a 26-year-old Syrian woman whose mother resides in the area. At this time, the Federal Defendants have no reason to believe that these nine refugees have received material-support waivers; however, the Federal Defendants are in the process of confirming that to be the case and will promptly inform the Court and Plaintiff as Defendants gather additional information.

The Federal Defendants do not intend to resettle in Texas any Syrian refugees between Monday, December 14, 2015, and Friday, December 18, 2015.

## ARGUMENT

As Plaintiff observes, the showing required for entry of a temporary restraining order is the same as that for a preliminary injunction. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). To obtain such extraordinary relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Relief should be granted only "if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). "[I]f the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue." *Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

Plaintiff has not carried its burden as to any of the required elements, and therefore its motion for a temporary restraining order should be denied.

### A. Plaintiff Has Not Established a Likelihood of Success on the Merits.

Plaintiff's application for temporary relief should be denied because it has not demonstrated that it is likely to prevail on the merits of its claim that the Government has breached a duty of consultation imposed by the Refugee Act that entitles Plaintiff to injunctive relief. Plaintiff relies specifically on 8 U.S.C. § 1522(a)(2)(A), which provides ORR and PRM

> shall consult regularly (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies *concerning the sponsorship process and the intended distribution of refugees among the States and localities* before their placement in those States and localities [emphasis added].

Plaintiff claims that the Government failed to comply with this consultation requirement by refusing to provide it, and allegedly preventing the IRC from providing it, with "[a]ll demographic, medical, security, and other case information" relating specifically to the six Syrian refugees now due to arrive in Dallas on December 7 as well as all other Syrian refugees scheduled for resettlement in Texas during the next 90 days. Compl. ¶¶ 14-15, 20 & Exh. B. This claim lacks merit for many reasons.[3]

First, nothing in § 1522(a)(2) requires the Government in each instance to provide the Commission with "demographic, medical, security [or] other case information" about individual refugees before they are settled. *See* Compl. Exh. B. The statute only instructs the Government to consult with State and local governments and nonprofit organizations such as the IRC on a periodic basis (at least quarterly) about "the sponsorship process and intended distribution of refugees among the State and localities." The particularized information about individual refugees that the Commission requested in its December 1, 2015, letter to PRM plainly does not fall within the scope of the statute's directive to consult about the "sponsorship process" and the

---

[3] Plaintiff alleges in Count II of its Complaint that the IRC failed to comply with 8 U.S.C. § 1522(a)(1)(B)(iii). Compl. ¶¶ 21-30. Because Plaintiff does not raise Count II against the Federal Defendants or claim that the Government violated this provision of the Refugee Act, the Government will not address 8 U.S.C. § 1522(a)(1)(B)(iii) in its opposition.

"distribution of refugees," and the statute has not been understood to require disclosures of such information. So far as the Federal Defendants have been able to ascertain in preparing this opposition to Plaintiff's application, it has not been the practice (within memory) of either PRM or ORR to provide States with such detailed case information about individual refugees before they are settled, nor of the States to request it.

Second, the Government has met the consultation requirement actually imposed by § 1522. PRM is in regular contact with State refugee coordinators, including the Texas state refugee coordinator, regarding refugee resettlements in their States. In advance of deciding on the placement of refugees in a State for a particular fiscal year, PRM consults with State refugee coordinators regarding the number of refugees that will be arriving in their State by region (*e.g.* the Middle East or Western Hemisphere). Additionally, every quarter, PRM makes available to the State refugee coordinators a forecasting report showing the resettlement preference by city and State of refugees seeking resettlement in the U.S. but who have not been allocated to a specific location. The most recent report was provided on October 3, 2015. Exh. B, hereto. Every quarter PRM also makes available to State refugee coordinators a report with information about the numbers, nationalities, ethnicity, and intended destination localities of refugees who will be arriving in their respective States. The most recent such report was issued on November 23, 2015. In addition, PRM requires nonprofit organizations that offer resettlement assistance to refugees (using funds provided by the State Department) to conduct quarterly consultations with relevant stakeholders, including State refugee coordinators, "concerning the sponsorship process and the intended distribution of refugees in such localities before their placement in those localities." *See, e.g.*, Exh. C, hereto (Cooperative Agreement with IRC, § 16.e.).

Likewise, ORR representatives participated in a number of quarterly stakeholder meetings convened by the State. These concerned in part the intended distribution of

refugees. ORR representatives also maintain regular contact with State refugee assistance agencies about a wide range of matters, including the distribution of refugees.

Most critically, however, § 1522(a)(2) creates no judicially enforceable right that entitles a State to consultation before the Federal Government may exercise its plenary authority to admit and settle foreign refugees. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id*. The inquiry "simply require[s] a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). Where the necessary intent is absent, "a cause of action does not exist and courts may not create one." *Sandoval*, 532 U.S. at 286-87.

Section 1522 has no express provision creating a private cause of action in favor of States or state agencies. *See* 8 U.S.C. § 1522. The statutory language on which Plaintiff relies does not contain the sort of "rights-creating language" that courts have found "critical" to imputing to Congress an intent to create a private right of action. *Sandoval*, 532 U.S. at 288; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam); *Love v. Delta Air Lines*, 310 F.3d 1347, 1352-53 (11th Cir. 2002) (looking "first and foremost" to the "statutory test for rights-creating language" (quotations omitted)). In *Sandoval*, the Supreme Court distinguished between the rights-creating language, "[n]o person . . . shall . . . be subjected to discrimination," and its antithesis, "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [the statute]." 532 U.S. at 288-89. Section 1522(a)(2)(A) falls squarely within the latter camp. It does not "explicitly confer [any] right directly on" States or state agencies. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979). Instead, it is "phrased as a directive to federal agencies engaged in the distribution of public funds."

*Sandoval*, 532 U.S. at 289; *see* 8 U.S.C. § 1522(a)(2)(A) ("The Director and the Federal agency administering subsection (b)(1) of this section shall . . ."). Courts typically do not infer a private remedy where, as here, Congress, rather than drafting the legislation with an unmistakable focus on the benefited class, instead has framed the statute simply as a . . . command to a federal agency." *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981); *see Sandoval*, 532 U.S. at 289 (explaining that a statute that "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating" is unlikely to create a private right of action).

This understanding of § 1522(a)(2) as creating no right of action for State or local governments is buttressed by the context in which Congress legislated. The Constitution vests authority for the establishment and administration of immigration policy exclusively with the Federal Government. *See Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012); *see also Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"). Under our constitutional structure, States may not interfere with the Federal Government's execution of the immigration laws or its ordering of immigration priorities. *See Arizona*, 132 S. Ct. at 2498 (emphasizing the breadth of "federal power to determine immigration policy"). Nothing in § 1522 suggests an intent by Congress to upend the constitutional design in the realm of refugee resettlement by permitting States, in effect, to veto resettlement determinations made by the Government on the ground that they were not furnished with detailed "demographic, medical, [or] security information" about particular refugees.

Plaintiff's reliance on the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, as the basis for its claims does not alter this conclusion. The Declaratory Judgment Act does not create

10

a substantive cause of action. *See, e.g.*, *Harris Cty. Texas v. MERSCORP Inc.*, 791 F.3d 545, 552-53 (5th Cir. 2015). The Act "enlarged the range of remedies available in the federal courts," but it did not create a new right to seek those remedies. *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671 (1950); *Schilling v. Rogers,* 363 U.S. 666, 677 (1960) ("The Declaratory Judgment Act is not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right."); *Okpalobi v. Foster,* 244 F.3d 405, 423 n.31 (5th Cir. 2001) ("[T]he law makes clear that—although the Declaratory Judgment Act provides a *remedy* different from an injunction—it does not provide an additional cause of action with respect to the underlying claim."). A plaintiff, therefore, must point to a cause of action arising under some other federal law for jurisdiction to exist in a declaratory judgment suit. *See Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984). "A plaintiff cannot use the Declaratory Judgment Act to create a private right of action where none exists." *Dallas Cty., Tex. v. MERSCORP, Inc.*, 2 F. Supp. 3d 938, 945-46 (N.D. Tex. 2014). Because plaintiff here has not pointed to any source of law that provides a cause of action for either of its claims, the Declaratory Judgment Act itself provides no basis here for relief. For all of these reasons, the Commission's consultation claim lacks merit and is unlikely to succeed. Accordingly, Plaintiff's application for a temporary restraining order must be denied.

      **B.     Plaintiff Has Made No Showing of Irreparable Harm.**

A preliminary injunction cannot be entered only on a "possibility" of irreparable harm; "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 24. The same is true of a temporary restraining order. *See, e.g.*, *Allstate Settlement Corp. v. Doucette*, No. CIV.A. H-15-1130, 2015 WL 2091767, at *2 (S.D. Tex. May 5, 2015) (denying temporary restraining order because plaintiff failed to show likelihood of irreparable injury). "The jurisprudence of this Circuit reflects that

speculative injury is not sufficient to justify the issuance of a temporary restraining order or preliminary injunction." *Scott v. Moak*, No. CIV.A. 07-1161, 2008 WL 373470, at *2 (E.D. La. Feb. 8, 2008). To obtain the "extraordinary relief" of a preliminary injunction or temporary restraining order, a plaintiff must demonstrate "a presently existing actual threat"; the "possibility of some remote future injury" is insufficient. *Id.* (citing *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001)); *see also Aquifer Guardians v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011) ("The *Winter* standard requires [Plaintiff] to demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential— with admissible evidence.").

Here, Plaintiff fails to demonstrate that it imminently will suffer the concrete harm required for a preliminary injunction or a temporary restraining order. As an initial matter, Plaintiff provides no evidence to support a finding of harm. *See, e.g.*, *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005) ("The plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction."); *see also* Fed. R. Civ. P. 65 (to obtain temporary restraining order, plaintiff must produce "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result"). Plaintiff's theory of harm is tied to the supposed "security risk to Texans" posed by the resettlement of specific refugees. Compl. ¶ 7; *see also id.* at 10-11 (referring to "concerns about the safety and security of the citizenry of the State of Texas"). Since fiscal year 2011, 243 Syrian refugees have resettled in Texas. Yet Plaintiff does not explain how these specific refugees—mostly children, their parents, and in one case their grandparents—pose a danger to anyone anywhere, let alone to the State of Texas. Nor can any supporting evidence be found in Plaintiff's exhibits, which consist primarily of (1) agreements between Plaintiff and the IRC, and (2) declarations cursorily attesting to the truth of the facts alleged.

Further, any claim that these specific refugees imminently threaten the security of Texas is necessarily speculative. And to the extent Plaintiff's "concerns" are based on supposed dangers posed by refugees not yet scheduled to be resettled in Texas, any claim of harm would be even more speculative. *Cf. New York Reg'l Interconnect, Inc. v. F.E.R.C.*, 634 F.3d 581, 587 (D.C. Cir. 2011) ("This theory stacks speculation upon hypothetical upon speculation, which does not establish an actual or imminent injury.") (citation omitted). Indeed, as Plaintiff itself admits, it has not "assess[ed] the security risk posed by the refugees in advance of their arrival." Compl. ¶ 11; *see also id.* ¶ 7 (claiming refugees "*could well* pose a security risk") (emphasis added). Moreover, Plaintiff's reference to material support is wholly irrelevant; as explained above, the specific Syrian refugees to be soon resettled in Texas did not receive this exemption or are not believed to have received it. Accordingly, Plaintiff has failed to carry its burden that it imminently will suffer an actual and irreparable harm. Indeed, the Commission's claim of harm is so dependent upon a speculative chain of possibilities as to call into serious question whether it can make the showing of injury necessary to establish its Article III standing to maintain this suit. *See Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147 (2013).

### C. The Balance of Equities and the Public Interest Also Mandate Against a Temporary Injunction.

Finally, Plaintiff has failed to demonstrate—as it must—that the threatened irreparable injury outweighs the threatened harm that a temporary restraining order would cause the Government and unrepresented third parties, and that granting the injunction or order would not "be adverse to the public interest." *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986); *Bian v. Rice*, No. CIVA3:08CV1651L, 2008 WL 4442544, at *1 (N.D. Tex. Sept. 30, 2008); *Southdown, Inc. v. Moore McCormack Res., Inc.*, 686 F. Supp. 595, 596 (S.D. Tex. 1988). Courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) (citation

13

omitted). "[E]ven though irreparable injury may otherwise result to plaintiff," courts may postpone issuing an injunction "until a final determination of the rights of the parties" if the injunction would "adversely affect a public interest[.]" *Id.*

Here, the balance of equities and the public interest weigh heavily against Plaintiff's requested relief. As set forth above, Plaintiff has not shown that it will suffer any immediate and irreparable harm if the Court denies its request for a preliminary injunction or a temporary restraining order. Plaintiff makes no showing that the specific refugees to be resettled in Texas pose a danger to the "safety and security of the State's citizens," nor to the State's "exercise [of] its sovereign authority." *See* Complaint, at 11.

By contrast, the relief sought is in tension with the national interest of the United States as determined by the President. *See supra* at 3. *Cf. Haitian Refugee Ctr., Inc. v. Gracey*, 600 F. Supp. 1396, 1400 (D.D.C. 1985) *aff'd sub nom. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . ."); *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) (in challenge to South Carolina's immigration laws, "injury to the nation's foreign policy" weighs in favor of the United States in public-interest inquiry). It also would harm the humanitarian interests at stake. By definition, a refugee "is someone who has fled from his or her home country and cannot return because he or she has a well-founded fear of persecution based on religion, race, nationality, political opinion or membership in a particular social group." *See* Refugee Admissions, U.S. Dep't of State, available at http://www.state.gov/j/prm/ra/. In allowing such afflicted persons to resettle in the United States, "[t]he U.S. refugee resettlement program reflects the United States' highest values and aspirations to compassion, generosity and leadership." *Id. Cf. Arizona*, 132 S. Ct. at 2499 ("Discretion in the enforcement of immigration law embraces

immediate human concerns."). Delaying the resettlement of the refugees at issue here—including small children and their grandparents—would prolong their suffering and inflict further hardship upon them that is unjustified by any demonstration of harm by Plaintiff. Accordingly, the third and fourth factors weigh in favor of Defendants and the application for a temporary restraining order must be denied.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a temporary restraining order should be denied.

Dated: December 4, 2015

                                            Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
JOHN R. PARKER
United States Attorney
JOSEPH H. HUNT
Director
SHEILA M. LIEBER
Deputy Director
ANTHONY J. COPPOLINO
Deputy Director
JAMES J. GILLIGAN
Special Litigation Counsel

    */s/ Stuart J. Robinson*
STUART J. ROBINSON
MICHELLE R. BENNETT
Trial Attorneys
United States Department of JusticeCivil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, D.C. 20530
Tel: (202) 514-9239
Fax: (202) 616-8470
Email: stuart.j.robinson@usdoj.gov

*Attorneys for the Federal Defendants*