# Appendix

# Exhibit A



GOVERNOR GREG ABBOTT

**RECEIVED**

NOV 1 7 2015

OFFICE OF THE
HHS EXECUTIVE COMMISSIONER

November 17, 2015

Mr. Chris Traylor
Executive Commissioner
Texas Health and Human Services Commission
4900 North Lamar Boulevard, 4th Floor
Austin, Texas  78751-3247

Colonel Steven C. McCraw
Director
Texas Department of Public Safety
P.O. Box 4087
Austin, Texas  78773-4087

Dear Commissioner Traylor and Colonel McCraw:

As you are aware, I sent a letter to President Obama yesterday informing him that the State of Texas will not participate in the resettlement of Syrian refugees in the wake of recent deadly terrorist attacks in Paris.  I direct your agencies to use your full authority to comply with this direction.

In addition, I direct both agencies to communicate this directive to all local volunteer agencies and organizations that participate in the U.S. Refugee Resettlement Program.  I further direct Texas Health and Human Services Commission to immediately submit to the U.S. Department of Health and Human Services all necessary amendments to Texas' Refugee Resettlement State Plan.

Additionally, I direct the Texas Department of Public Safety to work with federal and local officials to ensure any refugees already in this state do not pose a risk to public safety.

Finally, in accordance with Section 752.003 of the Texas Government Code and 45 C.F.R. § 400.5, I appoint Cecile Young as the State Refugee Coordinator for Texas, to serve a term at the pleasure of the governor.

Sincerely,

Greg Abbott
Governor

GA:eek

# Exhibit B

| | | |
|---|---|---|
| **U.S. Department Of State**<br><br>**Federal Assistance<br>Award Coversheet** | 1. Assistance Type<br> Cooperative Agreement | |
| | 2. Award Number<br> S-PRMCO-16-CA-1005 | |
| | 3. Amendment Number | 4. Amendment Type |

**5. Recipient Name, Address and Contact Information**
International Rescue Committee, Inc.
122 E 42nd St Fl 12
New York, NY 10168-1299
UNITED STATES
Ph. 212-551-3000
Contact: Ms. Jennifer Sime

**6. Project Period**
From: 10/20/2015    Through: 09/30/2016

**7. Funding Period**
From: 10/20/2015    Through: 09/30/2016

**8. Program CFDA Number**
19.510

**9. Recipient Federal Tax I.D./DUNS Number**
DUNS: 078854940
EIN:  1135660870A6

**10. Type of Recipient**
U.S. Non-Profit Organization (501(c)(3))

**11. Award Title**
IRC FY2016 Reception and Placement Program

**12. Purpose**
To provide Reception and Placement (R&P) services to refugees admitted to the United States under the US Refugee Admissions Program (USRAP).

**13. Issued By**   Bureau of Population Refugees and Migration - Comptrollers
2201 C Street NW, 8 h Floor, SA-9
Washington, DC 20520
UNITED STATES

**14. Funds Certified By**
Ms. Pamela-Marie Y Thorn
Financial Management Analyst
10/20/2015

**15. Statutory Authority - Authorization**
MRAA (Migration and Refugee Assistance act)

**17. Statutory Authority  - Appropriation**
Migration and Refugee Assistance

**16. Agreement:**
The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and the applicable rules checked below and any subsequent revisions.

2 CFR 200
2 CFR 600
Approved Application Attached
Other – See Terms and Conditions

**18. Funding Distribution**

| | Total Prior Costs | Total New Costs | Amended Total Costs |
|---|---|---|---|
| **U.S. Share of Costs** | $0.00 | $2,505,778.00 | $2,505,778.00 |
| **Recipient Share of Costs** | $0.00 | $0.00 | $0.00 |
| **Total Costs** | $0.00 | $2,505,778.00 | $2,505,778.00 |

**19. Recipient Name, Title and Signature**
Ms. Kimberly Gildersleeve
_____
Name
Electronically Signed
_____
Signature

| Acting Director | 10/22/2015 |
|---|---|
| Title | Date |

**20. Grants Officer Name, Title and Signature**
Ms. Norin, Reasmy
_____
Name
Electronically Signed
_____
Signature

| Grants Officer | 10/20/2015 |
|---|---|
| Title | Date |

**21.  Accounting and Appropriation Data**
19___X11430009,2016,,1037,4122,2512,,,031000,,2016FDSTRRM1439,1037650510

| 22. Send Requests for Reimbursement to: |
|---|
| **Amount**<br>$2,505,778.00 |
| US Department of Health and Human Servic es' Payment Management System |

**23.** By signing this agreement, the recipient assures that it will comply with the terms and conditions of this award.  Recipient is required to sign and return this document within 10 business days of the signature of the Grants Officer to the Grants Office listed in Section 13.

Terms and Conditions attached:      ☒ Yes    ☐ No

DS-1909

5

# AWARD ATTACHMENTS

International Rescue Committee, Inc.                                    S-PRMCO-16-CA-1005

1. U.S. Department of State Award Provisions
2. Award Proposal Documents - Attachment A
3. U.S. Department of State Standard Terms and Conditions - Attachment B
4. Quarterly Status Report - Attachment C

International Rescue Committee                                          S-PRMCO-16-CA-1005

 **U.S. Department of State Award Provisions**

## 1. Purpose/Scope of Award:

a.  Purpose:  **International Rescue Committee (IRC)**, a non-governmental organization, (hereinafter referred to as the "Recipient") is hereby awarded a Cooperative Agreement to partially support the Recipient's expenses in administering the FY 2016 Reception and Placement Program as authorized under the applicable provisions of the Migration and Refugee Assistance Act of 1962, as amended, and the Immigration and Nationality Act, as amended (the "INA"). The Recipient shall:

1)  arrange for the reception and placement of refugees in the United States and offer appropriate assistance during their initial resettlement in the United States,

2)  provide refugees with basic necessities and core services during their initial period of resettlement, and

3)  in coordination with publicly supported refugee service and assistance programs, assist refugees in achieving economic self-sufficiency through employment as soon as possible after their arrival in the United States.

b.  The Recipient shall carry out the Agreement in accordance with its revised proposal dated September 23, 2015, and any revisions to which both parties agree to in writing.  The above-mentioned proposal is hereby incorporated by reference (Attachment A) and made an integral part of the Agreement. The period of this agreement shall be from October 1, 2015 through September 30, 2016.

c.  Statement of Objectives and Indicators: The Recipient agrees to:

1)  promote effective resettlement through community involvement including, but not limited to, coordination with ethnic and other community-based, public, and private organizations and through consultation and coordination with state and local public officials involved in assisting refugees;

2)  promote refugee placement through agencies that maximize the use of private resources and programs;

3)  promote the placement of all refugees in areas conducive to the attainment of economic self-sufficiency;

4)  maintain the capability and flexibility to receive and place new caseloads, including refugees with special needs, and to shift program and staff resources to reflect changing refugee populations and arrival patterns;

5) ensure that R&P core services and basic needs support are made available in an appropriate language to refugees through its nationwide network of affiliated offices;

6) ensure that each refugee receives the following R&P basic needs support and core services according to standards included in the Cooperative Agreement within the specified time frame, and that provision of such services is well-documented in case files:

    a) Sponsorship assurance;

    b) Pre-arrival planning;

    c) Reception;

    d) Basic needs support for at least 30 days, including the provision of: safe, sanitary, and affordable housing; essential furnishings; appropriate food, food allowances and other basic necessities; necessary clothing; assistance applying for social security cards; assistance in obtaining health screenings and assistance accessing other necessary health and mental health services; assistance in obtaining appropriate benefits, other social services, and English language instruction; assistance with enrollment in employment services; assistance registering children in school; and transportation to job interviews and job training;

    e) At least two home visits within the first 30 days and a third home visit to permanent housing if the refugee moves from temporary housing within the R&P period;

    f) Case management, including the development and implementation of individualized service plans during the initial 30-day period;

    g) Cultural orientation, with appropriate language interpretation as needed;

    h) Assistance to refugee minors resettled in non-parental family units, as required: initial placement suitability assessments; orientation to U.S. child welfare requirements; assistance regarding guardianship and legal obligations in caring for the child; regular and personal contact; and follow-up assessments and suitability determinations.

7) ensure effective monitoring of local affiliates performing R&P services in accordance with the Cooperative Agreement.

8) achieve R&P performance outcomes, specifically:

    a) Refugee is in a safe, stable environment

        i. Refugee is picked up at the airport upon arrival with appropriate language interpretation as needed

        ii. Refugee is placed in a safe dwelling

        iii. Refugee is placed in an affordable dwelling

        iv. Refugee has basic necessities

    b) Refugee can navigate appropriate and relevant systems

        i. Refugee can access/use appropriate transportation

        ii. Refugee obtains own food and basic needs

        iii. Refugee obtained social security card and other identification as needed

        iv. Refugee accesses health care

        v. Refugee demonstrates ability to contact emergency services

        vi. Refugee children are enrolled in school within 30 days of arrival

        vii. Refugee knows where to get assistance to file paperwork to bring family members to the United States

        viii. Refugee knows how to ask for interpretation services

Page 3 of 43

    c)   Refugee family is connected to means of ongoing support for self/family
- i.   Refugee is connected to or enrolled in eligible services
- ii.   Refugee is financially supported (or self-sufficient)
- iii.   Refugee can explain where the household money will come from when the initial assistance is finished

    d)   Refugee understands surroundings and situation
- i.   Refugee knows his/her address, knows how to make phone call, and how to be contacted
- ii.   Refugee understands the effects of moving
- iii.   Refugee knows the role of the agency and expectations of the agency and self
- iv.   Refugee has a basic understanding of U.S. laws and cultural practices

9)   ensure that R&P program and performance information is accessible to the public.

**2. Grants Officer Contact Information:**

Reasmy Norin
Grants Officer
Office of the Comptroller
Bureau of Population, Refugees, and Migration
United States Department of State
2201 C Street, NW, 8th Floor, SA-9
Washington, DC 20520
NorinRC@state.gov
Phone 202-453-9233
Fax 202-453-9395

**3. Grants Officer Representative (GOR):**

Irving Jones
Program Officer
Office of Refugee Admissions
Bureau of Population, Refugees, and Migration
United States Department of State
2201 C Street, NW, 8th Floor, SA-9
Washington, DC 20520
JonesJI2@state.gov
Phone 202-453-9248
Fax 202-453-9393

**4. Post-Award Compliance:**

Department of State Standard Terms and Conditions (Attachment B) are incorporated by reference and made part of this Notice of Award.  Electronic copies containing the complete text are available at: https://statebuy.state.gov, under Resources select Terms and Conditions to access the terms and conditions.

International Rescue Committee                                      S-PRMCO-16-CA-1005

The Recipient and any sub-recipient, in addition to the assurances and certifications made part of the Notice of Award, must comply with all applicable terms and conditions during the project period.

**5.  Authorized Budget Summary:**

All expenditures paid with funds provided by this Agreement must be incurred for authorized activities, which take place during this period, unless otherwise stipulated.

Payment of funds under this Agreement will not be disbursed until the DOS has been assured that the Recipient's financial management system will provide effective control over and accountability for all Federal funds in accordance with 2 CFR 200.300 – 200.303.

| Budget Categories | Amount |
|---|---|
| 1. Personnel | $279,487 |
| 2. Fringe Benefits | $82,449 |
| 3. Travel | $13,066 |
| 4. Equipment | $901 |
| 5. Supplies | $48 |
| 6. Contractual | $0 |
| 7. Construction | $0 |
| 8. Other Direct Costs<br>  a.  Refugee Per Capita  (915*$1,125): $1,029,375<br>  b.  Affiliate Per Capita (915*$900): $823,500<br>  c. Other:<br>    Professional Fees:  $1,250<br>    Space/Utilities:  $46,786<br>    Other: $31,761 | $1,932,672 |
| 9. Total Direct Costs (lines 1-8) | $2,308,622 |
| 10. Indirect Costs (8.54% provisional) | $197,156 |
| 11. Total Costs (lines 9-10) | $2,505,778 |
| 12. Recipient Share | $0 |

a.      Any anticipated purchase of non-expendable equipment, such as computers or vehicles with an acquisition cost of $5,000 or more per unit and were not part of the approved budget (Attachment A to this agreement), requires the prior written approval of the Bureau.

b.      If any part of the costs of goods and services charged under this agreement are collected from or reimbursed by the refugees or other sources, such collections shall be paid promptly to the Department or off-set against charges to the agreement; thereby, ensuring that no charges to this agreement results in duplicated reimbursement to the Recipient.

c.      Local Offices/Affiliates and Services to Refugees Per Capita Grant

International Rescue Committee                                        S-PRMCO-16-CA-1005

    1)   The Bureau shall provide the Recipient a fixed per capita grant of $2,025.00 per refugee admitted under Section 207 of the INA who is assigned to the Recipient pursuant to this agreement for a total of up to 915 refugees who are expected to arrive in the United States during the period October 1, 2015 through September 30, 2016.  It is the intent of the Bureau that the per capita grants shall be spent in their entirety on expenses related to meeting the material needs of refugees and providing services to them, within the parameters of this subsection 5.c.

    2)   Of the $2,025.00 fixed per capita grant:
       a)  At least $1,125.00 (refugee per capita) is to be provided in its entirety to the affiliate to which the refugee is assigned and is to be used to cover payments made by the affiliate to or on behalf of individual refugees for cash disbursement or for material goods, as needed, to meet the requirements of the program;
         i.  No less than $925.00 of this $1,125.00 must be spent on behalf of the refugee by the affiliate to which the refugee is assigned during that refugee's R&P service delivery period;
         ii.  Up to $200.00 of this $1,125.00 may be spent on behalf of other vulnerable refugees assigned to the same affiliate who have unmet needs during their R&P period;

       b)  No more than $900.00 (affiliate per capita) may be used to partially cover the actual expenses of the affiliates to which refugees are assigned in providing reception and placement services, including expenses that will lower the client-to-staff ratio, support positions that will coordinate volunteers or develop resources for the R&P program, deliver cultural orientation to refugees, and/or otherwise improve the quality of the R&P services received by refugees.
       c)  The Recipient will demonstrate through the reporting required under this agreement that the amounts funded for the per capita grants were provided by the Recipient in their entirety to affiliates based on the total number of refugees assigned to the Recipient during the period of October 1, 2015 through September 30, 2016.

    3)   Payment of the amounts specified in subsection 5.c.2(a) shall be made only for the number of assigned refugees who actually arrive in the United States during the period October 1, 2015 through September 30, 2016, but in no case shall the total payment of refugee per capita funds exceed $1,029,375 during this period.

    4)   Payment of the amounts specified in subsection 5.c.2(b) may be made in advance of actual refugee arrivals and shall be for the actual expenses of affiliates up to $823,500 OR shall be made only for the number of assigned refugees who actually arrive in the United States during the period October 1, 2015 through September 30, 2016, whichever is higher. In no case shall the total payment of affiliate per capita funds exceed $823,500 during this period.

    5)   This agreement may be amended to reflect the actual number of refugee arrivals during the period October 1, 2015 through September 30, 2016 and to adjust the amount of funds accordingly.

d.      The funds awarded under this agreement may be used only for the performance of the Recipient's responsibilities authorized herein for the provision of reception and placement

services and may not be used to cover expenses of other activities or services that may be provided to refugees during their resettlement.  For example, funding provided under this agreement shall not be used to cover any expenses of collecting the IOM Promissory Note.

e.      The affiliate per capita funds earned under this agreement must be used in their entirety to cover affiliates expenses and shall not be used to cover national management expenses, as specified in subsection 5.c.2.

f.      The refugee per capita funds earned under this agreement must be used in their entirety to cover cash disbursements to refugees and/or purchases of material goods on their behalf at the Recipient's affiliate for which the refugee is assigned and shall not be used to cover national management expenses, as specified in subsection 5.c.2.

g.      In the event that the Recipient's activities related to the performance of its responsibilities under this agreement are also eligible for funding under other federal government grants or agreements, the Bureau and the Recipient shall consult each other and any other federal agency concerned to prevent attribution of the same expenditures to two (2) separate federal funding agreements.

h.      National Management.  Any unexpended funds available to the Recipient for national management expenses at the end of the validity period of this agreement must be returned to the Bureau and may not be used to cover affiliate expenses or for payments to or on behalf of refugees.

i.      Per Capita Funds

1)      Any unexpended per capita funds designated for affiliates expenses may be used to continue authorized basic needs support and core services beyond the R&P period for refugees assigned under this agreement, excluding payments to or on behalf of refugees which must be expended by the end of the R&P period.

2)      Per capita funds designated for payment to or on behalf of each refugee may be used only to cover direct payments to or on behalf of each refugee and must be expended by the end of their R&P period.  A minimum of $925 per capita must be spent on each refugee.

3)      Up to $200 per capita of funds designated for payment to or on behalf of refugees may be used only to cover direct payments to or on behalf of any refugee placed at the affiliate that received the per capita.

4)      All per capita funds earned under this agreement, however, must be expended no later than three (3) months following September 30, 2016 from which funded and reported as part of the final or interim final financial report for the period October 1, 2015 through September 30, 2016.  Funds remaining at the end of the above-specified period shall be returned to the Bureau.

Page 7 of 43

5)     Any interest accrued on per capita funds made available under this agreement may be expended only (1) for the Recipient's responsibilities under this agreement; and (2) within the same time period specified in paragraph 8 above.  Interest remaining at the end of such period shall be returned to the Bureau.

6)     With the written approval of the Bureau, the Recipient may enter into funding arrangements with other voluntary organizations participating in the Bureau's initial reception and placement program that will ensure that each organization is reimbursed for the actual number of refugees to whom it has provided services required by this agreement.

j.   Transportation.  Funds awarded under this agreement may not be used for travel outside the fifty (50) United States without the prior written approval of the Bureau.  All approved international travel to be paid with funds awarded under this agreement shall be performed on U.S. flag carriers to the extent such service is available in accordance with the provisions of the "Federal Travel Regulations."

## 6.  Payment Method

a.   Payments under this award will be made through the U.S. Department of Health and Human Services Payment Management System (PMS).  The Payment Management System instructions are available under the PMS website and can be accessed at the following address: http://www.dpm.psc.gov/.  Recipients should request funds based on immediate disbursement requirements and disburse funds as soon as possible to minimize the Federal cash on hand in accordance with the policies established by the U.S. Treasury Department and mandated by the OMB Regulations.

b.   Requests for reimbursement of National Management Expenses shall be submitted separately from requests for other funds and only in amounts that are required to meet the immediate cash needs of this activity.

c.   Requests for payment of the per capita shall be submitted only for those assigned refugees who have actually arrived in the United States.

## 7.  Reporting and Monitoring

The Recipient must submit required program, financial, and inventory reports to the Bureau's Office of the Comptroller through the GrantSolutions grants management System at www.grantsolutions.gov.  The Recipient must submit required reports to the Office of the Comptroller using the Grant Notes functionality for this agreement number.  The subject line of the Grant Note transmitting the report must include the Report Type and Reporting Period.

The Recipient is required to submit quarterly program and financial reports based on the schedule outlined below.  The first page of the Performance Progress Report Form (SF PPR) must be submitted with all program reports.  The Federal Financial Report (FFR SF-425/SF-425a) must be submitted for all financial reports.  These forms can be accessed at:

Page 8 of 43

https://www.statebuy.state.gov . **Failure to comply with these reporting requirements may jeopardize the Recipient's eligibility for future Agreements.**

The Recipient must submit performance reports using OMB-approved government-wide standard information collections when providing performance information. As appropriate in accordance with above mentioned information collections, these reports will contain, for each Federal award, brief information on the following unless other collections are approved by OMB:

a.  A comparison of actual accomplishments to the objectives of the Federal award established for the period. Where the accomplishments of the Federal award can be quantified, a computation of the cost (for example, related to units of accomplishment) may be required if that information will be useful. Where performance trend data and analysis would be informative to the Federal awarding agency program, the Federal awarding agency should include this as a performance reporting requirement.

b.  The reasons why established goals were not met, if appropriate.

c.  Additional pertinent information including, when appropriate, analysis and explanation of cost overruns or high unit costs.

Program Progress Report Schedule and Requirements:

| Quarter Start Date | Quarter End Date | Report Due Date |
|---|---|---|
| October 1, 2015 | December 31, 2015 | January 31, 2016 |
| January 1, 2016 | March 31, 2016 | April 30, 2016 |
| April 1, 2016 | June 30, 2016 | July 31, 2016 |
| July 1, 2016 | September 30, 2016 | December 31, 2016 |

The final three (3) month report should also contain a brief summary of the activities carried out during the full period of the agreement.

Each report should address the objectives and indicators set forth in Section 1.c. and the extent to which they were accomplished.  The Performance Progress Report (SF-PPR) is a standard, government-wide performance reporting format available at: http://www.whitehouse.gov/omb/grants_forms/.  Recipients must submit the signed SF-PPR cover page with each program report.

**Quarterly R&P Program Report**
The Recipient shall submit quarterly a brief summary of:
1)  program activities, such as conferences, workshops, and training or other activities funded through this agreement;
2)  the Recipient's affiliate monitoring activities to include findings and recommendations on each affiliate monitored;

Page 9 of 43

3)  a discussion of actions taken to address any identified weaknesses in R&P core service delivery, including follow-up on corrective actions taken as a result of prior Recipient or Bureau monitoring;

4)  evidence of final compliance with all prior Recipient or Bureau monitoring findings and recommendations; and

5)  the number and percentage of affiliates in compliance with the requirements for community consultations, as well as best practices and issues that prevent adequate resettlement in a given community or result in changes in the Recipient's placement plans.

## Annual Report

The Recipient shall submit no later than March 31, 2017, a report to be submitted by the Bureau to Congress pursuant to Section 412(b)(7)(E) of the INA.  The report will be considered timely if submitted on or before the due date.  Such report shall describe for the period October 1, 2015 through September 30, 2016:

1)  the number of refugees placed by county of placement and the total expenditures incurred during the year, including the proportion of such expenditures used for administrative purposes (National Management) and for provision of services (Local Offices/Affiliates and Payments to or on Behalf of Refugees);

2)  to the extent the information is available, the Recipient will make its best effort to determine the proportion of refugees placed during the agreement period by the Recipient and who, on September 30, 2016, are receiving publicly funded cash or medical assistance;

3)  the Recipient's program to monitor placement of the refugees and the activities of its affiliates;

4)  the efforts by the Recipient and its affiliates to coordinate with local social service providers so as to avoid duplication of services;

5)  the efforts by the Recipient and its affiliates to notify public welfare offices of refugees who have been offered employment and to provide documentation to public welfare offices to which refugees have applied for cash assistance concerning cash or other resources directly provided to such refugees;

6)  the efforts of the Recipient's affiliates to inform appropriate public health agencies of the arrival of refugees known to have medical conditions affecting the public health and requiring treatment; and

7)  any complaints received from beneficiaries about provision of services by the Recipient pursuant to this agreement.

## R&P Period Reports

A copy of the R&P period report form will be provided to the Recipient.  Data from this form will be submitted to the RPC no later than the 15th day of the second month following the end of the R&P period, and shall be considered timely if electronically submitted on or before the due date.  The report shall be submitted to the RPC at Incoming-Datafiles@wrapsnet.org. The Recipient will retain the reported information for a period of not less than one year from the date of arrival, and will make it available for review by the Bureau upon request.

Page 10 of 43

International Rescue Committee                                    S-PRMCO-16-CA-1005

## Federal Financial Report Schedule and Requirements:

Financial reports shall be submitted within thirty (30) days following the end of each calendar year quarter (January 30th, April 30th, July 30th, and October 30th) during the validity period. A preliminary final financial report covering the entire period of the agreement shall be submitted within ninety (90) days after the expiration date of this agreement and on March 31, 2017. This preliminary final report shall include the total charges for each budget category reflected in Section 5 including charges for post-performance activities such as audits and evaluations. Should the Recipient have awarded $15,000 or more to a sub-recipient for the implementation of a portion of this project, the reports shall identify the name and amount of funds given to each sub-recipient organization.

Should the funds provided under this cooperative agreement reimburse the Recipient for only a portion of the total costs of this project with additional costs being covered from other Federal or private resources, the financial reports required by the Bureau must reflect the costs to be charged to the Bureau's cooperative agreement and those costs to be charged to other financial resources for the total cost of the project.

Reports reflecting expenditures for the Recipient's overseas and United States offices shall be completed in accordance with the Federal Financial Report (FFR SF-425) and submitted electronically in the Department of Health and Human Services' Payment Management System and transmitted as a Grant Note through www.grantsolutions.gov.

Expenses to be charged against this agreement must be for actual costs incurred for authorized activities that are adequately documented and that can be confirmed through an audit. Expenses based on an average or prorated share of costs that do not represent individually identified costs or those that cannot be specifically confirmed through an audit shall not be charged to or reported under this agreement.

Should the Recipient receive refunds or rebates after the reporting period, these must be returned with a revised preliminary final financial report within thirty (30) days of the receipt of such refunds or rebates.

For the Recipient that has an approved USG indirect cost rate: A final financial report, including any allowable post performance charges for an audit and/or an evaluation, shall be submitted within sixty (60) days from the date the Recipient countersigns an indirect cost rate agreement with its cognizant government agency that establishes final rates applicable to the validity period of this agreement. This final financial report shall have the authorized charges detailed by the time period covered by each different indirect cost rate in effect during the validity period of this agreement.

## Reconciliation of Claimed Refugee Sponsorships

The Recipient shall reconcile with the Refugee Processing Center within sixty (60) days its claimed arrivals each month._A final summary of the Recipient's claimed arrivals for the period October 1, 2015 through September 30, 2016 must be reconciled with the Refugee Processing

Page 11 of 43

Center no later than December 31, 2016.

**Inventory Report**

A report shall be submitted within thirty (30) days prior to the expiration of this agreement listing all items and purchase price of all non-expendable tangible personal property having a useful life of more than one year and having a current per unit fair market value of $5,000 or more per unit which were purchased with funds provided under this agreement. This report must include the following information for each item purchased: description, date of purchase, serial number, and the country in which the item was used.

This required inventory report shall include any items of non-expendable tangible personal property that were purchased under a previous Bureau funding arrangement that continue to be used in activities funded under this agreement.

The required inventory report shall also include the Recipient's specific recommendations for the disposition of each item of non-expendable tangible personal property. In certain circumstances, the proposed disposition may include a recommendation to retain specified items for continued use in other Bureau funded activities or similar activities carried out by the Recipient. If such property is no longer required for authorized activities, a recommendation for final disposition, e.g., sale, donation or disposal, shall be specified.

**Quarterly Status Report**

The Recipient shall submit calendar quarterly status reports, in the formats attached hereto as Attachment C. Financial reports shall be submitted within thirty (30) days following the end of each calendar year quarter (January 30th) during the validity period and transmitted as a Grant Note through www.grantsolutions.gov. Proposed revisions or adjustments to the report may only be made within the subsequent sixty (60) days following the report deadline for each calendar quarter or ninety (90) days from the end of the calendar quarter. Adjustments to direct costs proposed subsequently to this ninety (90) day period will not be considered for reimbursement under this agreement, except for possible charges for post-performance activities such as audits, evaluations and adjustments for indirect costs.

In recognition of the delay in determining final per capita earnings based on final reconciliation of arrivals, the Recipient may adjust the allocation of expenses between per capita and private resources, but may not increase expenses, during the one hundred twenty (120) day period for submission of the final expenditure report.

A final or interim final financial report for expenditures together with a summary report of the previously reported quarterly expenditures shall be due March 31, 2017. This report is to include any proposed revisions or adjustments to direct costs and to include earned income based on the reconciliation of arrivals with the Refugee Processing Center. After this date, no revisions or adjustments of direct expenditures or adjustments of direct costs charges or earned per capita income will be recognized for consideration under this agreement.

Page 12 of 43

**For National Management expenses**: In addition to the SF-425 required above, a listing of total expenditures by the Items of Expenditure Categories set forth in Attachment C of this agreement reflecting separately the costs being charged to this agreement and those charged to other sources. The quarterly line item expenditure reports must be transmitted as a Grant Note through www.grantsolutions.gov.

**For Local Office/Affiliate and Payments to or on Behalf of Refugees expenses:** In addition to the SF-425 required in paragraph (a) above, a reporting of expenditures shall be completed as set forth in Attachment C of this agreement that indicate per capita income earned during the reporting period, expenditures incurred chargeable to per capita funds, and the total amount of non-Federal funds used to augment the per capita funds.  This information is to be provided by affiliate noting the affiliate RPC code and city, number of refugees arrived, affiliate expenses per capita expenditure, and per capita expenditures to or on behalf of refugees during the quarter as set forth in Attachment C. The quarterly expenditure reports must be transmitted as a Grant Note through www.grantsolutions.gov.

Availability of Per Capita Funds

A written statement must be submitted on or before December 31, 2016 reporting the amount of per capita funds and accrued interest unexpended and available as of October 1, 2016.  This statement must confirm the amount of those funds that were expended and reported as a part of the quarterly financial reports for the period October 1, 2015 through September 30, 2016.

Should the Recipient have any unexpended per capita funds as of the financial report due on March 31, 2017, such funds must be returned to the Bureau no later than April 30, 2017.

IOM Promissory Note Repayments

The Recipient shall submit quarterly reports of transportation loan repayments indicating amounts repaid and remitted to the International Organization for Migration within thirty (30) days of the end of each reporting period.  The reports shall be due on or before January 30, 2016, April 30, 2016, July 31, 2016, and October 31, 2016.

**8.  Acknowledgement of DOS or USG involvement:**

The Recipient shall acknowledge the involvement of the USG, as outlined in the Department of State Standard Terms and Conditions, Attachment B.

**9.  Waiver of the Publications for Professional Audiences:**  N/A

**10. Pre-Award Costs:**

The Department of State hereby agrees to reimburse the recipient for costs incurred and considered allowable within the amounts of the Authorized Budget – Section 5.  This pre-award condition applies to costs incurred from October 1, 2015 until the date of the award.

Page 13 of 43

International Rescue Committee                                    S-PRMCO-16-CA-1005

**11. Substantial Involvement**:

The Recipient shall carry out its operational and administrative responsibilities hereunder in close coordination with and under the direction of the Bureau.  For the information of the Recipient, responsibilities relevant to this agreement are allocated as follows:

   a.  Bureau

     1)  Office of Refugee Admissions

        Acting as the Grants Officer's representative:

        a)  Provides overall policy guidance and program direction.

        b)  Reviews and comments on proposed budget for the Recipient.

        c)  Reviews and comments on proposed changes or revisions in terms of this agreement.

        d)  Monitors and evaluates the general performance of the Recipient's operations under this agreement to ensure that the established responsibilities and objectives are being successfully met, maintains contact, including site visits and liaison, with the Recipient, assists the Grants Officer in the review of required Recipient Program and Financial Progress Reports to verify timely and adequate performance, and provides the Bureau regular written reports on whether performance is in compliance with all the terms and conditions of this agreement.

     2)  Office of the Comptroller

        a)  Reviews and negotiates with the Recipient's headquarters the Recipient's budget and any subsequent requests for funding.

        b)  Prepares and executes the cooperative agreement, interprets the terms thereof, arranges for payment, works with the Recipient's headquarters for the overall administration of the funded activities, and is the mandatory control point of record for all official communications and contacts with the Recipient that may affect the budget, the project scope, or terms and conditions of the award.

        c)  Considers requests for amendments to the cooperative agreement and, upon determination of appropriateness, prepares and executes formal amendments to the cooperative agreement.  Only the Grants Officer may amend the cooperative agreement.

        d)  Monitors and evaluates the Recipient's performance in providing refugee transportation loan services.

Page 14 of 43

**12. Program Income**: N/A

**13. Cost-Sharing:**  N/A

**14. Sub-recipients:** N/A

**15. Additional Bureau Specific Requirements:**

Responsibilities of the Recipient.  The Recipient shall perform its responsibilities under this agreement in coordination with the Bureau and in a manner consistent with United States law and policy.

a.   Program Management

1) The Recipient shall provide the core services specified in section 16 below to refugees who are assigned to it under this agreement and who arrive in the United States during the period of this agreement in a manner consistent with United States law and policy.

2) In compliance with the Bureau's policy that all funded activities be implemented in a manner that fully meets the standard of conduct established by the Inter-Agency Standing Committee (IASC) Task Force on Protection from Sexual Exploitation and Abuse in Humanitarian Crises, ensure that the activities conducted with funds provided under this agreement are implemented in accordance with the Recipient's established code of conduct submitted to the Bureau in its proposal (Attachment A). Should any change be made to the Recipient's code of conduct during the validity period of this agreement, inform the Bureau in writing within thirty (30) days of the changes for consideration of whether the revised code continues to meet the Bureau's standard of core principles.

3) The Recipient is reminded that U.S. Executive Order and U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism.  It is the legal responsibility of the Recipient to ensure compliance with these Executive Orders and laws.  This provision must be included in all sub-contracts/sub-awards issued under this agreement.

4) The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons.  None of the funds made available under this agreement may be used to promote, support, or advocate the legalization or practice of prostitution.  Nothing in the preceding sentence shall be construed to preclude assistance designed to ameliorate the suffering of, or health risks to, victims while they are being trafficked or after they are out of the situation that resulted from such victims being trafficked.  This provision shall be incorporated into all sub-agreements under this agreement.  The Recipient does not promote, support, or advocate the legalization or practice of prostitution.

5)   Branding and Marking Strategy. State in all appropriate publications and printed descriptions, including press releases, annual reports, and financial statements that reception

Page 15 of 43

and placement activities conducted under this agreement are paid for, in part, through financial assistance provided by the Department of State.

6)   Accord the Bureau and its authorized representatives the legally enforceable right to examine, audit and copy, at any reasonable time, all records in its possession pertaining to this agreement.

7)   Assist the Bureau, as appropriate, in evaluating the Recipient's performance under this agreement by facilitating access to all relevant records and to all persons directly involved under this agreement.

8)   Permit the Bureau to make available to the public the Recipient's performance outcomes, the Bureau's monitoring reports on the Recipient and its affiliates, and the Recipient's final consolidated placement plan, in a manner to be determined by the Bureau.

b.   Prior Approval Requirements and Revision of Budget and Program Plans.  The Recipient must submit all requests for prior approvals and revisions required under this award in writing to the GO/GOR, before the project period end date indicated on form DS-1909. Final approval is subject to review and acceptance by the GO.  The transfer of funds among direct cost categories or programs, functions and activities for which the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total approved budget (see 2 CFR 200.308(e)) requires prior approval by the GO by way of amendment.

## 16. Specific Conditions:   Reception and Placement Program Core Services

**a.       Definitions**

For the purposes of this agreement and the Attachments thereto, which are an integral part of it:

1)   **"Refugee"** means a person admitted to the United States under section 207(c) of the Immigration and Nationality Act, as amended, or a person to whom eligibility for the resettlement assistance available to individuals admitted under section 207(c) has been extended by statute.

2)   "**Agency**" means a public entity or a private nonprofit organization, registered as such with the Internal Revenue Service under 26 U.S.C. 501(c)(3), having a cooperative agreement with the Bureau for reception and  placement services.

3)   "**Affiliate**" means:

a)   a regional office of an Agency, which is part of the corporate structure of the Agency; or

Page 16 of 43

b) a public entity or a private nonprofit legal entity which has accepted in a written agreement with the Agency responsibility to provide, or ensure the provision of, reception and placement services to certain refugees sponsored by an Agency; or

c) a sub-office of an entity referred to in subparagraph 2 above that the Recipient proposes for affiliate status in the proposal for the FY 2016 program or during the course of the year, and that the Bureau agrees in writing may serve as an affiliate. A "sub-office" is defined as an office where reception and placement services are provided and refugee case files are maintained during the reception and placement period with management oversight provided by a nearby affiliate office.

4) "**Local co-sponsor**" means an established community group, such as a congregation or service organization, which has accepted in a written agreement with an Agency responsibility to provide, or ensure the provision of, reception and placement services to certain refugees sponsored by an Agency. Individuals or informal groups may not serve as local co-sponsors. Local co-sponsors differ from volunteers in that they agree in writing to accept responsibility for performing certain services required in this agreement.

5) "**The Refugee Processing Center"** (RPC) means the center located at 1401 N. Wilson Boulevard, Arlington, Virginia 22209, which will manage, on behalf of the Bureau, data processing of refugee cases.

6) "**Assurance**" means a written commitment, submitted by a Recipient, to provide, or ensure the provision of, the basic needs support and core services specified in subsections 16.3.g.1 through 16.3.g.6 of the cooperative agreement for the refugee(s) named on the assurance form.

7) **"Reception and Placement period"** (R&P period) means an initial thirty (30)-day period that can be extended up to ninety (90) days after arrival should more than thirty (30) days be required to complete R&P Program requirements.

8) "**Employable refugee**" means any refugee who is between the ages of 18 and 64 other than a refugee who:

a) is required to be in the home to care for a child under one year of age or other fully dependent person (only one adult per household unit may be considered to be in this category); or
b) is unable to work for physical or mental health reasons.

9) "**Loan Services**" means those activities deemed appropriate through consultation with the International Organization for Migration and the Bureau to ensure that maximum efforts are made to conduct required loan activities for refugees signing Promissory Notes executed by IOM for funds advanced by the Bureau to cover transportation costs to the United States.
10) "**Appropriate language interpretation/translation**" means interpretation/translation which allows for communication with the refugee in his/her native language, if possible, or in a common language in which the refugee is fluent.

International Rescue Committee                                          S-PRMCO-16-CA-1005

**b.      Performance Standards**

The Bureau will evaluate Recipient performance on an ongoing basis and will expect timely Recipient cooperation to remedy any identified weaknesses in affiliate, sub-office, or Recipient performance.  The Bureau may find it necessary to restrict placement of cases to affiliate offices for a period of time to allow for corrective action by the national Agency.

The Recipient will permit the Bureau to monitor its affiliates upon advance notice, and, when Bureau on-site or telephonic monitoring results in recommendations for modifications in the operations of an affiliate of the Recipient, respond to the Bureau's recommendations in writing and ensure that required modifications are implemented at the local level within the specified time-frame.  If the Recipient fails to comply with this provision, the Recipient may be prohibited by the Bureau from utilizing funds received under this agreement for further resettlement by the affiliate.

The Bureau will evaluate Recipient performance in the following areas:

1) Reception and Placement Performance Outcomes
   a)    Refugee is in safe, stable environment
      i.    Refugee is picked up at the airport upon arrival with appropriate language interpretation as needed;
      ii.   Refugee is placed in a safe dwelling;
      iii.  Refugee is placed in affordable dwelling; and
      iv.   Refugee has basic necessities.

   b)    Refugee can navigate appropriate and relevant systems
      i.    Refugee can access/use appropriate transportation;
      ii.   Refugee obtains own food and basic necessities;
      iii.  Refugee obtained social security card and other identification as needed
      iv.   Refugee accesses health care;
      v.    Refugee demonstrates ability to contact emergency services;
      vi.   Refugee children are enrolled in school within thirty (30) days of arrival;
      vii.  Refugee knows where to get assistance to file paperwork to bring family members to the U.S.; and
      viii. Refugee knows how to ask for interpretation services.

   c)    Refugee family is connected to means of ongoing support for self/family
      i.    Refugee is connected to or enrolled in eligible services;
      ii.   Refugee is financially supported (or self-sufficient); and
      iii.  Refugee can explain where the household money will come from when the initial assistance is finished.

   d)    Refugee understands surroundings and situation
      i.    Refugee knows his/her address, knows how to make a phone call, and how to be contacted;
      ii.   Refugee understands the effects of moving;

Page 18 of 43

International Rescue Committee                                        S-PRMCO-16-CA-1005

   iii. Refugee knows the role of the agency and expectations of the agency and self; and

   iv. Refugee has a basic understanding of U.S. laws and cultural practices.

2) National Agency Program Management

 a) Staff training

Headquarters shall have in place a formal plan for training new headquarters staff and affiliate directors, and should ensure that each affiliate has a structured training plan for each of its new employees. Headquarters shall also have in place a mechanism for training existing staff at all levels on changes that occur in the R&P Program, as well as local and national legislative changes that affect refugee resettlement. Training for new and existing staff at all levels shall include the national and/or local established code of conduct.

 b) Communication with Affiliates on Policy Changes

Headquarters shall have in place mechanisms for informing affiliates of policy changes and shifts in expected refugee arrivals. Headquarters shall also have in place mechanisms for informal communications with affiliates on everyday resettlement issues.

 c) Strategy for Site Selection

Headquarters shall have in place a coherent strategy for selecting resettlement sites and placement of individual refugee cases. That strategy should show evidence of adaptability to new circumstances, e.g., influx of new populations, welfare or economic changes in any given location. Such strategy should also provide adequate justification for continued use of a site with poor employment outcomes.

 d) Corrective Action on Program Deficiencies

Headquarters shall maintain records of corrective actions taken and evidence of final compliance by affiliates in response to recommendations made by headquarters and Bureau monitors during on-site and telephonic monitoring reviews. These records should show evidence of follow-up as needed, and should address each recommendation made by the monitors.

 e) Employment of Refugees

Although the Recipient is not required to effect job placement through its own efforts, this agreement requires that the Recipient provide employment orientation and assistance with enrollment in appropriate employment services. Refugee program service providers or other resources available in the community may accomplish job placement. Since employment is recognized as one of the significant elements in successful resettlement, the Recipient will determine the employment status of each employable refugee at the end of the R&P period.

 f) Out-Migration of Refugees

Page 19 of 43

The Bureau will review the Recipient's out-migration performance as a part of its annual review.

g)    On-Site Affiliate Monitoring

i.  Frequency of Monitoring
Headquarters shall maintain records verifying that it conducts on-site monitoring of each affiliate and sub-office in its network at least every three (3) years, unless the office has resettled fewer than twenty-five (25) refugees during the previous fiscal year.  Headquarters should perform and document monitoring of a new affiliate or sub-office during its first year of operation. Headquarters should also perform and document monitoring visits to affiliate offices that have experienced a turnover in resettlement directors within one (1) year of the new director's appointment, which resets the three (3)-year monitoring cycle for that affiliate. Bureau exceptions to these requirements, which should be requested only in exceptional circumstances, should also be documented.

ii.  Written Reports
Headquarters monitors shall write a formal report for each monitoring visit they conduct.  The reports shall include:
(a)   a description that quantifies and qualifies how the affiliate coordinates volunteers or develops private resources for Reception and Placement activities;
(b)   a description of the affiliate's policy on how refugee per capita funds beyond the $925 per person minimum are spent;
(c)   a narrative statement describing the affiliate's R&P program, including quality of housing, local services, and the local resettlement environment;
(d)   evidence of a review of the affiliate's performance and compliance with R&P requirements, including evidence of refugee understanding of cultural orientation topics;
(e)   evidence of contacts made by the monitor(s) with state and local refugee program officials, including the state refugee coordinator and state refugee health coordinator;
(f)   evidence of compliance with quarterly stakeholders meeting requirements;
(g)   a description of the affiliate's training plan;
(h)   evidence of the affiliate's policy on protection from sexual exploitation and abuse;
(i)   evidence of the monitor's review of five percent (5%) (but not fewer than ten (10) cases, nor more than thirty (30) cases) of all case files for cases which arrived during the preceding twelve (12)-month period, including a representative sample of local co-sponsor placement, if applicable.  The monitoring report must indicate whether the case files contained fully completed and implemented service plans for each member of the family, evidence of timely and compliant delivery of all required services, evidence of compliant documentation of R&P per capita expenditures, and R&P period reports.  The report must also indicate whether the case logs presented a complete and accurate picture of the resettlement process;

Page 20 of 43

(j)   evidence of the monitor's visit to at least four (4) refugee cases in their homes, and an assessment of the welfare, living conditions, current needs, and the affiliate's assistance with the provision of basic needs and core services.  If fewer than four (4) cases have arrived in the fiscal year being monitored, all arrived cases for that fiscal year shall be included in home visits; and

(k)   recommendations for any necessary follow-up.

h)   The following documents shall be available to the Bureau upon request.  The documents shall be accurate and complete, be submitted in a timely manner, and adhere to all requirements:

  i.    R&P Period Reports
  ii.   Sponsorship Assurances
  iii.  Affidavits of Relationship
  iv.   Ninety (90)-day follow-up reports for minors coded M2-M3 and M5-M7
  v.    Quarterly R&P Program Reports
  vi.   Record of affiliates' local consultations
  vii.  Annual Report
  viii. Reconciliation of Claimed Refugee Sponsorships
  ix.   Quarterly Financial Status Reports
  x.    Availability of Funds Statement for Current Fiscal Year
  xi.   Audit Data Collection Form and Reporting Package
  xii.  Policy on the Prevention of Sexual Exploitation and Abuse

3) Bureau Monitoring of Agency Affiliates

a)   On-Site Monitoring Visits

All affiliates and sub-offices are subject to monitoring by the Bureau with advance notice to the Recipient and affiliate.  Findings and recommendations will be reported in writing to the Recipient, which will respond to the recommendations in writing before reports become final.  Evaluation will be based on affiliate staff interviews, oral and written questionnaires, case file reviews, and refugee home visits.  Reviews will include evaluation of:

  i.    affiliate staff understanding of required Reception and Placement Program services;
  ii.   demonstration of effective coordination with other organizations and agencies that provide services to refugees;
  iii.  compliance and quality of R&P basic needs support and core service delivery;
  iv.   evidence of refugee understanding of cultural orientation topics;
  v.    presence of all documents in files and degree to which each has been thoroughly and legibly completed;
  vi.   evidence of orientation and training of staff, volunteers, and co-sponsors;
  vii.  evidence of the affiliate's policy on the prevention of sexual exploitation and abuse; and
  viii. affiliate R&P performance outcomes.

Page 21 of 43

The Bureau will provide an oral overview of its findings and recommendations to the affiliate immediately following the review.

b)      National Agency Response

The responsiveness of the Recipient to the Bureau's monitoring reports, including timeliness of response to the draft report and timely implementation of recommendations will be evaluated.

## c.   Performance of Core Services by or Under the Direction of the Recipient

1) A written proposal, submitted by the Recipient and incorporated into this agreement as Attachment A, will constitute the basis for the assignment of Reception and Placement responsibility for specific refuges. Subject to any limitations established in this agreement (e.g., the inability of the Recipient to assist refugees of a particular linguistic group), the Bureau may assign a reasonable number of special cases to any participating Recipient. The Recipient shall describe its network of affiliates in its annual proposal, including the proposed service area to be covered by each affiliate. A Recipient may assure and place a case assigned to it under the Agreement only within the approved service area and caseload projections of its approved affiliates as set forth in the proposal. The Bureau authorizes cases with U.S. ties to be placed within a radius of one hundred (100) miles within the same state of the affiliate and cases without U.S. ties to be placed within a radius of fifty (50) miles within the same state of the affiliate.

2) The Bureau will consider approving a larger service area for cases with U.S. ties when the Recipient demonstrates to the satisfaction of the Bureau that the larger area will not impair the quality of service provided to refugees placed in that area. The affiliate will ensure that the affiliate will be able to respond on a same day basis to any urgent needs of the refugees and assist the refugees to resolve the issues.

3) The Recipient may propose to open a new affiliate or sub-office during the validity period. The Recipient must provide a statement of rationale for each proposed new site. The rationale should be accompanied by: a completed abstract; a letter of support from the proposed site's governing entity; a letter of support from the state refugee coordinator; letters of support from local refugee service agencies; an explanation of the proposed management structure at the new location; a timeline for the opening of the proposed site and implementation of program activities; and a detailed training plan for R&P staff. Each affiliate or sub-office abstract should present information pertaining only to activities of that specific office and should not include data related to activities corresponding to partner agencies (at joint sites), sub-offices, or administering affiliates. Abstracts representing jointly operated affiliates must contain information in all fields regarding only the sponsoring agency's activities; it should not reflect a combination of partner agencies' information. The Bureau may request additional information.

4) The Recipient must inform the Bureau and the relevant state refugee coordinator in writing of the intended closure of an established affiliate or sub-office at least thirty (30) days in advance of closure. The notification submitted to the Recipient's designated program officer in the Bureau should include:  a plan for completion of services for all active R&P cases; a list of

Page 22 of 43

all assured cases that have not arrived to be returned to the Refugee Processing Center (RPC) for reallocation; a list of all outstanding Affidavits of Relationship (AORs), including pre-case ID numbers, and anchor contact information; a plan for the disposition of all R&P records and case files (to be retained for a period of no less than three years), including a plan to transfer files to the affiliate designated to receive active cases; and a copy of the Recipients' notice of closure letter to the state refugee coordinator.

As a part of the affiliate closure process, the Bureau must approve in advance the transfer of AORs and current cases from the closing affiliate to any other affiliate. This includes transfers to another affiliate within the Recipient's network. Upon approval by the Bureau, the affiliate closure plan will be forwarded to the RPC for action.

In the case of planned consolidation of a sub-office operation into an administering affiliate, the Recipient should follow the procedures outlined above and prepare a revised Abstract for submission to the Bureau which reflects the consolidation information.

The Recipient will further ensure that its affiliate provides written notification to all active cases and to persons with AORs on file at the closing site. The closing affiliate should inform filers of AORs that they may express in writing a preference to work with a specific alternate affiliate. If the AOR filer identifies an alternate affiliate, the Recipient will transfer the AOR directly to the appropriate R&P agency upon approval by the Bureau. Evidence of such direct transfers should be included in the closure plan submitted to the Bureau. All other outstanding AORs will be transferred to nearby affiliates by RPC, in coordination with the Bureau.

　　5)  A copy of the signed assurance form will be maintained on file at the headquarters of the Recipient for a period of at least one year from the date the refugee enters the United States.

　　6)  With respect to every placement, the Recipient or affiliate will have on staff, or available from within the community of resettlement, persons who can communicate with the refugee in a common language and who can assist with the provision of services in person, as needed. These services will be available to the refugee on a daily basis during the R&P period.

　　7)  The procedures for initial assignment, assurance, and transfer of refugee cases are set forth in the Allocations Handbook, which may be updated during the agreement period and is hereby incorporated by reference.

　　8)  The basic needs support and core services shall be provided to any refugee assigned to the Recipient during the R&P period after the refugee's arrival in the United States, except where a different period of time is stated.

　　9)  The basic needs support and core services shall be provided in accordance with the proposal submitted by the Recipient as approved by the Bureau. Deviations from the proposal involving the addition of affiliates or increases of more than ten percent (10%) in each proposed affiliate's caseload must be approved in advance in writing by the Bureau. An increase in an affiliate's caseload does not increase the total number of a Recipient's proposed and accepted total network capacity for refugee arrivals during the fiscal year. Any increase in a Recipient's

Page 23 of 43

International Rescue Committee                                    S-PRMCO-16-CA-1005

total network capacity for refugee arrivals must be requested by the Recipient in writing and approved in advance in writing by the Bureau.  It is understood that caseload may fall short of that in the proposal, and deviations resulting from such shortfall do not require Bureau approval.

10) Faith-based Recipients should take steps to ensure their inherently religious activities, such as religious worship, instruction, or proselytizing, are separate in time or location from the government-funded services that they offer.  Also the Recipients may not require refugees to profess a certain faith or participate in religious activities in order to receive services.

11) Recipients shall request prior approval from the Bureau for one or more of the following program or National Management budget related reasons:

     a)   Change in the scope or the objective of the project or program (even if there is no associated budget revision requiring prior written approval).
     b)   Change in a key person specified in the application or award document (as specified in the 2 CFR 200).
     c)   The absence for more than three months, or a twenty-five percent (25%) reduction in time devoted to the project, by the approved project director.

**d.     Delegation of Functions by the Recipient**

1)   Unless otherwise provided herein, the responsibilities assumed by the Recipient shall be delegated only to an affiliate designated in the approved proposal, who may re-delegate such responsibilities to a local co-sponsor, provided such co-sponsor is identified on the applicable assurance form submitted to the Refugee Processing Center.  When the Recipient relies on an affiliate or local co-sponsor to provide a service, the Recipient shall remain responsible for ensuring that the service is provided.

2)   Any local co-sponsor to whom the Recipient's responsibility for providing core services is re-delegated by an approved affiliate must be located in the affiliate's approved area of geographic responsibility, as designated in the proposal.  When the affiliate has an agreement with a local co-sponsor to provide basic needs support or core services, the affiliate shall remain responsible for ensuring that the services are provided.

3)   The Recipient, and any affiliate and/or local co-sponsor to which a delegation is made, must carry out its responsibilities in accordance with Title VI of the Civil Rights Act of 1964.

**e.     Coordination and Consultation with Public Agencies**

The Recipient shall:

1)   Conduct placement planning, reception, and basic needs and core service activities in close cooperation and coordination with state and local governments. In each placement location, the affiliate(s) responsible for refugee placement shall convene and conduct quarterly consultations with state and local government officials concerning the sponsorship process and

Page 24 of 43

the intended distribution of refugees in such localities before their placement in those localities. Local participation should include, at minimum, representation from the following offices: state refugee coordinator; state refugee health coordinator; local governance (city and/or county, as applicable); local and/or county public health; welfare and social services; and public education. Consultations may take place in person and simultaneously via teleconference, videoconference, or a combination thereof.  The content of the consultations should include year-to-date arrivals and projections through the end of the current federal fiscal year compared to approved placement numbers; a presentation of characteristics of arriving refugee populations including nationality, ethnicity, average family size and composition, language and education background, and medical conditions; a discussion of the participant stakeholders' abilities to adequately receive and serve the actual and projected caseload; and a discussion about aspects of integration to support refugee participation in civic life. Issues that might prevent adequate resettlement should be discussed. Concerns that might result in changes to the approved placement plan should be raised with the affiliate's/affiliates' headquarters immediately, and resolved.  Existing procedures and protocols between the Bureau and the resettlement agencies shall be used to make any necessary changes to approved placement plans.

One of these consultations shall take place  in preparation of an agency's application to participate in the R&P Program the following fiscal year. Agencies will keep a record of their affiliates' local consultations and report on the number and percentage of their affiliates in compliance with this guidance. Agencies will report to the Bureau in quarterly narrative reports the number and percentage of affiliates in compliance, as well as describe both best practices and issues that prevent adequate resettlement or result in changes in placement plans;

    2)   Ensure that its affiliates participate in appropriate meetings called by state and local governments in their geographic areas of responsibility to coordinate plans for the placement of refugees;

    3)   Coordinate with other publicly supported refugee services programs or refugee case management systems; and

    4)   Inform both the Bureau and the Department of Homeland Security Bureau of Citizenship and Immigration Services of any suspected fraud in any refugee case sponsored by the Recipient.  Such reporting is required of the Recipient regardless of whether the applicants are still overseas or whether they have already been admitted into the United States as refugees.

**f.      Limitation of Responsibility to Perform Core Services**

    The Recipient shall be relieved of its responsibilities under this agreement to the extent they cannot be carried out because (1) the refugee does not remain in the general geographic area where initially placed or (2) the refugee refuses to receive services from or to cooperate with the Recipient, its affiliates, or its local co-sponsors.  In cases when non-cooperation by the refugee makes compliance impossible, the Recipient should ensure that the refugee is counseled and that such counseling and result is noted in the case file. Unexpended refugee per capita funds may be retained by the affiliate and returned to Bureau.  Any other barriers to full compliance that are beyond the control of the Recipient should be documented in the case notes.

Page 25 of 43

**g.     Core Services**

**1)  Pre-Arrival Services.**

The responsibilities in paragraphs a), b), c), and e) may not be delegated; the responsibilities in paragraph d for training local co-sponsors may be delegated to an affiliate.  Training must be provided in person by a representative of the Recipient or its affiliate to any local co-sponsor that has not resettled a refugee who arrived in the United States within the past two (2) years. The Recipient shall:

a)   Assume responsibility for sponsorship of the refugees assigned to the Recipient under this agreement;

b)   Arrange the placement of sponsored refugees in accordance with the policies established under Section 412(a)(2) of the INA and this agreement;

c)   Ensure that its affiliates and local co-sponsors share relevant information with health care providers and/or state and local officials, as needed, in order to plan for the provision of appropriate health services for refugees who have health care requirements;

d)   Submit sponsorship assurances to the Refugee Processing Center; and

e)   Train any affiliate or local co-sponsor that has agreed in writing to assist the Recipient in sponsorship and ensure that the affiliate or local co-sponsor understands the overall sponsorship process, the Recipient's role, and the responsibilities of affiliates and local co-sponsors.

**2)  Case File Preparation and Maintenance**

The Recipient shall establish and maintain a case file for each arriving refugee case.  This responsibility may be delegated only to an affiliate.  It is expected that each case file shall be treated as confidential, in accordance with Immigration and Nationality Act Sec. 222(f).  Case files may be retained in electronic or hard copy format.  Case files covering minors coded M2 through M7 must be clearly identified and easily segregated. Secure electronic signatures are acceptable.  Each case file shall contain evidence of required basic needs support and core service delivery, including:

a)   a clearly legible case note log which shows the date, mode, and substance of regular affiliate/refugee contact throughout the R&P period and which identifies the person or entity making such contact; a clear plan of action and follow-up (service plan) for each refugee, including children, in the case, based on an assessment of individual needs, and a detailed record of basic needs support and core service delivery;

b)   a record of cash and in-kind support provided to meet the refugees' basic needs for at least the initial thirty (30)-day period, including clear acknowledgement by an adult member of the refugee case of receipt of cash and in-kind support and evidence that the amount

provided either in cash or documented cash payments on behalf of the refugee case is equal to at least $925 times the number of individuals in that case and reflects the total Bureau R&P per capita amount spent on the refugee case;

    c)   a record of all public assistance applied for and received or denied, indicating type(s) of assistance and start date(s) including a record of all notifications from a state, county, or other local welfare office that the refugee has applied for welfare benefits and a record of all information the Recipient provided  to state, county, or other local welfare offices and of all information provided by such offices to the Recipient;

    d)   if appropriate, a copy of the signed co-sponsor agreement;

    e)   evidence that housing was provided  in accordance with this agreement;

    f)   evidence that an intake interview as described herein was conducted;

    g)   evidence that orientation as described herein was completed, and documentation of refugee understanding of orientation topics;

    h)   evidence that the affiliate has conducted at least two (2) home visits, which shall include a documented assessment of the welfare, living conditions and any current or expected needs of the refugee(s), and assistance with any basic needs, within (30) thirty days of arrival by affiliate staff, co-sponsor, or other designated representative and an additional home visit to permanent housing if the refugee moves from temporary housing within the R&P period. Cases must be visited the next calendar day after arrival.  An additional home visit should occur for all cases within thirty (30) days of arrival;

    i)   documentation of assistance with enrollment in state-administered assistance and social service programs;

    j)   evidence that the refugee was provided with information on permanent resident alien status and family reunion procedures, and assisted with completing and filing Affidavits of Relationship as appropriate

    k)   evidence that the refugee was provided with information on the legal requirement to notify the U.S. Department of Homeland Security of each change of address and new address within 10 (ten) days, and assisted, to comply with this requirement. Authority: Secs. 103, 265 of the Immigration and Nationality Act, as amended by sec.11, Public Law 97-166, 95 Stat. 1617 (8 U.S.C. 1103, 1305);

    l)   evidence that the legal requirement for males between the ages of 18 and 26 to register for the selective service within thirty (30) days of arrival has been completed (as appropriate) and that the refugee was provided with information on the requirement to notify the Selective Service System of each change of address;

International Rescue Committee                                                S-PRMCO-16-CA-1005

m) a service plan which indicates the initial assessment of employability for each refugee, including the reason(s) a person may not be employable;

n) a legible copy of the I-94 form for each refugee in the case;

o) a R&P period report, which will be retained by the affiliate for a period of not less than three (3) years from the date of arrival, based upon an interview with the refugee by the affiliate or local co-sponsor from which it can be determined, inter alia:

      i. that all R&P basic needs support and core services were made available to the refugee in accordance with this agreement;

      ii. whether the refugee household had income in excess of expenses at the end of the R&P period;

      iii. that each refugee was enrolled in state-funded or other appropriate social services;

      iv. the social security number for each refugee in the case;

p) a copy of the assurance form or equivalent documentation; and

q) where applicable, copies of suitability determinations for placement of refugee minors, follow-up evaluation forms, signed statements concerning responsibilities and legal obligations in the state of residence, and a copy of the best interest determination (BID) of the child, if available.

## 3)  Reception Services

The Recipient shall ensure that refugees assigned to it are met at the airport of final destination and transported to furnished living quarters and provided culturally appropriate, ready-to-eat food and seasonal clothing as necessary to meet immediate needs.  The Recipient shall visit the refugees the next calendar day after arrival to ensure that all immediate basic needs have been met and to provide refugees with basic orientation regarding housing and personal safety matters, including emergency contacts and procedures.  These services shall be provided with appropriate language interpretation.

## 4)  Basic Needs Support

Upon arrival and for a period of not less than thirty (30) days after arrival, the Recipient shall provide or ensure that the refugees assigned to it are provided the following:

    a.     Decent, safe, and sanitary housing based on federal housing quality standards or local or state standards if local or state standards are higher than federal standards, and the following:

Page 28 of 43

i.   All areas and components of the housing (interior and exterior) should be free of visible health and safety hazards and in good repair, including no visible bare wiring, no peeling or flaking interior paint for dwellings built before 1978, no visible mold, and no detectable dangerous or unsanitary odors.

ii.   Housing should include identified and accessible emergency escape route(s); fire extinguishers in accessible locations where required; working locks on all windows and outside doors;  appropriate number of working smoke detectors;  windows in working order; adequate heat, ventilation, lighting, and hot and cold running water in working order; and electrical fixtures in good repair**.**

iii.   Housing should provide minimum habitable area for each occupant, including number of bedrooms or sleeping areas.

iv.   Each residence shall be equipped with stove, oven, refrigerator, sink, flush toilet, and shower or bath in good repair.

v.   Each residence shall have easily accessible storage or disposal facility for garbage.

vi.   Each residence shall be free of rodent and insect infestation.

vii.   In cases of refugees with disabilities, housing should be free of, or permit the removal of, architectural barriers and otherwise accommodate known disabilities, to the extent required by law.

viii.   To the extent possible, the family should be able to assume payment of rent at the end of the R&P period, based upon projected family income from all sources.  The family should be left with sufficient resources for other essential expenses (food, transportation, utilities, etc.) after rent payments are made.

b)      Furniture and household items that need not be new, but must be clean, in good condition, and functional and include the following:

i.   Beds (described as bed frame and spring, or equivalent, and mattress) appropriate for age and gender composition of family; one set of sheets for each bed; blanket or blankets for each bed as seasonally appropriate; and one pillow and pillowcase for each person.  Only married couples or small children of the same gender may be expected to share beds.

ii.   One set of drawers, shelves, or other unit appropriate for storage of clothing in addition to a closet, unless the closet has shelving to accommodate clothing, per family.

iii.   One kitchen table per family and one kitchen chair per person.

iv.   One couch, or equivalent seating, per family, in addition to kitchen chairs.

Page 29 of 43

International Rescue Committee                                        S-PRMCO-16-CA-1005

    v.   One lamp per room, unless installed lighting is present and adequate, and light bulbs.

    vi.   One place setting of tableware (fork, knife, and spoon) and one place setting of dishes (plate, bowl, and cup or glass) per person.

    vii.   Food preparation utensils to include at least one sauce pan; one frying pan; one baking dish; mixing/serving bowls; one set of kitchen utensils (such as spatula, wooden spoon, knife, serving utensils, etc.); and one can opener per family.

    viii.   One bath towel per person.

    ix.   One alarm clock.

    x.   Paper, pens, and/or pencils.

    xi.   Cleaning supplies to include: dish soap, bathroom/kitchen cleanser, sponges or cleaning rags and/or paper towels, laundry detergent, two waste baskets, mop or broom, and trash bags.

    xii.   Toiletries to include: toilet paper, shampoo, soap, one toothbrush per person, toothpaste, and other personal hygiene items as appropriate. These items should be new.

    xiii.   Baby items as needed.

c)  Food or a food allowance to include:

    i.   Culturally appropriate, ready-to-eat food available on arrival, plus one (1) day's additional food supplies and staples (including baby food as needed).

    ii.   Within one (1) day of arrival, food or food allowance at least equivalent to the food stamp allocation for the family unit and continued food assistance until receipt of food stamps or until the individual or family is able to provide food for himself, herself, or themselves.

d)  Appropriate seasonal clothing required for work, school, and everyday use as required for all members of the family, including proper footwear for each member of the family, and diapers for children as necessary.  Clothing need not be new, but must be clean, in good condition, and functional.

e)  An appropriate amount of pocket money for each adult throughout the first thirty (30) days to allow independent spending at the refugee's discretion.

f)  Transportation in compliance with local motor safety laws.

g)  Transportation to job interviews and job training.

Page 30 of 43

International Rescue Committee                                    S-PRMCO-16-CA-1005

5) **Core Services**

These services shall be provided with appropriate language interpretation:

   a)  Intake Interview
   An intake interview shall be conducted within five (5) working days of arrival to verify refugee documentation and discuss roles and responsibilities of the Recipient and any other individual or group assisting in sponsorship, as well as the refugee's role and responsibilities.

   b)  Home visits
   At least two (2) home visits within thirty (30) days of arrival, which shall include an assessment of the welfare, living conditions and any current or expected needs of the refugee(s), and assistance with any basic needs.  Cases must be visited the next calendar day after arrival. An additional home visit should occur for all cases within thirty (30) days of arrival.

   c)  Assistance with the following on the schedule noted:
      i.  Application for social security card(s) within seven (7) working days of arrival.

      ii.  Application for cash and medical assistance, as appropriate, within seven (7) working days of arrival.

      iii.  Application for food stamps, if necessary, within seven (7) working days of arrival.

      iv.  Enrollment in other services for which each refugee is eligible, as appropriate, within ten (10) working days of arrival.

      v.  Enrollment in English language programs, as appropriate, within ten (10) working days of arrival.

      vi.  Enrollment in employment services, as appropriate, within ten (10) working days of arrival.

      vii.  Meeting school enrollment requirements and registering children for school within thirty (30) days of arrival.

      viii.  Registration with the selective service within thirty (30) days, as appropriate.

      ix.  Filing change of address forms with the U.S. Department of Homeland Security and the U.S. Post Office (and Selective Service, as applicable) for all changes of address, including initial and temporary housing, during the R&P period.

      x.  Completing and filing Affidavits of Relationship, as appropriate and as requested.

   d)  Service Plans

Page 31 of 43

These responsibilities must be performed by the affiliate or the affiliate in active collaboration with the local co-sponsor.  The Recipient shall:

    i.  Develop and implement during the first thirty (30) days a service plan with each refugee.  For each employable refugee, the principal objective of the service plan shall be assisting the refugee to obtain early employment.  The  plan for each refugee in the case may be documented on the same form;

    ii.  Assist each employable refugee to enroll in such appropriate job counseling, job placement, and/or job training programs as are available in the community; and

    iii.  Monitor and document implementation of the service plan and progress toward reaching each refugee's goals throughout the R&P period.

e)  Assistance with Access to Health Services

    The Recipient shall:

    i.  Coordinate with state and /or local health care providers to provide medical services to refugees requiring medical care upon arrival;

    ii.  Ensure that refugees with acute health care requirements receive appropriate and timely medical attention;

    iii.  Assist refugees (other than those with Class A conditions, covered below in paragraph d) in obtaining a health screening within thirty (30) days of arrival and other health care services, as needed, during the R&P period;

    iv.  Encourage and assist refugees as soon as possible after arrival to obtain or complete immunizations as required for adjustment to permanent resident alien status one year after arrival;

    v.  Assist refugees in accessing appropriate providers of continued therapy or preventive treatment for health conditions affecting the public health;

    vi.  In the case of a refugee who fails or refuses to receive health screenings, provide additional information and counseling to the refugee, including an explanation of local health regulations and practices, and document the circumstances and action taken in the case file; and

    vii.  Ensure that its affiliates and local co-sponsors cooperate with state and local public health officials by sharing information needed to locate refugees, including secondary migrants to the degree possible, for the purpose of providing health services to them.

f)  Class A Health Conditions

These responsibilities may not be delegated beyond an affiliate.  The Recipient shall:

Page 32 of 43

i.   Advise, encourage, and assist, insofar as possible, refugees with Class A physical disorders affecting the public health (as designated by the Public Health Service) to report within seven (7) days of arrival to the official public health agency in the resettlement area; request the local health provider (by telephone or in person) to give refugees with Class A health conditions an appointment date within seven (7) days of their arrival; and document in the case file the dates of such advice, assistance and requests, including the name of the individual contacted; and

ii.   Advise, encourage, and assist, insofar as possible, a refugee who has a Class A mental disorder to receive within thirty (30) days of arrival an initial evaluation by the health care provider who supplied a written commitment prior to the granting of a waiver for admission; request the health care provider to provide a copy of the initial evaluation to Refugee Activity, Division of Quarantine, Centers for Disease Control and Prevention, Atlanta, Georgia 30333; make reasonable efforts to ensure that such refugee receives assistance in seeking medical treatment, education, and training that any previously identified mental disorder may require; and document in the case file the dates of such advice, assistance, and requests, including the name of the individual contacted.

g)   Communication with State and Local Welfare Authorities

These responsibilities may not be delegated beyond an affiliate.  The Recipient shall:

i.   Notify the appropriate state, county, or other local welfare office at the time the Recipient, its affiliate, or local co-sponsor becomes aware that a refugee receiving welfare benefits has been offered employment or has voluntarily quit a job, and notify the refugee that such information has been provided to the welfare office.  Notice of offered employment shall be given whether or not the refugee accepts the offer;

ii.   Respond to inquiries from a state, county, or other local welfare office relating to a refugee's application for and receipt of cash or medical assistance, and furnish, upon request of such office or agency, documentation respecting any cash or other resources provided directly by the Recipient, its affiliate, local co-sponsor, or other sources, to the refugee; and

iii.   Maintain in the case file required under subsection 16.g.2 above a record of all notifications from a state, county, or other local welfare office that the refugee has applied for welfare benefits and a record of all information provided by the Recipient to state, county, or other local welfare offices and of all information provided by such offices to the Recipient.

h)   Orientation

During the initial reception and placement period, the Recipient shall provide or ensure that the refugees assigned to it are provided orientation, with appropriate language interpretation if needed.  To the extent practical, written orientation materials in an appropriate language covering the topics listed below shall be made available to the refugee upon arrival.  Complete orientation on all topics shall be completed before the end of the R&P period. Orientation materials are available from the Cultural Orientation Resource Exchange at www.COResourceExchange.org.  Orientation topics and content objectives must include:

Page 33 of 43

International Rescue Committee                                    S-PRMCO-16-CA-1005

i. Role of the Local Resettlement Agency

- The local resettlement agency is not a government agency.
- Assistance provided by the local resettlement agency and public assistance is limited and benefits vary across agencies, locations, and cases.
- There are a number of organizations that will work alongside local resettlement agencies to assist with access to locally-available programs and provision of services.
- The local resettlement agency provides assistance to refugees through the provision of items and/or money to meet initial needs, a limited scope of services, and advocacy on refugees' behalf to receive service for which they are eligible.
- The quality and quantity of items provided will vary.
- Refugees and the local resettlement agency are responsible in partnership for successful resettlement.

ii. Refugee Status

- There are rights related to refugee status.
- There are responsibilities related to refugee status.
- Applying for permanent residency and naturalization are important steps in the adjustment process.
- There may be immigration consequences to breaking U.S. laws.
- Refugees may be eligible to file for family reunification, which would allow family members overseas to come to the U.S.

iii. English

- For both adults and children, learning English is critical to successful adjustment in the U.S.
- Learning English will take time and the process may vary from person to person.
- There are a variety of ways to learn English

iv. Public Assistance

- Public assistance is available to help refugees pay for their needs, but is limited in amount and scope.
- There are a variety of types of government assistance.
- The local resettlement agency will provide help in accessing public assistance services.
- There are responsibilities associated with some types of assistance.

v. U.S. Laws

- The U.S. is governed by the rule of law.

- The U.S. has many laws governing behavior in public.
- There are legal rights and restrictions related to family life.
- There are rights and responsibilities related to U.S. residency and citizenship.

vi. Your New Community

- There are community and public services that are available to support residents.
- The local resettlement agency will assist refugees in becoming acquainted with their new community.
- Members of the refugee's ethnic or religious group who live in the area may be a good source of support.

vii. Employment

- Early employment and job retention are essential to survival in the U.S., and must be the primary focus for all employable adults (men and women).
- A person's initial job might not be in their chosen profession.
- The refugee himself or herself plays a central role in finding/obtaining employment in the U.S.
- A crucial way of finding better paying jobs is learning how to speak English.
- There are general characteristics of U.S. professional and work culture to which refugees must adapt in order to be successful in finding and maintaining employment.
- Employees have rights as well as responsibilities in the workplace.

viii.  Health

- Only critical and immediate health care needs may be met in the initial weeks of resettlement.
- Initial health screenings and immunizations will be scheduled within thirty (30) days of arrival.
- The U.S. has no universal healthcare system and refugee medical assistance (RMA) differs state by state. In many cases RMA is available for eight months.
- A variety of health care services are available in the U.S.
- Preventative health care plays a large role in maintaining good health.
- There are norms associated with health care services in the U.S.
- U.S. health practices may differ from those of other cultures or countries.
- There are local resources available to support refugees' mental health.

ix.  Budgeting and Personal Finance

- Refugees are responsible for managing their personal finances
- In the U.S., financial transactions are mostly conducted through the banking system.

- Paying taxes is a legal obligation in the U.S.

x.  Housing

- There are a variety of types of housing arrangements depending on affordability and the local context (including shared housing, apartment, house, etc.).
- The local resettlement agency provides assistance in home orientation, after which housekeeping and home maintenance are individual and family responsibilities.
- Understanding basic safety considerations and use of appliances/facilities will promote safety in the home.
- There are additional domestic life skills that facilitate independent living.

xi.  Hygiene

- There are norms for personal hygiene in the U.S.

xii.  Safety

- Attention to personal safety is an important consideration for all people.
- Police and law enforcement agencies exist to help people if they become a victim of a crime.
- It is important to be prepared for emergencies.
- It is important to be familiar with safety procedures.

xiii.  Cultural Adjustment

- There are core characteristics that define the American experience.
- There are cultural norms and expectations that are fairly widespread throughout the U.S.
- The philosophies of self-sufficiency and self-advocacy are central to American culture and to refugees' cultural adjustment.
- There are numerous phases of cultural adjustment.
- Resettlement may have an impact on family roles and dynamics.
- Expectations regarding parenting practices may differ in the U.S. from what refugees are used to.
- There are some basic coping mechanisms to deal with the stress of adjustment.
- There are ways to seek assistance from others in your community.

xiv.  Education

- There are legal and normative expectations regarding schooling in the U.S.
- The value for adults and teenagers to continue formal education should be weighed against the need to work.

- There are many options for continuing education and training beyond compulsory K-12 schooling.

xv.  Transportation

- Public transportation options exist in most communities.
- Owning or having access to a personal vehicle comes with benefits and responsibilities.

## 6)  Assistance to Refugee Minor Children

Unaccompanied refugee minors (under 18 years of age) are defined and categorized by their relationships with traveling companions and ultimate resettlement circumstances.  The following codes are used to identify the circumstances of refugee minor children.

Refugee Minor Codes:

**M1:** Minors attached to, traveling with, and resettling with biological or legally adoptive parents;

**M2:** Minors attached to, traveling with, and resettling with blood relatives other than biological or legally adoptive parents;

**M3:** Minors attached to, traveling with and resettling with non-relatives and minors traveling alone to join non-relatives (only those agencies with refugee foster care responsibilities as described in subsection 16.g.7 will have the authority to place refugee children in this category unless otherwise approved by the Bureau);

**M4:** Minors destined for foster care (only those agencies with refugee foster care responsibilities as described in the cooperative agreement will have the authority to place refugee children in this category);

**M5:** Minors traveling apart from but destined to join biological or legally adoptive parent(s).  This includes minors traveling alone to join parent(s) in the U.S., minors traveling with relatives other than parents to join parent(s) in the U.S. and minors traveling with non-relatives to join parent(s) in the U.S.;

**M6:** Minors traveling apart from the blood relative(s) (other than parents) they are destined to join.  This includes minors traveling alone to join a relative (not parent) in the U.S. and minors traveling with non-relatives to join a relative (not parent) in the U.S.;

**M7:** Minors who are married regardless of their traveling companions or U.S.-based relatives.

With respect to any minor allocated to the Recipient under this agreement entering the United States according to one of the minor codes listed above, the Recipient shall:

Page 37 of 43

a)   Have knowledge of the state and local child abuse and neglect mandatory reporting requirements and follow such requirements during the R&P period;

b)   Ensure that case files covering such minors can readily be identified and segregated (codes M2-M7) and include a copy of the Best Interest Determination (BID) of the child, if available;

c)   In the case of a minor entering the United States unaccompanied by parents and seeking to be united with relatives, or other caretakers, including parents (codes M2, M3, M5, M6), conduct a suitability determination of the family unit, taking into account the principle that children should be reunited with relatives whenever possible and appropriate.  The suitability determination shall be conducted prior to submitting a sponsorship assurance for minors whose designated caregivers are already in the U.S. (codes M5, M6, M3) and within seven (7) days of arrival for minors who are traveling with relatives or other caretakers (codes M2, M3), in accordance with subsection 16.g.1.d above and will include, but need not be limited to:

   i.   An assessment of the nature and extent of any previous relationship between the child and the family unit prior to the minor's arrival in this country;

   ii.   An assessment of the nature and extent of the current relationship between the child and others in the family unit;

   iii.   An assessment of whether the family unit is willing and able to provide ongoing care and supervision of the child, and how the family plans to provide for the child;

   iv.   As assessment of the family unit's understanding of and intentions regarding securing legal responsibility for the child; and

   v.   As assessment of the requirements of state law, including whether the family unit must be licensed as a foster care provider or must acquire legal custody or guardianship so that the child may legally remain in the household.

d)   If the Recipient's professional resettlement staff determine that the placement is not suitable, the Recipient shall immediately notify the Bureau and return the case to the Refugee Processing Center so that the minor (codes M3, M6,) can be reclassified to enter the United States as an unaccompanied minor requiring foster case.  In the event that a caseworker deems a parent unsuitable to receive a minor (code M5), the State Refugee Coordinator and the Bureau must be immediately notified.  If the Recipient's professional resettlement staff determines that the placement is not suitable during a post-arrival suitability determination (M2, M3), the Recipient shall immediately notify the Bureau and the State Refugee Coordinator.  A copy of the statement of suitability determination shall be retained in the minor's case file (codes M2, M3, M5, M6);

e)   If the minor is traveling with non-relatives to be resettled with the same or other non-relatives (code M3), the Recipient shall undertake the assessment as described above within seven (7) days of arrival of the family.  If the Recipient's professional resettlement staff

determines that the child's placement with the non-parental unit is not suitable, the Recipient shall notify the Bureau immediately in order to coordinate transfer of the unaccompanied minor to foster care;

f)   In the case of a minor entering with or coming to join non-relatives (code M3), the Recipient, other than those referenced in subsection 16.g.6 above, shall obtain the Bureau's agreement to the placement before assuring the case;

g)   For unaccompanied minors resettling with non-relatives or non-parental relatives (code M2, M3, M6), the Recipient shall orient the family unit to the nature and expectations of U.S. practices and legal requirements respecting child care using appropriate language interpretation as necessary, and provide the family unit with a written statement, provided or approved by the state, county, or local child welfare bureau, and translated as necessary, of its responsibilities and legal obligations in caring for the child.  This statement shall include requirements for guardianship, licensing as a foster care provider if relevant, or other forms of legal responsibility.  The acknowledgement of understanding and commitment to carry out such responsibilities in the written statement shall be documented by having the responsible adult(s) in the family unit sign the statement.  Copies of the signed statement shall be given to the family unit and retained in the case file covering the minor.  In the case of a minor entering the United States alone, this will be done at the time of the suitability determination described in subsection 16.g.6.c above.  In the case of a minor traveling with relatives, this will be done during the orientation described in subsection 16.g.6.e above;

h)   For minors described as codes M2, M3, M5, M6 and M7, the Recipient shall:

i.   Advise, encourage, and assist the family in regard to the above-mentioned responsibilities and legal obligations in caring for the child under the requirements of the state;

ii.   Provide regular and personal contact with the minor for ninety (90) days following arrival, and maintain in the case file covering the minor records of assistance to the minor and of the minor's needs during the ninety (90)-day period;

iii.   Within fourteen (14) days after the ninetieth (90th) day after arrival, conduct a follow-up home visit to determine the continued suitability of the placement and to assess the need for continued services and arrange for such services, if needed and feasible; and

iv.   Within thirty (30) days after the ninetieth (90th) day after arrival submit a minor follow-up evaluation report, including an assessment of the family unit's understanding and intentions regarding the securing of legal responsibility for the minor under state law.  Copies of this evaluation shall be retained in the case file covering the minor and sent to the Recipient's headquarters and the State Refugee Coordinator so that further action may be taken by the state if the state deems it necessary.  Headquarters should maintain the completed Minor Follow-up Evaluation Forms for no less than one year after the minor's arrival to the U.S.

Responsibilities enumerated in section 16.g.6. may not be delegated beyond an affiliate and may only be performed by professional resettlement staff.

International Rescue Committee                                                    S-PRMCO-16-CA-1005

7)      **Foster Care**

a)      General

    i.   The services performed by the Recipient under this section shall be performed for the purposes of (a) ensuring that foster care minors (minor code M4) approved for admission to the United States are sponsored as required by law, (b) facilitating Department of Health and Human Services/Office of Refugee Resettlement (HHS/ORR) efforts to place such children under the laws of the states pursuant to section 412(d)(2)(B) of the INA, and (c) ensuring that foster care minors are admitted and moved to their resettlement locations in a manner that takes due regard of their special circumstances;

    ii.   The Recipient shall perform the program services specified in subsection 16.g.7.(b) through 16.g.7.(d) below on behalf of foster care minors who are assigned to it under this agreement; and

    iii.   The program services shall be performed by paid staff of the Recipient's operational headquarters.

b)      Pre-arrival Services

    The Recipient shall, with respect to foster care minors assigned to it by the Refugee Processing Center (RPC), prior to their arrival in the United States:

    i.   Provide for such foster care minors the sponsorship assurances required for their admission to the United States;

    ii.   Prepare and submit on behalf of such foster care minors sponsorship assurances and other documents required for admission to the Refugee Processing Center for transmission to appropriate overseas processing offices of the Department of Homeland Security, the Department of State, or their designees;

    iii.   After a careful review of the case (including, but not necessarily limited to, consideration of the minor's ethnicity, educational level, medical status, family relationships, reunification potential, age, and religion), and in consultation with the appropriate overseas processing post and voluntary agency, assign the case to one of the state-authorized providers of foster care services (hereinafter referred to as an "approved provider") listed in the proposal;

    iv.   Notify the approved provider that the case has been assigned to it, transmit available information (including appropriate documentation) concerning the foster care minor to the approved provider, respond to inquiries from the approved provider and other appropriate state or local social service providers concerning the foster care minor, and obtain additional information as needed from the appropriate processing post and voluntary agency;

    v.   Upon request, consult with and provide advice to the approved provider concerning problem cases, including cases that may require transfer to another core provider; prepare the

Page 40 of 43

necessary paperwork for cases that require transfer; and accept appropriate pre-arrival transfer cases and assign them to an approved provider;

vi.   Provide orientation on the initial reception and placement of foster care minors as needed to the staffs of approved providers; and

vii.  Assist in the preparation of documents needed to process applications for the parents of foster care minors for admission to the United States as refugees.

c)     Post-arrival Services

The Recipient shall, with respect to foster care minors assigned to it under this agreement, after their arrival in the United States:

i.    Facilitate refugee travel to resettlement sites in the United States;

ii.   Upon request, consult with and provide advice to the approved provider concerning difficult cases; and

iii.  When the Recipient deems it appropriate, provide funding for emergency needs of foster care minors that cannot be met through other social service programs and that arise within ninety days of a minor's arrival in the United States; and

iv.  Initiate preparation of the Interstate Compact Form and prepare documents that are required to transfer a foster care minor to another state, if necessary.

d)     Case Files

The Recipient shall establish and maintain a case file on each arriving foster care minor assigned under this agreement that includes a written confirmation of sponsorship, biographic data, and other information pertinent to managing the minor's initial resettlement.  The Bureau, the Inspector General of the Department of State, and any of their authorized representatives shall have the right to examine at any reasonable time the case files maintained by the Recipient.  It is expected that all case files will be treated as confidential.

8)     **Loan Services**

a)  Recipient hereby confirms that it will operate in accordance with all the terms of the current Memorandum of Understanding (MOU) entered into by the Recipient or its representative with IOM for servicing refugee transportation loans, and also confirms that it will actively participate in all meetings organized by the IOM, in consultation with the Bureau, to discuss methods, policies and procedures for standardizing services among all participating organizations.  These meetings are intended to provide information and guidance that will improve loan services.

Page 41 of 43

b)  In accordance with the MOU, entered into by the Recipient or its representative with IOM, the Recipient is required to use its best efforts for transportation loan services through the establishment and maintenance of a computerized system that permits the initial bill to be sent within six (6) months of the refugee's arrival in the U.S.; the regular mailing of bills and reminder notices to encourage repayments to be made according to schedule; the management of the loan billing and repayment records; and full accounting and appropriate transfer of funds to IOM.  In accordance with the terms, criteria, policies and procedures of the MOU, entered into by the Recipient or its representative with IOM, the Recipient's efforts shall include:

i.   developing and maintaining a loan tracking system that provides for the prompt billing of refugees within six (6) months of arrival, provided required loan information has been received;

ii.  billing refugees monthly provided a valid address is available;

iii. maintaining a system that actively seeks refugees' current addresses and social security numbers for use in billing activities;

iv.  maintaining a system that records and calculates balances on individual refugee loan accounts;

v.   establishing and maintaining a procedure for reviewing and determining the appropriateness of requests for deferral, in accordance with established criteria;

vi.  maintaining a procedure for transferring funds to IOM on a monthly basis with required accounting details;

vii. reporting accounts status and fund transfers on a quarterly basis to IOM and to the Bureau;

viii. transferring to IOM all loan notes becoming in default;

ix.  submitting requests to IOM as needed for approval to forgive ("cancel") loans for humanitarian reasons; and

x.   reporting monthly to a consumer reporting agency ("CRA").

c)   In addition, the Recipient will ensure that each affiliate, during the Reception and Placement period informs each refugee who signed an IOM loan note that the loan is a legal debt that must be repaid in accordance with the terms of the note, and documents this notification in the case file; reports to the Recipient headquarters on a monthly basis any known change in the address of an adult refugee; and requests and maintains a record of the Social Security number obtained by each refugee in connection with the assistance provided under section 16.g.4 of the Cooperative Agreement.

Page 42 of 43

d)   The Recipient agrees to cover all expenses of loan services activities from the twenty-five percent (25%) amount that is authorized to be retained from the funds repaid by refugees and to transfer the remaining seventy-five percent (75%) promptly to IOM.

e)   In the event Recipient provides resettlement services to a refugee but is not designated by IOM as the billing agency for the refugee's transportation loan or has returned the loan to IOM, Recipient shall assist IOM or any other entity assigned responsibility for providing loan services to refugees being resettled under this Cooperative Agreement.  The assistance shall continue during the Reception and Placement period and include: informing each adult refugee having signed a loan note of their legal responsibility to fully repay the loan in accordance with the schedule set forth in their loan note, unless revised in writing by the loan servicing agency; reporting each adult refugee's initial resettlement address or subsequent address change; responding to inquiries from the loan servicing agency for address information; and providing the social security number of each adult refugee holding a loan.

**17.  Special Provision for Performance in a Designated Combat Area (SPOT):**  N/A

**18.  State Department Leahy Amendment Vetting Requirements:**  N/A

**19.  Statutory Deviations:**  N/A



International Rescue Committee
122 East 42nd Street
New York, NY 10168-1289
Tel 212.551.3000
Fax 212.551.3179
www.theIRC.org

September 23rd, 2015

Kiera Berdinner
Program Officer for US Refugee Admissions
Bureau of Population, Refugees and Migration
U.S. Department of State
2025 E Street NW
Washington, DC 20520
Regional Director

Dear Ms. Berdinner:

Re: IRC's Reception and Placement FY16 Budget Revision

The International Rescue Committee has prepared a budget revision to reflect an increase of $50 in the per capita for the FY2016 Reception and Placement program. Per your instructions on September 22nd, this additional funding has been applied to the program management portion of the budget. Attached for your review are the following documents:

- Budget Workbook
- Detailed Budget Narrative
- Signed SF-424
- SF424a

Please let us know if you have any questions regarding these documents.

Sincerely,

Jennifer Sime
Vice President, US Programs

49



**International Rescue Committee**
122 East 42nd Street
New York, NY 10168-1289
TEL + 1 212 551 3000
FAX + 1 212 551 3179

Rescue.org

**David Miliband**
President and CEO
@DMiliband

**Sarah O'Hagan**
**Thomas Schick**
Co-Chairs
Board of Directors

**Glenda R. Burkhart**
**Scott Pelley**
Co-Chairs, Overseers

**Board of Directors**
Laurent Alpert
Cliff S. Asness
Christoph Becker
Mary Boies
Andrew H. Brimmer
Glenda Burkhart
Florence A. Davis
Trinh D. Doan
Kenneth R. French
Timothy F. Geithner
George F. Hritz
M. Farooq Kathwari
David Levine
Robert E. Marks
Eduardo G. Mestre
David Miliband
Sarah O'Hagan
Anjali Pant
Andrew Robertson
Gideon Rose
Omar Saeed
Thomas Schick
Gordon Smith
Sally Susman
Michael VanRoyen, M.D.
Josh S. Weston
Maureen White
William T. Winters
Tracy R. Wolstencroft

**Members of the Overseers**
Morton I. Abramowitz
Madeleine K. Albright
Kofi A. Annan
Lila Azam Zanganeh
F. William Barnett
Alan R. Batkin
Georgette F. Bennett
Vera Blinken
Betsy Blumenthal
W. Michael Blumenthal
Jennifer Brokaw, M.D.
Tom Brokaw
Glenda Burkhart
Frederick Burkle, M.D.
Nestor Carbonell
Robin Fray Carey
Jeremy Carver
Geoffrey Colvin
Karen Cook
Robert M. Cotten
Jocelyn Cunningham
Susan Dentzer
Robert P. DeVecchi
Dina Dublon
Robin Chandler Duke
Jodie Eastman
Katherine G. Farley
H.R.H. Princess Firyal of Jordan
Harold Ford, Jr.
Jeffrey E. Garten
Evan G. Greenberg
Maurice R. Greenberg
Andrew S. Grove
Morton I. Hamburg
Karen Hein, M.D.
Lucile P. Herbert
Frederick Iseman
Aly S. Jeddy
Howard Jonas
Marvin Josephson
Alton Kastner
Henry A. Kissinger
Yong Kwok
Reynold Levy
Winston Lord
Dan Lufkin
Vincent A. Mai
John Makinson
Lucretia Martin
Roman Martinez IV
Kati Marton
Jay Mazur
W. Allen Moore
Kathleen Newland
Indra K. Nooyi
Sadako Ogata
Sarah O'Hagan
Susan Patricof
Scott Pelley
Alexandra L. Peters
David L. Phillips
Colin L. Powell
Milbrey Rennie
Condoleezza Rice
John Richardson
Felix G. Rohatyn
George Rupp
George S. Sarlo
Thomas Schick
James T. Sherwin
Jean Kennedy Smith
H. Peter Stern
James C. Strickler, M.D.
Georgia Travers
Liv Ullmann
William J. vanden Heuvel
Ronald J. Waldman, M.D.
Rhonda Weingarten
Edwin J. Wesely
Anna Whitehead
John C. Whitehead
Elie Wiesel
Jonathan L. Wiesner
James D. Wolfensohn

August 19, 2015

Mr. Irving Jones
Office of Admissions
Bureau of Population, Refugees and Migration
2025 E Street, NW
SA-9, 8th Floor
Washington, DC 20522-0908

Dear Irving:

In response to your email of August 14th, the IRC is pleased to submit the following revised FY16 R&P proposal documents:

- A revised budget, budget narrative, and description of HQ staff to reflect the removal of 0.10 FTE for TA US Research Programs and a total proposed placements of 10,590 individuals
- An updated pdf file of all abstracts reflecting changes to the Atlanta, Boise, Baltimore, Elizabeth, San Diego, Phoenix and Dallas abstracts. In accordance with your instructions, the following specific changes have been made:
  o Atlanta's arrivals have been adjusted to 850
  o Boise's No US Tie numbers were reduced by 25, for a total of 300
  o Baltimore's arrivals have been adjusted to 825
  o Elizabeth's No US Tie numbers were reduced by 20 for a total of 290

In addition, changes were made to the following abstracts to meet the total of 10,590 proposed placements:
  o San Diego reduced to 905
  o Phoenix reduced to 960
  o Dallas reduced to 800

- A revised FY2016 Consolidated Placement Plan to reflect the above changes

- Revised SF424 forms

If you have any questions or comments, please feel free to contact me or Gerrard Khan. Thank you for your continued support of IRC's R&P programming.

Sincerely,

*(signature)* (gerrard khan)

Jennifer Sime
Vice President for US Programs



## International Rescue Committee
## US Programs

Presents a proposal for:

# Reception & Placement Program

**Submitted to:**
U.S. Department of State
Bureau of Population, Refugees & Migration

**June 22, 2015**

**International Rescue Committee**
**122 East 42nd Street, New York, NY 10168-1289**
**Telephone: 212-551-3071**
**Contact: Gerrard Khan**

## I.       ORGANIZATIONAL MANAGEMENT

**Organizational Structure**

Founded as a refugee resettlement agency in 1933, the International Rescue Committee, Inc. (IRC) is a leading non-sectarian, voluntary organization providing resettlement, relief and protection services to refugees and victims of violent conflict. IRC has been a participant in the Reception and Placement (R&P) program since 1975 and has since resettled over 160,000 refugees from over 40 countries. Staff in IRC national headquarters in New York and San Diego direct the work of 16 existing field offices and six sub-offices, with one additional sub-office proposed for Tallahassee, FL in FY16. The IRC US Programs (USP) resettlement network is vertically integrated: IRC is a single corporate entity and each field office is a branch of – and is directly accountable to – HQ. USP field offices receive funding from IRC HQ and operate under the direct supervision of HQ staff, who provide guidance and direction regarding refugee processing, core services provision, legal services, and other issues pertaining to resettlement and community integration. All salaried staff are paid from HQ and field operating funds are provided through bank transfers from HQ.

Each USP field office is led by an Executive Director (ED) who has responsibility for oversight of R&P implementation and supervises the senior resettlement managers who direct frontline case management activities. Sub-offices receive on-site supervision from a Resettlement Director, who reports to the Executive Director. All offices employ case management staff who have the requisite language and cultural skills specific to the refugees they serve, as well as resource development staff who supervise volunteers and generate local cash and in-kind support to supplement resettlement programs. Each office also has a Finance Manager who assists the ED with budget development, expenditure tracking and reporting. All R&P financial transactions are easily tracked through a SUN systems central accounting database. Each ED is accountable to one of two Regional Directors at HQ. The Regional Directors – who are supported by regional teams consisting of Program Officers and Managers – report directly to the IRC Vice President for US Programs, as do a Deputy Vice President and a Senior Director of Resource Acquisition & Management. A Senior Director for Resettlement Programs, Director of National Programs and a Program Quality Director complete the senior team that oversees IRC's resettlement portfolio. Currently, 41 HQ staff work exclusively or partially on the R&P Program (see attached chart).

**Network Capacity Management**

IRC's single corporate status allows for strong oversight of financial and programmatic activities at the field level. New policy communication and implementation is made more efficient through an HQ management structure whereby Regional Directors supervise EDs in the field offices and monitor implementation of any program changes. The vertically integrated, centrally-managed structure at IRC enables greater field flexibility – private resources are efficiently deployed to their strongest effect and can be rapidly recalibrated to meet changing community needs and realities. IRC HQ staff consult daily with local office staff, monitor arrivals, and shift resources between offices as needed, closing offices when warranted and changing placement strategies to respond to changing resettlement needs. With a single line of authority, IRC is able to maximize responsiveness to placement needs and accountability for outcomes. PRM's affiliate monitoring data, which consistently finds IRC field operations to be of high functionality and quality, supports this conclusion. Of the nine resettlement agencies, IRC has been ranked by PRM monitors as having the highest level of compliance with R&P programmatic requirements over the five-year

1

period from FY10 to FY14 – at 98.1%, it is more than 4 points higher than the average agency compliance rate of 93.4%. In particular, IRC sites ranked well above the FY14 average in the following areas: **staff understanding of R&P program requirements** (IRC 100%, all agencies 56.92%) and **community coordination** (IRC 100%, all agencies 84.2%). Additionally, PRM's annual Agency Headquarters Monitoring consistently finds IRC to be in full fiscal and programmatic compliance: the FY14 HQ Monitoring Report found that "IRC has extensive training programs and effective communication mechanisms. IRC has coherent strategies for selecting and maintaining sites and for placing individual refugee cases" (PRM Monitoring Report, May 22, 2015).

HQ staff regularly conduct monitoring and technical assistance visits to the field to assess office capacity, evaluate the effectiveness of services provided to refugees, and monitor performance outcomes. Thus far in FY15, technical assistance visits and on-site trainings have been conducted for the Boise, Oakland, Sacramento and Silver Spring offices. A new offsite desk monitoring procedure was developed and piloted with the IRC Los Angeles office and was complemented by remote training via webinar with that office. To better facilitate program monitoring, IRC has specifically designed the Efforts to Outcomes (ETO) program management software system to capture the majority of the R&P performance outcomes and to facilitate easy review and analysis at all levels of the organization, by HQ personnel as well as field level managers, supervisors and front line staff. In FY15, IRC HQ developed management reports to allow aggregate review of these data points, and continues to develop and refine a process for routine analysis, follow up and, where needed, support for corrective action.

The Senior Director for Resettlement and Processing and her team provide daily oversight and guidance to field offices on issues related to program outcomes and pre and post-arrival issues in general. Weekly meetings with the senior management team provide a forum for the Senior Director to bring emerging R&P field challenges to the USP senior team for discussion and resolution. Finally, an annual strategic planning process provides an important mechanism for assessing programmatic activities, objectives and results; the impact of refugee placements; field office capacity changes; and other factors affecting placement determinations. HQ and field staff jointly review performance outcomes and develop new annual goals and objectives, which are linked to a comprehensive strategic plan that addresses current and anticipated fluctuations in arrivals and changes in refugee populations. The team also issues a monthly newsletter with relevant resettlement program updates and manages a resettlement.org mailbox to handle inquiries from field staff regarding implementation of the R&P program.

**Private Resource Generation**

IRC HQ continues to raise considerable private resources to support R&P clients, both during the R&P period and in the critical months beyond, during which clients integrate into American life and begin to access other services. In FY16, IRC HQ will continue to raise unrestricted funds to support R&P clients as offices attempt to bridge critical support gaps and address emergency needs. IRC HQ also provides field offices with extensive technical support to build capacity for local resource development. A Senior Director for Resource Acquisition & Management (SDRAM) oversees an annual process in which each office maps annual goals for raising resources within the local community. These plans are reviewed monthly to determine progress toward goals and individualized support is provided to offices with difficulties meeting targets. The SDRAM

2

also acts as the field office liaison to IRC HQ's Revenue Department, which includes the following units: Marketing, Web, Communications, Direct Response, Strategic Events, Major Gifts, and Corporate and Foundation Relations. In FY15, IRC HQ hired two additional Regional Major Gift Fundraisers who are exclusively dedicated to raising unrestricted funds to support US Programs field activities. IRC's Board of Directors also launched a new sub-committee aimed at increasing board member participation in fundraising efforts specifically for resettlement. These initiatives are expected to significantly enhance resource development efforts, particularly giving from high-level individual donors. In July, field office resource development staff will gather at IRC HQ in New York for a three-day training in local fundraising techniques.

Approximately **3,500 volunteers** play a critical role in supporting field offices in managing arrivals and maximizing the quality of R&P service delivery. Thus far in FY15, volunteers have contributed 115,000 hours to IRC's resettlement work and, as part of a strategic goal, the IRC network has been able to double its number of corporate volunteers by creating tailored group opportunities for this sector. Additionally, IRC has enhanced its Volunteer Community website portal to include recruitment resources and mobile accessibility. In FY16, the website portal will be further tailored to foster a more interactive volunteer community, including a dedicated corporate page so that corporate partners can easily view group volunteer opportunities and other ways for employees to engage with IRC. Finally, IRC is also expanding its national partnership with the Corporation for National and Community Service (CNCS) as a resource for full-time volunteer staff. In addition to implementing a three-year AmeriCorps National Grant, which funds 26 full-time volunteers in 14 sites, IRC was one of only three national resettlement agencies to receive an FY16 joint ORR/CNCS RefugeeCorps grant for 16 extra AmeriCorps members, who will focus on providing intensive case management services for vulnerable clients.

**Local and State Partnership Outreach Guidance**
IRC HQ develops a variety of public information and outreach materials and provides regular advocacy and communication training to field staff, highlighting effective management of partnerships with local authorities and community stakeholders and ways to foster greater understanding and support for incoming refugee populations. An IRC-developed Community Consultation Outreach Toolkit is a key resource for staff, with templates and tips to assist field office staff in their efforts to engage local stakeholders in building a consensus for resettlement. As an ongoing HQ support function, IRC helps USP offices utilize their local websites and email software to meet local communications and outreach needs. Over the past year, IRC has supported more than 20 official trainings with development managers, volunteer coordinators and local communications staff. Additionally, the annual Case Management Conference held in March 2015 offered training to supervisors and frontline staff on effective communication and public outreach strategies. A three-day Advocacy Workshop is scheduled for the end of June in Baltimore, where select Executive Directors, field staff and HQ management will meet to hone public outreach strategies at the local and state levels for FY16 and beyond.

IRC requires that all field office Executive Directors actively participate in local refugee service provider forums and a number of the directors hold coordinating positions within these forums. A key element of the ED job description is to engage with local authorities and rapidly address community issues affecting resettlement. Each ED must routinely report to his or her Regional Director on their progress towards meeting this objective. Similarly, a key component of IRC's standard R&P resettlement manager job description is to liaise with local departments of public

3

health, education, human services, and the Social Security Administration. Each resettlement manager must routinely report to his or her Executive Director on progress towards this objective.

All USP offices hold refugee service provision grants or contracts funded by state and local authorities and maintain regular contact with these authorities in administering grants and contracts. IRC HQ provides critical support to this effort in the areas of program development and compliance. Supported by HQ, each USP office prioritizes the development and sharing of refugee success stories with local media, and disseminates these stories among local authorities and community stakeholders. In addition, the IRC Government Relations and Advocacy Department helps field offices build productive relationships with local and national government officials through training and capacity building. IRC External Relations, Government Relations, Finance, Legal and Regional teams proactively engage with field offices at all levels to resolve potential and actual bottlenecks with community partners.

In FY15, USP field offices carried out quarterly consultations with local stakeholders to build community awareness of incoming refugee populations and generate broader support for local resettlement activities. IRC HQ collects and reviews each local office's consultation report, verifying that consultations took place with all key stakeholders and that plans are in place to address ongoing issues. Although the majority of issues are effectively addressed at the local level, IRC HQ may become involved to broaden advocacy, provide additional technical assistance, or modify case placements based on information gleaned during local consultations.

**Logical Framework** – The attached logical framework identifies indicators used by IRC to measure achievement of program objectives. See Section III for details on IRC uses program objectives and indicators to evaluate performance.

**Changes in Headquarters Management, Operations or Policies** – In January 2015, Robin DunnMarcos was appointed as Senior Director for Processing and Resettlement Programs, assuming responsibility for oversight and quality assurance of IRC's R&P pre- and post-arrival programming. In March, Kerry Sheldon was appointed Director for Resettlement Programs, responsible for management of post-arrival R&P implementation. Sara Dadkhah was also appointed as R&P Program Officer. No IRC sites are slated for closure in FY15 or FY16. IRC plans to begin R&P programming in Tallahassee, Florida in FY16 (see new site materials attached).

## II.    PLACEMENT
### Placement Planning Procedures
IRC expects to resettle about 9,900 refugees in FY15. To prepare for this proposal, HQ first requested that all offices complete a placement survey that included minimum and maximum capacity per site as well as information on specialized services available through the office and/or community. HQ then sent detailed instructions to each field office on how to prepare the abstracts, emphasizing changes from previous years. HQ provided a detailed analysis of the anticipated resettlement landscape during the coming year, including overseas pipeline projections and expected funding contributions from headquarters and other sources. Each office then worked with their respective Regional Director to finalize plans for FY16. Once plans were finalized, each Executive Director held consultations with the State Coordinator and other key community partners, incorporating feedback into the final abstracts.

4

The processing team at IRC HQ confers extensively with relevant offices before assigning individual cases. Especially for cases without US ties, the processing team relies on field offices to make a determination on whether a particular case will or will not be suitable for a specific location. While the final decision on individual placements rests with each office's Executive Director, IRC HQ actively encourages all offices to broaden the scope of cases they can accept and EDs are accountable to Regional Directors when their sites are repeatedly reluctant to accept cases that they should have the capacity to resettle. The Regional Director directly supervises each office's ED, who in turn supervises the local R&P resettlement manager or supervisor. Through this direct chain of authority, IRC HQ is able to ensure that each office is equipped to handle their allocated caseloads from pre- to post-arrival and that placement issues are promptly addressed at the local level, with the assistance of the HQ processing team, and if necessary, IRC USP senior leadership. HQ staff, including RDs, Program Officers and other monitors, routinely visit offices in the network to further ensure that office caseloads are appropriately handled. A formal monitoring schedule is developed and implemented by the resettlement team led by the Director for Resettlement.

**Placement Criteria**

IRC prioritizes placement in areas where housing and transportation is affordable and accessible; early employment is possible; neighborhoods are safe; schools are accessible; and the cost of living is appropriate for refugee families. A significant majority of the incoming caseload in recent years has had a US tie. IRC has been able to accommodate most US tie placement requests, with exceptions when US relatives indicate a lack of any close relationship; where the cost of living would be prohibitive; and when necessary specialized medical care is not available. If placement in the preferred location is not possible, IRC makes every effort to place the case nearby. Cases without US ties continue to be placed where a welcoming community is present, appropriate services are accessible, and others from the same ethnic community are already located. Key placement factors include:

- **Ethnicity and nationality –** Refugees are generally placed in communities that have existing populations comprised of the new arrivals' ethnic group. If IRC plans to resettle new ethnic groups or open a new office, it may be necessary to first build an ethnic community through placements of multiple refugee cases.
- **Language –** Cases without US ties are placed in locations that have linguistically appropriate staff or other community members who can offer long-term assistance with interpretation and translation. IRC HQ supports field offices to operate in-house community interpreter programs that reduce both the costs and the potential unreliability associated with external services.
- **Employment –** High potential for early employment and self-sufficiency is a key placement factor. Job placement priorities in the IRC network focus on finding clients stable, full-time positions with good benefit packages.
- **Expedited cases –** For refugees who need to be resettled immediately after approval, ethnicity and language resources are priorities, as is the ability of a local office to quickly meet the needs that triggered the expedited status. USP's centralized management structure enables maximum responsiveness in placing expedited cases, as IRC does not work through an affiliate-based model where various approvals with sub-grantees need to be negotiated.
- **Special P-2 and other caseloads** – When IRC is aware in advance that a refugee group is being considered for the US Refugee Admissions Program, placement of groups may take place in close coordination with other resettlement agencies. IRC HQ is currently assisting field offices

5

to expand their outreach to Spanish-speaking immigrant communities that could benefit from the new Central American Minors Program.

- **Cases arriving with special needs** – The IRC network currently implements more than 250 distinct projects that address the full spectrum of refugee needs. Given the size of the network and the varied scope of programming and resources available at each office, the HQ processing team can readily identify appropriate sites to place special needs cases. The HQ Processing Unit and HQ Regional Directors monitor the distribution of complex cases throughout the network and are sensitive to issues such as family size, local welfare rates, and recent office history with complex cases. To the extent possible, IRC distributes difficult cases equitably across the network and works individually with offices if field staff express concern that a particular placement might not thrive in their community. Recognizing that clients with acute and chronic medical conditions account for the largest proportion of the special needs caseload, IRC HQ also supports field offices to hire health navigators or liaisons. These positions help reduce the burden on caseworkers, expand local networks of specialized care service providers, enable staff to develop expertise in handling specific medical problems, and consolidate resources to better support medical cases.  In FY16, IRC will add 16 full-time AmeriCorps members in field offices, whose jobs will be to support special needs cases.

**Addressing the Needs of the Most Vulnerable**

IRC strives to foster a welcoming environment for all new arrivals, particularly the most vulnerable. IRC recognizes that the women and girls served by the R&P program often come from countries in which gender inequality is extremely prevalent. This means that marginalization, gender discrimination and violence shape the activities in which women and girls can engage, the access they have to goods and services, and the control they have over resources and decision-making. Based on data pulled from the ETO data management system, in 2014, two out of three female clients spoke no English upon arrival, compared with one out of two male clients. Only 38% of female clients had secondary or higher education upon arrival, while 45% of male clients had the same level of education. These and other vulnerabilities require IRC to implement programs that expressly target gender-specific needs. IRC understands that in order to prepare clients to succeed in their new communities, we need to understand and respond to different experiences based on gender.

In recognition of the specific barriers women and girls face, IRC's new five-year strategic plan includes a commitment to gender equality: that IRC programs will be designed to address the various barriers women and girls face, and that IRC as an organization will enable women at all levels to fulfill their potential. IRC is currently carrying out a Gender Opportunity Analysis that will assess measures of gender equality within IRC programs and operations, with the goal of building a common understanding of opportunities and pathways to promote gender equality through programs, operations, and organizational culture. Results from the analysis will be available in Fall 2015 and will inform organization-wide action planning in 2016. In addition, IRC is convening an "Equal Outcomes: Gender Equality in R&P" mini-conference in July. Goals of the circuit ride are to: 1) identify practical ways to improve R&P service delivery to females; 2) raise awareness about different experiences clients have with R&P services based on gender; and, 3) generate staff ownership of gender equality commitments in daily work.

6

The initiatives listed above will shape how USP assesses the risks posed by gender dynamics in the coming years. Sample topics related to the R&P program that the USP network has identified and developed strategies to address include:

- Gender-balanced R&P staffing – Particularly at small resettlement sites, staff composition may be disproportionately male or female. IRC strives to maintain a casework team at each site that is gender balanced and not notably inconsistent with the gender composition of the incoming caseload. Each site should have at least one caseworker of either gender. Particularly when addressing sensitive matters, each site also strives to ensure that interpretation is available through either male or female interpreters.

- Lack of sensitivity to issues where gender is an important factor – All refugees arrive in the US after suffering persecution and loss, and some staff may have difficulty discerning the further vulnerabilities that affect women and girls, particularly given differing cultural contexts. IRC addresses this issue through staff training – an entire section of the main caseworker manual, or 'kiosk,' covers sensitivity to issues facing women and girls. Gender topics are also reviewed in webinars and at the annual national caseworker conference.

- Prevalence of domestic and sexual violence against women – IRC's worldwide experience has demonstrated that refugee women and girls are at particular risk of violence throughout the migration process and that cycles of violence do not end at resettlement. In March 2014, IRC launched a foundation-funded pilot project in Baltimore, Dallas and Seattle to strengthen the network's ability to identify and meet the needs of women survivors of violence through: improved capacity to respond to survivors; better leveraged partnerships with local service providers and communities; increased awareness and prevention activities; and, broader advocacy for refugee women and girls. The pilot draws from IRC's 20 years of experience implementing women's protection and empowerment programs in conflict-affected settings and is being externally evaluated at the end of FY15. Results from the evaluation will inform scaling efforts internally and externally. In addition to the pilot, many USP offices engage men and women separately during resettlement conversations to talk about violence; some conduct workshops on healthy relationships; and, at times, caseworkers register public benefits under women's names in cases where there is evidence of or red flags for domestic violence.

- Strengthening cultural orientation – IRC has found cultural orientation to be a useful forum to integrate messages aimed at addressing gender dynamics. Key messages include: a) We want all clients to be safe. This means men, women, boys, and girls all have the right to live lives free from violence; b) Violence has negative consequences on survivors and on women, men, children, families, and communities; c) Family violence is illegal in the US; and d) IRC is a safe space to talk about experiences of violence and family relationship problems. There is help available.

- *Women's health and employment* – Many refugee women arrive in the US with little education, no work history, and cultural and familial responsibilities that discourage employment. Select IRC sites support programs such as job clubs that have been successful in specifically targeting the employment needs of women. Similarly, many sites have support groups and initiatives that address refugee women's health concerns and reproductive health.

- Support to LGBTI cases – While some IRC sites have developed partnerships and internal capacity to meet the needs of LGBTI cases, very often individuals do not self-identify as LBGTI until after resettlement, if at all. In the past two years, IRC has prioritized creating safe environments for LBGTI clients at all sites. However, a 2015 IRC network survey indicated that only 11 LGBTI-identified clients had accessed R&P services in the previous 24 months, raising

7

concerns that additional efforts should be exerted to strengthen LBGTI client outreach and services. IRC has identified a LGBTI Liaison to serve as a key resource for the network and is convening a working group of HQ and field staff to look more closely at organizational culture and resource deployment. The Liaison has actively participated in national and local LGBTI events while also mapping resources and service gaps across the network, and is now developing further resources to benefit field offices.

**Strategy for Addressing Arrivals Fluctuations**
At the beginning of each fiscal year, each IRC field office receives an approved budget that is based on a projected number of refugee arrivals and takes into account the potential for PRM floor funding. IRC HQ closely reviews the RPC pipeline and affiliate reports as well as other internal pipelining tools to ensure that offices have sufficient capacity to manage fluctuations from their approved caseload while maintaining adequate levels of services for all clients. Offices are consulted and supported early in the process to develop contingency plans in case significant arrival fluctuations occur. For larger-than-anticipated caseloads, strategies include diverting non-US tie cases to other offices, hiring additional staff as necessary, and sending staff temporarily from other sites during periods of high arrivals. For smaller-than-expected caseloads, IRC HQ coordinates closely with each affected field office to reforecast annual budgets and implement measures to reduce operational costs, such as staff reductions, hiring freezes, and transfers of R&P staff to other programs. In addition, IRC's centralized operational structure allows greater flexibility to deploy private and administrative resources to field sites on an as-needed basis to meet individual office needs. IRC HQ deploys approximately one million dollars annually in privately-raised resources in order to maintain network capacity for a robust national resettlement program. In FY15, the trend towards an even flow of arrivals has been interrupted by slower than anticipated arrivals from the Middle East and North Africa. Across the network, with support from IRC HQ, select offices with significant caseloads from this region are preparing for a lower year-end caseload than anticipated. Additionally, the Miami office has experienced a significant downturn in Cuban arrivals and is building its capacity to accept non-Cuban cases. While SIV-impacted sites had initially prepared for continued rapid expansion of that caseload in FY15, SIV arrivals have remained relatively stable.

**Strategy for Selecting and Maintaining Sites**
PRM's FY14 HQ Monitoring Report notes that "IRC has a refugee-centric strategy for the selection of resettlement sites." IRC is committed to ensuring that refugees remain supported in their communities well beyond the initial resettlement period. Every office is dedicated to providing services that will enable refugee clients to become integrated, self-reliant citizens of their adopted communities. New site selection therefore requires a resource-intensive cost-benefit analysis that evaluates a number of factors, including: employment (rates, trends, diversity); cost of living (housing, utilities, transportation); community support levels (social service and refugee provider networks, school and elder care facilities, existing ethnic communities); quality of life (access to health and mental health care, safety, cultural integration opportunities); and office sustainability (community acceptance, private fundraising potential). Prior to opening a new site, IRC closely consults with and solicits cooperation from state refugee and health coordinators and other community stakeholders, including local health departments, welfare departments, schools, landlords, employers and police, among others. For greater flexibility, IRC may open temporary sub-offices to meet the needs of secondary migrants in communities where the conditions for

8

effective resettlement are less optimal. With an eye to medium to long-term R&P program expansion and changing local community dynamics, IRC is undertaking a thorough assessment of its practices for new site evaluation and planning in FY15, and, based on the assessment findings, will refine its site selection practices in order to proactively seek out new sites in FY16 and beyond.

Each IRC office and its HQ regional team jointly revisits the resettlement favorability factors listed above as part of an annual strategic planning process. IRC HQ works with each office to develop a diversified portfolio of programs and resources that will address refugee needs and facilitate community connections for additional client resources beyond the scope of IRC programming. IRC closes operations when a rigorous assessment determines that an office is no longer viable or needed; this last occurred in Boston, MA in FY09 and Bakersfield, CA in FY10, while a temporary satellite office in Midland, TX was closed in FY13. The decision to close an office is made in accordance with PRM and IRC global requirements for office closure and in close consultation with relevant community stakeholders, sister resettlement agencies, and state and local refugee coordinators. Other offices may be downsized, but not closed, in order to maintain capacity for smaller family reunification caseloads and to provide ongoing extended services for existing vulnerable clients in areas such as immigration or employment. Because the relationships, knowledge and expertise needed for successful resettlement in any given community are developed over time, IRC will seek alternatives to closure in those circumstances where unfavorable conditions may be resolved and/or where the recently resettled refugee community continues to benefit from other IRC programs. However, a site will not be maintained if circumstances do not allow for incoming refugee populations to achieve self-sufficiency.

**Local Strategies for Communication and Outreach**
As mentioned in Section 1, IRC HQ offers comprehensive communications, outreach and advocacy support to field office staff. In FY15, IRC field offices conducted quarterly community consultations with a broad spectrum of stakeholders. On an ongoing basis, IRC offices assess existing operations to identify new stakeholders who could be tapped to drive community consensus towards welcoming refugees. Offices are guided by an IRC-developed Community Consultation Outreach Toolkit that provides easy-to-use tips on how to engage a broad range of civic stakeholders, along with templates and materials for community education on refugee resettlement and welcoming newly-elected officials and policymakers.

IRC also uses performance reviews, HQ on-site monitoring, and day-to-day communication with HQ regional teams to hold field office directors and staff directly accountable for establishing and maintaining partnerships with key community stakeholders. HQ departments support field staff in developing compelling and informational refugee stories tailored for a local audience, disseminating these stories to local media outlets, and preparing for interaction with the press and local government officials. Ongoing monitoring and supervision from HQ is complemented by a variety of formal and informal capacity-building opportunities available to field office staff.

In addition to PRM-required consultations on refugee arrivals, IRC HQ encourages field offices to engage key county and community-level stakeholders through local health, mental health, law enforcement, education and governmental forums. By disseminating information prior to arrival and following up post-arrival, these discussions help manage community expectations and counter negative perceptions of refugees and of the resettlement agency as an outsider. If necessary, IRC

9

also forms "newcomer groups" amongst stakeholders to address issues such as school enrollment, access to health care, interpretation and other concerns. IRC HQ also encourages field representatives to actively participate in community action groups, planning associations, and other local council committees in order to ensure that resettlement activities are grounded in the local context and community structures. In these forums, each office seeks to establish its role as a community resource on refugee issues, providing accurate information, clarifying misconceptions, and maintaining transparency on resources available to and provided for refugees.

**Population and Placement Shifts**

IRC is preparing one new site to accept placements: Tallahassee, FL. This site was selected in part to diversify IRC's programming in Florida as the Cuban caseload going to Miami declines. Apart from Miami, few sites are expected to experience decreases in placements in FY16 and most sites are equipped to handle a modest increase in cases from previous years. With the exception of the Middle East and North Africa, arrivals for most major groups have largely remained steady, or have increased, for most of FY15. Given the full pipeline, IRC expects that Iraqi arrivals will again pick up in FY16. IRC has welcomed the newly-invigorated Africa resettlement program, with a growing number of Congolese, Eritrean and Darfuri arrivals. Of 30 nationalities IRC has resettled this year, four of the top ten are African in origin. IRC offices are well-prepared to receive these groups due to previous experience resettling similar caseloads. When necessary, USP also taps the expertise of IRC staff overseas who provide assistance to these populations in countries such as Chad, the Democratic Republic of Congo, Burundi, Ethiopia, Uganda and Rwanda, among others. USP is also drawing on the expertise of staff working in Jordan, Turkey and Lebanon in preparation for a larger Syrian caseload in FY16. Meanwhile, a growing number of ethnic Rohingya cases arrived from Malaysia in FY15 and even higher numbers are expected in FY16, with a concurrent decrease in the numbers of Chin Burmese. Expanded processing in Indonesia should generate a larger East Asia regional caseload.

## III.   NETWORK TRAINING AND MONITORING

**Monitoring**

Led by the Senior Director of Resettlement and Processing, HQ staff conduct regular monitoring visits to ensure that field offices are implementing R&P activities in compliance with PRM guidelines. Each field office is monitored, at a minimum, every three years, while offices with newly-appointed directors are monitored within one year of the director's appointment. During each visit, monitors review a cross-section of refugee case files and conduct a representative sample of home visits. Monitors meet with the State Refugee Coordinator and State Health Coordinator for an appraisal of the office's performance. Standardized questionnaires and checklists are utilized to assess the quality of service delivery, case management, and overall grant compliance, enabling IRC to evaluate the extent to which R&P performance outcomes have been achieved and core resettlement services have been provided. Monitors also observe cultural orientation workshops and assess local cultural orientation protocols and implementation plans. At the conclusion of each monitoring visit, IRC HQ issues a comprehensive report, including specific findings and recommendations. Within one month, the field office responds with a detailed action plan to address issues raised in the report.  IRC HQ then follows up with field offices on an ongoing basis in order to discuss progress and spot-check compliance issues. IRC HQ regularly reviews monitoring reports to identify key regional and thematic trends. These findings then frame future

10

training priorities. For example, IRC monitors recently identified a need for supplemental training among caseworkers on filing Affidavits of Relationships (AORs). HQ therefore held dedicated webinars on this topic and developed a Family Reunification Desktop Reference job aid for caseworkers, which was disseminated in June 2015. In addition, after a monitoring visit, monitors will conduct a HQ debrief to ensure that USP leadership is apprised of field site performance issues. Findings are also summarized and distributed to the entire network on a semi-annual basis, providing an important learning opportunity for all network R&P staff

**Outcome and Indicator Performance Monitoring**

IRC HQ staff review aggregate R&P Period Report outcomes on a bi-monthly basis as well as aggregate cultural orientation assessment results to inform overall and office-level performance on key outcomes. IRC HQ staff also review aggregate quality assurance reports available in the Efforts to Outcomes (ETO) data system. If performance in any area is substandard, at either the network or office level, additional information will be gathered and a follow-up plan developed. These routine reviews also inform technical assistance, training and monitoring activities. Previously, HQ personnel had typically only used the capabilities in ETO to explore programmatic performance when other information suggested concerns, including findings from PRM or HQ monitoring visits. As the information entered into ETO develops sufficient integrity and reliability, however, it is increasingly used upfront to inform programmatic and operational decision-making. IRC HQ is now in the process of developing and refining a protocol for routine review of performance data, involving analysis and dissemination of aggregate reports along with guidance for pursuing more targeted and robust analyses. It will also include desk monitoring protocols and procedures. This process will enable training and technical assistance to be increasingly driven by proactive analysis of R&P performance outcomes and to be less dependent on on-site monitoring visits to identify areas that need support.

IRC HQ also maintains and regularly updates a set of field monitoring procedures to ensure that monitors are equipped to evaluate the accuracy and reliability of field performance outcome data, particularly data involving qualitative determinations. During field visits, IRC HQ staff monitor performance outcomes through case file evidence reviews as well as interviews with field staff in the office and clients during home visits. Utilizing a standardized home visit questionnaire, monitors pose questions to the client to evaluate the performance outcomes that are concerned with the client's "understanding," such as how to contact emergency services, how to file paperwork to reunite with family members, and how to use transportation, among others. Home visits evaluate and confirm safe housing and basic necessities outcomes through visual "inspection" of homes and furnishings. File reviews are cross-checked through client interviews to confirm outcomes related to receipt of core services (school and social service enrollment, for example). Finally, staff questionnaires test and confirm field staff understanding of core service requirements as well as the standard IRC methodology for measuring performance outcomes.

**Training and Learning**

PRM's FY14 Agency HQ Report found that "IRC has extensive, comprehensive tools and materials for training new and existing staff at all levels on R&P program requirements." The USP network learning strategy is based on a culture of continuous knowledge creation and knowledge sharing, with an emphasis on IRC's strategic priorities. Each year, USP creates an annual training plan for the network that draws on strategic planning objectives and the results of monitoring

11

exercises and evaluations. USP utilizes a 'blended learning approach' in which training initiatives are conducted through a variety of platforms. The training plan is designed to build the capacity of staff members to provide linguistically and culturally appropriate resettlement services, and is monitored and updated on a monthly basis by the ten-member USP HQ R&P Training & Tools Team. All new employees participate in a comprehensive orientation that includes an introduction to IRC's organizational policies, the code of conduct, and the R&P program's contractual requirements, as well as an overview of the refugee resettlement process and the USP program framework. R&P field and HQ staff also participate in ongoing training and annual performance reviews that specifically address the services and standards outlined in the PRM Cooperative Agreement.

## 2015 Achievements

**Learning Liaisons:** IRC HQ supports a group of USP staff who help promote and facilitate learning initiatives across the network. Twenty-seven Learning Liaisons are currently active, with at least one representative from each field office. Since the inception of this initiative in October 2009, the Learning Liaisons have played an instrumental role in leading training activities, promoting webinars, and improving access to online learning tools such as the Learning Portal and eCornell courses. Learning Liaisons also facilitate learning transfer following workshops and conferences and promote involvement in peer-to-peer learning initiatives, including the Communities of Practice. Learning Liaisons are provided with a comprehensive orientation and are kept up-to-date through bimonthly webinars and newsletter on new learning initiatives.

**Communities of Practice (CoPs):** These groups are designed to share and disseminate best practices within specific domains. A CoP is a *"group of* professionals united by a common purpose and dedicated to supporting each other in increasing their knowledge, creating new insights and *enhancing performance."* CoPs enable staff members across the IRC network to share best practices, access expertise on technical issues, and engage peer-to-peer support networks. IRC has supported CoPs since 2010; a total of fourteen CoPs are currently active. A sample of recent topics includes: violence against women, food-secure resettlement, and preparing for Syrian resettlement (Case Management CoP); the new caseworker CO toolkit and training on the cultural orientation statistical report in ETO (Cultural Orientation CoP); employer partnerships and transportation challenges (Employment Services CoP); service integration, goal-setting, and neighborhood financial services maps (Financial Education and Counseling CoP); and corporate engagement and social media strategies (Resource Development CoP). CoPs meet via conference calls or webinars on a monthly basis and participate in discussion boards and file-sharing via collaborative websites. Ten CoPs use online workspaces to improve their knowledge management capabilities. USP provides quarterly training for CoP leaders on topics such as the use of technology for knowledge management and the cultivation of virtual communities. A **7-minute video** on the CoP model is included in new staff orientation, and Learning Liaisons provide their colleagues with regular updates on CoP activities.

**New staff orientation:** New staff members receive an introduction to the refugee admissions program through standardized orientation checklists and two 20-minute e-learning modules. All new case management staff are required to read and be familiar with *The Case Manager's KIOSK*, a comprehensive guide to case management that is fully updated every two years. As necessary and appropriate, IRC HQ will assign a program mentor from one office to help a less experienced

12

staff member at another office in developing the skills, systems, protocols and/or strategies required to support the R&P program. New EDs receive an initial orientation from their Regional Director and other key staff at IRC HQ. Once at their field site, they receive ongoing support and supervision from their Regional Director. New ED Orientation includes an overview of IRC's systems, policies, protocols, and procedures in the areas of human resources, development, finance, external relations, and government relations as well as strategic planning goals and objectives. An online resource, Directopedia, provides EDs with an efficient way to access up-to-date resources. All EDs are kept current through weekly emails from the Processing Department, while cooperative agreements and other administrative directives are shared with EDs, on an ongoing basis, by the Senior Director of Resettlement and Processing.

**E-learning modules:** The IRC **Refugee 101** e-learning module provides a 20-minute, easy-to-understand overview of the complex resettlement process. This module is shared with the greater NGO community through Learning International for NGOs (LINGOS). The **USP Program Framework** e-module provides an overview for new staff and volunteers on IRC's work in the United States. The **Separated Minor Case Compliance** e-module outlines the essential elements of managing and maintaining compliance for minor casework and includes tips for conducting household interviews to ensure that separated minors are in as safe and stable an environment as possible. **US Programs Information Systems: Introduction to IRIS and ETO** provides a 20-minute primer to IRIS and ETO, including how both systems are used to manage pre-arrival processing, post-arrival reporting and case management activities. **Tracking Service Delivery in ETO** offers a comprehensive overview on how to record R&P activities for clients in ETO, along with methods to maintain data quality and integrity. **Case File Documentation** provides an interactive overview of R&P case file documentation requirements, IRC standardized file forms available in IRIS and ETO, and practices to maintain the quality, confidentiality and security of case file documentation. A set of three e-learning modules regarding interpretation includes: **Protocols and Procedures for Interpreters** (modes of interpretation, introduction techniques and strategies to improve skills), **Ethics for Interpreters** (ethics and protocols for resettlement interpreters) and **Working with Interpreters** (controlling physical space, monitoring communication, tailoring language and exploring the importance of cultural competences).

**USP Learning Collaborative:** To enhance the technical skills of some of USP's emerging leaders, the IRC has established a virtual learning course through an online collaborative site and live webinars. The FY15 cohort includes 18 participants who are engaged in topics such as budget and finance management, strategic planning, the project cycle, motivating others, and community engagement. Teachers are drawn from the highest levels of IRC management.

**Management Development Program:** This is IRC's first global training program for managers, focusing on three core competencies: Building Teams, Communicating Effectively, and Managing People. By the end of FY15, over 20 MDP courses will have been held globally and over 60 USP managers will have completed the program.

**Mental Health Training:** In December 2014, the USP Mental Health TA co-hosted a three-part training series on Refugee Mental Health. The series assessed current issues in refugee mental health, profiled interventions from around the country, and identified appropriate interventions in the context of client symptoms and each office's resources. The third and final training explored

13

the use of the Refugee Health Screener – 15 (RHS-15), a culturally competent short assessment that detects symptoms of anxiety and depression in refugee populations from different countries. Selected participants were tasked with sharing information with their respective offices.

**Gender Equality in Programming:** In FY15, the Technical Advisor for Women's Protection and Empowerment trained direct service staff in nine USP offices on the dynamics of violence against refugee women. The intensive, two-day training focused on responding to disclosures of domestic and sexual violence and providing support for survivors. A session on gender equality in programs, focusing on awareness-raising and the use of program monitoring to measure gender-disaggregated outcomes, was also included at the Case Management and Employment services conference in San Diego.

**Economic Empowerment:** In FY15, the Technical Advisor for Economic Empowerment provided ongoing training to USP sites on the tracking and reporting of financial education activities within the ETO data management system.

**Early Nutrition:** Throughout FY15, two Technical Advisors for Food Security and Agriculture supported USP offices to provide nutrition education for newly arrived refugees (including the development of diagrams and other tools to facilitate grocery store orientations, along with a 30-day home visit interview guide with discussion questions to help families make positive nutrition choices). In June, the TAs conducted a workshop in Baltimore to explore monitoring and evaluation resources, additional tools for managers, and capacity building resources for staff.

**LGBTI Services:** In FY15, USP appointed an LGBTI Liaison to advance IRC's in-house resources and programming throughout the network. In April, the Liaison conducted a network-wide survey to map best practices in providing core services for LGBTI clients. Individual office snapshots were then developed on the basis of the survey, along with a comprehensive view of the network.

**Job Manuals & Job Aids:** In February, USP released a new job manual for casework staff that provides an overview of standard IRC Intensive Case Management Program requirements. In May, the Family Reunification Desktop Reference was developed and distributed to all offices.

**Notable National Conferences, Workshops, & Trainings**

- *Executive Directors' Conference* (November 3-7, 2014 – New York): A total of 40 field and HQ staff came together for Leadership Week in New York. The conference focused on advancing IRC's Strategic Plan and the organization's newly defined outcomes: Safety, Education, Income, Health and Power. Along with updates on finance, human resources, and national programs, USP participants also engaged in discussions on issues such as the Ebola response and arrivals of unaccompanied minors.
- Case Management & Employment Services Conference for Supervisors (March 17-19, 2015 – San Diego): The Road to Self-Reliance conference brought more than 60 case management and employment supervisors together with Intensive Case Management  (ICM) and USP HQ staff. Topics included: Program Effectiveness, Resource Development and Grant Writing, Mental Health, Integrating ICM, Staff Wellness, Services for Challenging Clients, Turning Around Challenging Cases, Teaching Skills to Clients and Staff, Processing, Career Development,

14

Gender Equality in Programming, and Action Planning. Prior to the conference, a webinar was held for all participants to address key issues, including changes in the Cooperative Agreement.

- Executive Director and Finance Manager Conference (April 27-May 1, 2015 – Salt Lake City): Executive Directors and Finance Managers from each USP office met with senior leadership from HQ for a three-day finance conference covering topics such as R&P flex tracking, and budget re-forecasting based on arrival projections. During the final two days of the conference, EDs and HQ staff discussed strategic planning, resettlement programs, processing, program quality and innovation, advocacy and human capital.
- Advocacy Workshop (June 23-25, 2015 – Baltimore): Select Executive Directors, Technical Advisors and USP HQ management will meet for a three-day workshop to develop local and state advocacy and outreach components of their strategic plans.
- Resource Development Workshop (July 22-24, 2015 – New York): Development Managers and other resource development staff will meet for a 2 ½ day workshop focused on cultivating lasting relationships with donors, enhancing technical experience in development planning and database management, and exploring new fundraising tactics.
- Communications and Outreach Training: As one of its ongoing HQ support functions, IRC helps USP offices utilize their local websites and email software to more effectively meet their communications and outreach needs. Over the past year, IRC has supported more than 20 official trainings with Development Managers, Volunteer Coordinators and communications staff. Trainings were held both in person and by phone.
- New Database Training: Training sessions for IRIS and ETO users continued throughout FY15. In December, webinars were delivered to introduce new ETO tools and reports that are used to monitor data quality, including an R&P Core Services QA report, Service Plan QA report and Direct Financial Assistance QA report. In January, webinars were delivered to train staff on enhancements to the R&P client and case dashboards in ETO, maximizing the feature's utility in case management. In February, webinars were delivered to train EDs and HQ staff on R&P reporting capabilities in both IRIS and ETO. In April, webinars were delivered to train staff on enhancements to the reports and forms page in ETO, including an overview of new aggregate reports that were developed for program management.
- Volunteer Program Training: In FY15, IRC conducted ongoing trainings with all USP offices on the volunteer management system. USP offices also continue to train volunteers on using the online timesheet.
- eCornell: IRC staff have access to eCornell courses authored by renowned faculty from Cornell's highly-rated Johnson Graduate School of Management.

## FY16 Training Plan

In FY16, all R&P staff will participate in at least one interactive training, including webinars on changes in the FY16 Cooperative Agreement and R&P reporting mechanisms. In addition, staff will also receive reference materials and newsletters specific to their job functions, software training, and alerts and policy memos on relevant issues, as well as notifications of classroom and web-based trainings offered by IRC and partner agencies. The Learning Collaborative will hold its third year of virtual training for emerging leaders, while IRC HQ staff will be available to provide technical assistance and share best practices with regional staff via email and phone. Peer-to-peer learning will continue through the Communities of Practice and staff exchanges. IRC's Global Learning Management System will move to a new platform in June 2015 and will continue

15

to offer more than 300 e-Learning courses as well as resettlement-focused technical modules developed in-house.

USP will hold a conference for Executive Directors in FY16 with subject material highlighting R&P program management, financial management, human resources, and community outreach issues. Key representatives from PRM, ORR, USCIS and UNHCR will be invited to participate in the conference. Meanwhile, a dedicated R&P conference will focus on case management and employment issues, with an additional track for intensive case management and an additional day dedicated to supervisors. The conference will utilize a Training-of-Trainers model, and participants will be tasked with conducting workshops in their respective offices based on content provided at the conference and the individual needs of their office. USP will also conduct one training workshop focused on emerging needs that develop throughout the year. The training workshop will be designed to maximize cost efficiency by bringing together case managers from offices that are located within a defined geographical area. USP will also host a training for internal monitors, including field monitors.

### Fraud Prevention
IRC takes the issue of fraud very seriously, and has issued policies designed both to combat fraud and to ensure that it is reported as required in a timely manner. IRC has established a system in the field to report anomalies as well as allegations that might indicate fraud or coercion. When fraud is suspected, staff members present the facts of the case through the local field office. The relevant Executive Director then reports the matter to IRC HQ. An HQ committee reviews the case, asks questions, and/or requests additional information, as appropriate, and reports the matter to PRM staff accordingly. IRC staff can also report on fraud via telephone and email, using EthicsPoint, an independent firm that specializes in providing a confidential and anonymous reporting tool for employees.

### Code of Conduct
IRC is committed to the highest standards of workplace conduct, a commitment that forms the foundation of trust on which all of the agency's activities as a global humanitarian organization rest. The organization's standards for professional conduct embody IRC's three core values of Integrity, Service and Accountability and 22 specific undertakings to which all IRC employees must adhere in the course of their work. These standards have been summarized in an easily comprehensible, one-page document – **The IRC Way** (attached). The IRC Way incorporates the IRC Beneficiary Protection from Exploitation and Abuse Policy and the six IASC principles. IRC Way staff "Ambassadors" are appointed for each USP office to help orient all employees to the code of conduct and assist in the integration of the IRC Way into the new hire induction process. In addition to sessions facilitated by each of these Ambassadors, during which a video explaining the IRC Way is viewed, staff members receive explanatory brochures, reminder cards, and posters describing IRC's core values. The Ambassadors act as a focal point for the IRC Way and are available to explain the behavioral standards that are expected of staff. IRC conducts refresher sessions and yearly awareness activities on the IRC Way.

## IV. IOM TRAVEL LOAN PROGRAM
IRC operates an International Organization for Migration (IOM) loan processing unit at its headquarters office in New York. The department is managed and supervised by senior staff from

16

the IRC Finance Department. Loan collection staff participate in annual meetings convened with IOM and PRM on loan processing procedures. In FY10, IRC implemented the Loan Tracking Interface (LTI), an electronic system created by IOM to help resettlement agencies report their account activities and outstanding balances. The system interfaces with the IOM Loan Tracking System (LTS) for the importing of USRAP Travel Loan Promissory Note (ePN) data and the exporting of account balances, transactions and transfers to IOM. The IOM Loan Department utilizes the Travel Loan Manager System database to maintain its accounting records and create monthly billing statements for IRC clients, to whom letters are mailed on a monthly basis. The database also allows staff to generate loan analysis reports and monitor and correct changes in the client's or sponsor's address. When a programming change is required, IRC utilizes a programmer hired on a contractual basis.

Refugees are informed of their legal responsibility to repay their IOM transportation loans during their first intake meeting and orientation session with R&P case managers. After arrival, information regarding newly-arrived and billable clients is transferred from the IRC processing database to the IOM loan database. A letter of introduction is sent to clients before they receive their first bill. The letter details the total loan amount, the monthly payment required, and procedures for updating addresses, splitting loans and arranging payment plans. Refugees are billed for their travel within six months of their arrival, with the initial bill sent at the beginning of the client's sixth month in the United States. Thereafter, bills are sent on a monthly basis to all clients with a viable address.

The IOM Loan Department also advises clients about credit bureau reporting. On a monthly basis, information regarding outstanding IOM transportation loans for clients who have been in the United States at least six months is reported to the Trans Union Credit Bureau. Clients are offered a deferred payment or request a reduced-amount monthly payment schedule if the client is experiencing financial hardship. The lowest acceptable amount is a $25 payment, which can be arranged for up to six months, allowing staff to maintain monthly contact with clients and ensure that a current address remains on file. The IOM Loan Department regularly utilizes information from IRC field offices, US Postal Service returns, the IRIS system, and R&P reports in order to maintain a current address database. R&P reports are used not only to update refugee addresses but also to record social security numbers for all family members. In addition, IRC staff work with the Experian credit bureau to identify clients' current addresses. Clients who reside in the US for at least 48 months and whose payments do not comply with the terms of the IOM/Voluntary Agencies MOU are transferred to IOM. This procedure is conducted on a quarterly basis.

The IRC Loan Department is currently comprised of four full-time employees. The number of staff is expected to stay the same in FY16. Staff and other expenses are not directly charged to the R&P program but are allocated to the 25% of the net collection amount retained by IRC. The chart below illustrates IRC's loan collection activities since 2000.

| | ILFROE | RLF | TOTAL | % INCREASE OVER PRIOR YEAR |
|---|---|---|---|---|
| **2000** | $2,146,125.84 | $3,834,087.83 | $5,980,213.67 | 8% |

17

| | ILFROE | RLF | TOTAL | % INCREASE OVER PRIOR YEAR |
|---|---|---|---|---|
| 2001 | $1,758,773.41 | $4,204,983.31 | $5,963,756.72 | 0% |
| 2002 | $1,208,176.34 | $3,938,661.33 | $5,147,722.67 | -14% |
| 2003 | $815,679.82 | $2,880,954.73 | $3,697,479.90 | -28% |
| 2004 | $488,166.96 | $2,449,361.75 | $2,937,528.71 | -21% |
| 2005 | As of 2005, IOM does not split collections between ILFROE and RLF. | | $2,793,375.69 | -5% |
| 2006 | | | $3,057,878.28 | +9% |
| 2007 | | | $3,270,733.24 | +7% |
| 2008 | | | $4,339,490.17 | +33% |
| 2009 | | | $5,871,153.12 | +35% |
| 2010 | | | $7,534,764.84 | +28% |
| 2011 | | | $8,338,529.63 | +11% |
| 2012 | | | $7,190,988.54 | -14% |
| 2013 | | | $6,511,911.55 | -9% |
| 2014 | | | $5,521,899.46 | -15% |

18

## IRC Reception & Placement Program Logical Framework

| Goals |
|---|
| To create opportunities for refugees served under the R&P program to successfully transition into American society and become self-reliant citizens who are well-integrated in their new communities. |

| Activities |
|---|
| • Conduct programmatic monitoring visits • Review programmatic reports • Process assurances      • Review office budgets, placement plans and staffing rosters • Provide training and technical assistance to staff and monitors |

| Objective | Indicators | Means of Verification |
|---|---|---|
| a. To ensure that R&P core services and basic needs support are made available in an appropriate language to refugees through nationwide networks of affiliated offices | • By 10/1/15, % of offices that demonstrate adequate language resources available for R&P core services • By 9/30/16, % of offices monitored that receive a compliant or mostly compliant rating in core service delivery with adequate interpretation | • R&P proposal abstracts • Internal Case Placement Surveys • Monitoring Reports |
| b. To promote the placement of all refugees in areas conducive to the attainment of economic self-sufficiency | • By 9/30/16, % of cases that demonstrate income exceeding expenses at end of R&P Period • By 9/30/16, % of offices that demonstrate 95% or more cases with income exceeding expenses at end of R&P Period | • R&P Period Reports |
| c. To promote refugee placement through agencies that maximize the use of private resources and programs | • By 10/1/15, % of offices that report additional financial resources dedicated to FY15 R&P clients of at least 10% of R&P budget • By 10/1/15, % offices that have budgeted staff positions dedicated to securing private cash and in-kind resources • By 9/30/16, 20,000 volunteer hours will be contributed to the R&P program | • R&P Proposal Abstracts • Operating budgets • Volunteer database |
| d. To promote effective resettlement through community involvement including, but not limited to, coordination with ethnic and other community-based organizations and through consultation and coordination with state and local public officials involved in assisting refugees | • By 9/30/16, % of offices that demonstrate full compliance with community consultation requirements | • Quarterly consultation reports |
| e. To ensure that each refugee receives the following R&P basic needs support and core services according to standards included in the Cooperative Agreement within the specified time frame, and that provision of such services is well-documented in case files: | • By 9/30/16, % of cases with timely submission of assurances. • By 9/30/15, % of cases with assurance waivers. | • PRM HQ Monitoring Report • Monitoring Reports • R&P Period Reports |

| | | |
|---|---|---|
| 1. Sponsorship assurance;<br>2. Pre-arrival planning;<br>3. Reception;<br>4. Basic needs support for at least 30 days, including the provision of: decent, safe, sanitary, and affordable housing; essential furnishings; appropriate food and food allowances and other basic necessities; necessary clothing; assistance applying for social security cards; assistance in obtaining health screening and assistance accessing other necessary health and mental health services; assistance in obtaining appropriate benefits, other social services, and English language instruction; assistance with enrollment in employment services; assistance registering children in school; and transportation to job interviews and job training;<br>5. At least two home visits within the first 30 days and a third home visit to permanent housing if the refugee moves from temporary housing within the R&P period;<br>6. Case management, including the development and implementation of individualized service plans during the initial 30-day period;<br>7. Cultural orientation, with appropriate language interpretation as needed;<br>8. Assistance to refugee minors resettled in non-parental family units, as required: initial placement suitability assessments; orientation to U.S. child welfare requirements; assistance regarding guardianship and legal obligations in caring for the child; regular and personal contact; and follow-up assessments and suitability determinations. | • By 9/30/16, % of offices monitored that receive a compliant or mostly compliant rating for pre arrival, reception, basic needs support, case management, home visit, cultural orientation, and minor services<br>• By 9/30/16, % of cases that receive basic needs and core services in accordance with the Cooperative Agreement<br>• By 9/30/16, % of offices monitored that receive a compliant or mostly compliant rating for services to refugee minors resettled in non-parental family units, where applicable | |
| f. To maintain the capability and flexibility to receive and place new caseloads, including refugees with special needs, and to shift program and staff resources to reflect changing refugee populations and arrival patterns | • By 9/30/16, % of offices that have performed budget reforecasting activities at least two times based on arrival patterns.<br>• By 9/30/16, % of offices that have received training and other resources to increase capacity to serve new caseloads and refugees with special needs<br>• By 9/30/16, % of offices that implement annual training plans as proposed. | • Budget reforecast submissions<br>• Training agendas/Terms of Reference |

| | | |
|---|---|---|
| g. To ensure effective monitoring of local affiliates performing R&P services in accordance with the Cooperative Agreement | • By 9/30/16, % of monitoring reports that are compliant with Cooperative Agreement requirements<br>• By 10/1/15, % of monitors who demonstrate adequate knowledge to perform effectively as monitors<br>• By 9/30/16, % of monitoring visits performed within required timeframes | • Monitoring Reports<br>• Monitoring Training Attendance Logs<br>• Annual Monitoring Plan |
| h. To achieve R&P performance outcomes, specifically:<br>  1. Refugee is in a safe, stable environment<br>    a) Refugee is picked up at the airport upon arrival with appropriate language interpretation as needed<br>    b) Refugee is placed in a safe dwelling<br>    c) Refugee is placed in an affordable dwelling<br>    d) Refugee has basic necessities<br>  2. Refugee can navigate appropriate and relevant systems<br>    a) Refugee can access/use appropriate transportation<br>    b) Refugee obtains own food and basic needs<br>    c) Refugee obtained social security card and other identification as needed<br>    d) Refugee accesses health care<br>    e) Refugee demonstrates ability to contact emergency services<br>    f) Refugee children are enrolled in school within 30 days of arrival<br>    g) Refugee knows where to get assistance to file paperwork to bring family members to the United States<br>    h) Refugee knows how to ask for interpretation services<br>  3. Refugee family is connected to means of ongoing support for self/family<br>    a) Refugee is connected to or enrolled in eligible services<br>    b) Refugee is financially supported (or self-sufficient) | • By 9/30/16, % of offices monitored that receive a compliant or mostly compliant rating in each performance outcome<br>• By 9/30/16, % of adult clients completing CO assessments who respond with correct answers to questions regarding use of transportation, obtaining basic necessities, contacting emergency services, requesting interpretation, knowing addresses and phone number, and role of agency/self<br>• By 9/30/16, % of cases that receive basic needs and core services in accordance with the Cooperative Agreement<br>• By 9/30/16, % of cases that demonstrate income exceeding expenses at end of R&P Period<br>• By 9/30/16, % of offices monitored that demonstrate cultural orientation curriculum and practices compliant with requirements | • Monitoring Reports<br>• CO Assessments<br>• R&P Period Reports |

| | | |
|---|---|---|
| c) Refugee can explain where the household money will come from when the initial assistance is finished<br>4. Refugee understands surroundings and situation<br> a) Refugee knows his/her address, knows how to make phone call, and how to be contacted<br> b) Refugee understands the effects of moving<br> c) Refugee knows the role of the agency and expectations of the agency and self<br> d) Refugee has a basic understanding of U.S. laws and cultural practices | | |
| i. To ensure that R&P program and performance information is accessible to the public | • By 9/30/16, % of HQ quarterly and annual reports that meet all reporting requirements and submitted to PRM on time. | • R&P quarterly and annual reports |



**RECEPTION & PLACEMENT PROGRAM**
**Proposed FY2016 National Headquarters Management Staff Summary**

**R&P Agency:**      International Rescue Committee (IRC)

| Name | Title | Description of R & P Duties (Brief summary of major tasks) | Hours working | % Time Funded by PRM | % Time Funded by |
|------|-------|------------------------------------------------------------|---------------|----------------------|------------------|
| Robin Dunn Marcos | Senior Director Processing & Resettlement Programs | implementation of the Reception and Placement program through management of the HQ resettlement and processing teams, collaboration with Regional Directors, and serving as a focal point for PRM and related working groups | 19 | 50% | 50% |
| Kerry Sheldon | Director for Resettlement Programs | Supports the management an implementation of the Reception and Placement program through ongoing technical assistance as well as monitoring and contractual oversight | 21 | 55% | 45% |
| Sara Dadkhah | Program Officer R&P | Coor nates technical support to R&P programming, overseas R&P training efforts, manage R&P report tracking and analysis and conducts onsite monitoring and compliance review | 32 | 85% | 15% |
| Gejsi Cangonji | Program Officer Resettlement | Conducts onsite monitoring and compliance review and ensures that R&P clients are effectively transitioned to other relevant programs at the end of the R&P period | 4 | 10% | 90% |
| Courtney Madsen | Program Officer Resettlement | Conducts onsite monitoring and compliance review and ensures that R&P clients are effectively transitioned to other relevant programs at the end of the R&P period | 4 | 10% | 90% |
| VACANT | Program Manager | Provides logistical and operational support to monitoring and compliance review processes as well as in-person and remote field staff training; manages distribution of training and compliance communication to field offices | 19 | 50% | 50% |
| Jackie Mize-Baker | Director | Manage all processing operations, represents IRC at allocations meetings and resettlement committees | 38 | 100% | 0% |
| Yolanda Barila | Arrivals Specialist | Manages arrivals process and is liaison with IOM | 38 | 100% | 0% |
| Meryem Altan | Processing Specialist | Manages pre-arrival processing, assists travel specialist, assists with R&P reports, enters data, manages unit supplies, archives documents | 38 | 100% | 0% |
| Annie Wu | Processing Specialist | Manages pre-arrival processing, assists travel specialist, assists with R&P reports, enters data, manages unit supplies, archives data | 38 | 100% | 0% |
| Jany Ha Do | Processing Specialist | Manages pre-arrival processing, assists travel specialist, assists with R&P reports, enters data, manages unit supplies, archives documents | 38 | 100% | 0% |
| Prospero Herrera | Program Officer Data Quality Management | Manages pre-arrival processing reporting, and is the primary WRAPS contact | 38 | 75% | 25% |
| Muoi Lam | Processing Coordinator | Manages pre-arrival processing, enters data, collects I-94s, manages mail | 38 | 100% | 0% |
| Hana Sahar | Processing Assistant | Assists in all areas of pre-arrival processing | 38 | 100% | 0% |
| Gerrard Khan | Sr. Director, Resource Acquisition and Mgmt. | Oversees grant reporting and compliance and liaises with PRM and other resettlement agencies on grant management issues | 8 | 20% | 80% |
| Kelly Ricculli | Program Development Officer | Provides technical assistance for community resource development and compiles reports | 19 | 50% | 50% |
| Natalia Lopez | Sr. Program Officer Volunteer Operations | Oversees training and best practices for volunteers providing R&P services | 10 | 25% | 75% |
| Floor De Ruijter | Program Officer | Assists the HQ team in monitoring oversight of Reception and Placement activities | 8 | 20% | 80% |
| Rachel Beck | Associate Director, Resource Acquisition and Mgmt. | Assists with grant reporting and compliance | 2 | 5% | 95% |
| Roisin Ford | Program Officer - Pacific West Region | Performs onsite monitoring and is a point of contact on social service issues, capacity development for core services, placement suitability determination | 17 | 45% | 55% |
| VACANT | Program Officer - Atlantic Central Region | Performs onsite monitoring and is a point of contact on social service issues, capacity development for core services, placement suitability determination | 17 | 45% | 55% |
| Sara Lubetsky | Program Manager - Pacific West Region | Assists the Regional team in monitoring oversight of Reception and Placement activities | 17 | 45% | 55% |
| Jessica Shih | Program Manager - Atlantic Central Region | Assists the Regional team in monitoring oversight of Reception and Placement activities | 17 | 45% | 55% |
| Hiwot Bekele | Budget Officer | Responsible for the network budget and financial management | 13 | 35% | 65% |

1

| Name | Title | Description of R & P Duties (Brief summary of major tasks) | Hours working | % Time Funded by PRM | % Time Funded by |
|------|-------|-----------------------------------------------------------|-------|------|------|
| VACANT | Department Manager | Supports Vice President, Deputy Vice President, and the Department at large | 23 | 60% | 40% |
| Jennifer Chan | Program Administrator | Manages special projects | 19 | 50% | 50% |
| Abigail Clarke-Sayer | Program Officer - Program Info Systems | Oversee IRIS/ETO, manage the IRC's instance of IRIS, coordinate IRIS trainings, represent IRC at monthly IRIS partner meetings, analyze R&P data, and create custom queries and reports | 11 | 30% | 70% |
| Quentin Scott | IT Project Manager | Manage technical activities related to IRIS/ETO and integration | 4 | 10% | 90% |
| Sumita Chandrasekhar | Software Training Specialist | Create training materials and conduct trainings related to IRIS/ETO | 11 | 30% | 70% |
| Adnan Suvalic | Software Developer | Assists with integrating IRIS with ETO and other IRC systems | 5 | 12% | 88% |
| Kristy Gladfelter | Senior Technical Advisor - Strategy & Learning | Oversees and designs training for staff providing R&P services | 8 | 20% | 80% |
| Kasra Movahedi | Senior Technical Advisor - Economic Empowerment | Provides technical assistance to R&P staff in the areas of cultural orientation, employability and US workplace standards | 4 | 10% | 90% |
| Katie Donohue | Technical Advisor - Women Protection & Empowerment | Provides technical assistance to R&P staff in the areas of women protection and empowerment | 4 | 10% | 90% |
| Annie Bonz | Technical Advisor - Mental Health | Provides technical assistance to R&P staff in the areas of mental health | 4 | 10% | 90% |
| Graeme Rodgers | Technical Advisor - US Research Programs | Provides technical assistance to R&P staff in the areas of US research programs | 4 | 10% | 90% |
| Jennifer Sime | Vice President for US Programs | Led's IRC US Programs Department an approves strategic direction for IRC implementation of the R&P program. Represents and advocates for R&P interests to IRC Senior Leadership, Board and external parties. | | 0% | 100% |
| Hans Van de Weerd | Deputy Vice President | overall responsibility for program quality, research, evaluation and innovation. Represents and advocates for R&P interests to IRC Senior Leadership, Board and external parties. | | 0% | 100% |
| Debi Wheeler | Regional Director - Atlantic Central Region | oversight of R&P program and financial management at the field office level. Region includes Los Angeles, San Diego, Northern California, Boise, Seattle, Phoenix, Tucson, and Salt Lake City | | 0% | 100% |
| Mireille Cronin Mather | Regional Director - Pacific West Region | oversight of R&P program and financial management at the field office level. Region includes Atlanta, Silver Spring, Baltimore, Charlottesville, New York, New Jersey, Miami, Tallahassee, Dallas, Abilene, Wichita and Garden City | | 0% | 100% |
| Ellen Beattie | Director of National Programs | programming to spur innovation in the areas of health, mental health, economic employment, women's empowerment, food security, among others. Leads quality control for new initiatives and involved in business development for new programs. | | 0% | 100% |
| Paula Forero | Director, Immigration Programs | Oversees the provision of immigration-related technical assistance and guidance to IRC field offices, including the CAM and P3 programs | | 0% | 100% |

2

Three-Year Affiliate Monitoring Plan
Reception and Placement Program
FY 2015 - FY 2017

R&P Agency:  International Rescue Committee, Inc.

| Affiliate Information | | | | Monitoring Plan | | | |
|---|---|---|---|---|---|---|---|
| State | City | PRM/RPC Affiliate Code | If joint site, list collaborating agency | FY 2015 Proposed | FY 2015 Actual | FY 2016 Planned | FY 2017 Planned |
| AZ | Phoenix | AZIRC01 | n/a | X | X | | |
| AZ | Tucson | AZIRC02 | n/a | | | X (Jul) | |
| CA | Los Angeles | CAIRC01 | n/a | | | X (Aug) | |
| CA | Sacramento | CAIRC08 | n/a | | | ND (May) | |
| CA | San Diego | CAIRC02 | n/a | X | ND (Aug) | | |
| CA | Oakland | CAIRC03 | n/a | | | ND (Apr) | |
| CA | San Jose | CAIRC05 | n/a | | | ND (Apr) | |
| CA | Turlock | CAIRC11 | n/a | | | ND (May) | |
| FL | Miami | FLIRC01 | n/a | | | X (Nov) | |
| FL | Tallahassee | | n/a | | | X (Sep) | |
| GA | Atlanta | GAIRC01 | n/a | | | X (Mar) | |
| ID | Boise | IDIRC01 | n/a | X | X | | |
| KS | Garden City | KSIRC02 | n/a | | | X (Oct) | |
| KS | Wichita | KSIRC01 | n/a | ND | X (Jul) | | |
| MD | Baltimore | MDIRC01 | n/a | | | X (Jan) | |
| MD | Silver Spring | MDIRC02 | n/a | X | X(Aug) | ND (Jun) | |
| NJ | Elizabeth | NJIRC02 | n/a | | | | X |
| NY | New York | NYIRC01 | n/a | | | | X |
| TX | Abilene | TX1RC02 | n/a | | | ND (Feb) | |
| TX | Dallas | TXIRC01 | n/a | X | X (Sep) | | |
| UT | Salt Lake City | UTIRC01 | n/a | X | X | | |
| VA | Charlottesville | VAIRC01 | n/a | | | | X |
| WA | Seattle | WAIRC01 | n/a | X | X | | |

Instructions:
1.   Only official, on-site monitoring visits should appear on this three-year plan.
2.   List the month in which the visit is planned.
3.   Do not list technical assistance, training, or other visits.
4.   Briefly describe below the reasons any FY 2015 proposed sites were not monitored.
5.   PRM Affiliate code is the code assigned by PRM/RPC, e.g. AZ (agency acronym)01.
6.   For joint site affiliates, identify the collaborating agency and identify the agency making the visit.

Key
X = Scheduled Monitoring Visit
ND = New Director Monitoring Visit
IA = Insufficient Arrivals (Fewer than 25 arrivals; site is not part of FY2013 on-site monitoring plan)
SC = Special Circumstances Monitoring Visit - briefly describe

FY2016 Proposed Consolidated Placement Plan
Reception and Placement Program

R&P Agency: **International Rescue Committee**

| Affiliate Information | | | FY2016 - U.S. Tie | | | | | | FY2016 - No U.S. Tie | | | | | | FY2016 | Client/FTE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | City | Affil Code | AF | EA | ECA | LAC | NE/SA | Total | AF | EA | ECA | LAC | NE/SA | Total | Total | Ratio |
| AZ | Phoenix | AZIRC01 | 30 | 80 | 10 | 25 | 60 | 205 | 235 | 20 | 0 | 25 | 475 | 755 | 960 | 83 |
| AZ | Tucson | AZIRC02 | 30 | 0 | 0 | 10 | 60 | 100 | 245 | 0 | 0 | 10 | 25 | 280 | 380 | 73 |
| CA | Los Angeles | CAIRC01 | 0 | 10 | 0 | 15 | 705 | 730 | 10 | 0 | 0 | 0 | 20 | 30 | 760 | 98 |
| CA | Oakland | CAIRC03 | 20 | 45 | 0 | 5 | 335 | 405 | 20 | 5 | 0 | 5 | 30 | 60 | 465 | 94 |
| CA | Sacramento | CAIRC08 | 0 | 0 | 20 | 0 | 790 | 810 | 20 | 0 | 10 | 0 | 10 | 40 | 850 | 92 |
| CA | San Diego | CAIRC02 | 40 | 25 | 35 | 0 | 680 | 780 | 85 | 0 | 0 | 0 | 40 | 125 | 905 | 92 |
| CA | San Jose | CAIRC05 | 10 | 10 | 0 | 5 | 155 | 180 | 0 | 0 | 0 | 0 | 15 | 15 | 195 | 99 |
| CA | Turlock | CAIRC11 | 0 | 0 | 0 | 0 | 160 | 160 | 0 | 0 | 0 | 0 | 20 | 20 | 180 | 102 |
| FL | Miami | FLIRC01 | 5 | 10 | 0 | 110 | 10 | 135 | 15 | 0 | 10 | 20 | 20 | 65 | 200 | 101 |
| FL | Tallahassee | TBD | 0 | 10 | 10 | 15 | 25 | 60 | 15 | 0 | 0 | 0 | 25 | 40 | 100 | 88 |
| GA | Atlanta | GAIRC01 | 40 | 190 | 10 | 20 | 280 | 540 | 220 | 20 | 0 | 20 | 50 | 310 | 850 | 54 |
| ID | Boise | IDIRC01 | 15 | 15 | 5 | 0 | 140 | 175 | 105 | 0 | 0 | 0 | 20 | 125 | 300 | 76 |
| KS | Garden City | KSIRC02 | 30 | 40 | 0 | 10 | 0 | 80 | 0 | 0 | 0 | 0 | 0 | 0 | 80 | 80 |
| KS | Wichita | KSIRC01 | 30 | 0 | 0 | 0 | 50 | 80 | 150 | 0 | 0 | 0 | 70 | 220 | 300 | 68 |
| MD | Baltimore | MDIRC01 | 25 | 270 | 0 | 20 | 170 | 485 | 260 | 10 | 0 | 0 | 70 | 340 | 825 | 89 |
| MD | Silver Spring | MDIRC02 | 70 | 35 | 0 | 5 | 110 | 220 | 70 | 0 | 0 | 15 | 90 | 175 | 395 | 89 |
| NJ | Elizabeth | NJIRC02 | 5 | 0 | 0 | 60 | 200 | 265 | 10 | 0 | 0 | 0 | 15 | 25 | 290 | 87 |
| NY | New York | NYIRC01 | 5 | 40 | 0 | 10 | 85 | 140 | 0 | 0 | 0 | 0 | 10 | 10 | 150 | 94 |
| TX | Abilene | TXIRC02 | 15 | 100 | 0 | 25 | 50 | 190 | 60 | 0 | 0 | 0 | 0 | 60 | 250 | 72 |
| TX | Dallas | TXIRC01 | 10 | 270 | 0 | 15 | 485 | 780 | 10 | 5 | 0 | 0 | 5 | 20 | 800 | 75 |
| UT | Salt Lake City | UTIRC01 | 175 | 80 | 0 | 5 | 140 | 400 | 60 | 10 | 0 | 0 | 60 | 130 | 530 | 95 |
| VA | Charlottesville | VAIRC01 | 0 | 0 | 0 | 5 | 20 | 25 | 15 | 0 | 0 | 15 | 195 | 225 | 250 | 88 |
| WA | Seattle | WAIRC01 | 100 | 30 | 10 | 0 | 240 | 380 | 125 | 10 | 0 | 0 | 60 | 195 | 575 | 96 |
| TOTAL | | | 655 | 1260 | 100 | 360 | 4950 | 7325 | 1730 | 80 | 20 | 110 | 1325 | 3265 | 10590 | |

## IRC FY2016 R&P Placement Matrix

| State | Office | Affiliate Code | Complex Medical | Mental Health | Large Families | Single-Headed Households | Singles | Disabilities | Elderly | LGBTI |
|---|---|---|---|---|---|---|---|---|---|---|
| AZ | Phoenix | AZIRC01 | | | | | | | | |
| AZ | Tucson | AZIRC02 | | | | | | | | |
| CA | Los Angeles | CAIRC01 | | | | | | | | |
| CA | Oakland | CAIRC03 | | | | | | | | |
| CA | Sacramento | CAIRC08 | | | | | | | | |
| CA | San Diego | CAIRC02 | | | | | | | | |
| CA | San Jose | CAIRC05 | | | | | | | | |
| CA | Turlock | CAIRC11 | | | | | | | | |
| FL | Miami | FLIRC01 | | | | | | | | |
| FL | Tallahassee | TBD | | | | | | | | |
| GA | Atlanta | GAIRC01 | | | | | | | | |
| ID | Boise | IDIRC01 | | | | | | | | |
| KS | Garden City | KSIRC02 | | | | | | | | |
| KS | Wichita | KSIRC01 | | | | | | | | |
| MD | Baltimore | MDIRC01 | | | | | | | | |
| MD | Silver Spring | MDIRC02 | | | | | | | | |
| NJ | Elizabeth | NJIRC02 | | | | | | | | |
| NY | New York | NYIRC01 | | | | | | | | |
| TX | Abilene | TXIRC02 | | | | | | | | |
| TX | Dallas | TXIRC01 | | | | | | | | |
| UT | Salt Lake City | UTIRC01 | | | | | | | | |
| VA | Charlottesville | VAIRC01 | | | | | | | | |
| WA | Seattle | WAIRC01 | | | | | | | | |
| | | TOTAL | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 |

Key:

Full capacity to serve clients with these characteristics.

Limited capacity to serve clients with these characteristics; determined on case by case basis.

No capacity to serve clients with these characteristics. (Note: not applicable; all offices have full or limited capacity)