IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 3:15-cv-03851-N |
| UNITED STATES OF AMERICA, et al., | ) ) | |
| Defendants. | ) ) ) ) | |

**DEFENDANT INTERNATIONAL RESCUE COMMITTEE'S BRIEF
IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ i

Table of Authorities ....................................................................................................... ii

Legal Background ......................................................................................................... 1

    A.  Basic legal framework for refugee resettlement ............................................. 1

    B.  IRC's compliance with federal law ................................................................ 4

    C.  The State's actions to bar Syrian refugee resettlement and to interfere with IRC's work and its compliance with federal law ........................................................... 5

Argument ...................................................................................................................... 8

    A.  The State is not substantially likely to prevail on the merits .......................... 8

        1.  The State's contract claims are without merit ............................................ 9

            a) Statutory Contract Claim ...……………………………………………... 9

            b) Records Clause Contract Claim……………………………………………11

        2.  The State's claims are contrary to federal law. ......................................... 12

            a) 8 U.S.C. § 1522(a)(5) ........................................................................ 12

            b) Supremacy Clause ............................................................................. 13

            c) Equal Protection Clause .................................................................... 15

            d) Title VI ............................................................................................. 16

    B.  The State has shown no irreparable injury ................................................... 18

    C.  The State's actions cause a severe harm to IRC ........................................... 19

    D.  The public interest will not be served by the requested injunctive relief ....................... 19

Conclusion .................................................................................................................. 20

**Cases**

*Arizona v. United States*, 132 S. Ct. 2492 (2012) .............................................................. 13, 14, 15

*Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628 (10th Cir. 1993) ..................................... 17

*Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272 (9th Cir. 1982) ........................ 16

*Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729 (2011) ............................................ 16

*Canal Auth. of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974) .............................................. 8

*Clark v. Prichard*, 812 F.2d 991 (5th Cir. 1987) .......................................................................... 8

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ...................................................... 15

*Graham v. Richardson*, 403 U.S. 365 (1971) .............................................................. 13, 15, 16

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .................................................................................. 14

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ......................................................................... 8

*Johnson v. California*, 543 U.S. 499 (2005) .............................................................................. 15

*Kelley v. Bd. of Trustees of Univ. of Illinois*, 832 F. Supp. 237 (C.D. Ill. 1993) ......................... 17

*Kelley v. Bd. of Trustees*, 35 F.3d 265 (7th Cir. 1994) ............................................................. 17

*Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76 (D.D.C. 2006) ................................ 17

*Martinez v. Mathews*, 544 F.2d 1233 (5th Cir. 1976) ................................................................. 8

*Midi v. Holder*, 566 F.3d 132 (4th Cir. 2009) ........................................................................... 16

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .................................................................. 17

*Takahashi v. Fish and Game Comm'n*, 334 U.S. 410 (1971) .............................................. 13, 15

*Toll v. Moreno*, 458 U.S. 1 (1982) ............................................................................................ 13

*Truax v. Raich*, 239 U.S. 33 (1915) ......................................................................................... 13

*U.S. v. Playboy Entertainment Group*, Inc., 529 U.S. 803 (2000) ............................................. 16

*United States v. Pink*, 315 U.S. 203 (1942) .............................................................................. 14

*Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) ............... 13

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................................... 16

**Statutes & Regulations**

U.S. Const., XIV Amend. ...................................................................................................... 12, 17

U.S. Const., Art. VI ............................................................................................................... 12, 17

42 U.S.C. § 2000d .................................................................................................................. 10, 17

8 U.S.C. § 1101 ............................................................................................................................. 1

8 U.S.C. § 1157(a)(2) .............................................................................................................. 2, 15

8 U.S.C. § 1158(b)(1) .................................................................................................................... 2

8 U.S.C. § 1522 ..................................................................................................................... passim

45 C.F.R. § 400.5 ............................................................................................................ 4, 10, 13

**DEFENDANT INTERNATIONAL RESCUE COMMITTEE'S BRIEF
IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Acting without any lawful authority, the Governor of the State of Texas has directed that

"the State of Texas will not accept any refugees from Syria."  Pursuant to that order, Plaintiff, the

Texas Health and Human Services Commission ("HHSC" or the "State") has undertaken a series

of unlawful measures and filed this lawsuit to prevent the settlement in Texas of families from

Syria who have undergone extensive screening procedures and been admitted to the United

States as refugees by the federal government.  The State's attempt to interfere with refugee

resettlement, and to discriminate against certain refugees on the basis of their nationality, is

preempted by federal law, violates the Equal Protection Clause, and violates federal civil rights

statutes.  In addition, the claim the State has brought against Defendant International Rescue

Committee, Inc. ("IRC") is utterly meritless. The States is therefore unlikely to prevail and,

indeed, its actions to block IRC's work are illegal and unconstitutional.  The State also has

entirely failed to demonstrate that it will suffer any harm, much less irreparable harm, or any of

the other requisites for temporary injunctive relief.  The State's motion should be denied.[1]  The

government Defendants in this case are opposing the State's motion separately.

## Legal Background

**A.     Basic legal framework for refugee resettlement**

The State's complaint and motion ignore a basic tenet of law:  Refugee resettlement

involves two areas of exclusive federal authority—foreign relations and immigration.  It is

---

[1] The State did not file a separate motion for a temporary restraining order and preliminary injunction but rather incorporated that motion and its complaint in its single filing.  Defendant IRC respectfully submits this brief in opposition only to the motion, and reserves its responsive pleading for later filing pursuant to Federal Rule of Civil Procedure 12.  Defendant IRC does not waive herein any answer, defenses, or counterclaims.

governed by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*., as amended

by the Refugee Act of 1980, Pub. L. No. 96-21.  Under the INA, the State simply does not have

the legal authority to dictate the terms of refugee resettlement, and the State is unlikely to prevail

on the merits of its claims.

Through the INA, Congress has reinforced that the power to admit and to resettle

refugees is exclusively in the hands of the federal government.  The INA provides that a

"refugee" is an individual "unable or unwilling to return to . . . [his or her country of nationality]

because of persecution or a well-founded fear of persecution on account of race, religion,

nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1).

Not all refugees are granted admission to the United States; instead, Congress granted the

President explicit authority to determine the number of refugee admissions in a given fiscal year,

8 U.S.C. § 1157(a)(2); to determine which refugees are of "special humanitarian concern to the

United States" and to allocate admissions accordingly, 8 U.S.C. § 1157(a)(3); and to increase the

number of refugee admissions as necessary to account for emergencies, 8 U.S.C. § 1157(b).

The U.S. Departments of State and Homeland Security have established extensive

processes for determining whether applicants are refugees and for screening them for security

threats.[2]  It typically takes a successful Syrian applicant for refugee admission at least two years

to clear the multiple layers of screening and processing that are part of this system.[3]

---

[2] U.S. Dep't of State, U.S. Refugee Admissions Program,
http://www.state.gov/j/prm/ra/admissions/index.htm.
[3] Haeyoun Park & Larry Buchanan, *Why It Takes Two Years for Syrian Refugees to Enter the U.S*., N.Y. Times, Nov. 20, 2015, http://www.nytimes.com/interactive/2015/11/20/us/why-it-takes-two-years-for-syrian-refugees-to-apply-to-enter-the-united-states.html.

Refugees who are ultimately approved for admission are placed in the Department of State's Reception and Placement Program.[4]  IRC is one of nine national non-profit organizations that contract with the Department of State's Bureau of Population, Refugees and Migration ("PRM") to provide initial resettlement assistance to refugees in the United States, and has signed a "Cooperative Agreement" with PRM to provide these services.

After initial resettlement, refugees are eligible for certain further assistance and services to help them integrate into life in the United States. 8 U.S.C. §§ 1521-22.  The Office of Refugee Resettlement ("ORR") in the Department for Health and Human Services "fund[s] and administer[s]" these longer-term assistance programs "in consultation with the Secretary of State." 8 U.S.C. § 1521.  Federal resettlement funds overseen by ORR flow to states and nonprofit agencies, and ultimately to refugees, asylees, and parolee entrants.

In particular, under 8 U.S.C. § 1522, states, including Texas, receive grants from ORR both for activities undertaken directly by the state and for amounts that are "passed through" to nonprofit agencies, including IRC, to provide assistance such as job training, employment services, English-language training, and social services. 8 U.S.C. §§ 1522(a)(4)(B), (b)(5), (c)(1), (c)(2), (d)(2).

Critically, Congress has explicitly provided that "[a]ssistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion." 8 U.S.C. § 1522(a)(5).  And federal law also subjects the states' role in the refugee resettlement to strict limits and requirements.  "As a condition for receiving assistance," a State must submit a "state plan" outlining how it intends to achieve certain program goals; designate a State employee as state refugee coordinator; "meet standards, goals, and priorities,

---

[4] U.S. Dep't of State, The Reception and Placement Program, http://www.state.gov/j/prm/ra/receptionplacement/index.htm.

developed by [ORR], which assure the effective resettlement of refugees and which promote their economic self-sufficiency as quickly as possible and the efficient provision of services"; and report annually to ORR on the use of funds administered by the state. 8 U.S.C. § 1522(a)(6).

In addition, section 1522 further states that "local voluntary agency activities should be conducted in close cooperation and advance consultation with State and local governments." 8 U.S.C. § 1522(a)(1)(B).  But nothing in section 1522 or any other federal law remotely suggests that such "close cooperation and advance consultation" permits states or municipalities to set the terms for resettlement or unilaterally to block certain groups of refugees from being settled in the state.

Federal regulations flesh out these statutory requirements.  By federal regulation, a state resettlement plan contemplated by section 1522(a)(6) must explicitly "[p]rovide that assistance and services funded under the plan will be provided to refugees without regard to race, religion, nationality, sex, or political opinion," 45 C.F.R. § 400.5(g).  The plan must also "assure that meetings are convened, not less often than quarterly, whereby representatives of local resettlement agencies, local community service agencies, and other agencies that serve refugees meet with representatives of State and local governments to plan and coordinate the appropriate placement of refugees in advance of the refugees' arrival." 45 C.F.R. § 400.5(h).  And the plan must "provide that the State will . . . [c]omply with the provisions of Title IV, Chapter 2, of the [INA, 8 U.S.C. §§ 1521-24]," as well as "all other applicable Federal statutes and regulations and regulations . . . ." 45 C.F.R. § 400.5(i).

## B.      IRC's compliance with federal law

IRC is fully in compliance with all applicable federal laws governing its work.  IRC has worked in Texas for some 40 years in a constructive partnership with the state, local officials,

and communities. *See* Compl. Ex. D.  It numbers among approximately 20 nonprofit agencies that work on refugee resettlement in the state. Duvin Decl. ¶ 4, attached as Ex. A.  In accordance with federal statute and regulation and the Texas state plan under 8 U.S.C. § 1522(a)(6) ("the Texas State Plan"), agencies within the North Texas region meet quarterly with the State to plan and coordinate resettlement activities and assistance. Duvin Decl. ¶ 8.  Typically these meetings are convened by the State. *Id*.  The most recent meeting was on September 11, 2015; the next meeting, which has been convened by nonprofit stakeholders, is scheduled for December 11, 2015, and the State has been invited to attend.  *Id*. IRC consistently attends these quarterly meetings and intends to continue doing so. *Id*. ¶¶ 8, 10. In addition, nonprofit agencies statewide are to meet with the State on an annual basis; the most recent statewide meeting was held in March 2015, and IRC was in attendance. *Id*. ¶ 9.

In addition to these meetings, IRC routinely communicates with the State regarding resettlement activities.  For example, IRC regularly consults with HHSC's Refugee Coordinator and Refugee Health Services coordinator in advance of providing proposed refugee placements to PRM for the coming fiscal year. *Id*. ¶ 11.  Specifically, prior to sending its projected resettlement figures to PRM for fiscal year 2016, IRC engaged in extensive consultation with the State and, in response to the State's requests, provided detailed information regarding its proposed placements, including the placement of Syrian refugees. *Id*.

**C.     The State's actions to bar Syrian refugee resettlement and to interfere with IRC's work and its compliance with federal law**

Syrians have been migrating to Texas, and becoming Texans, for well over a century.[5]  In early 2011, a civil war marked by extraordinary brutality, terrorist tactics employed by the state

---

[5] Lebanese/Syrian Texans, *Texas Almanac 2006-07*, *available at* http://texasalmanac.com/topics/culture/lebanesesyrians/lebanesesyrian-texans; *Lebanese Texans*

and numerous rebel groups, and immense suffering visited upon the civilian population erupted in Syria; it continues to this day.[6]  The State has facilitated the resettlement of 243 Syrians in Texas since 2011, in keeping with the State's proud tradition of hospitality toward refugees.[7]  In attempting to show the need for a temporary injunction, the State points to President Obama's February 5, 2014, Exercise of Authority, which waived technical violations of the material support bar for certain refugees.  But even after that lawful exercise of the President's authority pursuant to federal law, 224 Syrian refugees have been resettled in Texas with the State's assistance.[8]  In its motion, the State has articulated absolutely no harm to its interests flowing from the settlement of those refugees, or any others.

However, following terrorist attacks on Paris on November 13, 2015, a number of governors announced that they would not allow Syrian refugees to resettle in their states—without any lawful authority for insinuating state policy into an area of exclusive federal authority, and moreover without any factual basis demonstrating why they were attempting to discriminate on the basis of nationality against Syrians.  Among these governors was Governor Abbott, who announced on Twitter on November 16, 2015, that "Texas will not accept any Syrian refugees & I demand the U.S. act similarly.[9]  The same day, the Governor sent a letter to President Obama that began, "As governor of Texas, I write to inform you that the State of Texas

---

[6] *See generally* U.S. Dep't of State, Syria 2014 Human Rights Report, *available at* http://www.state.gov/documents/organization/236834.pdf.

*and Syrian Texans* (Univ. of Tx. Institute of Texan Cultures at San Antonio 1988), *available at* http://digital.utsa.edu/cdm/ref/collection/p16018coll6/id/286.

[7] *See* Refugee Processing Center Interactive Reporting, U.S. Department of State, *available at* http://www.wrapsnet.org/Reports/InteractiveReporting/tabid/393/EnumType/Report/Default.aspx?ItemPath=/rpt_WebArrivalsReports/Map%20-%20Arrivals%20by%20State%20and%20Nationality.

[8] *See id.*

[9] https://twitter.com/GregAbbott_TX/status/666275701549502464

will not accept any refugees from Syria in the wake of the deadly terrorist attack in Paris."[10]   The

letter went on to explain that "[e]ffective today, I am directing the Texas Health & Human

Services Commission's Refugee Resettlement to not participate in the resettlement of any Syrian

refugees in the State of Texas."  The following day, November 17, 2015, the Governor sent a

directive to Plaintiff Texas Health and Human Services Commission and the Texas Department

of Public Safety instructing them to implement his directive and to notify nonprofit agencies

such as IRC.

On November 19, 2015, HHSC sent to Defendant IRC a letter demanding information

about IRC's resettlement plans and informing IRC that "[i]n light of [the Governor's] direction

and additional instructions from the Governor," HHSC "will *refuse to cooperate* with the

resettlement of any Syrian refugees in Texas." (Emphasis added.)  Plaintiff further instructed

IRC to "discontinue . . . immediately" any "active plans to resettle Syrian refugees in Texas."

Compl. Ex. A.  IRC promptly responded to the State's letter and provided the information

requested by the State.

On November 25, 2015, HHSC again wrote to Plaintiff, claiming that "we have been

unable to achieve cooperation with your agency" because "your agency insists on resettling

certain refugees from Syria in the near future." Compl. Ex. C.  When IRC received this letter on

November 30, 2015, it again immediately responded, explaining that it is "committed to working

in close cooperation with the highest levels of Texas State leadership," that it "has worked in

Texas for over 40 years in a constructive partnership with state, local officials, and

communities," and offered to discuss the issues further in person or via videoconference.  IRC

noted, though, that "in accordance with its obligations under federal guidelines and its

---

[10] Letter from Gov. Greg Abbott to the President, *available at* http://gov.texas.gov/files/press-office/SyrianRefugees_BarackObama11162015.pdf.

Cooperative Agreement with the U.S. Department of State," it would "continue to provide

assistance and services to all refugees who have been admitted lawfully to the United States."

Compl. Ex. D.  The State responded by letter on December 1, 2015, demanding that the IRC

"halt resettlement of any Syrians seeking refugee status in Texas," and requiring the IRC to

confirm that it would comply with the demand by the next day. Compl. Ex. H.  IRC did not so

confirm, and HHSC filed this suit on December 2, 2015.

## Argument

In order to prevail in its motion for a temporary restraining order and preliminary

injunction, the State must show that (1) there is a substantial likelihood that it will prevail on the

merits; (2) there is a substantial threat that irreparable injury will result if the injunction is not

granted; (3) the threatened injury outweighs the threatened harm to the Defendant; and (4)

granting the preliminary injunction will not disserve the public interest.  *Janvey v. Alguire*, 647

F.3d 585, 595 (5th Cir. 2011); *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.

1974); *see also Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (same standard for

temporary restraining order and preliminary injunction).  The State has failed to carry its burden

on any of the four factors.

Moreover, the State is *not* seeking to maintain the status quo.  To the contrary, it is

seeking to stop IRC's ongoing work of resettling refugees who have been admitted by the federal

government and without discrimination on the basis of nationality as required by federal law.

Such "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo

pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly

favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).  The motion

should be denied.

**A.**  **The State is not substantially likely to prevail on the merits**

The State is not substantially likely to prevail on the merits.  Indeed, its claims against the

Defendants are entirely without merit, and it is the State's actions that are contrary to federal law

and the U.S. Constitution.

**1.  The State's contract claims are without merit**

The State's only cause of action against IRC claims that IRC has breached a contractual

duty toward the State, on two grounds.  The first, which we will call the "Statutory Contract

Claim," is that, in the State's view, 8 U.S.C. § 1522(a)(1)(B)(iii) "require[s] … that [IRC] work

'in close cooperation and advance consultation with the [HHSC]," and IRC has failed to do so.

Thus, the State alleges, IRC has violated a contractual requirement that it "[p]rovide services . . .

in compliance with . . . applicable Federal laws and regulation," *see* Compl. Ex. K, p. 5, ¶ U.

The State's second argument, which we will call the "Records Clause Contract Claim," is that

IRC has, in the State's view, breached a contractual obligation to "cooperate fully and allow

HHSC and all appropriate federal and state agencies or their representative's access to client

records, books, and supporting documents pertaining to services provided" and to "make

documents available at reasonable times and for reasonable periods for the purpose of inspection,

monitoring, auditing, or evaluating."  The State is not substantially likely to prevail on either

theory; indeed, these claims are entirely without merit.

**a)  Statutory Contract Claim**

As an initial matter, the State repeatedly suggests that 8 U.S.C. § 1522 requires IRC to

"cooperate" and "consult" with the State.  But there is no mandatory language in 8 U.S.C. §

1522(a)(1)(B)(iii), which provides only that "[i]t is the intent of Congress that in providing

refugee assistance under this section … local voluntary agency activities *should* be conducted in

close cooperation and advance consultation with State and local governments" (emphasis added). This is one of three hortatory provisions setting out broad preferences (the others being that refugees "should be placed in jobs as soon as possible" and that social service funds "should be focused on employment-related services") but conspicuously omitting any statutory command. Notably, other applicable federal statutes do contain such mandatory language. *See*, *e.g.*, 8 U.S.C. § 1522(a)(5) ("Assistance and services funded under this section *shall* be provided to refugees without regard to race, religion, nationality, sex, or political opinion.") (emphasis added); 42 U.S.C. § 2000d ("[N]o person in the United States *shall*, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.") (emphasis added).

But even if there were a statutory requirement of consultation and cooperation, IRC would be in full compliance.  As set out above, IRC has always collaborated with the State and has repeatedly stated—even on the day that HHSC brought this suit—it had every desire to continue to work in close consultation and cooperation with the State. And it has done so consistently. Specifically,

- IRC faithfully attended and participated in all or substantially all of the quarterly meetings between the state and refugee resettlement agencies under the state plan. Duvin Decl. ¶ 10.  As 45 C.F.R. 400.5(h) establishes, these meetings serve the purpose of "plan[ning] and coordinat[ing] the appropriate placement of refugees in advance of the refugees' arrival."

- IRC also frequently consulted with HHSC staff outside these meetings to provide projections regarding resettlement and to determine whether HHSC staff had concerns about IRC's plans. Duvin Decl. ¶ 11.

- IRC provided information regarding projected Syrian resettlement specifically on multiple occasions in the last three months, including a conversation at the end of September 2015, at which IRC proposed a specific number of Syrian refugees for resettlement in the Dallas area as part of a broader projection of refugee arrivals for

Dallas, and the HHSC official said he had no problem with the projection; a spreadsheet prepared by IRC and provided to HHSC on November 12, 2015, in response to a query from HHSC regarding Syrian refugees anticipated to arrive in Fiscal Year 2016; and a conversation on November 18, 2015, in which HHSC explained that the Governor's office was seeking additional information on Syrian refugees and IRC provided information on arrivals expected December 3, 2015. *Id.* ¶ 12.

- IRC responded promptly to each letter that HHSC sent regarding Syrian resettlement, reiterating its desire to cooperate and offering to meet in person or via videoconference. *Id.* ¶ 15. Moreover, where IRC could not give any information on account of the confidentiality provisions governing its relationship with PRM, its provided HHSC the contact information for persons at PRM who could provide the information it sought. *Id.*

### b)     Records Clause Contract Claim

The State's Records Clause Contract Claim is even harder to fathom than its Statutory Contract Claim.  The State has failed to explain what, if any, "client records, books, and supporting documents" it sought from IRC; whether it sought such items for the purposes specified in the Records Clause; or how IRC failed to "make documents available at reasonable times and for reasonable periods."

Indeed, the evidence demonstrates that IRC has promptly complied with all of the State's requests for information.  Even the State's December 1, 2015, letter to IRC merely stated in conclusory terms that "the State has not been given access to any of the information necessary for meaningful participation" and that HHSC has "asked the Department of State" to provide it with information relating to Syrian refugees.  As detailed above, IRC repeatedly provided information to HHSC about its refugee resettlement plans, including information specifically relating to Syrian refugees, in recent months. Duvin Decl. ¶¶ 11-15.

Finally, as the State must concede, IRC's contract also required IRC to "comply with Federal laws and regulation[s]."  To the extent that HHSC's Records Clause claim is based on

11

any alleged failure to provide information that is confidential under federal laws and regulations, that is an additional reason it fails.

### 2.   The State's claims are contrary to federal law

In short, the State entirely fails to set forth in its motion with any specificity why it believes IRC has failed to cooperate.  The State simply alleges, in conclusory terms, that Defendant has not cooperated.  That is not nearly enough to justify the extraordinary emergency remedy that the State seeks.  Indeed, the State's claim boils down to an argument that IRC and the federal government defendants failed to implement the State's attempted ban on Syrian refugees.  That claim fails utterly on the merits.

First, the plain and ordinary meaning of "cooperation" does not mean that IRC must do whatever the State says—especially when that is an order to discriminate against refugee families on the basis of nationality.  And critically, as IRC sets out in brief herein and will develop further in a responsive pleading, it is the State's actions that are unlawful, as follows: The State's attempts to prevent or obstruct the settlement of Syrian refugees in Texas violate at least the following statutory and constitutional provisions: (1) the INA, specifically 8 U.S.C. § 1522(a)(5); (2) the Supremacy Clause; (3) the Fourteenth Amendment's Equal Protection Clause; and (4) Title VI of the Civil Rights Act of 1964.

### a)   8 U.S.C. § 1522(a)(5)

First, the State's efforts to bar the resettlement of Syrian refugees violate the Refugee Act, which provides that "[a]ssistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion." 8 U.S.C. § 1522(a)(5).  Contrary to Congress's express provision, Texas has denied assistance to Syrian refugees on the sole basis of their nationality, and has attempted to compel IRC to deny

assistance to Syrian refugees on the sole basis of their nationality.  That is a straightforward

violation of the statute, as well as the regulatory requirement that, via the Texas State Plan, the

State must ensure "that assistance and services funded under the plan will be provided to

refugees without regard to race, religion, nationality, sex, or political opinion," 45 C.F.R.

400.5(g).

      **b)**      **Supremacy Clause**

The State's attempt to bar Syrian refugees also impinges unlawfully on an area of

exclusive federal authority.  The federal government has "broad, undoubted power over the

subject of immigration and the status of aliens." *Arizona v. United States*, 132 S.Ct. 2492, 2498

(2012).  Accordingly, the Supreme Court and other courts have "long recognized the preeminent

role of the Federal Government with respect to the regulation of aliens within our borders," and

have repeatedly invalidated state laws and policies targeting immigrants under the Supremacy

Clause. *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (collecting cases); *see also*, *e.g.*, *Villas at Parkside

Partners v. City of Farmers Branch*, 726 F.3d 524, 526 (5th Cir. 2013), *cert. denied*, 134 S. Ct.

1491 (2014).  The State's actions violate the Supremacy Clause in at least three separate ways:

First, the State's actions interfere with the federal government's exclusive power to

regulate immigration. *Toll*, 458 U.S. at 11 (1982) (quoting *Takahashi v. Fish and Game

Comm'n*, 334 U.S. 410, 419 (1971)).  Furthermore, "aliens lawfully within this country have a

right to enter and abide in any State in the Union 'on an equality of legal privileges with all

citizens under nondiscriminatory laws.'" *Graham v. Richardson*, 403 U.S. 365, 378 (1971)

(quoting *Takahashi*, 334 U.S. at 420); *accord Truax v. Raich*, 239 U.S. 33, 39 (1915) (a non-

citizen admitted to the United States under federal law has "the privilege . . . of entering and

abiding in any State in the Union").  Here, the State is claiming precisely the powers that the

Supremacy Clause denies it: the power to deny refugees lawfully admitted to this country the right to enter and abide in Texas; and the right to add an additional condition—ineligibility for resettlement in Texas—to those imposed by the federal government on the admission of refugees.

Second, the State's actions are field-preempted.  States have no power to act "[w]here Congress occupies an entire field"—that is, where "the federal framework of regulation [is] so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 132 S. Ct. at 2502, 2501 (punctuation and citation omitted). The admission and settlement of refugees is just such a field.  The federal statutes address all aspects of refugee admissions and resettlement defines a specific, limited, role for states to play in the process. *See generally* 8 U.S.C. § 1522.

Moreover, the federal government has a dominant interest in the admission of non-citizens generally, of which refugee resettlement is a key part.  And Congress has explicitly delegated extensive authority to the President to set refugee admission levels and allocate refugee admissions in light of "national interest" and "humanitarian" concerns, which amount in whole or in part to foreign policy concerns. *Cf. United States v. Pink*, 315 U.S. 203, 233 (1942) ("No State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively.") It is clear that there is no room for states to add their own regulations on this subject. *See Hines v. Davidowitz*, 312 U.S. 52, 66 (1941) ("[T]he regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject . . . the law of the state . . . must yield to it.")

Third, the state's actions are conflict-preempted, both because "'compliance with both federal and state regulations is a physical impossibility,'" and because the state's actions "'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).  IRC cannot both comply with 8 U.S.C. § 1522(a)(5)'s (and Title VI's) requirement that it provide services "without regard to . . . nationality" and comply with Texas's demand that it "halt resettlement of any Syrians."  And even leaving § 1522(a)(5) aside, the state's actions present an obstacle to Congress's scheme in many ways.  For example, the federal statute provides that the President allocates refugee admissions, 8 U.S.C. § 1157(b), and that the federal government has ultimate authority to determine where refugees are settled, 8 U.S.C. § 1522(a)(2).  But if the state can do what it has done, it has an effective veto over these decisions. The federal statute does not permit a state veto, and the U.S. Constitution does not tolerate it.

### c)   Equal Protection Clause

The State's actions also violate equal protection.  It is well established that state discrimination against or among aliens who are lawfully in the United States is "inherently suspect and subject to close judicial scrutiny," *Graham*, 403 U.S. at 372—*i.e.*, the state must demonstrate that its discriminatory actions are "'-narrowly tailored measures that further compelling governmental interests,-'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted).  Thus, in *Takahashi*, the Supreme Court struck down a California statute that had denied fishing licenses to lawfully admitted non-citizens who were ineligible for citizenship, while allowing other non-citizens and citizens to obtain such licenses.  334 U.S. at 420.  In *Graham*, the Court likewise invalidated statutes that prohibited aliens lawfully in the United States from receiving public assistance.

Of course, Texas is not discriminating against all refugees, only Syrian refugees.  But that only makes matters worse.  The Court in *Graham* also explained that state classifications based on nationality are subject to the same strict scrutiny. 403 U.S. at 372; *see also*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (reversing, on equal protection grounds, convictions under facially neutral California law on the ground that state applied it exclusively against Chinese non-citizens); *Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009) (strict scrutiny is applied to national-origin discrimination against lawfully admitted aliens); *Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 277 n.15 (9th Cir. 1982) (citing *Graham*, 403 U.S. at 371-72).

The State clearly cannot meet its burden of justifying its action when strict scrutiny is applied.  While, as a theoretical matter, ensuring safety is compelling, positing an entirely speculative risk, as the State does in its motion, is not sufficient to demonstrate a compelling state interest.  Instead, "[t]he State must specifically identify an 'actual problem' in need of solving."  *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011) (quoting *U.S. v. Playboy Entertainment Group*, Inc., 529 U.S. 803, 822 (2000)).  "Conclusory statement[s]" are not enough. *Id.*  The state must do far more than allude to terrorist attacks in Paris or cite a few out-of-context quotes from officials to identify "an actual problem" with regard to the Syrian refugees coming to America after a lengthy and extensive review by the federal government.

Nor is the suspension of resettlement imposed by the State the least restrictive alternative to meet security concerns, even if these concerns were compelling.  A total ban on all Syrian refugees because of a theoretical concern that one refugee may present a security concern is the antithesis of least restrictive alternative.  To the contrary, it is a categorical assumption (not based upon any facts)—the most restrictive means of addressing the "problem" that can be

imagined.  Of course, the least restrictive thing to do is to individually review all refugees being placed—and the federal government is already doing just that.

### d)     Title VI

The State's actions also violate Title VI of the Civil Rights Act of 1964, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  The two elements for establishing a cause of action pursuant to Title VI are "(1) that there is racial or national origin discrimination and (2) the entity engaging in discrimination is receiving federal financial assistance." *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993).

Coextensive with the Equal Protection Clause of the Fourteenth Amendment, discrimination occurs under Title VI when the state "intentionally classif[ies] similarly situated individuals for different treatment on the basis of an impermissible characteristic, such as race, national origin, or gender." *Kelley v. Bd. of Trustees of Univ. of Illinois*, 832 F. Supp. 237, 242 (C.D. Ill. 1993) *aff'd sub nom. Kelley v. Bd. of Trustees*, 35 F.3d 265 (7th Cir. 1994).  Intentional discrimination is shown either by providing direct evidence of discrimination or by alleging "circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference.  Such evidence includes any statement or written document showing a discriminatory motive on its face." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (internal quotations omitted).

17

Here, the discriminatory policy is explicit: the Governor stated that "the State of Texas will not accept any refugees from Syria", and HHSC ordered IRC to "halt resettlement of any Syrians seeking refugee status in Texas." These directives apply solely to Syrian refugees and the only criterion for barring refugees from the State is their Syrian nationality. Texas is therefore engaged in direct and explicit discrimination on the basis of national origin.

The second element of a Title VI claim is equally clear. HHSC is receiving "federal financial assistance" for its refugee programs; HHSC's contract with IRC explicitly states its activities are "funded by [ORR] under Refugee Social Services Program Catalog of Federal Domestic Assistance (CFDA) # 93.566 and ORR, Targeted Assistance Grants CFDA #93.584." Compl. Ex. K, Sec. I.

The violation of Title VI here has been confirmed by the federal government. On November 25, 2015, ORR published a letter underlining that "States that continue to use ORR funding must ensure that assistance and services are delivered without regard to race, religion, nationality, sex, or political opinion" and that "States may not deny ORR-funded benefits and services to refugees based on a refugee's country of origin or religious affiliation. Accordingly, states may not categorically deny ORR-funded benefits and services to Syrian refugees." *See* United States Department of Health and Human Services—Office of Refugee Resettlement, Resettlement of Syrian Refugees, *available at* http://www.acf.hhs.gov/programs/orr/resource/ resettlement-of-syrian-refugees (last visited Nov. 30, 2015). The ORR letter explained that state discrimination on this ground not only would violate state plan requirements, 8 U.S.C. § 1522(a)(5), and 45 C.F.R. § 440.5(g), but would also violate Title VI.

In sum, the State's actions plainly constitute intentional discrimination on the basis of national origin under Title VI of the Civil Rights Act of 1964.

**B.       The State has shown no irreparable injury**

In alleging irreparable injury, the State alludes in entirely speculative and vague fashion

to security concerns, notwithstanding the fact that each of the refugee families that IRC is

scheduled to resettle in Texas has passed through the federal government's rigorous security

screen.[11]  The State has entirely failed to carry its burden of proving irreparable injury.

**C.       The State's actions cause a severe harm to IRC**

Moreover, an injunction would severely harm IRC by interfering with its core mission

and duty under its contracts and federal law to resettle refugees without discrimination on the

basis of nationality.  In addition, IRC has invested key resources in order to prepare for

resettlement of 1,050 individuals in Texas in FY 2016.  If an injunction ensues, those resources

would be wasted, resulting in loss of services and other harms to IRC clients. *See* Duvin Decl.

¶ 17.  The harm to IRC posed by any injunction would be severe, while the State has shown no

injury that would be caused by permitting the status quo to continue.

**D.       The public interest will not be served by the requested injunctive relief**

The State has entirely failed to demonstrate that the public interest will be served by an

emergency injunction.  To the contrary, the public interest will be harmed if the State is

permitted to stop IRC from fulfilling its organizational mission and resettling fully vetted Syrian

refugee families, as that unilateral state action would be entirely contrary to the U.S. Constitution

and federal law, as set forth above.[12]

_____

[11] The State also asserts that its contract with Defendant IRC contains an express agreement that breach of contract constitutes irreparable injury.  However, the State's contract claim is invalid for the reasons set forth above.  *See supra.*

[12] *See, e.g.*, *McIntire v. Bethel School,* 804 F. Supp. 1415, 1429 (W.D. Okla. 1992) ("Vindication of constitutional freedoms is in the public interest.") (internal citation and quotation omitted); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010), *aff'd,* 726 F.3d 524 (5th Cir.) (en banc), *cert. denied,* 134 S. Ct. 1491 (2014) ("[T]he

**Conclusion**

The State's motion for a temporary restraining order and preliminary injunction order should be denied.


Dated: December 4, 2015                        Respectfully submitted,

                                               /s/Rebecca L. Robertson
                                               Rebecca L. Robertson
                                               Adriana Piñon
                                               Satinder Singh
                                               AMERICAN CIVIL LIBERTIES
                                               UNION FOUNDATION OF TEXAS
                                               1500 McGowan, Suite 250
                                               Houston, TX 77004
                                               Tel.: (713) 942-8146
                                               Fax: (713) 942-8966
                                               Email:  rrobertson@aclutx.org
                                                        apiñon@aclutx.org
                                                        ssingh@aclutx.org


                                               Cecillia D. Wang*
                                               AMERICAN CIVIL LIBERTIES UNION
                                               FOUNDATION
                                               IMMIGRANTS' RIGHTS PROJECT
                                               39 Drumm Street
                                               San Francisco, CA  94111
                                               Tel:  (415) 343-0775
                                               Fax:  (415) 395-0950
                                               Email:  cwang@aclu.org

                                               Omar C. Jadwat*
                                               Judy Rabinovitz*
                                               Michael K.T. Tan*
                                               AMERICAN CIVIL LIBERTIES UNION
                                               FOUNDATION
                                               125 Broad Street

---

public interest favor[s] preserving the uniform application of federal immigration standards."); *Valle del Sol*, 732 F.3d at 1029 ("'it is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available.") (internal citation and quotations omitted).

New York, NY 10004
Tel.: 212-549-2620
Fax: 212-549-2654
Email:  ojadwat@aclu.org
         jrabinovitz@aclu.org
         mtan@aclu.org

Kristi L. Graunke*
Michelle Lapointe*
SOUTHERN POVERTY LAW CENTER
1989 College Avenue NE
Atlanta, GA 30317
Tel: (404) 521-6700
Fax: (404) 221-5857
Email:  kristi.graunke@splcenter.org
         michelle.lapointe@splcenter.org

Karen C. Tumlin*
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Blvd.
Suite 2850
Los Angeles, CA  90010
Tel:  (213) 674-2850
Fax:  (213) 639-3911
Email:  tumlin@nilc.org

*Attorneys for Defendant International
Rescue Committee, Inc.*

*Applications for admission *pro hac vice*
forthcoming

## CERTIFICATE OF SERVICE

I hereby certify the foregoing brief in opposition was served upon the parties via ECF notification.

/s/Rebecca L. Robertson
Rebecca L. Robertson

# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-cv-03851-N |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF STATE, JOHN KERRY in his Official Capacity as SECRETARY OF STATE, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, SYLVIA BURWELL, in her Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, ROBERT CAREY, in his Official Capacity as Director of the OFFICE OF REFUGEE RESETTLEMENT, and INTERNATIONAL RESCUE COMMITTEE, INC. | § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

DECLARATION OF DONNA DUVIN

I, Donna Duvin, under penalty of perjury declare the following:

1. I am the Executive Director of U.S. Programs in Dallas with the International Rescue

   Committee (IRC). I have been in this position since March 2015.

2. The IRC is a non-profit organization that helps to resettle refugees globally and across the

   United States. It is one of nine organizations with a contract with the State Department

Bureau for Populations, Refugees and Migration (PRM) to help resettle refugees approved for entry into the United States.

3.  IRC operates local field offices in Dallas and Abeline, Texas that effectuate IRC's resettlement activities at the local level. Our offices work with local and State partners to provide case management services concerning employment, public benefits, and social services for refugees being resettled in the Dallas and Abeline areas.

4.  My understanding is that, altogether, approximately 20 non-profit agencies, including IRC, provide refugee resettlement services in Texas.

5.  At the stage in the resettlement process when my office and other non-profit agencies begin working to resettle refugees, they already have been heavily vetted by the State Department and the Department of Homeland Security for approval to enter the United States. This vetting process includes multiple layers of screening and processing to ensure that prospective refugees do not pose a security threat. For Syrian refugees, this screening process typically takes two years.

6.  My responsibilities as Executive Director include ensuring that the resettlement activities my office undertakes operate in accordance with the cooperative agreement we have with federal agencies; overseeing resettlement activities and resource management; providing necessary reports to funders; and working in cooperation with local and state partners.

7.  I also coordinate our work and consult regularly with two Texas state agencies: the Texas Health and Human Services Commission (HHSC) and the Texas Department of Health Services. Specifically, since assuming the role of Executive Director, I have regularly consulted and communicated with Caitriona Lyons, former Texas State Refugee Coordinator, Randall Patrick, currently the HHSC Refugee Program Manager and who,

before assuming that role, I knew as the Interim Coordinator for HHSC, and Jessica Montour, State Refugee Health Coordinator of the Refugee Health Program under the Texas Department of Health Services (DHS). My relationship and communications with Ms. Lyons, Mr. Patrick and Ms. Montour have always been open, transparent, and respectful.

8.  I have attended quarterly in-person meetings with Ms. Lyons, Mr. Patrick and Ms. Montour to discuss and advise the state on trends we are seeing in resettlement, and any challenges we are experiencing in our work, among other things. These meetings are typically convened by the State and attended by other resettlement organizations in the north Texas region. The most recent meeting was on September 11, 2015, in Arlington, Texas. The next one is scheduled for December 11, 2015, in Arlington. The forthcoming meeting was coordinated by the local groups who attend the meetings; the State has been invited to participate, but HHSC and DHS have not yet confirmed their attendance.

9.  I also attend state-wide meetings with HHSC and DHS. These are conducted less frequently than the regional quarterly meetings, approximately once a year. The last one was held in March 2015.

10. I have attended all of these meetings since becoming the Executive Director. I understand that the individuals who occupied my position before me also attended all or substantially all of these meetings.

11. Separate from these in-person meetings, I also regularly communicate and consult with HHSC and DHS to provide projections regarding resettlement in advance of providing proposed refugee placements to PRM for the coming fiscal year and to determine whether HHSC staff has any concerns about IRC's plans. Specifically, prior to sending

its projected resettlement figures to PRM for fiscal year 2016, IRC engaged in extensive consultation with the State and, in response to the State's requests, provided detailed information regarding its proposed placements, including the placement of Syrian refugees.

12.  IRC provided information regarding projected Syrian resettlement specifically on multiple occasions in the last three months. This included a conversation at the end of September 2015, in which IRC communicated a specific number of Syrian refugees for resettlement in the Dallas area as part of a broader projection of refugee arrivals for Dallas, and the HHSC official stated he had no problem with this projection for Dallas and, I subsequently provided adequate consultation records to justify the Abilene projection to Mr. Randall's satisfaction; a spreadsheet prepared by IRC and provided to HHSC on November 12, 2015, in response to a query from HHSC regarding Syrian refugees anticipated to arrive in Fiscal Year 2016; and a conversation on November 18, 2015, in which HHSC explained that the Governor's office was seeking additional information on Syrian refugees, and IRC provided information on arrivals expected December 3, 2015. A true and correct copy of the spreadsheet provided to HHSC on November 12 is appended as Attachment 1.

13. During the period of my tenure, the only information HHSC has asked IRC to provide regarding Syrian refugees is the date of their arrival and numbers arriving to Texas.

14. On November 19, 2015, I received a letter from Chris Traylor, the Executive Commission of HHSC, requesting notification about any current plans to resettle Syrian refugees in Texas and about any proposed future resettlement of Syrian refugees in Texas. I responded to his request in writing on November 20, 2015, and once again

4

provided arrival information specifying an early December arrival date. A true and correct copy of this letter is appended as Attachment 2.

15.  In general, IRC replied promptly to all the letters from HHSC requesting information about Syrian resettlement plans in Texas. Where I could not give any information on account of the confidentiality provisions governing our relationship with PRM, I provided HHSC the contact information for PRM and the procedure for requesting such information.

16. In sum, my communications with HHSC and DHS have been collaborative, frequent, and open. The State's allegation that IRC has refused to provide information is false.

17. IRC invests key resources in order to prepare for resettlement of 1,050 individuals in Texas in FY 2016.  If an injunction ensues, those resources would be wasted or curtailed, resulting in loss of services and other harms to IRC clients.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above is true and correct.

Executed December 4, 2015.

*Donna Duvin*
_____

Donna Duvin

Attachment 1

Texas Resettlement Agencies-Revised FY16 Proposals

| Agency Name | FY15 Proposed R&P | FY15 Resettled R&P | FY16 Resettled Cuban Parolees | Original FY16 Proposed R&P | Revised FY16 Proposed R&P U.S. Tie | Revised FY16 Proposed R&P Non-U.S. Tie | Revised FY16 Proposed R&P TOTAL | FY16 Syrians Proposed | List specific entities and individuals participating in community consultations | Dates of consultations | Specific concerns or issues noted | How consultation taken into consideration when proposing increased placements for FY 2016. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ABILENE** | | | | | | | | | | | | |
| International Rescue Committee | | | | | | | | | | | | |
| Catholic Charities | | | | | | | | | | | | |
| Refugee Services of Texas | 200 | 428 | 218 | 250 | 325 | 25 | 350 | 200-250 | State level: Patrick Randall, SRC, Jessica Montour, SRHC; Abilene: Taylor County Health Department, Abilene ISD, Alta Vista Adult Educ. Ctr., City of Abilene, Basic Needs Network, United Way 211, Midland City Manager's office, Midland ISD, Midland Health Department, Bilingual Education & ESL, Midland Community Chin Assoc., Welfare | 9/2/2/15, 9/23/15, 9/29/15- local organizations; 9/30/15 and 10/8/15-SRHC, 10/15/15-SRHC, Midland | With proposed increase, note was made that Abilene health clinic will have reached their capacity to manage health screenings for both R&P arrivals and Cuban parolees from Abilene and Midland. | Consultations were made prior to local office formally proposing increase in placements |
| **AMARILLO** | | | | | | | | | | | | |
| Catholic Charities | | | | | | | | | | | | |
| Refugee Services of Texas | | | | | | | | | | | | |
| **AUSTIN** | | | | | | | | | | | | |
| Caritas of Austin, Inc. | | | | | | | | | | | | |
| Refugee Services of Texas | | | | | | | | | | | | |
| Flood Relief | | | | | | | | | | | | |
| **CORPUS CHRISTI** | | | | | | | | | | | | |
| Catholic Charities | | | | | | | | 0 Social Services | | | | |
| Catholic Charities | | | | | | | | | | | | |
| **DALLAS** | | | | | | | | | | | | |
| Proposal Migration 6. | | | | | | | | | | | | |
| International Rescue Committee | | | | | | | | | | | | |
| Refugee Services of Texas | 700 | 831 | 19 | 800 | 820-860 | 190-230 | 1050 | 200-250 | State level: Patrick Randall, SRC, Jessica Montour, SRHC; Dallas: Jennifer Gates, City Councilwoman Dist. 13, Beth Huddleston, Mayor's office; Connie Dunlap, Dallas County Refugee Outreach Clinic, Darryl Whitten, Operations Dallas North Social Security, Zelda Pavlija, Dallas liaison | 9/11/15, 9/23/15, 9/29/15, 10/8/15 - local organizations; 9/30/15 and 10/8/15-SRHC, 10/15/15-SRHC | No resettlement/service challenges noted by IRC or voiced by partners. The IRC has already built a substantial network with Dallas Syrian-oriented partners in anticipation of potential arrivals. Texas Health & Human Services and IRC Dallas did receive some anti-Muslim communication which is being closely monitored going forward. The IRC is also working with leaders in the local community to create pro-resettlement messaging meant to educate the community on all arriving populations. | Consultations were made prior to local office formally proposing increase in placements |
| **EL PASO** | | | | | | | | | | | | |
| **FORT WORTH** | | | | | | | | | | | | |
| Catholic Charities | | | | | | | | | | | | |
| Refugee Services of Texas | | | | | | | | | | | | |
| Interfaith Ministries | | | | | | | | | | | | |
| Refugee Services of Texas | | | | | | | | | | | | |
| Flood Relief | | | | | | | | | | | | |
| **HOUSTON** | | | | | | | | | | | | |
| Catholic Charities | | | | | | | | | | | | |
| YMCA International Services | | | | | | | | | | | | |
| Interfaith Ministries | | | | | | | | | | | | |
| Refugee Services of Texas | | | | | | | | | | | | |
| Alliance for Multicultural Community Services | | | | | | | | | | | | |
| **SAN ANTONIO** | | | | | | | | | | | | |
| Catholic Charities | | | | | | | | | | | | |
| **TOTAL** | 900 | 1259 | 237 | 1050 | 1145-1185 | 215-235 | 1400 | 200-250 | | | | |

## Christopher Clay

| | |
|---|---|
| **From:** | Adriana Pinon |
| **Sent:** | Friday, December 04, 2015 2:20 AM |
| **To:** | Christopher Clay |
| **Subject:** | FW: State Consultations - Proposed Arrival Increases - IRC in Dallas and Abilene response |
| **Attachments:** | Copy of FY16 TX Refugee Program Revised Proposals.xlsx |

-----Original Message-----
From: Donna Duvin [mailto:Donna.Duvin@rescue.org]
Sent: Thursday, December 03, 2015 7:00 PM
To: Adriana Pinon
Subject: FW: State Consultations - Proposed Arrival Increases - IRC in Dallas and Abilene response

Donna Duvin  | Executive Director | US Programs Dallas International Rescue Committee
6500 Greenville Suite 500, Dallas, TX 75206  | Rescue.org/Dallas |  Donate Now
T+1 214-461-9781 ext. 213 | F+1 214 461 9782 | skype:  donna.duvin

-----Original Message-----
From: Randall,Patrick (HHSC) [mailto:Patrick.Randall@hhsc.state.tx.us]
Sent: Thursday, November 12, 2015 6:55 PM
To: Donna Duvin
Cc: Montour,Jessica (DSHS); McNally-Cook,Kelly (HHSC)
Subject: FW: State Consultations - Proposed Arrival Increases - IRC in Dallas and Abilene response

Hello Donnna -

Thank you for your response to our office's request for information pertaining to your proposed increase in refugee placements for Fiscal Year 2016.

The HHSC Office of Immigration and Refugee Affairs acknowledges that we have been informed by your agency, International Rescue Committee, of the revised number of refugees you will propose to resettle in Fiscal Year 2016 in Dallas and Abilene following the increase in national resettlement goals under the Presidential Determination.  Given the condensed time-frame for HHSC review and in the absence of information regarding funding from ORR corresponding to the proposed increase in refugee placements, our office is unable to commit at this time to an official response indicating support or the lack thereof for the proposed increased numbers.

Our office recognizes that the recent increase in proposed resettlement numbers and the need to conduct additional consultations with the community and with the State regarding the increases in a short timeframe represents an unusual circumstance.  HHSC will respond to the U.S. Department of State when they request comments regarding all proposed Fiscal Year 2016 resettlement figures, including the proposed increases.

Thank you for providing the requested information regarding your proposed resettlement figures and consultations you held with stakeholders in your community regarding your proposed figures.  Please let me know if you have any questions.

Thank you.

Patrick Randall
Program Manager
Office of Immigration and Refugee Affairs Texas Health and Human Services Commission
512-206-5129
Patrick.randall@hhsc.state.tx.us

-----Original Message-----
From: Donna Duvin [mailto:Donna.Duvin@rescue.org]
Sent: Thursday, November 12, 2015 10:08 AM
To: Randall,Patrick (HHSC); Montour,Jessica (DSHS)
Cc: Daley Ryan
Subject: RE: State Consultations - Proposed Arrival Increases - IRC in Dallas and Abilene response

Hi Patrick and Jessica,

Please see the attached response from IRC Dallas and IRC Abilene.  As a reminder, Abilene's proposed 350 arrivals reflects:

200 arrivals in Abilene and
150 arrivals in Midland (all US Tie)

I am currently traveling, but will plan to touch base with you next week upon my return.  I'd like to update you on IRC's thoughts related to having a presence in Midland.

In the meanwhile, please let me know of any questions regarding the attached that you might have.  I will be monitoring my emails.

Best,
Donna

Donna Duvin  | Executive Director | US Programs Dallas International Rescue Committee
6500 Greenville Suite 500, Dallas, TX 75206  | Rescue.org<http://www.theirc.org/Dallas>/Dallas |  Donate Now<https://www.rescue.org/donate/us-dallas-tx>
T+1 214-461-9781 | F+1 214 461 9782 | skype:  donna.duvin

---

From: McNally-Cook,Kelly (HHSC) [Kelly.McNally-Cook@hhsc.state.tx.us]
Sent: Friday, November 06, 2015 1:44 PM
To: Miriam Diria (mdiria@allianceontheweb.org); Adelita Winchester (awinchester@caritasofaustin.org); Paula Walker (pwalker@ccaosa.org); 'jmachado@ccdallas.org'; 'aknox@ccdallas.org'; Mike Auman (mauman@ccdofw.org); Ardiane Ademi (aademi@catholiccharities.org); Thuraya Lohony (tlohony@cfsama.com); 'mlopez@dmrs-ep.org'; Ali Al Sudani (aalsudani@imgh.org); Donna Duvin; 'eschmidt@rstx.org'; 'arippenkroeger@rstx.org'; 'hbatar@rstx.org'; Laila Amara (lamara@rstx.org); 'skauffman@rstx.org'; 'ftalamante@rstx.org'; 'aposson@rstx.org'; 'jdemers@wr.org'; Lisa Guitquit (lisag@ymcahouston.org); 'jwatkins@ymcahouston.org'; Daley Ryan; 'nkoons@cctxp.org'; Susanna Lubanga

Cc: Randall,Patrick (HHSC); Montour,Jessica (DSHS)
Subject: State Consultations - Proposed Arrival Increases

Good Afternoon,

As part of your requests for review and consultation with the Office of Immigration and Refugee Affairs and the State Refugee Health Coordinator regarding proposed increases in refugee placements for Fiscal Year 2016 following the recent Presidential Determination, we are asking that you provide us with the information requested in the attached form.

Please provide the requested information to the attention of Patrick.randall@hhsc.state.tx.us<mailto:Patrick.randall@hhsc.state.tx.us> and Jessica.montour@dshs.state.tx.us<mailto:Jessica.montour@dshs.state.tx.us> by close of business Thursday, November 12, 2015 or earlier if you have the information already.

Thank you,

Office of Immigration & Refugee Affairs
Community Access & Services
Texas Health & Human Services Commission

# Attachment 2



**International Rescue Committee
in Dallas**
6500 Greenville Suite 500
Dallas, TX 75206
TEL +1 214 461 9781
FAX +1 214 461 9782
Rescue.org/Dallas

November 20, 2015

Mr. Chris Traylor
Executive Commissioner
Texas Health and Human Services Commission
P. O. Box 13247
Austin, TX  78711
Sent via email to Sandra.MedelReyes@hhsc.state.tx.us

Dear Mr. Traylor,

This letter is written in response to your communication to the International Rescue
Committee in Dallas and Abilene on November 19, 2015, requesting information on any
pending Syrian refugee arrivals and our plans for provision of services.

At present, we have two family reunification cases (US Tie cases) whose travel has been
booked to arrive in Dallas in early December.

The IRC plans to assist these two cases in accordance with federal donor guidelines. The IRC
will also continue to provide additional support to the families that are funded through the
generosity of private charitable organizations, corporate donors, community groups,
congregations, and the volunteer networks that exist in Dallas.

We appreciate the important role that the Texas Health and Human Services Commission
plays as a critical partner in this process.

Sincerely,

Donna Duvin
Executive Director
International Rescue Committee in Dallas

cc:  Cecile Young, Texas State Refugee Coordinator

80% post consumer fibers