IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-cv-3851 |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF STATE, JOHN KERRY in his Official Capacity as SECRETARY OF STATE, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, SYLVIA BURWELL, in her Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, ROBERT CAREY, in his Official Capacity as Director of the OFFICE OF REFUGEE RESETTLEMENT, and INTERNATIONAL RESCUE COMMITTEE, INC. | § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFF'S AMENDED APPLICATION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................I

TABLE OF AUTHORITIES............................................................................................II

I.      FACTUAL BACKGROUND ................................................................. 1

II.     LEGAL STANDARD FOR PRELIMINARY INJUNCTION............................... 9

   A.     There is a substantial likelihood that the Plaintiff will prevail. .................... 10

   B.     There is a substantial threat that irreparable injury will result. .................. 12

   C.     The threatened injury to the Plaintiff and the State's citizenry outweighs any threatened harm to the Defendants. ............................................................ 13

   D.     A preliminary injunction will not disserve the public interest. ..................... 13

PRAYER FOR RELIEF............................................................................................... 14

CERTIFICATE OF SERVICE .................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Canal Auth. of Florida v. Callaway,*
489 F.2d 567 (5th Cir. 1974) ................................................................. 10

*Halter v. Nebraska,*
205 U.S. 34 (1907) ................................................................................. 2

*Janvey v. Alguire,*
647 F.3d 585 (5th Cir. 2011) ................................................................. 10

*Klitzman, Klitzman & Gallagher v. Krut,*
744 F.2d 955 (3d Cir. 1984) ................................................................. 13

*Lombardo v. City of Dallas,*
73 S.W.2d 475 (Tex. 1934) .................................................................... 2

*State v. Richards,*
301 S.W.2d 597 (Tex. 1957) .................................................................. 2

*Texas v. Seatrain Int'l,*
518 F.2d 175 (5th Cir. 1975) ................................................................. 13

**Statutes**

8 U.S.C. § 1157(e) ............................................................................ 10-11

8 U.S.C. § 1182(a)(3)(B) ......................................................................... 3

8 U.S.C. § 1522(a)(1)(B)(iii) ........................................................... 2, 7, 8

8 U.S.C. § 1522(a)(2)(A) ................................................................... 2, 10

TEX. GOV'T CODE § 752.001 .................................................................... 3

TEX. GOV'T CODE § 752.003 .................................................................... 3

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) .............................................. 10

Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and
Nationality Act, 79 Fed. Reg. 6913 (Feb. 5, 2014) ................................... 3

Homeland Security Committee, U.S. House of Representatives, 114th Congress,
Syrian Refugee Flows: Security Risks and Counterterrorism Challenges 2-3 (Nov.
2015), *available at* https://homeland.house.gov/wp-
content/uploads/2015/11/Homeland-Security-Committee-Syrian-Refugee-
Report.pdf) .............................................................................................. 5

Statement of Congressman Michael McCaul on H.R. 158, Dec. 8, 2015, *at*
http://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=5db2309f-7ad3-46f6-
8b3d-7b8172f0126d ........................................................................... 6, 12

THE OXFORD ILLUSTRATED DICTIONARY (2d ed. 1975)................................................. 10

U.S. House of Representatives Committee on Homeland Security, *Nation's Top Security Officials' Concerns on Refugee Vetting* (Nov. 19, 2015), *available at* https://homeland.house.gov/press/nations-top-security-officials-concerns-on-refugee-vetting/ ............................................................................................. 3

U.S. House of Representatives Committee on the Judiciary, to Barack Obama, President of the United States of America (Oct. 27, 2015) (available at http://judiciary.house.gov/_cache/files/20315137-5e84-4948-9f90-344db69d318d/102715-letter-to-president-obama.pdf............................................. 4

U.S. House of Representatives Homeland Security Committee, Final Report of the Task Force on Combating Terrorist and Foreign Fighter Travel, at 42-43 (Sept. 2015), available at http://homeland.house.gov/wp-content/uploads/2015/09/TaskForceFinal Report.pdf ............................................. 4

**Constitutional Provisions**

U.S. Const. art. IV, § 4.............................................................................................. 2

TO THE HONORABLE JUDGE OF SAID COURT:

Pursuant to the Court's directive during the telephonic hearing on December 7, 2015, the Texas Health and Human Services Commission ("Commission" or "HHSC") files this amended application for a Preliminary Injunction preserving the status quo and compelling the United States of America, United States Department of State ("State Department"), John Kerry, in his official capacity as Secretary of State, United States Department of Health and Human Services ("Department"), Sylvia Burwell in her official capacity as Secretary of Health and Human Services, Office of Refugee Resettlement ("ORR"), Robert Carey, in his official capacity as Director of the Office of Refugee Resettlement (collectively, "Federal Defendants"), and International Rescue Committee, Inc. from resettling Syrian refugees in Texas without complying with their statutory and contractual duties of advance consultation with the State and would show the Court as follows.  This amended motion supplements the evidence and legal authority contained in the previous motion (Doc. No. 13).

## I.      FACTUAL BACKGROUND

1.      Texas accepts approximately 10 percent of all refugees resettled in the United States—more than any other State.  Texas performs this work by partnering with local volunteer agencies to help refugees transition to the State and pay for associated costs.

2.      The Refugee Act of 1980 established an initial framework for collaboration and cooperation among the federal government, the States, and local volunteer agencies, such as the Defendant Committee, in resettling refugees.  As the law has been amended over the years, it now highlights the indispensable and intimate role of the States to the process by the use of "States" 14 times within the text of section 1522.  Instead of adhering to that statutory framework, the federal

government and the Committee have left Texas generally uninformed about refugees that could well pose a security risk to Texas, and yet without Texas having any collaborative input in the process of resettling these refugees.

3.     The current law requires that the federal government "*shall consult regularly* (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the *intended distribution of refugees among the States* and localities *before their placement in those States* and localities." 8 U.S.C. § 1522(a)(2)(A) (emphases added).

4.     The law further requires that, "in providing refugee assistance . . . local voluntary agency activities should be conducted in *close cooperation and advance consultation with State* and local governments." *Id.* § 1522(a)(1)(B)(iii) (emphasis added).

5.     In addition to Texas resettling more refugees than any other State, it has not only the sovereign authority, but the Constitutional authority, to protect the safety of its residents. *See, e.g.*, *Halter v. Nebraska*, 205 U.S. 34, 40-41 (1907) ("[A] state possesses all legislative power consistent with a republican form of government [U.S. Const. art. IV, § 4]; therefore each state, when not thus restrained, and so far as this court is concerned, may, by legislation, provide not only for the health, morals, and safety of its people, but for the common good, as involved in the well-being, peace, happiness, and prosperity of the people."); *State v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957) ("As a general rule the [police] power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience . . . ."); *Lombardo v. City of Dallas*, 73 S.W.2d 475, 479 (Tex. 1934) ("[T]he police power of a state embraces regulations designed to . . . promote the public health, the public morals, or the public safety."). The Texas Legislature established the Office of Immigration and Refugee Affairs in the Commission to

"ensure coordination of public and private resources in refugee resettlement." TEX. GOV'T CODE §§ 752.001, 752.003.

6.      To assist the states in providing for the health, morals, and safety of its people, Congress decided that the federal government may not resettle within the several states refugees who have provided material support to terrorists.  8 U.S.C. § 1182(a)(3)(B).  Historically, the federal government admitted less than 100 Syrian refugees per year.  However, the current Administration announced a policy goal of admitting 10,000 Syrian refugees this fiscal year (Oct. 1, 2015 through Sept. 30, 2016).  To accomplish this goal, the Administration granted a waiver to refugees who provided material support to terrorists if, among other things, the support was "insignificant" and the refugee "poses no danger to the safety and security of the United States."   Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 79 Fed. Reg. 6913 (Feb. 5, 2014).

7.      Myriad members of the federal executive branch are expressing ongoing concern regarding this massive expansion of refugees from an area engulfed in fighting with ISIS, as well as terrorism.  For example, the Director of the FBI recently told Congress that the federal government cannot conduct effective security checks on Syrian nationals.  Director Comey testified that "we can query our databases until the cows come home but nothing will show up because we have no record of that person." U.S. House of Representatives Committee on Homeland Security, *Nation's Top Security Officials' Concerns on Refugee Vetting* (Nov. 19, 2015), *available at* https://homeland.house.gov/press/nations-top-security-officials-concerns-on-refugee-vetting/ (last visited Dec. 8, 2015).   The Assistant Director of the FBI's Counterterrorism Division explained his "concern is in Syria, the lack of our footprint on the ground in Syria, that the databases won't have information we need.  So it's not that we have a lack of process, it's that there is a lack of information."  Letter of

Bob Goodlatte, Chairman, U.S. House of Representatives Committee on the Judiciary, to Barack Obama, President of the United States of America (Oct. 27, 2015) (available at http://judiciary.house.gov/_cache/files/20315137-5e84-4948-9f90-344db69d318d/102715-letter-to-president-obama.pdf (last visited Dec. 8, 2015). The Director of National Intelligence summed up the worries of these federal counterterrorism experts: "We don't obviously put it past the likes of ISIL to infiltrate operatives among these refugees." *Nation's Top Security Officials' Concerns on Refugee Vetting*, *supra*.

8.    Likewise, the federal legislative branch has shared similar concerns. The Homeland Security Committee of the U.S. House of Representatives' Task Force on Combating Terrorist and Foreign Fighter Travel found:

> Key Finding 24: U.S. law enforcement and intelligence agencies remain concerned about terrorists posing as refugees. Agencies have made improvements to the refugee security screening process, but more must be done to mitigate potential vulnerabilities. Members of terrorist groups like ISIS have publicly bragged they are working to sneak operatives into the West posing as refugees, and European officials are worried this is already the case. . . . [M]ore than four million people have fled the conflict zone in Syria, offering extremists ample opportunity to blend into migrant groups. . . . Fighters belonging to ISIS's predecessor, al Qaeda in Iraq, successfully slipped into the United States through the refugee resettlement program in 2009, when two terrorist responsible for killing U.S. troops in Iraq were granted entry and settled in Kentucky. Only later did the FBI and DHS discover this error and arrest the suspects after finding their fingerprints matched those found on IEDs in Iraq.

U.S. House of Representatives Homeland Security Committee, Final Report of the Task Force on Combating Terrorist and Foreign Fighter Travel, at 42-43 (Sept. 2015), available at http://homeland.house.gov/wp-content/uploads/2015/09/TaskForceFinalReport.pdf (citations omitted). Additionally, the November 2015 report of the United States House of Representatives Homeland Security Committee verified only that

ISIS and other terrorists "are determined" to abuse refugee programs and "focused on deploying operatives to the West."  Homeland Security Committee, U.S. House of Representatives, 114th Congress, *Syrian Refugee Flows: Security Risks and Counterterrorism Challenges* 2-3 (Nov. 2015), *available at* https://homeland.house.gov/wp-content/uploads/2015/11/Homeland-Security-Committee-Syrian-Refugee-Report.pdf) (last visited Dec. 8, 2015).  And most recently, the Chairman of the United States House of Representatives Homeland Security Committee stated the following today on the House floor in light of the pending committee investigation into the refugee vetting process:

> I am concerned that terrorists are attempting to exploit the U.S. refugee program to enter our country and that we currently lack the ability to confidently vet Syria refugees to weed out individuals with potential terrorist ties.  Top law enforcement and intelligence officials have testified before my Committee that terrorist groups have expressed a desire to infiltrate refugee programs to enter the United States and Europe, and ISIS has said in their own words that they intend to do so.  In Paris, we saw them follow through on those pledges, sneaking at least two operatives into Europe posing as refugees.  It also appears that individuals with extremist links have already tried to gain entry to our country as refugees.  *This year the Office of the Director of National Intelligence informed me in writing that the National Counterterrorism Center has identified 'individuals with ties to terrorist groups in Syria attempting to gain entry to the U.S. through the U.S. refugee program.'*  This is deeply troubling.  At this time, I am concerned that serious intelligence gaps preclude us from conducting comprehensive screening to detect all Syrian refugees with terrorist ties, and as a result I have proposed adding additional national security checks to the process before the United States approves any further admissions."  Naturally, the States are concerned that the refugees being resettled in their communities may not have been effectively screened – especially given the volume of refugees the Administration has committed to accepting.  Refugee resettlement is within the purview of the federal government.  However, the Administration must be transparent in sharing information with the States about the people being resettled within their borders.  The Refugee Act of 1980 requires that the federal government "shall consult regularly" with state and local governments and private nonprofit voluntary agencies concerning the intended distribution of refugees.  In Texas, it appears the federal government

has not fully held-up its end of the bargain.

Statement of Congressman Michael McCaul on H.R. 158, Dec. 8, 2015, *at* http://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=5db2309f-7ad3-46f6-8b3d-7b8172f0126d (emphasis added).

9.      In light of these concerns, the Commission called the Defendant Committee on November 18, 2015 to learn whether it currently had plans to resettle Syrian refugees in Texas.  The Defendant Committee informed the Commission during that call that it intended to resettle six Syrian refugees in Dallas, Texas on or about Friday, December 4, 2015.

10.     The Commission followed that phone call with a letter on November 19, 2015.  The letter, among other things, advised the Defendant Committee that Texas, until further notice, will refuse to cooperate with the resettlement of any Syrian refugees in Texas.  *See* Ex. A.  The letter copied the Director of the Texas Department of Public Safety and the Deputy Director for Homeland Security and Services in the Department of Public Safety.  *Id*.

11.     The Commission received an email from the State Department with instructions for requesting specific refugee case information.  The email said that the information is confidential, that requests for the information should be sent to the State Department, and that the State Department would decide if and how any information would be shared.  The Commission requested the information, on an expedited fashion, as instructed from a federal entity under the State Department on December 1, 2015.  Ex. B.  When the Commission requested that the Defendant Committee provide it with specific information regarding these incoming refugees, the Defendant Committee advised the Commission that all information requests and sharing must go through the State Department.

12.     A letter from the Executive Commissioner to the Committee on

November 25 asked the Committee to contact the Commission by November 30 in order to work together in close cooperation and avoid termination of the contract or legal action. Ex. C. The Committee responded on November 30 and expressed an intent to communicate with the Commission. Ex. D.

13.     In a letter to the Committee on December 1, the Commission asked the Committee to temporarily halt resettlement of Syrian refugees in Texas "until we have receive the requested information and our concerns with screening procedures have been appropriately addressed." Ex. E. The letter asked the Committee to confirm by 3 p.m. CST on December 2, 2015 its intent to cooperate with the State. The Committee responded announcing its intention to continue working with the federal government to resettle Syrians in Texas. Ex. F.

14.     The relevant law requires that, "in providing refugee assistance . . . local voluntary agency activities should be conducted in *close cooperation and advance consultation with State* and local governments." 8 U.S.C. § 1522(a)(1)(B)(iii) (emphasis added). The Committee is a local volunteer agency under the meaning of the section 1522.

15.     The Commission entered into an agreement with the Committee to provide for refugee cash assistance, Ex. G at 11 (hereinafter "Refugee Cash Assistance Agreement") and an agreement to provide for refugee social services, Ex. H at 11 (hereinafter "Refugee Social Services Agreement"). Both contracts were entered into for good and valuable consideration.

16.     Both contracts require the Committee to "[p]rovide services . . . [i]n compliance with this contract and with applicable Federal laws and regulation, state laws and regulations, and Commission policies including service delivery standards." Ex. G at 5; Ex. H at 5. This necessarily includes the requirement that the Committee work "in close cooperation and advance consultation" with the Commission. 8 U.S.C.

§ 1522(a)(1)(B)(iii).

17.     The Committee asserted it could not share certain information with the Commission because it was confidential.  The Commission received an email from the Department of State with instructions for requesting specific refugee case information.  The email said that the information is confidential, that requests for the information should be sent to the Department of State, and that the Department of State would decide if and how any information would be shared.

18.     The Commission's contracts with volunteer agencies are similar to the ones with the Committee.  According to the cooperation clause in those contracts:

> The [Committee] must cooperate fully and allow [the Commission] and all appropriate federal and state agencies or their representative's access to client records, books, and supporting documents pertaining to services provided.  [The Committee] must make documents available at reasonable times and for reasonable periods for the purpose of inspection, monitoring, auditing, or evaluating.

Ex. G at 1; Ex. H at 11.

19.     And pursuant to the Commission's Uniform Terms and Conditions, incorporated into all such the contracts by reference, Ex. G at 7; Ex. H at 7, the Committee:

> acknowledges that, if [it] breaches (or attempts or threatens to breach) its obligations under this Agreement, *the State will be irreparably harmed*. . . .  If a court of competent jurisdiction finds that [the Committee] breached (or attempted or threatened to breach) any such obligations, [the Committee] agrees that any additional findings of irreparable injury or other conditions to injunctive relief, *it will not oppose the entry of an appropriate order compelling performance* by [the Committee] and restraining it from any further breaches (or attempted or threatened breaches).

Ex. I at 22 (emphases added).

20.     In its written response to the Plaintiff's motion for a Temporary

Restraining Order, the Federal Defendants divulged to Texas, for the first time, their intent to resettle nine Syrian refugees on or about December 10, 2015 in Houston. (Doc. No. 5 at 6).  During this Court's telephonic hearing on Monday, December 7, 2015, the Federal Defendants divulged to Texas, for the first time, that the refugees scheduled for resettlement in Houston on or about December 10, 2015 have not been found to have materially supported terrorism and that no other such resettlements are scheduled for the month of December 2015.

## II.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION

21.    The Commission seeks a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.  In particular, the Commission requests the Court to preliminarily enjoin and/or stay any and all activities of the Defendants regarding placement of Syrian refugees in Texas unless and until the Defendants have complied with their aforementioned statutory and contractual obligations of consulting with Texas before placement and sharing information and working in close cooperation and advance consultation with the Commission.

22.    The Commission also seeks to preserve the status quo pending this Court's final adjudication on declaratory judgment claims, the status quo being that, at present, the refugees at issue in this filing have yet to enter or establish residency in the State of Texas.

23.    To obtain a preliminary injunction, the Commission must show:

A. there is a substantial likelihood that the Commission will prevail on the merits;

B. there is a substantial threat that irreparable injury will result if the injunction is not granted;

C. the threatened injury outweighs the threatened harm to the Defendants; and

D. granting the preliminary injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Canal Auth. of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).

**A.    There is a substantial likelihood that the Plaintiff will prevail.**

24.    The Commission is substantially likely to prevail on the merits because the Defendants are sharing no person-specific information with Texas, in violation of their statutory and contractual obligations of advance consultation.  The Refugee Act of 1980 requires that the federal government "*shall consult regularly* (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the *intended distribution of refugees among the States* and localities *before their placement in those States* and localities." 8 U.S.C. § 1522(a)(2)(A) (emphases added).  Thus, the statute mandates consultation that occurs before placement of refugees, or advance consultation.  "Consultation" means "[t]he act of asking the advice or opinion of someone."  BLACK'S LAW DICTIONARY (10th ed. 2014).  Likewise, to consult is to "[t]ake counsel (*with*); seek information or advice from; take into consideration."  THE OXFORD ILLUSTRATED DICTIONARY (2d ed. 1975).  Of course, to consult with the State in advance of resettling refugees means to seek advice, opinion, or even consent from the State before the act of resettling the refugees.  The Federal Defendants' preferred approach is to share no person-specific information with the State in advance, which stands in irreconcilable conflict with the plain meaning of the statute.

25.    Furthermore, contrast the approach of the Federal Defendants to this matter with the requirements of "appropriate consultation," as defined by Congress in the Refugee Act of 1980.

> For purposes of this section, the term "appropriate consultation" means, with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review

the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information:

> (1) A description of the nature of the refugee situation.

> (2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.

> (3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.

> (4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.

> (5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees.

> (6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.

> (7) Such additional information as may be appropriate or requested by such members.

> To the extent possible, information described in this subsection shall be provided at least two weeks in advance of discussions in person by designated representatives of the President with such members.

8 U.S.C. § 1157(e).  And while this definition applies to what information the

President is to receive, that Congress employed the same word ("consultation") for

both what the President is to receive and what States (and their governors and

agencies) are to receive, the comparative disparity of reporting, consultation, and

accountability put forth by the Federal Defendants in this matter cannot be

reconciled with the overall language of the Act and clear purposes of disclosure,

cooperation, collaboration, and accountability to the chief executives of the sovereigns

involved in the process.  And the initial position put forth by the Federal Defendants is even more divergent from the intentional design of sovereign collaboration in light of the significant security concerns posed by Syrian refugees addressed above.  Under these circumstances, and the ever-growing threats and acts of terrorism committed against Americans, advanced consultation requires, at a minimum, the Federal Defendants sharing refugee-specific information with the State, including information related to their security risk.

**B.      There is a substantial threat that irreparable injury will result.**

26.    As addressed above, the FBI Director, the Assistant Director of the FBI's Counterterrorism Division, and the Director of National Intelligence have all recently expressed concern with the federal government's ability to accurately assess the security risk posed by Syrian refugees.   Moreover, the House Homeland Security Committee has repeatedly made findings regarding the vulnerability of the federal government's security screens on Syrian refugees.  And Chairman McCaul indicated that the "National Counterterrorism Center has identified 'individuals with ties to terrorist groups in Syria attempting to gain entry to the U.S. through the U.S. refugee program.'"  Statement of Congressman Michael McCaul on H.R. 158, Dec. 8, 2015, *at* http://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=5db2309f-7ad3-46f6-8b3d-7b8172f0126d.

27.    The  Defendants  have  only  disclosed  minimal  person-specific information regarding Syrian refugees, and that only in response to this lawsuit.  The Defendants have not disclosed any details regarding placing Syrian refugees in Texas beyond December 31, 2015.  As mentioned herein, the Plaintiff possesses reasonable concerns about the safety and security of the citizenry of the State of Texas regarding these refugees in light of the statements expressed by federal administration officials as well as the legislative branch.   The safety and security of the citizenry is the

rightful concern of the sovereign State of Texas and one of the many reasons why the Plaintiff maintains an ongoing right to full cooperation, communication, collaboration, and candor with the Defendants regarding their efforts in resettling foreign nationals amongst the Texas citizenry. Further, the Defendants cannot rightly claim that the Commission has not met its burden of proving irreparable harm when they themselves have breached statutory and contractual duties in withholding the information at issue.[1]

### C.   The threatened injury to the Plaintiff and the State's citizenry outweighs any threatened harm to the Defendants.

28.   As stated above, the Plaintiff has reasonable concerns about the safety and security of the State's citizens as a result of the resettlement of certain refugees.

29.   The threatened harm to the Plaintiff outweighs any harm to the Defendants from a temporary halt of certain refugees pending a determination of whether the Defendants are complying with their statutory and contractual obligations to consult in advance with the State on the resettlement of refugees in the State.

### D. A preliminary injunction will not disserve the public interest.

E.   A preliminary injunction would allow Texas to exercise its sovereign authority and duty to protect the safety of its residents, thus serving the public interest.

F.   Granting the preliminary injunction will maintain the status quo until the rights and duties of the parties can be finally adjudicated.

---

[1] In applying the four factor test, "none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Texas v. Seatrain Int'l*, 518 F.2d 175, 180 (5th Cir. 1975). This often "requir[es] delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury." *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir. 1984).

## PRAYER FOR RELIEF

The Commission respectfully petitions the Court to issue a preliminary injunction under Federal Rule of Civil Procedure 65(b) preventing the Defendants from resettling refugees to Texas due to their violations of statutory duty to consult with the State in advance of placing refugees in Texas and statutory and contractual duties to consult with the State in advance of placing refugees in Texas.

Dated:        December 8, 2015.

Respectfully submitted,


KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

BRANTLEY STARR
Deputy Attorney General for Legal
  Counsel

/s/ Austin R. Nimocks
AUSTIN R. NIMOCKS
Associate Deputy Attorney General for
  Special Litigation
Texas Bar No. 24002695

ANGELA V. COLMENERO
Division Chief – General Litigation

ADAM N. BITTER
Assistant Attorney General

General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

*ATTORNEYS FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I certify that a copy of this pleading was served on all counsel of record listed below via e-mail and/or through this Court's CM/ECF system:

Stuart J. Robinson
Michelle R. Bennett
Trial Attorneys
United States Department of Justice
Civil Div., Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
stuart.j.robinson@usdoj.gov

*Attorneys for the Federal Defendants*

Rebecca L. Robertson
Adriana Piñon
Satinder Singh
**American Civil Liberties Union**
**Foundation of Texas**
1500 McGowan, Suite 250
Houston, TX 77004
rrobertson@aclutx.org
apiñon@aclutx.org
ssingh@aclutx.org

Cecillia D. Wang
**American Civil Liberties Union Foundation**
**Immigrants' Rights Project**
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org

Omar C. Jadwat
Judy Rabinovitz
Michael K.T. Tan
**American Civil Liberties Union Foundation**
125 Broad Street
New York, New York 10004
ojadwat@aclu.org
jrabinovitz@aclu.org
mtan@aclu.org

Kristi L. Graunke
Michelle Lapointe
**Southern Poverty Law Center**
1989 College Avenue NE
Atlanta, GA 30317
kristi.graunke@splcenter.org
michelle.lapointe@splcenter.org

Karen C. Tumlin
**National Immigration Law Center**
3425 Wilshire Blvd., Ste. 2850
Los Angeles, CA 90010
tumlin@nilc.org

Robert Rivera, Jr.
Terrell W. Oxford
Neal Manne
Vineet Bhatia
Shawn L. Raymond
Robert S. Safi
Stephen Shackelford
SUSMAN GODFREY, LLP
1000 Louisiana St., Suite 5100
Houston, Texas 77002
rrivera@susmangodfrey.com
toxford@susmangodfrey.com
nmanne@susmangodfrey.com
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com
rsafi@susmangodfrey.com
sshackelford@susmangodfrey.com

*Attorneys for Defendant International Rescue Committee, Inc.*

/s/ Austin R. Nimocks
AUSTIN R. NIMOCKS
Attorney for Plaintiff