**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-cv-3851 |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF STATE, JOHN KERRY in his Official Capacity as SECRETARY OF STATE, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, SYLVIA BURWELL, in her Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, ROBERT CAREY, in his Official Capacity as Director of the OFFICE OF REFUGEE RESETTLEMENT, and INTERNATIONAL RESCUE COMMITTEE, INC., | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

---

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AGAINST FEDERAL DEFENDANTS**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES..........................................................................................iii

   I.   FACTUAL BACKGROUND..........................................................................1

   II.   LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER..............7

     A.   There is a substantial likelihood that the Plaintiff will prevail....................8

     B.   There is a substantial threat that irreparable injury will result...............10

     C.   The threatened injury to the Plaintiff and the State's citizenry outweighs any threatened harm to the Defendants...........................12

     D.   A temporary restraining order will not disserve the public interest. ........12

PRAYER FOR RELIEF...............................................................................................12

CERTIFICATE OF SERVICE ....................................................................................14

# TABLE OF AUTHORITIES

## Cases

*Canal Auth. of Florida v. Callaway,*
489 F.2d 567 (5th Cir. 1974) ............................................................................... 7-8

*GE Capital Commercial, Inc. v. Worthington Nat'l Bank,*
2011 WL 5025153 (N.D. Tex. 2011) ...................................................................... 11

*Halter v. Nebraska,*
205 U.S. 34 (1907) ................................................................................................. 2

*Janvey v. Alguire,*
647 F.3d 585 (5th Cir. 2011) ................................................................................. 7

*Klitzman, Klitzman & Gallagher v. Krut,*
744 F.2d 955 (3d Cir. 1984) ................................................................................ 11

*Lombardo v. City of Dallas,*
73 S.W.2d 475 (Tex. 1934) .................................................................................... 3

*State v. Richards,*
301 S.W.2d 597 (Tex. 1957) .................................................................................. 3

*Texas v. Seatrain Int'l,*
518 F.2d 175 (5th Cir. 1975) ............................................................................... 11

## Constitutional Provisions, Statutes, and Rules

U.S. Const. art. IV, § 4............................................................................................ 2

8 U.S.C. § 1157(e)................................................................................................... 9

8 U.S.C. § 1182(a)(3)(B) ......................................................................................... 3

8 U.S.C. § 1522(a)(2)(A) ..................................................................................... 2, 8

Tex. Gov't Code § 752.001...................................................................................... 3

Tex. Gov't Code § 752.003...................................................................................... 3

Fed. R. Civ. P. 65 ................................................................................................... 7

Fed. R. Civ. P. 65(b) ............................................................................................. 12

## Other Authorities

161 Cong. Rec. H9054 (daily ed. Dec. 8, 2015) ............................................ 7, 10, 11

Black's Law Dictionary (10th ed. 2014)................................................................ 8

Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and
Nationality Act, 79 Fed. Reg. 6913 (Feb. 5, 2014) ................................................ 3

Homeland Security Committee, U.S. House of Representatives, 114th Congress,
   Syrian Refugee Flows: Security Risks and Counterterrorism Challenges 2-3
   (Nov. 2015), *available at* https://homeland.house.gov/wp-
   content/uploads/2015/11/Homeland-Security-Committee-Syrian-Refugee-
   Report.pdf) ................................................................................................................ 5

Michael McCaul, Chairman, U.S. House of Representatives Homeland Security
   Committee, State of Homeland Security Address at the National Defense
   University (Dec. 7, 2015) (transcript available online at
   https://homeland.house.gov/wp-content/uploads/2015/12/12-07-15-State-of-
   Homeland-Security-Address.pdf) (video available at http://www.c-
   span.org/video/?401616-1/representative-michael-mccaul-state-homeland-
   security-address) ..................................................................................................... 5-6

THE OXFORD ILLUSTRATED DICTIONARY (2d ed. 1975).................................................. 8

U.S. House of Representatives Committee on Homeland Security, *Nation's Top
   Security Officials' Concerns on Refugee Vetting* (Nov. 19, 2015), *available at*
   https://homeland.house.gov/press/nations-top-security-officials-concerns-on-
   refugee-vetting/ ........................................................................................................ 4

Letter of Bob Goodlatte, Chairman, U.S. House of Representatives Committee on
   the Judiciary, to Barack Obama, President of the United States of America
   (Oct. 27, 2015) (available at http://judiciary.house.gov/_cache/files/20315137-5e84-
   4948-9f90-344db69d318d/102715-letter-to-president-obama.pdf ........................... 4

U.S. House of Representatives Homeland Security Committee, Final Report of the
   Task Force on Combating Terrorist and Foreign Fighter Travel, at 42-43
   (Sept. 2015), available at http://homeland.house.gov/wp-
   content/uploads/2015/09/TaskForceFinal Report.pdf.............................................. 5

TO THE HONORABLE JUDGE OF SAID COURT:

The Texas Health and Human Services Commission ("Commission" or "HHSC") files this application for a Temporary Restraining Order preserving the status quo and compelling the United States of America, United States Department of State ("State Department"), John Kerry, in his official capacity as Secretary of State, United States Department of Health and Human Services ("Department"), Sylvia Burwell in her official capacity as Secretary of Health and Human Services, Office of Refugee Resettlement ("ORR"), and Robert Carey, in his official capacity as Director of the Office of Refugee Resettlement (collectively, "Federal Defendants") from resettling Syrian refugees on December 10 in Texas without complying with their statutory duties of advance consultation with the State.

A group of nine refugees is set to arrive Thursday, December 10.  Evidence came to light *after* the Court's 11am telephonic hearing on December 8 that terrorist organizations have infiltrated the very refugee program that is central to the dispute before this Court.  Congressman Mike McCaul, Chair of the House Homeland Security Committee, gave speeches announcing that fact on December 7 and December 8.  Moreover, the Texas Department of Public Safety Deputy Director of Homeland Security has expressed "serious security concerns with the process for vetting refugees from Syria and other countries overrun by ISIS" given that U.S. immigration officials have no access to Syrian government records or other identifying information.  Ex. A.  The Commission is mindful of the fact that, at the telephonic hearing on December 7, the Court refused to rule on the merits issues in this case this week.  But the Commission feels duty bound to notify the Court of these developments.

## I.      FACTUAL BACKGROUND

1.      The Commission incorporates by reference the Factual Background

contained in its Amended Application for Preliminary Injunction (Doc. No. 14).

2.     Texas accepts approximately 10 percent of all refugees resettled in the United States—more than any other State.  Texas performs this work by partnering with local volunteer agencies to help refugees transition to the State and pay for associated costs.

3.     The Refugee Act of 1980 established an initial framework for collaboration and cooperation among the federal government, the States, and local volunteer agencies, such as the Defendant Committee, in resettling refugees.  As the law has been amended over the years, it now highlights the indispensable and intimate role of the States to the process by the use of "States" 14 times within the text of section 1522.  Instead of adhering to that statutory framework, the federal government and the Committee have left Texas generally uninformed about refugees that could well pose a security risk to Texas, and yet without Texas having any collaborative input in the process of resettling these refugees.

4.     The current law requires that the federal government "*shall consult regularly* (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the *intended distribution of refugees among the States* and localities *before their placement in those States* and localities." 8 U.S.C. § 1522(a)(2)(A) (emphases added).

5.     In addition to Texas resettling more refugees than any other State, it has not only the sovereign authority, but the Constitutional authority, to protect the safety of its residents.  *See, e.g.*, *Halter v. Nebraska*, 205 U.S. 34, 40-41 (1907) ("[A] state possesses all legislative power consistent with a republican form of government [U.S. Const. art. IV, § 4]; therefore each state, when not thus restrained, and so far as this court is concerned, may, by legislation, provide not only for the health, morals, and safety of its people, but for the common good, as involved in the well-being, peace,

happiness, and prosperity of the people."); *State v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957) ("As a general rule the [police] power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience . . . ."); *Lombardo v. City of Dallas*, 73 S.W.2d 475, 479 (Tex. 1934) ("[T]he police power of a state embraces regulations designed to . . . promote the public health, the public morals, or the public safety."). The Texas Legislature established the Office of Immigration and Refugee Affairs in the Commission to "ensure coordination of public and private resources in refugee resettlement." TEX. GOV'T CODE §§ 752.001, 752.003.

6.     To assist the states in providing for the health, morals, and safety of its people, Congress decided that the federal government may not resettle within the several states refugees who have provided material support to terrorists. 8 U.S.C. § 1182(a)(3)(B). Historically, the federal government admitted less than 100 Syrian refugees per year. However, the current Administration announced a policy goal of admitting 10,000 Syrian refugees this fiscal year (Oct. 1, 2015 through Sept. 30, 2016). To accomplish this goal, the Administration granted a waiver to refugees who provided material support to terrorists if, among other things, the support was "insignificant" and the refugee "poses no danger to the safety and security of the United States." Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 79 Fed. Reg. 6913 (Feb. 5, 2014).

7.     Myriad members of the federal executive branch are expressing ongoing concern regarding this massive expansion of refugees from an area engulfed in fighting with ISIS, as well as terrorism. For example, the Director of the FBI recently told Congress that the federal government cannot conduct effective security checks on Syrian nationals. Director Comey testified that "we can query our databases until the cows come home but nothing will show up because we have no record of that

person." U.S. House of Representatives Committee on Homeland Security, *Nation's Top Security Officials' Concerns on Refugee Vetting* (Nov. 19, 2015), *available at* https://homeland.house.gov/press/nations-top-security-officials-concerns-on-refugee-vetting/ (last visited Dec. 8, 2015).   The Assistant Director of the FBI's Counterterrorism Division explained his "concern is in Syria, the lack of our footprint on the ground in Syria, that the databases won't have information we need.  So it's not that we have a lack of process, it's that there is a lack of information."  Letter of Bob Goodlatte, Chairman, U.S. House of Representatives Committee on the Judiciary, to Barack Obama, President of the United States of America (Oct. 27, 2015) (available      at      http://judiciary.house.gov/_cache/files/20315137-5e84-4948-9f90-344db69d318d/102715-letter-to-president-obama.pdf (last visited Dec. 8, 2015).  The Director of National Intelligence summed up the worries of these federal counterterrorism experts: "We don't obviously put it past the likes of ISIL to infiltrate operatives among these refugees."  *Nation's Top Security Officials' Concerns on Refugee Vetting*, *supra*.

       8.    Likewise, the federal legislative branch has shared similar concerns. The Homeland Security Committee of the U.S. House of Representatives' Task Force on Combating Terrorist and Foreign Fighter Travel found:

> Key Finding 24: U.S. law enforcement and intelligence agencies remain concerned about terrorists posing as refugees. Agencies have made improvements to the refugee security screening process, but more must be done to mitigate potential vulnerabilities.  Members of terrorist groups like ISIS have publicly bragged they are working to sneak operatives into the West posing as refugees, and European officials are worried this is already the case. . . .  [M]ore than four million people have fled the conflict zone in Syria, offering extremists ample opportunity to blend into migrant groups. . . . Fighters belonging to ISIS's predecessor, al Qaeda in Iraq, successfully slipped into the United States through the refugee resettlement program in 2009, when two terrorist responsible for killing U.S. troops in Iraq were granted entry and settled in Kentucky.  Only later did the FBI and DHS discover this

error and arrest the suspects after finding their fingerprints matched
those found on IEDs in Iraq.

U.S. House of Representatives Homeland Security Committee, Final Report of the

Task Force on Combating Terrorist and Foreign Fighter Travel, at 42-43 (Sept. 2015),

available at http://homeland.house.gov/wp-content/uploads/2015/09/TaskForceFinal

Report.pdf (citations omitted).  Additionally, the November 2015 report of the United

States House of Representatives Homeland Security Committee verified only that

ISIS and other terrorists "are determined" to abuse refugee programs and "focused

on deploying operatives to the West."  Homeland Security Committee, U.S. House of

Representatives, 114th Congress, Syrian Refugee Flows: Security Risks and

Counterterrorism    Challenges    2-3    (Nov.    2015),    *available    at*

https://homeland.house.gov/wp-content/uploads/2015/11/Homeland-Security-

Committee-Syrian-Refugee-Report.pdf) (last visited Dec. 8, 2015).  Further, evidence

came to light after this Court's 11 a.m. CST telephonic hearing on Monday, December

7, 2015 that terrorist organizations may have infiltrated the very refugee program

that is central to the dispute before this Court.  Congressman Michael McCaul,

Chairman of the U.S. House Homeland Security Committee, publicly announced that

fact on Monday, December 7, 2015, after this Court's telephonic hearing, in his State

of Homeland Security address:

> Our government must also move swiftly to improve the screening of
> Syrian and Iraqi refugees. ISIS has said in their own words that they
> want to exploit the refugee process to infiltrate the West, and they did
> exactly that to attack Paris. I can also reveal today that the U. S.
> government has information to indicate that individuals tied to terrorist
> groups in Syria have already attempted to gain access to our country
> through the U. S. refugee program.

Michael McCaul, Chairman, U.S. House of Representatives Homeland Security

Committee, State of Homeland Security Address at the National Defense University

(Dec. 7, 2015) (emphasis added) (transcript available online at https://homeland.house.gov/wp-content/uploads/2015/12/12-07-15-State-of-Homeland-Security-Address.pdf) (video available at http://www.c-span.org/video/?401616-1/representative-michael-mccaul-state-homeland-security-address) (last visited Dec. 9, 2015).  Chairman McCaul reiterated this point yesterday evening on the House floor in light of the pending committee investigation into the refugee vetting process:

> I am concerned that terrorists are attempting to exploit the U.S. refugee program to enter our country and that we currently lack the ability to confidently vet Syria refugees to weed out individuals with potential terrorist ties.  Top law enforcement and intelligence officials have testified before my Committee that terrorist groups have expressed a desire to infiltrate refugee programs to enter the United States and Europe, and ISIS has said in their own words that they intend to do so. In Paris, we saw them follow through on those pledges, sneaking at least two operatives into Europe posing as refugees.  It also appears that individuals with extremist links have already tried to gain entry to our country as refugees.  *This year the Office of the Director of National Intelligence informed me in writing that the National Counterterrorism Center has identified 'individuals with ties to terrorist groups in Syria attempting to gain entry to the U.S. through the U.S. refugee program.'* This is deeply troubling.  At this time, I am concerned that serious intelligence gaps preclude us from conducting comprehensive screening to detect all Syrian refugees with terrorist ties, and as a result I have proposed adding additional national security checks to the process before the United States approves any further admissions."  Naturally, the States are concerned that the refugees being resettled in their communities may not have been effectively screened – especially given the volume of refugees the Administration has committed to accepting. Refugee resettlement is within the purview of the federal government. However, the Administration must be transparent in sharing information with the States about the people being resettled within their borders.  The Refugee Act of 1980 requires that the federal government "shall consult regularly" with state and local governments and private nonprofit voluntary agencies concerning the intended distribution of refugees.  In Texas, it appears the federal government has not fully held-up its end of the bargain.

161 Cong. Rec. H9054 (daily ed. Dec. 8, 2015) (statement of Rep. McCaul) (emphasis added).

9.      In light of these concerns, the Commission requested information on Syrian refugees to be resettled in Texas from the State Department.  The Commission requested the information, on an expedited fashion, as instructed from a federal entity under the State Department on December 1, 2015.  The Federal Defendants have not disclosed the entirety of the information the Commission requested regarding the refugees set to arrive December 10.

## II.     LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER

10.     The Commission seeks a temporary restraining order and pursuant to Federal Rule of Civil Procedure 65.  In particular, the Commission requests the Court to temporarily restrain the Federal Defendants from placing the Syrian refugees in Texas scheduled to arrive December 10 unless and until the Federal Defendants have complied with their aforementioned statutory obligations of consulting with Texas before placement.

11.     The Commission also seeks to preserve the status quo pending this Court's final adjudication on declaratory judgment claims, the status quo being that, at present, the aforementioned refugees have yet to enter or establish residency in the State of Texas.

12.     To obtain a temporary restraining order, the Commission must show:

A.  there is a substantial likelihood that the Commission will prevail on the merits;

B.  there is a substantial threat that irreparable injury will result if the injunction is not granted;

C.  the threatened injury outweighs the threatened harm to the Defendants; and

D.  granting the order will not disserve the public interest.

*Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011); *Canal Auth. of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).

**A.      There is a substantial likelihood that the Plaintiff will prevail.**

13.      The Commission is substantially likely to prevail on the merits because the Federal Defendants are sharing no person-specific information with Texas, in violation of their statutory obligations of advance consultation.  The current law requires that the federal government "*shall consult regularly* (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the *intended distribution of refugees among the States* and localities *before their placement in those States* and localities." 8 U.S.C. § 1522(a)(2)(A) (emphases added).  Thus, the statute mandates consultation that occurs before placement of refugees, or advance consultation.  "Consultation" means "[t]he act of asking the advice or opinion of someone." Black's Law Dictionary (10th ed. 2014).  Likewise, to consult is to "[t]ake counsel (*with*); seek information or advice from; take into consideration." The Oxford Illustrated Dictionary (2d ed. 1975).  Of course, to consult with the State in advance of resettling refugees means to seek advice, opinion, or even consent from the State before the act of resettling the refugees.  The Federal Defendants' preferred approach is to share no person-specific information with the State in advance, which stands in irreconcilable conflict with the plain meaning of the statute.

14.      Furthermore, contrast the approach of the Federal Defendants to this matter with the requirements of "appropriate consultation," as defined by Congress in the Refugee Act of 1980.

> For purposes of this section, the term "appropriate consultation" means, with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review

the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information:

> (1) A description of the nature of the refugee situation.
>
> (2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.
>
> (3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.
>
> (4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.
>
> (5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees.
>
> (6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.
>
> (7) Such additional information as may be appropriate or requested by such members.

> To the extent possible, information described in this subsection shall be provided at least two weeks in advance of discussions in person by designated representatives of the President with such members.

8 U.S.C. § 1157(e).  And while this definition applies to what information the President is to receive, that Congress employed the same word ("consultation") for both what the President is to receive and what States (and their governors and agencies) are to receive, the comparative disparity of reporting, consultation, and accountability put forth by the Federal Defendants in this matter cannot be reconciled with the overall language of the Act and clear purposes of disclosure, cooperation, collaboration, and accountability to the chief executives of the sovereigns

involved in the process.  And the initial position put forth by the Federal Defendants is even more divergent from the intentional design of sovereign collaboration in light of the significant security concerns posed by Syrian refugees addressed above.  Under these circumstances, and the ever-growing threats and acts of terrorism committed against Americans, advanced consultation requires, at a minimum, the Federal Defendants sharing refugee-specific information with the State, including information related to their security risk.

**B.**     **There is a substantial threat that irreparable injury will result.**

15.     As addressed above, the FBI Director, the Assistant Director of the FBI's Counterterrorism Division, and the Director of National Intelligence have all recently expressed concern with the federal government's ability to accurately assess the security risk posed by Syrian refugees.   Moreover, the House Homeland Security Committee has repeatedly made findings regarding the vulnerability of the federal government's security screens on Syrian refugees.  And Chairman McCaul indicated that the "National Counterterrorism Center has identified 'individuals with ties to terrorist groups in Syria attempting to gain entry to the U.S. through the U.S. refugee program.'" 161 Cong. Rec. H9054 (daily ed. Dec. 8, 2015) (statement of Rep. McCaul).

16.     Moreover, the Texas Department of Public Safety has expressed its concerns with the lack of information regarding Syrian refugees.  Specifically, the Deputy Director of Homeland Security explained that in Iraq, the federal government has some access to verify refugees' identities through government records.  Ex. A at 2.  But because the federal government has no similar access to Syrian government records or other identifying information, it is impossible to accurately verify the identity and background of Syrian refugees.  *Id*.  Moreover, the Federal Defendants are not administering security polygraph examinations.  *Id*.  This would allow a refugee to give false identifying information to the Federal Defendants without them

knowing.  *Id.*  And these security vulnerabilities have led to the compilation of a list of vetted refugees who turned to jihad against the United States.  *Id.*

17.  The Defendants have only disclosed minimal person-specific information regarding Syrian refugees, and that only in response to this lawsuit.  The Defendants have not disclosed any details regarding placing Syrian refugees in Texas beyond December 31, 2015.  As mentioned herein, the Plaintiff possesses reasonable concerns about the safety and security of the citizenry of the State of Texas regarding these refugees in light of the statements expressed by federal administration officials as well as the legislative branch.  The safety and security of the citizenry is the rightful concern of the sovereign State of Texas and one of the many reasons why the Plaintiff maintains an ongoing right to full cooperation, communication, collaboration, and candor with the Defendants regarding their efforts in resettling foreign nationals amongst the Texas citizenry.  Further, the Defendants cannot rightly claim that the Commission has not met its burden of proving irreparable harm when they themselves have breached statutory and contractual duties in withholding the information at issue.[1]  That the Defendants come to this Court without clean hands should militate against their request to avoid the imposition of injunctive relief.  *Cf. GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 2011 WL 5025153 at *4 (N.D. Tex. 2011).  And there is no question that any act of terror committed against the State of Texas is the type of harm for which there is no reasonable or adequate remedy at law.

---

[1] In applying the four factor test, "none of the four prerequisites has a fixed quantitative value.  Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."  *Texas v. Seatrain Int'l*, 518 F.2d 175, 180 (5th Cir. 1975).  This often "requir[es] delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury."  *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir. 1984).

**C.     The threatened injury to the Plaintiff and the State's citizenry outweighs any threatened harm to the Defendants.**

18.     As stated above, the Plaintiff has reasonable concerns about the safety and security of the State's citizens as a result of the December 10 anticipated resettlement of certain refugees.

19.     The threatened harm to the Plaintiff outweighs any harm to the Federal Defendants from a temporary halt of certain refugees pending a determination of whether the Federal Defendants are complying with their statutory obligations to consult in advance with the State on the resettlement of refugees in the State.

**D. A temporary restraining order will not disserve the public interest.**

E.     A TRO would allow Texas to exercise its sovereign authority to protect the safety of its residents, thus serving the public interest.

F.     Granting the TRO will maintain the status quo until the rights and duties of the parties can be finally adjudicated

## PRAYER FOR RELIEF

The Commission respectfully petitions the Court to issue a Temporary Restraining Order under Federal Rule of Civil Procedure 65(b) preventing the Federal Defendants from resettling refugees to Texas that are scheduled to arrive December 10 due to their violations of statutory duty to consult with the State in advance of placing refugees in Texas.

Dated:          December 9, 2015.

                                    Respectfully submitted,


                                    KEN PAXTON
                                    Attorney General of Texas

                                    CHARLES E. ROY
                                    First Assistant Attorney General

                                    BRANTLEY STARR
                                    Deputy Attorney General for Legal
                                      Counsel

                                    /s/ Austin R. Nimocks
                                    AUSTIN R. NIMOCKS
                                    Associate Deputy Attorney General for
                                      Special Litigation
                                    Texas Bar No. 24002695

                                    ANGELA V. COLMENERO
                                    Division Chief – General Litigation

                                    ADAM N. BITTER
                                    Assistant Attorney General

                                    General Litigation Division
                                    P.O. Box 12548, Capitol Station
                                    Austin, Texas 78711-2548

                                    *ATTORNEYS FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I certify that a copy of this pleading was served on all counsel of record listed below via e-mail and/or through this Court's CM/ECF system:

Stuart J. Robinson
Michelle R. Bennett
Trial Attorneys
United States Department of Justice
Civil Div., Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
stuart.j.robinson@usdoj.gov

*Attorneys for the Federal Defendants*

Rebecca L. Robertson
Adriana Piñon
Satinder Singh
**American Civil Liberties Union**
**Foundation of Texas**
1500 McGowan, Suite 250
Houston, TX 77004
rrobertson@aclutx.org
apiñon@aclutx.org
ssingh@aclutx.org

Cecillia D. Wang
**American Civil Liberties Union Foundation**
**Immigrants' Rights Project**
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org

Omar C. Jadwat
Judy Rabinovitz
Michael K.T. Tan
**American Civil Liberties Union Foundation**
125 Broad Street
New York, New York 10004
ojadwat@aclu.org
jrabinovitz@aclu.org
mtan@aclu.org

Kristi L. Graunke
Michelle Lapointe
**Southern Poverty Law Center**
1989 College Avenue NE
Atlanta, GA 30317
kristi.graunke@splcenter.org
michelle.lapointe@splcenter.org

Karen C. Tumlin
**National Immigration Law Center**
3425 Wilshire Blvd., Ste. 2850
Los Angeles, CA 90010
tumlin@nilc.org

Robert Rivera, Jr.
Terrell W. Oxford
Neal Manne
Vineet Bhatia
Shawn L. Raymond
Robert S. Safi
Stephen Shackelford
SUSMAN GODFREY, LLP
1000 Louisiana St., Suite 5100
Houston, Texas 77002
rrivera@susmangodfrey.com
toxford@susmangodfrey.com
nmanne@susmangodfrey.com
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com
rsafi@susmangodfrey.com
sshackelford@susmangodfrey.com

*Attorneys for Defendant International Rescue Committee, Inc.*

/s/ Austin R. Nimocks
AUSTIN R. NIMOCKS
Attorney for Plaintiff

## CERTIFICATE OF CONFERENCE

On December 9, counsel for the Federal Defendants informed me they are opposed to the relief requested in this motion.


/s/ Austin R. Nimocks
AUSTIN R. NIMOCKS
Attorney for Plaintiff