**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

——————————————————————— )
)
TEXAS HEALTH AND HUMAN SERVICES )
COMMISSION, )
)
Plaintiff, )
)     Civil Action No. 3:15-cv-3851 (DCG)
v. )
)
UNITED STATES OF AMERICA, *et al.*, )
)
Defendants. )
——————————————————————— )

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

Dated:  January 5, 2016

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
JOHN R. PARKER
United States Attorney
JOSEPH H. HUNT
Director
SHEILA M. LIEBER
Deputy Director
ANTHONY J. COPPOLINO
Deputy Director
JAMES J. GILLIGAN
Special Litigation Counsel
MICHELLE R. BENNETT
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, D.C.  20530
Tel: (202) 514-9239
Fax: (202) 616-8470
Email: stuart.j.robinson@usdoj.gov

*Attorneys for the Federal Defendants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

    Statutory Background .................................................................................................................. 2

    Security Screening of Refugees for Resettlement in the United States ...................................... 4

    Enhanced Security Screening of Syrian Refugees ...................................................................... 6

    Final Approval and Resettlement in the United States ............................................................... 6

    The Consultation Process ........................................................................................................... 8

    Proceedings to Date ................................................................................................................... 9

ARGUMENT ................................................................................................................................. 11

    A.   Plaintiff Has Made No Showing of Irreparable Harm. ...................................................... 12

    B.   Plaintiff Has Not Established a Likelihood of Success on the Merits. ............................... 15

        1.   Section 1522(a)(2)(A) does not require the Government to provide States with particularized information about individual refugees. ................................................. 15

        2.   The Government is complying with the consultation requirement. .............................. 17

        3.   Plaintiff has no cause of action to compel consultation before individual refugees may be resettled in Texas ...................................................................... 18

            a.   Section 1522(a)(2)(A) ....................................................................................... 18

            b.   The Declaratory Judgment Act .......................................................................... 20

            c.   The Administrative Procedure Act ..................................................................... 20

    C.   The Balance of Equities and the Public Interest Also Militate Against a Preliminary Injunction. ..................................................................................... 23

CONCLUSION .............................................................................................................................. 25

## TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Alexander v. Sandoval,*
532 U.S. 275 (2001).............................................................................................. 18, 19

*Alsharqawi v. Gonzales,*
2007 WL 1346667 (N.D. Tex. Mar. 14, 2007) ..................................................... 22

*Arizona v. United States,*
132 S. Ct. 2492 (2012)..................................................................................... 16, 19, 24

*Avmed Inc. v. BrownGreer PLC,*
300 Fed. App'x 261 (5th Cir. 2008) ..................................................................... 25

*Bluefield Water Ass'n, Inc. v. City of Starkville,*
577 F.3d 250 (5th Cir. 2009) ............................................................................... 11

*Brunner v. Ohio Republican Party,*
555 U.S. 5 (2008)................................................................................................. 19

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979).............................................................................................. 19

*Dallas Cty., Tex. v. MERSCORP, Inc.,*
2 F. Supp. 3d 938 (N.D. Tex. 2014) ..................................................................... 20

*Dep't of Navy v. Egan,*
484 U.S. 518 (1988)............................................................................................. 13

*Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.,*
112 F.3d 1283 (5th Cir. 1997) .............................................................................. 22

*Elkins v. Moreno,*
435 U.S. 647 (1978)............................................................................................... 3

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
762 F.2d 464 (5th Cir. 1985) ............................................................................... 11

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*

460 F.3d 13 (D.C. Cir. 2006) ............................................................................... 21

*Graham v. Richardson,*
403 U.S. 365 (1971).............................................................................................. 14

**PAGE(S)**

*Guerrero v. Clinton*,
    157 F.3d 1190 (9th Cir. 1998) ........................................................ 21

*Haig v. Agee*,
    453 U.S. 280 (1981) ................................................................... 13, 23

*Haitian Refugee Ctr., Inc. v. Gracey*,
    600 F. Supp. 1396 (D.D.C. 1985) ................................................. 24

*Harris Cty. Texas v. MERSCORP Inc.*,
    791 F.3d 545 (5th Cir. 2015) ........................................................ 20

*Hunter Grp., Inc. v. Smith*,
    164 F.3d 624 (4th Cir. 1998) ........................................................ 14

*Invention Submission Corp. v. Rogan*,
    357 F.3d 452 (4th Cir. 2004) ........................................................ 21

*Lopez v. Sentrillon Corp.*,
    749 F.3d 347 (5th Cir. 2014) ........................................................ 16

*Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*,
    723 F.2d 1173 (5th Cir. 1984) ...................................................... 20

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ....................................................................... 19

*McGee v. United States*,
    849 F. Supp. 1147 (S.D. Miss. 1994) ........................................... 23

*New York Reg'l Interconnect, Inc. v. F.E.R.C.*,
    634 F.3d 581 (D.C. Cir. 2011) ...................................................... 12

*Newsome v. EEOC*,
    301 F.3d 227 (5th Cir. 2002) ........................................................ 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................... 23

*Norton v. S. Utah Wilderness All.*,

    542 U.S. 55 (2004) ............................................................. 20, 21, 22

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ........................................................ 20

*PCI Transp., Inc. v. Fort Worth & W. R. Co.*,
    418 F.3d 535 (5th Cir. 2005) ........................................................ 12

**PAGE(S)**

*Perales v. Casillas,*
    903 F.2d 1043 (5th Cir. 1990) ........................................................................ 18

*Plyler v. Doe,*
    457 U.S. 202 (1982).................................................................................... 19, 23

*Pub. Citizen, Inc. v. NHTSA,*
    489 F.3d 1279 (D.C. Cir. 2007) .................................................................... 14

*Skelly Oil Co. v. Phillips Petrol. Co.,*
    339 U.S. 667 (1950)........................................................................................ 20

*Southdown, Inc. v. Moore McCormack Res., Inc.,*
    686 F. Supp. 595 (S.D. Tex. 1988) ............................................................... 25

*Star Satellite, Inc. v. Biloxi,*
    779 F.2d 1074 (5th Cir. 1986) ...................................................................... 23

*Toll v. Moreno,*
    458 U.S. 1 (1982)................................................................................... *passim*

*Truax v. Raich,*
    239 U.S. 33 (1915)................................................................................... 14, 25

*U.S. Dep't of Justice v. FLRA,*
    727 F.2d 481 (5th Cir. 1984) ........................................................................ 16

*United States v. Emerson,*
    270 F.3d 203 (5th Cir. 2001) ........................................................................ 12

*United States v. Oakland Cannabis Buyers' Co-op.,*
    532 U.S. 483 (2001)................................................................................. 23, 25

*United States v. Pink,*
    315 U.S. 203 (1942)...................................................................................... 14

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ........................................................................ 25

*Universities Research Ass'n, Inc. v. Coutu,*
    450 U.S. 754 (1981)...................................................................................... 19

*Urban Areas v. FHA,*
    779 F. Supp. 2d 542 (W.D. Tex. 2011)......................................................... 12

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982)...................................................................................... 23

**PAGE(S)**

*Whitlock Const., Inc. v. Glickman*,
   71 F. Supp. 2d 1154 (D. Wyo. 1999) ................................................................... 21

*Wild Fish Conservancy v. Jewell*,
   730 F.3d 791 (9th Cir. 2013) ............................................................................... 21

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ......................................................................................... 11, 23

## STATUTES

5 U.S.C. § 701(a)(2) ................................................................................................ 18

5 U.S.C. § 701(b)(2) ................................................................................................ 21

5 U.S.C. § 706(1) ............................................................................................. 10, 20

5 U.S.C. § 551 ......................................................................................................... 21

8 U.S.C. § 1101 ......................................................................................................... 2

8 U.S.C. § 1101(a)(42) ............................................................................................ 24

8 U.S.C. § 1157(a) ................................................................................................... 16

8 U.S.C. § 1157(a)(2) ................................................................................................ 3

8 U.S.C. § 1157(e) ................................................................................................... 16

8 U.S.C. § 1202(f) ...................................................................................................... 9

8 U.S.C. § 1522 .......................................................................................................... 3

8 U.S.C. § 1522(a)(2)(A) ............................................................................. 2, 4, 8, 22

8 U.S.C. § 1522(a)(2)(D) ......................................................................................... 15

8 U.S.C. § 1522(a)(5) .............................................................................................. 25

8 U.S.C. § 1522(b)(1) ................................................................................................ 7

8 U.S.C. § 1522(c) ..................................................................................................... 4

8 U.S.C. § 1522(e) ..................................................................................................... 4

42 U.S.C. § 2000d .................................................................................................... 25

**PAGE(S)**

Refugee Act of 1980, Pub. L. No. 96-212 ...................................................................... 3

Refugee Assistance Extension Act of 1986, Pub. L. No. 99-605 ............................................ 4, 16

## OTHER AUTHORITIES

79 Fed. Reg. 6913 (Feb. 5, 2014) ............................................................................. 13

H.R. Rep. No. 96-608 (1979) .................................................................................. 16

H.R. Rep. No. 99-132 (1985) ........................................................................ 4, 15, 16, 20

S. Rep. No. 96-256 (1979) ................................................................................ 16, 24

# INTRODUCTION

The admission and resettlement of refugees within the United States are matters committed to the Federal Government as part of its exclusive constitutional and statutory authority over immigration.  Nevertheless, Plaintiff Texas Health and Human Services Commission (the "Commission") seeks to exercise veto power over individual federal refugee resettlement decisions and bar Syrian refugees—one of the most afflicted and thoroughly vetted populations seeking admission to the United States—from resettling in Texas.  Plaintiff attempts to base this unprecedented claim of State authority on a directive to the Federal Government, in the Refugee Act of 1980, to consult periodically with State and local governments about sponsorship procedures and the intended distribution of refugees among the States.  And relying on "concerns" that Syrian refugees may pose a threat to public safety, it seeks a preliminary injunction barring resettlement of Syrians in Texas while this case is litigated.  Unable, though, to make a showing of imminent irreparable injury, of statutory right, or that an injunction would serve the public interest, Plaintiff has failed to carry its heavy burden to obtain injunctive relief.

First, Plaintiff has not demonstrated that Syrian refugees whom the Federal Government may resettle in Texas while this case is pending pose any danger, much less an imminent one, to Texas residents or any Americans.  Plaintiff's assertions of harm are based on inadmissible hearsay and are at best speculative, as this Court has already found.  That conclusion alone is fatal to Plaintiff's request for preliminary relief.  Plaintiff's claim of injury is more speculative still when viewed in light of the thorough security screening to which all refugees are subject, and the enhanced procedures the Government has implemented for screening Syrian refugees.

Second, Plaintiff has not established a likelihood of success on the merits.  In its own words, Plaintiff seeks "specific refugee case information" about each individual to be resettled in Texas.  However, the Refugee Act requires only that the Government consult on a regular basis

with the States about the "sponsorship process" and "the intended distribution of refugees among the States." 8 U.S.C. § 1522(a)(2)(A).  It does not create an enforceable legal obligation to provide a State with information about individual refugees so the State may play an independent role in determining who may be resettled there.  Further, the Government has satisfied the consultation requirements actually imposed by the Act.  In any event, neither the Refugee Act, nor the Declaratory Judgment Act, nor the Administrative Procedure Act provides Plaintiff with a cause of action to compel consultation before the Government may exercise its plenary authority to admit and resettle foreign refugees in a State.

Finally, Plaintiff has not shown that the balance of equities and the public interest weigh in favor of an injunction.  Plaintiff offers only speculative and uninformed fears about security, which this Court already rejected as unsupported by competent evidence.  By contrast, granting an injunction would undermine important U.S. foreign-policy objectives, and it would frustrate the Government's humanitarian efforts to address the worst refugee crisis seen in a generation, contrary to both the nation's proud tradition of welcoming the world's most vulnerable people to our shores, and the clear intent of the Refugee Act.  For these reasons, discussed in greater detail below, Plaintiff's application for a preliminary injunction should be denied.

## BACKGROUND

### Statutory Background

The Constitution allocates to the Federal Government the exclusive authority to regulate the "admission, naturalization, and residence of aliens in the United States or the several states," leaving the States no power to "add to [or] take from the conditions lawfully imposed by Congress."  *See, e.g., Toll v. Moreno*, 458 U.S. 1, 10 (1982).  Pursuant to this authority, Congress enacted the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, a "comprehensive and complete code covering all aspects of admission of aliens to this country."  *Elkins v.*

2

*Moreno*, 435 U.S. 647, 664 (1978).  The Refugee Act of 1980, Pub. L. No. 96-212, amended the INA to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States," and "to provide comprehensive and uniform provisions for [their] effective resettlement."  Pub. L. No. 96-212, § 101(b).  The Act provides that the number of refugees annually shall generally be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultations [with Congress], is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).  For the current fiscal year, the President has determined, after appropriate consultations with Congress, that "[t]he admission of up to 85,000 refugees to the United States . . . is justified by humanitarian concerns or is otherwise in the national interest."  *See* https://www.whitehouse.gov/the-press-office/2015/09/29/presidential-determination-presidential-determination-refugee-admissions (last visited Jan. 5, 2016).  The President also recently announced that at least 10,000 of the refugees admitted to the United States in fiscal year 2016 will be from Syria.  Declaration of Lawrence E. Bartlett. (Ex. A, hereto) ("Bartlett Decl.") ¶ 6.

Under the Refugee Act, the Government may issue grants to and contract with State and local governments and private non-profit agencies to manage the initial resettlement of, and provide resettlement assistance to, refugees admitted to the United States.  8 U.S.C. § 1522. Pursuant to this authority, the State Department Bureau of Population, Refugees, and Migration ("PRM") maintains and oversees the U.S. Refugee Admissions Program ("USRAP"), a public-private partnership involving U.S. Government agencies, domestic non-profit organizations, and international organizations such as the United Nations High Commissioner for Refugees ("UNHCR"), to screen, transport, and provide resettlement services for refugees, while safeguarding the American public from threats to our national security.  Bartlett Decl. ¶¶ 4-6.

3

The Refugee Act, as amended by the Refugee Assistance Extension Act of 1986, Pub. L. No. 99-605, directs that the Government, in carrying out this initial program of resettlement under § 1522(b)(1), shall "consult regularly (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement in those States and localities."  8 U.S.C. § 1522(a)(2)(A).  This consultation requirement is "not intended to give States and localities any veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement planning capacity." H.R. Rep. No. 99-132 at 19 (1985).

The Department of Health and Human Services Office of Refugee Resettlement ("ORR") is also authorized to make grants to and contract with public and private non-profit agencies to assist refugees in achieving economic self-sufficiency, including job training and English-language education.  8 U.S.C. § 1522(c); *see* Declaration of Kenneth Tota (Ex. B, hereto) ("Tota Decl.") ¶ 4.  The Federal Government may also make grants to and contract with State and local governments and private non-profit agencies, and provide reimbursement to States, to cover the costs of cash and medical assistance provided to refugees.  8 U.S.C. § 1522(e); Tota Decl. ¶¶ 4-11.  In order to receive federal funds for these purposes, a State must submit a plan that meets the  requirements imposed by the INA.  8 U.S.C. § 1522(a)(6).

**Security Screening of Refugees for Resettlement in the United States**

Refugees seeking to resettle in the United States must undergo an extraordinarily thorough and comprehensive screening process.  Declaration of Barbara L. Strack (Ex. C, hereto) ("Strack Decl.") ¶ 5.  First, the UNHCR interviews candidates and makes preliminary determinations as to whether they fall into categories that the United States has prioritized for resettlement, and whether "exclusion grounds" apply that would render them ineligible.  Bartlett

Decl. ¶ 7.  Eligible applicants are referred for processing to one of nine PRM-funded

Resettlement Support Centers ("RSCs") located around the globe.  RSCs assist applicants in

completing required documentation, collect identification documents, and gather information

about applicants that may not already exist in Government databases, to prepare for applicants'

eligibility interview with the Department of Homeland Security's Bureau of United States

Citizenship and Immigration Services ("USCIS").  *Id.* ¶¶ 8-9; *see infra*.

Once referred, refugee applicants must successfully undergo multiple layers of intensive

security screening, conducted by and in cooperation with numerous law-enforcement, national-

security, and intelligence agencies across the Federal Government.  This process begins with

biographic checks (*e.g.*, name checks) against numerous law-enforcement and intelligence

databases maintained by multiple agencies, to screen for security risks.  Applicants' fingerprints

are also screened against the biometric holdings of multiple agencies.  Strack Decl. ¶¶ 6-8.

Thereafter, specially trained USCIS officers conduct face-to-face eligibility interviews of

all applicants, to further scrutinize their claims of refugee status, and to detect fraud and other

grounds of ineligibility, including security threats.  *Id.* ¶ 9.  Following the interview, USCIS

determines whether an applicant can be granted refugee status, based on all information collected

about the applicant, the results of all biographic and biometric security checks, the eligibility

interview, and the criteria of the INA.  At all times during this process the burden of proof is on

applicants to show that they qualify for refugee status and present no threat to U.S. national

security.  *Id.* ¶¶ 10-11.  No refugee applicant can be approved for travel and admission to the

United States until all required security checks have been completed and cleared.  *Id.* ¶ 6.

Due to the protocols, precautions and security screening required, it typically takes

successful refugee candidates between 18 and 24 months to complete the application and

screening process.  Bartlett Decl. ¶ 10.

**Enhanced Security Screening of Syrian Refugees**

Intelligence assessments conducted to date do not indicate that Syrian terrorists or terrorist groups are actively trying to infiltrate the USRAP to gain access to the United States. While intelligence holdings on Syrian nationals may not be as extensive as for some other refugee groups where the United States has had a significant ground presence in the country of origin, the Government has a great deal of prior experience in screening and admitting large numbers of refugees from war-torn, chaotic environments, including regions where intelligence holdings were limited. USCIS has developed training and review protocols and procedures for enhanced review of Syrian resettlement cases in light of the dynamics of the Syrian conflict. These include, *inter alia*, intelligence-driven support, threat identification, and other assistance provided to USCIS officers and decisionmakers by the USCIS Fraud Detection and National Security Directorate. Strack Decl. ¶¶ 12-13.

Moreover, the overwhelming majority of the Syrian refugees who have been or likely will be resettled in the United States are families—particularly female-headed households—that include victims of torture, children, and persons with severe medical conditions. Only a very small portion of these refugees (historically two percent) have been or likely will be military-aged males who are neither accompanied by children nor joining family in the United States. Adult males who are accepted generally will be especially vulnerable individuals, such as survivors of torture, or those with disabilities. Not only do these cases represent great humanitarian need, they generally do not fall in high-risk categories most likely to pose a security threat. Bartlett Decl. ¶ 11.

**Final Approval and Resettlement in the United States**

Once a refugee is approved by USCIS (and has undergone medical screening), the RSC obtains a "sponsorship assurance" from one of nine domestic non-profit organizations, known as

6

resettlement agencies, that contract each fiscal year with PRM to provide assistance to (that is, to sponsor) newly arrived refugees.  *Id.* ¶ 12.  PRM does not determine in individual cases where refugees will be settled in the United States.  Rather, subject to a PRM-approved placement plan (specifying the anticipated number and distribution of the refugees the agency will resettle that year), the resettlement agency assesses the best location for the refugee candidate, based on such considerations as family ties, medical needs, and employment opportunities.  *Id.* ¶ 13.

After the RSC has obtained the necessary sponsorship assurances, the RSC refers approved refugees to the International Organization for Migration ("IOM") for transportation to the United States.  IOM is an inter-governmental organization, with 162 member nations that (among other humanitarian functions) administers a PRM-funded program to arrange and pay for the commercial transport of approved refugees from their temporary host countries to their initial ports of entry into the United States, and from there (as the case may be) to their final destinations.  *Id.* ¶¶ 14-15.  Approved refugees do not travel to the United States in Government custody, nor are they placed in custody on arrival.  Once admitted to and present in the United States, refugees, as lawfully admitted aliens, are free to travel throughout the country.  *Id.* ¶ 16.

When refugees reach their final U.S. destinations, their sponsoring resettlement agencies are required, under their cooperative agreements with PRM, to provide core resettlement services including basic housing, clothing and food, and assistance with access to medical, educational, and other needed social services.  *Id.* ¶ 17.  PRM helps meet the costs of these services during refugees' first few months in the United States through one-time per capita payments to their sponsoring resettlement agencies, and time-limited assistance programs.  ORR works through the States and nongovernmental organizations to provide longer-term cash and medical assistance, as well as language education and job training, to help refugees find employment, become economically self-sufficient, and integrate into American society.  *Id.* ¶ 18; Tota Decl. ¶¶ 4-11.

**The Consultation Process**

PRM, as the agency responsible under 8 U.S.C. § 1522(b)(1) for the initial resettlement

of refugees, is also responsible for consulting in advance with State and local governments about

the sponsorship process and intended distribution of refugees among States and localities, as

required by the Refugee Act.  *See id.* § 1522(a)(2)(A).  To comply with this mandate, PRM first

consults with State refugee coordinators regarding the numbers of refugees that their States will

be receiving in the coming fiscal year.  This process allows States to provide input regarding

proposed refugee placements, and to raise concerns such as strains on State and local resources.

PRM issues correspondence memorializing each State's approved number of resettlements for

the coming fiscal year.  Bartlett Decl. ¶ 20.  (PRM consulted extensively with Plaintiff to plan for

FY 2016 resettlements in Texas, including resettlements of Syrian refugees.  *Id.* ¶ 21 & Exs.

1-4.)  In addition, every quarter PRM makes available to the State refugee coordinators two

reports.  First is a quarterly forecast listing approved refugee cases (including their numbers,

nationalities, and ethnicity) who have expressed location preferences but whose sponsorship to a

particular destination has not yet been assured.  The second is a caseload report containing

similar information about approved refugee cases whose sponsorships to particular locations

have been assured, and who will likely arrive during the upcoming quarter.  *Id.* ¶¶ 22-23 & Exs.

5, 6.  PRM also provides each State a monthly report of arrivals, to help the States plan and

assess capacity for refugee resettlement services going forward.  *Id.* ¶ 24 & Ex. 7.

Further, PRM's agreements with resettlement agencies require them to conduct quarterly

consultations with relevant stakeholders, including State refugee coordinators, "concerning the

sponsorship process and the intended distribution of refugees in [State] localities before their

placement."  *Id.* ¶ 27 & Ex. 8, § 16.e.  The agencies are best positioned due to their experience

and knowledge of local conditions to consult with State and local governments about their

8

capacity, and the capacity of local communities, to meet the needs of forthcoming refugees. *Id.* ¶ 29. Consultations are expected to address such topics as year-to-date and projected arrivals, characteristics of arriving refugee groups, and stakeholder capacity to adequately receive and serve the actual and projected caseload. *Id.* ¶ 28. PRM also regularly engages with State and local officials as part of its training, outreach, and monitoring efforts. *Id.* ¶¶ 25-26.

**Proceedings to Date**

As Defendant International Rescue Committee ("IRC") has observed, Syrians have been migrating to Texas for well over a century. *See* Dkt. No. 6 at 5 & n.5. Since the outbreak of the brutal civil war in Syria in 2011, over 240 Syrians have been resettled in Texas without objection from the State. Bartlett Decl. ¶ 30. Nonetheless, on November 17, 2015, the Governor of Texas directed the Commission to cease participation in resettling Syrian refugees in Texas, citing "the recent deadly terrorist attacks in Paris." Ex. D, hereto. Accordingly, on November 19, 2015, the Commission wrote to the refugee resettlement agencies operating in Texas, including IRC, requesting that they immediately discontinue resettlement of Syrian refugees in Texas. Dkt. No. 17, Ex. A. Plaintiff also asserts that it requested "specific information" from IRC about the Syrian refugees scheduled to arrive in Texas on December 4, 2015, but was told that requests for such information must be addressed to the Department of State. *Id.* at 6.[1]

Almost two weeks later, on December 1, 2015, the Commission wrote to PRM requesting "specific refugee case information" about all Syrian refugees to be resettled in Texas within the next 90 days, including "[a]ll demographic, medical, security, and other case information" about them. *Id.* Ex. B at 1. Plaintiff brought this suit the next day, on December 2, 2015, and filed an amended complaint on December 7. Dkt. No. 13 (the "Amended Complaint" or "Am. Compl.").

---

[1] Such information is considered confidential under the INA, 8 U.S.C. § 1202(f), and § 16.g(2) of the agencies' cooperative agreements, as PRM explained in a November 20, 2015, e-mail to all resettlement agencies and State refugee coordinators. Ex. E, hereto.

The Amended Complaint seeks declaratory and injunctive relief against the Federal Defendants, Am. Compl. at 1-2, alleging that they have not "'consult[ed] regularly' with States concerning 'the intended distribution of refugees among the States . . . before their placement in those States," *id.* ¶¶ 1, 3, thus leaving Texas "uninformed about refugees that could well pose a security risk to Texans and without any say in the process of resettling these refugees," *id.* ¶ 7. On this basis, Count I of the Amended Complaint contends that the Federal Defendants have breached a "statutory duty of advance consultation" under § 1522(a)(2)(A). *Id.* ¶ 20. Count II asserts a claim under the Administrative Procedure Act, 5 U.S.C. § 706(1), to compel "agency action unlawfully withheld." *Id.* ¶¶ 22-29.[2]

On December 2, Plaintiff also filed an application for a temporary restraining order ("TRO") and preliminary injunction, seeking to enjoin "any and all activities of the Defendants regarding placement of Syrian refugees in Texas unless and until the Defendants have complied with [claimed] statutory and contractual obligations of consulting with Texas before placement . . . ." Dkt. No. 1 at 9. Plaintiff claimed to be "reasonabl[y] concern[ed]" about the safety and security of Texas citizens due to the impending arrival of six Syrian refugees, *id.* at 11, a family including two small children and their grandparents. Shortly after the Defendants filed their oppositions on December 4, 2015, Dkt. Nos. 5, 6, Plaintiff withdrew its application for a TRO.[3]

---

[2] Count III advances a breach-of-contract claim against IRC that is not directed at the Federal Defendants, Am. Compl. ¶¶ 21-30, and so is not addressed in this opposition.

[3] Plaintiff also requested that a hearing on its motion for a preliminary injunction be held on December 9, 2015. Dkt. No. 10 at 1. The Court denied that request during a telephonic conference on December 7, ordering instead that Plaintiff's motion be briefed under the schedule set forth in the Court's Local Civil Rules. The Court directed the Federal Defendants, in the meantime, to provide Texas with seven days' notice of any additional Syrian refugees to be resettled there. The Court also instructed Plaintiff that it must submit any additional evidence to be considered in support of its motion by December 8, 2015. Plaintiff filed an amended preliminary injunction motion on that date. Dkt. No. 17 ("Am. PI Mot.").

On December 9, 2015, Plaintiff filed a second TRO motion to prohibit the resettlement of nine Syrian refugees scheduled to arrive on December 10.  Dkt. No. 18 at 1.  Plaintiff argued that its renewed application was justified by new evidence, including statements by Representative Mike McCaul that individuals with ties to terrorist groups in Syria had attempted to gain entry to the United States through the refugee resettlement program.  *Id.* at 1, 10-11.  The Court denied Plaintiff's request during a telephonic hearing on December 9, and issued an Order (Dkt. No. 19) ("TRO Order"), observing that the evidence submitted in support of Plaintiff's argument "that terrorists could have infiltrated the Syrian refugees and could commit acts of terrorism in Texas" was "largely speculative hearsay."  TRO Order at 2.  The Court concluded that "[t]he Commission has failed to show by competent evidence that any terrorists actually have infiltrated the refugee program, much less that these particular refugees [those scheduled to arrive on December 10] are terrorists intent on causing harm."  *Id.*

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Id.* at 20.  The movant must "clearly carr[y] the burden of persuasion on all four requirements," *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009), and if it fails to do so "a preliminary injunction may not issue . . . ." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).  Plaintiff has not carried its burden as to any of the required elements.

### A.      Plaintiff Has Made No Showing of Irreparable Harm.

A preliminary injunction cannot be entered only on a "possibility of some remote future injury." *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001). "The *Winter* standard requires the plaintiff to demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence." *Aquifer Guardians in Urban Areas v. FHA*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011); *see also PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005). To meet this standard, as the Court recently held, Plaintiff must show by competent evidence that refugees who will be resettled in Texas during the litigation of this case will be "terrorists intent on causing harm." TRO Order at 2.

Plaintiff has made no such showing. Plaintiff continues to assert "concerns about the safety and security of the citizenry of the State of Texas regarding [Syrian] refugees." Am. PI Mot. at 12. But as this Court already found in denying Plaintiff's second application for a TRO, this claim of injury is both speculative and without evidentiary support. Plaintiff admits that it has not "assess[ed] the security risk posed by the refugees in advance of their arrival." Am. Compl. ¶ 21; *see also id.* ¶ 7 (positing that refugees "*could well* pose a security risk") (emphasis added). And so far as Plaintiff's concerns are based on supposed dangers posed by unidentified refugees not yet scheduled to be resettled in Texas, its claim of harm "stacks speculation upon hypothetical upon speculation, which does not establish an actual or imminent injury." *Cf. New York Reg'l Interconnect, Inc. v. F.E.R.C.*, 634 F.3d 581, 587 (D.C. Cir. 2011) (citation omitted).

Citing public remarks by Government officials, Plaintiff contends that its safety concerns are "reasonable" because limited U.S. intelligence on the Syrian populace makes it difficult to detect terrorists who seek to gain entry to the United States posing as Syrian refugees. Am. PI Mot. at 3-6, 12. This argument fails at every turn. As discussed *supra*, at 4-5, all refugees admitted to the United States must undergo rigorous security screening. Strack Decl. ¶ 5. The

Government, moreover, has extensive prior experience in vetting refugees from regions of the world where the Government's intelligence holdings were limited, and has developed protocols and procedures for enhanced review of Syrian resettlement cases based on the dynamics of the Syrian conflict. *Id.* ¶¶ 12-13.  In addition, the overwhelming majority of Syrian refugees to be admitted will likely fall in low-risk categories, such as female-headed households, as opposed to single, military-aged males.  Bartlett Decl. ¶ 11.[4]

Under these circumstances, the national-security officials charged with screening refugee applicants have concluded that the United States can continue to resettle Syrian refugees while safeguarding the American people from harm.  Strack Decl. ¶ 4.  Plaintiff has presented no evidence to the contrary that would permit a court to second-guess that judgment.  *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988).  Plaintiff certainly has presented no evidence that the Syrian refugees who will be resettled in Texas during the pendency of this lawsuit pose a danger to anyone

---

[4]  In February 2014, the Secretaries of State and Homeland Security exercised their authority under 8 U.S.C. § 1182(d)(3)(B) to issue an exemption to be applied on a case-by-case basis for a narrow category of aliens who would otherwise be inadmissible for providing "material support" to individuals or groups engaged in terrorist activity, if the support provided was insignificant, such as providing a meal to someone on a single occasion.  79 Fed. Reg. 6913 (Feb. 5, 2014); 8 U.S.C. § 1182(a)(3)(B)(iv)(VI).  Plaintiff's suggestion that this is a broad exemption adopted for the purpose of admitting large numbers of Syrians, Am. PI Mot. at 3, is incorrect.  First, the exemption was issued in February 2014—more than a year before the President announced his decision to admit 10,000 Syrian refugees in FY 2016—and has been applied to individuals of many nationalities.  Second, the Secretaries authorized the exemption only for aliens who "do not pose a national security or public safety risk."  Third, the exemption may be granted only to aliens who provided insignificant material support, as discussed above, and where, *inter alia*, they did so without intent to further terrorist or violent activities.  Finally, refugees who satisfy these strict qualifications must still meet all other requirements for admission, including clearing all applicable security checks.  79 Fed. Reg. at 6913; *see* Implementation of the Discretionary Exemption Authority under Section 212(d)(3)(B)(i) of the [INA] for the Provision of Insignificant Material Support, http://www.uscis.gov/sites/default/files/files/nativedocuments/2015-0508_Insignificant_Material_Support_PM_Effective.pdf.

anywhere.  Indeed, it relies now on the same arguments and evidence that this Court already determined are "speculative hearsay," and, as such, insufficient to establish the requisite "threat of irreparable injury."  TRO Order at 2; *compare* Dkt. No. 18, at 10-11 *with* Am. PI Mot. at 12-13.  That remains the case now.[5]

The State's concerns for the safety and security of its people and its desire to protect them from threats of terrorist attack are, of course, wholly legitimate and understandable.  The Federal Government is just as determined as the State that terrorists must not be allowed to exploit the refugee resettlement program to inflict harm on the American people.  But responsibility for protecting the nation from threats that originate outside our borders lies with the Federal Government.  *United States v. Pink*, 315 U.S. 203, 233 (1942).  Concerns such as Plaintiff raises here, involving "future events where the possibility of harm . . . is remote and speculative," are properly addressed to the Federal Government officials who are diligently attending to that duty, "not the Article III courts."  *See Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1295 (D.C. Cir. 2007).[6]

---

[5]  Plaintiff also argues that "the Defendants cannot rightly claim that the Commission has not met its burden of proving irreparable harm when they themselves have breached statutory and contractual duties in withholding the information at issue."  Am. PI Mot. at 13.  This is a further exercise in speculation that does not excuse Plaintiff's failure to adduce evidence of immediate irreparable harm, as the Court has already held.  TRO Order at 2.  If the Government were aware of information indicating that a refugee applicant represented a potential terrorist threat, that individual would not be approved for admission in the first place.  Strack Decl. ¶¶ 6, 11.  It is the height of conjecture to posit that the Government is "withholding" any such information about refugees who have been approved for resettlement in the United States.

[6]  In addition, "a preliminary injunction will not issue unless it will remedy the alleged injuries."  *Hunter Grp., Inc. v. Smith*, 164 F.3d 624 (4th Cir. 1998).  If due to an injunction the Government provided Texas the information it seeks, the State still would have no authority to prevent resettlement of Syrian refugees there.  Even if the Government, to comply with an injunction, withheld financial assistance for resettling Syrian refugees, that would not prevent them from relocating to Texas.  Approved refugees, once present in the United States as lawfully admitted aliens, are free "to enter and abide in any State in the Union."  *Graham v. Richardson*, 403 U.S. 365, 378 (1971); *Truax v. Raich*, 239 U.S. 33, 39 (1915).  *See also* Bartlett Decl. ¶ 16.

**B.      Plaintiff Has Not Established a Likelihood of Success on the Merits.**

Plaintiff's application for preliminary relief should also be denied because Plaintiff has

not demonstrated a likelihood of success on the merits.  Plaintiff contends that the Federal

Defendants have breached a duty of consultation imposed by § 1522(a)(2)(A), which provides

that the Government shall "consult regularly (not less often than quarterly) with State and local

governments . . . *concerning the sponsorship process and the intended distribution of refugees*

*among the States and localities* before their placement in those States and localities" (emphasis

added).  Plaintiff claims that the Government failed to comply with this requirement by refusing

to provide it (and allegedly preventing IRC from providing it) with "[a]ll demographic, medical,

security, and other case information" relating to individual Syrian refugees to be resettled in

Texas.  Am. PI Mot. at 10, 12 & Ex. B.  This claim lacks merit for many reasons.

**1.      Section 1522(a)(2)(A) does not require the Government to provide**
**States with particularized information about individual refugees.**

Nothing in § 1522(a)(2)(A) requires the Government to provide Plaintiff with

"demographic, medical, security," or other "refugee-specific information," Am. PI Mot. Ex. B;

*id.* at 12, so that Texas may "assess the security risk posed by refugees in advance of their

arrival," Am. Compl. ¶ 21.  Neither the Refugee Act nor the Constitution permits a State to

exclude refugees based on its assessment of their "security risk," or any other grounds.  *See* H.R.

Rep. No. 99-132 at 19 (§ 1522(a)(2)(A) is "not intended to give States and localities any veto

power over refugee placement decisions"); *Toll*, 458 U.S. at 10.

Section 1522(a)(2)(A) only instructs the Government to consult periodically with State

and local governments about "the sponsorship process and intended distribution of refugees

among the State and localities."  The particularized information about individual refugees that

the Commission requested of PRM, and that it now pursues in this litigation, plainly does not fall

within the scope of the statute's directive to consult about the "sponsorship process" and the

"distribution of refugees." That should end the inquiry on the merits. *See Lopez v. Sentrillon Corp.*, 749 F.3d 347, 349 (5th Cir. 2014), *as revised* (Apr. 28, 2014) ("[W]here the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms.").

That said, the legislative history also confirms that § 1522(a)(2)(A) does not entitle Plaintiff to the information it seeks. The House Report on the Refugee Assistance Extension Act of 1986, Pub. L. No. 99-605, describes the statute as requiring consultation "on the sponsorship and placement process," and explains that consultation is intended to "enhance cooperation and communication . . . regarding placement strategies and decisionmaking." H.R. Rep. No. 99-132 at 18-19. Nothing in the legislative history suggests that the consultation provision requires the Government to provide States with "person-specific" or "demographic, medical, and security" information on individual refugees before they are resettled. Am. PI Mot. at 10.[7]

Plaintiff's reliance on 8 U.S.C. § 1157(e), Am. PI Mot. at 10-11, is misplaced. The INA provides that the number of refugees to be admitted to the United States each fiscal year shall be determined by the President after "appropriate consultation" with Congress. 8 U.S.C. § 1157(a). Subsection 1157(e) defines "appropriate consultation" to include certain categories of information, but only "for the purposes" of consultation with Congress. Plaintiff nonetheless suggests that "appropriate consultation" should inform the meaning of § 1522(a)(2)(A). Am. PI Mot. at 11-12. Even accepting that dubious proposition at face value,[8] § 1157(e) does not

---

[7] That interpretation is also confirmed by longstanding administrative practice. *See U.S. Dep't of Justice v. FLRA*, 727 F.2d 481, 486 (5th Cir. 1984) ("[T]he construction of a statute by those charged with its execution should be followed if reasonably defensible."). It has not been the practice within memory of PRM or ORR to provide States with case-specific information about individual refugees before they are settled. *See* Bartlett Decl. ¶ 30; Tota Decl. ¶ 12.

[8] Congress determined that its role in the decision-making process for refugee admissions should be "explicitly stated" by defining in § 1157(e) what is meant by "appropriate consultation," because the Constitution charges Congress "with the responsibility for the regulation of immigration." S. Rep. No. 96-256 at 7 (1979); H.R. Rep. No. 96-608 at 14 (1979).

include an obligation to provide "person-specific" information to Congress about individual refugees, and so does not suggest that a similar obligation arises under § 1522(a)(2)(A).

Because the plain language of § 1522(a)(2)(A) does not require the Government to provide the Commission with particularized information about individual refugees before they are resettled, Plaintiff is not likely to prevail on the merits of its claims.

### 2. The Government is complying with the consultation requirement.

The Government, moreover, has met the consultation requirement actually imposed by § 1522(a)(2)(A)—to consult in advance with State and local governments on at least a quarterly basis about the sponsorship process and allocation of refugees among the States and their localities. First, in advance of deciding on the distribution of refugees in a State for a particular fiscal year, PRM consults with State refugee coordinators regarding the proposed numbers and regional origins of refugees to be resettled in their States, allowing the States to offer feedback and to raise concerns (such as resource constraints) before the final number and allocation of refugees for each State is determined. *See supra* at 8; Bartlett Decl. ¶¶ 20-21 & Exs. 1-4. In addition, PRM makes available to State refugee coordinators both a quarterly forecast of approved but as yet unsponsored refugee cases including their numbers, nationalities, ethnicities, and location preferences, a quarterly report containing similar information about refugees whose sponsorship to particular locations has been assured, and whose arrival is expected within 90 days, and a monthly report of arrivals. Bartlett Decl. ¶¶ 22-24 & Exs. 5, 7.

PRM also requires resettlement agencies, pursuant to their cooperative agreements, to conduct quarterly consultations with State refugee coordinators and others, on a variety of subjects that "concern[ ] the sponsorship process and the intended distribution of refugees . . .

---

State and local governments play no similar role in the admission of aliens to this country. *See Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012); *Toll*, 458 U.S. at 10.

before their placement . . . ."  *See supra* at 8-9; Bartlett Decl. ¶¶ 27-28 & Ex. 8.  Thus, PRM

ensures that State and local governments are given the opportunity to consult at least quarterly

with the organizations responsible for sponsoring and determining the placement of individual

refugees on the Government's behalf, and which are best positioned, therefore, to discuss them

knowledgeably with the States and to take action as needed to address the States' concerns.  *See*

*supra* at 8-9; Bartlett ¶ 29.  And PRM itself remains continually engaged with State refugee

coordinators through ongoing training, monitoring, and outreach.  Bartlett Decl. ¶¶ 25-26.[9]

### 3.      Plaintiff has no cause of action to compel consultation before individual refugees may be resettled in Texas.

Plaintiff is also unlikely to prevail on the merits because neither the Refugee Act, nor the

Declaratory Judgment Act, nor the Administrative Procedure Act (the "APA") creates a cause of

action to compel consultation before individual refugees are placed in the State of Texas.

### a.      Section 1522(a)(2)(A)

Section 1522(a)(2)(A) does not itself create a cause of action to compel consultation

before the Federal Government may exercise its plenary authority to admit and resettle foreign

refugees.  "[P]rivate rights of action to enforce federal law must be created by Congress."

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  "The judicial task is to interpret the statute

Congress has passed to determine whether it displays an intent to create not just a private right

---

[9] ORR does not determine in advance where individual refugees will be resettled in the United States.  That determination is made by resettlement agencies, in accordance with their cooperative agreements with PRM.  *See supra* at 6-7; Bartlett Decl. ¶ 13.  ORR's role is limited to funding programs of resettlement assistance provided to refugees after they have reached their final destinations.  *See supra* at 4; Tota Decl. ¶¶ 4-12.  Accordingly, PRM has assumed the lead role in ensuring that the Government consults at least quarterly with State and local governments regarding sponsorship and allocation of refugees.  *See* Bartlett Decl. ¶¶ 19-29.  Notably, although § 1522(a)(2)(A) specifies the minimum content and frequency of consultation, it does not address the manner in which the consultation is to take place.  That determination is therefore committed to agency discretion by law.  *See Perales v. Casillas*, 903 F.2d 1043, 1047 (5th Cir. 1990); 5 U.S.C. § 701(a)(2).

but also a private remedy." *Id.*  Where the necessary intent is absent, "a cause of action does not

exist and courts may not create one." *Id.* at 286-87.

Section 1522 has no express provision creating a private cause of action for the States.

The statute does not contain the sort of "rights-creating language" that courts find "critical" to

imputing to Congress an intent to create a private right of action.  *Sandoval*, 532 U.S. at 288; *see*

*also Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam).  In *Sandoval*, the

Supreme Court distinguished between the rights-creating language, "[n]o person . . . shall . . . be

subjected to discrimination," and its antithesis, "[e]ach Federal department and agency . . . is

authorized and directed to effectuate the provisions of [the statute]."  532 U.S. at 288-89.

Section 1522(a)(2)(A) falls squarely within the latter camp.  It does not "explicitly confer[] [any]

right directly on" the States.  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979).

Instead, it is "phrased as a directive to federal agencies engaged in the distribution of public

funds" under § 1522(b)(1).  *Sandoval*, 532 U.S. at 289.  Courts typically do not "infer a private

remedy where [as here] Congress . . . has framed the statute simply as a . . . command to a

federal agency." *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981).

This understanding of § 1522(a)(2)(A) is buttressed by the context in which Congress

legislated.  The Constitution vests authority to regulate the admission, naturalization, and

residence of aliens exclusively with the Federal Government.  *Toll*, 458 U.S. at 10; *see Arizona*,

132 S. Ct. at 2499; *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976).  Under our constitutional

structure, States may not interfere with the Federal Government's execution of the immigration

laws or impose conditions on the admission or residence of aliens that Congress has not

authorized. *Toll*, 458 U.S. at 11; *see Arizona*, 132 S. Ct. at 2498; *Plyler v. Doe*, 457 U.S. 202,

225 (1982).  Nothing in § 1522 suggests an intent by Congress to invert the constitutional order

by permitting States to veto the Federal Government's refugee resettlement determinations on

the ground that States were not furnished person-specific information about individual refugees. The legislative history demonstrates just the opposite, "emphasiz[ing] that the[] requirements [of § 1522] are not intended to give States and localities any veto power over refugee placement decisions." H.R. Rep. No. 99-132 at 19.

### b. The Declaratory Judgment Act

Plaintiff's reliance on the Declaratory Judgment Act, *see* Am. Compl. at 7, does not alter this conclusion. The Declaratory Judgment Act does not create a substantive cause of action. *See, e.g.*, *Harris Cty. Texas v. MERSCORP Inc.*, 791 F.3d 545, 552-53 (5th Cir. 2015). The Act "enlarged the range of remedies available in the federal courts," but it did not create a new right to seek those remedies. *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671 (1950); *Okpalobi v. Foster*, 244 F.3d 405, 423 n.31 (5th Cir. 2001). Hence, to maintain a declaratory judgment action a plaintiff must point to a cause of action arising under some other law, *see Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984), and "cannot use the Declaratory Judgment Act to create a private right of action where none exists." *Dallas Cty., Tex. v. MERSCORP, Inc.*, 2 F. Supp. 3d 938, 945-46 (N.D. Tex. 2014), *aff'd sub nom. Harris Cty. Tex. v. MERSCORP, Inc.*, 791 F.3d 545 (5th Cir. 2015). Plaintiff has identified no such law here; thus the Declaratory Judgment Act provides it no basis for relief.

### c. The Administrative Procedure Act

Count II of the Amended Complaint asserts a claim under the APA to "compel agency action" (*i.e.,* consultation) "unlawfully withheld." Am. Compl. ¶¶ 23-29; *see* 5 U.S.C. § 706(1). Such a claim can proceed "only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004). Plaintiff cannot succeed on this claim, either.

First, the consultation contemplated by § 1522(a)(2)(A) is not "agency action." *SUWA*, 542 U.S. at 64.  The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. §§ 551(13), 701(b)(2).  Each of these categories of action is then further defined.  *See id.* §§ 551(4), (6), (8), (10), (11).  A "'failure to act' is properly understood as . . . a failure to take one of the agency actions . . . defined in § 551(13)."  *SUWA*, 542 U.S. at 62.

Courts "have long recognized" that the term "agency action," while "expansive," "is not so all-encompassing as to authorize . . . judicial review over everything done" by an agency. *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 19-20 (D.C. Cir. 2006); *see Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004); *Whitlock Const., Inc. v. Glickman*, 71 F. Supp. 2d 1154, 1159 (D. Wyo. 1999).  "Agencies prepare proposals, conduct studies, meet [*i.e.*, consult] with Members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs."  *Fund for Animals,* 460 F.3d at 19-20.  Such activities do not constitute agency action.  *See id.*

The consultation contemplated by § 1522(a)(2)(A) is not an "agency action."  Rather, it is a continual process, *see supra* at 8-9, through which the Federal Government communicates with State and local governments concerning statutorily designated topics pertaining to refugee resettlement.  Such a process cannot reasonably be viewed as a "rule," 5 U.S.C. § 551(4), "order," *id.* § 551(6), "license," *id.* § 551(8), "sanction," *id.* § 551(10), or "relief," *id.* § 551(11). *See, e.g.*, *Fund for Animals*, 460 F.3d at 19-20 (an agency's budget request is not agency action); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013) (closing the gates of a dam is not fairly analogous to a "rule, order, license, sanction, [or] relief"); *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998) (agency response to a congressional reporting requirement is not agency action).  Moreover, the challenged agency conduct must also be "discrete."  *SUWA*, 542

U.S. at 64, 67.  The ongoing process of "regular[ ]" consultation called for by § 1522(a)(2)(A) is not a "discrete" action subject to compulsion under the APA.  *See id.* at 64-65.

Even where agency action is involved, only agency action "that is legally *required*" can be compelled under the APA.  *SUWA*, 542 U.S. at 63.  "In this regard the APA carrie[s] forward the traditional practice" under writs of mandamus, which were limited "to enforcement of a specific, unequivocal command," *id.*, and "rules out judicial direction of . . . action that is not demanded by law," *id.* at 65.  Hence, agency action may be compelled "only whe[re] the plaintiff can establish a clear right to the relief sought [and] a clear duty by the defendant to do the particular act." *Alsharqawi v. Gonzales*, 2007 WL 1346667, at *3 (N.D. Tex. Mar. 14, 2007) (quoting *Newsome v. EEOC*, 301 F.3d 227, 231 (5th Cir. 2002)); *see also Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1288 (5th Cir. 1997)).

Plaintiff's APA claim does not meet this exacting standard.  The Federal Defendants have no duty, much less a plainly defined and unequivocal one, to provide to Plaintiff "[a]ll demographic, medical, security, and other case information relating to Syrians slated or scheduled for resettlement in Texas."  Am. Compl., Ex. B.  To the contrary, the statute specifies the two and only two subjects as to which the Government must consult with State and local governments, the "sponsorship process," and the "intended distribution of refugees among the States and localities."  8 U.S.C. § 1522(a)(2)(A).  Neither subject encompasses "person-specific" information about individual refugees, Am. PI Mot. at 12.  Thus, the Refugee Act does not "plainly prescribe" a duty to disclose such information to Plaintiff, *Alsharqawi*, 2007 WL 1346667, at *2-3, and the Government cannot be compelled under the APA to provide it.

For all of these reasons, Plaintiff's claims against the Federal Defendants lack merit and are unlikely to succeed, and its application for a preliminary injunction must be denied.

**C.**      **The Balance of Equities and the Public Interest Also Militate Against a Preliminary Injunction.**

Finally, Plaintiff has not demonstrated that its claimed injury outweighs the harm that a preliminary injunction would cause the Government, or that "an injunction is in the public interest," *Winter*, 555 U.S. at 20; *Star Satellite, Inc. v. Biloxi,* 779 F.2d 1074, 1079 (5th Cir. 1986) ("If no public interest supports granting preliminary relief, [it] should ordinarily be denied . . . ."); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). These two factors merge where, as here, the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In assessing the public interest, a court must heed "the judgment of Congress, deliberately expressed in legislation," and "the balance that Congress has struck." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001); *McGee v. United States*, 849 F. Supp. 1147, 1149 (S.D. Miss. 1994) ("[T]his Court is not free to disturb [Congress'] determination" of the public interest embodied in a statute.).

Here, the public interest weighs heavily against the relief that Plaintiff requests. Plaintiff contends that "[t]he threatened harm to [it] outweighs any harm to the Defendants," Am. PI Mot. at 13, but that conclusory statement cannot disguise the fact that Plaintiff has made no showing that any refugees to be resettled in Texas while this case is litigated pose a danger to the "safety and security of the State's citizens." *See id.* On the other side of the scale, an injunction barring the resettlement of Syrian refugees in Texas, or any other State, would be contrary to the nation's foreign-policy and humanitarian interests as determined by the President, *see supra* at 3—a determination that is owed great deference by the Court, *see, e.g.*, *Plyler*, 457 U.S. at 25 (courts should "avoid intrusion" into the field of admissions of aliens); *Haig*, 453 U.S. at 292—and by the same token would disserve the public interests that Congress meant the Refugee Act to promote.

As the sponsors of the Refugee Act recognized, the United States' treatment of refugees implicates foreign policy concerns.  *See* 126 Cong. Rec. 3756, 3758 (Feb. 26, 1980) (statement of Sen. Kennedy) (the Act implicates "our country's ability to respond to the resettlement needs of refugees around the world, which touches at the heart of America's foreign policy"); *see also Arizona*, 132 S. Ct. at 2498 ("Immigration policy can affect . . . diplomatic relations for the entire Nation . . . ."); *Haitian Refugee Ctr., Inc. v. Gracey*, 600 F. Supp. 1396, 1400 (D.D.C. 1985) (same), *aff'd*, 809 F.2d 794 (D.C. Cir. 1987).  These concerns are especially acute here.  The willingness of the United States to resettle Syrian refugees lends credibility to our efforts to encourage other nations to support the global response to the Syrian humanitarian crisis, which promotes the important foreign-policy objective of achieving and maintaining stability in the Middle East.  Bartlett Decl. ¶ 34.  Actions taken by Texas and other States seeking to exclude Syrian refugees can severely undermine our diplomatic efforts in this regard.  *Id.*  Such actions can also "appear[ ] to substantiate the ISIL narrative, which maliciously argues that the American people are hostile to Syrians," also contrary to important diplomatic and national-security interests.  *Id.* ¶ 35.

The relief Plaintiff seeks also implicates the humanitarian interests served by the Refugee Act.  *See* S. Rep. No. 96-256 at 1 (observing that the Act "reflects one of the oldest themes in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns"); Bartlett Decl. ¶ 31 ("The [U.S. refugee resettlement program] reflects the United States' highest values and aspirations to compassion, generosity and world leadership.").  By definition, refugees are persons who have been "persecut[ed] or have a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).  The Refugee Act allows the United States to assist such afflicted

persons in times of international crisis, such as that now occurring in Syria, and to encourage other nations to do the same. *See* Bartlett Decl. ¶¶ 31-34.

The injunction Plaintiff seeks would be contrary to these foreign-policy and humanitarian interests, public interests that the Refugee Act was intended specifically to advance. As such, the requested injunction should be denied. *See Oakland Cannabis*, 532 U.S. at 497; *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) ("[I]njury to the nation's foreign policy" weighs in favor of the United States in public-interest inquiry).[10]

Injunctive relief should also be denied because of the effect it would have on Syrian refugees seeking to resettle in Texas. A court considering a request for a preliminary injunction should also take into account the impact on persons who are not parties to the suit. *See Avmed Inc. v. BrownGreer PLC*, 300 Fed. App'x 261, 265 (5th Cir. 2008); *Southdown, Inc. v. Moore McCormack Res., Inc.*, 686 F. Supp. 595, 596 (S.D. Tex. 1988) (petitioner has the burden to show an injunction will cause "no disservice to unrepresented third parties"). Delaying the arrivals of Syrian refugees who plan to resettle in Texas would prolong their suffering, and inflict further hardship upon them that is unjustified by any demonstration of harm by Plaintiff.

Accordingly, the balance of equities and the public interest weigh decisively against the preliminary relief that Plaintiff requests.

## CONCLUSION

Plaintiff's application for a preliminary injunction should be denied.

---

[10]   A preliminary injunction would also disserve the public interest to the extent it were used to facilitate discrimination against Syrian refugees based on their national origin. A State's refusal to provide federally funded resettlement assistance to refugees on the basis of their Syrian nationality would violate the Refugee Act, 8 U.S.C. § 1522(a)(5), Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, and perhaps the Fourteenth Amendment, *see Truax*, 239 U.S. at 39-42. Needless to say, it would be contrary to the public interest to effectively authorize by injunction what the law prohibits a party from doing itself.

Dated:  January 5, 2016

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOHN R. PARKER
United States Attorney

JOSEPH H. HUNT
Director

SHEILA M. LIEBER
Deputy Director

ANTHONY J. COPPOLINO
Deputy Director

JAMES J. GILLIGAN
Special Litigation Counsel


  /s/   *Stuart J. Robinson*
MICHELLE R. BENNETT
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, D.C.  20530
Tel: (202) 514-9239
Fax: (202) 616-8470
Email: stuart.j.robinson@usdoj.gov

*Attorneys for the Federal Defendants*

## CERTIFICATE OF SERVICE

I certify that on January 5, 2016, I caused to be filed electronically the foregoing opposition brief with the Clerk of Court using the Court's CM/ECF system, which sends a Notice of Electronic Filing to counsel of record.

 */s/ Stuart J. Robinson*
STUART J. ROBINSON

*Attorney for the Federal Defendants*