Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TEXAS HEALTH AND HUMAN
SERVICES COMMISSION,

            Plaintiff,

            v.

UNITED STATES OF AMERICA, *et al.*,

            Defendants.

Civil Action No. 3:15-cv-3851 (DCG)

## DECLARATION OF BARBARA L. STRACK, CHIEF, REFUGEE AFFAIRS DIVISION, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY

I, Barbara L. Strack, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows:

1.      I am the Chief of the Refugee Affairs Division ("RAD"), U.S. Citizenship and Immigration Services ("USCIS"), within the U.S. Department of Homeland Security ("DHS"). I have held this position since November 2005.

2.      I submit this declaration in support of the Federal Defendants' opposition to plaintiff Texas Health and Human Services Commission's motion for a preliminary injunction. Specifically, I address herein the security screening of refugees before they are admitted to the United States and the enhanced screening process for Syrian refugees.

3.      The statements made herein are based on my personal knowledge and information made available to me in the course of carrying out my duties and responsibilities as Chief of RAD.

## The Refugee Screening Process

4.      The United States has a proud and long-standing tradition of offering protection, freedom, and opportunity to refugees from around the world who live in fear of persecution and often reside in difficult conditions of temporary asylum. USCIS remains dedicated to fulfilling this mission and continuing the United States' leadership role in humanitarian protection. An integral part of this mission is to ensure that refugee resettlement opportunities go to those who are eligible for such protection and do not present a risk to the safety and security of our country. Accordingly, USCIS continues to employ the highest security measures to protect against risks to our national security and is committed to deterring and detecting fraud among those seeking to resettle in the United States. As Secretary Johnson has noted, "We have tremendous faith in this system's ability to detect, investigate, and disrupt terrorist plotting in this country, as it has done repeatedly. With these measures in place, we believe that we are able to both protect the American people and maintain this Nation's long standing position as the world's beacon of hope and freedom." See pages 4-5 of the attached November 20, 2015 letter from Secretary Johnson and Secretary of State Kerry to Governor Rick Snyder of Michigan.

5.      The security vetting for refugees is extraordinarily thorough and comprehensive, the most robust screening process for any category of traveler to the United States.

6.      Coordinating security checks of refugee applicants is a shared responsibility between the Department of State and DHS. The process is multi-layered and intensive, involving multiple law enforcement, national-security, and intelligence agencies across the Federal Government including the National Counterterrorism Center, the Federal Bureau of Investigation's Terrorist Screening Center, and the Departments of Homeland Security, State, and Defense. The refugee resettlement program has forged strong and deep relationships with colleagues in the law enforcement, national security, and intelligence communities, and the

2

United States Refugee Admissions Program ("USRAP") continues to benefit enormously from their expertise, analysis, and collaboration. It is a dynamic process in which USCIS and the Department of State work closely with interagency partners to improve, refine, and streamline the security vetting regime for refugee applicants. Security screening of refugee applicants, which includes both biometric and biographic checks as well as a comprehensive review of all available evidence and information, occurs at multiple stages throughout the process. Screening is initiated prior to an interview with a USCIS officer, while the refugee is located overseas, and further screening is conducted immediately before a refugee's departure to the United States, as well as upon arrival at a port of entry in the United States. No refugee applicant can be approved for travel and admission to the United States until all required security checks have been completed and cleared. If there is any reason to believe that an applicant might pose a security risk to the United States, that individual will not be approved for admission to the United States as a refugee unless and until that concern is resolved.

7.     All available biographic and biometric information from refugee applicants is vetted against a broad array of law enforcement, intelligence community, and other relevant databases to confirm a refugee applicant's identity, to check for any criminal or other derogatory information, and to identify information that could inform lines of questioning during USCIS's in-person refugee interview. In particular, the screening of refugee applicants involves the following biographic checks that are initiated by Resettlement Support Centers ("RSCs") at the pre-screening phase (as described in the Declaration of Lawrence E. Bartlett (January 5, 2016)), and the results of these checks are later reviewed and resolved by USCIS, as necessary. The Department of State conducts biographic checks of the refugee's primary name and any name variants against its Consular Lookout and Support System database ("CLASS"). CLASS includes watchlist and other information from the Terrorist Screening Database, the Drug

3

Enforcement Agency, the FBI's Terrorist Screening Center and INTERPOL, including criminal history, immigration history, and records of any prior visa applications submitted by the applicants. Significantly, for individuals meeting certain criteria, the Department of State also requests a Security Advisory Opinion ("SAO"), *i.e.,* a name check against law-enforcement and intelligence agency databases. The SAO process was implemented following the September 11, 2001, terrorist attacks to provide additional scrutiny of certain higher-risk categories of individuals seeking to enter the United States. Beginning in 2008, the USRAP launched an additional check, known as the Interagency Check ("IAC"), for Iraqi refugee applicants, which has now been expanded to all nationalities. The IAC screens biographic data, including names, dates of birth and other information of all refugee applicants within designated age ranges against a broad array of Intelligence Community holdings. In June 2015, the U.S. Government implemented recurrent vetting for IACs, whereby vetting partners continuously check refugee applicant data against their holdings.

8.      Refugee applicants are also subject to biometric security vetting. USCIS collects applicants' fingerprints and coordinates the screening of applicants' fingerprints against the biometric holdings of the FBI's Next Generation Identification system ("NGI"), DHS's Automated Biometric Identification System ("IDENT"), and the Department of Defense's Automated Biometrics Identification System ("ABIS"). Through NGI and IDENT, applicants' fingerprints are screened not only against criminal-history and watchlist information, but also for previous immigration encounters in the United States and overseas—including, for example, cases in which an applicant previously applied for a visa at a U.S. embassy. Applicants must clear all required biographic and biometric security checks before their application is approved.

9.      In addition to this biographic and biometric screening, USCIS officers conduct an individual, in-person interview with each applicant to determine his or her eligibility for refugee

4

status, including whether he or she meets the refugee definition and is otherwise admissible to the United States under U.S. law and whether he or she poses a threat to national security. Recognizing that well-trained officers are critical to protecting the integrity of the refugee process, RAD has focused its efforts on providing the highest quality training to refugee adjudicators. In addition to the basic training required of all USCIS officers, refugee adjudicators receive five weeks of specialized training that includes comprehensive instruction on all aspects of the job, including refugee law, grounds of inadmissibility, fraud detection and prevention, security protocols, interviewing techniques, credibility analysis, and country conditions research. Before deploying overseas, officers also receive pre-departure training which focuses on the specific population they will be interviewing. This includes information on the types of refugee claims they are likely to encounter, detailed country of origin information, and updates on any fraud trends or security issues that have been identified. Officers also draw on information obtained during the RSC's pre-screening interview of the applicant. In order to fully explore refugee claims and to identify any possible grounds of ineligibility, USCIS officers inquire about, among other things, an applicant's background, activities, any criminal history, and any involvement in terrorist activity. USCIS officers assess the credibility of the applicant and evaluate whether the applicant's testimony is consistent with known country conditions. Additionally, all eligibility determinations undergo secondary review before a final decision is made. USCIS policy requires officers to submit certain categories of sensitive cases, including cases that may present a national security-related concern, to RAD headquarters. This allows for headquarters staff to conduct additional research, liaise with law enforcement or intelligence agencies, or consult with an outside expert to resolve any concern before finalizing the decision. Applications are placed on hold if a refugee officer or supervisor concludes that supplemental information regarding the refugee's application is required before a decision can be finalized.

10.     Following the applicant eligibility interview, USCIS makes the ultimate determination as to whether an applicant is approved for resettlement to the United States as a refugee, based on all information collected about the refugee, the results of all biographic and biometric security checks, the interview, and the criteria of the Immigration and Nationality Act ("INA").

11.     Individuals outside the United States do not have a right to be resettled in the United States as a refugee. All refugee resettlement applicants, including Syrian nationals, may be admitted to the United States only after USCIS has approved their case. Approval is granted only after USCIS has received and reviewed the results of all security checks run by the intelligence and law enforcement communities, and all issues have been favorably resolved. At all times the burden of proof is on the applicant—the refugee must show that he or she qualifies for refugee status and is otherwise admissible to the United States as a refugee. Accordingly, all applicants are required to provide information that is sufficient to establish their identities and that allows the Federal Government to assess whether they present security risks to the country. If an applicant does not meet his or her burden of proof, the case will not be approved for resettlement. In addition, refugees are cleared to travel to the United States only where all members of a case – a principal applicant and his or her derivative family members -- pass all applicable security checks. If one member of the family fails to pass a required check, the entire family is placed on hold until the issue can be resolved or until a denial is issued.

**Enhanced Security Screening of Syrian Refugees**

12.     Intelligence assessments conducted to date do not indicate that Syrian terrorists or terrorist groups are actively trying to infiltrate the USRAP to gain access to the United States. While intelligence holdings on Syrian nationals may not be as extensive as for some other refugee groups where the United States has had a significant ground presence in the country of

6

origin, the U.S. Government has a great deal of prior experience in screening and admitting large numbers of refugees from chaotic and war-torn environments, including regions where intelligence holdings are limited.  In light of the dynamic nature of the Syrian conflict, USCIS has developed training and review protocols and procedures for enhanced review of Syrian resettlement cases.

13.    Before interviewing refugee applicants from the Middle East (including Syrians), USCIS officers must attend another five-day training specific to these caseloads.  The training includes information on country conditions, armed groups operating in Iraq and Syria, and a classified briefing.  Additionally, USCIS's Fraud Detection and National Security Directorate ("FDNS") provides an enhanced review of certain Syrian resettlement cases.  This review involves FDNS providing intelligence-driven support to refugee adjudicators, including threat identification, and suggesting topics for questioning.  The Federal Government continually examines options for enhancing still further the screening process for Syrian refugees.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 5th, 2016.

Barbara L. Strack

Barbara L. Strack

 

November 20, 2015

The Honorable Rick Snyder
Governor
State of Michigan
Office of the Governor
P.O. Box 30013
Lansing, MI 48909

Dear Governor Snyder:

Thank you for your November 16, 2015 letter.

Like you, we are committed first and foremost to the security of the people of our Nation, which is the U.S. Government's most sacred responsibility. Like you, we are also proud of our Nation's history of providing refuge to some of the world's most vulnerable people. In light of the concerns expressed in your letter regarding the security vetting procedures refugee applicants undergo before they are admitted to the United States under our refugee resettlement program, we would like to describe for you, in detail, this rigorous process, particularly as it pertains to the population of refugees fleeing from the conflict in Syria.

In short, the security vetting for this population—the most vulnerable of individuals—is extraordinarily thorough and comprehensive. It is the most robust screening process for any category of individuals seeking admission into the United States. The process is multi-layered and intensive, involving multiple law enforcement, national security, and intelligence agencies across the Federal Government. Additional precautions have been added with regard to Syrian refugees. We continually evaluate whether more precautions are necessary.

Today, the world faces an unprecedented outpouring of more than four million refugees from Syria, presently in Turkey, Lebanon, Jordan, Iraq, Egypt, Europe, and beyond. A number of nations, including our closest allies, have pledged to share some of this responsibility and accept Syrian refugees into their borders. For example, the new government of our neighbor to the north, Canada, has pledged to accept 25,000 Syrian refugees this calendar year. President Hollande of France, while his country reels from

The Honorable Rick Snyder
Page 2

the terrorist attacks of last week, subsequently reiterated his nation's commitment to
accepting Syrian refugees.

Meanwhile, our Government has pledged to increase the number of Syrian
refugees we will accept, from approximately 1,682 last fiscal year to at least 10,000 this
fiscal year. This represents a modest commitment by our Government to accept less than
one percent of the approximately four million Syrian refugees in the world.

Further, it is important to note that the overwhelming majority of Syrian refugees
we have accepted and will accept are families, victims of torture, and children. We have
prioritized the most vulnerable of Syrian refugees for resettlement—which means those
who are the principal victims of the violence perpetrated by both the Assad regime and
ISIL in Syria. A very small proportion of these refugees have been or will be adult males
who are not accompanied by children nor joining family in the U.S., and those adult
males who are accepted will generally be especially vulnerable individuals, such as
survivors of torture, LGBT individuals, or those with disabilities.

A refugee applicant cannot be approved for travel and admission to the
United States until all required security checks have been completed and cleared. Bottom
line—under the current system, if there is doubt about whether an applicant would pose a
security risk, that individual will not be admitted to the United States as a refugee. Below
is a detailed description of the process for vetting refugees.

First, many candidates for refugee resettlement in the United States are
interviewed by the United Nations High Commissioner for Refugees (UNHCR) to
determine whether they meet the definition of refugee—i.e., persons who have been
persecuted, or have a well-founded fear of persecution, based on political opinion, social
group, race, religion, or nationality.

In the interview, UNHCR identifies any "red flags" which would render
individuals ineligible for resettlement under our laws and security protocols. UNHCR
also screens applicants to determine whether they fall within the priorities the
United States has established for resettlement—those refugees who are deemed most
vulnerable. Examples of priority profiles include families, unaccompanied children,
victims of torture, and individuals with family ties in the United States.

Second, a refugee applicant is referred by the UNHCR to the United States along
with a package of information. At that point, the State Department takes over the
process. Resettlement support centers, operated by faith-based and international
organizations contracting with the State Department, first interview the applicant to
confirm information about the case and collect any identification documents and aliases
used by the refugee applicants and initiate security checks, which are exclusively

2

The Honorable Rick Snyder
Page 3

conducted by the U.S. Government.  These interviews provide the U.S. Government a
very useful tool for gathering information about a potential refugee that may not already
exist in a database.

For every single refugee applicant, the Department of State conducts biographic
checks of the refugee's primary name and any aliases against its Consular Lookout and
Support System database (CLASS).  CLASS includes watchlist information from the
Terrorist Screening Database (TSDB), the Drug Enforcement Agency, the FBI's Terrorist
Screening Center and Interpol, including criminal history, immigration history, and
records of any prior visa applications submitted by the applicants.  Significantly, for
individuals meeting certain criteria, the Department of State also requests a Security
Advisory Opinion name check against law enforcement and intelligence databases.  In
addition, the Department of State initiates an interagency check against intelligence
community holdings, including the National Counterterrorism Center.  These enhanced
biographic checks are conducted for all refugee applicants within a designated age range,
regardless of nationality.  This vetting occurs throughout the process.

Third, refugee applicants screened by the Department of State are then referred to
the United States Citizen and Immigration Services (USCIS) at the Department of
Homeland Security (DHS), where USCIS oversees rigorous refugee status interviews and
additional security vetting.  Security checks are an integral part of this process.

USCIS collects biometric information, consisting of fingerprints, for each refugee
applicant, ages 14 to 79.  USCIS coordinates the screening of refugee applicant
fingerprints against the vast biometric holdings of the Federal Bureau of Investigation's
Next Generation Identification system, and DHS's Automated Biometric Identification
System (IDENT).  Through IDENT, applicant fingerprints are screened not only against
watchlist information, but also for previous immigration encounters in the United States
and overseas—including, for example, cases in which the applicant previously applied
for a visa at a U.S. embassy.

Working with the Department of Homeland Security, the Department of Defense
augments biometric screening on refugee applicants of all nationalities who fall within
the prescribed age ranges by checking the fingerprints of refugee applicants against their
own database.

At the same time, a team of highly-trained USCIS refugee officers is responsible
for personally conducting the refugee status interviews.  These officers undergo five
weeks of specialized and extensive training that includes comprehensive instruction on
all aspects of the job, including refugee law, grounds of inadmissibility, fraud detection
and prevention, security protocols, interviewing techniques, credibility analysis, and
country conditions research.

3

The Honorable Rick Snyder
Page 4

Before deploying overseas, officers also receive additional weeks of pre-departure training, which focuses on the specific population that they will be interviewing, detailed country of origin information, and updates on any fraud trends or security issues that have been identified. Officers conducting interviews of Syrian applicants now undergo an additional one-week training focusing on Syria-specific topics, including classified intelligence briefings.

USCIS has officers providing intelligence-driven support to adjudicators to identify threats and lines of inquiry, as well as watchlisting and dissemination of intelligence information reports on applicants determined to present national security threats. Every officer's decision, whether it is to approve or deny a refugee's application, is reviewed by a supervisor. Refugee status is granted by USCIS only after supervisory review, once the application is deemed complete. Applications are often placed on hold until supplemental information is obtained.

Fourth, before an approved refugee arrives in the United States, U.S. Customs and Border Protection (CBP) at DHS receives a manifest of all refugees who have prior approval to travel to the United States. CBP receives this manifest eight days before a refugee's scheduled travel. The agency performs initial vetting before they arrival at a Port of Entry, then conducts additional background checks of these subjects upon arrival.

Fifth, and finally, the Department of State and the Department of Health and Human Services work together to determine an appropriate resettlement site in the United States, transport the refugee, and provide services to help the refugee make the transition to self-sufficiency and become contributing members of the community.

We want to emphasize that no one has a right to be resettled in the United States as a refugee. All refugees, including Syrians, may only be admitted the United States after USCIS receives all the security checks run by the intelligence and law enforcement communities and all issues are resolved. With every refugee application, the burden of proof is on the applicant—the refugee must show that he or she qualifies for refugee status. The law requires the applicant to provide information that establishes their identity and allows us to assess whether they present a security risk to the country. If the expert screener fails to be satisfied on either score, the applicant will not be resettled in the United States.

Our multi-agency system for vetting refugees is strong, and it has been significantly enhanced over the past few years. Indeed, applicants for refugee admission are screened more carefully than any other type of traveler to the United States. We have tremendous faith in this system's ability to detect, investigate, and disrupt terrorist plotting in this country, as it has done repeatedly. With these measures in place, we

The Honorable Rick Snyder
Page 5

believe that we are able to both protect the American people and maintain this Nation's long standing position as the world's beacon of hope and freedom.

Thank you again for your letter. Our highest priority is the protection of the American people. We look forward to continuing to work with you to ensure our Nation lives up to its humanitarian heritage while keeping the American people safe.

Sincerely,

John F. Kerry

Jeh Charles Johnson

5