# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-cv-3851 |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF STATE, JOHN KERRY in his Official Capacity as SECRETARY OF STATE, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, SYLVIA BURWELL, in her Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, ROBERT CAREY, in his Official Capacity as Director of the OFFICE OF REFUGEE RESETTLEMENT, and INTERNATIONAL RESCUE COMMITTEE, INC. | § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

**PLAINTIFF'S REPLY IN SUPPORT OF AMENDED APPLICATION FOR PRELIMINARY INJUNCTION**

"[T]he Paris attacks remind us that we must remain ever-vigilant in this effort and that the highest priority of our government is to keep American's [sic] safe."[1] Secretary Napolitano is one of many leaders concerned about importing terrorists as "refugees" since the mass murder in Paris. The Defendants' Oppositions generally lament that Texas has joined these growing voices of concern, as if Texas has neither right nor role in safeguarding its residents. To this point, the Defendants regale this Court with extensive histories of what was in terms of refugee resettlement. But just last week, individuals who entered the U.S. through the refugee program (one from Syria) have been arrested (one in Houston) for seeking to support terrorist organizations.[2] Texas has a right to protect its residents and obtain full advanced consultation regarding proposed refugee placements—which is far more than after-the-fact notices of mass placements—including person-specific information *before* Defendants place refugees in Texas.[3] Their refusal to provide the requested information *before* resettlement is a harm that cannot be remedied at law.

## I. RELEVANT HISTORY

### A. Congress's Intended Flexibility and Cooperation.

The U.S. has constantly revised and reformed its approach to "respond[ing] to the urgent needs of persons subject to persecution in their homelands," and admitting "refugees of special humanitarian concern to the United States." 8 U.S.C. § 1521 (notes). "Prior to the enactment of the Refugee Act of 1980, the United States had no formal process for the admission of individuals seeking refuge in this country." H.R. Rep. No. 99-132, at 9 (1985). Refugees were handled with "a patchwork of different

---

[1] Nov. 19, 2015 Letter of Janet Napolitano and Michael Chertoff to President Obama about refugee resettlement within the U.S. IRC Opp., Exh. A to Decl. of Napolitano (Doc. 44-1).

[2] Under federal law, refugees are generally homeless and innocent parties to political, cultural, or circumstantial persecution or unrest, and not a "person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

[3] More Syrian refugees are scheduled for Texas resettlements on Jan. 25, 2016. Unlike prior notices, there was no assurance that this group was *not* admitted through a material support waiver. *See* Fed. Defs.' Doc. 36 at 4, n.1

programs that evolved in response to specific crises," but later "became inadequate to cope with the refugee problem we face [in 1980]." S. Rep. No. 96-256, at 4 (1979).

However, greater "*flexibility [was] needed*, for example, to handle such situations as the evacuation of Saigon," and other refugees. S. Rep. No. 96-256, at 4 (1979) (emphasis added). Thus, the Refugee Act of 1980 was a groundbreaking enactment, "establish[ing] for the first time a comprehensive United States refugee resettlement and assistance policy[,] . . . reflect[ing] one of the oldest themes in America's history—welcoming homeless refugees to our shores. [The Act gave] statutory meaning to our national commitment to human rights and humanitarian concerns," S. Rep. No. 96-256, at 1 (1979), something that Texas embraces.[4]

To assist in the dynamic process of resettling refugees, the Refugee Act of 1980 "provides an orderly but *flexible* procedure for meeting emergency refugee situations and any other situations of special concern to the United States." S. Rep. No. 96-256, at 2 (1979) (emphasis added). However, to maintain flexibility, "[t]he bill does not, and cannot, explicitly define what refugees are deemed to be 'of special concern to the United States.' This is an issue only the future can define," S. Rep. No. 96-256, at 6 (1979), and must be addressed on a case-by-case, situation-by-situation basis.

B.  **Cooperative Struggles between Governments.**

There is a documented history of struggles in collaboration regarding refugee resettlement. In 1980, "there [was] too little coordination between the various branches of Government involved with the refugee programs, and with the voluntary resettlement agencies." S. Rep. No. 96-256, at 2 (1979). The Act remedied, in part, Congress's own lack of involvement, "provid[ing] for the first time the statutory requirement that Congress be consulted before refugees are admitted, and defines

---

[4] Texas resettles more refugees than any other State. *See*, *e.g.*, Office of Refugee Resettlement Statistics for FY 2014 (http://www.acf.hhs.gov/programs/orr/resource/fiscal-year-2014-refugee-arrivals). Texas gladly welcomes thousands of orphans, political prisoners, and others who, through no fault of their own, seek a safe haven and to live peaceably with their neighbors.

and exerts congressional control over the process." S. Rep. No. 96-256, at 2 (1979).

Before 1980, the congressional and state role was minimal. But the Act required the President to undertake "appropriate consultation" with Congress. *See generally* 8 U.S.C. § 1157 (where "appropriate consultation" appears 11 times).[5] And because States and local communities are indispensable to resettlement, the Act established a cooperative framework between the federal government and the States.

> The Director, together with the Coordinator, shall consult regularly with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities.

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. *But note how this original language pales compared to the current collaboration requirements of 8 U.S.C. § 1522.* This is because early into administering the 1980 statutory overhaul, it was clear that the federal government needed to cooperate more with State and local officials.

> Governors . . . and local officials have sharply criticized the federal government for its failure to consult with them on refugee placement decisions. Some improvements have occurred in recent months. Yet, the committee remains disturbed that the consultation requirements of the 1980 Act have not been effectively implemented.
>
> . . .
>
> While the bill refers to quarterly meetings, *it is the committee's expectation that such meetings be held more frequently, as needed.*
>
> . . .
>
> It is clearly the intent of this committee to insure that these meetings are meaningful and productive and provide an *opportunity for expansion of the concerns on the part of state and local officials* and a free exchange of views between these officials and voluntary agency representatives.

S. Rep. No. 97-638, at 9 (1982) (emphasis added); *see* H.R. Rep. No. 97-541, at 12

---

[5] Defendants misconstrue Plaintiff's argument about the "appropriate consultation" required between the President and Congress. 8 U.S.C. § 1157(e). There, the nature, purpose, and extent of the "consultation" is expressly cabined, and Congress is *not* required "to the maximum extent possible, take into account recommendations of the [President]." The consultation with the States is not limited in scope, and yet the President (presumably) gets far more information than the States.

(1982). Thus, Congress amended the law to remain flexible and responsive to changing circumstances, "as needed." But the initial changes fell short, requiring more amendments to address, *inter alia*, the need for "greater coordination between the federal government, State and local governments, and voluntary agencies in the placement and resettlement of refugees." H.R. Rep. No. 99-132, at 7 (1985).[6]

## II.   THE PRESENT CONFLICT

Against this backdrop of flexibility and a plan that "provide[s] an *opportunity for expansion of the concerns on the part of state and local officials*," the Defendants appeal to a rigid history of processes employed *before* Texas initiated recent concerns about terrorism.[7] But it was for exactly this type of unforeseen circumstance (*e.g.*, terrorism) that the Act was made the way it is—flexible, requiring heavy collaboration between State and federal entities, "and to the maximum extent possible, take into account recommendations of the State." 8 U.S.C. § 1522(a)(2)(D).

The "recommendations" of Texas relevant to this dispute are largely that those claiming "refugee" status from a region and country controlled generally by terrorists, with whom we have no diplomatic relationship, and where reliable databases and other means to vetting claimants do not generally exist (Fed. Defs.' Opp. at 6; Supp. Decl. of Bodisch at ¶¶21-24), not be settled within its borders, or at least that Texas be able to see the security file. Contrary to notions cooperation and consultation, the Defendants have ignored Texas's concerns. Decl. of Randall at ¶¶2-5.

Defendants' responses to this motion are entirely historical, extoling only what was done before Paris and existing concerns about links between terrorism and

---

[6] *See* Plaintiff's colored composition of the Act and its amendments, attached hereto as Ex. J.
[7] Arguments that Texas is invidiously discriminating against refugees because of their national origin are spurious and mock substantiated security concerns. Refugees from Syria receive an "enhanced review . . . in light of the dynamics of the Syrian conflict." Fed. Defs.' Opp. at 6. This "enhanced review" is because of regional conflict and not due to any desire to discriminate against Syrians per se. That Texas has resettled more refugees than any other State, including hundreds from Syria, before raising its existing concerns demonstrates that it has no improper animus towards any nationality.

refugee resettlement were raised. And whether Defendants agree with State concerns and recommendations is not dispositive of their duty to consult and "to the maximum extent possible, take into account the recommendations of the State."

### A. The Consultation Requirement

The consultation requirement is intentionally flexible and does not seek to limit or restrict Who?, When?, Where?, How?, Why?, and most importantly What?

*Who?* The Act contemplates federal and State consultations, 8 U.S.C. § 1522(a)(2)(A), but does not limit participation. S. Rep. No. 97-638, at 9 (1982). There is an unlimited variety of participants indispensable to any given refugee discussion. Decl. of Bartlett at ¶¶25-27 (Doc. 46-1); Decl. of Randall at ¶¶6-12. For example, one Texas consult involved local health, school, and police officials, and a federal homeland security official. Decl. of Bartlett at ¶26.

*When?* Consultations are to occur "before" and "in advance of" arrivals. 8 U.S.C. §§ 1522(a)(2)(A), (a)(2)(C)(ii). While "quarterly" and "annual" meetings occur, *see, e.g.*, Fed. Defs.' Opp. at 17-18; IRC's Opp. at 12, "it is the [Senate] committee's expectation that such meetings be held more frequently, as needed." S. Rep. No. 97-638, at 9 (1982). The Defendants "business as usual" approach—that past actions are perpetually sufficient—fails. *See, e.g.*, Fed. Defs.' Opp. at 8-9, 17-18; Decl. of Bartlett at ¶¶19-30; IRC's Opp. at 12; Decl. of Randall at ¶¶2-5. The statute requires more, especially under the present circumstances that are garnering national attention.

*Where and How?* The Act does not dictate meeting structure or locations, but is designed to be "flexible" and allow for meetings on an "as needed" basis. Meetings are instigated by various persons and occur in-person and via electronic communication. Decl. of Bartlett at ¶¶19-30; Decl. of Randall at ¶¶6-12.

*Why?* State and local communities bear the ultimate costs of resettlement, S. Rep. No. 96-256, at 8 (1979), and the monies provided to assist (*see* 8 U.S.C. § 1522(b)-

(e)) are limited in scope, hoping that refugees will become "self-sufficient" and "free from long-term dependence on public assistance." 8 U.S.C. §§ 1522(a)(1)(A), (a)(2)(C)(iii)(III). While nobody knows whether particular refugees will become "self-supporting and contributing members" of a community, State and local officials know their communities best, which is why their intimate involvement is required by the Act. That the federal Defendants largely control who becomes a "refugee" does not mean they solely control *where* a refugee is resettled. States have a say.

*__What?__* Congress intended that the federal government be accountable to the needs of State and local communities in refugee resettlement. Congress mandated a "flexible" framework to embrace the concerns of local bodies on an "as needed" basis, which is why the Act does not limit topics that can be addressed. The federal Defendants topically cabin their consultative duties to a *limited vision* of "sponsorship" and "allocation," Fed. Defs.' Opp. at 17-18, but their reading defies the Act's plain language, the intent of Congress, and is belied by their own behavior.

The plain language does not limit discussion points between actors. It provides for consultation "concerning the sponsorship process and the intended distribution of refugees," 8 U.S.C. § 1522(a)(2)(A), bearing in mind that the federal Defendants must, "to the maximum extent possible, take into account recommendations of the State." 8 U.S.C. § 1522(a)(2)(D). Within this framework is room for virtually *any* discussion, including whether certain refugees should be sponsored at all, or if other jurisdictions are better resettlement options given any set of relevant facts. Congress knew conflicts would ensue and requires the federal Defendants to defer, "to the maximum extent possible . . . [the] recommendations of the State." 8 U.S.C. § 1522(a)(2)(D).

And a no-limits approach to consultative topics is consistent with the history of the Act and Congress's expressed desire for maximum collaboration. The 1980 law was motivated in part out of concern for local governments. S. Rep. No. 96-256, at

10-13 (1979). In 1986, Congress acted in part because states "have consistently complained that their interests and concerns are not adequately considered by Volags when these allocations are made." H.R. Rep. No. 99-132, at 18 (1985).

Of course, the "interests and concerns" of governments encompass a plethora of topics, including health and safety. In 1982 and 1986, Congress appropriated millions because the medical conditions of refugees posed a threat to the public health of states. S. Rep. No. 97-638, at 7-8 (1982); H.R. Rep. No. 99-132, at 12 (1985). Congress also addressed the safety concerns of States regarding an influx of criminal "refugees" in 1980. H.R. Rep. No. 99-132, at 21 (1985). Thus, the history of refugee law is filled with instances of collaboration over health and safety.

Finally, actual consultations include health and police officials, and members of DHS. *See*, *e.g.*, Decl. of Bartlett at ¶26; Decl. of Randall at ¶6-10. And Volags must provide information on refugees that affect "the public health and requir[e] treatment," or may be engaged in terrorism. Decl. of Bartlett, Ex. 8 at §§ 7, 15(a)(4). These admonitions to Volags validate Texas's right to seek more information. Security does not begin and end with an imperfect screening process. Safeguarding the homeland requires meaningful, ongoing cooperation. The security-oriented consultation Texas seeks "before" refugees are placed within its borders is not beyond the text of the Act, Congress's vision of cooperation, or current practice.

Undergirding Texas's expectation of the highest levels of cooperation and information sharing with its resettlement partners is its existing maximum collaboration in safeguarding the homeland. As part of the Intelligence and Counter-Terrorism Division of the Texas Department of Public Safety (DPS), Texas hosts one of the largest Fusion Centers[8] in the nation. Supp. Decl. of Bodisch at ¶16-19. Staffed

---

[8] Fusion Centers are "focal points . . . for the receipt, analysis, gathering, and sharing of threat-related information between the federal government and state, local, tribal, territorial (SLTT) and private sector partners." *See*, *e.g.*, http://www.dhs.gov/state-and-major-urban-area-fusion-centers.

24/7, it involves 15 federal and State agencies.[9] *Id*. at ¶16. For maximum intelligence sharing with agencies, officials within DPS possess security clearances. *Id*. at ¶17.

### B. The Confidentiality Issue.

Defendants claim confidentiality laws prohibit information sharing. Fed. Defs.' Opp. at 9; IRC Def. Opp. at 8, 12-15. But 8 U.S.C. § 1202 applies only to visas, and refugees do not receive visas.[10] Even if § 1202(f) applied, it would not preclude data sharing here because "records . . . shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States," 8 U.S.C. § 1202(f). This dispute involves the "formulation, amendment, administration, or enforcement" of the Refugee Act of 1980. And Defendants cannot skirt duties by adding this irrelevant law to their contract with each other. *See* Fed. Defs.' Opp. to Pl.'s TRO, Ex. B at 26 (Doc. 5-1).

The "federal law" cited by IRC is actually a "fact sheet" which concludes that "as a matter of policy, USCIS extends the same protections outlined in 8 CFR 208.6 to refugees." Decl. of Napolitano, Ex. B at 2-3, 4, and 7 (Doc. 44-1). But § 208.6 applies only to "asylum application[s]" and the "fear determination[s]" that are unique to asylees. 8 C.F.R. §§ 208.30-208.31. Thus, applying § 208.6 to refugees is improper. If § 208.6 was vague, fact sheets "lack the force of law" and only receive "respect."[11]

### III. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

#### A. There is a substantial likelihood that the Plaintiff will prevail.

Defendants cannot reconcile their narrow reading of the Act with its plain language, the vision of Congress, or their actions. Moreover, Defendants' claims of confidentiality fail. Section 1202(f) does not apply to refugees. Even so, its exception

---

[9] President Obama's own National Security Strategy echoes the importance of this model. *See* https://www.whitehouse.gov/sites/default/files/rss_viewer/national_security_strategy.pdf, at p. 20.
[10] *See* http://www.state.gov/j/prm/releases/factsheets/2013/210135.htm.
[11] "Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 586-87 (2000).

applies to the administration of the Refugee Act. The "fact sheet" is not authoritative and circumvents adherence to Texas's wishes "to the maximum extent possible."

### B. There is a substantial threat that irreparable injury will result.

There are at least three irreparable injuries that will occur but for an injunction. First, the permanent loss of foreknowledge is irreparable as a matter of law. Consultation and cooperation is required *before* refugee resettlement. Were the Court to require information sharing *after or during* resettlement, the statutory right is forever lost and permits the Defendants to functionally re-write the Act.

Second, in the opinion of the Deputy Director for Homeland Security for Texas DPS, the resettlement of refugees from terrorist-controlled areas poses significant security risks to the residents of Texas. This is especially so regarding individuals from Syria. The opinion of Director Bodisch is based upon appropriate intelligence and bolstered by the January 7, 2016 arrests of so-called "refugees," both of which were engaged in terrorist activity in Texas. Supp. Decl. of Bodisch at ¶¶20-22.

Federal Defendants contend that an injunction will not remedy the harm because Texas cannot veto any refugee. If the Texas received person-specific information, and a mutual resolution did not result over a particular dispute, Texas law enforcement would still be able to more adequately address the situation than if Texas had no information at all. Even the minimum that a preliminary injunction would grant—person-specific information—could prevent the irreparable harm. An actual terrorist attack need not come to fruition in Texas to demonstrate the *threat* of irreparable harm. Arrests for terrorist activity in Texas by individuals admitted through the refugee program should suffice.

Third, the absence of information prevents Texas from realizing the full measure of its sovereign choice to receive refugees,[12] as well as its particular decision

---

[12] Texas is one of 38 states to choose to receive refugees. *See* ORR Chart of Participating States, located at http://www.acf.hhs.gov/programs/orr/state-programs-annual-overview; TEX. GOV'T CODE § 752.003.

*Plaintiff's Reply in Support of Amended Application for Preliminary Injunction*     Page 9

to participate in resettlement through a public-private partnership. Texas's unique public-private partnership is its chosen model for a State that receives (a) refugees from 20 different countries (many of which are smaller than Texas), and (b) more refugees than any other State or territory. The particular choices of Texas, along with the volume of refugees it resettles, gives Texas a significant sovereign interest that is harmed by the Defendants' refusal to share information.[13]

### C. The threatened injuries outweigh any harm to Defendants.

Compliance with Congressional requirements, as outlined herein, is not "contrary to the nation's foreign-policy and humanitarian interests as determined by the President." Fed. Defs.' Opp. at 23. The Act is not a Presidential blank check. The President plays a role in resettlement, but exclusive focus on his priorities[14] defies the intent of Congress that refugee resettlement be a collaborative process which accommodates, as much as possible, the preference of the States.

Texas asks that the federal Defendants be made to do what is required—fully consult with Texas *before* resettlement and provide "for [the] expansion of the concerns on the part of state and local officials and a free exchange of views between these officials and voluntary agency representatives." S. Rep. No. 97-638, at 9 (1982). Not enjoining resettlements until Defendants comply with the will of Congress allows the executive to resettle refugees without the accountability envisioned in the Act.

### D. A preliminary injunction is in the public interest.

Congress expressed unwavering desire for unlimited levels of cooperation between federal, State, and local officials in refugee resettlement. Thus, boundless collaboration "before [refugee] placement in those States" is in the public interest.

---

[13] *Cf. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.").
[14] Syria severed diplomatic ties with the U.S. in 2012, minimizing these concerns in balancing harms.

Dated:  January 15, 2016.

        Respectfully submitted,

        KEN PAXTON
        Attorney General of Texas

        CHARLES E. ROY
        First Assistant Attorney General

        BRANTLEY STARR
        Deputy Attorney General for Legal
          Counsel

        <u>/s/ Austin R. Nimocks</u>
        AUSTIN R. NIMOCKS
        Associate Deputy Attorney General for
          Special Litigation
        Texas Bar No. 24002695

        ANGELA V. COLMENERO
        Division Chief – General Litigation

        ADAM N. BITTER
        Assistant Attorney General

        General Litigation Division
        P.O. Box 12548, Capitol Station
        Austin, Texas 78711-2548

        *ATTORNEYS FOR PLAINTIFF*

# Certificate of Service

I certify that a copy of this pleading was served on all counsel of record listed below via e-mail and/or through this Court's CM/ECF system. Mr. Goad has been served via U.S. Certified Mail.

**Stuart J. Robinson**
**Michelle R. Bennett**
Trial Attorneys
**United States Department of Justice**
Civil Div., Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
stuart.j.robinson@usdoj.gov
michelle.bennett@usdoj.gov

***Attorneys for the Federal Defendants***

**Rebecca L. Robertson**
**American Civil Liberties Union**
**Foundation of Texas**
1500 McGowan, Suite 250
Houston, TX 77004
rrobertson@aclutx.org


**Cecillia D. Wang**
**American Civil Liberties Union Foundation -**
**Immigrants' Rights Project**
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org

**Omar C. Jadwat**
**Judy Rabinovitz**
**Michael K.T. Tan**
**American Civil Liberties Union Foundation –**
**Immigrants' Rights Project**
125 Broad Street, 18th Floor
New York, New York  10004
ojadwat@aclu.org
jrabinovitz@aclu.org
mtan@aclu.org

**Justin B. Cox**
Law Offices of Justin B. Cox
1989 College Avenue NE
Atlanta, GA  30317
cox@cox.legal


**Kristi L. Graunke**
**Michelle Lapointe**
**Southern Poverty Law Center**
1989 College Avenue NE
Atlanta, GA  30317
kristi.graunke@splcenter.org
michelle.lapointe@splcenter.org

**Karen C. Tumlin**
**Nicholas Espiritu**
**National Immigration Law Center**
3425 Wilshire Blvd., Ste. 2850
Los Angeles, CA 90010
tumlin@nilc.org
espiritu@nilc.org

**Neal Stuart Manne**
**Robert Rivera, Jr.**
**Robert S. Safi**
**Shawn Raymond**
**Vineet Bhatia**
Susman Godfrey LLP
1000 Louisiana St, Ste. 5100
Houston, TX 77002-5096
nmanne@susmangodfrey.com
rrivera@susmangodfrey.com
rsafi@susmangodfrey.com
sraymond@susmangodfrey.com
vbhatia@susmangodfrey.com


**Stephen Shackelford, Jr.**
**Terrell W. Oxford**
Susman Godfrey LLP
901 Main St., Ste 5100
Dallas, TX 75202-3775
toxford@susmangodfrey.com
sshackelford@susmangodfrey.com

*Attorneys for Defendant International Rescue Committee, Inc.*

**Amelia L. B. Sargent**
**Joseph D. Lee**
**C. Hunter Hayes**
Munger, Tolles & Olson, LLP
355 South Grand Avenue, Ste. 3500
Los Angeles, CA 90071-1560
amelia.sargent@mto.com
joseph.lee@mto.com
hunter.hayes@mto.com

**Anne Schutte**
Law Office of Anne Shuttee
6060 N. Central Expressway
Suite 560
Dallas, TX 75206
*Attorneys for Amicus Curiae Interfaith Clergy*


**David Goad**
1154 Rivertree Drive
New Braunfels, TX 78130

*Movant*

                                                   /s/ *Austin R. Nimocks*
                                                   AUSTIN R. NIMOCKS
                                                   Associate Deputy Attorney General for
                                                   Special Litigation