## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-cv-3851 |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF STATE, JOHN KERRY in his Official Capacity as SECRETARY OF STATE, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, SYLVIA BURWELL, in her Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, ROBERT CAREY, in his Official Capacity as Director of the OFFICE OF REFUGEE RESETTLEMENT, and INTERNATIONAL RESCUE COMMITTEE, INC. | § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

---

## DECLARATION OF PATRICK RANDALL

---

My name is Patrick Randall and I am over the age of 18 and fully competent to make this declaration and state the following:

1.      I am the Program Manager of the Office of Immigration and Refugee Affairs (OIRA) at the Texas Health and Human Services Commission (HHSC). In this capacity, I  serve as the primary contact between the Commission and the local

resettlement agencies (volunteer agencies or Volags), the U.S. Department of Health and Human Service's Office of Refugee Resettlement (ORR), and U.S. Department of State's Bureau of Population, Refugees, and Migration (PRM). As program manager, I also provide leadership and oversight over the daily operation and strategic direction of OIRA. I have held this specific position since October 5, 2015. I have been employed by HHSC since May 1, 1999.

**Responsiveness to Texas' Concerns and Recommendations**

2.      On August 14, 2015, my office remitted the Texas plan for participation in the refugee program to ORR. A true and correct copy of this plan is attached hereto as Attachment 1. This plan was composed, finalized, and remitted for federal review and approval before the President's September 2015 announcement that he planned to increase the total number of refugees received into the United States for fiscal year 2015-2016 (Oct. 1, 2015 – Sept. 30, 2016) by 10,000, and that the additional 10,000 would come from Syria.

3.      In light of security concerns raised by public officials from across the country about refugees from Syria, on December 1, 2015, HHSC elected to seek additional information about refugees from Syria that were scheduled for resettlement in Texas. See letter to Bureau of Population, Refugees, and Migration of the U.S. Department of State attached hereto at Attachment 2.

4.      PRM instead provided a spreadsheet containing nonspecific information about refugees already settled in Texas. See e-mail and spreadsheet attached hereto as Attachment 3.

5.     On January 4, 2016, PRM contacted HHSC via e-mail to advise us that in order to satisfy the President's desire to resettle 10,000 additional refugees from Syria, it intended to resettle nearly 2,000 more refugees in Texas during FY 15-16 than originally forecasted. See e-mail attached hereto as Attachment 4. While the e-mail sought HHSC's "input", it affirmed that PRM was already "engaged in negotiations with each resettlement agency regarding proposed increases to their network capacity to match the increased refugee ceiling of 85,000 for FY 2016."

**History of Interaction and Consultation**

6.     Historically, to my own personal knowledge, local annual or quarterly meetings about refugee placement do not always directly include a federal participant. In my experience, ORR typically engages with our office, as issues arise, post-placement, though ORR regional representatives do occasionally attend quarterly meetings with the resettlement agencies and HHSC. The primary federal participant in the placement process is PRM, but they do not typically participate in regular local meetings that involve government officials. Rather, they receive proposed placement information from the Volags.

7.     When meetings have occurred about refugee resettlement, the federal participation has not always been limited to PRM or ORR. I recall meetings involving the U.S. Citizenship and Immigration Services (USCIS) of the Department of Homeland Security. Other federal agencies or representatives may have been involved in other meetings in the past.

8.     Participation in certain meetings about refugee resettlement varies

depending on the type of meeting, the locale, and who is primary facilitator of the meeting. Historically, the manager of the HHSC Office of Immigration and Refugee Affairs, along with the Texas State Refugee Health Coordinator (who works at the Department of State Health Services), facilitated quarterly meetings in Texas with local resettlement agencies, refugee health clinics, other refugee service providers (some HHSC contractors, some not), and other stakeholders such as school districts, law enforcement, and mainstream service providers. The meetings were only held with representation from the primary resettlement communities in Texas (Houston, Dallas/Fort Worth, Austin, and San Antonio).

9.     In the past, meetings and teleconferences have been conducted with agencies in other resettlement areas of the state, but not necessarily quarterly. Sometimes, other interested stakeholders (such as local law enforcement) would attend these meetings, but it always varied.

10.     It is my understanding that in the past, unscheduled or impromptu meetings have been held regarding refugee resettlement with various federal, state, and local stakeholders, and that some of these meetings have been initiated by state and local authorities regarding state or local concerns that arose.

11.     In my years of experience with refugee resettlement in Texas, I have never viewed any topics surrounding refugee resettlement to be improper or "off limits" in terms of the various meetings and consultations that occur between federal, state, and local officials.

12.     Until December 2015, I do not recall any instance where federal

agencies, or Volags with whom we contract, have been unwilling to share information requested by HHSC, or another agency of the State of Texas. Until December 2015, I do not recall any instance where federal agencies, or Volags with whom we contract, have been unwilling to engage in a meaningful discussion with HHSC, or another agency of the State of Texas, on issues that arise regarding refugee resettlement.

13.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 14th day of January, 2016.

_____
PATRICK RANDALL

Attachment 1

**State of Texas**
**State Plan for the Refugee Program**
**Effective Date: October 1, 2015**

## Section I Administration

### A.   §400.5(a) and (d): Designations of Authority

1.   §400.5(a): Single State Agency

The Texas Health and Human Services Commission (HHSC) is the single state agency responsible for the development and administration of the State Plan for refugee resettlement services and benefits in Texas funded through the Office of Refugee Resettlement (ORR), Administration for Children and Families, United States Department of Health and Human Services (DHHS).  HHSC refugee programs are managed by the HHSC Office of Immigration and Refugee Affairs (OIRA).

2.   §400.5(d): State Refugee Coordinator

HHSC has requested the appointment of Ms. Michelle Harper, Associate Commissioner of Community Access and Services as the State Refugee Coordinator.  The former designated State Coordinator, Caitriona Lyons, retired effective June 30, 2015.  HHSC will update ORR on the outcome of this appointment once it has been approved.

3.   Texas elected to administer the Refugee Cash Assistance (RCA) program as a public/private partnership as allowed under the final regulations published in the Federal Register (64FR 15409) by ORR.  In compliance with Section 400.58 of the regulations published on March 22, 2000, ORR approved HHSC's plan describing how the state and local resettlement agencies administer and deliver RCA to eligible populations under the refugee program. The RCA program is administered through contracts with fourteen resettlement agencies in eight primary resettlement areas of the state including Abilene, Amarillo, Austin, Dallas, El Paso, Fort Worth, Houston, and San Antonio.

### B.   §400.5(a): Organization Description and Functions

HHSC is the State Agency responsible for administering programs providing financial assistance, medical benefits, food and nutrition services, disaster assistance, and other social services to low income residents of the state.  Within HHSC, Community Access and Services (CAS) is responsible for the administration of the Refugee Program.  Ms. Michelle Harper, Associate Commissioner for CAS reports directly to Ms. Stephanie Muth, Deputy Executive Commissioner for the Office of Social Services (OSS).  The Refugee Program Manager for the Office of Community Services (OCS) within CAS, reports directly to Ms. Marilyn Eaton, Director of Community Services.

There are ten core OIRA staff members dedicated 100% to the program. Staff is completing programming, design and maintenance for the updated statewide data

Attachment 1

collection system.  OIRA staff members administer the statewide programs and are responsible for program development, coordination, monitoring, reporting, training, technical assistance, and administration.

Eligibility for the Refugee Medical Assistance (RMA) program is overseen by the Centralized Benefits Services (CBS) unit, under the direction of Wayne Salter, Associate Commissioner, Eligibility Services within the OSS.  CBS facilitates telephone interviews for the application and review process of RMA and associated Supplemental Nutrition Assistance Program (SNAP) and Temporary Aid for Needy Families (TANF) cases. RMA remains the primary medical coverage for newly arriving adult single individuals and married couples without children.

HHSC contracts with the Department of State Health Services (DSHS) to provide Refugee Health Screening services and contracts with the Department of Family and Protective Services (DFPS) to administer the Unaccompanied Refugee Minor (URM) program.

Texas does not have a General Assistance program; RCA and TANF are the only cash assistance programs.  The RCA program in Texas follows a public/private partnership model.  Refugee resettlement agencies are responsible for determining client eligibility and dispensing cash benefits.

## C.   Assurances

1. OIRA assures ORR that it will comply with all provisions of Title IV, Chapter 2 of the Act, and official issuances of the Director (§400.5(i)(1)

2. OIRA assures ORR that it will meet the requirements specified in Title 45 of the Code of Federal Regulations (CFR), Part §400.5(i)(2).

3. OIRA will comply with all other applicable federal statutes and regulations in effect during the time that it is receiving grant funding as specified in §400.5(i)(3).

4. OIRA will amend the Plan to comply with ORR standards, goals and priorities established by the Director as needed as specified in §400.5(i)(4).

5. OIRA assures ORR that assistance and services funded under the plan will be provided to refugees without regard to race, religion, nationality, sex or political opinion as required by §400.5(g).

6. In accordance with §400.5(h), OIRA, unless exempted, assures that meetings are convened, not less often than quarterly, whereby representatives of local resettlement agencies, local community services agencies, and other agencies that serve refugees meet with representatives of state and local governments to plan and coordinate the appropriate placement of refugees in advance of the refugees' arrival.

7. OIRA does not have a publicly administered RCA program, and therefore, it will not use the same mediation/conciliation procedures as those for TANF.

8. OIRA will use the hearing standards and procedures as set forth in §400.83(b) for the RCA program.

9. OIRA provides assurance that refugee programs and populations are included in the State pandemic influenza emergency plan and other emergency operational plans.

## Section II   Assistance and Services

**A.** In accordance with §400.5(b), OIRA will coordinate cash and medical assistance with support services under the RCA program as follows.

OIRA is responsible for statewide contracts with existing local resettlement agencies for the administration of RCA funds.  OIRA, in conjunction with local resettlement agencies and other refugee stakeholders, is responsible for the implementation and maintenance of the RCA program.

Resettlement agencies providing employment services are required to provide referral services and follow up to other appropriate refugee social services.  RCA participants continue to be priority one clients in all refugee social services.

OIRA and local resettlement agencies must maintain ongoing coordination with other refugee organizations to ensure that the services provided under the RCA program are 1) appropriate to the linguistic and cultural needs of the incoming populations; and 2) coordinated with state refugee social services and longer-term resettlement services frequently provided by other refugee organizations.

HHSC procures RCA services through open enrollment contracts.  Under the open enrollment process, any resettlement agency in the State of Texas is eligible to provide RCA services provided they meet minimum standards for state contracting.  Each individual resettlement agency is responsible for determining program eligibility and providing cash assistance according to the RCA program.

Under the approved RCA program, all applicants for RCA must be categorically ineligible for TANF.  In Texas, single individuals without children are not eligible for TANF.  Families with children must submit an application for TANF to CBS to determine eligibility based on income and family composition.  TANF is generally applied for simultaneously with SNAP, Medicaid, and CHIP.

**B.** As required by §400.5(c), OIRA assures ORR of the availability of language training and employment services for refugees receiving cash assistance and other refugee populations, including efforts to encourage the use of employment services.

Refugees receiving RCA are a primary priority for refugee funded employability services.  In order to ensure that employment services and language training are linked to RCA recipients, OIRA dedicates a percentage of the total available Refugee Social Service funding for the provision of employment services to RCA clients through enrollment contracts.  These services are administered by the same resettlement agencies that also administer the RCA program.  This ensures that contractors administering the RCA program will also receive dedicated employment funds for RCA recipients.  This ensures that RCA participants residing in areas of the state where there are resettlement agencies have access to employment services to be in compliance with Code of Federal Regulations Part 400.75 which mandates registration for employment services and acceptance of appropriate employment.

Remaining social service funds are awarded competitively to refugee resettlement agencies and other faith-and community-based organizations in areas of the state that resettle 100 or more refugees annually.  These competitively procured services are provided in Taylor, Potter, Travis, Dallas, Tarrant, Harris, and Bexar counties and adjacent areas.

Contractors are also required to refer and help all eligible refugees to access other employability services in their community including Education, Social Adjustment and Integration Services.  All contractors are required to conduct outreach activities in the community, which includes notifying all local refugee resettlement offices of the availability of language and employment services.

OIRA also requires contractors to network with other agencies in the community, including language instruction and literacy groups, to make their services known and to develop additional resources for refugee services.

## C. Refugee Cash Assistance (RCA) 45 CFR Part 400.45

1. RCA program elements

   a) RCA contractors verify applicant's income at the time of application for months 1 through 4 and at the time of recertification for months 5 through 8. The income eligibility standard for enrollment in RCA benefits during months 1 through 4 is 125% of the Federal Poverty Income Limit (FPIL).  The income eligibility standard for enrollment during months 5 through 8 is 165% of the FPIL.  All refugees found eligible at the date of application and who are in compliance with participation requirements will receive cash/vendor assistance through month 4 regardless of income.  For months 5 through 8, benefits will continue if the refugee is under 165% of the FPIL regardless of income.

   b) TANF and RCA payment levels

1.   TANF payment standards for case sizes 1-5

| Temporary Assistance for Needy Families (TANF) Budgetary Allowances (Oct. 1, 2014) | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Non-Caretaker Cases | | | Caretaker Cases Without Second Parent | | | Caretaker Cases With Second Parent | | |
| **Family Size** | **Bud Needs (100%)** | **Rec Needs (25%)** | **Max Grant** | **Bud Needs (100%)** | **Rec Needs (25%)** | **Max Grant** | **Bud Needs (100%)** | **Rec Needs (25%)** | **Max Grant** |
| **1** | 256 | 64 | 96 | 313 | 78* | 117 | --- | --- | --- |
| **2** | 369 | 92 | 138 | 650 | 163 | 243 | 498 | 125** | 186 |
| **3** | 518 | 130 | 194 | 751 | 188 | 281 | 824 | 206 | 308 |
| **4** | 617 | 154 | 231 | 903 | 226 | 338 | 925 | 231 | 346 |
| **5** | 793 | 198 | 297 | 1003 | 251 | 375 | 1073 | 268 | 401 |

* Caretaker of child receiving Supplemental Security Income (SSI)
** Caretaker and second parent of child receiving SSI
"Bud Needs" is budgetary needs.
"Rec Needs" is recognizable needs.

2.   RCA payment standards for case sizes 1-5

The following provides a detailed description of RCA payment standards including a description of employment incentives and/or income disregards to be used, if any, as well as methods of payments to be used, such as direct cash or vendor payments.

| 1 person family unit | |
| --- | --- |
| $2,680 | Maximum allowable |
| -150 | Incentive funds: $150 cash for early employment. See qualifications below. |
| $2,530 | Remaining balance |
| -1,780 | Available benefits for months 1-4.* 1. $800 must be equally distributed in cash benefits during months *1-4* 2. Remaining balance of $980 will be dispersed in the form of vendor payments for rent and utility payments. 3. A total of $1,930 (1,780 + 150 ) is the maximum allowable benefit for months 1-4, and can not be carried forward to months 5-8. |
| $750 | Remaining balance |
| -750 | Available benefits for months 5-8.** Per ORR rule, funds must be available through month 8; therefore, remaining funds will be equally distributed in the form of cash payments. |
| $0 | |

| 2 person family unit | |
|---|---|
| $3,600 | Maximum allowable |
| -202 | Incentive funds: $150 cash for early employment to first participant meeting requirements.  $52 for the second participant meeting requirements.  See qualifications below. |
| $ 3,398 | Remaining balance |
| -2,390 | Available benefits for months 1-4.*   1. $1,200 must be equally distributed in cash benefits during months 1-4.. 2. Remaining balance of $1,190 will be dispersed in the form of vendor payments for rent and utilities. 3. A total of $2,592 (2,390 +202 ) is the maximum allowable benefit for months 1-4, and cannot be carried forward to months 5-8. |
| $1,008 | Remaining balance |
| -1,008 | Available benefits for months 5-8.**  Per ORR rule, funds must be available through month 8; therefore, remaining funds will be equally distributed in the form of cash payments**.** |
| $0 | |

| 3 person family unit | |
|---|---|
| $4,560 | Maximum allowable |
| -259 | Incentive funds: $150 cash for early employment to first participant meeting requirements.  $54.50 for each additional participant meeting requirements.  See qualifications below. |
| $4,301 | Remaining balance |
| -3,024 | Available benefits for months 1-4.*   1. $1,800 must be equally distributed in cash benefits during months 1-4.  2. Remaining balance $1,824 will be dispersed in the form of vendor payments for rent and utilities.  3. A total of $3,283 (3,024+ 259) is the maximum allowable benefit for months 1-4, and cannot be carried forward to months 5-8. |
| $1,277 | Remaining balance |
| -1,277 | Available benefits for months 5-8.**  Per ORR rule, funds must be available through month 8; therefore, remaining funds will be equally distributed in the form of cash payments. |
| $0 | |

| 4 person family unit | |
|---|---|
| $5,480 | Maximum allowable |
| -310 | Incentive funds: $150 cash for early employment to first participant meeting requirements.  $53.33 for each additional participant meeting requirements.  See qualifications below. |
| $5,170 | Remaining balance |
| -3,636 | Available benefits for months 1-4. * **1.** $2,400 must be equally distributed in cash benefits during months 1-4.  2. Remaining balance $1,236 will be dispersed in the form of vendor payments for rent and |

|  | utilities. 3. A total of $3,946 (3,636+ 310) is the maximum allowable benefit for months 1-4, and cannot be carried forward to months 5-8. |
|---|---|
| $1,534 | Remaining balance |
| -1,534 | Available benefits for months 5-8.** Per ORR rule, funds must be available through month 8; therefore, remaining funds will be equally distributed in the form of cash payments**.** |
| $0 | |

| 5 person family unit | |
|---|---|
| $6,040 | Maximum allowable |
| -341 | Incentive funds: $150 cash for early employment to first participant meeting requirements. $47.75 for each additional participant meeting requirements. See qualifications below. |
| $5,699 | Remaining balance |
| -4,008 | Available benefits for months 1-4. * **1.** $3,000 must be equally distributed in cash benefits during months 1-4. 2. Remaining balance $1,008 will be dispersed in the form of vendor payments for rent and utilities 3. A total of $4,349 (4,008+341) is the maximum allowable benefit for months 1-4, and cannot be carried forward to months 5-8. |
| $1,691 | Remaining balance |
| -1,691 | Available benefits for months 5-8.** Per ORR rule, funds must be available through month 8; therefore, remaining funds will be equally distributed in the form of cash payments. |
| $0 | |

| For family units greater than 5 persons, the payment ceiling will be increased by $560 per additional person. Each increase of $560 shall be divided following the chart below. | |
|---|---|
| $560 | Maximum allowable |
| -33 | Incentive funds: $33 cash for early employment . See qualifications below. |
| $529 | Remaining balance |
| -343 | Available benefits for months 1-4.* $343 must be equally distributed in cash benefits during months 1-4. A total of $343 is the maximum allowable benefit for months 1-4, and cannot be carried forward to months 5-8. |
| $184 | Remaining balance |
| -184 | Available benefits for months 5-8.** Per ORR rule, funds must be available through month 8; therefore, remaining funds will be equally distributed in the form of cash payments. |
| $0 | |

c) The Texas RCA program does not consider proration of shelter, utilities and similar needs under §400.66(a)(3).

d) All financial eligibility and payment rules are outlined in this section.

e) In accordance with §400.66(b), OIRA assures ORR that the Texas RCA program will not consider resources remaining in the applicant's country of origin.

f) In accordance with §400.66(c), OIRA assures ORR that the Texas RCA program will not consider a sponsor's income and resources as accessible to the refugee solely because the person is serving as a sponsor.

g) In accordance with §400.66(d), OIRA assures ORR that the Texas RCA program will not consider any cash grant received by the applicant under the Department of State or Department of Justice Reception and Placement programs.

h) OIRA uses the date of application as the date RCA begins

i) The State does not administer RCA and therefore notification to the local resettlement agency is not required.

j) The State does not administer RCA and therefore notification to the applicant's sponsor regarding offers of employment is not required.

k) The Texas RCA program is within prescribed assistance and budget levels as defined in §400.60

l) A RCA recipient who is employed within the first three months and has been employed at least 35 hours per week for at least 30 days is eligible to receive an early employment incentive payment.  Note: To ensure encouragement of early employment, refugees who do attain early employment, also receive payments through month four.   Incentive payment levels are defined in the tables above.

m) The Texas RCA program includes the following exemptions from participating in employability services.  Since economic self-sufficiency is the ultimate goal of the refugee program, circumstances that allow for an employability exemption are limited, and provided for by agency rule, which includes:

- Age 15 or younger
- Age 16, 17 or 18 and attending elementary, secondary, vocational, or technical school full time

- Age 60 or older
- Permanently disabled.  Permanently disabled means a mental or physical impairment that is expected last more than 90 days.
- Needed at home to care for an ill or disabled child/adult in the household.  The caretaker must provide a current doctor's statement to claim this exemption unless the child/adult receives a permanent government disability benefit.
- Unable to work as a result of pregnancy
- A single parent or single caretaker relative for a child under age one at initial application. (Note: neither parent in a two-parent household may receive a caretaker exemption.)

The Texas RCA program includes a two-month exception from participating in employability services if the RCA participant has good cause.  Service providers must maintain documentation of good cause, and must reassess the good cause every two months at a minimum.  Since economic self-sufficiency is the ultimate goal of the program, circumstances that allow for a good cause exception will be very limited, and will be provided for by agency rule. Examples include:

- Needed at home to care for an ill or temporarily disabled child/adult in the household.  The caretaker must provide a current doctor's statement to claim this exemption unless the child/adult receives a temporary government disability benefit.
- Temporarily disabled. Incapacity expected to last 90 days or less. This includes mothers of newborn children for up to 90 days after the child's birth.
- A victim of family violence for whom participation would endanger the client and/or her children.

RCA program participants are required to register for employment services, participate in employability service programs and targeted assistance programs, job interviews, and to accept appropriate offers of employment. Under this plan, participation requirements set forth under CFR 45 Part 400 Subpart F (Requirements for Employability Services and Employment) Section 400.75 are utilized as a basis for participation.

n)  As required by §400.55 OIRA assures ORR that the Texas RCA program meets requirements regarding Limited English Proficiency (LEP) guidance and language materials. Translations of written policies, notices, and determinations in refugee languages are provided to all participants through the contracted resettlement agencies administering the distribution of cash benefits.

2.      RCA Program Administration

     a) The Texas RCA program follows a public/private partnership model. Resettlement agencies are eligible to provide RCA services provided they meet minimum standards for state contracting.  Each individual resettlement agency is responsible for determining client eligibility.

     b) Each individual resettlement agency is responsible for providing cash assistance according to the RCA State Plan.

     c) RCA is privately administered so state staff are not allocated between TANF and RCA.

     d) There are 52.34 full-time equivalents at contracted resettlement agencies allocated to RCA administration.

     e) The share of State and federal funding for administrative and program support functions is determined according to an annual federally approved cost allocation methodology called a Public Assistance Cost Allocation Plan (PACAP). HHSC does not charge administrative federal funds through a flat indirect rate but through a plan in which factors are updated either monthly or quarterly (according to the PACAP). Each program area in which more than one federal fund can be charged has a specific cost allocation factor or combination of factors that determines the State share and federal share.

**D.  Refugee Medical Assistance (RMA) 45 CFR Part §400.90**

1. All refugees are given the opportunity to apply for medical assistance including Medicaid, CHIP, or RMA.   Eligibility is determined by a centralized eligibility office responsible for all initial refugee applications in the state.

     a) Eligibility caseworkers use the Texas Integrated Eligibility System (TIERS) which cascades through all possible Medicaid programs to check eligibility prior to enrolling refugee clients into RMA.  Recertification for ongoing medical benefits is processed through local state eligibility offices.  This can be done in person or online.

     b) Newly arriving refugees who may be eligible for Medicaid or RMA, SNAP, TANF or CHIP are assisted in preparing the HHSC Application for Assistance and submitting the application to HHSC's Centralized Benefit Services (CBS). Resettlement agency staff is designated as authorized representatives for clients and assist with the phone interview and necessary follow up.  CBS utilizes eight state office staff to determine eligibility for RMA benefits and associated SNAP and TANF cases.

     RMA will remain the primary medical coverage for many newly arriving adult

refugees given that Texas did not opt to expand Medicaid under the Affordable Care Act.

2. RMA eligibility is based on applicant's income and resources on the date of application. Income and resource increases do not affect eligibility, unless the individual subsequently applies and qualifies for another type of Medicaid.

   a) The Texas RMA standard is set at 200% of the Federal Poverty Income Limit. Texas uses modified adjusted gross income (MAGI) methodologies to determine RMA eligibility.  Resources are applicable when determining eligibility for RMA.

   b) In accordance with 400.102, caseworkers do not consider any Match Grant or Reception & Placement (R&P) cash assistance payments, or in-kind services and shelter provided to an applicant by a sponsor or local resettlement agency in determining eligibility for RMA.

In determining RMA eligibility, the refugee must be determined ineligible for Medicaid and the Children's Health Insurance Program (CHIP).
If determined ineligible for Medicaid or CHIP, eligibility will be determined for RMA. In the event that an individual is ineligible for RMA due to income, they will be referred to the Marketplace.

3. OIRA provides assurance of compliance with continued coverage of recipients per requirements under §400.104 and §400.105

4. RMA services are currently fee- for- service and cover the same services as Medicaid.

5. Additional services (§400.106)

   a) In addition to the components of the ORR Medical Screening Guidelines, the Texas Department of State Health Services (DSHS) Refugee Health Program (RHP) provides ova and parasite (O&P) screening for protozoa (at select clinics), provides treatment for identified parasites, and treats limited minor conditions not needing referrals (such as cuts, lice, etc.).  These activities ensure that clients can be treated for minor conditions immediately instead of referring clients to a primary care physician, which may take several weeks, and/or utilizing urgent care facilities.  Screening and treating for intestinal parasites by providers familiar with the practice is essential for providing appropriate care for this patient population.

6. Program-eligible clients served by a refugee resettlement agency are referred to a local health department (LHD), Refugee Health Program clinic for a health assessment.  The Refugee Health Program (RHP) works with

resettlement agencies to coordinate care plans for medically complex cases. Newly arrived clients with complex health conditions will be linked with appropriate health-related resources (including screening, primary care, and specialist visits) in an expedited manner. When necessary, RHP clinic staff and the DSHS RHP will work with resettlement agency case management staff to monitor cases needing additional attention. Clients not sponsored by an agency (including secondary migrants) may self-refer to be seen at a RHP clinic if they are within the eligibility period for services.

a) The Centers for Disease Control and Prevention (CDC) sends arrival notifications via the Electronic Disease Notification System (EDN). The system also indicates if Class A/B conditions are identified during the refugee's overseas medical examination.  Additionally, the system provides information on the following: medical history, vaccination records, Syphilis/HIV/ TB testing, and presumptive treatment. In Texas, the EDN system is divided into jurisdictions so that each LHD RHP clinic has direct access to overseas records which are used during the health assessment process to establish previous care, and pre-existing conditions.

b) DSHS RHP contracts with seven local health departments to provide each eligible client with a culturally and linguistically appropriate comprehensive health assessment, including appropriate follow-up and referrals.  Oversight, monitoring, and coordination of the local programs are provided by the DSHS RHP. LHD RHP clinics provide the following services: physical exams, screenings, vaccinations, laboratory services, limited treatment, interpreter services, health education, referrals, case management through initial referral appointment, outreach, and transportation services.  All coordination is funded by RMA.

c) The following is a description of medical screening providers categorized by type (e.g., Federally Qualified Health Centers, private clinics, local public health departments) and basic description of providers conducting the screening.

The seven contracted RHP clinics (located in local health departments), along with associated provider credentials, are as follows:

- Harris County Public Health and Environmental Services - Physicians
- Dallas County Department of Health and Human Services – Nurse Practitioner
- Tarrant County Public Health Department - Physician

12

- City of Amarillo Department of Public Health (Potter County) – Nurse Practitioner
- City of Austin Health and Human Services Department (Travis County) - Physician
- University Health System (Bexar County) - Physician
- City of Abilene/Taylor County Public Health District - Physician

The DSHS RHP also contracts with the City of Midland Health Department to provide vaccination services.

d) Local health department-based refugee health programs bill Medicaid when a billing infrastructure exists.  Traditional public health entities do not bill insurance for payment and many lack the infrastructure to do so.  Two LHDs have recently began to attempt to bill the majority of screening components to Medicaid, including office visits, vaccines and vaccine administration, and laboratory tests.  One LHD is billing for laboratory tests and is beginning to explore other billing possibilities.  . The other three LHDs do not currently bill any services to Medicaid, but are exploring required steps to be able to do so in the future.

At the state level, the Texas DSHS RHP accesses Medicaid where possible and practical.  The DSHS state laboratory services section runs RHP submissions against a Medicaid list. The state program continues to work with the state laboratory and local RHPs to ensure Medicaid eligibility documentation on laboratory specimen submission slips.

It should be noted that Medicaid in the state of Texas serves primarily low income families, children, related caretakers of dependent children, pregnant women, elderly, and people with disabilities.  In general, state Medicaid policy does not include any coverage for childless individuals ages 18 to 44.  Therefore, this segment of the refugee population in Texas does not meet the eligibility criteria for Medicaid.  Medicaid expansion under the Affordable Care Act has not taken place in Texas.  RMA provides the needed assistance during the first eight months of arrival and ensures necessary screening for public health concerns and the well-being of clients as they transition into residents of the United States.

7. Refugee Medical Assistance Costs

a) RMA direct costs are fee for service and include non-medical costs such as interpretation and transportation on an as needed basis to the same extent as Medicaid.

13

     b) RMA eligibility determination is administered through the HHSC Eligibility Operations Division within the Office of Social Services. Policy staff and Eligibility Operations staff administering RMA meet as needed with OIRA to discuss and address any pending issues.

**E.  Refugee Medical Screening Program (RMS) 45 CFR Part §400.107**

1. The Texas Department of State Health Services (DSHS) is requesting re-approval to continue to operate a medical screening program per §400.107 with Refugee Medical Assistance (RMA) funds.  Refugee medical screening is performed in accordance with the requirements prescribed by the director of the ORR.   OIRA has an Interagency Contract Agreement with DSHS RHP to provide health assessments for refugees and other program-eligible populations in Texas.

2. HHSC OIRA and DSHS RHP assures that Refugee Medical Screening is in accordance with the requirements prescribed by the Director under §400.107(a) (1).

     a) Please refer to item 6d under section D. Refugee Medical Assistance (RMA) 45 CFR Part §400.90 Although most local RHPs do not fully access Medicaid, a number of services are provided by existing state programs after the initial assessments.  The DSHS Tuberculosis Program is currently absorbing all costs of tuberculosis screenings within the RHP.

     b) In addition to the guidelines, the RHP provides O&P screening for protozoa (at certain clinics), provides treatment for parasites, and treats limited minor conditions not needing referrals (such as cuts, lice, etc.).  These activities ensure that clients can be treated for minor conditions immediately instead of referring clients to a primary care physician, which may take several weeks, and/or utilizing urgent care facilities.  Screening and treating for intestinal parasites by providers familiar with the practice is essential for providing appropriate care for this patient population.

     c) Medical screening costs are based on negotiated budgets with contracted LHD RHP clinics.  In turn, each LHD has negotiated contract prices for laboratory services, vaccines, etc.  However, the state of Texas is serving an increasing number of unanticipated clients who have received no overseas medical care (including presumptive treatment for intestinal parasites) or have documentation of vaccine histories.  Though costs remain reasonable, these factors have increased overall costs from fiscal year 2015.

     d) Program-eligible clients served by a refugee resettlement agency (VolAg) are referred to a RHP clinic for a health assessment by their agency.  Health assessments are performed within 90 days of arrival or eligibility date, with a goal of providing the health assessment within 30 days of arrival or eligibility date.  Desk audits are performed on a tri-annual basis to ensure that LHD refugee

14

program clinics are not initiating care beyond the 90 day mark. 100% of clients screened in the first tri-annual period of fiscal year 2015 were seen within 90 days.

3. Medical Screening Costs

    a) The medical screening payment model is based on negotiated contract budgets. Services included in direct costs that are non-medical include interpretation, transportation, travel, move costs, and postage and printing.

    <u>Medical Screening Direct Costs</u>
The majority of funds will support contractual services at the seven local health departments (LHDs), as well as state laboratory services and medications. A breakdown of costs is as follows: $4,198,042 for personnel, $1,838,076 for fringe, $38,665 for in-state and local travel, $1,003,431 for equipment (move costs and furnishings), $4,008,196 for supplies (medical supplies, office supplies, and vaccines), $2,715,659 for contractual services (lab services, physician time, interpreting costs), $963,104 for other costs (postage, printing, transportation), and $725,140 in indirect costs. Much of the increase in the proposed budget is due to increased needs for clinic space and staffing levels required to provide quality patient care.

A breakdown of estimated RMA direct costs of health assessments in federal fiscal year 2015-2016 also includes $250,000 for state laboratory costs for refugee health assessment activities and $6,125,000 for medications. Laboratory costs are for Ova and Parasite (O&P) and schistosomiasis testing. Medication costs are for limited treatments provided to program-eligible clients (mainly vitamins and anti-parasitics). In fiscal year 2016, the two largest local RHPs will begin presumptively treating for parasites. These clinics, located within the Dallas County Department of Health and Human Services and Harris County Public Health and Environmental Services account for 60% of the client population in the state. Despite an increase in overseas presumptive treatment, domestic medication costs remain high due to the fact that the anti-helminth albendazole has increased from $2.00 per tablet (in 2008) to the current price of $102.00 per tablet.

Funding is also used for services in two secondary migration sites where there is no local refugee health clinic. These sites are the City of Midland Health Department (a contracted local health department) and DSHS Health Services Region 1 serving Cactus and Dumas, Texas. In order to apply for Legal Permanent Residency, refugees are required to obtain a current set of vaccinations. Vaccines are provided by local public health departments to refugees for Adjustment of Status purposes (within one year of arrival). The combined funding for this purpose is $39,646 for adult vaccines.

Total Direct Costs: $21,875,313

     b)  <u>Medical Screening Administrative Costs</u>

Refugee Medical Assistance (RMA) funds support personnel costs in the amount of $218,224 to cover salaries (including merits) and $73,934 in fringe for the refugee health coordinator, data clerk, business analyst, community liaison, and also a pharmacy branch employee (as required by the TB/HIV/STD Unit).  RMA funds are also used for in-state program monitoring, technical assistance visits, travel to quarterly meetings, and attendance at conferences.  The amount of funding for these purposes is $26,504.  $500 is used for general office supplies. Under the category "Other", $240 is used for postage $30,000 is used for printing of educational materials and demographic reports, $5,000 is used for document translations, $35,428 is used (as per agency requirements) for the Office of the General Council and the Contract Management Unit.  $22,643 will be used for a temporary data entry operator to meet increasing data entry needs, $1,289 is used for the State Office of Risk Management and $1,832 is used for a copier lease. Indirect charges $1,028,585.

Total Administrative Costs: $1,444,179

The responsibilities of the Texas Refugee Health Coordinator include:
- Coordinating with contracted clinics (including guidance, oversight, and monitoring)
- Creating and maintaining the state screening protocol
- Facilitating contract and budget development, and grant monitoring
- Performing epidemiologic functions and data management
- Reporting to OIRA and ORR
- Creating  epidemiological reports, policies and procedures, and program manuals
- Serving as  subject matter expert and lead for CDC projects
- Serving as program contact for ORR, PRM, CDC, etc.
- Collaborating with State Refugee Coordinator
- Assigning duties to RHP staff
- Participating in the Association of Refugee Health Coordinators Past Chair- 2016

## F.  Refugee Social Services (RSS) 45 CFR Part §400.140

1. OIRA assures the ORR that social services are provided as described under §400.154/§400.155.  Services include employability services, English language instruction, vocational training, skills recertification, transportation,  translation and interpretation services, case management services, assistance with obtaining Employment Authorization Documents, information and referral services, social adjustment services, emergency and health related services, home management, day care services, and citizenship and naturalization preparation services.

2. All social services are consistent with §400.154/§400.155. Contractors are also required to refer and help all eligible refugees to access other employability services in their community and to conduct outreach activities in the community.

   a) Citizenship and naturalization preparation services and assistance with obtaining Employment Authorization Documents do not include the application fee to the United States Citizenship and Immigration Services (USCIS).

## G.   Cuban/Haitian Entrant Program (C/H) 45 CFR Part §401

OIRA will include Cuban and Haitian Entrants as one of the populations served in the refugee program consistent with 45 CFR Part §401 and State Letter #94-22.

## H.   Unaccompanied Refugee Children (URM) 45 CFR Part §400.5(e)

1. The State of Texas receives URM funding to operate programs in Houston and Fort Worth.

2. The Administrative Structure and State Oversight §400.117; §400.120; ORR Statement [1] III. Program Standards, Administration/Management

   a) The Texas URM program operates as follows:

      1. HHSC has an interagency contract with the Texas Department of Family and Protective Services (DFPS) for administration of the URM Program. DFPS is the State agency responsible for foster care, licensing and child welfare services in the State. DFPS contracts with Catholic Charities Archdiocese of Galveston-Houston and Catholic Charities Diocese of Fort Worth to operate the URM program in Texas. Per the contract, both Catholic Charities of Houston and Fort Worth assume legal responsibility for the children assigned to their agency and must provide the full range of assistance, care, and services to which these children are entitled. DFPS monitors the contract to ensure services comply with federal regulations and consults with HHSC regarding any discrepancies.

      2. Placement and outcome reports such as ORR 3 and ORR 4 are to be submitted directly through the ORR website database every Friday by the two programs (Catholic Charities). State receives the notification of submission and will review and approve these reports within 5 business days. Upon State's approval, the system immediately submits the approved reports to ORR.

      3. Legal responsibility is established under the Texas Family Code (TFC): Texas Administrative Code Chapter 376, Subchapter 1 Rule 376.903 ensures URM's eligibility for the full range of assistance, care, and services to which all minors in foster care in the state are

17

entitled. This is in compliance with CFR 44, Section 400 Subpart H-Child Welfare Services.

4. On site DFPS contract monitoring reviews are conducted annually or more frequently, if deemed necessary. These monitoring reviews include a team consisting of the DFPS Contract Manager, the DFPS URM Program Specialist, the Contract Manager for the HHSC/DFPS contract, and the OIRA Program Specialist.  The Texas URM Programs are also monitored annually by Residential Child Care Licensing (RCCL), a division of the Texas Department of Family and Protective Services.  In addition, the state child welfare agency monitors activity of the URM provider through various other means including:

- Monthly and trimester reports
- Monthly scan calls with both programs
- Quarterly visits to the program providing Technical Assistance as needed
- Contractual reporting requirements
- Annual contract/program monitoring
- Monthly meetings with URM Program Provider officials and OIRA.

b) OIRA assures ORR the following:

1. The State assures program accountability for all aspects of the program, including fiscal and program reporting.

2. The State assures that URM service providers in Texas are licensed according to State requirements.

3. The State assures that, at a minimum, DFPS Program and Contract staff annually confers with URM provider agencies.

3. Legal Responsibility - §400.115(a) and ORR Statement, III. Program Standards, Legal Considerations

a) The State's legal responsibility is described below:

1. The private agencies initiate the process of establishing legal responsibilities within 30 days and assume legal responsibility, while adhering to the State's policies and timelines in the Texas Family Code, Title 5, Subtitle B, Chapter 153, Conservatorship, Possession, and Access in establishing conservatorship of youth in the URM program.

2. The private agencies (Catholic Charities), who contract with DFPS, assume legal authority for the URMs.  Family court

awards legal authority/conservatorship of the youth in the URM program to the private agencies.

3. The private agencies file an annual review for each URM case with the court.

4. After legal responsibility ends, youth can remain in foster care on a voluntary agreement until they turn 21 years old if they have a high school diploma or equivalent or 22 years old if they do not have a high school diploma or equivalent.

The 18+ age group represents a large portion of the youth in the URM Programs in Texas. DFPS is actively working on developing parity in the Extended Care Program for youth in this age group. Youth who meet eligibility requirements are available to access independent living skills classes, transitional living services and placements, and a supervised independent living program.

4. URM Program Eligibility

a) The State assures service provision to all URM-eligible populations in accordance with §400.111; TVPA (2000), Sec. 107 (b) (1) (A); [2] TVPRA 2008, Sec. 235 (d) (4) (A); VAWRA 2013, Sec. 1263; [4] §400.113; §400.116; SL # 09-09; SL # 14-01[3]

b) Aging Out and Voluntary Placement:

1. After legal responsibility ends, youth can remain in foster care on a voluntary agreement until they turn 21 years old if they have a high school diploma or equivalent or 22 years old if they do not have a high school diploma or equivalent.

2. Youth in the URM Program may "age out" at age 18 or continue in the URM Program on a voluntary basis until the age of 21 or 22, depending on educational needs.

c) Termination and Return Placement:

1. There are no triggers that would terminate eligibility from the URM program in the State other than death, imprisonment or emancipation without signing an Extended Voluntary Foster Care Agreement (EVFCA).

2. Youth may remain or return to the URM Program beyond their 18th birthday, if they sign an Extended Voluntary Foster Care Agreement and meet the requirements by age and activity as listed below:

19

| A youth must be… | and... | may remain eligible until… |
|---|---|---|
| 18 - 21 years of age | regularly attending high school or enrolled in a program leading to a high school diploma or a high school equivalency certificate (GED).<br><br>A youth who just completed his or her high school diploma or GED and is accepted into a higher educational program, or other post-secondary vocational or technical program with regular terms, will remain eligible for extended foster care up to the month of the 22nd birthday provided the youth begins taking the required number of class hours as specified below. | he or she completes or withdraws from the program or the end of the month in which the youth turns 22 years old, whichever comes first. |
| 18 - 20 years of age | • regularly attending an institution of higher learning or postsecondary vocational or technical program (minimum six hours per semester); or<br><br>• participating in a program or activity that promotes or removes barriers to employment; or<br><br>• employed at least 80 hours a month; or | he or she completes or withdraws from the program or the end of the month in which the youth turns 21 years old, whichever comes first.<br><br>Youth no longer engaged required activities will have a maximum of 30 days in which to begin participation in another educational or work related activity in order to remain continuously eligible for extended foster care. |
| 18 - 20 years of age | incapable of performing the activities described above due to a documented medical condition<br><br>Acceptable documentation of eligibility criteria may include either of the following:<br><br>• A statement from one or more medical doctors that documents the youth's medical condition, including the activities of daily living that the youth is incapable of doing as a result of that medical condition<br><br>• Determination of a disability from the Social Security Administration | he or she withdraws from the program or the end of the month in which the youth turns 21 years old (annual documentation required). |

d)   The chart above outlines independent living services or education benefits and the higher age that eligibility for such services and benefits end.

5.     Services  and  Case  Review/Planning  -  §400.115(c);  §400.116(a);  §400.118;  SL  # 09-09;   ORR Statement, III. Program Standards, Legal Considerations and Programmatic

a)  The State assures that youth in the Texas URM program are eligible for the same range of child welfare benefits and services that are available to other children in the state per titles IV-B and IV-E of the Social Security Act.

Mainstream Child Protective Service foster care children that age out of care have access to:
- Federal Chafee benefits
- Education stipends at state universities
- Transitional Living Allowance
- Aftercare Room and Board and Case Management Assistance
- Extended Care and Supervised Independent Living

These services are being established as parity services utilizing URM dollars with the exception of education stipends to state universities.  Education stipends are state funded benefits available to youth who age out of the Texas foster care system.

b)  Case Review

1.  The State assures youth in the URM program have a case review every six months, or sooner if deemed necessary, to review the continuing appropriateness of living arrangements and services.

2.  Individual service plans are currently reviewed by child placement management staff and treatment teams.  Currently service plans are reviewed every 90-180 days depending upon the service level of the client. Permanency plan reviews are scheduled annually.  Texas URM programs have added the position of Permanency Specialist to their URM Program staff. This position is responsible for the Permanency Plan reviews.

The private agencies consider all permanency plan options when developing an appropriate permanency goal and adhere to the four permanency goals specified in The Texas Family Code §263.3026 listed below:

- Reunification;
- Adoption by a relative or other suitable individual;
- Permanent managing conservatorship to a relative or other suitable individual; or
- Another planned permanent living arrangement for the child.

   c)  The State assures that the following elements are addressed in case plans and reviewed during DFPS monitoring visits:

- Family Reunification
- Placement
- Health Screening and Treatment
- Mental Health Needs
- Social Adjustment
- Education/Training
- English Language Training
- Career Planning
- Preparation for Independent Living
- Preservation of Ethnic and Religious Heritage

   d)  Placement Options and Health Coverage:

     1.  Placement options include but are not limited to family foster homes, ethnically matched foster homes, transitional agency homes, agency homes, Residential Treatment Centers, and Supervised Independent Living.

     2.  Health coverage and payment is provided for URMs through the State Medicaid programs up to the age of 19. Continued medical coverage is provided if the minor opts to remain in the program and is funded through the Office of Refugee Resettlement.

   e)  Young adults in the Texas URM Programs can apply for educational training vouchers (ETV) as applicable. Young adults in the Texas URM Programs who meet eligibility requirements are able to access independent living skills classes, Transitional Living Services and placements, and a Supervised Independent Living Program.

6.     Interstate Movement - §400.119

   a)  The Texas URM Programs follow the Interstate Compact for the Placement of Children (ICPC) in parity with DFPS.

## Section III. Approval

As specified by 400.8, the Governor of the State of Texas or his designee hereby approves the content of the plan:

_Michelle Harper, Associate Commissioner_

Attachment 2



## TEXAS HEALTH AND HUMAN SERVICES COMMISSION

CHRIS TRAYLOR
EXECUTIVE COMMISSIONER

December 1, 2015

*Via Email:  PRM-Admissions-Inquiries@state.gov*

Lawrence Bartlett
Director, Office of Admissions
Bureau of Population, Refugees, and Migration
United States Department of State
Washington, D.C.

Re:    Request for Information

Dear Mr. Bartlett:

As you are aware, Texas Governor Greg Abbott has raised concerns about the effectiveness of security screenings of Syrians seeking refugee status and has called for a halt to resettlement until those concerns are appropriately addressed.  Obtaining meaningful information about the screening process and specific information about Syrians proposed for resettlement in Texas is critical to that effort and to enable Texas to ensure the safety of its residents.

We understand that the Department of State recently instructed voluntary resettlement agencies not to share specific refugee case information with the states.  Instead, we were told that requests for specific refugee case information must be made to your office, and your office will determine if and how any information will be shared.

Pursuant to that instruction, the State of Texas makes the following request:

**Information Requested:**  All demographic, medical, security, and other case information relating to Syrians slated or scheduled for resettlement in Texas during the next ninety days.

**Purpose of the Request:**  The State of Texas is expected to partner with the federal government and the voluntary agencies in the resettlement process, but has not been given access to any of the information necessary for meaningful participation.  As a result, the state is making this information request to satisfy our concerns with the effectiveness of the screening procedures and to facilitate the process of cooperation and advance consultation required by federal law prior to placement of refugees in the state.

P. O. Box 13247   •   Austin, Texas  78711   •   4900 North Lamar, Austin, Texas   78751   •   (512) 424-6500

Attachment 2

Lawrence Bartlett
December 1, 2015
Page 2

**Requestor:** This request is made by Cecile Young, State Refugee Coordinator, Texas Health and Human Services Commission. This request was authorized by Chris Traylor, Executive Commissioner for the Texas Health and Human Services Commission.

We understand that Syrians may be scheduled to resettle in Texas as early as at the end of this week. Therefore, we respectfully request you respond with the requested information as soon as possible.

Sincerely,

Cecile Young
State Refugee Coordinator

Attachment 3

**From:** Hilary Ingraham [mailto:IngrahamH@wrapsnet.org]
**Sent:** Thursday, December 17, 2015 5:17 PM
**To:** Medel Reyes,Sandra (HHSC); Young,Cecile (HHSC); Randall,Patrick (HHSC)
**Cc:** 'Bartlett, Lawrence E.'
**Subject:** Refugee Arrival Information to Texas

Good afternoon,

Thank you for your request to receive information about refugees resettling to Texas. Please find attached a report which shows refugee arrivals to date in Fiscal Year 2016, as well as arrivals in November.

We can schedule these reports so they are sent to you on the 5th of every month. Please let me know if there is anyone else from your office who should receive this report.

Best regards,
Hilary

Hilary Ingraham
Director, Refugee Processing Center, Refugee Admissions • Bureau of Population, Refugees, and Migration • U.S. Department of State
1401 Wilson Avenue, Suite 1100, Arlington, VA 22209 | phone: 703.907.7283| fax: 703.907.7727| email: IngrahamHE@state.gov /
IngrahamH@wrapsnet.org

Attachment 3

**Department of State**
**Bureau of Population, Refugees, and Migration**
**Office of Admissions - Refugee Processing Center**
**Refugee Arrivals**

**to Texas**

**Fiscal Year 2016**

**as of Thursday, December 17, 2015**

**General Notes:**

The report is broken down by the Nationality of the Primary Applicant (PA) on the case as well as gender and age of each member at the time of arrival.

**Current FY Arrivals**
Displays all refugee arrivals during the current Fiscal Year

**Previous Month Arrivals**
Displays refugee arrivals for the previous month only

**Note: Recipients of Special Immigrant Visas (SIVs) who opted for refugee benefits are excluded from this report.**

Department of State
Bureau of Population, Refugees, and Migration
Office of Admissions - Refugee Processing Center
Refugee Arrivals

to Texas

Fiscal Year 2016

as of Thursday, December 17, 2015

**Current Fiscal Year Arrivals (October 01, 2015 through September 30, 2016)**

| Nationality | 0-4 F | 0-4 M | 0-4 Total | 5-11 F | 5-11 M | 5-11 Total | 12-17 F | 12-17 M | 12-17 Total | 18-59 F | 18-59 M | 18-59 Total | 60+ F | 60+ M | 60+ Total | Gender F | Gender M | Cumulative Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Afghanistan | 1 | 2 | 3 | | 5 | 5 | | 5 | 5 | 5 | 6 | 11 | | | | 6 | 18 | 24 |
| Bhutan | 4 | 3 | 7 | 2 | 1 | 3 | | 2 | 2 | 20 | 16 | 36 | 1 | | 1 | 27 | 22 | 49 |
| Burma | 27 | 42 | 69 | 41 | 31 | 72 | 40 | 19 | 59 | 117 | 130 | 247 | 6 | 3 | 9 | 231 | 225 | 456 |
| Burundi | | | | | | | | | | | 3 | 3 | | | | | 3 | 3 |
| Colombia | | | | | | | | | | 1 | | 1 | | | | | 1 | 1 |
| Cuba | | | | 1 | 1 | 2 | | | | 1 | 3 | 4 | 1 | | 1 | 3 | 4 | 7 |
| Dem. Rep. Congo | 5 | 10 | 15 | 16 | 10 | 26 | 12 | 19 | 31 | 30 | 27 | 57 | 1 | | 1 | 64 | 66 | 130 |
| El Salvador | | | | | | | | | | 1 | | 1 | | | | 1 | | 1 |
| Eritrea | 1 | | 1 | 2 | 3 | 5 | 2 | 3 | 5 | 9 | 6 | 15 | | | | 14 | 12 | 26 |
| Ethiopia | 1 | | 1 | | | | | | | 2 | 4 | 6 | | | | 3 | 4 | 7 |
| Iran | | | | 5 | 3 | 8 | | 2 | 2 | 22 | 22 | 44 | 3 | 4 | 7 | 30 | 31 | 61 |
| Iraq | 20 | 25 | 45 | 16 | 21 | 37 | 5 | 10 | 15 | 90 | 117 | 207 | 9 | 4 | 13 | 140 | 177 | 317 |
| Jordan | | | | | | | | | | | 1 | 1 | | | | | 1 | 1 |
| Malaysia | | | | | | | | | | 1 | | 1 | | | | 1 | | 1 |
| Nepal | | | | 1 | | 1 | | | | | 1 | 1 | | | | 1 | 1 | 2 |
| Rwanda | | | | | | | | | | 1 | 1 | 2 | | 1 | 1 | 1 | 2 | 3 |
| Senegal | | | | | | | | | | | 1 | 1 | | | | | 1 | 1 |
| Somalia | 3 | 3 | 6 | 7 | 8 | 15 | 6 | 7 | 13 | 16 | 20 | 36 | | 1 | 1 | 32 | 39 | 71 |
| Sudan | 4 | | 1 | | | | | 2 | 2 | 2 | 3 | 5 | | | | 2 | 6 | 8 |
| Syria | 4 | 4 | 8 | 7 | 8 | 15 | 7 | 3 | 10 | 11 | 12 | 23 | | | | 29 | 27 | 56 |
| **Total** | **66** | **90** | **156** | **98** | **91** | **189** | **72** | **72** | **144** | **328** | **374** | **702** | **21** | **13** | **34** | **585** | **640** | **1,225** |

Data extracted from the Worldwide Refugee Admissions Processing System (WRAPS).
RPC/Refugee Arrivals by State
Report Run Date: 12/17/2015 1:30:58 PM

Department of State
**Bureau of Population, Refugees, and Migration**
**Office of Admissions - Refugee Processing Center**
**Refugee Arrivals**

**to Texas**

**Fiscal Year 2016**

**as of Thursday, December 17, 2015**

**Previous Month Arrivals (November 01, 2015 through November 30, 2015)**

| Nationality | 0-4 F | 0-4 M | 0-4 Total | 5-11 F | 5-11 M | 5-11 Total | 12-17 F | 12-17 M | 12-17 Total | 18-59 F | 18-59 M | 18-59 Total | 60+ F | 60+ M | 60+ Total | Gender F | Gender M | Cumulative Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Afghanistan | | 2 | 2 | | 3 | 3 | | 2 | 2 | 1 | 2 | 3 | | | | 1 | 9 | 10 |
| Bhutan | 1 | 1 | 2 | 1 | | 1 | | 1 | 1 | 4 | 2 | 6 | 1 | | 1 | 7 | 4 | 11 |
| Burma | 7 | 8 | 15 | 9 | 9 | 18 | 11 | 3 | 14 | 26 | 33 | 59 | 2 | | 2 | 55 | 53 | 108 |
| Cuba | | | | | | | | | | | 1 | 1 | | | | | 1 | 1 |
| Dem. Rep. Congo | 4 | 2 | 6 | 7 | 3 | 10 | 4 | 5 | 9 | 9 | 14 | 23 | | | | 24 | 24 | 48 |
| El Salvador | | | | | | | | | | 1 | | 1 | | | | 1 | | 1 |
| Eritrea | | | | 1 | 2 | 3 | 1 | 1 | 2 | 3 | 2 | 5 | | | | 5 | 5 | 10 |
| Ethiopia | | | | | | | | | | 1 | | 1 | | | | 1 | | 1 |
| Iran | | | | | | | | | | 6 | 6 | 12 | 1 | 1 | 2 | 7 | 7 | 14 |
| Iraq | 4 | 7 | 11 | 1 | 8 | 9 | 1 | 1 | 2 | 18 | 25 | 43 | 2 | 1 | 3 | 26 | 42 | 68 |
| Somalia | | | | | | | | | | 1 | 2 | 3 | | | | 1 | 2 | 3 |
| Sudan | | | | | | | | | | 1 | | 1 | | | | 1 | | 1 |
| Syria | 1 | 3 | 4 | 1 | 1 | 2 | 1 | 1 | 2 | 3 | 3 | 6 | | | | 6 | 8 | 14 |
| **Total** | **17** | **23** | **40** | **20** | **26** | **46** | **18** | **14** | **32** | **74** | **90** | **164** | **6** | **2** | **8** | **135** | **155** | **290** |

Data extracted from the Worldwide Refugee Admissions Processing System (WRAPS).

Attachment 4

**From:** Berdinner, Kiera [mailto:BerdinnerKR@state.gov]
**Sent:** Monday, January 04, 2016 4:11 PM
**To:** Randall,Patrick (HHSC)
**Cc:** Day, Barbara J
**Subject:** RE: Approved Refugee Placements FY 2016

Dear State Refugee Coordinator,

Per the letter you received in November (see attached), we are currently engaged in negotiations with each resettlement agency regarding proposed increases to their network capacity to match the increased refugee ceiling of 85,000 for FY 2016.  Prior to making any decisions, we would like to solicit your input on the below proposed revisions we received from resettlement agencies in your state.  We would appreciate receiving your input as soon as possible, though no later than COB Friday, January 15th.

**PROPOSED CHANGES TO APPROVED AFFILIATES**

| Agency | City | Initial FY 2016 Approved Capacity | Agency Proposal for Revised FY 2016 Capacity |
|---|---|---|---|
| IRC | Abilene | 250 | 350 |
| CWS | Amarillo | 175 | 175 |
| LIRS | Amarillo | 107 | 107 |
| USCCB | Amarillo | 160 | 160 |
| CWS | Austin | 260 | 322 |
| EMM | Austin | 265 | 317 |
| USCCB | Austin | 455 | 455 |
| CWS | Dallas | 300 | 380 |
| IRC | Dallas | 800 | 1,050 |
| LIRS | Dallas | 300 | 300 |
| USCCB | Dallas | 625 | 730 |
| USCCB | El Paso | 35 | 35 |
| CWS | Fort Worth | 230 | 295 |
| LIRS | Fort Worth | 215 | 265 |
| USCCB | Fort Worth | 600 | 600 |
| WR | Fort Worth | 550 | 600 |

Attachment 4

| CWS | Houston | 300 | 350 |
|---|---|---|---|
| ECDC | Houston | 675 | 900 |
| EMM | Houston | 290 | 370 |
| LIRS | Houston | 250 | 375 |
| USCCB | Houston | 505 | 605 |
| USCRI | Houston | 650 | 730 |
| USCCB | San Antonio | 750 | 1,250 |
| | TOTAL | 8,747 | 10,721 |

Please do not hesitate to let me know if you have any questions.  We look forward to hearing from you.

Best,
Kiera

Kiera Berdinner
Program Officer for Domestic Resettlement, Refugee Admissions • Bureau of Population, Refugees, and Migration • U.S. Department of State
2025 E Street NW, Washington, DC 20520 | phone: 202.453.9259 | fax: 202.453.9393 | email: berdinnerkr@state.gov

This email is UNCLASSIFIED.

---

**From:** Cumming, Anna
**Sent:** Tuesday, November 10, 2015 2:31 PM
**To:** Patrick.Randall@hhsc.state.tx.us
**Cc:** Day, Barbara J; Berdinner, Kiera
**Subject:** Approved Refugee Placements FY 2016

Dear Mr. Randall,

Please see the attached letter from Lawrence Bartlett regarding the approved refugee placement numbers for Texas for FY 2016.

Best,
Anna

Anna Cumming
Intern for Domestic Resettlement, Refugee Admissions • Bureau of Population, Refugees, and Migration • U.S. Department of State
2025 E Street NW, Washington, DC 20520 | phone: 202.453.9254 |email: CummingA@state.gov
Stay Connected with PRM



**United States Department of State**

*Bureau of Population, Refugees,*
*and Migration*

*Washington, D.C. 20520*

November 9, 2015

Dear Mr. Randall,

Thank you for the input submitted by your office regarding proposed refugee placements in Texas for the U.S. Department of State's Reception and Placement (R&P) Program for fiscal year (FY) 2016. We appreciate your specific concerns regarding the strain on programs due to the continuing influx of Cuban parolees, particularly in Austin and Houston. The Department of State recognizes the generous support the state of Texas continues to provide to refugees. This support helps ensure refugees are able to move quickly toward becoming independent, productive members of their new communities.

Your input, including the recommendation that affiliates in Amarillo resettle only refugees with family ties was examined by our review panel and given full consideration as we finalized placements for Texas. The final approved placement numbers for Texas for FY 2016 are as follows:

| Affiliate | Individuals with U.S. Ties | Individuals without U.S. Ties | Total Approved for FY 2016 (Individuals) |
|---|---|---|---|
| IRC – Abilene | 190 | 60 | 250 |
| CWS – Amarillo | 175 | 0 | 175 |
| LIRS – Amarillo | 107 | 0 | 107 |
| USCCB – Amarillo | 160 | 0 | 160 |
| CWS – Austin | 210 | 50 | 260 |
| EMM – Austin | 200 | 65 | 265 |
| USCCB – Austin | 295 | 160 | 456 |
| CWS – Dallas | 215 | 85 | 300 |
| IRC – Dallas | 780 | 20 | 800 |
| LIRS – Dallas | 200 | 100 | 300 |
| USCCB – Dallas | 450 | 175 | 625 |
| USCCB – El Paso | 35 | 0 | 35 |
| CWS – Fort Worth | 128 | 102 | 230 |
| LIRS – Fort Worth | 125 | 90 | 215 |
| USCCB – Fort Worth | 420 | 180 | 600 |
| WR – Fort Worth | 380 | 170 | 550 |
| CWS – Houston | 225 | 75 | 300 |
| ECDC – Houston | 350 | 325 | 675 |

| | | | |
|---|---|---|---|
| EMM – Houston | 190 | 100 | 290 |
| LIRS – Houston | 175 | 75 | 250 |
| USCCB – Houston | 300 | 205 | 505 |
| USCRI – Houston | 550 | 100 | 650 |
| USCCB – San Antonio | 675 | 75 | 750 |
| **TOTAL – Texas** | **6,535** | **2,212** | **8,747** |

| URM Affiliate | Individuals with U.S. Ties | Individuals without U.S. Ties | Total Approved for FY 2016 (Individuals) |
|---|---|---|---|
| USCCB – Fort Worth URM | 0 | 25 | 25 |
| USCCB – Houston URM | 0 | 25 | 25 |
| **TOTAL URMs – Texas** | **0** | **50** | **50** |

These affiliate capacities were proposed against a projected ceiling for FY 2016 of 75,000 refugees and 7,000 special immigrant visa recipients (SIVs). The President has since determined a ceiling of 85,000 refugees for this year. The previous projection of 7,000 SIVs remains the same. We will soon engage in negotiations with each resettlement agency regarding increases in their network capacity. We have instructed them to conduct consultations to determine community capacities and secure state refugee coordinator input. PRM will share proposed changes with state refugee coordinators prior to making final decisions; please be aware that the requested response time will be short.

Note that numbers approved by PRM are to be viewed as an annual plan for each site. Changes may be made to this plan throughout the year for a variety of reasons. An affiliate may exceed its final approved number by up to ten percent without approval from PRM. To exceed ten percent of the approved number, it is our practice to receive concurrence from the State Refugee Coordinator before approving the increase.

Please feel free to contact me if you have any questions. Thank you for your continued interest in refugee resettlement and in the well-being of the members of Texas communities who have fled persecution abroad and found refuge in the United States. My staff and I look forward to working closely with you throughout the coming year on this important partnership.

Sincerely,

Lawrence Bartlett
Director
Office of Refugee Admissions