IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-cv-3851 |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF STATE, JOHN KERRY in his Official Capacity as SECRETARY OF STATE, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, SYLVIA BURWELL, in her Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, ROBERT CAREY, in his Official Capacity as Director of the OFFICE OF REFUGEE RESETTLEMENT, and INTERNATIONAL RESCUE COMMITTEE, INC. | § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

---

## SUPPLEMENTAL DECLARATION OF ROBERT J. BODISCH

My name is Robert J. Bodisch and I am over the age of 18 and fully competent to make this declaration and state the following:

1.     I currently serve as the Deputy Director of Homeland Security and Services at the Texas Department of Public Safety. In this capacity, I have 18 direct report employees and over 4,400 full-time employees under my supervision. As

Deputy Director, I maintain operational responsibility for Texas Homeland Security as well as responsibility for the following: Administrative Operations (includes a wide variety of core support functions for the Department, including human resources management, facilities management, administrative services, procurement & contract services, fleet operations, and distribution services); Driver License (includes administration of the driver license program for the state); Education, Training & Research (includes providing employee development courses, law enforcement training courses, Tactical Training Center, Motorcycle Safety Unit, Physical Fitness Safety Unit, Recruiting, and the DPS Command College); Financial Operations (involves management of the agency's appropriations with oversight agencies, responsible for managing an annual budget of $1.3 billion, processes all the agencies Revenues and Expenditures and manages $275 million in federal grants); Information Technology (encompasses the creating and maintaining of organizational infrastructure and governance processes to support the agency); Law Enforcement Support (this division is comprised of three main bureaus, including the Crime Lab, Crime Records, and Public Safety Communications); Regulatory Services (this division maintains the responsibility of administering and regulating Capitol Access Pass, Handgun Licensing, Ignition Interlock, Compassionate Use Program, Texas Metals Program, Private Security, Vehicle Inspection, Controlled Substances, Texas Prescription Program, and the Precursor Chemical Laboratory Apparatus Program); Cyber Security (includes overall charge of protecting information systems and the agency network, emphasizing

confidentiality, integrity and availability to ensure the greatest level of protection

for the citizens of Texas); Executive Protection (dignitary protection for the state's

elected officials); Media & Communications (which supports the agency by working

with reporters in traditional media organizations, utilizing social media outlets,

also coordinating and organizing media events hosted by or involving the

Department of Public Safety); Government Relations (which acts as a liaison

between legislative members or the public and the Texas Department of Public

Safety), Equal Employment Opportunity (which is responsible for maintaining the

department's EEO program, liaising with other governmental entities and the

public regarding equal employment opportunity issues, and handling department

matters concerning the Department's policy on sexual harassment, discrimination,

retaliation, and unprofessional conduct); and the Dispute Resolution Office (which

is an independent, impartial, and informal office which serves as a confidential

resource for the department's members who need assistance with questions,

concerns, complaints, or conflicts relating to the workplace).   I have held this

specific position since February 2014.

      2.     From September 2009 until my present appointment, I served as the

Texas Department of Public Safety Chief of Staff and Assistant Director of

Homeland Security. Prior to joining the Texas Department of Public Safety in 2009,

I served as the Deputy Director of the Governor's Office of Homeland Security

(2007-2009).

      3.     I began my extensive homeland security, law enforcement, and

criminal justice career in 1973, serving as Deputy Sheriff with the Harris County Sheriff's Office, Lieutenant Investigator with the Harris County District Attorney's Office, and Senior Criminal Investigator with the Texas Attorney General's Office. I also served as a Director in the Governor's Criminal Justice Division and as the Director of Education and Training for the Texas Commission on Law Enforcement Officer Standards and Education.

4.     In approximately 1999, I began developing an expertise regarding global terrorist organizations, their tactics, techniques and procedures as well as their ideologies, culture, jurisprudence, and law enforcement capabilities of the countries they operate in.   I developed this expertise through a combination of extensive reading, research, attending training conferences and seminars, nationally and internationally, briefings and discussions, all of which continues today. A list of many of the education and training courses that I have completed is at Attachment 1. In addition to the courses listed in Attachment 1, I have conducted an intensive study of Islam, including a study of the Quran, Hadith, Sunna, and Islamic jurisprudence texts including The Reliance of the Traveller (Ahmad Ibn Lulu Ibn Al-Naqib) and the Tafsir Ibn Kathir (the most respected and accepted explanations for the Quran and is the most widely used explanations in Arabic used today).   I have read hundreds of books, thousands of articles, studies, reports, analysis relative to the Middle East, terrorism and terror organizations.

5.     In 2005, the U. S. Government issued me a "Secret" security clearance. This clearance was as a result of serving in Iraq during 2005 and 2007 and it has

4

remained in effect since 2005 as I have maintained employment with a government agency in a high-level homeland security position and routinely access, and need to access, classified information for the purposes of my homeland security duties. Other employees of the Texas Department of Public Safety maintain "Secret" and "Top Secret" clearances issued by the U.S. Department of Defense, the U.S. Department of Homeland Security and the Federal Bureau of Investigation.

6.      During 2005 and 2007, I served two tours of duty in Iraq.  In 2005 I served in a number of roles including, manager of the Iraqi Police Executive Leadership Development Team, the Plans and Projects officer at the Civilian Police Assistance Training Team (CPATT) and in June of 2005 as the Senior International Law Enforcement Advisor to the Ministry of Interior Transition Team (MOI-TT).  In 2007, I served as the Deputy Program Manager for the Department of Justice, International Criminal Investigative Training Assistance Program (ICITAP-Iraq). In that capacity, I worked closely with the Iraqi Ministry of the Interior to help redesign and rebuild their police force.

7.      From 2005 to present, my experiences have made me familiar with the various tactics, goals, and modus operandi of terrorists and those that support them. And my many experiences, including those in Iraq, helped me develop knowledge about the various Foreign Terrorist Organizations that operate both within the United States, and abroad, as well as an understanding about their methodologies, beliefs, ideologies and goals.

8.      A more detailed listing of my experience and positions held during my

extensive career can be seen at Attachment 2.

9.    I earned an associate and bachelor's degree in Criminal Justice from the University of Houston in 1978. In 2003, I earned a Master's Degree in Quality Systems Management from the National Graduate School.

10.    I currently a member of several professional organizations, including the FBI-Law Enforcement Executive Development Association, International Association of Chiefs of Police, Sheriff's Association of Texas, American College of Forensic Examiners Institute – Certified in Homeland Security, National Guard Association of Texas, and Central Texas Counterterrorism Working Group.  Over the past 42 years I have been a member of the Association of Former Intelligence Officers, International Association for Counterterrorism & Security Professionals, and a number of other professional law enforcement associations.

11.    In 2006, I authored Special Policy & Procedure, Response to a Suicide/Homicide Bomber.  In 2008, developed a training module for Response to a Suicide/Homicide Bomber.  I have also given numerous presentations on terrorism, suicide bombers, emerging global threats, and a wide array of law enforcement and homeland security topics.

12.    I hold a variety of licenses and certifications, including: 1995, Master Peace Officer Certification, Texas Commission on Law Enforcement Officer Standards and Education; 2006, Certified Incident Response to Terrorist Bombings Instructor, New Mexico Tech., Energetic Materials Research and Testing Center; Certified Prevention and Response to Suicide Bombing Incidents Instructor, New

6

Mexico Tech., Energetic Materials Research and Testing Center; 2005, Improvised Explosive Device (IED) Awareness Instructor, U. S. Marine Corps (Iraq); 2001, Certified Law Enforcement Instructor, Texas Commission on Law Enforcement; 1981, Professional Criminal Investigator Certificate, Texas District and County Attorney's Association.

13.   At the end of my 2005 tour in Iraq, I was awarded the Chairman of the Joint Chiefs of Staff, Joint Civilian Service Commendation Medal, awarded by Lieutenant General Martin E. Dempsey, Commanding General, Multi-National Security Transition Command-Iraq. At the end of my 2007 tour in Iraq, I was awarded the U. S. Army Outstanding Civilian Service Medal, awarded by Lieutenant General James M. Dubik. In 2007, I was also awarded an Honorary Doctor of Philosophy in International Police Studies from the Baghdad Police College, and conferred by Major General Jassim Taher Chilab, General Director, The High Institute – Baghdad Police College.

14.   Because of my education, vast array of training, and experiences at the state, federal, and international levels regarding law enforcement, homeland security, and terrorism, I am acknowledged as an expert in these areas.

15.   In my capacity as the Deputy Director of Homeland Security at the Texas Department of Public Safety, there are various types of information and information sources upon which I regularly rely to perform my duties. The types of information that I seek, consider, and employ, some of which is outlined or referenced herein in greater detail, are the types of information upon which persons

in my position, and the law enforcement community in general, would and do reasonably rely on performing their duties.

16.    In my opinion, since the terrorist attacks of September 2001, the need for greater information sharing amongst federal, state, and local law enforcement has been a priority. In 2009, Texas participated in the establishment of Fusion Centers across the country. Fusion Centers are facilities where federal, state, and local law enforcement and intelligence communities can come together, share information, and work together in a collaborative environment. The State of Texas Fusion Center, which resides within the Intelligence and Counter-Terrorism Division of DPS, is considered as one of the most successful fusion centers in the nation.  It operates around-the-clock and serves as a central point for cooperation, collaboration and exchange of information amongst approximately 15 federal and state agencies, including the federal Department of Homeland Security and it serves the entire law enforcement community in Texas.

17.    In order to facilitate maximum intelligence and information sharing within the Fusion Center, and between agencies generally, several officials within the Texas Department of Public Safety possess "Secret" or "Top Secret" clearances. The existence of these various clearances within the Texas Department of Public Safety permits us to send or receive certain data in a confidential context and for limited usage as it pertains to law enforcement or homeland security considerations.

18.    The information we receive and consider comes from various sources

that are known and relied upon by members of the law enforcement, homeland security, and intelligence communities. For example, members of the Texas Department of Public Safety receive frequent classified briefings from the Federal Bureau of Investigation (FBI) in Austin, Dallas, San Antonio, Houston, and El Paso, as well as classified briefings from the U. S. Department of Homeland Security and other federal partners. Because these briefings are classified, the information received must be held and managed confidentially, and is not appropriate for public dissemination or usage.

19.     One of the perpetual points of focus within the Texas Fusion Center is potential terrorist activity primarily by individuals that claim membership in, or otherwise identify or sympathize with Foreign Terrorist Organizations. At present, there are many individuals inside the United States, as well as the State of Texas, who have known or suspected ties to Foreign Terrorist Organizations. In my opinion, the refugee resettlement program presents an opportunity for terrorists and their supporters to lawfully enter our country undetected.

20.     In my opinion, recent arrests in both Texas and California demonstrate the porous nature of the refugee vetting process. On Jan. 7, 2016, Omar Faraj Saeed al Hardan was arrested in Houston for, among other things, providing material support to a Foreign Terrorist Organization. See a true and correct copy of the DOJ's press release as Attachment 3. According to the Jan. 6, 2016 indictment, Hardan entered the United States as a refugee. See a copy of the actual indictment as Attachment 4. In my opinion, these FBI arrests affirm the

comment expressed by the Office of the Director of National Intelligence, released on Dec. 7, 2015 by the Chairman of the United States House of Representatives Homeland Security Committee, that "individuals with ties to terrorist groups in Syria [are] attempting to gain entry to the U.S. through the U.S. refugee program." See a transcript of Congressman Michael McCaul's Dec. 7, 2015 statement on the floor of the House on H.R. 158 as Attachment 5. And this type of information, and the nature of the sources, are some of the kinds of intelligence important to a person in my position.

21.     On Jan. 7, 2016, Aws Mohammed Younis Al-Jayab was arrested in Sacramento, California for his ties to and material support of terrorism. See an actual copy of the criminal complaint against him as Attachment 6. According to the complaint, he also entered the United States as a refugee—from Syria in 2012. Of particular concern to my office is that this gentleman was in communication with an "Individual I, who resided in Texas according to immigration records." Attachment 6 at p. 7.

22.     Regrettably, the arrest of Mr. Al-Jayab is not the first problem that the American intelligence and law enforcement communities have had with refugees. In my opinion, and based on information sources upon which I regularly rely, problems with refugees from Syria and other Middle Eastern countries extend back several years. And, in my opinion, refugees from Syria present unique problems, which are well understood within the intelligence, homeland security and law enforcement communities.  In fact, refugees from Syria may pose an even greater

security threat than refugees from Iraq, Afghanistan, and other Middle Eastern countries.

23.    What we know and understand within the intelligence, homeland security, and law enforcement communities is that the civil unrest that is ongoing in Syria has resulted in the destruction of many governmental buildings and records. This destruction of records, coupled with the United States' general lack of physical presence and diplomatic relations with the Syrian government, greatly inhibits the ability to conventionally vet prospective refugees from Syria. Furthermore, the U. S. Department of State has classified Syria a state sponsor of terrorism since 1979.  There have also been a number of reports of stolen Syrian passports that are outside the control of proper government authorities which may fall into the hands of terror organizations.   With no ability to verify passport numbers, or number sequences, or authenticity, the intelligence community believes that a multitude of fake Syrian passports are being used by terrorists.

24.    In my opinion, the problems with Syria are, at this time, largely unique to that country and region. In a country like Iraq, however, where the U. S. possesses diplomatic relations, as well as access to government databases (including biometric databases), the ability to vet prospective refugees is more significant. In Afghanistan, for example, there are demonstrable regions known for terrorist activity, and where government records may be non-existent regarding a prospective applicant, language dialects and differences can oftentimes separate legitimate refugee applicants from imposters. Unfortunately, in Syria, the perpetual

state of civil unrest, migrancy and influx of foreign fighters, coupled with the absence of reliable, accessible government records, reduces the vetting process to primarily interviews.

25.    In my opinion, there is no valid reason why the information requested by the Texas Health and Human Services Commission about refugees from Syria cannot be shared with the Texas Health and Human Services Commission or the Texas Department of Public Safety. Given mine and my co-workers' access to classified and other information, it is my opinion that Texas has a legitimate concern about the importation of terrorists through the refugee program. My opinion is amplified by type of incidents and reports that are significant to members of the law enforcement, homeland security, and intelligence communities, like me. These incidents and reports include, but are not limited to, the previously mentioned arrests on Jan. 7, 2016, the Dec. 31, 2015 sexual assaults in Cologne, Germany (reportedly at the hands of refugees from Syria), the Dec. 5, 2015 shootings in San Bernadino, CA, and the mass murder in Paris, France on Nov. 13, 2015. On May 3, 2015, two terrorists with assault rifles opened fire on police officers in Garland, Texas. Fortunately, they were killed by the police officers before they were able to inflict harm upon the dozens of attendees of an event in the Curtis Culwell Center.

26.    In my opinion, our inability to access, in advance of resettlement, identifying and security information about individuals being resettled in Texas puts a significant strain on law enforcement, homeland security, and intelligence

resources. Because the Texas Department of Public Safety and other law enforcement agencies know that terrorists posing as "refugees" have already been resettled in Texas, our normal anti-terrorism efforts must necessarily encompass not only attention to specific intelligence, but also general concern with the greater communities where persons that identify as "refugees" are scheduled for resettlement. And the absence of person-specific information prohibits us from narrowing our intelligence focus, or even omitting as threats or concerns, certain individuals. The strain imposed upon law enforcement by general knowledge, instead of person-specific knowledge, can be significant.

27.    Additionally, as already mentioned, the Texas Department of Public Safety and member agencies of the Texas Fusion Center are experienced in the receipt, management, and usage of sensitive and classified data and information. More detailed information about incoming refugees, especially those from Syria, would be of significant benefit to the work and operations of Texas Department of Public Safety and the Texas Fusion Center and help conserve precious law enforcement resources. I can envision no legitimate reason why our agency cannot be entrusted with that information and am of the opinion that we have a genuine need for the information requested by the Texas Health and Human Services Commission regarding certain refugees proposed for resettlement in Texas.

28.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 15th day of January, 2016.

ROBERT J. BODISCH

Attachment 1

**Robert J. Bodisch**

## Law Enforcement Experience (1973 to present)

**09/01/09 to Present**: Deputy Director, Texas Department of Public Safety, In addition to the duties and responsibilities outlined below as Deputy Director, Office of Homeland Security, which was moved to the Texas Department of Public Safety in August 2009, dual-hatted as Deputy Director Services. Primary duties include: Supervision of 8 Divisions and 7 Special Sections to include; Administrative Operations, Driver License Division, Education, Training & Research, Emergency Management, Financial Operations, Information Technology, Law Enforcement Services, Regulatory Services, Cyber Security, Equal Employment Opportunity, Executive Protection Bureau, Government Relations, Media & Communications, Ombudsman, and the Homeland Security State Administrative Agency. Additional duties include Assisting the Director of the Department, and as assigned, all duties regarding reporting to the Commission, responsibility for the success or failure in enforcing state criminal and traffic laws, preventing crime, detecting and apprehending law breakers, and fulfilling regulatory and licensing duties. Assist the Director in facilitating optimum interaction between department senior leadership. Assist the Director in developing and implementing the Department's vision, mission, values, strategy, and annual goals and objectives; and provide leadership in achieving same. Assist the Director in developing and implementing the Department's Performance Excellence Program. Assist the Director in developing succession planning and the development of future organizational leaders. Assist the Director in focusing action to accomplish the department's goals and objectives, improve performance and performance measures, and attain its vision. Assist the Director in creating and balancing value for customers and other stakeholders in the department's performance expectations.

**11/01/07 – 09/01/09** Deputy Director, Office of Homeland Security, Office of the Governor. Responsibilities include assuming the duties of the Director in his absence, performs advanced managerial duties providing direction and guidance in strategic operations and planning. Serves as primary point of contact for prevention and deterrence operations. Performs intelligence coordinator duties reporting to the Director of the Department of Homeland Security. Briefs the Governor, Chief of Staff and other senior staff members as needed to ensure proper coordination and statewide emergency alerts and preparedness. Serves as the chief coordinator and Homeland Security liaison with state, local and federal law enforcement, including representing the Director. Performs a wide range of functions on matters affecting state and national security. Secret Clearance (DHS).

**01/24/07 - 10/30/07** Deputy Program Manager, Department of Justice, International Criminal Investigative Training Assistance Program-Police, assigned to the Multi-National Security Transition Command-Iraq, as Director of Training, Civilian Police Assistance Training Team (CPATT). Senior International Police Advisor to the CPATT Commanding General in all areas regarding law enforcement training and policy. Performs actions as directed by the CPATT Commanding General, represents CPATT at assigned meetings and briefings with the ability to effectively communicate with high ranking military, Iraqi, and Coalition partners on matters related to Iraqi Police Service training and standards. Administrative and operational control of 185 senior coalition forces law enforcement personnel assigned to train, mentor and advise the Iraq Ministry of Interior, which includes over 300,000 personnel assigned to the Iraqi Police Service, National Police, Dept. of Border Forces, and Facilities Protection Service. Colaborates with Coalition Forces regarding force protection measures and critical infrastructure issues related to assigned tasks. Prepares complex and classified reports for dissemination to CPATT Commanding General and Coalition Forces. Developed National Training Center Assessement program for all Iraqi Training Centers throughout Iraq. Certified in Homeland Security-Level III, American College of Forensic Examiners Institute. Top Secret Clearance.

**01/15/06 - 12/31/06** Assistant Director, Office of Special Investigations (OSI), Office of the Attorney General (OAG). Principal duties and responsibilities include strategic planning, training, and support services for all OAG peace officers (134). Serve as agency point of contact for Homeland Security issues. Coordinator and facilitator for OSI Survey of Organizational Excellence. Serve as agency ex-officio representative to the Texas Commission on

Attachment 1

Law Enforcement Officer Standards and Education (TCLEOSE) and agency chief administrator for all TCLEOSE matters.  Member of the Central Texas Counter Terrorism Working Group.

**01/24/05 - 12/22/05** Bureau Chief, Civilian Police Assistance Training Team, International Criminal Investigative Training Assistance Program, Department of Justice, Baghdad, Iraq.  Served as Senior Law Enforcement Advisor to the Ministry of Interior, Multi-National Security Transition Command-Iraq.  In this position advise the Ministry of Interior and Deputy Ministers on all aspects of law enforcement reconstruction of the Iraqi Police Service, a national police service with 214,000 employees.  Additionally, served as Senior Coordinator for the Ministry of Interior, Iraqi Police Service Comprehensive Assessment Project, Member of the Iraqi Justice Integration Project and Rule of Law Working Group.  Member of III Corps and CPATT Improvised Explosive Device Work Group

**07/02/01 - 10/31/05**  Director, Education and Training, and Special Services and Operations Divisions, Texas Commission on Law Enforcement.  Duties include supervision of Education and Training, Curriculum Development and Field Services Operations Divisions, CALEA Accreditation, Distance Education, Peace Officer Benefits, Peace Office (Deceased) Flag Project, Peace Officer Memorial, Racial Profiling Project, Violent Crimes Project, and serve as agency contact for the Governor's State Agency Operations Group for Homeland Security.  Responsible for hiring, promotion and discipline of all Division personnel as well as developing and implementing agency budget.  Certified Anti-Terrorism Instructor (Dept. of Justice) and Instructor for the        U.S. State Department, Bureau of International Narcotics and Law Enforcement Programs, International Law Enforcement Academy, Roswell, NM.  Cross-designated as Special Deputy U. S. Marshal.

**11/01/01 - 07/01/02**  Director, Criminal Justice Management Systems, Criminal Justice Center, Sam Houston State University.  Duties include directing a major law enforcement distance education project in conjunction with the Texas Commission on Law Enforcement Officer Standards and Education.  (One-year Grant Funded Position)

**03/01/1996 – 10/31/01** Director, Law Enforcement Programs and Texas Narcotics Control Program, Office of the Governor (Gov. George W.  Bush), Criminal Justice Division.  During this period administered approximately $180 million in state and federal funds which funded  50 narcotics task forces throughout the State of Texas as well as numerous drug impact courts, narcotics prosecution projects and specialized law enforcement and narcotic enforcement projects.  Additionally, served as the State Coordinator for the Texas Military Surplus Property and Procurement Program; Advisory Board member of the Department of Justice Border Research and Technology Center; member of the Joint  Command Group, Operation Alliance; member of the Central Texas Counter Terrorism Working Group, Border States Anti-Drug Information Systems; member of the Drug Policy Task Force, Council of State Governments; State Point of Contact, Department of Justice Bulletproof Vest Program; and Program Manager for the Local Law Enforcement Block Grant Program.  Also served as the Interim Director, Texas Crime Stoppers (1998-1999), and advisor to the Executive Director on Crime Stoppers matters (1999-2001).

**1991 – 1996** President, R. J. Bodisch & Associates, Inc. Owner and manager of a political consulting corporation engaged in general consulting to state and national political campaigns and specializing in the area of issue development, research, planning, strategy and communications.  During 1991-1994 had exclusive contract with the National Republican Senatorial Campaign Committee (Senator Phil Gramm, Chairman), and involved in over 20 U.S. Senate campaigns.  During 1994-1996 involved in numerous congressional campaigns and numerous state and local races.

**1989 - 1990** Senior Political Consultant, Blythe, Nelson, Newton & Towery Political Consultants. Duties included consulting in all areas of campaign planning, organization, strategy, tactics, communications, budget and finance. Worked closely with local, state and federal office holders and staff personnel.

**1985 – 1989** Senior Criminal Investigator, Texas Attorney General's Office. Duties included conducting criminal investigations upon invitation or request of district or county attorneys or other criminal justice officials; conducted public integrity and corruption investigations; collected and evaluated criminal intelligence information for dissemination to local, state and federal agencies; assisted law enforcement agencies in organized crime investigations; conducted research on criminal justice issues and author of law enforcement articles. In 1988, cross designated and credentialed as a United States Customs Agent, Blue Fire Operation. Duties included arresting smugglers found bringing illegal merchandise into the United States, maintaining surveillance, boarding and searching of vessels suspected of having contraband drugs. Worked closely with the Houston Customs Office on major narcotics smuggling cases.

**1975 – 1984** Lieutenant Investigator, Harris County District Attorney's Office. Duties included supervision of investigations and investigative personnel in multi-criminal divisions. Assisted in preparation of budget and finance, oversaw personnel administration, conducted personnel evaluations, coordinated training and maintained investigative inventory and supplies. Conducted internal, public integrity, corruption and background investigations. Extensive experience in homicide investigations, major crimes and white-collar crimes. (4/1983-9/1984 Ran for public office, Harris County Constable Precinct 5.)

**1973 – 1975** Patrolman, Harris County Sheriff's Office. Duties included routine patrol and preliminary investigations as assigned.

Attachment 2

## Education and Training Courses Completed

**Name**                    **TCOLE ID (P ID)**    **STATUS**
ROBERT J. BODISCH SR        13116
**Citizen**      **Race**  **Gender**      **Federal ID**    **State ID**
Yes              White     Male

## Education Information

| Institution | Hours | Education |
|---|---|---|
| Univ of Houston | 0 | Bachelor |
| NATIONAL GRADUATE SCHOOL | 165 | Master |

**Total Hours** 165
**Total Training Hours** 3300

**09/01/2013 - 08/31/2015**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3150 Law Update 8/25/2015 16 Williamson County Sheriff's Office
3106 Conference (General) 7/15/2015 7 Texas Department of Public Safety LEA
3030 Answering EEO Complaints 7/13/2015 1 Texas Department of Public Safety LEA
3183 83rd Legislative Session Legal Update 5/25/2015 3 Texas Department of Public Safety LEA
        83rd Session State and Federal Law Update
3030 Answering EEO Complaints 5/11/2015 1 Texas Department of Public Safety LEA
3751 Effective Leadership /Leadership Training 5/6/2015 9 Texas Department of Public Safety LEA
57013 U.S. Supreme Court Legal Updates 5/3/2015 2 Texas Department of Public Safety LEA
7820 Security Awareness Training (Securing the Human) 8/31/2014 10 Texas Department of Public Safety LEA
3016 Personnel Evaluation 11/21/2013 3 Texas Department of Public Safety LEA
780001 DPS - EEO Online 10/8/2013 2 Texas Department of Public Safety LEA
**Unit Hours 54**

**09/01/2011 - 08/31/2013**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3008 Executive Development 11/30/2012 16 Texas Department of Public Safety LEA
3182 82nd Legislative Session Legal Update 8/10/2012 2 Texas Department of Public Safety LEA 82nd Session State and Federal Law Update
3012 Management Theory 7/27/2012 50 TEXAS DEPT. OF PUBLIC SAFETY (Training Rosters)
3012 Management Theory 4/11/2012 14 Texas Department of Public Safety LEA
780001 DPS - EEO Online 12/14/2011 2 Texas Department of Public Safety LEA
2051 Terrorism/Dignitary Protection/Special Threat 11/18/2011 8 Texas Department of Public Safety LEA
**Unit Hours 92**

**09/01/2009 - 08/31/2011**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3320 Terrorism & Homeland Security (General) 12/7/2010 23 TEXAS DEPT. OF PUBLIC SAFETY
3320 Terrorism & Homeland Security (General) 9/9/2010 15 San Antonio Police Academy
3800 Technical/Specialized 8/26/2010 4 Texas Department of Public Safety LEA
3751 Effective Leadership /Leadership Training 6/24/2010 8 Texas Department of Public Safety LEA
3800 Technical/Specialized 6/12/2010 14 Texas Parks & Wildlife LEA
3181 81st Legislative Session Legal Update 2/17/2010 2 Texas Department of Public Safety LEA
3700 Management/Supervision 11/4/2009 8 Texas Department of Public Safety LEA
**Unit Hours 74**

Attachment 2

**09/01/2007 - 08/31/2009**

**Course No. Course Title Course Date Course Hours Institution Training Mandates**

66208 FEMA State Disaster Management (FEMA IS-208a) 8/12/2008 10 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
3200 Investigations 7/22/2008 17 Texas Attorney General's Office
66860 FEMA Nat Infrastructure Protection Plan (FEMA IS-860a) 6/23/2008 2 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
3320 Terrorism & Homeland Security (General) 5/13/2008 8 Gus George LEA
66547 FEMA Intro Continuity/Ops (COOP) (FEMA IS-547a) 5/12/2008 5 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
66546 FEMA Continuity/Operations Aware (FEMA IS-546a) 5/9/2008 1 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
66000 FEMA Homeland Security Planning for Campus Executives 4/3/2008 6 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
66000 FEMA Homeland Security Planning for Campus Executives 4/3/2008 6 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
3320 Terrorism & Homeland Security (General) 2/5/2008 16 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
**Unit Hours 71**

**09/01/2005 - 08/31/2007**

**Course No. Course Title Course Date Course Hours Institution Training Mandates**

3331 Terrorism Awareness for Emergency First Responders 7/8/2007 4 GRIMES CO. SHERIFF'S OFFICE (Training Rosters)
2046 Driving 5/11/2007 16 OTHER TRAINING
2051 Terrorism/Dignitary Protection/Special Threat 5/11/2007 40 OTHER TRAINING
3700 Management/Supervision 11/15/2006 16 Galveston Police Dept.
3700 Management/Supervision 10/25/2006 8 Texas Attorney General's Office
3800 Technical/Specialized 10/24/2006 4 OTHER TRAINING
3200 Investigations 10/3/2006 32 OTHER TRAINING
3200 Investigations 8/28/2006 32 OTHER TRAINING
3100 LAW 8/6/2006 60 Texas Commission on Law Enforcement
3800 Technical/Specialized 8/3/2006 8 Austin Police Academy
3800 Technical/Specialized 8/2/2006 5 Austin Police Academy
3800 Technical/Specialized 8/1/2006 5 Austin Police Academy
2098 Alcoholic Beverage Code 8/1/2006 5 Austin Police Academy
3700 Management/Supervision 7/27/2006 7 OTHER TRAINING
3700 Management/Supervision 7/19/2006 4 Texas Attorney General's Office
3700 Management/Supervision 7/18/2006 7 OTHER TRAINING
3200 Investigations 6/15/2006 28 Hood County Sheriff's Office
3700 Management/Supervision 5/19/2006 32 College Station Police Dept.
3800 Technical/Specialized 5/9/2006 16 Bexar Co. Sheriff's Academy
66200 FEMA ICS Single Res/Initial Action Inc(FEMA IS-200) 4/26/2006 3 OTHER TRAINING
66100 FEMA Intro ICS (FEMA IS-100a) 4/7/2006 3 OTHER TRAINING
55018 Officer Survival 4/5/2006 8 Texas Attorney General's Office
1014 Basic Instructor Course 4/3/2006 55 Texas Attorney General's Office
3320 Terrorism & Homeland Security (General) 3/17/2006 27 FEDERAL BUREAU OF INVESTIGATION
3232 Special Investigative Topics 3/8/2006 4 Texas Attorney General's Office Special Investigative Topics (Intermediate)
3939 Cultural Diversity 3/8/2006 4 Texas Attorney General's Office Cultural Diversity (Intermediate)
66800 FEMA National Resp Plan Intro (FEMA IS-800b) 2/27/2006 3 OTHER TRAINING
3200 Investigations 1/27/2006 7 Texas Attorney General's Office
**Unit Hours 443**

**09/01/2003 - 08/31/2005**

## Course No. Course Title Course Date Course Hours Institution Training Mandates

3800 Technical/Specialized 5/24/2005 50 OTHER TRAINING
3900 Community 4/2/2005 8 OTHER TRAINING
3300 Patrol/Tactical 3/10/2005 24 OTHER TRAINING
3232 Special Investigative Topics 1/12/2005 1 Texas Commission on Law Enforcement Special Investigative Topics (Intermediate)
3939 Cultural Diversity 1/12/2005 2 Texas Commission on Law Enforcement Cultural Diversity (Intermediate)
3800 Technical/Specialized 12/28/2004 16 TEEX Central Texas Police Academy
3800 Technical/Specialized 12/3/2004 25 Sam Houston State University
3800 Technical/Specialized 11/18/2004 16 Texas Department of Public Safety LEA
3304 Hostage and Barricade Suspect Situations 11/12/2004 36 Texas Commission on Law Enforcement
3736 New Training Coordinator Orientation (TCLEOSE) 11/3/2004 8 North Central Texas Reg. Academy
3277 Identity Theft 10/27/2004 4 TCOLE Online Identity Theft (Intermediate)
6024 Commission Rules & Procedures 10/22/2004 2 Texas LEA
3800 Technical/Specialized 10/12/2004 2 Texas Commission on Law Enforcement
3816 WMD Awareness for LE Executives 9/29/2004 16 Texas Commission on Law Enforcement
9999 Other In-Service Training 9/16/2004 60 Texas Commission on Law Enforcement
6025 Training Coordinator Annual Conference 9/15/2004 16 TCOLE Online
3840 CIT - Train the Trainer 8/11/2004 16 Texas Commission on Law Enforcement Crisis Intervention Training
3800 Technical/Specialized 8/5/2004 1 Texas Commission on Law Enforcement
6026 Curriculum Development Committee 7/13/2004 3 Texas LEA
3700 Management/Supervision 7/9/2004 3 OTHER TRAINING
3300 Patrol/Tactical 6/19/2004 2 Texas Commission on Law Enforcement
3700 Management/Supervision 6/1/2004 1 Texas Commission on Law Enforcement
3300 Patrol/Tactical 5/19/2004 24 Grand Prairie Police Academy
3800 Technical/Specialized 4/22/2004 2 Texas Department of Public Safety LEA
3200 Investigations 4/20/2004 16 Houston Police Academy
3256 Racial Profiling 3/29/2004 3 Palo Alto College Racial Profiling (Intermediate)
2095 Use of Force (Non-Intermediate Core Course) 3/15/2004 2 Texas Commission on Law Enforcement
6026 Curriculum Development Committee 2/27/2004 3 Texas LEA
6026 Curriculum Development Committee 2/19/2004 6 Texas LEA
6026 Curriculum Development Committee 2/18/2004 6 Texas LEA
3800 Technical/Specialized 2/11/2004 16 Bexar Co. Sheriff's Academy
1014 Basic Instructor Course 2/10/2004 50 Texas Commission on Law Enforcement
3277 Identity Theft 12/2/2003 8 OTHER TRAINING Identity Theft (Intermediate)
3800 Technical/Specialized 11/12/2003 1 Texas Commission on Law Enforcement
6026 Curriculum Development Committee 10/30/2003 12 Texas Commission on Law Enforcement
3800 Technical/Specialized 10/29/2003 1 Texas Commission on Law Enforcement
6026 Curriculum Development Committee 10/28/2003 6 Texas Commission on Law Enforcement
3277 Identity Theft 10/15/2003 8 Texas Attorney General's Office Identity Theft (Intermediate)
1014 Basic Instructor Course 10/3/2003 40 FEDERAL BUREAU OF INVESTIGATION
3306 Tactical Tracking 9/21/2003 27 Texas Commission on Law Enforcement
3800 Technical/Specialized 9/19/2003 8 CyberEvidence, Inc
**Unit Hours 551**

**09/01/2001 - 08/31/2003**

## Course No. Course Title Course Date Course Hours Institution Training Mandates

3100 LAW 8/26/2003 2 Texas Commission on Law Enforcement
3200 Investigations 8/13/2003 16 University of Houston -Downtown LEA
6026 Curriculum Development Committee 7/30/2003 16 Texas Commission on Law Enforcement
3256 Racial Profiling 7/24/2003 4 Texas Commission on Law Enforcement Racial Profiling (Intermediate)

3800 Technical/Specialized 5/7/2003 4 Texas Commission on Law Enforcement
3700 Management/Supervision 5/6/2003 6 Texas Commission on Law Enforcement
3200 Investigations 3/27/2003 6 OTHER TRAINING
3800 Technical/Specialized 3/18/2003 1 Texas Commission on Law Enforcement
3700 Management/Supervision 11/22/2002 20 Bill Blackwood LEMI of Texas
3831 Basic Life Support American Heart Association 10/8/2002 8 Texas Commission on Law Enf
3300 Patrol/Tactical 9/30/2002 4 OTHER TRAINING
3800 Technical/Specialized 9/27/2002 12 OTHER TRAINING
3800 Technical/Specialized 4/17/2002 2 Texas Commission on Law Enforcement
3257 Combined Asset Forfeiture and Racial Profiling 4/2/2002 6 Texas Commission on Law Enf
3800 Technical/Specialized 1/15/2002 4 OTHER TRAINING
3800 Technical/Specialized 1/10/2002 4 OTHER TRAINING
3800 Technical/Specialized 1/4/2002 2 OTHER TRAINING
3800 Technical/Specialized 1/3/2002 4 OTHER TRAINING
3800 Technical/Specialized 12/26/2001 10 OTHER TRAINING
3800 Technical/Specialized 12/6/2001 8 OTHER TRAINING
3800 Technical/Specialized 11/29/2001 2 OTHER TRAINING
**Unit Hours 141**

**09/01/1999 - 08/31/2001**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3232 Special Investigative Topics 8/10/2001 4 Williamson County Sheriff's Office Special Investigative
Topics (Intermediate)
3939 Cultural Diversity 8/10/2001 4 Williamson County Sheriff's Office Cultural Diversity (Intermediate)
3224 Child Abuse (POSEIT) 8/8/2001 8 TCLEOSE/UT DISTANCE EDUCATION
Part 2 of 4 (POSEIT) Special Investigative Topics
3254 Sex Offender Characteristics Web with Exercises 8/8/2001 8 TCLEOSE/UT DISTANCE
EDUCATION Part 4 of 4 (POSEIT) Special Investigative Topics
3214 Family Violence Web w/ Exercises 8/8/2001 8 TCLEOSE/UT DISTANCE EDUCATION Part 1 of 4
(POSEIT) Special Investigative Topics
3244 Sexual Assault Web with Exercises 8/7/2001 8 TCLEOSE/UT DISTANCE EDUCATION Part 3 of 4
(POSEIT) Special Investigative Topics
3925 Ethics for Law Enforcement Distance 8/7/2001 4 TCLEOSE/UT DISTANCE EDUCATION Ethics in
Law Enforcement
3611 Juvenile Justice Procedures Course w/o Exercises 8/7/2001 4 TCLEOSE/UT DISTANCE
EDUCATION
3800 Technical/Specialized 6/20/2001 4 OTHER TRAINING
3800 Technical/Specialized 6/13/2001 4 OTHER TRAINING
3200 Investigations 4/26/2001 24 Capital Area Council of Governments
3800 Technical/Specialized 1/28/2000 10 OTHER TRAINING
3800 Technical/Specialized 1/13/2000 10 OTHER TRAINING
393 Cultural Diversity Web 11/22/1999 4 TCLEOSE/UT DISTANCE EDUCATION
3300 Patrol/Tactical 11/18/1999 4 Texas Department of Public Safety LEA
**Unit Hours 108**

**09/01/1997 - 08/31/1999**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3100 LAW 7/22/1999 16 Texas District & County Attorneys Association
3300 Patrol/Tactical 7/1/1999 26 Capital Area Council of Governments
3700 Management/Supervision 6/22/1999 12 Capital Area Council of Governments
3300 Patrol/Tactical 4/14/1999 4 Texas Department of Public Safety LEA
3800 Technical/Specialized 10/9/1998 14 Capital Area Council of Governments
3300 Patrol/Tactical 7/2/1998 24 Capital Area Council of Governments
3200 Investigations 2/4/1998 24 Temple Police Academy
3737 New Supervisor's Course 11/19/1997 20 Capital Area Council of Governments Cultural Diversity

(Intermediate) Special Investigative Topics (Intermediate)
**Unit Hours 140**

**09/01/1995 - 08/31/1997**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3200 Investigations 7/3/1997 24 Temple Police Academy
3737 New Supervisor's Course 5/23/1997 16 Capital Area Council of Governments Cultural Diversity (Intermediate) Special Investigative Topics (Intermediate)
3800 Technical/Specialized 11/8/1996 2 Texas Department of Public Safety LEA
3700 Management/Supervision 10/25/1996 12 Institute for Law Enforcement Administration
3200 Investigations 10/10/1996 18 U. S. DEPT. OF JUSTICE
3700 Management/Supervision 10/4/1996 34 Texas Commission on Law Enforcement
3800 Technical/Specialized 9/27/1996 3 Texas Department of Public Safety LEA
3200 Investigations 7/12/1996 45 Texas Commission on Law Enforcement
3200 Investigations 6/5/1996 14 Temple Police Academy
1021 Family Violence/Child/Sexual Abuse/Supervisor Role 11/15/1995 8 Williamson County Sheriff's Office
**Unit Hours 176**

**09/01/1993 - 08/31/1995**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3300 Patrol/Tactical 8/31/1995 21 Williamson County Sheriff's Office
3800 Technical/Specialized 10/21/1994 10 OTHER TRAINING
**Unit Hours 31**

**09/01/1989 - 08/31/1991**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3800 Technical/Specialized 8/26/1991 97 OTHER TRAINING
3800 Technical/Specialized 5/8/1991 111 OTHER TRAINING
**Unit Hours 208**

**09/01/1987 - 08/31/1989**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
3800 Technical/Specialized 4/24/1989 10 OTHER TRAINING
3800 Technical/Specialized 4/14/1989 8 Texas Commission on Law Enforcement
3800 Technical/Specialized 3/31/1989 10 OTHER TRAINING
3800 Technical/Specialized 2/16/1989 20 OTHER TRAINING
3200 Investigations 10/15/1988 327 Texas Attorney General's Office
3800 Technical/Specialized 9/15/1988 210 Sheriff's Association of Texas
3700 Management/Supervision 4/29/1988 16 test
**Unit Hours 601**

**01/01/1900 - 08/31/1987**
**Course No. Course Title Course Date Course Hours Institution Training Mandates**
1013 Basic Telecommunications Certification Course 7/3/1987 32 Texas Department of Public Safety LEA Basic Telecommunications Certification Course
9999 Other In-Service Training 2/17/1983 99 test
1009 Basic Investigative Hypnosis 10/5/1980 43 test
3200 Investigations 7/25/1979 180 AMERICAN INSTITUTE OF APPLIED SCIENCE
1000 Basic Peace Officer 9/27/1974 270 Harris County Sheriff's Academy Cultural Diversity (Mandate) Special Investigative Topic (Mandate)
1005 Basic Jail Course 10/11/1973 60 Texas Commission on Law Enforcement
**Unit Hours 684**

Total Hours 3374

## Total Hours
**Total Training Hours From Education: 3300**
**Total Training Hours: 3374**
**Total Hours: 6674**

Attachment 3



THE UNITED STATES ATTORNEY'S OFFICE

# SOUTHERN DISTRICT *of* TEXAS

U.S. Attorneys » Southern District of Texas » News

**Department of Justice**

U.S. Attorney's Office

Southern District of Texas

FOR IMMEDIATE RELEASE                                    Thursday, January 7, 2016

# Texas Man Charged with Attempting to Provide Material Support to ISIL

HOUSTON – Omar Faraj Saeed Al Hardan, 24, a Palestinian born in Iraq, has been charged in a three-count indictment alleging that he attempted to provide material support to the Islamic State of Iraq and the Levant (ISIL), a designated foreign terrorist organization.

U.S. Attorney Kenneth Magidson, Assistant Attorney General for National Security John P. Carlin, Special Agent in Charge Perrye K. Turner of the FBI's Houston Division and Special Agent in Charge Brian M. Moskowitz of Homeland Investigations (HSI) in Houston made the announcement.

The three-count indictment was returned Jan. 6, 2016 and unsealed tonight. He will have his initial appearance tomorrow at 10:00 a.m CST in Houston before U.S. Magistrate Judge John R. Froeschner.

Al Hardan entered the United States as an Iraqi refugee on or about Nov. 2, 2009. He was granted legal permanent residence status on or about Aug. 22, 2011, and resides in Houston.

He is charged with one count each of attempting to provide material support to ISIL, procurement of citizenship or naturalization unlawfully and making false statements.

The indictment alleges that Al Hardan attempted to provide material support and resources, including training, expert advice and assistance, and personnel – specifically himself – to a known foreign terrorist organization. According to the allegations, he also knowingly responded, certified and swore untruthfully on his formal application when applying to become a naturalized U.S. citizen. He allegedly represented that he was not associated with a terrorist organization when, in fact, he associated with members and sympathizers of ISIL throughout 2014, according to the charges. The indictment further alleges that during an interview in October 2015, Al Hardan

Attachment 3

falsely represented that he had never received any type of weapons training, when he allegedly received automatic machine gun training.

The charge of attempting to provide material support to terrorists carries a maximum sentence of 20 years in federal prison and a maximum fine of $250,000. The charge of false citizenship procurement carries a maximum sentence of 25 years in prison (if the offense was committed to facilitate an act of international terrorism). The charge of making false statements carries a maximum sentence of eight years in prison. If convicted, any potential sentence will be determined by the court after review of factors unique to this case, including the defendant's prior criminal history, if any, the defendant's role in the offense and the characteristics of the violation.

The charges are the result of an investigation conducted by the FBI's Joint Terrorism Task Force and HSI with the assistance of the Houston Police Department. Assistant U.S. Attorney Ralph Imperato is prosecuting the case along with Trial Attorney Kashyap Patel of the National Security Division's Counterterrorism Section.

***An indictment is a formal accusation of criminal conduct, not evidence.***
***A defendant is presumed innocent unless convicted through due process of law.***

---

National Security & Homeland Security
Download alhardan_indictment.pdf (253.62 KB)

USAO - Texas, Southern

Updated January 9, 2016

Attachment 4

Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order.

# UNITED STATES DISTRICT COURT
UNSEALED 1/7/16
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **16 CR 003** |
| | § | |
| **V.** | § | **CRIMINAL NO.:** |
| | § | |
| | § | **FILED UNDER SEAL** |
| OMAR FARAJ SAEED AL HARDAN, | § | |
| **Defendant** | § | |

United States Courts
Southern District of Texas
FILED

JAN 0 6 2016

David J. Bradley, Clerk of Court

## INDICTMENT

THE GRAND JURY CHARGES THAT:

## Introduction

1. At all times material to this Indictment:

   a. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

   b. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under

1

section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.   Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it through its history.   In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of its name to the Islamic State ("IS").   To date, ISIL remains a designated FTO.

c.  On December 11, 2012, the Secretary of State amended the designation of AQI to include the following aliases: al-Nusrah Front (ANF), Jabhat al-Nusrah, Jahbet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.   Also, on May 15, 2014, the Secretary of State, in response to the evolving nature of the relationships between ANF and AQI, amended the FTO designation of AQI to remove all aliases associated with al-Nusrah Front. Separately, the Secretary of State then designated al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet al-Nusrah, also

known as The Victory Front, also known as Al-Nusrah Front for the People of the Levant, also known as Al-Nusrah Front in the Lebanon, also known as Support Front for the People of the Levant, and also known as Jabaht al-Nusrah li-Ahl al-Sham min Mujahedi al-sham fi Sahat al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 132224.    To date, ANF remains a designated FTO.

d. The defendant, **OMAR FARAJ SAEED AL HARDAN,** is a Palestinian national; born in Iraq on or about December 25, 1991; entered the United States of America as a refugee on or about November 2, 2009; granted Legal Permanent Residence status in the United States on or about August 22, 2011; and currently resides in the Southern District of Texas.

## COUNT 1

**Attempting to Provide Material Support to a Designated Foreign Terrorist Organization
(Title 18, United States Code, Section 2339B)**

Beginning in or about May 2014, and continuously thereafter, up to and including the date of this indictment within the Southern District of Texas, and elsewhere, the defendant,

**OMAR FARAJ SAEED AL HARDAN,**

did unlawfully and knowingly attempt to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b)(1), including personnel, specifically himself, training, and expert advice and assistance, to a foreign terrorist organization, namely, the Islamic State of Iraq and the Levant ("ISIL"), knowing that the organization is a designated foreign terrorist organization, and knowing that ISIL engages in, and has engaged in terrorist activity and terrorism; all in violation of Title 18, United States Code, Section 2339B(a)(1) and Title 18, United States Code, Section 2.

## COUNT 2

**Procurement of citizenship or naturalization unlawfully
(Title 18, United States Code, Section 1425(a))**

On or about August 18, 2014, in the Southern District of Texas and elsewhere, the defendant,

4

**OMAR FARAJ SAEED AL HARDAN,**

knowingly procured and attempted to procure, contrary to law, naturalization, to wit:

in applying to become a naturalized American Citizen, the defendant, did respond,

certify, and swear untruthfully on his formal application for naturalization, Form

N-400, dated August 18, 2014.   Specifically, when responding to question 10C, the

defendant represented that he was not in any way associated (either directly or

indirectly) with a terrorist organization, whereas in truth, the defendant knew he

associated either directly or indirectly with a terrorist organization, to wit: ISIL

throughout 2014, and al-Nusrah Front during 2013 throughout 2014; all in violation

of Title 18, United States Code, Section 1425(a).

## COUNT 3

**False Statement or Representation Made to an Agency of the United States (18 U.S.C. § 1001(a)(1))**

On or about October 27, 2015, in the Southern District of Texas,

**OMAR FARAJ SAEED AL HARDAN,**

defendant herein, did willfully and knowingly falsify, conceal, and cover up by trick,

scheme, and device a material fact in a matter within the jurisdiction of the executive

branch of the government of the United States; to wit: defendant participated in an

interview with an agent from the U.S. Immigration and Customs

Enforcement-Homeland Security Investigations and when questioned about his

5

application for naturalization, Form N-400, dated August 18, 2014, defendant failed to disclose during that interview specifically that he, in question 19, represented that he had never received any type of weapons training, whereas in truth and in fact as the defendant well knew, he had received weapons training, specifically on an automatic machine gun; all in violation of Title 18, United States Code, Section 1001(a)(1).

**A TRUE BILL**

ORIGINAL SIGNATURE ON FILE
FOREPERSON OF THE GRAND JURY

**KENNETH MAGIDSON**
**United States Attorney**
**Southern District of Texas**

By: _____
    RALPH IMPERATO
    Assistant United States Attorney

By: _____
    KASHYAP P. PATEL
    Trial Attorney, Counterterrorism Section, U.S. Department of Justice

6

Attachment 5

# Media Monitoring Suite



**Log In** > **Transcript**

**Log In**

Log In

## Transcript

**CSPAN - U.S. Cable**
**U.S. House of Representatives Legislative Business**

**CSPAN 12/08/2015 03:56:57 PM:** ...gentleman yields back
the balance of his time. the gentlelady from
california reserves. the chair recognizes the gentleman from
virginia. mr. goodlatte: mr. speaker, at this time i'm pleaseed to
yield three minutes to the gentleman from texas, the chairman of
the homeland security committee, mr. mccaul. the speaker pro
tempore: the gentleman from texas is recognized for three
minutes. mr. mccaul: thank you, mr. speaker. i rise in support of
this bill, the visa waiver program improvement and
terrorist travel prevention act. our nation faces the highest terror
threat environment since 9/11. and we must do
everything possible to shut down terrorist pathways into this
country. working hard -- we're working hard to do just that with
this bill. last month the house voted overwhelmingly to
pass bipartisan legislation drafted to prevent terrorists
from entering the united states posing as refugees. they've
already done this to attack paris. and this year the office of
the director of national intelligence warned me that the national
counterterrorism center has identified, quote, individuals with
ties to terrorist groups in syria attempting to gain entry into the
united states through the u.s. refugee program. i ask unanimous
consent to submit an additional statement on this issue for the
record. the speaker pro tempore: without objection. mr. mccaul: we must go further. more than 30,000 individuals from 100
countries have gone to syria to join jihadist groups and 5,000 of them have western passports. this includes several of the paris
attackers who could have traveled to the united states without a visa. that's why this legislation is so important, before us
here today. it will close security gaps in the visa waiver program, to keep terrorists from entering our country undetected. it
also includes several recommendations from the bipartisan task force on combating terrorists and foreign fighter travel, which
i created earlier this year. this member-led panel uncovered gaping security weaknesses overseas, including the fact that some
countries are not sharing intelligence on terrorists, many are not screening travelers against critical counterterrorism databases,
and too few of them are cracking down on passport fraud. this bill will help close those security gaps, to keep terrorists from
crossing borders. and would implement several of the task force's top recommendations to ensure visa waiver program
countries are living up to their obligations and ramping up security. so with that, mr. speaker, i want to thank the chairman
of judiciary, i also want to thank those on the other side of the aisle for working in a bipartisan spirit and a cooperative nature
on what i consider to be one of the biggest security gaps we have facing this country after the paris attacks and after
san bernardino. and i want to thank our colleagues on the other side of the aisle. with that i yield back. the speaker pro
tempore: the gentleman yields back the balance of his time. the gentleman from virginia reserves. the chair recognizes
the gentlelady from california. ...

Copyright ©1999 – 2016 **TVEyes, Inc.** All rights reserved.
Questions, comments, or suggestions? Send us **feedback**.
**Privacy Policy**

Attachment 5

Attachment 6

AO 91 (Rev. 11/11)  Criminal Complaint

SEALED

## UNITED STATES DISTRICT COURT

**ORIGINAL FILED**

for the

Eastern District of California

JAN - 6 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| | ) | **2:16 - MJ - 1      ___ EFB** |
| | ) | |
| AWS MOHAMMED YOUNIS AL-JAYAB | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, Elizabeth Buckmiller, the complainant in this case, state that the following is true to the best of my knowledge and belief.

In or about the date(s) of _____ October 6, 2014 _____ in the county of _____ Sacramento _____ in the

_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 | Providing materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of an agency of the United States, an offense involving international terrorism as defined in 18 U.S.C. § section 2331 |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Elizabeth Buckmiller, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-6-2016                                        _____
*Judge's signature*

City and state: Sacramento, CA                  Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

Attachment 6

**AFFIDAVIT**

I, Elizabeth Buckmiller, being duly sworn, hereby state as follows:

## I.    INTRODUCTION AND AFFIANT'S BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since February 2013.  I am currently assigned to the Sacramento Field Office.  I have training in the preparation, presentation, and service of criminal complaints and arrest and search warrants.  I have participated in numerous investigations into terrorism-related activities and am familiar with tactics, methods, tradecraft, and techniques of terrorists and their agents.  I have received training regarding counterterrorism investigations, operations, and strategies, and have knowledge of various extremist groups, their ideologies, and their involvement in terrorist activity.  I am involved in the investigation of offenses against the United States, including crimes of terrorism as set forth in Title 18, United States Code, Section 2331, *et seq.*

2.      This affidavit is submitted for the limited purpose of establishing probable cause to support a criminal complaint charging the subject – Aws Mohammed Younis Al-Jayab – (hereinafter Al-Jayab) – with knowingly providing and attempting to provide materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States, in violation of Title 18, United States Code, Section 1001.  This affidavit does not purport to set forth all of my knowledge of, or investigation into, this matter.

3.      The facts set forth in this affidavit are based on, among other things:  my personal knowledge gathered from participation in the investigation of Al-Jayab; information obtained from the investigative activities of other law enforcement officers; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information obtained from interviews of Al-Jayab by United States government personnel.

4.      Certain quotations herein are taken from draft transcripts of written communications that transpired primarily in Arabic and were translated by FBI language analysts.  Additional quotations herein are taken from draft transcripts of recorded conversations that transpired in English and Arabic and were translated contemporaneously with the assistance of an interpreter.

1

Unless specifically indicated otherwise, all conversations described or quoted in this affidavit are related in substance and part only. For example, the use of an ellipsis within brackets denotes text which was not included in this affidavit for the sake of brevity and clarity. The conversations and other events described herein occurred on or about the referenced dates. In addition, the identities of Al-Jayab's associates and others have been redacted by replacing names with the word "Individual" followed by a letter.

5.      For the reasons stated herein, I respectfully assert that there is probable cause to believe that on or about October 6, 2014, Al-Jayab, a person who currently resides in the United States, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States, specifically the United States Citizenship and Immigration Services (USCIS), a component of the United States Department of Homeland Security (DHS), and an agency of the executive branch, and the offense involved international terrorism as defined in Title 18, United States Code, Section 2331, all in violation of Title 18, United States Code, Section 1001.

## II.      SUBJECT: AWS MOHAMMED YOUNIS AL-JAYAB

6.      As confirmed by photo identification and USCIS records, Al-Jayab is a 23-year-old male who currently resides in Sacramento, California. Al-Jayab was born in Iraq, and he emigrated from Syria to the United States as a refugee in October 2012. Travel, bank, and electronic communications records establish that Al-Jayab resided in the United States from approximately October 2012 to November 2013 and again from January 2014 to the present.[1] He remains in refugee status to the present date, and as such, he is subject to the jurisdiction of USCIS for purposes of this offense.

---

[1]      After arriving in the United States as a refugee in October 2012, Al-Jayab resided in Tucson, Arizona and Milwaukee, Wisconsin. He first began to reside in Sacramento, within the Eastern District of California, upon his return from Syria in late January 2014.

## III.    SUMMARY OF THE INVESTIGATION

7.    USCIS officers conducted an interview of Al-Jayab on October 6, 2014, at the Sacramento USCIS office, with the assistance of an Arabic language interpreter.[2]  Al-Jayab was advised it was unlawful to provide false statements to the interviewers.  Specifically, Al-Jayab was placed under oath and the following statement was read to him: "Title 18 USC makes it against the law to provide false statements to the government.  If you knowingly and willfully provide false information or conceal a material fact, you are subject to criminal penalties.  It is against criminal law to lie or cover up information during the interview."  Al-Jayab acknowledged he understood this statement.

8.    During the October 6, 2014 interview with USCIS, Al-Jayab made the following statements:

a)    When directed to list the countries he visited during the last time he traveled outside the United States, in 2013 to 2014, Al-Jayab responded that he went to Turkey, and from Turkey he went to Britain and returned to the United States.

b)    When asked the purpose of his trip, Al-Jayab responded he went to Turkey to see his grandmother and to visit the place.

c)    Al-Jayab responded, "No," to the following inquiries:

i.    if he had ever been a member of any rebel group, militia, or insurgent organization,

ii.    if he had ever assisted any rebel group, militia, or insurgent organization,

iii.    if he had ever solicited membership or funds for any terrorist group or organization,

iv.    if he had ever provided any type of material support to any person or group that engages in terrorist activity,

---

[2]    An FBI language analyst fluent in the Iraqi dialect of the Arabic language (spoken by Al-Jayab) was available to and used by Al-Jayab telephonically during the interview.

> v.   if he had ever called for, helped with, or committed the killing of any person,
>
> vi.   if he had ever called for, helped with, or committed the intentional and severe injury of any person,
>
> vii.   if he had ever been a member of a group of any kind in which he used or threatened to use any type of weapon against any person, and
>
> viii.   if he had ever assisted in a group where other people used or threatened to use a weapon against any person.

9.     As supported by the facts outlined below, there is probable cause to believe that Al-Jayab's statements and representations to USCIS listed above were materially false.

## IV.  EVIDENCE OF THE OFFENSE

### A.     Activity prior to travel

10.     The investigation has established the following facts concerning Al-Jayab's activities from approximately October 2012 to October 2013.

> a)     According to records of Al-Jayab's online social media communications obtained pursuant to search warrant, beginning as early as mid-October 2012, Al-Jayab told multiple family members and associates that he intended to travel to Syria.  Al-Jayab expressed his desire to return to Syria to "work,"[3] identified Turkey as a probable transit point, and sought to arrange the finances and logistics for his travel.
>
> b)     On October 13, 2012, Al-Jayab communicated with Individual A, who was then located in Iraq, according to Individual A's communications with Al-Jayab.  Al-Jayab wrote, "I want to go back.  God is my witness. […] I'll go to Turkey and enter smuggled

---

[3]     Based on the tenor and content of Al-Jayab's extensive electronic communications, in this context I believe the term "work" referred to assisting in and supporting violent jihad.

4

to Syria," and advised Individual A, "When I come, I'll call.  Don't go with anyone except the Front. [...] Go with Ansar or with the Front only." [4]

c)      On October 30, 2012, Al-Jayab communicated with Individual B, who was likely located in Syria based on the content of his communications with Al-Jayab.  Al-Jayab wrote, "My return will cost me much. [...]  Tell [Individual C] if I come to Turkey to find me a way to enter into Syria."

d)      On October 31, 2012, Al-Jayab wrote to Individual B, "Tell [Individual C] I want them to help me financially so I can return."  Individual B replied, "He said, 'If he wants to come through Turkey, we could get him in.'"

e)      On January 20, 2013, Al-Jayab communicated with Individual D, who was likely located in Syria based on his communications with Al-Jayab.  Individual D asked, "When are you coming?" and Al-Jayab replied, "As a matter of fact, money I do not have." Individual D wrote, "[Individual C] will send you." Individual D wrote that he was afraid that he would die and not see Al-Jayab and explained he (Individual D) had been shot twice in the hand and side.  Al-Jayab wrote, "I have someone in Turkey.  He wants to come to Syria and pull the trigger.  Do you understand? Via the Turkish borders. [...] Tell [Individual C] about him."  Individual D advised Al-Jayab, "Tell [Individual B] to tell [Individual C]."  Individual D wrote, "Tell me how much you need so we can plan ahead for you before you arrive. [...] [Individual C] once asked how much you need so he can send you.  I will tell him now to send you.  [...] Do not worry, [Individual C] will manage."

f)      On February 1, 2013, Al-Jayab communicated with Individual E.  Al-Jayab wrote, "I was told by the young men to talk with you so that you could arrange my return." Individual E wrote, "You just tell us and we will do it," and explained that another

---

[4]        "Front" is likely a reference to al Nusrah Front.  According to the *United States Department of State Country Reports on Terrorism 2013*, Al-Qa'ida in Iraq (AQI) was established in 2004 by long-time Sunni extremist Abu Mus'ab al-Zarqawi, who the same year pledged his group's allegiance to Osama Bin Laden.  On December 17, 2004, the Department of State designated AQI as a foreign terrorist organization (FTO) and Specially Designated Global Terrorist (SDGT).  On December 11, 2012, the Department of State amended the designation of AQI to include the al Nusrah Front (ANF)/ Jabhat al Nusrah (JAN) as aliases of AQI.  The Department of State's finding in support of amending the AQI designation was that ANF and JAN committed hundreds of terrorist attacks in Syria.

individual "told me to find out how much you need." Al-Jayab responded, "Whatever God enables," and Individual E advised, "Make arrangements with [Individual F] to send you the money."

g)      On February 5, 2013, Al-Jayab communicated with Individual F, who was likely located in Syria, based on his communications with Al-Jayab.  Individual F wrote, "I'll go to Damascus to transfer the money to you," and provided wire transfer details to Al-Jayab.  Later that same day, Al-Jayab discussed the wire transfer from Individual F with Individual B.

h)      According to records from Western Union, on February 5, 2013, an individual believed to be Individual F sent Al-Jayab $231 from Damascus, Syria. This individual also sent $450 in the name of one of Al-Jayab's associates, who, along with Al-Jayab, was then residing in Arizona.  Both wire transfers were received at a Western Union agent in Arizona.  On February 7, 2013, Al-Jayab confirmed to Individual F, "I received the transfer […] the total 681."

i)      On March 13, 2013, Individual F wrote to Al-Jayab, "Just come to Turkey without a passport and enter Aleppo from there.[5]  Tell them you are Syrian." Al-Jayab replied, "I'll come with temporary American passport."  Individual F wrote, "I'll show you the way, because [an associate] knows someone in Aleppo and I asked him to help you."  Al-Jayab asked, "How to enter Syrian borders if my passport is American?" and Individual F and Al-Jayab discussed various options for travel routes to Syria.

j)      On March 23, 2013, Al-Jayab communicated with Individual G, who was likely located in Iraq, based on his communications with Al-Jayab.  Al-Jayab wrote, "I am coming to Syria […] I have planned a route and everything. […] The most important is the duty of the path."  Al-Jayab offered, "If you want in Iraq, I will arrange it for you.  I will arrange it for you in Syria also.  I will take you with me at your convenience, so decide what you want to do. […] Only the Jabhat al-Nusrah group.  It is impossible that we go with others."

---

[5]      Aleppo is a city located in northwestern Syria.

k)      Also on March 23, 2013, Al-Jayab communicated with Individual H, who was then likely residing in Turkey according to his communications with Al-Jayab. Al-Jayab explained that he wanted to travel to Turkey to enter Syria, and he asked Individual H to pick him up at the airport. Individual H asked if Al-Jayab "want[ed] Al-Nusra Front," and Al-Jayab responded, "that's for sure." Individual H advised, "You know those who arrive to Syria from Turkey, most of them are citizens of Sweden and Australia and others, because war is to advance and retreat. […] Syria is one hour away from where I am now and smuggling takes place in our area." When Al-Jayab told Individual H that he would be traveling to Turkey with a United States travel document, Individual H reminded Al-Jayab of the importance of maintaining the ability to travel legally. Al-Jayab proposed, "I'll go to the American Embassy in Turkey. I will tell them that due to circumstances, I can't return now. […] I'll say tourism, or I'll tell him my grandmother is sick in Turkey and I wanted to be with her."

l)      On April 8, 2013, Al-Jayab wrote to Individual F about Individual I's desire to travel to Syria, and noted that Individual I was "recommended" to Al-Jayab by an "active brother." Individual F wrote, "I'll send you [Individual C]'s number and you tell him about [Individual I]'s affair. […] You explain to him [Individual I] if he comes here, he shouldn't go back [to America]. Either victory or martyrdom." Al-Jayab replied, "When I arrive, I'll arrange with [Individual C]. […] America will not isolate me from my Islamic duty. Only death will do us part. My only wish is to see you and start the action."

m)      On April 9, 2013, Al-Jayab communicated with Individual I, who resided in Texas according to immigration records. Al-Jayab informed Individual I, "[Individual F] spoke with me. He told me, 'Tell your friend to come and not return.'" Al-Jayab discussed various weapons with Individual I, to include the PKC, GC, Glock, and M16.[6] Individual I wrote to Al-Jayab, "I need to learn from your weapon expertise." Individual I asked, "If God makes it easier and wills it, would they place me at a center that would suit me or do I get to choose?" Al-Jayab responded, "No, they will arrange things for

---

[6]      I believe PKC, GC, Glock, and M16 are references to various firearms, including the Soviet-designed PK machine gun and the M16 assault rifle.

you.  If you arrive and I am still there, I will train you. And once you are done [training], I will submit a request to the person in charge so you would come and work with me." Individual I asked, "So they will assign me to a certain job according to my abilities, which they see," and Al-Jayab explained, "No, we will make your abilities very strong." Individual I asked, "In your opinion, what kind of job [will they] assign me to?" Al-Jayab replied, "Let us arrive and we will arrange there.  Our concern now is only to arrive there. [...] When you arrive to al-Sham [Syria] you will be trained."

n)     On April 13, 2013, Al-Jayab wrote to Individual I, "O God, grant us martyrdom for your sake while engaged in fighting and not retreating; a martyrdom that would make you satisfied with us."  Individual I wrote, "It is better if we leave together when the Turkish route is open, so that if we are confronted by any resistance from the enemy, there is the two of us [...] I mean we would help each other."  Individual I related that he learned from a Syrian associate, "He who enters illegally from Turkey to Al-Sham [Syria] does not have to pass through checkpoints."  Al-Jayab wrote, "When I arrive in Turkey, I will call our youth in Turkey, and they will solve the situation for me. [...] We just arrive to Turkey, everything would be solved."

o)     On April 16, 2013, Al-Jayab communicated with Individual J. Individual J wrote, "I am in Damascus, but I also work in Jirmanah."[7]  Al-Jayab wrote, "God willing, I'll return soon. [...] I am coming to you."  Individual J wrote, "Do you know that we just killed ten of the Syrian militia, the Shabihah. Hahaha, with an IED." Al-Jayab wrote, "I was told that you and I will work together."  Individual J wrote, "I wish, come, let us do the killing together." Al-Jayab asked, "What do you do now?  Using IEDs or fighting," and Individual J responded, "Both." Al-Jayab wrote, "Hey man, please do not die: wait for me to come. [...] Do you not want us to work together?" Individual J replied, "Of course." Al-Jayab wrote, "I do not want anything in the world, just to get to Syria safely and find you there, you and [Individual F], [Individual D], and [Individual C] [...] I am eager to see blood."

---

[7]     Jirmanah is a suburb or neighborhood of Damascus, Syria.

p)      On April 21, 2013, Individual I wrote to Al-Jayab, "Do you know that I have never sprayed fire with a Kalashnikov?" Al-Jayab replied, "God willing, you will have your chance to shoot [...] The most shots I made with it in my life was in the biggest battle I participated in. Seven magazines in one breath. [...] Just shooting, spraying, spraying." Individual I clarified, "You mean you were there during the battle against the Assadists?" and Al-Jayab confirmed, "Yes. Certainly." Al-Jayab wrote, "Brother, God willing, you will be bored of shooting with guns. I have not seen anything better than the Glock. All my work was with the Glock and a nine Tariq[8] and also its silencer [...] Once it hits someone, you would think the person fainted right before your eyes. It does not look like you killed him." Individual I asked, "Are there operations conducted with silencers in Damascus?" Al-Jayab replied, "Yes. We were using silencers in Damascus [on] control checkpoints, officers, everything." Individual I asked what "Assad's soldiers scream when you raid," and Al-Jayab replied, "They fall silent. They stiffen. I remember once I went down together with a brother. We executed [...] three. As for the brother who was with me, he shot two. The third one aimed the Russian at the brother [...] and would not unlock the safety. He was so scared, he could not do it." Individual I interjected, "God is great! And you silenced him." Al-Jayab replied, "Yes. At the time, the operation was without the use of silencer [...] in the chest, in the head. And when he falls, we shoot again." Al-Jayab continued, "Do you remember the national security headquarters building in Syria? The mujahidin, Al-Nusra Front struck it. [...] Those suicide bombers they want to break in. There is a control checkpoint that would stop them. Their call is full of ammunition and suicide vests, its booby traps were visible, so they would stop them and arrest them. We got down and overran the control checkpoint and opened the way for them to raid, and we retreated." Individual I confirmed, "You mean you were there during the raid?" and Al-Jayab replied, "Yes. Look, God is with the Mujahidin."

q)      On April 25, 2013, Individual I wrote to Al-Jayab, "O God please do not deprive me, my brothers, and my brother Aws from the blessings of Jihad in Syria," and asked,

---

[8]      I believe "nine Tariq" is a reference to the Iraqi-manufactured copy of the Beretta M1951 pistol. The Tariq was the service pistol of the Iraqi Army from approximately the 1980s to 2003, according to open-source information.

"Tell me, when did you join?"  Al-Jayab wrote, "I was a little over 16 years old.  My tribe, half of them are Mujahidin.  I did not find any difficulty to get to Al-Jihad," and further explained, "This group that I worked with […] those were from Saddam's era in Kurdistan.  Their Emir['s] name is Mullah Krikar […] their name was Ansar al-Sunnah and now they are called Ansar al-Islam."[9]

r)      On May 21, 2013, Al-Jayab communicated with Individual K.  Individual K informed Al-Jayab that Individual B and two others had been arrested by the Syrian government.  Individual K wrote, "They are accused of working for Al-Nusra Front. They were arrested in Jaramana."

s)      On May 26, 2013, Al-Jayab informed Individual I that "the brothers" had been arrested.  Al-Jayab wrote, "I really did not want to disturb you.  For some time I knew.  I did not want you to feel uneasy about Jihad and be concerned with being detained."

t)      On June 30, 2013, Al-Jayab wrote to Individual L, "I am at the shooting club.  I want to learn long range shooting," and sent photos from an identified gun range in Wisconsin, as well as photos of Al-Jayab with various weapons.

u)      On July 9, 2013, Al-Jayab pleaded with Individual D, "Try to raise some funds for me.  Otherwise I am going to explode.  [. . .] I need money, I want to come."

v)      On July 11, 2013, Al-Jayab wrote again to Individual D, "Try to manage the money this week, my dear.  You and [Individual C]."

w)      On August 18, 2013, Al-Jayab wrote to Individual D, "I have left $400 until I come there.  I want that you plan for me a route quickly."

x)      On August 19, 2013, Al-Jayab communicated with Individual M, who was likely residing in Syria based on his communications with Al-Jayab, as well as Individual M's social media account profile, which stated that he lived in Damascus, Syria.  Al-Jayab

---

[9]      According to the *United States Department of State Country Reports on Terrorism 2014*, Ansar al-Islam, also known as Ansar al-Sunna among other aliases, is a Sunni terrorist group which has vowed to establish an independent Islamic state in Iraq.  Ansar al-Islam originated in Iraqi Kurdistan and was founded by Mullah Krekar. Ansar al-Islam became a designated foreign terrorist organization on March 22, 2004.

wrote, "Finally, light at the end of the tunnel. I need $400 and I will come. I want you to plan a route. [...] I need people in Turkey to take me to Aleppo."

y)      On August 26, 2013, Al-Jayab communicated with Individual N. Based on records obtained via search warrant, Individual N's social media account appeared to be used to distribute ISIL propaganda and to communicate with individuals who are believed to be affiliated with ISIL and other terrorist organizations.[10]   Individual N told Al-Jayab, "May God protect you and grant success through you. [...] Haji, keep our job in your mind. And think. And it is tedious a little bit. We ask God to reward you." Al-Jayab responded, "Okay. By God, I am trying."

z)      On August 30, 2013, Al-Jayab told Individual N, "The most important thing is to send me money to return. [...] I want to come. God has facilitated the work before. [...] I will come."

aa)     On September 8, 2013, Al-Jayab wrote to Individual D, "I am burning with desire to come there and work," after which he and Individual D discussed a photo of various weapons including a gray gun and Kalashnikov rifle that Individual D claimed belonged to Individual D. Individual D wrote to Al-Jayab, "When you arrive here, we will give you better ones [...] along with five magazines, one of which holds 30." Al-Jayab replied, "I wish you will not die until I come."

bb)     On October 26, 2013, Al-Jayab wrote Individual N, "Sheikh, I need a path." Individual N replied on October 29, "I tasked [Individual D] and I will provide him with the money so he would transfer it to you."

## B.     Travel to Turkey and Syria

11.     The investigation has established the following facts concerning Al-Jayab's activities from approximately November 2013 to January 2014.

---

[10]     According to the *United States Department of State Country Reports on Terrorism 2014* and information published by the National Counterterrorism Center, AQI publicly re-named itself the Islamic State in Iraq in October 2006. In April 2013, AQI's leader Abu Bakr al-Baghdadi changed the group's public name to the Islamic State of Iraq and the Levant (ISIL), to reflect its operational expansion into the Syrian conflict. In May 2014, the Department of State amended the FTO designation of AQI to include the alias ISIL as its primary name.

a)      In early November 2013, Al-Jayab was residing in Milwaukee, Wisconsin according to travel, bank, and electronic communications records.  Bank records indicate Al-Jayab received approximately $4,500 from an auto insurance settlement on November 6, 2013.

b)      On November 7, 2013, Al-Jayab wrote to Individual N, "Haji, I managed to get money and everything, I do not want money from you, just find me a way, I beg you. Make arrangements for me, my Sheikh […] I will be going to Turkey and it is very important that you provide me with a telephone number."

c)      On November 8, 2013, Al-Jayab purchased an airline ticket in Chicago, Illinois. Travel records establish that Al-Jayab flew directly from Chicago to Istanbul, Turkey on November 9, 2013.

d)      Al-Jayab maintained contact with several of his family members and associates while he was outside of the United States between November 2013 and January 2014 and kept them apprised of his movements and wellbeing.

e)      I have reviewed electronic communications records of Internet Protocol (IP) addresses that Al-Jayab utilized to connect to the internet to access social media and email accounts during his travel to Syria.  Analysis of those IP addresses and other information establishes that Al-Jayab accessed the internet in the time period at issue through a satellite that covered both eastern Turkey and areas of northern Syria.

f)      On November 10, 2013, Al-Jayab communicated Individual O, who was then residing in Cyprus, and explained that he (Al-Jayab) was in Turkey, planned to enter Syria, and would be "going with the Mujahidin."

g)      On November 19, 2013, Al-Jayab informed Individual O that he [Al-Jayab] had safely arrived in Syria and was in Aleppo.

h)      On November 26, 2013, Al-Jayab told Individual N (see paragraphs 10(y, z, bb) and 11(b), above) that he (Al-Jayab) was in Aleppo and provided a telephone number that began with the numbers 0992 to Individual N in order to contact him (Al-Jayab).  Based

on publicly available information, this phone number corresponds to a Syrian telephone number.

i)      On November 28, 2013, Individual O advised Al-Jayab to avoid using his phone because it showed "that [Al-Jayab was] writing from Aleppo." Al-Jayab replied, "Okay." Individual O wrote, "Aws, I need you to get out of Syria as soon as possible," and noted Al-Jayab's phone "will reveal that you are in Syria [...] and this is dangerous to your situation over there."

j)      On December 10, 2013, Individual O informed Al-Jayab, "It shows that you are typing from Al-Hasakah."[11]   Al-Jayab responded, "How did you know?" Individual O wrote, "I am telling you, it [is] shown to me that you are writing from Al-Hasakah," and Al-Jayab replied, "Okay." Shortly thereafter, Al-Jayab wrote to Individual O, "Forgive me, I might become a martyr."

k)      On December 17, 2013, Al-Jayab told Individual O he was "afraid of being imprisoned in America [because] the government is alert for everything, [and] my trip here constitutes a charge."

l)      On December 23, 2013, Al-Jayab wrote to Individual O, "I have m16." Based on my training and experience as well as communications between Al-Jayab and his associates during his travel, I believe "m16" is a reference to the M16 assault rifle. On the same day, Al-Jayab informed Individual O that he (Al-Jayab) was returning to Aleppo.

m)      On December 25, 2013, Individual O told Al-Jayab to remove a picture that "shows that you are wearing military uniform."

n)      On December 28, 2013, Al-Jayab communicated with Individual P, who was then located in Indonesia according to his communications with Al-Jayab. Al-Jayab informed Individual P that he (Al-Jayab) was in Aleppo. Al-Jayab explained that he joined Ansar al-Sham, "the same as Ansar al-Islam, just with another name."[12]   Al-Jayab continued,

---

[11]     Al-Hasakah is a city located in northern Syria.
[12]     On December 28, 2013, Al-Jayab expressed to Individual P his understanding that, "Ansar al-Islam and Ansar al-Sham have one and the same faith and approach." Al-Jayab explained, "Ansar al-Sham and the Ansar al-

"It is the one that leads the new Islamic Front formed after merging with Jabhat al-Nusrah," but he noted that the alliance was not publicly declared. Al-Jayab wrote, "The Army of Islam and Ahrar al-Sham and Al-Tawhid Brigade became the al-Jabhah al-Islamiyyah.[13] When they engage in battles [they are] led by Jabhat al-Nusrah and Ansar al-Sham." Al-Jayab detailed the cooperation and "joint action" that existed between certain Sunni extremist groups engaged in the conflict against the Syrian regime. When Individual P encouraged Al-Jayab to not "be harsh on the State,"[14] Al-Jayab wrote that the State "have killed many from Jabhat al-Nusrah and hundreds of mujahidin [are detained] by the State." Al-Jayab wrote, "I came to Syria. […] I fight alongside." He then expressed concern over conflict that was occurring amongst some of the Islamic groups in the area: "Brother, this is the blood of Muslims shed at the hands of the State," and continued, "If it weren't for the State's bloodletting, I would have been the first one to join it. [That's] why I joined the al-Ansar even though there's little action; the al-Ansar, at least they don't kill Muslims."[15] Al-Jayab continued, "Brother, I'll join al-Nusrah shortly […] and if any sedition arises, I'll leave my weapon and go to Turkey."

o)  On January 2, 2014, Al-Jayab wrote to Individual O, "I have been thinking of joining the State and abandon[ing] the al-Ansar." Al-Jayab explained he was familiar with Ansar al-Islam because he "used to work with them in Iraq," and his "commander" came to Syria from Iraq. Al-Jayab wrote, "I came to him." Al-Jayab also asked Individual O's opinion of al-Ansar.

---

Islam are but one. Its Emir is Abu Hashim." According to the *United States Department of State Country Reports on Terrorism 2014,* Ansar al-Islam is a Sunni terrorist group which has vowed to establish an independent Islamic state in Iraq. Ansar al-Islam became a designated FTO on March 22, 2004. Abu Hashim Muhammad bin Abdul Rahman al Ibrahim became the leader of Ansar al-Islam in December 2011. See also footnote 9, above.

[13]   Al-Jabhah al-Islamiyyah is an Arabic phrase that translates to "the Islamic Front." According to open source reporting, the Islamic Front was an umbrella organization of Sunni Salafist groups fighting to depose the Syrian regime and seeking to establish an Islamic state in Syria. In late November 2013, founding members of the Islamic Front included Ansar al-Sham, Ahrar al-Sham, the Tawhid Brigade, and the Army of Islam, among others.

[14]   Based on my training and experience as well as open source information, I believe "the State" is shorthand commonly used to refer to ISIL.

[15]   Based on my training and experience as well as the content of Al-Jayab's electronic communications, I believe Al-Jayab's reference to "Muslims" excludes Shia Muslims. Al-Jayab refers to Shiites using terms such as "rafidah," meaning rejectionists or rejectors; this is a derogatory term commonly used by Sunni extremists when discussing Shia.

p)      On January 6, 2014, Al-Jayab wrote to Individual M (see paragraph 10(x) above), that Al-Jayab was in "Haritan, Aleppo, a fighting zone [between] the State and the Free Army."[16]   When Individual M asked if Al-Jayab was with "the Free now," Al-Jayab replied, "No. Ansar al-Islam." Individual M asked, "Who do they belong to?" and Al-Jayab replied, "Ansar al-Islam in Iraq." Al-Jayab discussed the infighting that occurred between various Islamic extremist groups engaged in the Syrian conflict.

q)      On January 7, 2014, Al-Jayab wrote to Individual P, "Brother, we do not sit and watch. [...] Our headquarters is next to the State exactly, and we are against the Free Army.  We have prevented the Free Army from entering the area and attacking the State's headquarters.  And if the Free Army advances, we will fight it.  [...] We installed the Doshkas[17] in the street and spread among all of our headquarters because we are at the entrance of Aleppo.  The Free Army is under the control of our forces." Al-Jayab concluded, "I swear that the State is killing [members of] al-Ansar and al-Nusrah.  They are our brothers, but they are making a mistake. And we are going to stand with the State against the [Free Army]." That same day, Al-Jayab wrote to Individual M, "I might withdraw. [...] When the seditious acts are over, I will return. [...] I did not come to fight for the sake of sedition."

C.      **Return to Turkey and the United States**

12.      The investigation has established the following facts concerning Al-Jayab's activities during approximately January 2014.

a)      On January 8, 2014, Al-Jayab informed Individual O the border crossing with Turkey was closed and he (Al-Jayab) remained in Aleppo.

b)      On January 9 and 13, 2014, according to telephone toll records, the Syrian phone number Al-Jayab provided to Individual N (see paragraph 11(h), above) was also in

---

[16]      According to open source information, the Free Syrian Army (FSA) was established in 2011 by Syrian military defectors, and it has since become an umbrella organization for various armed opposition groups fighting to depose the Syrian regime of Bashar al-Assad.  Elements of the FSA have historically stated support for secular governance in Syria.

[17]      I believe "Doshkas" is a reference to the DShK heavy machine gun, or variant, commonly referred to as "dushka" and widely used in the Syrian conflict.

contact with one of Al-Jayab's family members, who was then residing in Sacramento, California.

c)      On January 17, 2014, Al-Jayab informed Individual P that he would "leave in two hours [for Turkey]." Al-Jayab added, "Once I arrive in Turkey I will call you." Several hours later that day, Al-Jayab's social media account was accessed from an IP address which resolved to Turkey.

d)      Travel records confirm Al-Jayab returned to Sacramento, California via London, United Kingdom and Los Angeles, California on January 23, 2014. Upon his return to the United States, Al-Jayab's Customs Declaration Form made no mention of his travel to Turkey and Syria; "Jordan," and "U.K." were the only entries in the "countries visited" field.

e)      Materials gathered in the course of the investigation show that Al-Jayab made no reference to visiting his grandmother during communications he exchanged with family members or associates from mid-November 2013 to mid-January 2014.

**D.      USCIS and FBI Interviews**

13.      On July 29, 2014, Al-Jayab was interviewed by USCIS in conjunction with his application for adjustment of his immigration status. During that interview, Al-Jayab said that he had traveled to Turkey and returned to the United States about six months earlier. Six months before was January 2014.

14.      As outlined in paragraph 8, Al-Jayab was interviewed by USCIS a second time on October 6, 2014.

15.      On June 18, 2015, Al-Jayab voluntarily and without solicitation from the FBI, was interviewed by FBI agents regarding problems he experienced at the airport when traveling. During that interview Al-Jayab stated he had traveled to Turkey for a vacation. He denied traveling to Syria.

16.    The foregoing establishes probable cause to believe that Al-Jayab lied during his interview with USCIS officers on October 6, 2014.  There is probable cause to believe that, contrary to what he stated in the interview:

   a)    Al-Jayab traveled to Syria and his travel was not confined to Turkey and Britain before returning to the United States;

   b)    he went to Turkey to get to Syria and for reasons other than to visit his grandmother;

   c)    he was a member of and assisted a rebel group, militia, or insurgent organization;

   d)    he solicited membership for a terrorist group or organization and provided material support to a person or group that engages in terrorist activity;

   e)    he called for, helped with, or committed the killing and intentional and severe injury of any person;

   f)    he was a member of a group in which he used or threatened to use a weapon against any person; and

   g)    he assisted in a group where other people used or threatened to use a weapon against any person.

17.    Based on my training and experience as well as discussions with USCIS and Homeland Security Investigations (HSI) personnel, Al-Jayab's statements were material to the determination by USCIS of Al-Jayab's eligibility for immigration benefits.  If Al-Jayab admitted to being in Syria, USCIS would have asked additional questions and Al-Jayab's file may have been subjected to further process.  If Al-Jayab admitted to supporting terrorist activities or a terrorist group, Al-Jayab's refugee status may have been subject to termination.  In addition, intentional misstatements to USCIS, if proven, could negatively impact a refugee's ability to remain in the United States and may subject the individual to removal proceedings or criminal prosecution.

## V. CONCLUSION

18.     Based on the foregoing, I respectfully assert that there is probable cause to believe Aws Mohammed Younis Al-Jayab knowingly and willfully provided and attempted to provide materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States, specifically United States Citizenship and Immigration Services, a component of the United States Department of Homeland Security, and the offense involved international terrorism as defined in Title 18, United States Code, Section 2331, all in violation of Title 18, United States Code, Section 1001.

## VI.     REQUEST FOR SEALING

19.     I further request that the Court seal the arrest warrant, the affidavit, and the criminal complaint in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the Federal Bureau of Investigation, federally deputized state and local law enforcement officers, and other government and contract personnel



acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.  These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation at this time. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.  Sealing these documents will also better ensure the safety of agents and others.

Elizabeth Buckmiller
Special Agent, FBI

Reviewed and approved as to form.
Dated: 1/6/16

Jill M. Thomas
Assistant United States Attorney

SUBSCRIBED and SWORN to before me
this 6th day of January 2016.

HONORABLE EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE