**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-cv-3851 |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF STATE, JOHN KERRY in his Official Capacity as SECRETARY OF STATE, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, SYLVIA BURWELL, in her Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, ROBERT CAREY, in his Official Capacity as Director of the OFFICE OF REFUGEE RESETTLEMENT, and INTERNATIONAL RESCUE COMMITTEE, INC. | § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

---

## DECLARATION OF LAURA STOWE

---

I, Laura Stowe, hereby declare:

1. I make the statements in this Declaration based on my own personal knowledge, except as to any statements which are identified as being made on information and belief, and if called to testify I could and would do so competently as follows:

*Declaration of Laura Stowe*

2. I am a legal assistant at the Texas Office of the Attorney General. I have worked at the agency since September of 2008. I currently work with the attorneys representing the Plaintiff, Texas Health and Human Services Commission, in the action identified in the caption above.

3. On December 8, 2015, I requested S. Rep. 96-256 from the U.S. Senate Office. I received a PDF copy of S. Rep. 96-256 from the U.S. Senate Office via e-mail on the same day. A true and correct copy of the report I received is listed as Attachment 1.

4. On December 22, 2015, I requested H.R. Rep. 99-132 from the Office of the Historian, U.S. House of Representatives. I received a PDF copy of H.R. Report 99-132 via e-mail on the same day. A true and correct copy of the report is listed as Attachment 2.

5. On December 22, 2015, I requested a copy of S. Rep. 97-638 from the U.S. Senate Office and the Library of Congress. I received a PDF copy of the S. Rep. 97-638 via e-mail from both sources on December 23, 2015. A true and correct copy of the report is listed as Attachment 3.

6. On December 22, 2015, I requested a copy of S. Rep. 97-541 from the Library of Congress. I received a PDF copy of S. Rep. 97-541 via e-mail from the Library of Congress on December 23, 2015. A true and correct copy of the report is listed as Attachment 4.

7. On January 12, 2016, I visited the justice.gov website and printed a copy of a press release dated January 7, 2016, titled *Texas Man Charged with Attempting to Provide Material Support to ISIL*, available at http://www.justice.gov/opa/pr/california-man-arrested-making-false-statements-terrorism-investigation. I scanned the pages and created a PDF document. Attachment 5 is a true and correct copy of the justice.gov website I

visited January 12, 2016. This Attachment 5 is the same as Attachment 3 in the Supplemental Declaration of Robert J. Bodisch.

8. On January 12, 2016, I visited the justice.gov website and downloaded the PDF of the Indictment of Omar Faraj Saeed Al Harden, which was located on the same page as the press release dated January 7, 2016, titled *Texas Man Charged with Attempting to Provide Material Support to ISIL*, available at http://www.justice.gov/opa/pr/california-man-arrested-making-false-statements-terrorism-investigation. A true and correct copy of this Indictment is listed as Attachment 6. This Attachment 6 is the same as Attachment 4 in the Supplemental Declaration of Robert J. Bodisch.

9. On December 8, 2015, I visited the TV Eyes website, available at http://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=5db2309f-7ad3-46f6-8b3d-7b8172f0126d, which contains a transcript of Representative Michael McCaul's remarks made on the floor of the U.S. House of Representatives regarding H.R. 158, December 8, 2015. On January 14, 2015, I printed out this page and scanned to create a PDF. In addition, on December 8, 2015, at the request of my supervising attorneys, I carefully listened to an audio/video clip of the remarks of Michael McCaul regarding H.R. 158, found on the website listed above, and compared the language of the transcript to the recording to ensure its accuracy. Attachment 7 is a true and correct copy of the mms.tveyes.com website I visited January 14, 2016. This Attachment 7 is the same as Attachment 5 in the Supplemental Declaration of Robert J. Bodisch.

10. On January 12, 2016, I visited the justice.gov website and printed a press release dated January 7, 2016, titled *California Man Arrested for Making False Statements in a Terrorism Investigation*, available at

http://www.justice.gov/opa/pr/california-man-arrested-making-false-statements-terrorism-investigation. I scanned the pages and created a PDF document. Attachment 8 is a true and correct copy of the justice.gov website I visited January 12, 2016.

11. On January 12, 2016, I visited the justice.gov website and downloaded the PDF of the Criminal Complaint filed against Aws Mohammed Younis Al-Jayab, which was located on the same page as the press release dated January 7, 2016, titled *California Man Arrested for Making False Statements in a Terrorism Investigation*, available at http://www.justice.gov/opa/pr/california-man-arrested-making-false-statements-terrorism-investigation. A true and correct copy of this Criminal Complaint is listed as Attachment 9. This Attachment 9 is the same as Attachment 6 in the Supplemental Declaration of Robert J. Bodisch.

12. On January 12, 2016, I visited the justice.gov website and printed a press release dated January 7, 2016, titled *Sacramento Man Arrested for Terrorism Offense*, available at http://www.justice.gov/usao-edca/pr/sacramento-man-arrested-terrorism-offense. I scanned the pages and created a PDF document. Attachment 10 is a true and correct copy of the justice.gov website I visited January 12, 2016.

13. On January 14, 2016, I visited the official website of the U.S. Department of Homeland Security and printed the page available at http://www.dhs.gov/state-and-major-urban-area-fusion-centers. I scanned the page to create a PDF document. Attachment 11 is a true and correct copy of the dhs.gov website I visited January 14, 2016.

14. On January 14, 2016, I visited the official website of the U.S. Department of State and printed the page titled U.S. Refugee Admissions Program FAQs,

available at http://www.state.gov/j/prm/releases/factsheets/2013/210135.htm. I scanned the pages to create a PDF document, and at the request of my supervising attorneys, I highlighted the phrase "Approved refugees do not get visas." Thus, with the exception of the highlighting made for convenience of this Court, the PDF I created as Attachment 12 is a true and correct copy of the state.gov website I visited on January 14, 2016.

15. On January 14, 2016, I visited the official website of the White House, https://www.whitehouse.gov/sites/default/files/rss_viewer/national_security_s trategy.pdf, and downloaded the PDF of National Security Strategy of May 2010. A true and correct copy is listed as Attachment 13.

16. On January 14, 2016, I visited the official website of U.S. Department of Health & Human Services, where a map of state refugee programs is found, http://www.acf.hhs.gov/programs/orr/state-programs-annual-overview.      I printed a "screen shot" and scanned that print-out to create a PDF. Attachment 14 is a true and correct copy of the acf.hhs.gov website I visited January 14, 2016.

17. On January 15, 2016, I visited the official website of the Office of Refugee Resettlement and downloaded the Excel spreadsheet, available at http://www.acf.hhs.gov/programs/orr/resource/fiscal-year-2014-refugee-arrivals. I converted the Excel spreadsheet to a PDF. Attachment 15 is a true and correct copy of the spreadsheet found at the acf.hhs.gov website I visited on January 15, 2016.

I hereby declare that the foregoing is true and accurate under penalty of perjury pursuant to the laws of Texas and the United States.

Executed in Austin, Texas, this  15  day of January, 2016.

LAURA STOWE

Attachment 1

# Calendar No. 271

| 96TH CONGRESS<br>*1st Session* } | SENATE | { REPORT<br>No. 96–256 |
|---|---|---|

## THE REFUGEE ACT OF 1979

JULY 23 (legislative day, June 21), 1979.—Ordered to be printed

Mr. KENNEDY, from the Committee on the Judiciary
submitted the following

## REPORT

[To accompany S. 643]

The Committee on the Judiciary, to which was referred the bill (S. 643), to amend the Immigration and Nationality Act to revise the procedures for the admission of refugees, to amend the Migration and Refugee Assistance Act of 1962 to establish a more uniform basis for the provision of assistance to refugees, and for other purposes, reports favorably thereon, with amendments, and recommends that the bill as amended do pass.

### PURPOSE OF THE BILL

The Refugee Act of 1979 establishes for the first time a comprehensive United States refugee resettlement and assistance policy. It reflects one of the oldest themes in America's history—welcoming homeless refugees to our shores. It gives statutory meaning to our national commitment to human rights and humanitarian concerns, not reflected in the Immigration and Nationality Act of 1952, as amended. And it places into law what we do for refugees now by custom, and on an *ad hoc* basis, through the use of the "parole authority" in Section 212(d)(5) of the Immigration and Nationality Act.

The bill accomplishes five basic objectives:

First, it repeals the current immigration law's discriminatory treatment of refugees by providing a new definition of a refugee that recognizes the plight of homeless people all over the world, and by according refugee admissions the same immigration status given all other immigrants.

Second, it raises the annual limitation on regular refugee admissions from 17,400 to 50,000. This is accomplished without really in-

Attachment 1

creasing overall annual immigration to the United States in recent years, since the parole authority has been used repeatedly to exceed the 17,400 limit.

Third, the bill provides an orderly but flexible procedure for meeting emergency refugee situations and any other situations of special concern to the United States, if the resettlement needs of the homeless people involved cannot be met within the regular 50,000 ceiling.

Fourth, it provides for the first time the statutory requirement that Congress be consulted before refugees are admitted, and defines and exerts congressional control over the process.

Fifth, it provides for federal support of the refugee resettlement process—and extends coverage to all refugees entering the United States for two years for cash and medical benefits, and longer for other programs that help the refugees normalize their lives in their adopted communities.

## BACKGROUND

Reform of our Nation's immigration laws relating to the admission and treatment of refugees is one of the important unresolved issues left from the major reforms achieved in the 1965 Amendments. The current bill (S. 643), is a product of a consensus that has developed since then as to what our country should do in facilitating the admission and resettlement of refugees.

The immediate impetus behind the drafting of S. 643 was the action in 1977–78 of the Chairman of the Committee's former Subcommittee on Refugees, (Mr. Kennedy), requesting Executive Branch comment on previous refugee proposals. In letters sent on September 11, 1978 to Secretary of State Cyrus Vance, to Associate Attorney General Michael Egan, to Secretary of Health, Education, and Welfare Joseph Califano, and to the Chairman of the American Council of Voluntary Agencies' Committee on Migration and Refugees, Senator Kennedy wrote:

* * * I believe there is an urgent need for the United States to begin to take the steps necessary to establish a long range refugee policy—a policy which will treat all refugees fairly and assist all refugees equally. Such a national refugee policy is now clearly lacking, and there is too little coordination between the various branches of Government involved with refugee programs, and with the voluntary resettlement agenices.

Given the Senate calendar, there probably will not be the opportunity to act this year on S. 2751, [95th Congress], or on refugee legislation generally. However, it is my firm intention early in the next session of Congress to pursue in an orderly and thoughtful way the growing problems our country faces in meeting the resettlement needs of refugees around the world. With this goal in mind, I would like to begin now to work with you and others in the Executive Branch to shape proposals that will help lay the basis for early legislative action on a national refugee policy.

4

The need for such a permanent and systematic procedure was clearly set forth during the Committee's hearing on the bill by Ambassador Dick Clark:

> Until now, we have carried out our refugee programs through what is essentially a patchwork of different programs that evolved in response to specific crises. The resulting legislative framework is inadequate to cope with the refugee problem we face today. It was originally designed to deal with people fleeing Communist regimes in Eastern Europe or repressive governments in the Middle East in the immediate post-war period and the early cold war years. This framework still assumes that most refugees admitted to the United States come from these two geographic areas, or from Communist-dominated countries.

> The current law assumes that refugee problems are extraordinary occurrences. It provides for only a very limited number of refugees to enter the United States each year, on a conditional basis. But it also recognizes the Attorney General's power to parole additional individuals into the United States in case of unusually urgent humanitarian circumstances.

It was with these concerns in mind that the Committee acted on this bill, as outlined below.

### NEW REFUGEE DEFINITION

The bill provides a new statutory definition of a refugee which will be added to the Immigration and Nationality Act. This definition eliminates the geographical and ideological restrictions now applicable to conditional entrant refugees under section 203(a)(7) of the Immigration and Nationality Act. Also, the new definition will bring United States law into conformity with our international treaty obligations under the United Nations Protocol Relating to the Status of Refugees which the United States ratified in November 1968, and the United Nations Convention Relating to the Status of Refugees which is incorporated by reference into United States law through the Protocol.

The new definition has been amended by the Committee to include "displaced persons" who are not technically covered by the United Nations Convention—to insure maximum flexibility in responding to the needs of the homeless who are of concern to the United States. This flexibility is needed, for example, to handle such situations as the evacuation of Saigon. The Vietnamese evacuated in 1975 were internally displaced persons and evacuees, and would not be covered by the U.N. definition originally in the bill.

The Committee also believes that the addition of the phrase referring to a "displaced person" as a person "uprooted because of arbitrary detention" and "unable to return to his usual place of abode" will accommodate political prisoners and detainees who need resettlement opportunities outside their country.

3

The refugees of tomorrow, like the refugees of today, will continue to look to the United States for safe haven and resettlement opportunities—and our Government will continue to be called upon to help. Yet all agree that present law and practice is inadequate, and that the piecemeal approach of our Government in reacting to individual refugee crises as they occur is no longer tolerable. We must learn from our recent experience with the Indochinese refugee program, and explore new methods for meeting the growing demands for refugee resettlement in the United States.

I believe the provisions of my bill, S. 2751, go a long way in helping to establish a national policy of welcome to refugees. However, this basic reform of the immigration law deals with only half the problem—the admission of refugees to the United States. We must also consider the problems involved in their resettlement in communities across our land, and what the Federal responsibility is to help in that resettlement process.

Subsequently, intensive consultations began between November 1978 and February 1979 with the relevant Congressional Committee staff and officials in the Executive Branch, in an effort to draft refugee legislation that would reflect a consensus view of what needed to be done. On March 9, 1979, S. 643 was introduced in the Senate, and a companion bill (H.R. 2816) in the House, at the joint request of the Secretary of State, the Attorney General, and the Secretary of Health, Education, and Welfare.

A hearing on the bill was held on March 14, 1979 to receive testimony from the Administration, represented by Ambassador Dick Clark, newly appointed United States Coordinator for Refugee Affairs, from the American Council of Voluntary Agencies, from State and local public agencies, from the National Coalition for Refugee Resettlement, and from interested public groups. At the request of the ranking minority member of the Committee, the hearing record was held open for a month to solicit additional views and recommendations on this important legislative reform.

COMMITTEE ACTION

On July 10, 1979, the Committee met in open session, considered and amended the bill, and agreed unanimously to report the bill favorably, as amended.

GENERAL PROVISIONS AND COMMITTEE AMENDMENTS

PURPOSE OF BILL

Title I sets forth the purpose of the bill, which is to provide a permanent and systematic procedure for the admission to this country of refugees of special concern to the United States, and to provide comprehensive and uniform provisions for assistance to those refugees who are admitted.

5

## PROVISIONS FOR ADMITTING REFUGEES

The central feature of S. 643 is the establishment of statutory provisions for the admission of refugees during "normal flow" periods and during emergency situations. Sections 207 through 210 of the bill also write into the Immigration and Nationality Act the role of Congress in the admission process—ending the years of ad hoc use of the parole authority, which has been implemented by custom rather than clearly defined by law.

Section 207 provides for a normal flow of refugees, not to exceed 50,000 each year, except as provided to meet emergency situations that can be foreseen before the beginning of the fiscal year, and for which prior planning can be undertaken. The admission numbers will be allocated to groups of refugees "of special concern to the United States," as determined by the President in consultation with Congress, as defined below.

The President may admit more than the annual normal flow of refugees if, after consultation with the Committees on the Judiciary, he believes such is justified by urgent humanitarian concerns or is otherwise in the national interest.

For example, if the bill were law today, the President would have determined, as he has, that the national interest calls for the admission of more than 50,000 refugees of special concern to the United States in FY 1980. In the President's budget for FY 1980, as already submitted to the Foreign Relations Committee and Appropriations Committee, has has determined that some 120,000 refugees will need resettlement opportunities in the United States next fiscal year. However, if the pending bill were law, he would have previously "consulted" with the Judiciary Committees before determining the number of refugees to be admitted. If circumstances were then to change after submission of his budget request but before the beginning of the fiscal year, the President could conduct additional consultations regarding possible adjustments of estimated normal flow numbers. To facilitate such adjustments, the formal Presidential determination, based upon the results of all consultations, would not likely be issued until shortly before the beginning of the fiscal year.

The 50,000 annual numbers under the bill will be obtained by reallocating to refugees 20,000 numbers from the worldwide limitation of 290,000. (17,400 of these numbers of currently allocated to conditional entrants under section 203(a)(7), which the bill eliminates.) In addition, 30,000 numbers will be added over and above the current worldwide limitation. As a result, total immigration subject to numerical limitation will be 320,000 annually, except in those years when refugee admissions are increased by Presidential determination, after consultation with Congress.

This number, however, does not really increase our annual immigration flow, since by use of the parole authority over the past several decades the United States has accepted, on an average, some 40,000 refugees each year. Tables I and II present a summary of refugee parole actions and conditional entry numbers that document this fact.

**6**

TABLE I.—HISTORICAL SUMMARY OF REFUGEE PAROLE ACTION

| Year | Country and class of people | Total |
|------|----------------------------|-------|
| 1956 | Orphans from Eastern European countries | 925 |
| 1956–57 | Refugees from Hungary | 38,045 |
| 1960–65 | Refugee escapees from Eastern European countries | 19,754 |
| 1962 | Chinese refugees from Hong Kong and Macao | 14,741 |
| 1962 through May 31, 1979 | Refugees from Cuba | 692,219 |
| 1973 through May 31, 1979 | Refugees from the Soviet Union | 35,758 |
| 1975 through May 31, 1979 | Indochinese refugees | 208,200 |
| 1975–77 | Chilean detainees | 1,310 |
| 1975–77 | Chilean refugees from Peru | 112 |
| 1976–77 | Latin American refugees (Chileans, Bolivians, and Uruguayans) | 343 |
| 1978–79 | Lebanese refugees | ¹ 1,000 |
| 1979 | Cuban prisoners and families | ¹ 15,000 |
| Total | | 1,027,407 |
| Average per year | | 44,670 |

¹ Authorized.

*Table II.—Conditional entries of refugees under section 203(a)(7)*

| | |
|---|---|
| 1965–66 | 3,191 |
| 1967–68 | 13,267 |
| 1969–70 | 30,339 |
| 1971–72 | 20,894 |
| 1973–74 | 10,099 |
| 1975–76 | 17,778 |
| 1977–78 | 20,720 |
| Total | 126,288 |
| Average per year | 9,020 |

## REFUGEES OF "SPECIAL CONCERN"

The bill does not, and cannot, explicitly define what refugees are deemed to be "of special concern to the United States." This is an issue only the future can define. The bill, when enacted, is designed for the decades to come, and what refugees will be deemed of special concern to the American people will be a public policy issue that will be, as it is now, debated and reviewed continuously by Congress, the President, and the American people.

However, the past can, and will, serve as a guide as to what refugees have been of concern to the United States. Traditionally, the American people have responded generously to the individual needs of all homeless refugees wherever they have been found. But group refugee admissions have generally been concerned with classes of refugees from countries where, for example, the United States has had strong historic or cultural ties, or where we have been directly involved or have had treaty obligations. We have also admitted refugees to promote family reunion; to respond to human rights concerns embodied in the Universal Declaration for Human Rights; to fulfill foreign policy interests; and, when no other country has responded to the needs of the homeless, we have opened our door.

In recent years, the principal source countries for group admissions of refugees to the United States have been from Cuba, the Soviet Union, Eastern Europe, Indochina, as well as some from the Middle East, Uganda, Lebanon, Latin America and elsewhere.

7

## CONSULTATION PROCESS

In considering the bill, the Committee was concerned that the role of Congress should be explicitly stated in the decision-making process governing the admission of refugees. As amended by the Committee, the bill specifically defines the "consultation process" and codifies what is currently an informal, customary process. The bill establishes what "consultation" with Congress means, thereby exerting Congressional control over each group of refugees admitted to the United States.

Specifically, Section 307 (a) (2) provides that "consultation" means "personal contact by designated representatives of the President with members of the Committees on the Judiciary to review the refugee situation or emergency refugee situation, to project the extent of possible United States participation . . . to discuss the reason for believing that the proposd admission of refugees is in the national interest," and to provide detailed information no:

(*a*) description of the refugee situation;

(*b*) a description of the refugees who may be admitted, plans for their resettlement, estimated cost of their resettlement, analysis of their resettleability, and an analysis of conditions within the countries from which they originated;

(*c*) an analysis of the anticipated social, economic, and demographic impact to the United States;

(*d*) a description of the extent to which other countries will admit and assist in the resettlement of such refugees;

(*e*) an analysis of the impact of the United States' participation in the resettlement of such refugees on U.S. foreign policy interests; and

(*f*) such additional information as may be appropriate.

No time frame is specified in the bill for the consultation process, but the Committee would expect that it would be undertaken expeditiously. Given the unpredictable nature of refugee emergencies and the likely prospects for unforeseen refugee situations of concern to the United States, it is almost certain that the emergency provisions of the bill (Section 208) will be invoked by the President in the years to come. In such emergency circumstances it is the view of the Committee that the consultation process, as outlined above, should be viewed as urgent by both the Executive and Legislative Branches. While it is not advisable to place a statutory time limit on the consultation process, no longer than 15 to 30 days should elapse to fulfill the consultation requirements of section 208.

The bill also does not attempt to write a statutory definition of what action is required of the Judiciary Committee of Congress to conclude the consultation process. That is a matter properly defined at the time by each Committee.

## ADMISSION PROCEDURES

Normal flow refugees admitted under the bill will be admitted as lawful permanent residents, rather than under the current two-year conditional entry requirements. This ends the discriminatory practice of not granting to refugees what we grant to all other immigrants that we anticipate will come to the United States in any given year. All

8

persons accepted for immigration purposes will be treated equally, and granted permanent resident status. Like other immigrants, refugees can be admitted with a visa or other immigrant document prescribed under regulations established by the Attorney General.

This provision of the bill was strongly supported by the voluntary agencies who have carried the principal burden of helping refugees resettle in the United States over the past three decades. The following exchange at the Committee hearing illustrates the benefits of granting refugees permanent resident status:

Senator KENNEDY. What about giving refugees a visa? I would be interested in what you have heard from some of those who have been coming to this country.

Should we allow the Department of State's consular service to have a primary role, rather than just the Immigration Service? It seems to me that conditioned entry status is considerable impediment to full resettlement and I would think not an inconsiderable expense.

I am just wondering what your experience is—since you are the people who have worked directly with these refugees. Do you think we can try and accelerate the process with adequate protections against those who might not meet the criteria? Would you be wise to try and consider that as a possibility?

Ms. WALTERS.[1] The voluntary agencies feel that coming in with the immigrant visas would be of great benefit to the refugees. It is always difficult to secure employment for the refugee whose paper indicates that he is here on parole, or as a conditional entrant because this indicates that he is not here permanently. Many employers are reluctant to employ them.

If they could get papers as permanent resident aliens, this will improve their situation considerably.

Mr. MALES.[2] I would agree that right now if you are going to issue an immigrant visa, I assume that this would be handled by consular offices, which I highly recommend, as Ms. Walter has pointed out. It greatly helps the adjustment of these refugees, if they can come in with immigrant visas. You mentioned licenses. For instance, in New York State, a person cannot buy a taxicab unless he is a permanent resident.

In New York State, if a man wants to open a grocery store and sell beer, he cannot do that; because under the licensing authority of New York State, he must be a permanent resident and show he has filed for a declaration of intention.

So bringing a refugee in on an immigrant visa would be a distinct advantage to the refugees in terms of their adjustment in the United States. As far as processing abroad, I don't know what the committee contemplates whether they are going to be issued by the consular offices or by the Immigration Service.

[1] Ms. Ingrid Walter is Chairman of the American Council of Voluntary Agencies' Committee on Migration and Refugee Affairs, and Director of the Lutheran Immigration and Refugee Service.
[2] Mr. William Males represented HIAS (Hebrew Immigrant Aid Society).

9

In admitting refugees under the "normal flow" provisions of Section 207, it would be the view of the Committee that both consular officers in United States Embassies overseas, as well as officers with the Immigration and Naturalization Service, should be authorized to process refugees.

Under the provisions of the bill, applicants for refugee admission would be required to establish that they meet the refugee definition, that they have not become firmly resettled in any foreign country, and that they are admissible as immigrants under the Act except for certain requirements of section 212(a) of the Immigration and Nationality Act, which are waived.

### ASYLUM PROVISIONS

As amended by the Committee, the bill establishes an asylum provision in the Immigration and Nationality Act for the first time by improving and clarifying the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed; asylum will continue to be granted only to those who qualify under the terms of the United Nations Protocol Relating to the Status of Refugees, to which the United States acceded in November 1969.

The bill requires the Attorney General to establish a uniform procedure for passing upon an asylum application. The Committee believes such a uniform procedure should include a provision allowing all asylum applicants an opportunity to have their claims considered outside a deportation and/or exclusion proceeding, provided the order to show cause has not been issued.

The bill also provides that persons granted asylum shall be placed into a conditional admission status equivalent in most respects to that provided under current law to refugees admitted under present section 203(a)(7) or under this bill's proposed section 208. Under current practice, there is no single status uniformly given people granted asylum under the terms of the U.N. Protocol. Some are granted individual parole, and some are given "indefinite voluntary departure." This practice has often left the refugee in uncertainty as to his own situation and has sometimes made it more difficult for him to secure employment and enjoy the other rights to which he is entitled under The Protocol. The Committee expects that those difficulties will cease under this provision. The bill also makes it clear that the Attorney General may terminate the conditional admission status if conditions change in the individual's home country so that he would no longer be subject to persecution upon return.

The bill allows the use of up to 5,000 numbers a year for adjustment of status of a refugee granted asylum to that of lawful permanent resident. Adjustment cannot take place until the refugee has been in this country for two years, and the refugee must make application for adjustment. If conditions have changed in the refugee's home country so that he would no longer be subject to persecution upon return, adjustment would not be available. Spouses and children of refugees granted asylum are eligible for adjustment on the same terms.

10

### EMERGENCY ADMISSION PROCEDURES

For the first time, the bill provides procedures governing the admission of refugees in unforeseen emergency situations. If the President determines, following consultations with the Judiciary Committees, that an emergency refugee situation exists—that the admission of refugees in response to such an emergency is justified by grave humanitarian concerns or is otherwise in the national interest—he may fix a number of refugees to be admitted. Allocation of those admissions will be in accordance with a Presidential determination, after consultation with Congress.

Thereafter, the Attorney General will admit to the United States emergency situation refugees who establish that they meet the refugee definition and that they are not firmly resettled in any foreign country. The Attorney General may admit them as conditional entrants or as permanent resident aliens, according to regulations and procedures he may prescribe for dealing with emergency refugee situations. If adequate screening is impossible under the circumstances, he may admit refugees conditionally; if he is satisfied that time and circumstances permit adequate screening, he should admit refugees as permanent resident aliens.

For the purposes of the bill, the Committee believes that "emergency" should be defined in accordance with the simple dictionary definition of the term: "an unforeseen combination of circumstances or the resulting state that calls for immediate action." An unforeseen emergency refugee situation could result from many causes which, of course, no bill can foresee. But they might include: a sudden exodus of people from a country where there had been no refugee flow before (such as Iran today); or it could come from a substantial increase in the number of refugees in an area of the world where "normal flow" refugees were anticipated, but urgent new numbers developed, such as Indochina today; or any catastrophic circumstance affecting an asylum area requiring immediate action.

### ADJUSTMENT OF STATUS PROVISIONS

For those refugees who may have been admitted under Section 208 as conditional entrants, Section 210(a) provides lawful permanent resident status for any refugee who has been physically present in the United States at least two years, who has not otherwise acquired lawful permanent resident status, and whose conditional entry has not been terminated by the Attorney General.

### DOMESTIC RESETTLEMENT ASSISTANCE

Because refugees admitted to the United States are a result of a national policy decision and by federal action, the federal government clearly has a responsibility to assist States and local communities in resettling the refugees—assisting them until they are self-supporting and contributing members of their adopted communities.

Title III of the bill provides this assistance. It amends the Migration and Refugee Assistance Act of 1962, which has been the underlying

source of authority for the Cuban and Indochinese refugee programs. The bill expands these programs to cover all refugees admitted to the United States, and builds upon the experience and lessons learned from the Cuban and Indochinese programs.

The provisions of Title III essentially carry forward and expand the current domestic resettlement programs authorized under the Indochina Refugee Assistance Program. This program primarily provides qualified refugees with cash assistance under a modified Aid to Families with Dependent Children Program, for which the sole qualifications are income level and willingness to accept a suitable job or training, if offered. Secondly, it provides medical assistance according to each State's Medicaid Program and finally, it provides Social Services of the title XX type of the Social Security Act according to the plan approved for each State by the federal government. These services vary from State to State and include such services as: day care, hygiene, family planning, cultural counseling, home management, transportation, housing improvement, ethnic skills, protective service for adults, life skills, vocation services and training, English as a second language training, job referral, nutrition, driver's education.

These three types of aid noted above are provided through a 100 percent reimbursement to the States for all refugees who do not qualify for the regular AFDC-Medicaid Programs. For those who do qualify for the regular programs, the funds cover the State's portion of payment for these services.

The specific domestic assistance programs authorized in Title III include:

Payments to public or to private voluntary agencies with respect to their work in connection with the placement, resettlement, and care of refugees;

Funding authority for projects to aid refugees in securing employment and other short-term projects to increase their self-reliance—English as a second language, vocational training, refresher training for professionals, services to assist refugees in attaining recertification within the United States, and other such employment and social services;

Support for special educational services, including particularly training in English, and other educational services, through the elementary and secondary education system;

Funds for child welfare services for two years after the arrival of the refugee child, or, in the case of a child who enters the United States unaccompanied by a parent or other close relative, until the child reaches age 18 (or whatever higher age may be specified in the State's child welfare services plan);

Funding for cash and medical and other assistance during the first two years following the refugee's arrival in the United States. If the refugee's family were eligible for assistance under the State's program of Aid to Families with Dependent Children (part A of title IV of the Social Security Act) or for medical assistance under the State's Medicaid program (title XIX of the Social Security Act), funds under this authority would only be used for the non-Federal share of those programs. Funds could also be used to provide assistance to refugees, when and

12

if appropriate, through the Unemployment Insurance program of the Department of Labor.

The bill limits the 100 percent federal support of medical, cash, and employment programs to the first two years after the refugee's entry into the United States. This is intended to eliminate the risk of another open-ended refugee program, such as the 1965 Cuban refugee program—which continues today.

However, the Committee is mindful of the concern of many—especially State government agencies—that not all refugees will be self-supporting in two years. This concern over the need for continued federal support was raised by Mr. Simpson during the Committee's hearing:

> Senator SIMPSON. The final concern I have has to do with the issue of the withdrawal of the Federal Government from the system after 2 years and the States' bearing the full financial burden. We hear that in our travels at the State level. People of the States are very frustrated at the Federal Government beginning a program, whatever it may be, with the States in full participation and then suddenly withdrawing and saying, "Here you are." What response have you had from the State governments, Governors, mayors, and municipality officials with regard to that issue?
>
> Mr. CLARK. Fortunately, there is a State organization that is going to be testifying following us. I suspect that they could speak with more authority on this than I can. It is my understanding that there is some feeling among the State organizations representing State governments that these programs should be extended beyond 2 years. I must say, as I did earlier, that one can make a justification for extension because the burden does not suddenly end at the end of 2 years. It was our feeling that, given the overwhelming budgetary pressures of the Government at this time, that was a reasonable point to stop. But one certainly could make an argument on the other side.

In order to respond to residual needs among many refugees—which has been expressed strongly to the Committee by many State and local agencies—the Committee has amended the bill to place no time limitation upon the other assistance programs authorized by Title III, (except the 100% reimbursement for cash and medical assistance).

The bill has also been amended to continue the "special project" funds currently authorized in the Indochina Migration and Refugee Assistance Act of 1975, to provide up to $40 million annually "for special projects and programs, administered primarily by private, non-profit agencies participating in refugee resettlement programs, or by State or local public agencies, to assist refugees in resettling and in gaining skills and education necessary to become self-reliant."

No time limitation is placed upon the use of these special project funds. Together with the other funds authorized in Title III, the Committee believes adequate federal support should be available to help all local communities integrate and assist refugees resettling in the United States.

During the Committee's consideration of the bill, the Committee acted favorably upon a motion by Mr. MATHIAS to amend the bill by adding a new section requiring ongoing research and evaluation of the refugee resettlement programs authorized under Title III, in order to ensure that they maintain a high efficiency level from both a fiscal and managerial standpoint. First, the Comptroller General is required to undertake regular studies of the resettlement program, and report periodically to the Congress on his findings and recommendations, especially relating to fiscal management and control.

Second, the Committee also recognizes that there is a need to better understand the resettlement of refugees from a cultural, social linguistic, and psychological standpoint, in order to ensure adequacy and appropriateness of the programs authorized under Title III. The Secretary of HEW is thus directed to conduct or assist in the conduct of research into the resettlement process and adaptation to life in the United States. These reports should be printed and made available to Congress and the public within a reasonable amount of time so that they may be used to educate and inform those involved in policymaking and implementation of resettlement programs. As is possible, these studies should be conducted by or with individuals who possess a knowledge of the native language and culture of the subject group(s) under study. In order to facilitate the conduct of such studies, the Committee expects that the Secretary will ensure that there is a coordinated effort throughout HEW to provide research support through all sources of funding that may be available, and by way of all agencies which are authorized to provide such.

## BUDGET SUMMARY

The purpose of S. 643 is to establish a permanent authority in the law to admit and to assist refugees resettling in the United States. It does not authorize specified sums, since annual funding requirements for refugees will depend upon the number of refugees admitted each year. Annual authorizations and appropriations will obviously be necessary, and budget requests will be submitted each fiscal year to the appropriate Committees of Congress.

The following tables provide a break-down of refugee funding this fiscal year and that proposed for FY 1980 under the provisions of this bill. They also provide an estimate by the Department of Health, Education and Welfare of the budgetary costs envisioned for the next five years.

14

TABLE III.—ANALYSIS OF REFUGEE ASSISTANCE COSTS, FISCAL YEARS 1979 AND 1980

[In millions of dollars]

| | Current request | |
|---|---|---|
| | 1979 | 1980 [1] |
| Department of State: | | |
| Contribution to the Intergovernmental Committee for European Migration | $4.1 | $4.1 |
| UNHCR: | | |
| Estimated share of care and maintenance expenses associated with Indochinese refugees who will be resettled to the United States | 10.0 | 10.0 |
| United States refugee program: | | |
| Soviet and Eastern European project [2] | 49.7 | 49.8 |
| Indochinese project | 63.6 | 97.3 |
| Administrative expenses | 1.7 | 3.7 |
| United States emergency refugee and migration assistance fund [3] | 4.3 | [4] 15.0 |
| Subtotal | 133.4 | 179.9 |
| Department of Health, Education, and Welfare: | | |
| Soviet and Eastern European refugee program | 28.3 | 20.0 |
| Indochinese refugee program | 147.9 | 149.0 |
| Cuban refugee program | 56.6 | 53.3 |
| Administrative expenses | 2.2 | 2.2 |
| Subtotal | 235.0 | 224.5 |
| Grand total | 368.4 | 404.4 |

[1] Will be amended to reflect recent decisions of the President on admission rates.
[2] Includes cost of Far East refugee program ($500,000).
[3] Includes 25 percent of a drawdown made to increase the USG contribution to the UNHCR. This is the estimated share of that drawdown which benefited refugees who will be resettled to the United States:

| | Fiscal year— | |
|---|---|---|
| | 1979 | 1980 |
| Planned number of resettlements: | | |
| Soviet, Eastern European, and other refugees | 35,940 | 36,000 |
| Indochinese refugees | *76,500 | 168,000 |
| Cuban refugees | 8,000 | 4,000 |
| Total | 120,440 | 210,000 |

*Estimate includes projected 12,500 additional resettlements in the summer of 1979 to reflect the President's pledge of June 28, 1979.
[4] Estimate.

TABLE IV: 5-YR HEW COST OF NEW BILL

[All figures assume 108,000, fiscal year 1979; 124,000, fiscal year 1980]

| | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|
| High (120,000 refugees per year) | $224.5 | $269.8 | $276.2 | $279.7 | $261.8 |
| Low (50,000 refugees per year) | 224.5 | 208.6 | 158.4 | 134.8 | 110.6 |
| Impact on State/local governments: [1] | | | | | |
| High (120,000 refugees per year) | 62.4 | · 83.8 | 146.4 | 194.3 | 251.3 |
| Low (50,000 refugees per year) | 62.4 | 83.8 | 146.4 | 172.1 | 188.5 |

[1] For cash and medical assistance and administration. Impact of 2-yr limit on Federal funding, as compared with no time limit.

SECTION-BY-SECTION ANALYSIS

1. Title I sets forth the purpose of the bill which seeks to establish uniform provisions for the admission and assistance to refugees coming to the United States.

2. Section 201 (a) of the bill provides a new refugee definition which basically conforms to that of the United Nations Convention and

Protocol Relating to the Status of Refugees. It eliminates the geographical and ideological restrictions now applicable to conditional entrant refugees under Section 203(a)(7) of the Immigration and Nationality Act.

The new definition also applies to "displaced persons" and political prisoners/detainees who are not technically covered by the United Nations Convention.

3. Section 201(b) of the bill adds new section 207, 208, 209, and 210 to the Immigration and Nationality Act. These sections deal with admission procedures for refugees.

4. Section 207(a)(1) provides for a normal flow of refugees not to exceed 50,000 each year, except as provided to meet emergency situations that can be foreseen before the beginning of the fiscal year. The admission numbers will be allocated to groups of refugees "of special concern to the United States," as determined by the President in consultation with Congress, as defined in Section 201(b)(2).

The 50,000 annual numbers will be obtained by reallocating to refugees 20,000 numbers from the world-wide limitation of 290,000. (17,400 of these numbers are currently allocated to conditional entrants under Section 203(a)(7), which the bill eliminates.) In addition, 30,000 numbers will be added over and above the current worldwide limitation. Total immigration subject to numerical limitation will be 320,000 annually, except in those years when refugee admissions are increased by Presidential determination, after consultation with Congress.

5. Section 207(a)(2) incorporates a Committee amendment that more specifically defines the "consultation process" in admitting refugees.

6. Section 207(a)(3), as amended, provides that normal flow refugees admitted under Subsection (1) will be admitted as lawful permanent residents, rather than under the current two-year conditional entry provision. Like other immigrants, refugees will be admitted with a visa or other immigrant document prescribed under regulations established by the Attorney General. Both Consular Officers in United States Embassies overseas as well as officers with the Immigration and Naturalization Service should be authorized to process refugees admitted under Section 207(a)(1).

Under Section 207(a)(3), applicants for refugee admission would be required to establish that they meet the refugee definition, that they have not become firmly resettled in any foreign country, and that they are admissible as immigrants under the Act except for the labor certification requirements of Section 212(a)(14) of the Immigration and Nationality Act, the public charge provisions of Section 212(a) (15) of the Act, the immigrant visa requirements of Section 212(a) (20) and (21) of the Act, the literacy requirements of Section 212 (a)(25) of the Act, or the provisions of Section 212(a)(32) of the Act pertaining to alien physicians. The remaining exclusionary provisions of Section 212(a) may also be waived, at the discretion of the Attorney General, since these provisions apply to normal immigrants. Refugees may not entirely meet them, and humanitarian considerations may require their waiver.

7. Section 207(b), as amended by the Committee, establishes an asylum provision by improving and clarifying the procedures for

16

determining asylum claims filed by aliens who are physically present in the United States.

Paragraph (1) requires the Attorney General to establish a uniform procedure for passing upon an asylum application. The uniform procedure should include a provision allowing all asylum applicants an opportunity to have their claims considered outside a deportation and/or exclusion proceeding, provided the order to show cause has not been issued. Asylum shall be granted if the alien is a refugee within the definition provided in Section 101(a)(42)(A) and his deportation or return is prohibited under Section 243(h).

Paragraph (2) provides that persons granted asylum shall be placed into a conditional admission status equivalent in most respects to that provided under current law to refugees admitted under present Section 203(a)(7) or under this bill's proposed Section 208.

Paragraph (3) entitles the spouse and children of a person granted asylum to the same status as that person.

Paragraph (4) provides for the use of up to 5,000 numbers a year for adjustment of status of a refugee granted asylum to that of lawful permanent resident. Adjustment cannot take place until the refugee has been in this country for two years, and the refugee must make application for adjustment. If conditions have changed in the refugee's home country so that he would no longer be subject to persecution upon return, adjustment would not be available. Spouses and children of refugees granted asylum are eligible for adjustment on the same terms.

Paragraph (5) provides that Section 245(c) of the Immigration and Nationality Act shall not apply to refugee applicants who may have accepted unauthorized employment prior to the submission of their asylum application.

8. Section 208 provides procedures for the admission of refugees in unforeseen emergency situations, as outlined above.

9. Section 209 allows the spouse and children of a refugee admitted for lawful permanent residence or admitted conditionally under the bill to qualify for the same admission status as the principal alien if not so entitled in their own right. Such spouse or child would be charged against the appropriate refugee numerical limitation.

10. For those refugees who may have been admitted under Section 208 as conditional entrants, Section 210(a) provides lawful permanent resident status for any refugee who has been physically present in the United States at least two years, who has not otherwise acquired lawful permanent resident status, and whose conditional entry has not been terminated by the Attorney General. Under proposed Section 210(b) the conferring of such lawful permanent resident status shall be without regard to the labor certification requirement of Section 212(a)(14) of the Immigration and Nationality Act, the public charge provisions of Section 212(a)(15) of the Act, the immigrant visa requirements of Section 212(a)(20) and (21) of the Act, the literacy requirements of Section 212(a)(25), or the provisions of Section 212(a)(32) of the Act pertaining to alien physicians. Aliens who are found inadmissible to the United States will be dealt with in exclusion proceedings in accordance with the provisions of sections 235, 236, and 237 of the Immigration and Nationality Act.

17

The foregoing procedures are basically a completion of the inspection process which was begun at the time of the alien's conditional admission into the United States. They require no application on the part of the alien and no fee. Once granted, the lawful permanent resident status operates retroactively to the date of the alien's arrival in the United States.

In connection with its administration of the benefits to be provided under Title III of this bill, the Department of Health, Education, and Welfare has asked that aliens admitted as refugees carry documentation that provides evidence of their refugee status and shows their date of admission to this country. The INS has stated that it will work with HEW to provide the necessary identification administratively, for both normal flow and emergency situation refugees; based on these arrangements, the Committee believes it is not necessary to include such provisions in the legislation itself.

11. Sections 202 and 203 of the bill provide various conforming amendments to the Immigration and Nationality Act. In addition, Section 203(e) revises the provisions of Section 243(h) of the Act, relating to withholding of deportation based on fear of persecution, to require the Attorney General to withhold the deportation of aliens who seek asylum in exclusion, as well as deportation, proceedings.

12. The Attorney General's parole authority under Section 212(d)(5) of the Immigration and Nationality Act remains unchanged. Once the bill takes effect, however, the Attorney General does not anticipate using this authority with respect to refugees unless he determines that compelling reasons in the public interest related to individual or groups of refugees require that they be paroled into the United States, rather than be admitted in accordance with proposed Sections 207 or 208.

13. Section 204 of the original bill contained a "rollback" provision for any alien who would have been eligible for retroactive lawful permanent resident status under the original provisions of Section 207 (b). With the Committee's changes to Section 207(b) providing conditional admission status to persons granted asylum, such a rollback is no longer necessary or appropriate.

14. Title III of the bill contains amendments to the Migration and Refugee Assistance Act of 1962. Section 301 amends Section 2(b) of the Act. Subparagraphs (A) and (B) would preserve, with minor technical changes, the authorities for overseas assistance now appearing in Sections 2(b)(1) and 2(b)(2) of the Act.

Subparagraphs (C) through (G) authorize funding for various kinds of domestic resettlement assitance and services to refugees in the United States. While these are generally within the scope of the existing law and would not affect our continuing commitment with respect to Soviet refugees, the amendments serve to clarify the activities intended to be funded, and the limits on that funding. They also assure that all refugees admitted for resettlement will be eligible for the same basic benefits and assistance.

Subparagraph (G) of Section 301(b)(1) authorizes funding for cash and medical and other assistance during the first two years following the refugee's arrival in the United States. If the refugee's family were eligible for assistance under the State's program of Aid to Fam-

18

ilies with Dependent Children (part A of title IV of the Social Security Act) or for medical assistance under the State's Medicaid program (title XIX of the Social Security Act), funds under this authority would only be used for the non-Federal share of those programs.

Funding support under subparagraph (G) would be limited to the first two years after the refugee's entry into the United States. As amended, it also subjects the Cuban refugee program to the 2-year limitation. Since not all refugees will be self-supporting in two years, the bill has been amended to place no time limitation upon the other assistance programs authorized by Title III.

The bill has also been amended (Section 301(b)(2)) to continue the "special projects" funds currently authorized under provisions of the Indochina Migration and Refugee Assistance Act of 1975, to provide up to $40 million annually "for special projects and programs." No time limitation is placed upon the use of the special project funds.

Paragraph (3) specifies that the term "refugee" will have the same meaning as in paragraph (42) of Section 101(a) of the Immigration and Nationality Act, added by Section 201 of this bill—the definition basically derived from the Protocol and Convention Relating to the Status of Refugees.

15. Section 301(b) is a technical provision making it clear that this legislation does not disturb the requirement for annual authorizing legislation established by the act that furnishes basic authority for the Department of State.

16. Section 302 amends section 2(c) of the 1962 Act, which establishes the Emergency Refugee and Migration Assistance Fund. It raises the authorized funding level from $25.000.000 to $50.000,000, in order to assure that adequate amounts would be available from the Emergency Fund if needed for an admission of refugees in response to an emergency refugee situation, under Section 208 of the Immigration and Nationality Act.

17. Section 303 requires regular studies and evaluations of the refugee resettlement programs authorized under Title III, to be conducted by the Comptroller General of the United States and the Secretary of Health, Education, and Welfare.

18. Section 501 provides that the Act will take effect on October 1, 1979. It also contains a savings clause that preserves the rights of those aliens who had been admitted conditionally under Section 203(a)(7) of the Immigration and Nationality Act, or paroled into the United States under Section 212(d)(5) of the Act, before the effective date.

## REGULATORY IMPACT STATEMENT

In compliance with paragraph 5, Rule XXIX of the Standing Rules of the Senate, it is hereby stated that the Committee has concluded that the bill will have little or no direct regulatory impact. While it is anticipated that changes to streamline the Immigration and Nationality Act governing the admission of refugees, and amending the Migration and Refugee Assistance Act of 1962 to assist in their resettlement, will result in a greater percentage of the funds authorized to be applied to substantive program purposes, this result occurs from more effective program characteristics and efficient administrative requirements

19

rather than an increase or decrease of the minimal activity of the agencies involved that might be described as regulatory in nature.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., July 20, 1979.*

Hon. EDWARD M. KENNEDY,
*Chairman, Committee on the Judiciary, U.S. Senate,*
*Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed S. 643, the Refugee Act of 1979, as ordered reported by the Senate Committee on the Judiciary, July 10, 1979. This bill amends the Immigration and Nationality Act to provide a permanent and systematic procedure for the admission of refugees to this country, and amends the Migration and Refugee Assistance Act to provide temporary and transitional assistance to these refugees. The bill has two distinct refugee admission procedures that will in effect replace the procedures provided by present law: (1) a "normal flow" provision, which allows for the admission of up to 50,000 special concern refugees (which include Cubans, Eastern Europeans, Indochinese and Soviets); and (2) an "emergency group" admission procedure, which allows the President to determine an additional number of refugees to be admitted in response to an unforeseen emergency situation.

The present law allows refugees to enter the United States under the "conditional entry" procedure of section 203(a)(7) or under the parole authority of the Attorney General in section 212(d)(5). The normal flow provision of this bill will replace the conditional entry procedure and change the procedure for admitting refugees currently entering by way of parole authority. While this bill does not eliminate the Attorney General's parole authority under the Immigration and Nationality Act, the use of this authority is expected to diminish significantly. Approximately 40,000 refugees are already accepted each year under the two procedures provided by present law. Thus, the changes made by this bill do not increase the expected annual flow of immigrants to this country.

There is currently a $25 million ceiling of the total amount of funds appropriated to the Emergency Refugee and Migration Assistance Fund but not yet obligated. S. 643 would increase that ceiling by $25 million, to provide contingency funds for the costs of admitting and resettling those refugees that the President determines should be authorized to enter United States in an emergency. Because of the difficulty of predicting the nature and magnitude of such emergencies, it is not possible to estimate whether or when such funds would be used. There are no specific plans for their use at the present time.

Should the Committee so desire, we would be pleased to provide further details.

Sincerely,

ROBERT D. REISCHAUER,
(For Alice M. Rivilin, *Director*).

20

CHANGES IN EXISTING LAW

In compliance with paragraph 4 of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, will be shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

IMMIGRATION AND NATIONALITY ACT OF 1952

\*       \*       \*       \*       \*       \*       \*

SECTION 101(A)(42) OF THE IMMIGRATION AND NATIONALITY ACT

*SEC. 101. (a) (42) The term "refugee" means (A) any person who is outside any country of his nationality or, in the case of a person having no nationality, is outside any country in which he last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership of a particular social group, or political opinion, or (B) any person who have been displaced by military or civil disturbance or uprooted because of arbitrary detention, and who is unable to return to his usual place of abode.*

SECTION 201(a) OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 201. (a) Exclusive of special immigrants defined in section 101 (a)(27), [and] immediate relatives [of United States citizens as] specified in subsection (b) of this section, *and aliens who come within the provisions of sections 207, 208, and 209,* the number of aliens born in any foreign state or dependent area who may be issued immigrant visas or who may otherwise acquire the status of an alien lawfully admitted to the United States for permanent residence, [or who may, pursuant to section 203(a)(7), enter conditionally] shall not in any of the first three quarters of any fiscal year exceed a total of 72,000 and shall not in any fiscal year exceed [a total of 290,000] *270,000.*

SECTION 202(a) OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 202. (a) No person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of his race, sex, nationality, place of birth, or place of residence, except as specifically provided in section 101(a)(27), section 201(b), and section 203: *Provided,* That the total number of immigrant visas [and the number of condition entries] made available to natives of any single foreign state under paragraphs (13 through [(8)] *(7)* of section 203(a) shall not exceed 20,000 in any fiscal year.

SECTION 202(e) OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 202. (e) Whenever the maximum number of visas [or conditional entries] have been made available under section 202 to natives

of any single foreign state as defined in subsection (b) of this section or any dependent area as defined in subsection (c) of this section in any fiscal, in the next following fiscal year a number of visas [and conditional entries], not to exceed 20,000, in the case of a foreign state or 600 in the case of a dependent area, shall be made available and allocated as follows:

(1) Visas shall first be made available, in a number not to exceed 20 per centum of the number specified in this subsection, to qualified immigrants who are the unmarried sons or daughters of citizens of the United States.

(2) Visas shall next be made available, in a number not to exceed [20 per centum] *26 per centum* of the number specified in this subsection, plus any visas not required for the classes specified in paragraph (1), to qualified immigrants who are the spouses, unmarried sons, or unmarried daughters of an alien lawfully admitted for permanent residence.

(3) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in this subsection, to qualified immigrants who are members of the professions, or who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States, and whose services in the professions, sciences, or arts are sought by an employer in the United States.

(4) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in this subsection, plus any visas not required for the classes specified in paragraphs (1) through (3), to qualified immigrants who are the married sons or the married daughters of citizens of the United States.

(5) Visas shall next be made available, in a number not to exceed 24 per centum of the number specified in this subsection, plus any visas not required for the classes specified in paragraphs (1) through (4), to qualified immigrants who are the brothers or sisters of citizens of the United States, provided such citizens are at least twenty-one years of age.

(6) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in this subsection, to qualified immigrants capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shorage of employable and willing persons exists in the United States.

[(7) Conditional entries shall next be made available by the Attorney General, pursuant to such regulations as he may prescribe, in a number not to exceed 6 per centum of the number specified in this subsection, to aliens who satisfy an Immigration and Naturaliztaion Service officer at an examination in any non-Communist or non-Communist-dominated country, (A) that (i) because of persecution or fear of persecution on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area, or (II) from any country within the general area of the Middle East, and (ii) are unable or unwilling to return to such country or area on account of race,

religion, or political opinion, and (iii) are not nationals of the countries or areas in which their application for conditional entry is made; or (B) that they are persons uprooted by catastrophic natural calamity as defined by the President who are unable to return to their usual place of abode. For the purpose of the foregoing the term "general area of the Middle East" means the area between and including (1) Libya on the west, (2) Turkey on the north, (3) Pakistan on the east, and (4) Saudi Arabia and Ethiopia on the south: Provided, That immigrant visas in a number not exceeding one-half the number specified in this paragraph may be made available, in lieu of conditional entries of a like number, to such aliens who have been continuously physically present in the United States for a period of at least two years to application for adjustment of status.]

[(8) (7) Visas so allocated but not required for the classes specified in paragraphs (1) through [(7)] (6) shall be made available to other qualified immigrants strictly in the chronological order in which they qualify.

SECTION 203 OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 203. (a) Aliens who are subject to the numerical limitations specified in section 201(a) shall be allocated visas [or their conditional entry authorized, as the case may be,] as follows:

(1) Visas shall be first made available, in a number not to exceed 20 per centum of the number specified in section 201(a) to qualified immigrants who are the unmarried sons or daughters of citizens of the United States.

(2) Visas shall next be made available, in a number not to exceed [20 per centum] *26 per centum* of the number specified in section 201(a), plus any visas not required for the classes specified in paragraph (1), to qualified immigrants who are the spouses, unmarried sons or or unmarried daughters of an alien lawfully admitted for permanent residence.

(3) Visas shall next be available, n a number not to exceed 10 per centum of the number specified in section 201(a) to qualified immigrants who are members of the professions, or who because of their exceptional ability inu the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States, and whose services in the professions, sciences, or arts are sought by an employer in the United States.

(4) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 201(a), plus any visas not required for the classes specfied in paragraphs (1) through (3), to qualified immigrants who are the married sons or the married daughters of citizens of the United States.

(5) Visas shall next be made available, in a number not to exceed 24 per centum of the number specified in section 201(a), plus any visas not required for the classes specified in paragraphs (1) through (4), to qualified immigrants who are the

23

brothers or sisters of citizens of the United States, provided such citizens are at least twenty-one years of age.

(6) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 201(a) to qualified immigrants who are capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States.

[(7) Conditional entries shall next be made available by the Attorney General, pursuant to such regulations as he may prescribe and in a number not to exceed 6 per centum of the number specified in section 201(a), to aliens who satisfy an Immigration and Naturalization Service officer at an examination in any non-Communist or non-Communist-dominated country, (a) that (i) because of persecution or fear of persecution on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area, or (II) from any country within the general area of the Middle East, and (ii) are unable or unwilling to return to such country or area on account of race, religion, or political opinion, and (iii) are not nationals on the countries or areas in which their application for conditional entry is made; or (B) that they are persons uprooted by catastrophic natural calamity as defined by the President who are unable to return to their usual place of abode. For the purpose of the foregoing the term "general area of the Middle East" means the area between and including (1) Libya on the west, (2) Turkey on the north, (3) Pakistan on the east, and (4) Saudi Arabia and Ethiopia on the south: Provided, That immigrant visas in a number not exceeding one-half the number specified in this paragraph may be made available, in lieu of conditional entries of a like number, to such aliens who have been continuously physically present in the United States for a period of at least two years prior to application for adjustment of status.]

[(8] (7) Visas authorized in any fiscal year, less those required for issuance to the classes specified in paragraphs (1) through (6) [and less the number of conditional entries and visas made available pursuant to paragraph (7)], shall be made available to other qualified immigrants strictly in the chronological order in which they qualify. Waiting lists of applicants shall be maintained in accordance with regulations prescribed by the Secretary of State. No immigrant visa shall be issued to a nonpreference immigrant under this paragraph, or to an immigrant with a preference under paragraph (3) or (6) of this subsection, until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a) (14).

[(9)] (8) A spouse or child as defined in section 101(b) (1) (A), (B), (C), (D), or (E) shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa [or to conditional entry under paragraphs (1) through (8)] *under paragraphs (1) through (7)*, be entitled to the same status, and

the same order of consideration provided in subsection (b), if accompanying, or following to join, his spouse or parent.

(b) In considering applications for immigrant visas under subsection (a) consideration shall be given to applicants in the order in which the classes of which they are members are listed in subsection (a).

(c) Immigrant visas issued pursuant to paragraphs (1) through (6) of subsection (a) shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General as provided in section 204.

(d) Every immigrant shall be presumed to be a nonpreference immigrant until he establishes to the satisfaction of the consular officer and the immigration officer that he is entitled to a preference status under paragraphs (1) through [(7)] (6) of subsection (a), or to a special immigrant status under section 101(a) (27), or that he is an immediate relative of a United States citizen as specified in section 201(b). In the case of any alien claiming in his application for an immigrant visa to be an immediate relative of a United States citizen as specified in section 201(b) or to be entitled to preference immigrant status under paragraphs (1) through (6) of subsection (a), the consular officer shall not grant such status until he has been authorized to do so as provided by section 204.

(e) For the purposes of carrying out his responsibilities in the orderly administration of this section, the Secreary of State is authorized to make reasonable estimates of the anticipated numbers of visas to be issued during any quarter of any fiscal year within each of the categories of subsection (a), and to rely upon such estimates in authorizing the issuance of such visas. The Secretary of State shall terminate the registration of any alien who fails to apply for an immigrant visa within one year following notification to him of the availability of such visa, but the Secretary shall reinstate the registration of any such alien who establishes within the two years following notification of the availability of such visa that such failure to apply was due to circumstances beyond his control. Upon such termination the approval of any petition approved pursuant to section 204(b) shall be automatically revoked.

[(f) The Attorney General shall submit to the Congress a report containing complete and detailed statement of facts in the case of each alien who conditionally entered the United States pursuant to subsection (a)(7) of this section. Such reports shall be submitted on or before January 15 and June 15 of each year.

[(g) Any alien who conditionally entered the United States as a refugee, pursuant to subsection (a)(7) of this section, whose conditional entry has not been terminated by the Attorney General pursuant to such regulations as he may prescribe, who has been in the United States for at least two years, and who has not acquired permanent residence, shall forthwith return or be returned to the custody of the Immigration and Naturalization Service and shall thereupon be inspected and examined for admission into the United States, and his case dealt with in accordance with the provisions of sections 235, 236, and 237 of this Act.

[(h) Any alien who, pursuant to subsection (g) of this section, is found, upon inspection by the immigration officer or after hearing be-

fore a special inquiry officer, to be admissible as an immigrant under this Act at the time of his inspection and examination, except for the fact that he was not and is not in possession of the documents required by section 212(a)(20), shall be regarded as lawfully admitted to the United States for permanent residence as of the date of his arrival.]

### SECTION 207 OF THE IMMIGRATION AND NATIONALITY ACT

#### ANNUAL ADMISSIONS OF REFUGEES

SEC. 207. (a) (7) *The nummber of refugee admissions granted in any fiscal year shall not exceed fifty thousand, unless the President determines, prior to the beginning of the fiscal year and after consultation by the designated representatives of the President with the Committees on the Judiciary of the Senate and the House of Representatives, that admission of a specific number of refugees in excess of fifty thousand is justified by humanitarian concerns or is otherwise in the national interest, based upon the foreseeable number of refugees of special concern to the United States who will be in need of resettlement. These refugee admissions shall be allocated among groups or classes of refugees of special concern to the United States in accordance with a determination made by the President, and there shall be periodic discussions between designated representatives of the President and members of Committees on the Judiciary regarding the progress of refugee admissions and the possible need for adjustments in the allocation of admissions among groups or classes of refugees. Prior to the start of the fiscal year, the President shall report to the Committees on the Judiciary of the Senate and the House of Representatives regarding the foreseeable number of refugees who will be in need of resettlement during the fiscal year and the anticipated allocation of refugee admissions during the fiscal year.*

*(2) The term "consultation" with respect to the admission of all refugees means personal contact by designated representatives of the President with members of the Committees on the Judiciary to review the refugee situation or emergency refugee situation, to project the extent of possible United States participation therein, to discuss the reasons for believing that the proposed admission of refugees is in the national interest, and to provide such members with information that may include—*

*(A) a description of the nature of the refugee situation;*

*(B) a description of the refugees who may be admitted, including the proposed plans for their resettlement, the estimated cost of their resettlement, an analysis of conditions within the countries from which they originated;*

*(C) an analysis of the anticipated social, economic, and demographic impact of their admission to the United States;*

*(D) a description of the extent to which other countries will admit and assist in the resetttlement of such refugees;*

*(E) an analysis of the impact of the United States' participation in the resettlement of such refugees on the United States' foreign policy interests; and*

*(F) such additional information as may be appropriate or requested by such members.*

26

*(3) Subject to the numerical limitation established pursuant to paragraph (1), the Attorney General may, in his discretion and pursuant to such regulations as he may prescribe, admit for lawful permanent residence any refugee who is not firmly resettled in any foreign country, is within a group or class of refugees determined to be of special concern to the United States, and is admissible as an immigrant under this Act, except for the fact that he does not meet the requirements of paragraph (14), (15), (20), (25), or (32) of section 212(a). The remaining provisions of section 212(a) may be waived at the discretion of the Attorney General at any time for humanitarian purposes, to assure family unity, and when it is otherwise in the public interest.*

*(b)(1) The Attorney General shall establish a uniform procedure for an alien physically present in the United States, irrespective of his status, to apply for asylum, and the alien shall be granted asylum if he is a refugee within the meaning of section 101(a)(42)(A) and his deportation or return would be prohibited under section 243(h) of this Act.*

*(2) The Attorney General shall conditionally admit into the United States, pursuant to such regulations as he may prescribe, any alien granted asylum under paragraph (1). Such admission may be terminated if the Attorney General, pursuant to such regulations as he may prescribe, determines that the alien is no longer a refugee within the meaning of section 101(a)(42)(A) owing to a change in circumstances in the alien's country of nationality or the country in which he last habitually resided, as the case may be.*

*(3) A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of any alien who qualifies for conditional admission under paragraph (2) shall, if not otherwise entitled under such paragraph, be entitled to conditional admission if accompanying, or following to join, such alien.*

*(4)(A) Not more than five thousand of the refugee admissions authorized under subsection (a) in any fiscal year may be made available by the Attorney General, in his discretion and under such regulations as he may prescribe, to adjust to lawful permanent resident the status of any alien conditionally admitted under this subsection not less than two years before the date of adjustment also—*

    *(i) makes application for such adjustments;*

    *(ii) continues to be a refugee within the meaning of section 101(a)(42)(A);*

    *(iii) is not firmly resettled in any foreign country; and*

    *(iv) is admissible as an immigrant under this Act at the time of his examination under this paragraph, except for the requirements of paragraph (14), (15), (20), (25), or (32) of section 212(a). The remaining provisions of section 212(a) may be waived at the discretion of the Attorney General at any time for humanitarian purposes, to assure family unity, and when it is otherwise in the public interest.*

*(B) Upon approval of an application pursuant to this paragraph, the Attorney General shall record the alien's admission to the United States for lawful permanent residence as of the date two years prior to the date of approval.*

SECTION 208 OF THE IMMIGRATION AND NATIONALITY ACT

*ADMISSION OF EMERGENCY SITUATION REFUGEES*

*Sec. 208. (a) If the President determines, after consultation by the President's designated representatives with the Committees on the Judiciary of the Senate and the House of Representatives, that (1) an unforeseen emergency refugee situation exists; (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest; and (3) that the admission into the United States of these refugees cannot be accomplished under section 207, the President may fix a number of refugees to be admitted into the United States in response to the emergency refugee situation.*

*(b) The admissions authorized by subsection (a) shall be allocated among groups or classes of refugees of special concern to the United States in accordance with a determination made by the President.*

*(c) Subject to the numerical limitation established pursuant to subsection (a), the Attorney General may admit into the United States conditionally or for lawful permanent reisdence, in his discretion and pursuant to such regulations as he may prescribe, any alien who is a refugee within a group or class designated pursuant to subsection (b) and who is not firmly resettled in any foreign country.*

SECTION 209 OF THE IMMIGRATION AND NATIONALITY ACT

*SPOUSES AND CHILDREN OF REFUGEES*

*Sec. 209. A spouse or child (as defined in section 101 (b) (1) (A), (B), (C), (D), or (E) of any alien who qualifies for admission under section 207 (a) or 208 shall, if not otherwise entitled to admission under such section, be entitled to the same admission status as such alien if accompanying, or following to join, such alien, and upon the spouse's or child's admission into the United States, such admission shall be charged against the numerical limitation established in accordance with the section under which the alien qualifies for admission. A spouse or child who is admitted for lawful permanent residence in accordance with this section shall be required to establish admissibility to the United States as an immigrant except for the requirements of paragraph (14), (15), (20), (25), or (32) of section 212 (a). The remaining provisions of section 212 (a) may be waived at the discretion of the Attorney General at any time for humanitarian purposes, to assure family unity, and when it is otherwise in the public interest.*

SECTION 210 OF THE IMMIGRATION AND NATIONALITY ACT

*GRANTING OF IMMIGRANT STATUS TO EMERGENCY SITUATION REFUGEES*

*Sec. 210. (a) Notwithstanding any numerical limitation specified in this Act, any alien who has been admitted into the United States conditionally under section 208 or 209—*

 *(1) whose admission has not been terminated by the Attorney General pursuant to such regulations as he may prescribe;*

 *(2) who has not acquired permanent resident status; and*

*(3) who has been physically present in the United States for at least two years,*

*shall, at the end of such two years, return or be returned to the custody of the Service for inspection and examination for admission into the United States as an immigrant in accordance with the provisions of sections 235, 236, and 237.*

*(b) Any alien who, pursuant to subsection (a), is found upon inspection by an immigration officer or after a hearing before a special inquiry officer, to be admissible as an immigrant under this Act at the time of his inspection and examination except for the fact that the alien does not meet the requirements of paragraph (14), (15), (20), (21), (25), or (32) of section 212(a) shall be regarded as lawfully admitted to the United States for permanent residence as of the date of his arrival. The remaining provisions of section 212(a) may be waived at the discretion of the Attorney General at any time for humanitarian purposes, to assure family unity, and when it is otherwise in the public interest.*

### SECTION 211 OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 211. Except as provided in subsection (b) *and subsection (c)* no immigrant shall be admitted into the United States unless at the time of application for admission he (1) has a valid unexpired immigrant visa or was born subsequent to the issuance of such visa of the accompanying parent, and (2) presents a valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General. With respect to immigrants to be admitted under quotas of quota areas prior to June 30, 1968, no immigrant visa shall be deemed valid unless the immigrant is properly chargeable to the quota area under the quota of which the visa is issued.

(b) Notwithstanding the provisions of section 212(a) (20) of this Act in such cases or in such classes of cases and under such conditions as may be by regulations prescribed, returning resident immigrants, defined in section 101(a)(27)(A), who are otherwise admissible may be readmitted to the United States by the Attorney General in his discretion without being required to obtain a passport, immigrant visa, reentry permit or other documentation.

*(c) The provisions of subsection (a) shall not apply to an alien whom the Attorney General admits to the United States for lawful permanent residence under section 207.*

### SECTION 212(a)(14) OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 212(a)(14). Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that (A) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of aliens who are members of the teaching profession or who have exceptional ability in the sciences or the arts), and available at the time of application for a visa and admission to the United States and

29

at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to preference immigrant aliens described in section 203(a) (3) and (6), and to nonpreference immigrant aliens described in [section 203(a) (8)] *section 203(a) (7);*

### SECTION 212(a)(32) OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 212(a) (32). Aliens who are graduates of a medical school not accredited by a body or bodies approved for the purpose by the Commissioner of Education (regardless of whether such school of medicine is in the United States) and are coming to the United States principally to perform services as members of the medical profession, except such aliens who have passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health, Education, and Welfare) and who are competent in oral and written English. The exclusion of aliens under this paragraph shall apply to preference immigrant aliens described in section 203(a) (3) and (6) and to nonpreference immigrant aliens described in section [203(a) (8)] *203 (a) (7).*

### SECTION 243(H) OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 243. (h) The Attorney General [is authorized to withhold deportation of] *shall not deport or return* any alien [within the United States] *(other than an alien described in section 241(a) (19))* to any country [in which in his opinion the alien would be subject to persecution] *where such alien's life or freedom would be threatened* on account of *his* race, religion, *nationality, membership of a particular social group,* or political opinion, [and for such period of time as he deems to be necessary for such reason] *unless deportation or return would be permitted under the terms of the United Nations Protocol Relating to the Status of Refugees.*

### SECTION 244(D) OF THE IMMIGRATION AND NATIONALITY ACT

SEC. 244. (d) Upon the cancellation of deportation in the case of any alien under this section, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the cancellation of deportation of such alien is made, and unless the alien is an immediate relative within the meaning of section 201(b) the Secretary of State shall reduce by one the number of nonpreference immigrant visas authorized to be issued under [section 203(a) (8)] *section 203(a) (7)* for the fiscal year then current.

### MIGRATION AND REFUGEE ASSISTANCE ACT OF 1962

\*          \*          \*          \*          \*          \*          \*

SEC. 2. (a) \* \* \*

\*          \*          \*          \*          \*          \*          \*

【(b) There are hereby authorized to be appropriated such amounts as may be necessary from time to time—

【(1) for contributions to the activities of the United Nations High Commissioner for Refugees for assistance to refugees under his mandate or in behalf of whom he is exercising his good offices;

【(2) for assistance to or in behalf of refugees designated by the President (by class, group, or designation of their respective countries of origin or areas of residence) when the President determines that such assistance will contribute to the defense, or to the security, or to the foreign policy interests of the United States;

【(3) for assistance to or in behalf of refugees in the United States whenever the President shall determine that such assistance would be in the interest of the United States: Provided, That the term "refugees" as herein used means aliens who (A) because of persecution or fear of persecution on account of race, religion, or political opinion, fled from a nation or area of the Western Hemisphere; (B) cannot return thereto because of fear of persecution on account of race, religion, or political opinion; and (C) are in urgent need of assistance of the essentials of life;

【(4) *for assistance to State or local public agencies providing services for substantial numbers of individuals who meet the requirements of subparagraph (3) (other than clause (C) thereof) for (A) health services and educational services to such individuals, and (B) special training for employment and services related thereto;*

【(5) *for transportation to, and resettlement in, other areas of the United States of individuals who meet the requirements of subparagraph (3) (other than clause (C) thereof) and who, having regard for their income and other resources, need assistance in obtaining such services; and*

【(6) *for establishment and maintenance of projects for employment or refresher professional training of individuals who meet the requirements of subparagraph (3) (other than clause (C) thereof) and, having regard for their income and resources, need such employment or need assistance in obtaining such retaining.*】

(b) *(1) There are hereby authorized to be appropriated such amounts as may be necessary from time to time—*

(A) *for contributions to the activities of the United Nations High Commissioner for Refugees for assistance to refugees under his mandate or persons in behalf of whom he is exercising his good offices; for contributions to the Intergovernmental Committee for European Migration; the International Committee of the Red Cross; and to other relevant international organizations;*

(B) *for assistance to or in behalf of refugees designated by the President (by class, group, or designation of their respective countries of origin or areas of residence) when the President determines that such assistance will contribute to the foreign policy interests of the United States;*

(C) *for payments to appropriate public or non-profit private agencies to aid in the placement, resettlement, and care of refugees;*

*(D) for projects and programs to assist adult refugees in gaining skills and education necessary to become employed or otherwise self-reliant, including facility in English, vocational and technical training, professional refresher training and other recertification services, and social and employment services;*

*(E) for payments to State and local agencies for projects to provide special educational services (including facility in English) to refugee children in elementary and secondary schools;*

*(F) for child welfare services, including foster care maintenance payments and services and health care, furnished in any of the first twenty-four months during any part of which the refugee is in the United States or, in the case of a child who enters the United States unaccompanied by a parent or other close adult relative (as defined by the President), until the month after such child attains age eighteen (or such higher age as the State's child-welfare services plan prescribes for the availability of such services to any other child in that State), if later; and*

*(G) for interim support assistance during the period of initial adjustment, and for income maintenance and medical assistance, except that if a refugee receives aid or assistance under a State plan approved under Part A of title IV or under title XIX of the Social Security Act, or for supplementary security income benefits (including State supplementary payments) under the program established under title XVI of that Act, funds authorized under this subsection shall only be used for the non-Federal share of such aid or assistance, or for such supplementary payments.*

*(2) No payment shall be made under subparagraph (C) or (D) of paragraph (1) with respect to aid or services, furnished directly or through a project or program, to a refugee who entered the United States more than twenty-four months prior to receiving such aid or services.*

*(3) For special projects and programs authorized in paragraph (D) of this section, there are authorized to be appropriated each fiscal year $40,000,000, to remain available until expended, to be administered primarily by private, non-profit agencies participating in refugee resettlement programs, or by State or local public agencies, to assist refugees in resettling and become self-reliant.*

*(4) As used in this section, the term 'refugee' has the same meaning as that prescribed by paragraph (42) of section 101 (a) of the Immigration and Nationality Act (8 U.S.C. 1101 (a) (42)).*

(c) (1)  *  *  *

*      *      *      *      *      *      *

(2) There is established a United States Emergency Refugee and Migration Assistance Fund to carry out the purposes of this section. There is authorized to be appropriated to the President from time to time such amounts as may be necessary for the fund to carry out the purposes of this section, except that no amount of funds may be appropriated which, when added to amounts previously appropriated but not yet obligated, would cause such amounts to exceed [$25,000,000] *$50,000,000.* Amounts appropriated hereunder shall remain available until expended.

32

SEC. 303. (a) *The Comptroller General of the United States shall evaluate Federal and federally assisted programs to refugees resettling within the United States to determine their effectiveness and efficiency.*

*(b) The Secretary of Health, Education, and Welfare shall conduct research or provide assistance for the conducting of research into the resettlement of refugees and their adaptation to life in the United States. Such research shall include all aspects of the resettlement and adaptation process, and shall examine the status of resettled refugees to assess programs in securing and retaining employment, housing, and facility in the English language, and other factors as the Secretary finds relevant.*

*(c) There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this section.*

○

Attachment 2

| 99TH CONGRESS<br>1st Session | HOUSE OF REPRESENTATIVES | REPT. 99–132<br>Part 1 |
|---|---|---|

## REFUGEE ASSISTANCE EXTENSION ACT OF 1985

MAY 15, 1985.—Ordered to be printed

Mr. MAZZOLI, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## DISSENTING VIEWS

[To accompany H.R. 1452]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill
(H.R. 1452) to amend the Immigration and Nationality Act to
extend for two years the authorization of appropriations for refu-
gee assistance, and for other purposes, having considered the same,
report favorably thereon with an amendment and recommend that
the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof
the following:

SECTION 1. SHORT TITLE; REFERENCES IN ACT.

(a) SHORT TITLE.—This Act may be cited as the "Refugee Assistance Extension Act
of 1985".

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Whenever in this Act
an amendment or repeal is expressed in terms of an amendment to, or repeal of, a
section or other provision, the reference shall be considered to be made to a section
or other provision of the Immigration and Nationality Act.

SEC. 2. TWO-YEAR EXTENSION OF AUTHORIZATION OF APPROPRIATIONS.

(a) TWO-YEAR EXTENSION.—Section 414(a) (8 U.S.C. 1524(a)) is amended by striking
out "fiscal year 1983" and inserting in lieu thereof "each of fiscal years 1986 and
1987" each place it appears.

(b) ADDITIONAL AUTHORIZATIONS OF APPROPRIATIONS.—Such section is further
amended—

(1) by striking out "(2) and (3)" in paragraph (1) and inserting in lieu thereof
"(2) through (5)";

51-006 O

Attachment 2

2

(2) by striking out "412(c)" in paragraph (2) and inserting in lieu thereof "412(c)(1)"; and

(3) by adding at the end the following new paragraphs:

"(4) There are hereby authorized to be appropriated for each of fiscal years 1986 and 1987, $50,000,000 for the purpose of providing targeted assistance project grants under section 412(c)(2).

"(5) There are authorized to be appropriated for each of fiscal years 1986 and 1987 such sums as may be necessary to carry out section 412(f).".

SEC. 3. PLACEMENT OF OFFICE OF REFUGEE RESETTLEMENT WITHIN THE OFFICE OF SECRETARY OF HEALTH AND HUMAN SERVICES AND CLARIFYING ROLE OF SECRETARY OF EDUCATION.

(a) PLACEMENT OF ORR.—The first sentence of section 411(a) (8 U.S.C. 1521(a)) is amended by inserting "the Office of the Secretary in" after "within".

(b) PROVISION OF ASSISTANCE FOR REFUGEE CHILDREN BY SECRETARY OF EDUCATION.—Section 412(d)(1) (8 U.S.C. 1522(d)(1)) is amended by striking out "Director" and inserting in lieu thereof "Secretary of Education".

(c) AUTHORIZING SECRETARY OF EDUCATION AND ATTORNEY GENERAL TO ISSUE REGULATIONS.—Section 412(a)(9) (8 U.S.C. 1522(a)(9)) is amended by inserting ", the Secretary of Education, the Attorney General," after "The Secretary".

SEC. 4. POLICIES FOR PLACEMENT OF REFUGEES AND REGULAR CONSULTATION WITH STATE AND LOCAL GOVERNMENTS IN PLACEMENT PROCESS.

Section 412(a)(2) (8 U.S.C. 1522(a)(2)) is amended—

(1) in subparagraph (A)—

(A) by inserting "and the Federal agency administering subsection (b)(1)" after "Director",

(B) by inserting "(not less often than quarterly)" after "regularly", and

(C) by inserting "before their placement in those States and localities" after "localities";

(2) in subparagraph (C)—

(A) by striking out "and" at the end of clause (i),

(B) by striking out the period at the end of clause (ii) and inserting in lieu thereof ", and", and

(C) by adding at the end the following new clause:

"(iii) take into account—

"(I) the proportion of refugees and comparable entrants in the population in the area,

"(II) the availability of employment opportunities, affordable housing, the public and private resources (including educational, health care, and mental health services) for refugees in the area,

"(III) the likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance, and

"(IV) the secondary migration of refugees to and from the area that is likely to occur."; and

(3) by adding at the end the following new subparagraph:

"(D) With respect to the location of placement of refugees within a State, the Federal agency administering subsection (b)(1) shall, consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State.".

SEC. 5. RECEPTION AND PLACEMENT GRANTS.

(a) DIRECT GAO AUDIT OF GRANTS.—Paragraph (6) of section 412(b) (8 U.S.C. 1522(b)) is amended to read as follows:

"(6) The Comptroller General shall directly conduct an annual financial audit of funds expended under each grant or contract made under paragraph (1) for fiscal year 1985 and for fiscal year 1986.".

(b) REQUIREMENTS UNDER GRANTS.—Such section is further amended—

"(1) by adding at the end the following new paragraph:

"(7) Each grant or contract with an agency under paragraph (1) shall require the agency to do the following:

"(A) To provide quarterly performance and financial status reports to the Federal agency administering paragraph (1).

"(B)(i) To provide, directly or through its local affiliate, notice to the appropriate county or other local welfare office at the time that the agency becomes aware that a refugee is offered employment and to provide notice to the refugee that such notice has been provided, and

"(ii) upon request of such a welfare office to which a refugee has applied for cash assistance, to furnish that office with documentation respecting any cash

3

or other resources provided directly by the agency to the refugee under this subsection.

"(C) To assure that refugees, known to the agency as having been identified pursuant to paragraph (4)(B) as having medical conditions affecting the public health and requiring ·treatment, report to the appropriate county or other health agency upon their resettlement in an area.

"(D) To fulfill its responsibility to provide for the basic needs (including food, clothing, shelter, and transportation ·for job interviews and training) of each refugee resettled and to develop and implement a resettlement plan including the early employment of each refugee resettled and to monitor the implementation of such plan.

"(E) To transmit to the Federal agency administering paragraph (1) an annual report describing the following:

"(i) The number of refugees placed (by county of placement) and the expenditures made in the year under the grant or contract, including the proportion of such expenditures used for administrative purposes and for provision of services.

"(ii) The proportion of refugees placed by the agency in the previous year who are receiving cash or medical assistance described in subsection (e).

"(iii) the efforts made by the agency to monitor placement of the refugees and the activities of local affiliates of the agency.

"(iv) The extent to which the agency has coordinated its activities with . local social service providers in a manner which avoids duplication of activities and has provided notices to local welfare offices and the reporting of medical conditions of certain aliens to local health departments in accordance with subparagraphs (B)(i) and (C).

"(v) Such other information as the agency administering paragraph (1) deems to be appropriate in monitoring the effectiveness of agencies in carrying out their functions under such grants and contracts.

The agency administering paragraph (1) shall promptly forward a copy of each annual report transmitted under subparagraph (E) to the Committees on the Judiciary of the House of Representatives and of the Senate.", and

"(2) by striking out the fifth and sixth sentences of paragraph (1)(A).

(c) PERFORMANCE CRITERIA FOR GRANTS.—Such section is further amended by adding after paragraph (7) (added by subsection (b)) the following new paragraph:

"(8) The Federal agency administering paragraph (1) shall establish criteria for the performance of agencies under grants and contracts under that paragraph, and shall include criteria relating to an agency's—

"(A) efforts to reduce welfare dependency among refugees resettled by that agency,

"(B) collection of travel loans made to refugees resettled by that agency for travel to the United States,

"(C) arranging for effective local sponsorship and other nonpublic assistance for refugees resettled by that agency,

"(D) cooperation with refugee mutual assistance associations, local social service providers, health.agencies, and welfare offices,

"(E) compliance with the guidelines established by the Director for the placement and resettlement of refugees within the United States, and

"(F) compliance with other requirements contained in the grant or contract, including the reporting and other requirements under subsection (b)(7).

The Federal administering agency. shall use the criteria in the process of awarding or renewing grants and contracts under paragraph (1).".

(d) EFFECTIVE DATES OF AMENDMENTS.—(1) Section 412(b)(7) (other than subparagraphs (B)(i), (C), and (D)) of the Immigration and Nationality Act, as added by subsection (b)(1) of this section, shall apply to grants and contracts made or renewed after the end of the 30-day period beginning on the date of the enactment of this Act.

(2) Section 412(b)(7)(D) of the Immigration and Nationality Act, as added by subsection (b)(1) of this section, shall apply to grants and contracts made or renewed after the end of the six-month period beginning on the date of the enactment of this Act.

(3) The criteria required under the amendment made by subsection (c) shall be established not later than 60 days after the date of the enactment of this Act.

(e) REPORT ON RECEPTION AND PLACEMENT GRANTS.—(1) Within amounts provided in appropriation acts, the United States Coordinator for Refugee Affairs shall provide for a study on the advisability and feasibility of—

4

(A) using competitive proposals, cost reimbursement contracts, financial incentives based on performance standards, and other means for providing greater efficiency in awarding grants and contracts for initial reception and placement under section 412(b) of the Immigration and Nationality Act,

(B) modifying the eligibility requirements for agency participation under that section,

(C) permitting refugee mutual assistance associations to participate under that section and to apply for such grants and contracts, and

(D) using financial incentives linked to performance standards in awarding social service grants and contracts for services under section 412(c) of the Immigration and Nationality Act.

(2) The Coordinator shall submit the results of the study to Congress not later than six months after the date of the enactment of this Act.

(f) USE OF FUNDS FOR ENHANCED RECEPTION AND PLACEMENT.—Funds appropriated for fiscal year 1986 or fiscal year 1987 which may be used to carry out section 412(b)(1) of the Immigration and Nationality Act may be used for enhanced reception and placement services under that section without regard to any limitation of law that is not part of this Act, the Immigration and Nationality Act, or an appropriations Act.

SEC. 6. ALLOCATION AND USE OF SOCIAL SERVICE FUNDS.

(a) BASED ON REFUGEE POPULATION.—Section 412(c) (8 U.S.C. 1522(c)) is amended—

(1) by redesignating paragraphs (1), (2), and (3) as clauses (i), (ii), and (iii), respectively,

(2) by inserting "(1)(A)" before "The Director", and

(3) by adding at the end the following new subparagraph:

"(B) The funds available for a fiscal year for grants and contracts under subparagraph (A) shall be allocated among the States based on the total number of refugees (including children and adults) who arrived in the United States after March 31, 1975, and who are actually residing in each State (taking into account secondary migration) as of the beginning of the fiscal year.".

(b) CLARIFICATION OF USE OF SOCIAL SERVICE FUNDS.—Such section is further amended by adding at the end the following new subparagraph:

"(C) Any limitation which the Director establishes on the proportion of funds allocated to a State under this paragraph that the State may use for services other than those described in subsection (a)(1)(B)(ii) shall not apply if the Director receives a plan (established by or in consultation with local governments) and determines that the plan provides for the maximum appropriate provision of employment-related services for, and the maximum placement of, employable refugees consistent with performance standards established under section 106 of the Job Training Partnership Act.".

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to allocations of funds for fiscal years beginning with fiscal year 1986.

(d) CONFORMING AMENDMENT.—Section 412(e)(2)(A)(i) (8 U.S.C. 1522(e)(2)(A)(i)) is amended by striking out "(c)(1)" and inserting in lieu thereof "(c)(1)(A)(i)".

SEC. 7. MAINTAINING FUNDING LEVEL OF MATCHING GRANT PROGRAM.

(a) MAINTAINING FUNDING LEVEL.—Subject to the availability of appropriations, the Director of the Office of Refugee Resettlement shall not reduce the maximum average Federal contribution level per refugee in the matching grant program and shall not increase the percentage grantee matching requirement under that program below the level, or above the percentage, in effect under the program for grants in fiscal year 1985.

(b) MATCHING GRANT PROGRAM.—The "matching grant program" referred to in subsection (a) as the voluntary agency program which is known as the matching grant program and is funded under section 412(c) if the Immigration and Nationality Act.

SEC. 8. TARGETED ASSISTANCE PROJECT GRANTS.

(a) SPECIFIC AUTHORIZATION FOR TARGETED ASSISTANCE PROJECT GRANTS.—Section 412(c) (8 U.S.C. 1552(c)), as amended by section 6, is further amended by adding at the end the following new paragraph:

"(2)(A) The Director is authorized to make grants to States for assistance to counties and similar areas in the States where, because of factors such as unusually large refugee populations (including secondary migration), high refugee concentrations, and high use of public assistance by refugees, there exists and can be demonstrated a specific need for supplementation of available resources for services to refugees.

5

"(B) Grants shall be made available under this paragraph—
"(i) primarily for the purpose of facilitating refugee employment and achievement of self-sufficiency,
"(ii) in a manner that does not supplant other refugee program funds and that assures that not less than 95 percent of the amount of the grant award is made available to the county or other local entity, and
"(iii) without regard to the date a refugee arrived in the United States.".
(b) CONFORMING AMENDMENT.—Section 412(e)(2)(A)(ii) (8 U.S.C. 1522(e)(2)(A)(ii)) is amended by inserting "or targeted assistance" after "social service".

SEC. 9. CASH AND MEDICAL ASSISTANCE.

(a). CLARIFICATION OF DISQUALIFICATION FROM CASH ASSISTANCE FOR REFUGEES REFUSING OFFERS OF EMPLOYMENT OR TRAINING.—Paragraph (2) of section 412(e) (8 U.S.C. 1522(e)) is amended—
(1) by striking out the last sentence of subparagraph (A), and
(2) by adding at the end the following new subparagraph:
"(C) In the case of a refugee who—
"(i) refuses an offer of employment which has been determined to be appropriate either by the agency responsible for the initial resettlement of the refugee under subsection (b) or by the appropriate State or local employment service,
"(ii) refuses to go to a job interview which has been arranged through such agency or service, or
"(iii) refuses to participate in a social service or targeted assistance program referred to in subparagraph (A)(ii) which such agency or service determines to be available and appropriate,
cash assistance to the refugee shall be terminated (after opportunity for an administrative hearing) or for a period of three months (for the first such refusal) or for a period of six months (for any subsequent refusal).".
(b) ORR ARRANGING PROVISION OF MEDICAL ASSISTANCE.—(1) Paragraph (5) of such section is amended to read as follows:
"(5) The Director shall, to the extent of available appropriations, arrange for the provision of medical assistance during the one-year period after their entry, and for purposes of title XIX of the Social Security Act the Director may provide that such individuals may be considered to be individuals receiving assistance under title IV of such Act."; and
(2) Paragraph (6) of such section is amended by inserting "(other than under paragraph (5))" after "under this subsection".
(c) CONSIDERATION OF RECOMMENDATIONS AND ASSISTANCE OF VOLUNTARY AGENCIES.—Such section is further amended by adding at the end the following new paragraph:
"(8) In its provision of assistance to refugees, a State or political subdivision shall consider the recommendations of, and assistance provided by, agencies with grants or contracts under subsection (b)(1).".
(d) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) of this section shall apply to aliens entering the United States as refugees on or after the first day of the first calendar quarter that begins more than 90 days after the date of the enactment of this Act.

SEC. 10. PERMITTING COVERAGE OF CERTAIN DEPENDENT REFUGEES UNDER ALTERNATIVE PROJECTS.

Section 412(e)(7)(A) (8 U.S.C. 1522(e)(7)(A)) is amended by adding at the end the following new sentence: "The Secretary may permit alternative projects to cover specific groups of refugees who have been in the United States 36 months or longer if the Secretary determines that refugees in the group have been significantly and disproportionately dependent on welfare and need the services provided under the project in order to become self-sufficient and that their coverage under the projects would be cost-effective."

SEC. 11. REFUGEES COVERED BY ANNUAL REPORT.

Section 413(a)(2)(A) (8 U.S.C. 1523(a)(2)(A)) is amended by striking out "under this Act since May 1975" and inserting in lieu thereof "the United States within the five-fiscal year period immediately preceding the fiscal year within which the report is to be made and for refugees who entered earlier and who have shown themselves to be significantly and disproportionately dependent on welfare".

SEC. 12. PROHIBITING USE OF BLOCK OR CONSOLIDATED GRANTS.

Section 412(a)(4) (8 U.S.C. 1522(a)(4)) is amended—

6

(1) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively,

(2) by inserting "(A)" after "(4)", and

(3) by adding at the end the following new subparagraphs:

"(B) No funds may be made available under this chapter (other than under subsection (b)(1)) to States or political subdivisions in the form of block grants, per capita grants, or similar consolidated grants or contracts. Such funds shall be made available under separate grants or contracts—

"(i) for medical screening and initial medical treatment under subsection (b)(5),

"(ii) for services for refugees under subsection (c)(1),

"(iii) for targeted assistance project grants under subsection (c)(2), and

"(iv) for assistance for refugee children under subsection (d)(2).

"(C) The Director may not delegate to a State or political subdivision his authority to review or approve grants or contracts under this chapter or the terms under which such grants or contracts are made.".

SEC. 13. ASSISTANCE TO STATES AND COUNTIES FOR INCARCERATION OF CERTAIN CUBAN NATIONALS.

Section 412 (8 U.S.C. 1522) is further amended by adding at the end the following new subsection:

"(f) ASSISTANCE TO STATES AND COUNTIES FOR INCARCERATION OF CERTAIN CUBAN NATIONALS.—(1) The Attorney General shall pay compensation to States and to counties for costs incurred by the States and counties to confine in prisons, during the fiscal year for which such payment is made, nationals of Cuba who—

"(A) were paroled into the United States in 1980 by the Attorney General,

"(B) after such parole committed any violation of State or county law for which a term of imprisonment was imposed, and

"(C) at the time of such parole and such violation were not aliens lawfully admitted to the United States—

"(i) for permanent residence, or

"(ii) under the terms of an immigrant or a nonimmigrant visa issued, under this Act.

"(2) For a State or county to be eligible to receive compensation under this subsection, the chief executive officer of the State or county shall submit to the Attorney General, in accordance with rules to be issued by the Attorney General, an application containing—

"(A) the number and names of the Cuban nationals with respect to whom the State or county is entitled to such compensation, and

"(B) such other information as the Attorney General may require.

"(3) For a fiscal year the Attorney General shall pay the costs described in paragraph (1) to each State and county determined by the Attorney General to be eligible under paragraph (2); except that if the amounts appropriated for the fiscal year to carry out this subsection are insufficient to cover all such payments, each of such payments shall be ratably reduced so that the total of such payments equals the amounts so appropriated.

"(4) The authority of the Attorney General to pay compensation under this subsection shall be effective for any fiscal year only to the extent and in such amounts as may be provided in advance in appropriation Acts.".

## PURPOSE OF LEGISLATION

The purpose of the legislation is to extend for two years the funding authorization for domestic resettlement activities under the Refugee Act of 1980.

## NEED FOR LEGISLATION

The basic legislative authority for funding refugee resettlement expired on September 30, 1983. Since that time, the funding authority has been established annually through the Continuing Resolution. This legislation will authorize resettlement activities for two fiscal years, as well as provide for certain program changes. The Committee is convinced that a two year authorization, coupled

7

with the program changes included in this legislation, will promote a more effective and coordinated approach to refugee resettlement.

## HISTORY OF LEGISLATION

*97th Congress*

During the Ninety-seventh Congress the Subcommittee on Immigration, Refugees, and International Law held three days of hearings on September 16, 17, and 23, 1981, on the domestic and foreign policy implications of the United States Refugees Admissions Program, including two days on H.R. 5879, the Administration's refugee assistance extension legislation.

In addition, in April 1981, the Subcommittee undertook a factfinding trip to California to review refugee resettlement activities in that area. The findings and recommendations are contained in the Subcommittee's trip report (Committee Print No. 7). Following the hearings and oversight activities, legislation reauthorizing the Refugee Act for fiscal year 1983 was enacted (Public Law 97–363) during the Ninety-seventh Congress.

That legislation, which included many of the recommendations made in the Subcommittee's aforementioned trip report, required greater coordination between the Federal Government, state and local governments, and voluntary agencies in the placement and resettlement of refugees. The major area of focus in the legislation was an increased emphasis on social service programs aimed at promoting early self-sufficiency. A line item for social services was included with the stipulation that such programs be aimed at employment-related services and English language training.

The 1982 law also strengthened the penalties on refugees who did not accept job offers or who refused to participate in appropriate social service programs. It also denied refugee cash assistance to certain full-time students. Reporting requirements were also placed on Volags regarding notification to states of refugees on welfare. To respond to the concerns of highly impacted areas, the 1982 amendments required a plan for the initial placement of refugees so that the financial burden of continued influxes of refugees did not fall on already strained state and local resources.

*98th Congress*

The reauthorization of refugee resettlement activities was once again the focus of Subcommittee consideration in the 98th Congress. The Subcommittee held extensive hearings (June 6, 7, and 9, 1983) on H.R. 3195, a bill introduced on June 2, 1983, by the Honorable Romano L. Mazzoli, Chairman of the Subcommittee on Immigration, Refugees, and International Law, to extend refugee assistance for three years. Also considered was H.R. 3611, the Administration's three year extension proposal, introduced by the Honorable Dan Lungren (by request) on July 20, 1983.

In addition to reviewing the domestic resettlement program, the Subcommittee also received testimony on the legal and operational aspects of the refugee definition as set forth in the Refugee Act of 1980. The role and mandate of the Refugee Coordinator was also examined in detail. During the hearings, testimony was heard from: Ambassador Eugene Douglas, United States Coordinator for

8

Refugee Affairs; Elliott Abrams, Assistant Secretary for the
Bureau of Human Rights and Humanitarian Affairs; Alan Nelson,
Commissioner for Immigration and Naturalization Service; James
Purcell, Director for the Bureau for Refugee Programs and Phillip
Hawkes, Director in the Office of Refugee Resettlement (ORR), De-
partment of Health and Human Services; and Samuel W. Bowlin,
Director, National Security and International Affairs Division,
General Accounting Office.

Other witnesses included state refugee coordinators, representa-
tives of state and local governments, and voluntary agencies, and
other interested organizations. Additionally, Mr. Mazzoli and staff
made investigative site visits to the following areas: Houston,
Dallas/Ft. Worth, Texas; Chicago, Illinois; St. Paul, Minnesota; Mil-
waukee, Wisconsin; Providence, Rhode Island; Washington, D.C.
and Arlington, Virginia. These trips revealed a need for closer co-
operation between all parties in the resettlement process and a
concerted effort to reduce the "welfare dependency" syndrome.

The annual consultive process on the levels of admissions of refu-
gees under the Refugee Act was the subject of a private consulta-
tion and a Committee hearing on September 20, during which the
Executive Branch's proposal to admit 72,000 refugees during fiscal
year 1984 was considered.

On July 28, 1983, the Subcommittee approved H.R. 3195 with sev-
eral amendments. A clean bill was favorably reported to the full
Committee. The clean bill, H.R. 3729, was introduced on August 1,
1983, by Mr. Mazzoli and was cosponsored by all Members of the
Subcommittee.

*99th Congress*

During the Congressional recess, the Subcommittee staff made
several site visits by refugee resettlement agencies, service provid-
ers and Mutual Assistance Associations (MMA's) around the D.C.
Metropolitan Area to obtain current information on the status of
the refugee resettlement program. In addition, a site visit was
made to Chicago, Illinois to investigate firsthand the progress of
the Chicago Resettlement Demonstration Project.

On March 7, Subcommittee Chairman Mazzoli introduced legisla-
tion to reauthorize the Refugee Act, H.R. 1452. That bill, as intro-
duced, was identical to H.R. 3729 with one exception: H.R. 1452 did
not include the Fish Demonstration Project Amendment, since that
amendment had already been enacted into law by way of the Con-
tinuing Resolution.

On April 17, the Subcommittee held a hearing on H.R. 1452. Wit-
nesses testifying included the Director of the Office of Refugee Re-
settlement, HHS, Phillip Hawkes; the U.S. Coordinator for Refugee
Affairs, Eugene Douglas; the Director of the Bureau for Refugee
Programs, State Department, James Purcell; Karl Zukerman, rep-
resenting the voluntary resettlement agencies, Rachel Rhea, repre-
senting the National Association of Counties, and Edwin Silver-
man, representing the Illinois State Refugee Program.

On May 7, the Subcommittee marked-up H.R. 1452 and ordered
the bill, with a single amendment in the nature of a substitute fa-
vorably reported to the full Committee by a record vote of 8 to 1.

9

### Committee Vote

Following one day of full Committee mark-up on May 9, 1985, the Committee ordered H.R. 1452, with an amendment in the nature of a substitute, favorably reported to the House by a vote of 30 yeas to 3 nays.

### Background

Prior to enactment of the Refugee Act of 1980, the United States had no formal process for the admission of individuals seeking refuge in this country. Admissions were on an ad hoc basis, generally made in response to a particular crisis at a particular time involving particular groups of people. Recognizing the United States humanitarian responsibility to provide refuge and the need for a stable and organized admission and resettlement program, Congress enacted and the President signed into law the Refugee Act of 1980.

The Refugee Act of 1980 provides a definition for the determination of "refugee" status, consistent with international law, and establishes the framework for the selection of refugees for admission to the United States. Under the provisions of Title II of the Act, the President determines, after consultations between the Executive Branch and Congress, the number of refugees to be admitted during each fiscal year. Following is a table detailing the refugee admissions levels since enactment of the Refugee Act.

| | Executive branch proposed refugee admissions | Presidential determination | Actual admissions |
|---|---|---|---|
| Fiscal year: | | | |
| 1981 | 217,000 | 217,000 | 159,000 |
| 1982 | 173,000 | 140,000 | 97,000 |
| 1983 | 98,000 | 90,000 | 61,681 |
| 1984 | 72,000 | 72,000 | 71,113 |
| 1985 | 70,000 | 70,000 | [1] 32,918 |

[1] Through March 1985.

Title III establishes the Office of a United States Coordinator for Refugee Affairs and mandates the coordination of all United States domestic and international refugee admissions and resettlement programs.

Title IV provides for a detailed assistance program for the resettlement of refugees in the United States. The assistance provided under the terms of the Refugee Act takes several forms.

First, the act authorizes ORR to reimburse States for 100 percent of their costs in providing cash assistance and medical assistance to refugees in the U.S. for 3 years or less.

Second, ORR provides funding to States for a broad range of social services to refugees. Permissible services include any service allowable in a State's plan under Title XX of the Social Security Act, as well as a number of services specifically identified in ORR policy instructions to the States. These specific services include English language training, job development and placement, career counseling, vocational training, day care for children to permit en-

10

rollment of parents in training programs, and translation and interpreter services.

Third, under the authority of the Refugee Act, funds have been appropriated for overseas monitoring of health screening and immunization of Southeast Asian refugees prior to their entry into the country, for port-of-entry inspection and health department notification, and for health assessments after they arrive at their destination.

Finally, the Refugee Act authorizes ORR to provide special educational services to refugee children in elementary and secondary schools where a demonstrated need has been shown.

Approximately 54 percent of eligible refugees who have been in the United States three years or less are currently receiving some form of public assistance. In California, the percentage of time eligible refugees receiving assistance is estimated by ORR to be 85 percent. The current dependency rates continue to trouble the Committee.

The Committee notes that some innovative efforts are being made to involve the private sector to a greater extent in the resettlement process. Businesses, agricultural enterprises, and educational institutions have served to raise "community consciousness" and forge a closer relationship between refugees and the local community. In addition, alternative methods of refugee resettlement are being devised and tested with the goal of preventing and reducing welfare dependency.

These efforts to improve coordination at the local level must be expanded, and a constant and meaningful dialogue must be established and maintained between the various private and public participants in the resettlement process.

### ANALYSIS OF THE LEGISLATION, AS AMENDED

#### AUTHORIZATION PERIOD AND LEVEL

The amendment provides for a two-year extension of the authorization of appropriations for the domestic resettlement of refugees.

For each year the authorization levels are as follows: (1) $100 million for social services; (2) $50 million for targeted assistance to heavily impacted areas; (3) $14 million for health screening and initial treatment; and (4) such sums as may be necessary for all other activities, namely, cash and medical assistance, special educational assistance, the matching grant program, and administrative costs.

Since 1975, the Federal Government has maintained a policy of 100% reimbursement to State and local governments for the costs they incur in resettling refugees, subject to appropriations. The assessment of the reimbursable cash and medical costs is difficult due to the variable dependency rates and refugee flows. Accordingly, the Committee has continually adopted a "such sums" approach for these reimbursable costs to allow for maximum flexibility in the appropriations process. The Committee does not believe it is appropriate or advisable to establish a sum certain for cash and medical cost reimbursement. Consequently, nothing in the Committee amendment alters in any way the current federal reimbursement requirements for time eligible refugees.

11

SOCIAL SERVICES

The amendment, like the Refugee Act of 1980 itself, provides a line item authorization for refugee social services. The line item authorization carried forward for each of fiscal years 1986 and 1987 is $100 million. Such services include English language training, job training, and job placement. By maintaining a line item approach to social services, the Committee underscores its firm belief that the provision of such services is the fundamental element through which refugees can avoid cash or medical assistance dependency.

The Committee further underscores its view that the current funding level of social services is inadequate to provide the necessary services designed to promote faster resettlement and self-sufficiency. The current budget request is less than half the amount the Committee feels is required to carry out the mandate of the Refugee Act.

In its report on the Refugee Assistance Amendments of 1982 (H. Rept. No. 97–541) the Committee flatly rejected the theory upon which the Administration's fiscal year 1983 social services budget request was made, namely, that social service funding allocations, should be based on the anticipated number of refugee arrivals.

Again in its report on H.R. 3729 last Congress, the Committee reiterated its position that social service funds should be allocated based upon the number of refugees who need such services, regardless of their age and date of entry and expressed dismay at the Administration's continued disregard of this view. Consequently, the Committee amendment requires the allocation of social service funds to be based on total refugee population. The Committee feels, however, that the most effective use of these funds emphasizes upfront services to the refugees in the country less than 36 months to help them obtain jobs and thus prevent welfare dependency.

On a related issue of social service money allocation, the Committee provides that the current administratively-imposed limitation upon a state's use of social service funds shall not apply if ORR receives a plan providing for maximum job placement consistent with certain performance standards. These standards include placement in unsubsidized employment, retention in unsubsidized employment, increase in earnings, and the reduction in welfare dependency as outlined in Section 106 of the Job Training Partnership Act.

The Committee strongly reiterates its belief that the use of social service funds should emphasize employment-related services as the best method of ensuring refugee self-sufficiency and adjustment. Nothing in this provision alters that focus. The provision is simply designed to provide greater flexibility to the State and local governments given local circumstances and conditions. In addition, the Committee recognizes the humanitarian obligation to provide services to refugees in need of them and who, because they are unemployable due to age or health reasons, cannot access the employment-related services.

12

## TARGETED ASSISTANCE

Section 2 of the legislation provides a $50 million line item authorization for targeted assistance. Section 8, in turn, outlines the scope of the targeted assistance program and sets forth the conditions that must be met before a locality may be considered eligible for assistance. The criteria for receiving targeted assistance under the Committee amendment are very similar to the criteria set forth by the Department of Health and Human Services in fiscal year 1983 when it dispersed $81.5 million in targeted assistance to counties for refugees and Cuban/Haitian entrants where "because of factors such as unusually large refugee populations, high refugee concentrations, and high use of public assistance there exists and can be demonstrated a specific need for supplementation of currently available resources for services to [refugees]". The targeted assistance program contained in the legislation, however, differs in two significant respects from the Administration's fiscal year 1983 program.

First, whereas the Administration's program was aimed exclusively at funding projects that would directly promote economic self-sufficiency among refugees, the legislation, although specifying that the funding of projects aimed at self-sufficiency should be the primary goal of the program, does not preclude the use of some targeted assistance funds for other important activities, such as assisting local health departments to meet the costs of providing initial medical treatment to refugees.

Second, the targeted assistance funds will be allocated on the basis of total refugee population, not just adult time-eligible refugees. The Committee reiterates its belief that the use of targeted assistance funds should emphasize programs for time-eligible refugees as the best method of lessening the impact of a welfare-dependent refugee population.

The Committee intends to re-examine the necessity of a targeted assistance program in the future, taking into consideration the reduction in refugee admissions, the new formula for allocating social services and the lessening of the impact, if any, due to improved placement policies and the passage of time.

## MEDICAL SCREENING AND INITIAL TREATMENT

The legislation provides a $14 million line item for health screening and initial treatment. The Committee is concerned that the use of these funds also focus on initial preventative health treatment and follow-up. The Committee notes with disapproval that no funds have been expended in the past for treatment costs. The Committee feels it is vitally important that funding be provided to local health departments in some proportion to help defray the substantial costs they have had to bear in providing initial health treatment and any follow-up deemed necessary for preventative health reasons. Recognizing the importance of outreach services and health access services, the Committee sees no reason why these funds cannot be used to provide such services, once the initial screening and treatment costs have been met.

13

### EDUCATION ASSISTANCE AND TRANSFER OF OFFICE OF REFUGEE RESETTLEMENT

The Refugee Act of 1980 authorized the Director of ORR to make grants and enter into contracts for payments for projects to provide special education services to refugee children. Since 1980 this authority has been exercised by the Secretary of Education through an interagency agreement with ORR. This arrangement has proven too complicated and has resulted in long delays in providing funding to local school districts. The Committee amendment remedies this problem by relieving the Director of his authority to fund special education projects and transfers that authority directly to the Secretary of Education. The Committee expects that this transfer will reduce delays and promote a more orderly and efficient functioning of the program.

The Office of Refugee Resettlement is presently located within the Social Security Administration at HHS. The Committee believes that the Office should not be relegated to a suboffice within the Social Security Administration. Moreover, the Administration's decision to place ORR within Social Security has created the impression that ORR's primary mission is income maintenance, when in reality Congress intended that it be a high level office whose primary mission is to promote economic self-sufficiency.

The Committee is convinced that the placement of ORR within Social Security has impeded creative programming. Accordingly, the legislation transfers ORR to the Office of the Secretary of Health and Human Resources, where the Director will have ready access to the Secretary and where ORR's accountability to the Congress and the American people for all aspects of the domestic resettlement will be enhanced.

The Committee further believes that the statutory creation of a high level office will provide an important focal point for State and local governments, as well as public and private agencies, involved in the resettlement process. Finally, the Committee notes that the Conference Report on the Refugee Act of 1980 (Rept. No. 96–781) expressed the "intention of the Conferees that the Director should, unless and until a reorganization of the Department occurs, report directly to the Secretary." The legislation thus mandates that which was already intended.

### CASH AND MEDICAL ASSISTANCE

The refugee population, is, by its very nature, more severely affected by serious and debilitating bodily illness than the U.S. population in general. Because of their unique health needs, refugees are acutely aware of the importance of obtaining adequate medical coverage, whether through insurance or Medicaid. Unfortunately, many refugees, especially Indochinese refugees in entry level jobs, have found that their employers either do not offer their employees insurance or that the cost of private insurance is prohibitive. As a result, many feel compelled to either quit their jobs or pursue a job opportunity only half-heartedly, so as to ensure their eligibility for Medicaid. This is particularly the case for pregnant women and parent with sick children.

14

Other refugees who have every intention of seeking employment recognize the importance of medical coverage and, as a result, go to their local welfare office to apply. Once there, however, they are informed of the existence of various forms of cash assistance and many "sign up for the whole package" of benefits.

The Committee has heard from numerous witnesses that one of the biggest obstacles to self-sufficiency among refugees is the linkage between cash assistance and medical assistance. There is a clear consensus on the part of the Volags and witnesses who appeared during the Subcommittee's hearings or who were inteviewed during site visits that additional reductions in welfare use could be made through the separation of cash and medical assistance.

Accordingly, the Committee amendment requires the Director of ORR to establish a program through which all refugees in the United States will receive medical coverage, at no cost and without having to qualify for cash assistance, during their first year in the United States. The Committee has given the Director wide discretion in developing the type of program to be used. It can be Medicaid, private insurance, or a newly-designed program.

The Committee amendment also disqualifies an employable refugee from receiving cash assistance who has refused an appropriate offer of employment. It is the Committee's intent that under current ORR instructions, this disqualification would not apply to unemployable persons, such as those who are ill or incapacitated or age 65 or older; under age 16 or under 18 and a full-time student; or a mother or caretaker of a child under age six. In addition, the Committee amendment specifically provides that the determination of whether a particular job offer is appropriate shall be made either by the welfare eligibility worker or by the voluntary agencies (Volag) representative. It is noted that internal HHS regulations were listed several years ago to define what constitutes "appropriate work". In order to further assist eligibility workers and Volags in exercising the authority provided in this legislation it is expected that ORR will issue regulations defining the term "appropriate" offer of employment. In doing so, ORR should make clear that a particular job must be within the refugee's capabilities, does not impose any unreasonable working conditions, or pay less than the miniumm or prevailing wage.

RECEPTION AND PLACEMENT PROGRAM

*Responsibilities of Voluntary Agencies*

Voluntary agencies (Volags) are responsible for providing a wide range of resettlement services to newly-arriving refugees under the terms of their current reception and placement (R&P) cooperative agreements with the State Department. (Revised and updated in January 1985). For providing these services the Volags receive a per capita grant.

Specifically, the Volags are required to provide several "core services," including: pre-arrival, reception, counseling and referral, health services, employment related services, assistance to children, and consultation with public agencies. These "core services" are to be provided generally during the first 90 days after the refu-

15

gee's arrival with certain exceptions. In particular, Volags are responsible for providing decent, safe and sanitary housing for a minimum of 30 days, including essential furnishings, as well as food and other basic necessities for 30 days, and clothing.

The current cooperative agreement also stipulated that one of the primary goals of the R&P program is to "assist refugees to become self-sufficient through employment as soon as feasible after arrival in the United States."

The Committee wholeheartedly concurs with this objective (which is codified in the Refugee Act of 1980), but notes that existing dependency rates demonstrate that it has not been achieved. In many cases, refugees are placed on welfare within days of their arrival in this country. For example, GAO found in a March 1983 report (based on a five-county sample in selected States) that 88% of refugees receiving assistance registered for such assistance within 30 days of arrival. The sample also revealed that the dependency rate for employable age refugees was 71.4%.

These statistics indicated that many of the Volags were not living up to their commitment to move refugees toward early employment. Clearly, the unemployment situation and the availability of generous cash assistance programs in certain States have hindered their efforts.

Nevertheless, the Committee believes that Volags must redouble their efforts to discourage welfare dependency. It should be viewed only as a "last resort" in the development of a resettlement plan for any employable refugee.

To break this regrettable chain of welfare dependency, it is the Committee's belief that Volags should be primarily responsible for a refugee's well-being for those critical first few months in this country. In fact, the current cooperative agreement specifically states that it is "intended to preclude during the first 30 days that the refugees are in the United States, any necessity for reliance by the refugees on cash assistance."

To clarify their responsibilities under the R&P program, the Committee amendment proposes two major changes. First, it requires Volags to perform their responsibility "to provide for the basic needs (including food, clothing, shelter and transportation for job interviews and training) of each refugee resettled." It also requires the development and implementation of an individual resettlement plan, which emphasizes "early employment." The Committee expects to be consulted on this matter, prior to the implementation of this statutory requirement.

Second, and equally important, the Committee amendment imposes specific reporting requirements on the Volags. The Committee has been concerned for some time that the R&P grants did not provide sufficient assurances of Volag accountability. For years, Volags have not been required to report to the State Department on the number of refugees they resettled in the previous year, where they resettled them, what percentage of them are on welfare, or what portion of the total grant award was used for administrative expenses.

The legislation corrects these deficiencies by requiring the Department of State to demand, under their grant agreements, that Volags supply the above information. The legislation also requires

16

Volags to supply the State Department with quarterly performance and financial status reports. It further requires, once again as a grant condition, that Volags, upon the request of a local welfare office, provide such office with documentation describing the amount of cash or other resources that the Volag has provided or will provide to the refugee. In the case of non-cash resources, the Committee intends that such resources be quantified to assist county welfare officials in making eligibility determinations.

In this regard, the Committee amendment requires states and localities to consider the recommendations and "in kind" assistance of the Volags when providing cash assistance to refugees.

*Expenditures and Auditing*

The 1982 amendments to the Refugee Act provided that "the Comptroller General shall conduct an annual audit of funds expended under grants and contracts" between the State Department and the Volags. The General Accounting Office (GAO) interpreted this mandate to require merely that it conduct an audit of the State Department Inspector General's (IG) audit. This year, the legislation clarifies GAO's mandate. GAO is to conduct its own audit; the Committee never intended that it would be sufficient to audit the IG's audit. Such audits will be required only for fiscal years 1985 and 1986.

The GAO audits of funds expended by Volags will not relieve the Bureau for Refugee Programs of the Department of State of the responsibility for managing and monitoring their agreements with Volags and State governments. Nor are they to duplicate, or replace, the voluntary agencies' annual financial statements prepared by independent accountants. It is also expected that GAO will provide the Committee with independent reports on the Bureau's management of federal funds and the Volags' distribution and use of resettlement funds.

*Program Evaluation and Monitoring*

The Committee recognizes that over the past few years the Bureau for Refugee Programs in the State Department has made significant strides in improving its monitoring of the Volags.

While these actions, particularly the periodic on-site reviews of Volag activities in various cities around the country, are indeed commendable, the Committee believes that additional measures must be taken to improve the effectiveness of the R&P program.

In particular, GAO noted in testimony before the Immigration Subcommittee that the factors used in evaluating Volag proposals should be improved. The Committee agrees with GAO's assessment that the current review procedures do not provide an objective basis for determining Volag capability to resettle refugees in accordance with established placement policies. In fact, GAO observed that the State Department:

> should be able to establish more specific standards which would permit it to consider each voluntary agency's record of program performance in annual renewals of the Cooperative Agreements and determine whether an agency's continued participation in the program is warranted.

17

### 1. Performance Criteria

Because the Committee agrees with this GAO recommendation, the amendment mandates the establishment of criteria to evaluate the performance of Volags under their R&P grants. This performance criteria shall specifically include the Volags' efforts to: (1) reduce dependency; (2) collect refugee travel loans; (3) develop effective sponsorship; (4) encourage private sector participation; (5) cooperate with other public and private factors in the resettlement process; and (6) comply with their statutory and administrative requirements.

The legislation provides that the criteria shall be established not later than 60 days after the enactment of this legislation. It is expected that it will be utilized for evaluative purposes after a reasonable time period has elapsed between issuance of the criteria and the subsequent submission of Volag applications for an R&P grant. The Committee expects to be consulted in the development of this criteria and it will monitor closely their implementation.

### 2. Monitoring Personnel

The Committee continues to be disturbed that the State Department has not allocated adequate resources to monitoring Volag performance under their grants. Specifically, the Committee calls attention to the statement made in its 1983 Committee Report on the bill (H.R. 3729—98th Congress) which is the predecessor to this legislation. In that report (H. Rept. 98–404, p. 13) the Committee recommended that "there must be a substantial augmentation of the (Refugee) Bureau's resources and personnel devoted to this task."

Despite this recommendation, there has not been any measurable increase in staffing for this purpose. In fact, the Administration's current budget calls for an increase of only one reception and placement officer in that Bureau; thereby bringing the total to only four such officers to monitor and evaluate a program of some $50 million. Further, the Committee has been advised by the State Department that if additional responsibilities are imposed on Volags that there is a "potential need for expanded program and financial monitoring."

The Committee has brought this problem to the attention of the House Foreign Affairs Committee and the Secretary of State and is hopeful that additional personnel and resources can be provided for this important task.

The Committee also calls attention to its 1983 recommendations that: (1) "an appropriate system of sanctions be developed in the event a Volag fails to satisfy" its contractual responsibilities; and (2) the Refugee Coordinator and the Refugee Bureau "reexamine the amount of the R&P grant, with a view to increasing it to a level which takes into account these new responsibilities."

It is hoped that the aforementioned changes in the R&P program and closer communication between local Volag representatives and welfare eligibility workers as to the level of cash and "in kind" assistance provided will reduce the number of refugees qualifying for public assistance. It is expected that these changes, in conjunction with an increased commitment by the Refugee Bureau to exercise

H.Rept. 99-132 --- 2

18

effective oversight, will increase Volag responsibility and account-
ability and thereby improve the effectiveness of our domestic reset-
tlement program.

### REFUGEE PLACEMENT DECISIONS

Existing law requires the Director of ORR to develop and imple-
ment a policy for the placement and resettlement of refugees in
the United States. This policy is to be followed by the national
Volags when they meet and allocate refugees to sponsors and their
local affiliates around the country.

State and local governments have consistently complained that
their interests and concerns are not adequately considered by
Volags when these allocations are made. To insure greater coordi-
nation in this process, the Refugee Act was amended in 1982 to re-
quire the ORR Director to consult regularly with State and local
governments and with Volags "concerning the sponsorship process
and the intended distribution of refugees." ORR conducted four re-
gional consultations in fiscal year 1984 to satisfy this statutory
mandate. None have been held since that time, despite ORR's con-
clusion that the regional consultation procedure:

> ensures that national resettlement program and place-
> ment policies are developed with full awarness of State
> and local interests in facilitating successful resettlement
> . . . and that key participants in the refugee program are
> kept current on changes in international conditions affect-
> ing Federal policy in terms of the anticipated flow, level of
> assistance, and placement of refugee (ORR Report on 1984
> Consultation on Refugee Assistance, p. 1).

*Factors to be Considered*

While improvements have been made in the placement process
over the past few years, impacted states and counties continue to
voice their concerns and to urge that greater efforts be made to
place refugees in lesser-impacted areas.

In an effort to respond to this problem, the Committee amend-
ment requires the Director of ORR to consider the following factors
in developing and implementing a placement policy:

(1) the proportion of refugees and comparable entrants in the
population in the area;

(2) the availability of employment opportunities, affordable
housing, and public and private resources (including education-
al, health care, and mental health services) for refugees in the
area;

(3) the likelihood of refugees placed in the area becoming
self-sufficient and free from long-term dependence on public as-
sistance; and

(4) the secondary migration of refugees to and from the area
that is likely to occur.

In addition, the legislation directs the State Department, through
the R&P grant process, to take into account the recommendations
of a State with regard to placement locations in that State.

19

*Consultation Requirements*

The Committee amendment also strengthens the consultation requirement (described briefly above) by directing the State Department, in addition to ORR, to consult regularly with State and local governments and Volags on the sponsorship and placement process. Such consultations shall take place at least on a quarterly basis and prior to refugee placements in States and localities.

This latter requirement on timing is intended to ensure that governmental entities will be notified and consulted before the placement of large numbers of refugees in any particular State or locality. It is also anticipated that this requirement will enhance the cooperation and communication between the Federal Government, State and local governments and the Volags regarding placement strategies and decisionmaking.

The Committee emphasizes that these requirements are not intended to give States and localities any veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement planning capacity.

### ORR MATCHING GRANT PROGRAM

Since 1979, the Office of Refugee Resettlement (ORR), HHS, has funded a matching grant program for resettling refugees. While this program was originally designed to primarily serve Soviet refugees, it has been expanded in recent years to cover other refugee groups due to the declining numbers of Jews permitted to emigrate from the Soviet Union.

Basically, the program provides matching funds on a dollar-for-dollar basis to voluntary agencies for services performed in resettling refugees. These services include: English language training, employment counseling, job development and placement, recertification in the U.S. for professionals trained abroad, social services, maintenance assistance and health care.

Testimony before the Committee on numerous occasions since the program's inception has demonstrated its overwhelming success and cost effectiveness. In fact, an ORR-funded study in 1982 concluded that the Matching Grant program was an "effective mechanism for providing services in a manner and to a degree which would not be possible" under other resettlement programs. The same study also observed that the program "is a unique and effective partnership between the public and private sectors".

Despite the program's success and the findings of this study, the Administration, in its fical year 1986 budget submission for ORR, proposes to decrease the Federal matching payment from a maximum of $1,000 to $500 per refugee.

The Committee does not find any justification for this proposed decrease and, as a result, the Committee amendment includes specific language prohibiting it.

The Committee notes the relatively high levels of employment among refugees in the program and the fact that most have been kept off public assistance. In short, because the program has effectively advanced the 1980 Refugee Act's goal of early self-sufficiency, the Committee believes that the current level of funding must be continued.

20

## BLOCK GRANTS

In fiscal year 1984 the Administration proposed that the domestic resettlement of refugees be funded through a block grant (sometimes referred to as a "per capita grant"). This proposal has not been renewed for fiscal year 1986.

In the past, it was vigorously opposed by the National Governors' Association, the National Association of Counties, virtually every State refugee coordinator in the nation, and numerous Volag officials. Basically, they have all argued that the block grant proposal represents an attempt to transfer the primary funding responsibilities for resettlement from the Federal Government to State and local governments, and would politicize, within each State, the allocation of resources for refugee resettlement.

The Committee agrees that the disadvantages of the block grant proposal outweigh any potential for improvement that any such proposal might offer. The Committee is also concerned that any such proposal lacks a sufficient statutory basis to withstand a court challenge. Therefore, despite the fact that a block grant proposal has not been resubmitted to the Congress, the legislation specifically prohibits the use of block or per capita grants for domestic resettlement purposes. In short, the Committee intends that the funding mechanisms utilized since enactment of the Refugee Act shall be continued.

## DEMONSTRATION PROJECTS

In its Refugee Act Reauthorization bill in the 98th Congress, the Committee included a provision authorizing demonstration projects to test alternative refugee resettlement methods. The provision stated:

> The Secretary shall develop and implement alternative projects for refugees who have been in the United States less than thirty-six months, under which refugees are provided interim support, medical services, support services, and case management, as needed, in a manner that encourages self-sufficiency reduces welfare dependency and fosters greater coordination among the resettlement agencies and service providers.

This provision was included as an amendment to the Continuing Resolution which passed last Congress. The Committee was and still is, greatly concerned at the high incidence of welfare dependency and use among the recently arrived refugee population. The Committee hopes, that through the demonstration project method, a solution to many of the resettlement problems can be found.

The Committee recognizes the special resettlement problems of certain segments of the refugee population, particularly the Highlanders from Laos. Although many have been in this country for some time, they remain disproportionately dependent upon public cash assistance. For this reason, the Committee included a provision in this legislation permitting the demonstration projects to cover refugees in the United States longer that 36 months but who have been disproportionately dependent on welfare.

### REPORT ON RECEPTION AND PLACEMENT

The legislation calls for a study and report on the advisability and feasibility of changing certain aspects of the reception and placement program. Specifically, the U.S. Refugee Coordinator is authorized to "provide for a study," thereby allowing the Coordinator flexibility to utilize the services of an outside expert if it is determined to be necessary. The Coordinator is required to submit the results of such study undertaken either by that Office or by an independent, non-governmental entity, to Congress within six months of enactment.

No additional funds are authorized for the study since it is anticipated that the moneys to be appropriated for the Coordinator's Office will be sufficient to cover the cost of the study.

### REIMBURSEMENT FOR THE INCARCERATION OF CERTAIN CUBANS

In the Spring of 1980, approximately 125,000 Cuban nationals entered the United States in a massive boatlift from Cuba. Because of the magnitude of the "Mariel influx" and the brief time period involved, the Federal government was unable to conduct a thorough screening of many of these "entrants" prior to their release into the community.

During hearings before this Committee in 1980, it was learned that a large, but undetermined, number of entrants were released from mental health institutions and prisons and then transported to Mariel for the voyage to this country. A small number of these individuals still remain in Federal custody.

An additional number of entrants who were processed in 1980 are also incarcerated in State and local correctional facilities for non-Federal criminal offenses. This has had a disproportionate impact on certain States, such as Florida and New York, where substantial numbers of Cuban entrants have chosen to reside. Because the Federal government did not prevent their initial entry nor properly screen them upon arrival here, it bears some degree of financial responsibility for the costs of incarcerating them.

Therefore, the Committee amendment authorizes a 2-year program to reimburse States and counties for the costs of confining Cuban entrants.

The Committee notes that Congress established a reimbursement program under the auspices of the Office of Justice Assistance, Research and Statistics in P.L. 98–411. The reimbursement level of that program was not to exceed $12,000 per prisoner per annum. Although, some estimates as to the number of incarcerated Mariel Cubans in state prisons have been made, the Immigration and Naturalization Service cautions that its current estimate of 1700 is not precise. The estimate is based upon the requirements of the Justice Department program, not necessarily the same requirements as contained in the Committee amendment. Therefore, the Committee authorized such sums as necessary, subject to Appropriations, to carry out this provision.

In the event the total costs of a State and local government are not met by appropriated funds, each government's share shall be "ratably reduced".

22

SECTION-BY-SECTION ANALYSIS OF THE LEGISLATION, AS AMENDED

*Section 1:* Short title, "Refugee Assistance Extension Act of 1985."

*Section 2:* Provides a two-year authorization of appropriations for domestic resettlement; retains $100 million line item for social services and $14 million line item for health screening and initial treatment; adds a $50 million line item for targeted assistance; retains a "such sums" authorization for all other activities (i.e., education, cash and medical assistance, administrative costs, and matching grant program); and adds a "such sums" authorization for reimbursement to states and counties for costs incurred in incarcerating Mariel Cuban criminals.

*Section 3:* Moves the Office of Refugee Resettlement (ORR) from the Social Security Administration to the Office of the Secretary of HHS: transfers from ORR to the Department of Education the authority to fund special educational programs for refugee children.

*Section 4:* Requires the Director to take into account the population, availability of employment, housing, etc. and secondary migration when determining placement of refugees; requires regular consultation between the Secretary of State and states and localities prior to placement of refugees.

*Section 5:* Clarifies that during FY 1986 and 1987 the Comptroller General shall directly audit expenditures made under Reception and Placement (R & P) grants (i.e., cooperative agreements); provides that all R & P grants shall require the voluntary resettlement agency (VOLAG) to provide to HHS, for transmission to Congress, the following: (1) quarterly performance and financial status reports; and (2) an annual report describing the number and location of refugees placed, the amount of money (including administrative costs) spent under the grant, the number of refugees placed who are on welfare, the efforts made to monitor refugee placements and the activities of local VOLAG affiliates, and such other information as the Director of ORR deems appropriate; requires that each VOLAG be responsible for the basic needs (including food, clothing, shelter, and transportation for job interviews and training) of each refugee and to develop and monitor an early employment resettlement plan; requires that each VOLAG notify the local public welfare agency whenever it learns that a refugee has been offered employment and that it notify the local public health agency whenever it determines that a refugee has a medical condition affecting the public health and requiring treatment; establishes certain performance criteria to be used in the process of awarding R & P grants or contracts; requires the U.S. Refugee Coordinator to study and report on the advisability of competitive bidding, financial incentives, and expanded participation in the R & P program; authorizes R & P funds to be used for enhanced R & P without regard to any other provision outside of the Refugee Act of the Immigration and Nationality Act or Appropriations Acts.

*Section 6:* Provides that social service funding allocations shall be based on the total number of refugees in a state, including children, who entered after 1975; provides that any limitation established on the proportion of social service funds to be allocated

23

within the state shall not apply if the Director receives a plan and determines that it provides maximum provision of employment-related services and maximum job placements under the standards of the Job Training Partnership Act.

*Section 7:* Prohibits any reduction in the per capita level of the ORR matching grant program.

*Section 8:* Authorizes the Director of ORR to provide targeted assistance to impacted counties for the purpose of promoting refugee self-sufficiency; allows the use of targeted assistance grants for other than the time-eligible refugee population.

*Section 9:* Specifies that a refugee who refuses an appropriate offer of employment (as defined by the VOLAG or local employment service), or who refuses to go to a job interview arranged by the VOLAG or local employment service, or who refuses to participate in available social service or targeted assistance programs, shall be declared (after an opportunity for a hearing) to be ineligible for cash assistance for three months for the first refusal and six months for any subsequent refusal; requires the Director of ORR (to the extent of available appropriations) to arrange with states for the provision of medical assistance to all refugees, regardless of income or family composition, for the one-year period after their entry; requires a state or locality to consider the recommendations and in-kind assistance of the VOLAG's when providing cash assistance to refugees.

*Section 10:* Permits alternative projects under Fish/Wilson Amendment (enacted last year) to cover non-time-eligible groups who the Secretary determines have been significantly and disproportionately dependent on welfare if cost-effective.

*Section 11:* Limits certain reporting requirements to refugees who entered within the preceding five years unless earlier entrants remain significantly dependent on welfare.

*Section 12:* Prohibits the use of block grants, per capita grants or similar consolidated grants as a means of funding domestic resettlement activities.

*Section 13:* Directs the Attorney General to compensate state and counties (subject to available appropriations) for costs incurred by them in incarcerating, during FY 1986 and FY 1987, Mariel Cubans who entered the U.S. during 1980.

ADMINISTRATION POSITION

The Administration supports the reauthorization of the Refugee Act of 1980 and has submitted legislation to accomplish that objective. The views of the Administration on the instant proposal are set forth in the attached Departmental reports.

THE SECRETARY OF HEALTH AND HUMAN SERVICES,
*Washington, DC, April 16, 1985.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: There is currently pending before your Committee H.R. 1452, the "Refugee Assistance Extention Act of 1985". The bill contains several provisions which we strongly sup-

24

port and others about which we have serious concern. The Department's positions on the bill's major provisions are set out below.

*Responsibility of resettlement agencies for first 90 days (section 4)*

We strongly support the provision that would require the resettlement agencies to meet the basic needs of the refugees whom they resettle for food, clothing, shelter, and transportation for job interviews and for training during each refugee's first 90 days in the United States. The President's Budget for FY 1986 has anticipated such a policy by requesting that $17 million be appropriated to the Department of State rather than to this Department.

However, this provision needs to be strengthened in order to assure that a refugee does not receive duplicative assistance from both a sponsoring resettlement agency and a public welfare agency. Such simultaneous receipt of aid would be unnecessarily costly and would not reduce refugee dependency.

In order to assure that duplicative assistance is not received, we propose that the bill be strengthened by providing that refugees be ineligible for assistance under the programs of aid to families with dependent children (AFDC) and refugee cash assistance (RCA) during their first 90 days in the United States. In the absence of such a provision, refugees could be simultaneously eligible for AFDC in States which have elected not to count in-kind contributions from nonprofit agencies, as permitted by section 402(a(36) of the Social Security Act.

To avoid this occurrence, we recommend that you adopt, in this bill, language providing for a 90-day exclusion from AFDC and RCA eligibility (but not from Medicaid or refugee medical assistance eligibility) similar to the language now included in section 412(e)(7) of the Immigration and Nationality Act. Section 412(e)(7), which was enacted as part of the Continuing Resolution for FY 1985 (P.L. 98–473), requires the exclusion from public assistance eligibility of refugees who are included under alternative projects authorized by that section.

*Placement of Office of Refugee Resettlement in the Office of the Secretary (section 3(a))*

We oppose this provision for three reasons: (1) We believe that the organizational location of programs within the Department can best be determined by the Department, taking into consideration a wide range of factors which bear on the effective operation of the Department and its programs; (2) it would place an operating program in the Office of the Secretary, contrary to the organizational structure and functioning of this Department; and (3) it would disrupt an ongoing, established organizational arrangement which is functioning effectively.

The Office of Refugee Resettlement (ORR) is located in the Social Security Administration (SSA), reports directly to the Commissioner, and has access to the Secretary. In recognition of the importance of this program and the need to respond quickly to changing events, the Director of ORR also has a direct reporting relationship to the Under Secretary.

When compared to many of the Department's programs, the scope of the refugee program is limited. The refugee population is

small, the period during which ORR has its principal contact with the refugees is short (three years), and the number of mechanisms for providing assistance is limited.

From a management perspective, it is inefficient for the Department to operate with too many free-standing administrative units. The amendment would necessitate the establishment of duplicative administrative, budgetary, fiscal, personnel, and other support services that have been provided over the past few years by SSA.

*Authorization of targeted assistance project grants (section 5)*

This provision is unnecessary because targeted assistance is allowable under current law.

We oppose any specific language authorizing funds for targeted assistance because it is no longer needed and such language raises an expectation of permanent funding of what should be a temporary program. The need for targeted assistance arose from the very large numbers of refugees and Cuban and Haitian entrants who reached the United States principally during FY 1980–1982. Those needs have been addressed with funds previously appropriated under existing law, and no further funding for this purpose is currently needed or requested in the President's Budget.

The existing law provides the necessary authority for future targeted assistance funding if the need should arise.

*Transfer of the refugee educational assistance program to the Department of Education (section 3(b))*

While the President's Budget for FY 1986 does not request funds for this activity, we consider this provision to be undesirable. We believe that the intent, embodied in the Refugee Act of 1980, of creating the Office of Refugee Resettlement as a focal point for domestic assistance and services was correct and should be continued.

*Cash and medical assistance (section 6)*

We oppose the provision that mandates the eligibility for medical assistance of all refugees for the first year after entry regardless of need or economic circumstances. We are aware that the separation of eligibility for cash and medical assistance has been advocated by some as an inducement to early employment. However, that case has not been documented, nor has any showing been made that the benefits would exceed or even equal the increased assistance costs. Further, consideration must be given to the fact that medical assistance is not available to the general population on this broad basis, and such inequitable eligibility could undermine community support for refugee programs in general.

We also oppose including non-needy refugees in the Medicaid program. While recognizing that the authority is permissive, we think the precedent is extremely undesirable. In order that Medicaid retain its ability to serve the needy, it is essential that there be a clear delineation of the population eligible for services. Inclusion of unrelated groups must inevitably impede States' capacity to serve those for whom the program was originally designed.

Finally, the Administration supports the imposition of penalties, in the form of denial of cash assistance for specified periods of time, for refusing to participate in appropriate employment, em-

ployment-related activities, or social services programs. However, we are concerned with the authority that would be given to the voluntary agencies to determine that an activity or program in which a refugee has refused to participate is appropriate to his circumstances. The authority to sanction a refugee by causing publicly funded cash assistance to be denied for significant time periods should not be placed with these private entities. We would recommend that the determination be made by the welfare agency (i.e., the agency administering the cash assistance program under which benefits will be denied). Provision could also be made for recommendations from or consultation with the voluntary agency or the local employment service in cases where the agency or employment service has been involved. This would also serve to clarify that the administrative hearing required by the bill would be furnished by the public agency. Finally, consideration should be given to the inclusion of a good cause exception, so that some measure of flexibility is available to deal with the unusual case.

*Authorization of appropriations (section 2)*

We urge the adoption of a single authorization for FY 1986 and such sums as may be necessary for the following year. In its last three budgets, the Administration has proposed a single amount for refugee and entrant assistance. Given the uncertainty of refugee admissions and unexpected costs arising from secondary migration, a single authorization permits maximum responsiveness and flexibility in administering the refugee program.

Therefore, we would support enactment of the provisions discussed herein, with appropriate amendments in accordance with our above-stated views. We defer to the Departments of State and Justice on other provisions of the bill which will fall within their responsibility.

We are advised by the Office of Management and Budget that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

MARGARET M. HECKLER,
*Secretary.*

---

UNITED STATES DEPARTMENT OF STATE,
*Washington, DC, April 12, 1985.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*House of Representatives.*

DEAR MR. CHAIRMAN: The Department of State is pleased to refer to your letter of March 7, 1985 and to submit this Report on H.R. 1452, "the Refugee Assistance Extension Act of 1985." The Department wishes to address Section 4 of the bill: "Reception and Placement Grants." With respect to the other sections of the bill, we defer to the views of the Departments of Justice and Health and Human Services.

*Direct GAO Audit of Grants—Sec. 412(b)(6)*

In place of the proposed amendment, the Department of State recommends that section 412(b) (8 U.S.C. 1522(b)) be amended by striking out paragraph (6).

While recognizing the need for legislative branch review (through the GAO) of Federal programs, we believe placing an annual requirement in law for the audit of each voluntary agency grant or contract is unnecessary.

Concern about the overall financial management abilities of the voluntary agencies and specifically the existence of sizeable cash reserves arose in 1982 following the peak years of U.S. refugee admissions and the Cuban-Haitian entrant program when the voluntary agencies management structures were overextended. Since that time the Department's administration of this program has benefited from both a GAO and State Inspector General study. Based on these studies and our own internal review we have taken important steps to strengthen the monitoring and management of the voluntary agency agreements. In particular, we have included provisions in our agreements limiting the use of funds and requiring that unused balances be returned to the U.S. Government.

On January 16, 1984, the GAO commenced a second major audit, which is not yet completed. The Department believes that these two GAO reviews, together with the efforts of the Department's Inspector General and Bureau program and financial management staff, will prove more than adequate for this program which now operates under well established federal guidelines and voluntary agency procedures.

*Quarterly Reporting Requirements—Sec. 412(b)(7)(A)*

We recommend that subparagraph 7(A) of the proposed amendment be deleted.

The Department's Bureau for Refugee Programs has included in its cooperative agreements a requirement for semi-annual program and financial reports. For a program which is carried out on the basis of annual appropriations and annual admissions ceilings, we do not believe that quarterly reports would add significantly to the information needed for effective program management and oversight by either the Department or the Congress.

*Notifying Welfare Offices—Sec. 412(b)(7)(B)*

We concur with the provisions of subparagraph 7(B), which for the most part reflect a technical restructuring of this section. The requirements of both provisions are included in the cooperative agreements between the Bureau for Refugee Programs and the voluntary agencies.

*Cooperation with Public Health Agencies—Sec. 412(b)(7)(C)*

We concur with subparagraph 7(C). This requirement is also included in the Department's cooperative agreements with the voluntary agencies.

28

*90-day Responsibility for Basic Needs—Sec. 412(b)(7)(D)*

We have no objection to the language of this amendment as contained in H.R. 1452. The Administration has endorsed the concept embodied in this amendment and has incorporated it into the President's FY 1986 budget requests for the Departments of State and HHS. Such modifications to the language as we would recommend would be directed at ensuring that the legislation be effective and workable.

In particular, the amendment in H.R. 1452 does not address the question of the eligibility of a refugee for public assistance, in spite of the requirements on the voluntary agencies. For these and other technical reasons, we commend to the attention of the Committee the language of the Administration's bill to be transmitted shortly.

*Annual Reporting Requirements—Sec. 412(b)(7)(E)*

We generally support the provisions of this amendment respecting annual reporting requirements even though additional workload will result for the Department. We note, however, that the requirement set forth in Section 4(6)(E)(ii)—that voluntary agencies report on the proportion of refugees placed during the previous year who are receiving cash and medical assistance—would be difficult to fulfill. Such difficulty would result because of the relocation of some refugees, the limited period of formal voluntary agencies responsibility, and the incomplete reporting by State and local welfare agencies.

*Effective Dates*

We have no objection to the effective dates proposed for this section.

We are advised by the Office of Management and Budget that there is no objection to the presentation of this report from the standpoint of the Administration's program.

With best wishes,

Sincerely,

WILLIAM L. BALL III,
*Assistant Secretary,*
*Legislative and Intergovernmental Affairs.*

ESTIMATE OF COST

H.R. 1452, as amended, provides a two-year authorization for the refugee resettlement program established in Title IV of the Refugee Act of 1980. It also authorizes funds to reimburse states and counties for the costs associated with the incarceration of certain Cubans who were admitted to this county in 1980.

The Congressional Budget Office has estimated that the legislation will cost $520 million in fiscal year 1986 ($422 million in outlays) and $529 million in fiscal year 1987 ($513 million in outlays). The Committee concurs generally with this estimate, with one major exception.

The Committee believes that the CBO estimate overstates the cost of reimbursing State and local governments for cash and medical assistance and for administrative costs by some $25 million for each fiscal year. For example, the Committee agrees with ORR's es-

29

timate that these activities will cost $271 million in fiscal year 1986, instead of $296 million as estimated by CBO, and included as a part of CBO's 1986 fiscal year estimate (see below) of $325 million for refugee cash, medical and grant assistance. The same would be true for fiscal year 1987.

ORR's estimate is based on a projected dependency rate of 48%, whereas CBO uses a projected rate of 53%. In effect, CBO assumes that this legislation will have no effect whatsoever on refugee dependency rates. The primary purpose of this bill is to encourage economic self-sufficiency among refugees and it is the Committee's belief that H.R. 1452, if implemented promptly and properly, will result in a decreased dependency rate, particularly if California's demonstration project is successful.

Likewise, information supplied by ORR indicates that the unit costs for cash assistance, the medical utilization and medical costs, and the SSI State Supplementation costs were less in the first quarter of the current fiscal year than were originally estimated.

In addition, CBO's estimate is based on a refugee admissions level of 64,000 (excluding 4,000 matching grant refugees) when, in actuality, this level will not be determined until the Administration consults with this Committee later this summer under the terms of the Refugee Act of 1980.

## Budgetary Information

Clause 2(1)(3)(B) of Rule XI of the Rules of the House of Representatives is applicable because the instant legislation does not provide new budgetary authority. Pursuant to clause 2(1)(3)(C) of Rule XI, the following estimate was prepared by the Congressional Budget Office and submitted to the Committee.

## Congressional Budget Office Cost Estimate

1. Bill number: H.R. 1452.
2. Bill title: Refugee Assistance Extension Act of 1985.
3. Bill status: As ordered reported by the House Judiciary Committee May 9, 1985.
4. Bill purpose: This bill authorizes a two-year extension of current refugee programs and authorizes the Attorney General to reimburse states and counties for costs associated with the incarceration of Cuban refugees who were admitted to the United States in 1980 and are jailed in state and county prisons.
5. Estimated cost to the Federal Government:

[By fiscal year, in millions of dollars]

|  | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|
| Function 600: |  |  |  |  |
| Estimated authorization level: Refugee cash, medical, and grant assistance .. | 325 | 333 | ........ | ........ |
| Stated authorization Levels: |  |  |  |  |
| Refugee social services................................................................ | 100 | 100 | ........ | ........ |
| Targeted assistance............................................................................ | 50 | 50 | ........ | ........ |
| State and local medical screening and treatment services..................... | 14 | 14 | ........ | ........ |
| Authorization levels.................................................................... | 489 | 497 | ........ | ........ |
| Estimated outlays............................................................................. | 391 | 481 | 99 | 15 |

30

| | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|
| Function 750: | | | | |
| Estimated authorization level | 31 | 32 | | |
| Estimated outlays | 31 | 32 | | |
| Total cost to the Federal Government: | | | | |
| Authorization levels | 520 | 529 | | |
| Outlays | 422 | 513 | 99 | 15 |

Basis for estimate: The estimated authorization level for refugee cash, medical and grant assistance is based on projected average benefit levels and on projections of the number of refugees qualified to participate in the various programs.

This bill would permit the federal government to reimburse states for their payments for refugee benefits in the AFDC, SSI, and Medicaid programs for three years after the refugee enters the U.S. In addition the government must reimburse states for refugee costs in non-categorical and medical assistance programs in the first 18 months after a refugee enters the U.S. Average cost for cash and medical assistance vary depending on whether the refugee qualifies for AFDC, SSI, non-categorical cash assistance, or for general assistance.

The estimated authorization levels are based on the Administration's current ceilings for 70,000 refugee arrivals in 1985, 68,000 in 1986, and 58,000 in 1987. Historical data indicates that about 53 percent of these refugees will require some type of assistance. The Administration's estimated dependency rate was 54 percent in 1982, 53 percent in 1983, and 54 percent in 1984.

The education and federal administration costs are based on the 1985 appropriation level adjusted by the CBO projection of cost increases.

The authorization levels for social services, targeted assistance, and preventive health are those specifically stated in the bill. Full appropriation for all authorization levels is assumed in this estimate.

Estimated outlays for the refugee programs assume full appropriation of authorization levels and assume an 80 percent spendout rate in the first year, 17 percent in the second year, and the remainder in the third year.

The estimate of $31 million in 1986 and $32 million in 1987 for reimbursement to states for the incarceration of certain Cuban refugees is based on information obtained from the Immigration and Naturalization Service (INS), the Bureau of Prisons, and state and county corrections officials. The INS estimates that about 1,700 Cuban nationals currently in state prisons meet the qualifications specified in the bill. In addition, it is estimated that at least 800 such prisoners are held in county facilities—for a total of approximately 2,500 prisoners. (The estimate of county prisoners is very uncertain, however. Dade County, Florida officials estimate that there are 500 qualifying Cuban nationals in their facilities alone.) Based on information from the Department of Justice and from state and county corrections officials, it is estimated that an average reimbursement per prisoner would be approximately $12,500 in 1986 and $13,000 in 1987. This estimate assumes full appropriation

31

of the necessary amounts. If less is appropriated, the payment per prisoner would be reduced proportionately.

6. Estimated cost to state and local governments: Assuming full appropriation of the authorizations, this bill would reimburse state and local governments $413 million in 1986 and $422 million in 1987. These reimbursements would arise from direct payments to state and local governments for cash and medical assistance and for costs of incarceration of some Cuban nationals. Reimbursements would also occur from grants to states for targeted assistance and educational assistance. Federal grants to states of $100 million for social services could also result in savings to state budgets, depending on whether states would provide these services if federal aid were not provided.

7. Estimated comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Debra Goldberg and Anne Manley.

10. Estimate approved by: C. G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis).

### OVERSIGHT STATEMENTS

Pursuant to clause 2(1)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee states that the Subcommittee on Immigration, Refugees and International Law has maintained and will maintain close oversight with respect to those Departments responsible for administering the various provisions of this bill. In particular, the Subcommittee intends to monitor closely the role of the Departments of Justice and State in admitting refugees to this country and HHS activities in resettling refugees.

Clause 2(1)(3)(D) of rule XI of the Rules of the House of Representatives is inapplicable since no oversight findings and recommendations have been received from the Committee on Government Operations.

### INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(1)(4) of rule XI of the rules of the House of Representatives, the Committee estimates that this bill will not have a significant inflationary effect on prices and cost in the operation of the national economy.

### COMMITTEE RECOMMENDATION

The Committee, after careful and detailed consideration of all the facts and circumstances involved in this legislation, is of the opinion that this bill should be enacted and accordingly recommends that H.R. 1452, as amended do pass.

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

32

IMMIGRATION AND NATIONALITY ACT

\*　　\*　　\*　　\*　　\*　　\*　　\*

## TITLE IV—MISCELLANEOUS AND REFUGEES ASSISTANCE

\*　　\*　　\*　　\*　　\*　　\*　　\*

### CHAPTER 2—REFUGEE ASSISTANCE

#### OFFICE OF REFUGEE RESETTLEMENT

SEC. 411. (a) There is established, within *the Office of the Secretary in* the Department of Health and Human Services, an office to be known as the Office of Refugee Resettlement (hereinafter in this chapter referred to as the "Office"). The head of the Office shall be a Director (hereinafter in this chapter referred to as the "Director"), to be appointed by the Secretary of Health and Human Services (hereinafter in this chapter referred to as the "Secretary").

\*　　\*　　\*　　\*　　\*　　\*　　\*

#### AUTHORIZATION FOR PROGRAMS FOR DOMESTIC RESETTLEMENT OF AND ASSISTANCE TO REFUGEES

SEC. 412. (a) CONDITIONS AND CONSIDERATIONS.—(a)(A) In providing assistance under this section, the Director shall, to the extent of available appropriations, (i) make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, (ii) provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible, (iii) insure that cash assistance is made available to refugees in such a manner as not to discourage their economic self-sufficiency, in accordance with subsection (e)(2), and (iv) insure that women have the same opportunities as men to participate in training and instruction.

(B) It is the intend of Congress that in providing refugee assistance under this section—

(i) employable refugees should be placed on jobs as soon as possible after their arrival in the United States;

(ii) social service funds should be focused on employment-related services, English-as-a-second-language training (in non-work hours where possible), an case-management services; and

(iii) local voluntary agency activities should be conducted in close cooperation and advance consultation with State and local governments.

(2)(A) The Director *and the Federal agency administering subsection (b)(1),* together with the Coordinator, shall consult regularly (not less than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities *before their placement in those States and localities.*

(B) The Director shall develop and implement, in consultation with representatives of voluntary agencies and State and local gov-

33

ernments, policies and strategies for the placement and resettlement of refugees within the United States.

(C) Such policies and strategies, to the extent practicable and except under such unusual circumstances as the Director may recognize, shall—

(i) insure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the Director after consultation with such agencies and governments) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area, [and]

(ii) provide for a mechanism whereby representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States and localities[.], and

*(iii) take into account—*

*(I) the proportion of refugees and comparable entrants in the population in the area,*

*(II) the availability of employment opportunities, affordable housing, and public and private resources (including educational, health care, and mental health services) for refugees in the area,*

*(III) the likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependency on public assistance, and*

*(IV) the secondary migration of refugees to and from the area that is likely to occur.*

*(D) With respect to the location of placement of refugees within a State, the Federal agency administering subsection (b)(1) shall, consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State.*

(3) In the provision of domestic assistance under this section, the Director shall make a periodic assessment, based on refugee population and other relevant factors, of the relative needs of refugees for assistance and services under this chapter and the resources available to meet such needs. The Director shall compile and maintain data on secondary migration of refugees within the United States and, by State of residence and nationality, on the proportion of refugees receiving cash or medical assistance described in subsection (e). In allocating resources, the Director shall avoid duplication of services and provide for maximum coordination between agencies providing related services.

(4)(A) No grant or contract may be awarded under this section unless an appropriate proposal and application (including a description of the agency's ability to perform the services specified in the proposal) are submitted to, and approved by, the appropriate administering official. Grants and contracts under this section shall be made to those agencies which the appropriate administering official determines can best perform the services. Payments may be made for activities authorized under this chapter in advance or by way of reimbursement. In carrying out this section, the

34

Director, the Secretary of State, and such other appropriate administering official are authorized—

    ⟦(A)⟧ *(i)* to make loans, and

    ⟦(B)⟧ *(ii)* to accept and use money, funds, property, and services of any kind made available by gift, devise, bequest, grant, or otherwise for the purpose of carrying out this section.

*(B) No funds may be made available under this chapter (other than under subsection (b)(1)) to States or political subdivisions in the form of block grants, per capita grants, or similar consolidated grants or contracts. Such funds shall be made available under separate grants or contracts—*

*(i) for medical screening and initial medical treatment under subsection (b)(5),*

*(ii) for services for refugees under subsection (c)(1),*

*(iii) for targeted assistance project grants under subsection (c)(2), and*

*(iv) for assistance for refugee children under subsection (d)(2).*

*(C) The Director may not delegate to a State or political subdivision his authority to review or approve grants or contracts under this chapter or the terms under which such grants or contracts are made.*

(5) Assistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion.

(6) As a condition for receiving assistance under this section, a State must—

(A) submit to the Director a plan which provides—

(i) a description of how the State intends to encourage effective refugee resettlement and to promote economic self-sufficiency as quickly as possible,

(ii) a description of how the State will insure that language training and employment services are made available to refugees receiving cash assistance,

(iii) for the designation of an individual, employed by the State, who will be responsible for insuring coordination of public and private resources in refugee resettlement,

(iv) for the care and supervision of and legal responsibility for unaccompanied refugee children in the State, and

(v) for the identification of refugees who at the time of resettlement in the State are determined to have medical conditions requiring, or medical histories indicating a need for, treatment or observation and such monitoring of such treatment or observation as may be necessary;

(B) meet standards, goals, and priorities, developed by the Director, which assure the effective resettlement of refugees and which promote their economic selfsufficiency as quickly as possible and the efficient provision of services; and

(C) submit to the Director, within a reasonable period of time after the end of each fiscal year, a report on the uses of funds provided under this chapter which the State is responsible for administering.

(7) The Secretary, together with the Secretary of State with respect to assistance provided by the Secretary of State under subsec-

35

tion (b), shall develop a system of monitoring the assistance provid-
ed under this section. This system shall include—

   (A) evaluations of the effectiveness of the programs funded
   under this section and the performance of States, grantees, and
   contractors;

   (B) financial auditing and other appropriate monitoring to
   detect any fraud, abuse, or mismanagement in the operation of
   such programs; and

   (C) data collection on the services provided and the results
   achieved.

(8) The Attorney General shall provide the Director with infor-
mation supplied by refugees in conjunction with their applications
to the Attorney General for adjustment of status, and the Director
shall compile, summarize, and evaluate such information.

(9) The Secretary, *the Secretary of Education, the Attorney Gener-
al,* and the Secretary of State may issue such regulations as each
deems appropriate to carry out this chapter.

(10) For purposes of this chapter, the term refugee includes any
alien described in section 207(c)(2).

(b) PROGRAM OF INITIAL RESETTLEMENT.—(1)(A) For—

   (i) fiscal years 1980 and 1901, the Secretary of State is au-
   thorized, and

   (ii) fiscal year 1982 and succeeding fiscal years, the Director
   (except as provided in subparagraph (B)) is authorized,

to make grants to, and contracts with, public or private nonprofit
agencies for initial resettlement (including initial reception and
placement with sponsors) of refugees in the United States. Grants
to, or contracts with, private nonprofit voluntary agencies under
this paragraph shall be made consistent with the objectives of this
chapter, taking into account the different resettlement approaches
and practices of such agencies. Resettlement assistance under this
paragraph shall be provided in coordination with the Director's
provision of other assistance under this chapter. Funds provided to
agencies under such grants and contracts may only be obligated or
expended during the fiscal year in which they are provided (or the
subsequent fiscal year or such subsequent fiscal period as the Fed-
eral contracting agency may approve) to carry out the purposes of
this subsection. ⟦Such grants and contracts shall provide that the
agency shall provide (directly or through its local affiliate) notice to
the appropriate county or other local welfare office at the time
that the agency becomes aware that a refugee is offered employ-
ment and provide notice to the refugee that such notice has been
provided. Such grants and contracts shall also provide that the
agency shall assure that refugees, known to the agency as having
been identified pursuant to paragraph (4)(B) as having medical con-
ditions affecting the public health and requiring treatment, report
to the appropriate county or other health agency upon their reset-
tlement in an area.⟧

⟦(6) The Comptroller General shall conduct an annual audit of
funds expended under grants and contracts made under this sub-
section.⟧

36

*(6) The Comptroller General shall directly conduct an annual financial audit of funds expended under each grant or contract made under paragraph (1) for fiscal year 1985 and for fiscal year 1986.*

*(7) Each grant or contract with an agency under paragraph (1) shall require the agency to do the following:*

*(A) To provide quarterly performance and financial status reports to the Federal agency administering paragraph (1).*

*(B)(i) To provide, directly or through its local affiliate, notice to the appropriate county or other local welfare office at the time that the agency becomes aware that a refugee is offered employment and to provide notice to the refugee that such notice has been provided, and*

*(ii) upon request of such a welfare office to which a refugee has applied for cash assistance, to furnish that office with documentation respecting any cash or other resources provided directly by the agency to the refugee under this subsection.*

*(C) To assure that refugees, known to the agency as having been identified pursuant to paragraph (4)(B) as having medical conditions affecting the public health and requiring treatment, report to the appropriate county or other health agency upon their resettlement in an area.*

*(D) To fulfill its responsibility to provide for the basic needs (including food, clothing, shelter, and transportation for job interviews and training) of each refugee resettled and to develop and implement a resettlement plan including the early employment of each refugee resettled and to monitor the implementation of such plan.*

*(E) To transmit to the Federal agency administering paragraph (1) an annual report describing the following:*

*(i) The number of refugees placed (by county of placement) and the expenditures made in the year under the grant or contract, including the proportion of such expenditures used for administrative purposes and for provision of services.*

*(ii) The proportion of refugees placed by the agency in the previous year who are receiving cash or medical assistance described in subsection (e).*

*(iii) The efforts made by the agency to monitor placement of the refugees and the activities of local affiliates of the agency.*

*(iv) The extent to which the agency has coordinated its activities with local social service providers in a manner which avoids duplication of activities and has provided notices to local welfare offices and the reporting of medical conditions of certain aliens to local health departments in accordance with subparagraphs (B)(i) and (C).*

*(v) Such other information as the agency administering paragraph (1) deems to be appropriate in monitoring the effectiveness of agencies in carrying out their functions under such grants and contracts.*

*The agency administering paragraph (1) shall promptly forward a copy of each annual report transmitted under subparagraph (E) to the Committees on the Judiciary of the House of Representatives and of the Senate.*

37

(8) *The Federal agency administering paragraph (1) shall establish criteria for the performance of agencies under grants and contracts under that paragraph, and shall include criteria relating to an agency's—*

  (A) *efforts to reduce welfare dependency among refugees resettled by that agency,*

  (B) *collection of travel loans made to refugees resettled by that agency for travel to the United States,*

  (C) *arranging for effective local sponsorship and other non-public assistance for refugees resettled by that agency,*

  (D) *cooperation with refugee mutual assistance associations, local social service providers, health agencies, and welfare offices,*

  (E) *compliance with the guidelines established by the Director for the placement and resettlement of refugees within the United States, and*

  (F) *compliance with other requirements contained in the grant or contract, including the reporting and other requirements under subsection (b)(7).*

*The Federal administering agency shall use the criteria in the process of awarding or renewing grants and contracts under paragraph (1).*

(c) PROJECT GRANTS AND CONTRACTS FOR SERVICES FOR REFUGEES.—*(1)(A)* The Director is authorized to make grants to, and enter into contracts with, public or private nonprofit agencies for projects specifically designed—

  【(1)】 *(i)* to assist refugees in obtaining the skills which are necessary for economic self-sufficiency, including projects for job training, employment services, day care, professional refresher training, and other recertification services;

  【(2)】 *(ii)* to provide training in English where necessary (regardless of whether the refugees are employed or receiving cash or other assistance); and

  【(3)】 *(iii)* to provide where specific needs have been shown and recognized by the Director, health (including mental health) services, social services, educational and other services.

(B) *The funds available for a fiscal year for grants and contracts under subparagraph (A) shall be allocated among the States based on the total number of refugees (including children and adults) who arrived in the United States after March 31, 1975, and who are actually residing in each State (taking into account secondary migration) as of the beginning of the fiscal year.*

(C) *Any limitation which the Director establishes on the proportion of funds allocated to a State under this paragraph that the State may use for services other than those described in subsection (a)(1)(B)(ii) shall not apply if the Director receives a plan (established by or in consultation with local governments) and determines that the plan provides for the maximum appropriate provision of employment-related services for, and the maximum placement of, employable refugees consistent with performance standards established under section 106 of the Job Training Partnership Act.*

(2)(A) *The Director is authorized to make grants to States for assistance to counties and similar areas in the States where, because of factors such as unusually large refugee populations (including*

38

*secondary migration), high refugee concentrations, and high use of public assistance by refugees, there exists and can be demonstrated a specific need for supplementation of available resources for services to refugees.*

*(B) Grants shall be made available under this paragraph—*

*(i) primarily for the purpose of facilitating refugee employment and achievement of self-sufficiency,*

*(ii) in a manner that does not supplant other refugee program funds and that assures that not less than 95 percent of the amount of the grant award is made available to the county or other local entity, and*

*(iii) without regard to the date a refugee arrived in the United States.*

(d) ASSISTANCE FOR REFUGEE CHILDREN.—(1) The [Director] *Secretary of Education* is authorized to make grants, and enter into contracts, for payments for projects to provide special educational services (including English language training) to refugee children in elementary and secondary schools where a demonstrated need has been shown.

*       *       *       *       *       *       *

(e) CASH ASSISTANCE AND MEDICAL ASSISTANCE TO REFUGEE.—(1) The Director is authorized to provide assistance, reimbursement to States, and grants to, and contracts with, public or private nonprofit agencies for 100 per centum of the cash assistance and medical assistance provided to any refugee during the thirty-six month period beginning with the first month in which such refugee has entered the United States and for the identifiable and reasonable administrative costs providing this assistance.

(2)(A) Cash assistance provided under this subsection to an employable refugee is conditioned, except for good cause shown—

(i) on the refugee's registration with an appropriate agency providing employment services described in subsection [(c)(1)] *(c)(1)(a)(i)*, or, if there is no such agency available, with an appropriate State or local employment service;

(ii) on the refugee's participation in any available and appropriate social service *or targeted assistance* program (funded under subsection (c)) providing job or langauge training in the area in which the refugee resides; and

(iii) on the refugee's acceptance of appropriate offers of employment.

[Such cash assistance provided to such a refugee shall be terminated (after opportunity for an administrative hearing) with the month in which the refugee refuses such an appropriate offer of employment or refuses to participate in such an available and appropriate social service program.]

(B) Cash assistance shall not be made available to refugees who are full-time students in institutions of higher education (as defined by the Director after consultation with the Secretary of Education).

*(C) In the case of a refugee who—*

*(i) refuses an offer of employment which has been determined to be appropriate either by the agency responsible for the initial*

*resettlement of the refugee under subsection (b) or by the appropriate State or local employment service,*

*(ii) refuses to go to a job interview which has been arranged through such agency or service, or*

*(iii) refuses to participate in a social service or targeted assistance program referred to in subparagraph (A)(ii) which such agency or service determines to be available and appropriate,*
cash assistance to the refugee shall be terminated (after opportunity for an administrative hearing) for a period of three months (for the first such refusal) or for a period of six months (for any subsequent refusal).

\* \* \* \* \* \* \*

⟦(5) The Director is authorized to allow for the provision of medical asistance under paragraph (1) to any refugee, during the one-year period after entry, who does not qualify for assistance under a State plan approved under title XXI of the Social Security Act on account of any resources or income requirement of such plan but only if the Director determines that—

⟦(A) this will (i) encourage economic self-sufficiency, or (ii) avoid a significant burden on State and local governments; and

⟦(B) the refugee meets such alternative financial resources and income requirements as the Director shall establish.⟧

*(5) The Director shall, to the extent of available appropriations, arrange for the provision of medical assistance during the one-year period after their entry, and for purposes of title XXI of the Social Security Act the Director may provide that such individuals may be considered to be individuals receiving assistance under title IV of such Act.*

(6) As a condition for receiving assistance, reimbursement, or a contract under this subsection *(other than under paragraph (5))* and notwithstanding any other provision of law, a State or agency must provide assurances that whenever a refugee applies for cash or medical assistance for which assistance or reimbursement is provided under this subsection, the State or agency must notify promptly the agency (or local affiliate) which provided for the initial resettlement of the refugee under subsection (b) of the fact that the refugee has so applied.

(7)(A) The Secretary shall develop and implement alternative projects for refugees who have been in the United States less than thirty-six months, under which refugees are provided interim support, medical services, support services, and case management, as needed, in a manner that encourages self-sufficiency, reduces welfare dependency, and fosters greater coordination among the resettlement agencies and service providers. *The Secretary may permit alternative projects to cover specific groups of refugees who have been in the United States 36 months or longer if the Secretary determines that refugees in the group have been significantly and disproportionately dependent on welfare and need the services provided under the project in order to become self-sufficient and that their coverage under the projects would be cost-effective.*

(B) Refugees covered under such alternative projects shall be precluded from receiving cash or medical assistance under any other

40

paragraph of this subsection or under title XIX or part A of title IV of the Social Security Act.

(C) The Secretary, in consultation with the United States Coordinator for Refugee Affairs, shall report to Congress not later than October 31, 1985, on the results of these projects and on any recommendations respecting changes in the refugee assistance program under this section to take into account such results.

(D) To the extent that the use of such funds is consistent with the purposes of such provisions, funds appropriated under paragraph (1) or (2) of section 414(a) of this Act, part A of title IV of the Social Security Act, or title XIX of such Act, may be used for the purpose of implementing and evaluating alternative projects under this paragraph.

*(8) In its provision of assistance to refugees, a State or political subdivision shall consider the recommendations of, and assistance provided by, agencies with grants or contracts under subsection (b)(1).*

*(f) ASSISTANCE TO STATES AND COUNTIES FOR INCARCERATION OF CERTAIN CUBAN NATIONALS.—(1) The Attorney General shall pay compensation to States and to counties for costs incurred by the States and counties to confine in prisons, during the fiscal year for which such payment is made, nationals of Cuba who—*

> *(A) were paroled into the United States in 1980 by the Attorney General,*
>
> *(B) after such parole committed any violation of State or county law for which a term of imprisonment was imposed, and*
>
> *(C) at the time of such parole and such violation were not aliens lawfully admitted to the United States—*
>
>> *(i) for permanent resident, or*
>>
>> *(ii) under the terms of an immigrant or a nonimmigrant visa issued,*
>
> *under this Act.*

*(2) For a State or county to be eligible to receive compensation under this subsection, the chief executive officer of the State or county shall submit to the Attorney General, in accordance with rules to be issued by the Attorney General, an application containing—*

> *(A) the number and names of the Cuban nationals with respect to whom the State or county is entitled to such compensation, and*
>
> *(B) such other information as the Attorney General may require.*

*(3) For a fiscal year the Attorney General shall pay the costs described in paragraph (1) to each State and county determined by the Attorney General to be eligible under paragraph (2); except that if the amounts appropriated for the fiscal year to carry out this subsection are insufficient to cover all such payments, each of such payments shall be ratably reduced so that the total of such payments equals the amounts so appropriated.*

*(4) The authority of the Attorney General to pay compensation under this subsection shall be effective for any fiscal year only to the extent and in such amounts as may be provided in advance in appropriation Acts.*

41

CONGRESSIONAL REPORTS

SEC. 413. (a)(1) The Secretary, in consultation with the Coordinator, shall submit a report on activities under this chapter to the Committees on the Judiciary of the House of Representatives and of the Senate not later than the January 31 following the end of each fiscal year, beginning with fiscal year 1980.

(2) Each such report shall contain—

(A) An updated profile of the employment and labor force statistics for refugees who have entered [under this Act since May 1975] *the United States within the five-fiscal-year period immediately preceding the fiscal year within which the report is to be made and for refugees who entered earlier and who have shown themselves to be significantly and disproportionately dependent on welfare,* as well as a description of the extent to which refugees received the forms of assistance or services under this chapter during that period;

     \*       \*       \*       \*       \*       \*       \*

AUTHORIZATION OF APPROPRIATIONS

SEC. 414. (a)(1) There are hereby authorized to be appropriated for [fiscal year 1983] *each of fiscal years 1986 and 1987* such sums as may be necessary for the purpose of carrying out the provisions (other than those described in paragraphs (2) [and (3)] *through (5))* of this chapter.

(2) There are hereby authorized to be appropriated for [fiscal year 1983] *each of fiscal years 1986 and 1987* $100,000,000 for the purpose of providing services with respect to refugees under section 412(c)(1).

(3) There are hereby authorized to be appropriated for [fiscal year 1983] *each of fiscal years 1986 and 1987* $14,000,000 for the purpose of carrying our section 412(b)(5).

*(4) There are hereby authorized to be appropriated for each of fiscal years 1986 and 1987, $50,000,000 for the purpose of providing targeted assistance project grants under section 412(c)(2).*

*(5) There are hereby authorized to be appropriated for each of fiscal years 1986 and 1987 such sums as may be necessary to carry out section 412(f).*

(b) The authority to enter into contracts under this chapter shall be effective for any fiscal year only to such extent or in such amounts as are provided in advance in appropriation Acts.

## DISSENTING VIEWS OF F. JAMES SENSENBRENNER, JR.

I have chosen to oppose this bill because I believe its provisions invite a veto, and because I believe that $50 million in targeted assistance is more than we in the Congress should be spending.

In recent years, the Administration has been disciplined to implement and spend targeted assistance monies, even though we have authorized them, and I doubt that he Committee's action this time around will encourage the Department of Health and Human Services to alter that practice. Moreover, the Administration believes it can adequately handle the integration of refugees into American society without targeted assistance. America has accepted thousands of refugees with the implicit understanding that they will be able to support themselves; it is, in my judgment, counterproductive to continue to bail out heavily impacted states through targeted assistance, principally because it allows such states to avoid a close examination of their own public assistance programs.

I am of the view that the purpose for which targeted assistance was originally intended is now essentially obsolete. The Congress created the program because areas such as Florida and California were inundated with refugees from Cuba, Central America and Southeast Asia. That was several years ago. Since then, many refugees have become self-sufficient taxpayers who have contributed mightily to the treasures of what have now become their home states.

We hear a great deal from the Governors of heavily impacted states about the cost of accepting refugees, but we seem to hear very little about the tax revenues these refugees produce. Moreover, while I recall listening to strong opposition to my amendment from the gentlelady from Colorado (Mrs. Schroeder) and the gentlemen from California (Mr. Edwards and Mr. Berman), none of them mention the generosity of the California welfare system, which, I should add, leads the nation. I do not think this is an insignificant factor in fostering secondary migration.

It is also interesting that each of the individuals I have mentioned is a cosponsor of H.R. 822, which would allow, without advace proof of political persecution, an estimated 500,000 Salvadorans now illegally in this country to remain here lawfully pending a report by the General Accounting Office. I suppose the cost for supporting such enormous numbers would then be borne by an even more enhanced targeted assistance program.

Perhaps if the Congress eliminates targeted assistance altogether, we will ultimately force some of the states which have been receiving it to take a close look at their own public support systems, and the magnet effect they have on luring refugees from the snows of my state of Wisconsin to the beaches of Florida and southern California. Only then, perhaps, will we begin to see an end to the trap of welfare dependency.

(42)

43

When this bill is considered on the House floor, I will renew my efforts to strike targeted assistance. I hope that when that time comes, my three colleagues on the Committee who spoke out so forcefully in opposition to my amendment will be prepared to inform the membership of the House of the future cost, in terms of targeted assistance, if over half a million Salvadorans are legalized by the possible adoption of H.R. 822.

These two issues are intertwined, for greater numbers of people accepted into this country, outside the normal immigration process, dilutes the control we have over the qualifications of each entrant, and long term unemployability places strains on finite social service resources which should be reserved for our people.

F. JAMES SENSENBRENNER, Jr.

O

# Attachment 3

# Calendar No. 918

| 97TH CONGRESS } | SENATE | { REPORT |
|---|---|---|
| 2d Session } | . | No. 97–638 |

## REFUGEE ASSISTANCE AMENDMENTS OF 1982

---

SEPTEMBER 29 (legislative day, SEPTEMBER 8), 1982.—Ordered to be printed

---

Mr. THURMOND, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 5879]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to which was referred the bill
(H.R. 5879) to amend the Immigration and Nationality Act to
extend for one year the authorization for appropriations for refu-
gee assistance, to make certain improvements in the operation of
the program, and for other purposes, having considered the same,
reports favorably thereon and recommends that the bill do pass.

### PURPOSE OF THE BILL

The purpose of the bill, as passed by the House of Representa-
tives and favorably reported from the Subcommittee on Immigra-
tion and Refugee Policy and the Full Committee on the Judiciary,
is to amend the Immigration and Nationality Act to extend for one
year (fiscal year 1983) the authorization for appropriations for do-
mestic resettlement activities under the Refugee Act of 1980; to
make certain improvements in the operation of the program; to re-
quire greater coordination between the Federal government, state
and local governments, and voluntary agencies in the placement of
refugees and the provision of assistance to them; and for other pur-
poses.

11–010 O

Attachment 3

2

## HISTORY OF LEGISLATION

During this Congress, the Committee held hearings and engaged in several oversight activities to consider a variety of issues relating to the admission and resettlement of refugees.

Specifically, on September 22, 1981, the full Committee held a public hearing on the domestic and foreign policy implications of the U.S. refugee admissions program. Within the context of this hearing, members of the Committee met with the Attorney General and other Administration officials to conduct the annual consultation on refugee admissions for 1982, as required by the Refugee Act of 1980. Following this consultation on a proposed refugee admissions level of 173,000, the Administration reduced its refugee admissions level to 140,000 and pledged to manage the program so that admissions would fall below this ceiling. Actual refugee admissions for fiscal year 1982 have totaled about 99,000.

On October 9, 1981, Senator Charles Grassley chaired a field hearing in Des Moines, Iowa focusing on refugee resettlement from the perspective of the state and local level.

On March 17, 1982, the Administration's refugee assistance extension legislation (H.R. 5879) was introduced in the House of Representatives by Representative Peter Rodino (by request), Chairman of the House Committee on the Judiciary. H.R. 5879, as amended by the House Subcommittee on Immigration, Refugees, and International Law and the full committee on the Judiciary, was passed by the House of Representatives and received in the Senate on June 24, 1982.

On February 9, the Subcommittee on Immigration and Refugee Policy held a hearing on the proposed regulation changes on cash and medical assistance for refugees, which were promulgated by the Department of Health and Human Resources Office of Refugee Resettlement (ORR). Following this hearing, members of the Committee and other Senators voiced their concern to the Secretary of Health and Human Resources that refugee policies be promulgated with full consultation with state and local governments and voluntary agencies charged with refugee resettlement, and reaffirmed Congressional intent that fiscal responsibility for refuge resettlement rests with the Federal government during the three years after a refugee arrives in the United States.

On September 13, 1982, the Subcommittee on Immigration and Refugee Policy held a hearing on the provisions of H.R. 5879 as introduced in the House and as passed by the House. During the course of these hearings, testimony was received from Ambassador Eugene Douglas, U.S. Coordinator for Refugee Affairs, Department of State; Phillip Hawkes, Director, Office of Refugee Resettlement (ORR), Department of Health and Human Services (HHS); Alan C. Nelson, Commissioner, Immigration and Naturalization Service (INS), Department of Justice; and Robert A. Peterson, Senior Associate Director, Human Resources Division, U.S. General Accounting Office (GAO). Other witnesses included State refugee coordinators, representatives of city and local governments, the refugee community, and voluntary agencies, and experts on refugee resettlement from the private sector.

3

The Subcommittee on Immigration and Refugee Policy marked up H.R. 5879 on September 15, 1982, and favorably reported the bill by a unanimous vote.

## COMMITTEE VOTE

On September 28, 1982, the Full Committee ordered the bill, H.R. 5879, favorably reported to the Senate by an unanimous vote.

## NEED FOR LEGISLATION

As signed into law in March 1980, the Refugee Act provided for a three year authorization of appropriations for domestic resettlement of refugees. Accordingly, absent reauthorization during the 97th Congress, the authority to fund these activities will expire.

As discussed elsewhere in this report, the Committee believes that a one year reauthorization, with the essential changes made by the bill will promote a more effective administration of the Act while at the same time giving the Committee the opportunity to review various substantive issues during next year's reauthorization process.

## BACKGROUND

Title II of the Refugee Act of 1980 defines the term "refugee" and establishes the framework for selecting refugees for admission to the United States. In accordance with the Act, the President determines the number of refugees to be admitted during each fiscal year after consultations between Executive Branch officials and Congress prior to each fiscal year.

Title III sets forth the mandate of the U.S. Coordinator for Refugee Affairs and provides a detailed system for the resettlement of refugees in the United States.

In fiscal year 1980, the United States admitted 189,727 refugees; in fiscal year 1981 153,077 were admitted; and in fiscal year 1982 up to 140,000 can be admitted, whereas the actual number will be closer to 99,000. For each year, Indochinese refugees constitute the majority of refugees admitted or contemplated for admission.

Resettlement assistance is provided by ORR primarily through a State-administered refugee resettlement program. Soviet and certain other refugees are eligible for the State-administered program, but currently are provided resettlement assistance primarily through an alternative system of matching grants. In order to participate in the refugee program, a State must submit a plan which provides assurance that it will comply with the regulations of the program, and which indicates how it will meet the needs of refugees within its jurisdiction.

The assistance provided under the terms of the Refugee Act takes several forms. First, the Act authorizes ORR to reimburse States for up to 100 percent of their costs in providing cash assistance and medical assistance to refugees in the U.S. for 3 years or less. Full Federal funding has been provided at the 100 percent rate of reimbursement since enactment of the 1980 Act, as had been done in previous years.

4

Second, ORR provides funding to States for a broad range of social services to refugees. Permissible services include any service allowable in a State's plan under Title XX of the Social Security Act, as well as a number of services specifically identified in ORR policy instructions to the States. These specific services include English language training, job development and placement, career counseling, vocational training, day care for children to permit enrollment of parents in training programs, and translation and interpreter services.

Third, under the authority of the Refugee Act, funds have been appropriated for overseas monitoring of health screening and immunization of Southeast Asian refugees prior to their entry into the country, for port-of-entry inspection and health department notification of resettling refugees, and for health assessments after they have been relocated.

Finally, the Refugee Act authorizes, and funds have been appropriated for, educational assistance to school districts with large numbers of refugee children. No funds have been requested for this authorized activity for fiscal year 1983. In the event funds are provided in the future for educational assistance, consideration should be given to transferring this program from ORR to the Department of Education.

### ANALYSIS OF THE LEGISLATION

*Authorization period and level*

The bill provides for a one year extension of authorization of appropriations for such sums as may be necessary for all forms of refugee assistance except (1) social services, for which $100 million is authorized; and (2) health screening and initial treatment, for which $14 million is authorized.

The Committee believes that an authorization of longer duration would be unwise at this time. A number of extremely important matters could not be addressed in this legislation because of time constraints, which prevented the development of a complete record on these issues. The Committee intends to conduct a series of comprehensive hearings on domestic refugee resettlement during 1983.

Moreover, by spring of 1983, data from a number of studies presently being conducted by ORR should be available to the Committee. These studies address the following subjects: (1) Refugee self-sufficiency; (2) the effectiveness of English language training; (3) the implementation of the matching grant approach to resettlement assistance; and (4) state administration of the program.

The Committee is thus convinced that a one year reauthorization will balance the need to continue the program with the need to review the program in light of timely and significant informational developments.

The bill, by adopting a "such sums" approach with respect to the majority of the funding under the Refugee Act, recognizes the difficulty of assessing the proper funding level for cash and medical reimbursement costs. In this regard, there are two important variables; refugee dependency rates and the number of refugees admitted.

5

Phillip Hawkes, Director of ORR, recently testified that dependency rates have dropped from 67 percent in 1981 to 54 percent in 1982. Nevertheless, it is not possible at this time to predict with accuracy what those rates will be for fiscal year 1983. With respect to the number of refugees admitted, it is important to remember that the admissions numbers and allocations for fiscal 1983 will be determined immediately prior to the commencement of that fiscal year through consultations between the Administration and Congress.

The Committee thus believes that these two uncertainties—dependency rates and refugee flows—constitute compelling reasons for allowing maximum flexibility during the appropriations process.

### SOCIAL SERVICES

The bill, like the Refugee Act of 1980 itself, provides a line item authorization for refugee social services. Such services include English language training, job training, and job placement. By maintaining a line item approach to social services, the Committee underscores its firm belief that the provision of such services is the fundamental element through which refugees can avoid cash or medical assistance dependency. GAO, for example, which recently concluded a year long study of refugee resettlement, asserted in testimony before the Subcommittee on Immigration and Refugee Policy that "employment services are critical for refugees."

The Committee concurs and points out that the amount authorized by the Refugee Act for social services has never been approached by this Administration or the prior Administration in its budget requests. The Committee further believes that the Administration's fiscal year 1983 social service funding request is both inadequate and premised on an unsound theory, namely, that social service requests should be based on the anticipated flow of new refugee arrivals. The Committee sees no basis in law or logic for basing social service requests exclusively on arrivals. Instead, the Committee asserts that the proper focus should be on the number of refugees who need such services, regardless of their date of entry.

The Refugee Act clearly does not limit the availability of such services to new arrivals alone, nor are social services provided only to new arrivals. As a result, the Administration must reevaluate its policy for determining the level and allocation of funding for social services.

The Committee wishes to emphasize that self-sufficiency at the earliest possible date has been, and must remain, the clear objective of the Refugee Act. The Committee is disturbed that some confusion has apparently arisen over whether employable refugees who lack English language competency should be expected to exert a full-fledged, good faith effort to obtain employment. In the Committee's view, the Refugee Act neither states nor suggests that the inability to speak English constitutes a basis for postponing an employment search or engaging in such search half-heartedly.

The Committee recognizes that, in certain instances, the inability to communicate in English will prevent a refugee from obtaining

6

employment. Accordingly, it is incumbent upon the federal government to provide adequate resources for language training. Nevertheless, GAO's finding that 40 percent of the employed refugees surveyed had little or no English speaking ability has convinced the Committee that non-English speaking refugees will often meet with success in their efforts to obtain employment.

Furthermore, the Committee is concerned that adequate planning be undertaken on how to best use a portion of social service authorizations to fund projects which demonstrate well-coordinated and innovative approaches to fulfill the intent of Congress in Section 412(a)(1)(B)(i–iii).

While the Committee intends that the primary focus of social service grants continue to be for employment-related services and English language training, the Committee has provided that some of these funds may be used for case management services. The Committee does not intend, however, that funds under this authority be used to displace funds otherwise available from federal sources, particularly those available for administrative costs for state-administered cash and medical assistance programs.

The Committee is disturbed by frequent complaints—apparently well-founded—by state and local governments over the frequent interruptions in funding for social services. It is impossible to administer a program of any sort in an efficient and orderly manner if the promised funding upon which that program depends for its continuance is not forthcoming on a timely and reliable basis. The Committee strongly recommends that the Administration give every consideration to adopting a forward-funding approach for social services so as to avoid the unnecessary disruptions which have characterized the program in the past.

Finally, the Committee is concerned that in some instances the scheduling of social services has apparently been allowed to interfere with the objective of early employment. All parties involved in the resettlement program must make every effort to insure that, to the extent possible, social services are not scheduled so as to constitute an impediment to the job search effort of employable refugees. Once again, early self-sufficiency is the goal of the Refugee Act. Social services, properly administered, are a means toward that goal.

### MEDICAL SCREENING AND INITIAL TREATMENT

Many refugees suffer from illnesses which are either common in their home country, result from their flight to asylum, or develop while they live in refugee camps. These illnesses range from those common to all mankind—such as heart disease, cancer, etc.—to those peculiarly indigenous to underdeveloped countries—such as malaria, tuberculosis, and parasitic infestations. Clearly, some refugee groups suffer from more severe and more diverse illnesses than other populations. In recognition of this fact, the Refugee Act requires refugees to be medically screened. In addition, refugees with communicable diseases are prevented from entering the United States until they are no longer a threat to the public health.

Despite this legislative mandate, GAO has found that the medical screening of refugees abroad is "cursory" and "inadequate." Ac-

7

cording to GAO, the overseas examination is not in any way comparable to a physical examination conducted in a physician's office in the United States, since it does not include a medical history or an examination of the organ systems of the body. Furthermore, no attempt is made to identify or to test for malaria, hepatitis B, or parasitic diseases, even though these diseases are common in refugees. The Committee is sufficiently troubled by GAO's findings to conclude that a line item authorization for medical screening and initial medical treatment funding is in order.

The need for such funding is further supported by information supplied to the Committee by numerous state and local health agencies, which have expressed serious concerns over their ability to meet the health care needs of refugees.

These agencies have undertaken extensive activities to provide comprehensive health assessments and follow-up treatment for diseases of public health concern. They also refer refugees with personal health problems to appropriate health care professionals and institutions. A small grant program was initiated by ORR in September 1980, under the social services project authority, to assist States and localities in providing health assessments to newly arriving refugees and in addressing refugee health problems of public health concern. In fiscal year 1982, $4.9 million is being provided, through the Centers for Disease Control, for this purpose.

However, decreasing local support, increasing costs of health care, and the diminution of other forms of Federal assistance have placed an economic burden on public health agencies which now threatens their ability to provide essential services to refugees, while maintaining their services to U.S. citizens.

The Committee believes that local taxpayers should not bear this burden since meeting the costs of public health services to refugees is primarily a Federal responsibility. Therefore, the Committee has included a separate authority to expand the current program of grants and contracts to State and local health agencies to assist them in meeting the costs of health assessments and in addressing refugee health problems of public health concern. For fisacal year 1983, the bill authorizes $14 million for this purpose.

The Committee intends that funds appropriated under this section would be used to meet the costs of State and local health agencies for identifying and treating health conditions in refugees which could affect the public health, especially tuberculosis. Funds provided under this authority could also be used to support essential outreach activities, interpreter services, and coordination functions. The Committee does not intend that funds under this authority be used, however, to displace funds otherwise available from Federal sources, particularly those available under refugee medical assistance.

The Committee also believes that this program of Federal assistance, by itself, is not enough to address refugee health problems. Therefore, the Committee intends that appropriate steps be taken by the Secretary of State, the Attorney General, and the Secretary of Health and Human Services to tighten overseas processing of refugees who may have dangerous, contagious diseases, particularly those voluntary agencies, both nationally and locally, to assure that once in the United States, refugees with health conditions po-

tentially affecting the public health will report to appropriate county or other health agencies upon resettlement.

REIMBURSEMENT POLICY

Currently, the Refugee Act states that the Director of ORR is authorized to reimburse states for "up to" 100 percent of the cash assistance and medical assistance provided to any refugee during that refugee's first 36 months in the United States. The Committee amendment strikes the words "up to," thereby clearly expressing the Committee's belief that, to the extent of available appropriations, states should be fully reimbursed for their refugee-related cash and medical costs.

Although this change does not alter current policy, the Committee is convinced that it is proper and necessary for Congress to clarify its position on this matter. The decision to admit a refugee is a federal decision; it should also be a federal responsibility to meet that refugee's resettlement needs during the first 36 months. Hopefully, the Committee bill will assuage the fears of State and local governments which detect in recent decisions of the federal government a movement away from full federal support.

It is equally important to note that what the Committee bill does not do. The bill does not preclude the funding of cash and medical assistance on less than a 100 percent basis when such lesser basis is mutually agreed to, as in the matching-grant program under which cash and medical assistance may be provided to refugees through national voluntary refugee resettlement agencies. The bill will also permit entering into other arrangements for the provision of cash and medical assistance to refugees under which shared-funding arrangements are agreed to. Finally, the bill does not create an entitlement program for refugees assistance.

REFUGEE PLACEMENT POLICY

One of the major problems associated with the U.S. refugee program is the maldistribution of refugees, particularly Indochinese, around the country.

Indochinese refugees have tended to concentrate in certain geographic areas, as evidenced by the fact that California has approximately 40 percent of all Indochinese refugees admitted since 1975 and 78 percent have been placed in just 10 states. This has created severe problems for state and local governments and has severely strained social service networks in these impacted areas.

To respond to this problem of geographic maldistribution and to reduce further impacts on certain communities, the bill requires ORR to develop and implement a refugee placement policy.

It should be noted that ORR is currently drafting such a policy, but it is the Committee's intent to specifically charge that Office with the statutory responsibility for carrying out that task and for doing it in close consultation with state and local governments and with the voluntary agencies.

The legislation also mandates that the policy shall preclude placement, to the extent possible, of other than immediate family reunification cases in areas that have already been highly impact-

9

ed by the resettlement of large numbers of refugees and Cuban/Haitian entrants.

In addition, the Committee supports recent efforts by ORR and the State Department to preclude refugees on welfare from sponsoring other refugees. This practice promoted a philosophy of welfare dependency among newer arrivals and caused a significant increase in dependency rates over the past two years. As a result, it must be terminated and the State Department is encouraged to monitor voluntary agency compliance with this policy.

### CONSULTATION WITH STATE AND LOCAL GOVERNMENTS

Despite the specific requirements in the Refugee Act of 1980 that the U.S. Coordinator for Refugee Affairs and the Director of ORR "consult regularly with states, localities, and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees", much remains to be accomplished in this area.

The National Governors Association (NGA), the U.S. Conference of Mayors, the National Association of Counties (NACO), Governors from individual states and local officials have sharply criticized the Federal Government for its failure to consult with them on refugee placement decisions. Some improvements have occurred in recent months. Yet, the Committee remains disturbed that the consultation requirements of the 1980 Act have not been effectively implemented.

In light of these conclusions and recommendations and based on its oversight of the Refugee Act, the bill has language requiring the Director of ORR to establish a mechanism to enable State and local government officials to meet regularly with local voluntary agency representatives on the placement of refugees prior to their arrival in the U.S.

While the bill refers to quarterly meetings, it is the Committee's expectation that such meetings be held more frequently, as needed. Further the bill does not identify the specific individuals to participate in the meetings since the interested parties vary considerably by locality. In some instances locally elected officials should obviously participate. In other localities, such as Orange County, California, special forums have been created to deal with this problem.

It is anticipated that the Director of ORR in identifying the appropriate participants for each resettlement area will work closely with the State Refugee Coordinators and with the national, as well as the state and local, voluntary agency representatives.

Recognizing that the consultation requirements of the 1980 Act have not been properly implemented, the Committee intends to closely monitor the consultative mechanism established by ORR and the progress of the meetings held under this legislation.

It is clearly the intent of this Committee to insure that these meetings are meaningful and productive and provide an opportunity for expansion of the concerns on the part of State and local officials and a free exchange of views between these officials and voluntary agency representatives.

10

### DATA COLLECTION

The Refugee Act of 1980 does not merely establish a system for the admission of refugees; it also provides a comprehensive framework for their resettlement in the United States. With the passage of the Act, Congress recognized that refugees are fundamentally different from other types of immigrants.

The exigent circumstances under which they are admitted to the United States necessitates that the United States take an active role in ensuring that their assimilation into American society is as traumatic-free, speedy, and effective as possible.

The Committee has spent, and will continue to spend, a substantial amount of time overseeing the refugeee resettlement program in the United States. Congressional oversight, however, can only be effective if all relevant data and information is produced. Unfortunately, the Committee has found that ORR has failed to gather data in two critical areas: refugee dependency rates and secondary migration.

The Committee believes that effective oversight will not be fully realized as long as this informational gap exists. Accordingly, the bill requires ORR to maintain on a state-by-state basis information on the proportion of refugees receiving cash assistance and medical assistance. In addition, the bill mandates a further breakdown of that information by nationality.

It is the Committee's intent that this proportion be calculated on the basis of actual numbers of refugees in each state and by nationality receiving cash and medical assistance and that these numbers be included in the data compiled and maintained by the Director of ORR.

Equally disturbing has been the absence of information on secondary migration. This informational void hinders Congressional efforts to determine the effectiveness of initial resettlement efforts. It also prevents Congress from discovering the extent to which initial resettlements are being made in refugee impacted areas. Thus, the bill requires ORR to gather and maintain data on a state by state basis and by nationality on the number of refugees who fail to remain in their initial state of resettlement.

### COORDINATION BETWEEN VOLUNTARY AGENCIES AND LOCAL WELFARE OFFICES—NOTIFICATION REQUIREMENTS

Another serious problem identified by the Committee is the lack of communication and coordination between local voluntary agencies and county welfare offices. It is evident that this lack of contact is partially responsible for the escalating dependency rates and has hindered the development of a case management approach by some voluntary agencies.

There is no justification for the failure of local welfare officials to notify the local voluntary agency official when a refugee sponsored by that agency applies for welfare. This occurs quite frequently at the present time in many jurisdictions and gives some credence to the claim of voluntary agencies that they "lose control" of their refugee clients once they are exposed to the welfare system.

Further, the degree of that exposure is incredible for Indochinese refugees. For example, GAO testified that, "71 percent of the total

11

employable age members of our sample (of 594 Indochinese refu-
gees), were found to have registered for cash assistance." Even
more alarming, 88 percent of that group did so within 30 days of
arrival and most did so within 2 weeks.

Both the voluntary agencies and welfare eligibility workers have
contributed to this serious problem and as a result, they should im-
mediately reexamine their practices to curtail it.

GAO also found that voluntary agencies engage in only limited
monitoring of the progress which their sponsored refugees are
making in becoming self sufficient. In 30 percent of GAO's sample
there was no contact between local voluntary agency officials and
their refugees beyond 30 days. In 50 percent of these cases there
was no contact beyond 90 days.

In the Committee's judgment it is essential that voluntary agen-
cies monitor the self sufficiency efforts of their clientele as closely
as possible.

To achieve this objective and to ensure greater cooperation be-
tween voluntary agencies and welfare offices the bill:

    (1) Requires voluntary agency officials to notify welfare of-
fices whenever they are aware that a job has been offered to a
refugee sponsored by that agency (this will lead to the termina-
tion of cash assistance for that refugee—a subject discussed in
more detail below); and

    (2) Requires welfare offices to notify promptly the sponsoring
voluntary agency whenever a refugee applies for welfare.

In carrying out this mandate, it is expected that the notification
given to the refugee relating to that refugees job refusal shall in-
clude specific details on the job offer, the opportunity for a hearing
and the effect of that refusal on cash assistance eligibility. Further,
it should be noted that the notification requirement for voluntary
agencies only applies to their sponsored refugees who are receiving
welfare benefits.

These notification requirements are intended to force a closer
working relationship between these two entities and hopefully to
reduce welfare dependency rates among refugees.

### ELIGIBILITY FOR CASH ASSISTANCE

Coupled with these notification requirements are further limita-
tions on the use of cash assistance for refugees.

While the Refugee Act of 1980 conditions cash assistance on the
"refugee's acceptance of appropriate offers of employment," some
witnesses before the Committee indicated that this requirement
was not being followed. Others were unable to cite any specific in-
stances in which a refugee's welfare payments were terminated for
this reason and ORR has advised that "data are not available" on
this subject.

To clarify and strengthen this prohibition, the Committee
amendment specifically terminates cash assistance to a refugee
with the month in which the refugee refuses an appropriate offer
of employment, after opportunity for an administrative hearing. In
this regard, the Committee expects State and local agencies which
administer cash assistance programs to promptly schedule and hold
such administrative hearings.

12

In determining whether a particular job is "appropriate" or whether the refusal to accept it was for "good cause" reference should be made to existing HHS regulation on this subject (see 45 CFR 224.34; 233.100). Furthermore, the welfare official is expected to consult closely with the local voluntary agency caseworker or case manager to determine whether a specific job offer may be consistent with any employability plan that has been developed for that particular refugee. In reaching a final decision, the welfare eligibility worker should recognize that refugees should be encouraged to accept "entry level" jobs, if necessary, and that welfare should serve only as a "last resort" in refugee resettlement planning.

A similar prohibition is included in the bill with regard to refugees who refuse to participate in available and appropriate social services programs or who are full-time students in institutions of higher education.

The Committee does not believe that cash assistance should be used to subsidize one's college education, nor should it be available to those refugees who refuse to benefit from those supportive services (especially language training and job training and development) which will assist them in becoming self-sufficient.

### IMPACT AID STUDY

The Committee is disturbed that refugee resettlement in some areas of the United States is highly concentrated. As of September 30, 1981, for example, 10 states had 78 percent of the 547,700 Indochinese refugees in the United States. In addition, many counties had larger Indochinese refugee populations than a majority of the states combined. The Committee is concerned that this phenomenon may be placing unnecessary and intolerable strains upon the ability of certain states, counties, and municipalities to provide effective public welfare services not only to their native populations, but also to the refugee populations as well.

The bill addresses this concern by requiring the Director of ORR to conduct a study on the practicality and need for establishing an impact aid program for refugee concentrated areas. The Director is to furnish Congress a report on this study not later than January 1, 1983. In the course of such study, the Director should address the validity of ORR's method for allocating funds under the impact aid program proposed for fiscal year 1983. This report should also address ORR's plans and design for demonstration project grants within the framework of the existing social service program in fiscal year 1984 which would encourage a high degree of coordination at the local level between local affiliates of voluntary agencies with support from their national organizations, and state and local governments in areas with high refugee concentrations.

### EXPENDITURES AND AUDITING

Under cooperative agreements with the State Department, thirteen voluntary resettlement agencies receive per capita funding for the reception and placement of newly arrived refugees. These funds are used to provide immediate services such as food, clothing,

18

and shelter. They are also used for initial acculturation and orientation services.

The Committee is troubled to learn that some voluntary agencies have allowed these reception and placement funds to accumulate in bank accounts. In a February 1982 report by David North, Lawrence Lewin, and Jennifer Wagner entitled *Kaleidoscope* the authors found that total voluntary agency cash reserves "probably exceed $15,000,000." The authors also found that one voluntary agency had, since 1975, built up a cash reserve of $6,000,000.

Thus, the bill requires voluntary agencies to expend their reception and processing funds within two years of receipt. Funds may be held for a longer period only if the Federal contracting agency agrees. The Committee believes that this policy will place no undue burdens on the voluntary agencies, while at the same time ensuring that the utmost assistance is provided in a timely fashion.

At recent hearings the Committee received testimony from State Department officials who stated that no audit of the funds provided under the reception and placement agreements had been undertaken by any department or agency of the Executive branch.

The Committee firmly believes that it is essential for Congress to know whether federal money is being spent wisely and efficiently under the reception and placement agreement. The bill therefore requires GAO to conduct an annual audit of those federal funds, as opposed to any private funds that may be utilized by voluntary agencies or church organizations for resettling refugees. It is the Committee's intent, however, that the GAO audit not preclude the primacy of the State Department's reponsibility to audit the programs administered by its Bureau for Refugee Programs. Instead, the GAO audit is intended as a review of the auditing conducted by the Department of State.

### STUDY OF ALTERNATIVE REFUGEE SUPPORT MECHANISMS

The Refugee Act recognizes that no one resettlement strategy may be appropriate for all refugee groups under all cirumstances. As a result, it provides the Director of ORR with the flexibility to establish resettlement mechanisms designed to accommodate differing problems and needs. Various voluntary resettlement agencies have supported the concept case management, which would expand the responsibilities of the voluntary agencies in various areas, including interim cash support, ongoing needs assessments, services, and monitoring the progress toward self-sufficiency of those they resettle.

The extent to which the implementation of this concept would require modification of the Refugee Act would, of course, depend on the particulars of the program under consideration. In any event, the Committee is convinced that the case management concept, particularly as it incorporates the policy of interim support as a substitute for traditional cash assistance mechanisms, is worthy of further study and evaluation.

The bill thus requires the Director of ORR to study the practicability and usefulness of adopting the case management approach. The Director shall report to Congress on this study not later than January 1, 1983.

14

Part II of the study and report will, as mandated by the bill require an evaluation of the feasibility and advisability of establishing a mechanism for separating cash assistance from medical assistance.

Many individuals involved in the resettlement process have expressed the view that many refugees (especially those with entry level jobs) who originally desire to obtain only medical assistance coverage are required to qualify for cash assistance. For this reason the Refugee Act of 1980 authorized ORR to separate eligibility for cash and medical assistance. That authority, which was intended to reduce reliance on cash assistance, has never been exercised. Other individuals, equally knowledgeable, believe that this problem either does not exist or that its solution would not be cost effective. The Committee believes that further analysis of this issue is warranted, and therefore requires that it be included in the aforementioned study.

### STUDY ON ESTABLISHMENT OF REFUGEE CENTERS

The Committee has received substantial testimony that many recent refugee arrivals have come to the United States ill-prepared to achieve rapid self-sufficiency in American society. These refugees have frequently been preliterate, possessing little knowledge of English or job skills needed in the U.S. economy and unprepared to cope successfully in highly technological society. Many witnesses have testified before the Committee that this lack of preparedness has contributed to high refugee welfare dependency rates.

Some experts argued that adequate preparation for refugees would lead to more cost-effective and more rapid resettlement and refugee self-sufficiency, especially if such preparation were provided to refugees prior to their arrival in the U.S.

Therefore, the bill provides that the Director of ORR shall study and report to the Congress by September 30, 1983 on the advisability of establishing special refugee centers at which refugees would receive orientation, training and education in English and in the legal, governmental, monetary and economic systems, history, culture and geography of the U.S. before being settled in the U.S.

### DEPARTMENTAL POSITION

The Administration supports legislation to extend the funding authority for the domestic resettlement of refugees under the Refugee Act of 1980. In fact, the Administration's proposal, H.R. 5879, provided for a three year extension of such authority. On the other hand, the House passed bill extends for one year the authorization of funds for domestic refugee assistance. The Administration recommends that a specific amount of $514,809,000 be authorized for fiscal year 1983, without explicit authorizations for either social services or medical screening.

### ESTIMATE OF COST

The bill provides a one year authorization for the domestic resettlement assistance programs established in Title III of the Refugee Act of 1980. The Congressional Budget Office has estimated that

15

the legislation will cost $628 million. The Committee concurs with the cost estimate submitted by the Congressional Budget Office and which is set forth below. However, as noted earlier in this Report, the cost of cash and medical assistance is dependent on a number of variables and cannot, therefore, be estimated with precision. For this reason, the bill authorizes "such sums" as may be necessary for this purpose.

An Act to amend chapter 2 of title IV of the Immigration and Nationality Act to extend for one year the authorization of appropriations for refugee assistance, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United states of America in Congress assembled,*

SHORT TITLE

SECTION 1. This Act may be cited as the "Refugee Assistance Amendments of 1982".

EXTENSION OF AUTHORIZATION OF APPROPRIATIONS

SEC. 2. Subsection (a) of section 414 of the Immigration and Nationality Act (8 U.S.C. 1524) is amended to read as follows:

"(a)(1) There are hereby authorized to be appropriated for fiscal year 1983 such sums as may be necessary for the purpose of carrying out the provisions (other than those described in paragraphs (2) and (3)) of this chapter.

"(2) There are hereby authorized to be appropriated for fiscal year 1983 $100,000,000 for the purpose of providing services with respect to refugees under section 412(c).

"(3) There are hereby authorized to be appropriated for fiscal year 1983 $14,000,000 for the purpose of carrying out section 412(b)(5).".

CONGRESSIONAL INTENT RESPECTING REFUGEE ASSISTANCE

SEC. 3. (a) Section 412(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1522(a)(1)) is amended—

(1) by redesignation clauses (A) through (D) as clauses (i) through (iv), respectively,

(2) by inserting "(A)" after "(1)", and

(3) by adding at the end the following new subparagraph:

"(B) It is the intent of Congress that in providing refugee assistance under this section—

"(i) employable refugees should be placed on jobs as soon as possible after their arrival in the United States;

"(ii) social service funds should be focused on employment-related services, English-as-a-second-language training (in non-work hours where possible), and case-management services; and

"(iii) local voluntary agency activities should be conducted in close cooperation and advance consultation with State and local governments.".

(b) Section 413 of such Act (8 U.S.C. 1523) is amended by adding at the end the following new subsection:

16

"(c)(1) The Director shall study the feasibility and advisability of providing—

"(A) for interim support (to refugees who are not employment-ready upon arrival in the United States) for a period determined on a case-by-case basis through a mechanism (other than public assistance) that recognizes the primary role of case management through voluntary agencies at the local level, and

"(B) a mechanism (other than one associated with the provision of cash assistance) through which refugees, requiring medical (but not cash) assistance, are provided medical assistance,

and shall report to Congress on the study not later than January 1, 1983.

"(2) The Director shall study and report to the Congress, not later than September 30, 1983, on the feasibility and advisability of providing for the establishment of special refugee centers in various locations at which refugees would receive orientation, training, and education in English and in the legal governmental, monetary and economic systems, history, culture, and geography of the United States before resettlement in the United States.".

PROGRAM ADMINISTRATION

SEC. 4. (a) Paragraph (2) of section 412(a) of the Immigration and Nationality Act (8 U.S.C. 1522(a)) is amended—

(1) by inserting "(A)" after "(2)", and

(2) by adding at the end the following new subparagraphs:

"(B) The Director shall develop and implement, in consultation with representatives of voluntary agencies and State and local governments, policies and strategies for the placement and resettlement of refugees within the United States.

"(C) Such policies and strategies, to the extent practicable and except under such unusual circumstances as the Director may recognize, shall—

"(i) insure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the Director after consultation with such agencies and governments) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area, and

"(ii) provide for a mechanism whereby representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States and localities.".

(b) Paragraph (3) of such section is amended by inserting after the first sentence the following new sentence: "The Director shall compile and maintain data on secondary migration of refugees within the United States and, by State of residence and nationality, on the proportion of refugees receiving cash or medical assistance described in subsection (e).".

INITIAL RESETTLEMENT PROGRAM

SEC. 5. Section 412(b) of the Immigration and Nationality Act (8 U.S.C. 1522(b)) is amended—

(1) by striking out the last sentence of paragraph (1)(A);

(2) by adding at the end of paragraph (1)(A) the following new sentences: "Funds provided to agencies under such grants and contracts may only be obligated or expended during the fiscal year in which they are provided (or the subsequent fiscal year or such subsequent fiscal period as the Federal contracting agency may approve) to carry out the purposes of this subsection. Such grants and contracts shall provide that the agency shall provide (directly or through its local affiliate) notice to the appropriate county or other local welfare office at the time that the agency becomes aware that a refugee is offered employment and provide notice to the refugee that such notice has been provided. Such grants and contracts shall also provide that the agency shall assure that refugees, known to the agency as having been identified pursuant to paragraph (4)(B) as having medical conditions affecting the public health and requiring treatment, report to the appropriate county or other health agency upon their resettlement in an area.";

(3) by adding at the end the following new paragraph:

"(5) The Director is authorized to make grants to, and enter into contracts with, State and local health agencies for payments to meet their costs of providing medical screening and initial medical treatment to refugees."; and

(4) by adding after such paragraph the following new paragraph:

"(6) The Comptroller General shall conduct an annual audit of funds expended under grants and contracts made under this subsection.".

CASH AND MEDICAL ASSISTANCE

SEC. 6. (a) Paragraph (1) of section 412(e) of the Immigration and Nationality Act (8 U.S.C. 1522(e)) is amended by striking out "up to" before "100 per centum".

(b) Paragraph (2) of such section is amended—

(1) by striking out the semicolon at the end of subparagraph (B) and all that follows through the end of such paragraph and inserting in lieu thereof a period.

(2) by striking out "and" at the end of subparagraph (A);

(3) by redesignating subparagraphs (A) and (B) as clauses (i) and (iii), respectively, by inserting "(A)" after "(2)", and by inserting after clause (i) (as so redesignated) the following new clause:

"(ii) on the refugee's participation in any available and appropriate social service program (funded under subsection (c)) providing job or language training in the area in which the refugee resides; and"; and

(4) by adding at the end the following:

"Such cash assistance provided to such a refugee shall be terminated (after opportunity for an administrative hearing) with the

18

month in which the refugee refuses such as appropriate offer
employment or refuses to participate in such an available and a
propriate social service program.

"(B) Cash assistance shall not be made available to refugees wl
are full-time students in institutions of higher education (as c
fined by the Director after consultation with the Secretary of Ed
cation).".

(c) Such section is further amended by adding at the end the f(
lowing new paragraph:

"(6) As a condition for receiving assistance, reimbursement, or
contract under this subsection and notwithstanding any other pr
vision of law, a State or agency must provide assurances tha
whenever a refugee applies for cash or medical assistance f(
which assistance or reimbursement is provided under this subse
tion, the State or agency must notify promptly the agency (or loc
affiliate) which provided for the initial resettlement of the refug(
under subsection (b) of the fact that the refugee has so applied.

### STUDY OF NEED FOR REFUGEE IMPACT AID PROGRAM

SEC. 7. Section 413 of the Immigration and Nationality Act (
U.S.C. 1522), as amended by section 3(b) of this act, is furthe
amended by adding after subsection (c) the following new subse(
tion:

"(d) The Director shall study, and report to Congress not late
than January 1, 1983, on the feasibility and advisability of estal
lishing a program providing payments to States, counties, citie
and other units of local government to reflect a net increase in ou
lays on educational, health, criminal justice, and other governmer
tal services resulting directly from the initial resettlement of refi
gees in, or secondary migration of refugees to, that State, county
city, or other unit. Such study shall include an examination of th
extent to which the programs and assistance described in sectio
412 (particularly under subsection (c) thereof) provide for such pay
ments to impacted areas and the extent to which increased outlay
in these impacted areas are offset by the provision of addition
Federal funds under other programs or authority or by increase
taxes, revenues, or other economic activity resulting from refuge
resettlement in, or migration, to these areas.".

### EFFECTIVE DATE

SEC. 8. The amendments made by—

(1) sections 3(b), 4, 5(3), 5(4), 6(a), and 7 take effect on Octobe
1, 1982, and

(2) sections 5(2), 6(b), and 6(c) apply to grants and contract
made, and assistance furnished, on or after October 1, 1982.

Passed the House of Representatives June 22, 1982.

Attest:

EDMUND L. HENSHAW, Jr.,
*Clerk.*

By THOMAS E. LADD,
*Assistant to the Clerk.*

19

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., September 28, 1982.*

Hon. STROM THURMOND,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: At the request of your staff, the Congressional Budget Office has prepared the attached cost estimate for H.R. 5879, the Refugee Assistance Amendments of 1982, as passed by the House of Representatives on June 22, 1982.

Should the Committee so desire, we would be pleased to provide further details on the attached cost estimate.

Sincerely,

RAYMOND C. SCHEPPACH
(For Alice M. Rivlin, Director).

CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

1. Bill number: H.R. 5879.
2. Bill title: Refugee Assistance Amendments of 1982.
3. Bill status: As passed by the House of Representatives, June 22, 1982.
4. Bill purpose: The purpose of this bill is to amend the Refugee Act of 1980, which is under the Immigration and Nationality Act to extend for one year the authorization of refugee assistance, and for other purposes. The bill is subject to subsequent appropriation action.
5. Cost estimate:

[By fiscal year, in millions of dollars]

|  | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Estimated authorization level: |  |  |  |  |  |
| Refugee cash, medical and grant assistance | 514 |  |  |  |  |
| Stated authorization levels: |  |  |  |  |  |
| Refugee social services | 100 |  |  |  |  |
| State and local medical screening and treatment services | 14 |  |  |  |  |
| Total authorization levels | 628 |  |  |  |  |
| Estimated total outlays | 439 | 127 | 62 |  |  |

The costs of this bill fall in budget function 600.

6. Basis for estimate: This bill authorizes a one year extension of current refugee programs and authorizes a new program to reimburse state and local costs for medical services.

The estimated authorization level for refugee cash, medical and grant assistance is based on projected 1983 average benefit levels and the rate of program participation by refugees entering the United States from 1981 through 1983. The 1981 average cost was $1,458 per person for such services, and is inflated by the appropriate price indices to achieve a 1983 average cost. Volunteer agencies receive a one time $1,000 grant per refugee services.

The estimate assumes 103,500 refugees enter the United States during 1983, as projected by the Administration. Of these 11,000

are expected to be placed with private nonprofit agencies for resettlement services and 80 percent of the remaining 92,500 refugees will require cash and medical assistance, according to the Office of Refugee Resettlement. In addition, approximately 184,500 refugees who entered the United States between 1981 and 1982 would continue to require cash and medical assistance in 1983. The Administration's estimate of $18 million for assistance for refugee children, $6 million for preventive health services, and $6 million for administrative costs, are also included in the total.

The authorization levels for social services and the state and local medical service cost reimbursement program are those specifically stated in the bill. Further appropriation of estimated authorization levels is assumed in this estate.

Outlays for the state administered refugee programs, including cash and medical benefits and social services, are assumed to be 70 percent the first year, 20 percent the second, and the remainder the third year. Refugee voluntary agency grants program spendout rate is 50 percent, 43 percent, and 7 percent, respectivity, over three years. The remaining program outlays are spent out over two years.

7. Estimate comparison: None.

8. Previous CBO estimate: CBO prepared a cost estimate of H.R. 5789 as ordered reported from the House Judiciary Committee, May 12, 1982. The only amendment to the bill as reported directs the Office of Refugee Resettlement to study the advisability of providing special refugee centers to offer orientation to refugees. According to the Office of Refugee Resettlement, this study could cost up to $50,000. It is not known if this study would result in an additional funding request for 1983.

9. Estimate prepared by: Deborah Kalcevic, Kelly Lukins (226–2820)

10. Estimate approved by: C. G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis).

## ADDITIONAL VIEWS OF MR. KENNEDY

As I noted in my statement at the Subcommittee's hearing on H.R. 5879, there are few human dramas more compelling, or more revealing of the troubled time in which we live, than the plight of millions of refugees around the world. And there are few greater tests of the democractic and humanitarian ideals for which we stand than our response to the resettlement needs of refugees.

In 1980, Congress took a giant step permitting our country to meet the resettlement needs of refugees in a more humane and effective way with passage of The Refugee Act of 1980. Among the many essential reforms achieved in this legislation, none has been more important than the provisions which ended years of *ad hoc* refugee programs and different policies for different refugees. For the first time, the Act gave United States refugee admission and resettlement programs a firm and continuing foundation.

However, the authorization for these programs expires on September 30, 1982, unless we act—as we must—to reauthorize them. Therefore, I am pleased to join with Senator Simpson in moving expeditiously on this bill—of accepting it, without amendment, as it passed the House of Representatives. This is necessary given the time constraints and the press of other business confronting the Senate.

H.R. 5879 reauthorizes the full range of federal programs designed to assist in the resettlement of refugees. Because the admission of refugees is a federal decision, the federal government clearly has a responsibility to assist State and local communities in helping refugees become self-sufficient, contributing members of our society.

I had intended to offer a number of amendments to deal with some important reforms I believe are necessary to improve the refugee program. However, I have agreed to wait until next year, when we will have an opportunity to review the refugee program in a more thorough and thoughtful manner, without the current time constraints.

One of my concerns is that we are reauthorizing the refugee assistance program for only one year. I would hope that next year we would act to provide a longer-term authorization. Otherwise, we will be defeating one of the basic purposes of The Refugee Act—which was to end the year-by-year, ever changing character of the funding of our refugee program. Although federal assistance under this program should be carefully monitored by Congress, this can be achieved without requiring annual authorizations of what are essentially multi-year federal commitments to States and local communities. A three or four year authorization would make more sense.

A second concern I have is over the use of welfare assistance by refugees—which is facilitated by the waivers on assistance—with-

(21)

out sufficient case-management control by the voluntary agencies. I fully concur in the testimony offered by Mr. Wells Klein in behalf of the American Council of Voluntary Agencies, that for both philosophical and practical terms,

> we would like to see not more special refugee entitlements or resettlement-connected funding than are necessary to realistically assist refugees achieve economic independence. A necessary prerequisite for this approach is the elimination of the current waiver of categorical relatedness for refugee participation in cash assistance. However, to selectively implement this change would be inappropriate and damaging; such an action must only occur as part of a set of reforms. This is because there are refugees who are not categorically eligible for regular assistance who cannot be expected to be economically self-sufficient immediately after arrival. To leave them unassisted helps neither them nor their local community. Under our interim support proposal, appropriate case-by-case assistance could be utilized. The elimination of the waiver of categorical relatedness should not be effected without full consultation with state and local governments to assure minimum disruption to their efforts and minimal harm to dependent refugees.

Next year, the Committee should address this issue in a more detailed way.

Finally, I want to indicate my concern over the continued problems being encountered in the processing of refugees for admission to the United States, and the continuing impasse that has developed between the Department of State and the Immigration and Naturalization Service in determining who is and who is not a refugee under the terms of the Refugee Act. This problem has festered for two years, principally in Southeast Asia, as the staff report to the Subcommittee outlined last year.[1] In my view, this is largely the result of the inadequacy of the Immigration Service to undertake assignments overseas that involve not just narrow issues of immigration law, but equally important diplomatic and foreign policy questions as well as complex international and cultural relations that are more properly within the scope and competence of officials from the Department of State.

During the Senate's consideration of the Refugee Act, the Judiciary Committee's report made clear its view that "both Consular Officers in United States Embassies overseas as well as officers of the Immigration and Naturalization Service should be authorized to process refugees admitted under Section 207." We should follow this recommendation to amend the Act to explicitly authorize Consular Officers to approve refugees for admission to the United States—especially where there are no INS personnel stationed, or where the refugee situation calls for greater international experience or foreign cultural or linguistic knowledge than INS officers are trained to have.

---

[1] *Refugee Problems in Southeast Asia: 1981*, a Staff Report, Subcommittee on Immigration and Refugee Policy, Committee on the Judiciary, U.S. Senate, January 1982; pages 39–41.

23

This would end the unnecessary delays and expense of keeping many refugees waiting who are clearly eligible for admission under our programs, but must sit idly at considerable expense, simply because no INS officer will tour the circuit for another several months—which is often the case in countries in Latin America, Africa and most of Asia. It would also end the extraordinary anomaly that Consular Officers of the United States are charged with issuing every other visa to admit immigrants to the United States except one: refugees. It is duplicative and it makes no sense for Consular Officers and other officials of the Department of State to undertake all the processing of refugees around the world—as they do for every other immigrant or non-immigrant visa application— yet in the case of refugees, they must wait for an uncertain period until an INS officer arrives to further review, or second-guess, what these senior officials of the United States Government have already done.

The Immigration Service should be out of the overseas business. But until then we should at least make more flexible the ability of Department of State officials as well as INS officers to process refugees for admission to the United States.

EDWARD M. KENNEDY.

○

Attachment 4

| 97TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| *2d Session* | | No. 97-541 |

## REFUGEE ASSISTANCE AMENDMENTS OF 1982

MAY 17, 1982—Committee to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. MAZZOLI, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## DISSENTING VIEWS

[To accompany H.R. 5879]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5879) to amend the Immigration and Nationality Act to extend for three years the authorization for appropriations for refugee assistance, to make certain improvements in the operation of the program, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Strike all after the enacting clause and insert the following:

### SHORT TITLE

SECTION 1. This Act may be cited as the "Refugee Assistance Amendments of 1982"

### EXTENSION OF AUTHORIZATION OF APPROPRIATIONS

SEC. 2. Subsection (a) of section 414 of the Immigration and Nationality Act (8 U.S.C. 1524) is amended to read as follows:

"(a)(1) There are hereby authorized to be appropriated for fiscal year 1983 such sums as may be necessary for the purpose of carrying out the provisions (other than those described in paragraphs (2) and (3)) of this chapter.

"(2) There are hereby authorized to be appropriated for fiscal year 1983 $100,000,000 for the purpose of providing services with respect to refugees under section 412(c).

★ 89–006 O

Attachment 4

"(3) There are hereby authorized to be appropriated for fiscal year 1983 $14,000,000 for the purpose of carrying out section 412(b)(5)."

CONGRESSIONAL INTENT RESPECTING REFUGEE ASSISTANCE

SECTION 3. (a) Section 412(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1522(a)(1)) is amended—
    (1) by redesignating clauses (A) through (D) as clauses (i) through (iv), respectively,
    (2) by inserting "(A)" after "(1)", and
    (3) by adding at the end the following new subparagraph:
"(B) It is the intent of Congress that in providing refugee assistance under this section—
    "(i) employable refugees should be placed in jobs as soon as possible after their arrival in the United States;
    "(ii) social service funds should be focused on employment-related services, English-as-a-second-language training (in non-work hours where possible), and case-management services; and
    "(iii) local voluntary agency activities should be conducted in close cooperation and advance consultation with State and local governments."
(b) Section 413 of such Act (8 U.S.C. 1523) is amended by adding at the end the following new subsection:
"(c) The Director shall study the feasibility an advisability of providing—
    "(1) for interim support (to refugees who are not employment-ready upon arrival in the United States) for a period determined on a case-by-case basis through a mechanism (other than public assistance) that recognizes the primary role of case management through voluntary agencies at the local level, and
    "(2) a mechanism (other than one associated with the provision of cash assistance) through which refugees, requiring medical (but not cash) assistance, are provided medical assistance.
and shall report to Congress on the study not later than January 1, 1983."

PROGRAM ADMINISTRATION

SEC. 4. (a) Paragraph (2) of section 412(a) of the Immigration and Nationality Act (8 U.S.C. 1522(a)) is amended—
    (1) by inserting "(A)" after "(2)", and
    (2) by adding at the end the following new subparagraphs:
"(B) The Director shall develop and implement, in consultation with representatives of voluntary agencies and State and local governments, policies and strategies for the placement and resettlement of refugees within the United States.
"(C) Such policies and strategies, to the extent practicable and except under such unusual circumstances as the Director may recognize, shall—
    "(i) insure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the Director after consultation with such agencies and governments) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area, and
    "(ii) provide for a mechanism whereby representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States and localities."
(b) Paragraph (3) of such section is amended by inserting after the first sentence the the following new sentence: "The Director shall compile and maintain data on secondary migration of refugees within the United States and, by State of residence and nationality, on the proportion of refugees receiving cash or medical assistance described in subsection (e)."

INITIAL RESETTLEMENT PROGRAM

SEC. 5. Section 412(b) of the Immigration and Nationality Act (8 U.S.C. 1522(b)) is amended—
    (1) by striking out the last sentence of paragraph (1)(A);
    (2) by adding at the end of paragraph (1)(A) the following new sentences: "Funds provided to agencies under such grants and contracts may only be obligated or expended during the fiscal year in which they are provided (or the subsequent fiscal year or such subsequent fiscal period as the Federal contracting

agency may approve) to carry out the purposes of this subsection. Such grants and contracts shall provide that the agency shall provide (directly or through its local affiliate) notice to the appropriate county or other local welfare office at the time that the agency becomes aware that a refugee is offered employment and provide notice to the refugee that such notice has been provided. Such grants and contracts shall also provide that the agency shall assure that refugees, know to the agency as having been identified pursuant to paragraph (4)(B) as having medical conditions affecting the public health and requiring treatment, report to the appropriate county or other health agency upon their resettlement in an area.";
    (3) by adding at the end the following new paragraph:
"(5) The Director is authorized to make grants to, and enter into contracts with, State and local health agencies for payments to meet their costs of providing medical screening and initial medical treatment to refugees."; and
    (4) by adding after such paragraph the following new paragraph:
"(6) The Comptroller General shall conduct an annual audit of funds expended under grants and contracts made under this subsection."

CASH AND MEDICAL ASSISTANCE

SEC. 6. (a) Paragraph (1) of section 412(e) of the Immigration and Nationality Act (8 U.S.C. 1522(e)) is amended by striking out "up to" before "100 per centum"
    (b) Paragraph (2) of such section is amended—
    (1) by striking out the semicolon at the end of subparagraph (B) and all that follows through the end of such paragraph and inserting in lieu thereof a period;
    (2) by striking out "and" at the end of subparagraph (A);
    (3) by redesignating subparagraphs (A) and (B) as clauses (i) and (iii), respectively, by inserting "(A)" after "(2)", and by inserting after clause (i) (as so redesignated) the following new clause:
    "(ii) on the refugee's participation in any available and appropriate social service program (funded under subsection (c)) Providing job or language training in the area in which the refugee resides; and"; and
    (4) by adding at the end the following:
"Such cash assistance provided to such a refugee shall be terminated (after opportunity for an administrative hearing) with the month in which the refugee refuses such an appropriate offer of employment or refuses to participate in such an available and appropriate social service program.
    "(B) Cash assistance shall not be made available to refugees who are full-time students in institutions of higher education (as defined by the Director after consultation with the Secretary of Education).".
    (c) Such section is further amended by adding at the end the following new paragraph:
    "(6) As a condition for receiving assistance, reimbursement, or a contract under this subsection and notwithstanding any other provision of law, a State or agency must provide assurances that whenever a refugee applies for cash or medical assistance for which assistance or reimbursement is provided under this subsection, the State or agency must notify promptly the agency (or local affiliate) which provided for the initial resettlement of the refugee under subsection (b) of the fact that the refugee has so applied."

STUDY OF NEED FOR REFUGEE IMPACT AID PROGRAM

SEC. 7. Section 413 of the Immigration and Nationality Act (8 U.S.C. 1522), as amended by section 3(b) of this Act, is further amended by adding after subsection (c) the following new subsection:
    "(d) The Director shall study, and report to Congress not later than January 1, 1983, on the feasibility and advisability of establishing a program providing payments to States, counties, cities, and other units of local government to reflect a net increase in outlays on educational, health, criminal justice, and other governmental services resulting directly from the initial resettlement of refugees in, or secondary migration of refugees to, that State, county, city, or other unit. Such study shall include and examination of the extent to which the programs and assistance described in section 412 (particularly under subsection (c) thereof) provide for such payments to impacted areas and the extent to which increased outlays in these impacted areas are offset by the provision of additional Federal funds under other programs or authority or by increased taxes, revenues, or other economic activity resulting from refugee resettlement in, or migration, to these areas."

EFFECTIVE DATE

SEC. 8. The amendments made by—
(1) sections 3(b), 4, 5(3), 5(4), 6(a), and 7 take effect on October 1, 1982, and
(2) sections 5(2), 6(b), and 6(c) apply to grants and contracts made, and assistance furnished, on or after October 1, 1982.

Amend the title so as to read:

A bill to amend chapter 2 of title IV of the Immigration and Nationality Act to extend for one year the authorization of appropriations for refugee assistance, and for other purposes.

## PURPOSE OF THE BILL

The purpose of the bill, as introduced, is to extend for three years the funding authorization for domestic resettlement activities under the Refugee Act of 1980.

## PURPOSE OF THE AMENDMENT

The purpose of the amendment is to extend such funding authority for one additional year (fiscal year 1983) and to require greater coordination between the Federal Government, state and local governments, and voluntary agencies in the placement of refugees and the provision of assistance to them.

## HISTORY OF LEGISLATION

During this Congress, the Committee held extensive hearings and engaged in several oversight activities to consider a variety of issues relating to the admission and resettlement of refugees.

Specifically, the Subcommittee on Immigration, Refugees, and International Law held three days of hearings on September 16, 17, and 23, 1981, on the domestic and foreign policy implications of the U.S. Refugee Admissions Program. On September 24, 1981, Administration officials met with the Consultative Members of the Judiciary Committee on its proposal to admit 173,000 refugees during fiscal year 1982. On September 29, 1981, the full Committee held a hearing on this proposal. Following the Subcommittee and full Committee hearings, and the formal consultation under the provisions of the Refugee Act of 1980, the Administration reduced its refugee admissions proposal from 173,000 to 140,000.

In addition, in April 1981, the Subcommittee undertook a fact-finding trip to California to review refugee resettlement activities in that area. Many of the findings and recommendations contained in the Subcommittee's trip report (Committee Print No. 7, hereafter referred to as California trip report) are embodied in the legislation reported by the Committee and described later in this report.

On March 17, 1982, the Administration's refugee assistance extension legislation (H.R. 5879) was introduced by Chairman Rodino (by request) and referred to the Subcommittee on Immigration, Refugees, and International Law. The Subcommittee held two days of hearings on this legislation on April 22 and 28. During the course of these hearings, testimony was received from Ambassador Eugene Douglas, U.S. Coordinator for Refugee Affairs, Department of State; Phillip Hawkes, Director, Office of Refugee Resettlement (ORR), Department of Health and Human Services (HHS); and

Gregory Ahart, Director, Human Resources Division, General Accounting Office (GAO). Other witnesses included state refugee coordinators, representatives of city and local governments, and voluntary agencies.

The Subcommittee marked up H.R. 5879 on May 5, 1982. Congressman Mazzoli offered an amendment in the nature of a substitute which made substantial changes in the legislation as originally introduced. A single Subcommittee amendment to H.R. 5879 was approved and the bill, as amended, was ordered favorably reported to the full Committee.

### COMMITTEE VOTE

Following two days of full Committee mark-up on May 11 and 12, 1982, the Committee, on the latter date, ordered the bill, H.R. 5879, as amended, favorably reported to the House by a record vote of 22-4.

### NEED FOR LEGISLATION

As signed into law in March 1980, the Refugee Act provided for a three year authorization of appropriations for the domestic resettlement of refugees. Accordingly, absent reauthorization during the 97th Congress, the authority to fund these activities will expire.

As discussed elsewhere in this report, the Committee believes that a one year reauthorization, with the essential changes made by the Committee amendment, will promote a more effective administration of the Act while at the same time giving the Committee the opportunity to review various substantive issues during next year's reauthorization process.

### BACKGROUND

Title II of the Refugee Act of 1980 defines the term "refugee" and establishes the framework for selecting refugees for admission to the United States. In accordance with the Act, the President determines the number of refugees to be admitted during each fiscal year after consultations between Executive Branch officials and Congress prior to each fiscal year.

Title III sets forth the mandate of the U.S. Coordinator for Refugee Affairs and provides a detailed system for the resettlement of refugees in the United States.

In fiscal year 1980, the United States admitted 189,727 refugees; in fiscal year 1981 153,077 were admitted; and in fiscal year 1982 up to 140,000 can be admitted, whereas the actual number will be closer to 110,000. For each year, Indochinese refugees constitute the majority of refugees admitted or contemplated for admission.

Resettlement assistance is provided by ORR primarily through a State-administered refugee resettlement program. Soviet and certain other refugees are eligible for the State-administered program, but currently are provided resettlement assistance primarily through an alternative system of matching grants. In order to participate in the refugee program, a State must submit a plan which provides assurance that it will comply with the regulations of the

program, and which indicates how it will meet the needs of refugees within its jurisdiction.

The assistance provided under the terms of the Refugee Act takes several forms. First, the Act authorizes ORR to reimburse States for up to 100 percent of their costs in providing cash assistance and medical assistance to refugees in the U.S. for 3 years or less. Full Federal funding has been provided at the 100 percent rate of reimbursement since enactment of the 1980 Act, as had been done in previous years.

Second, ORR provides funding to States for a broad range of social services to refugees. Permissible services include any service allowable in a State's plan under Title XX of the Social Security Act, as well as a number of services specifically identified in ORR policy instructions to the States. These specific services include English language training, job development and placement, career counseling, vocational training, day care for children to permit enrollment of parents in training programs, and translation and interpreter services.

Third, under the authority of the Refugee Act, funds have been appropriated for overseas monitoring of health screening and immunization of Southeast Asian refugees prior to their entry into the country, for port-of-entry inspection and health department notification of resettling refugees, and for health assessments after they have been relocated.

Finally, the Refugee Act authorizes, and funds have been appropriated for, educational assistance to school districts with large numbers of refugee children. No funds have been requested for this authorized activity for fiscal year 1983. In the event funds are provided in the future for educational assistance, consideration should be given to transferring this program from ORR to the Department of Education.

### ANALYSIS OF THE LEGISLATION, AS AMENDED

#### AUTHORIZATION PERIOD AND LEVEL

The Committee amendment provides for a one year extension of authorization of appropriations for such sums as may be necessary for all forms of refugee assistance except (1) social services, for which $100 million is authorized; and (2) health screening and initial treatment, for which $14 million is authorized.

The Committee believes that an authorization of longer duration would be unwise at this time. A number of extremely important matters—such as the definition of "refugee," the annual consultation process through which refugee allocations and ceilings are determined, and the role of the U.S. Coordinator for Refugee Affairs—could not be addressed in this legislation because of time constraints, which prevented the development of a complete record on these issues.

Moreover, by the spring of 1983, data from a number of studies presently being conducted by ORR should be available to the Committee. These studies address the following subjects: (1) Refugee self-sufficiency; (2) the effectiveness of English language training;

(3) the implementation of the matching grant approach to resettlement assistance; and (4) state administration of the program.

The Committee is thus convinced that a one year reauthorization will balance the need to continue the program with the need to review the program in light of timely and significant informational developments.

The Committee amendment, by adopting a "such sums" approach with respect to the majority of the funding under the Refugee Act, recognizes the difficulty of assessing the proper funding level for cash and medical reimbursement costs. In this regard, there are two important variables; refugee dependency rates and the number of refugees admitted.

Although dependency rates have risen during recent years, the Committee believes that its amendment, if vigorously implemented, will reverse that trend. In any event, it is not possible at this time to predict with accuracy what those rates will be for fiscal year 1983. With respect to the number of refugees admitted, it is important to remember that the admissions numbers and allocations for fiscal year 1983 will be determined immediately prior to the commencement of that fiscal year through consultations between the Administration and Congress.

The Committee thus believes that these two uncertainties—dependency rates and refugee flows—constitute compelling reasons for allowing maximum flexibility during the appropriations process.

### SOCIAL SERVICES

The Committee amendment, like the Refugee Act of 1980 itself, provides a line item authorization for refugee social services. Such services include English language training, job training, and job placement. By maintaining a line item approach to social services, the Committee underscores its firm belief that the provision of such services is the fundamental element through which refugees can avoid cash or medical assistance dependency. GAO, for example, which recently concluded a year long study of refugee resettlement, asserted in testimony before the Subcommittee on Immigration, Refugees, and Inernational Law that "employment services are critical for refugees."

Similarly, Phillip Hawkes, Director of ORR, recently testified

> We have been encouraging states to target their refugee social service monies toward English language and job training programs. We believe that these social service programs are the key to refugee self-sufficiency.

Countless state and local officials directly involved in the resettlement effort have echoed Mr. Hawkes' sentiment.

In its California trip report the Subcommittee made a number of recommendations concerning the provision of social services. The Committee believes that these recommendations are sound. The Committee wishes to draw particular attention to that portion of the report, which recommended that social service funding be increased.

The Committee concurs and points out that the amount authorized by the Refugee Act for social services has never approached by this Administration or the prior Administration in its budget requests. The Committee further believes that the Administration's fiscal year 1983 social service funding request is both inadequate and premised on an unsound theory, namely, that social service requests should be based on the anticipated flow of new refugee arrivals. The Committee sees no basis in law or logic for basing social service requests exclusively on arrivals. Instead, the Committee asserts that the proper focus should be on the number of refugees who need such services, regardless of their date of entry.

The Refugee Act clearly does not limit the availability of such services to new arrivals alone, nor are social services provided only to new arrivals. As a result, the Administration must reevaluate its policy for determining the level and allocation of funding for social services.

The Committee wishes to emphasize that self-sufficiency at the earliest possible date has been, and must remain, the clear objective of the Refugee Act. The Committee is disturbed that some confusion has apparently arisen over whether employable refugees who lack English language competency should be expected to exert a full-fledged, good faith effort to obtain employment. In the Committee's view, the Refugee Act neither states nor suggests that the inability to speak English constitutes a basis for postponing an employment search or engaging in such search half-heartedly.

The Committee recognizes that, in certain instances, the inability to communicate in English will prevent a refugee from obtaining employment. Accordingly, it is incumbent upon the federal government to provide adequate resources for language training. Nevertheless, GAO's finding that 40 percent of the employed refugees surveyed had little or not English speaking ability has convinced the Committee that non-English speaking refugees will often meet with success in their efforts to obtain employment.

The Committee is disturbed by frequent complaints—apparently well-founded—by state and local governments over the frequent interruptions in funding for social services. It is impossible to administer a program of any sort in an efficient and orderly manner if the promised funding upon which that program depends for its continuance is not forthcoming on a timely and reliable basis. The Committee strongly recommends that the Administration give every consideration to adopting a forward-funding approach for social services so as to avoid the unnecessary disruptions which have characterized the program in the past.

Finally, the Committee is concerned that in some instances the scheduling of social services has apparently been allowed to interfere with the objective of early employment. All parties involved in the resettlement program must make every effort to insure that, to the extent possible, social services are not scheduled so as to constitute an impediment to the job search effort of employable refugees. Once again, early self-sufficiency is the goal of the Refugee Act. Social services, properly administered, are a means toward that goal.

### MEDICAL SCREENING AND INITIAL TREATMENT

Many refugees suffer from illnesses which are either common in their home country, result from their flight to asylum, or develop while they live in refugee camps. These illnesses range from those common to all mankind—such as heart disease, cancer, etc.—to those peculiarly indigenous to underdeveloped countries—such as malaria, tuberculosis, and parasitic infestations. Clearly, some refugee groups suffer from more severe and more diverse illnesses than other populations. In recognition of this fact, the Refugee Act requires refugees to be medically screened. In addition, refugees with communicable diseases are prevented from entering the United States until they are no longer a threat to the public health.

Despite this legislative mandate, GAO has found that the medical screening of refugees abroad is "cursory" and "inadequate." According to GAO, the overseas examination is not in any way comparable to a physical examination conducted in a physician's office in the United States, since it does not include a medical history or an examination of the organ systems of the body. Furthermore, no attempt is made to identify or to test for malaria, hepatitis B, or parasitic diseases, even though these diseases are common in refugees. The Committee is sufficiently troubled by GAO's findings to conclude that a line item authorization for medical screening and initial medical treatment funding is in order.

The need for such funding is further supported by information supplied to the Committee by numerous state and local health agencies, which have expressed serious concerns over their ability to meet the health care needs of refugees.

These agencies have undertaken extensive activities to provide comprehensive health assessments and follow-up treatment for diseases of public health concern. They also refer refugees with personal health problems to appropriate health care professionals and institutions. A small grant program was initiated by ORR in September 1980, under the social services project authority, to assist States and localities in providing health assessments to newly arriving refugees and in addressing refugee health problems of public health concern. In fiscal year 1982, $4.9 million is being provided, through the Centers for Disease Control, for this purpose.

However, decreasing local support, increasing costs of health care, and the diminution of other forms of Federal assistance have placed an economic burden on public health agencies which now threatens their ability to provide essential services to refugees, while maintaining their services to U.S. citizens.

The Committee believes that local taxpayers should not bear this burden since meeting the costs of public health services to refugees is primarily a Federal responsibility. Therefore, the Committee has included a separate authority to expand the current program of grants and contracts to State and local health agencies to assist them in meeting the costs of health assessments and in addressing refugee health problems of public health concern. For fiscal year 1983, the Committee bill authorizes $14 million for this purpose.

The Committee intends that funds appropriated under this section would be used to meet the costs of State and local health agencies for identifying and treating health conditions in refugees

which could affect the public health, especially tuberculosis. Funds provided under this authority could also be used to support essential outreach activities, interpreter services, and coordination functions. The Committee does not intend that funds under this authority be used, however, to displace funds otherwise available from Federal sources, particularly those available under refugee medical assistance.

The Committee also believes that this program of Federal assistance, by itself, is not enough to address refugee health problems. Therefore, the Committee intends that appropriate steps be taken by the Secretary of State, the Attorney General, and the Secretary of Health and Human Services to tighten overseas processing of refugess who may have dangerous, contagious diseases, particularly those with active tuberculosis. In addition, the Committee expects the voluntary agencies, both nationally and locally, to assure that once in the United States, refugees with health conditions potentially affecting the public health will report to appropriate county or other health agencies upon resettlement.

### REIMBURSEMENT POLICY

Currently, the Refugee Act states that the Director of ORR is authorized to reimburse states for "up to" 100 percent of the cash assistance and medical assistance provided to any refugee during that refugee's first 36 months in the United States. The Committee amendment strikes the words "up to," thereby clearly expressing the Committee's belief that, to the extent of available appropriations, states should be fully reimbursed for their refugee-related cash and medical costs.

Although this change does not alter current policy, the Committee is convinced that it is proper and necessary for Congress to clarify its position on this matter. The decision to admit a refugee is a federal decision; it should also be a federal responsibility to meet that refugee's resettlement needs for 36 months. Hopefully, the Committee amendment will assuage the fears of State and local governments, which detect in recent decisions of the federal government a movement away from full federal support.

It is equally important to note what the Committee amendment does not do. The amendment does not preclude the funding of cash and medical assistance on less than a 100 percent basis when such lesser basis is mutually agreed to, as in the matching-grant program under which cash and medical assistance may be provided to refugees through national voluntary refugee resettlement agencies. The matching-grant program serves primarily Soviet Jewish refugees. The amendment does not limit the flexibility of the ORR to continue the matching-grant program or to enter into other arrangements for the provision of cash and medical assistance to refugees under which shared-funding arrangements are agreed to. Finally, the amendment does not create an entitlement program for refugee assistance.

## REFUGEE PLACEMENT POLICY

One of the major problems associated with the U.S. refugee program is the maldistribution of refugees, particularly Indochinese, around the country.

Indochinese refugees have tended to concentrate in certain geographic areas, as evidenced by the fact that California has approximately 40 percent of all Indochinese refugees admitted since 1975 and 78 percent have been placed in just 10 states. This has created severe problems for state and local governments and has severely strained social service networks in these impacted areas.

To respond to this problem of geographic maldistribution and to reduce further impacts on certain communities, the Committee amendment requires ORR to develop and implement a refugee placement policy.

It should be noted that ORR is currently drafting such a policy, but it is the Committee's intent to specifically charge that Office with the statutory responsibility for carrying out that task and for doing it in close consultation with state and local governments and with the voluntary agencies.

The legislation also mandates that the policy shall preclude placement, to the extent possible, of other than immediate family reunification cases in areas that have already been highly impacted by the resettlement of large numbers of refugees and Cuban/Haitian entrants.

It is clear that refugee maldistribution has hindered the achievement of self-sufficiency in many cases and is, therefore, responsible to some extent for the high dependency rates of some refugee groups. According to testimony presented by Gregory Ahart, Director of the Human Resources Division, General Accounting Office on April 22, 1982:

> The allocation process, with its heavy emphasis on reunification, has resulted in cases being assigned to areas of the country even when key resettlement services were not effectively provided by local voluntary agency affiliates and other service providers . . . Further action is needed if the impact on areas with high concentrations of refugees is to be contained      and new resettlement areas which would be conducive to achieving effective resettlement and prompt self-sufficiency need to be identified.

The Committee agrees with this statement and expects ORR to proceed expeditiously in developing and promulgating the placement policy mandated by this legislation.

In addition, the Committee supports recent efforts by ORR and the State Department to preclude refugees on welfare from sponsoring other refugees. This practice promoted a philosophy of welfare dependency among newer arrivals and caused a significant increase in dependency rates over the past two years. As a result, it must be terminated and the State Department is encouraged to monitor voluntary agency compliance with this policy.

CONSULTATION WITH STATE AND LOCAL GOVERNMENTS

Despite the specific requirements in the Refugee Act of 1980 that the U.S. Coordinator for Refugee Affairs and the Director of ORR "consult regularly with states, localities, and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees", much remains to be accomplished in this area.

The National Governors Association (NGA), the U.S. Conference of Mayors, the National Association of Counties (NACO), Governors from individual states and local officials have sharply criticized the Federal Government for its failure to consult with them on refugee placement decisions. Some improvements have occurred in recent months. Yet, the Committee remains disturbed that the consultation requirements of the 1980 Act have not been effectively implemented.

In fact, NGA at its annual meeting this Spring adopted a resolution urging the establishment of a mechanism to insure appropriate coordination and consultation between the Federal Government and the states on placement strategies and the identification of impact areas.

In its California trip report, the Immigration Subcommittee specifically recommended that "state and local governments must be more directly involved in the decisionmaking process regarding the geographic distribution of refugees."

In light of these conclusions and recommendations and based on its oversight of the Refugee Act, the Committee has adopted language in its amendment requiring the Director of ORR to establish a mechanism to enable State and local government officials to meet regularly with local voluntary agency representatives on the placement of refugees prior to their arrival in the U.S.

While the Committee amendment refers to quarterly meetings, it is the Committee's expectation that such meetings be held more frequently, as needed. Further, the amendment does not identify the specific individuals to participate in the meetings, since the interested parties vary considerably by locality. In some instances, locally elected officials should obviously participate. In other localities, such as Orange County, special forums have been created to deal with this problem.

It is anticipated that the Director of ORR in identifying the appropriate participants for each resettlement area will work closely with the State Refugee Coordinators and with the national, as well as the state and local voluntary agency representatives.

Recognizing that the consultation requirements of the 1980 Act have not been properly implemented, the Committee intends to closely monitor the consultative mechanism established by ORR and the progress of the meetings held under this legislation.

It is clearly the intent of this Committee to insure that these meetings are meaningful and productive and provide an opportunity for appropriate input on the part of State and local officials and a free exchange of views between these officials and local voluntary agency representatives.

## DATA COLLECTION

The Refugee Act of 1980 does not merely establish a system for the admission of refugees; it also provides a comprehensive framework for their resettlement in the United States. With the passage of the Act, Congress recognized that refugees are fundamentally different from other types of immigrants.

The exigent circumstances under which they are admitted to the United States necessitates that the United States take an active role in ensuring that their assimilation into American society is an traumatic-free, speedy, and effective as possible.

The Committee has spent, and will continue to spend, a substantial amount of time overseeing the refugee resettlement program in the United States. Congressional oversight, however, can only be effective if all relevant data and information is produced. Unfortunately, the Committee has found that ORR has failed to gather data in two critical areas: refugee dependency rates and secondary migration.

In answering a supplemental written question propounded to him subsequent to his testimony on April 22, 1982 before the Immigration Subcommittee, ORR Director Phillip Hawkes explained the lack of data on refugee dependency rates by stating:

> Before 1981, ORR derived State refugee dependency rates from Form 2040 submitted by the States to claim reimbursements under the Refugee Assistance Program (RAP). Because the form was discontinued by OMB, it was no longer possible for ORR to derive the dependency rates from this reporting system. Since then, ORR has developed and OMB has approved Form 269 to collect fiscal data on the RAP. However, that data base does not provide the basis for calculating State-by-State welfare dependency rates.

The Committee believes that effective oversight will not be fully realized as long as this informational gap exists. Accordingly, the Committee Amendment requires ORR to maintain on a state by state basis information on the number of refugees receiving cash assistance and medical assistance. In addition, the Committee Amendment mandates a further breakdown of that information by nationality.

Equally disturbing has been the absence of information on secondary migration. This informational void hinders Congressional efforts to determine the effectiveness of initial resettlement efforts. It also prevents Congress from discovering the extent to which initial resettlements are being made in refugee impacted areas. Thus, the Committee Amendment requires ORR to gather and maintain data on a state by state basis and by nationality on the number of refugees who fail to remain in their initial state of resettlement.

## COORDINATION BETWEEN VOLUNTARY AGENCIES AND LOCAL WELFARE OFFICES—NOTIFICATION REQUIREMENTS

Another serious problem identified by the Committee is the lack of communication and coordination between local voluntary agencies and county welfare offices. It is evident that this lack of con-

tact is partially responsible for the escalating dependency rates and has hindered the development of a case management approach by some voluntary agencies.

There is no justification for the failure of local welfare officials to notify the local voluntary agency official when a refugee sponsored by that agency applies for welfare. This occurs quite frequently at the present time in many jurisdictions and gives some credence to the claim of voluntary agencies that they "lose control" of their refugee clients once they are exposed to the welfare system.

Further, the degree of that exposure is incredible for Indochinese refugees. For example, GAO testified that, "71 percent of the total employable age members of our sample (of 594 Indochinese refugees), were found to have registered for cash assistance." Even more alarming, 88 percent of that group did so within 30 days of arrival and most did so within 2 weeks.

Both the voluntary agencies and welfare eligibility workers have contributed to this serious problem and as a result, they should immediately reexamine their practices to curtail it.

GAO also found that voluntary agencies engage in only limited monitoring of the progress which their sponsored refugees are making in becoming self sufficient. In 30 percent of GAO's sample there was no contact between local voluntary agency officials and their refugees beyond 30 days. In 50 percent of the cases there was no contact beyond 90 days.

In the Committee's judgement it is essential that voluntary agencies monitor the self sufficiency efforts of their clientele as closely as possible.

To achieve this objective and to ensure greater cooperation between voluntary agencies and welfare offices the Committee amendment:

(1) Requires voluntary agency officials to notify welfare offices whenever it is aware that a job has been offered to a refugee sponsored by that agency (this will lead to the termination of cash assistance for that refugee—a subject discussed in more detail below); and

(2) Requires welfare offices to notify promptly the sponsoring voluntary agency whenever a refugee applies for welfare.

In carrying out this mandate, it is expected that the notification given to the refugee relating to that refugees job refusal shall include specific details on the job offer, the opportunity for a hearing and the effect of that refusal on cash assistance eligibility. Further, it should be noted that the notification requirement for voluntary agencies only applies to their sponsored refugees who are receiving welfare benefits.

These notification requirements are intended to forge a closer working relationship between these two entities and hopefully to reduce welfare dependency rates among refugees.

### ELIGIBILITY FOR CASH ASSISTANCE

Coupled with these notification requirements are further limitations on the use of cash assistance for refugees.

While the Refugee Act of 1980 conditions cash assistance on the "refugee's acceptance of appropriate offers of employment," some

witnesses before the Committee indicated that this requirement was not being followed. Others were unable to cite any specific instances in which a refugee's welfare payments were terminated for this reason and ORR has advised that "data are not available" on this subject.

To clarify and strengthen this prohibition, the Committee amendment specifically terminates cash assistance to a refugee with the month in which the refugee refuses an appropriate offer of employment, after opportunity for an administrative hearing. In this regard, the Committee expects State and local agencies which administer cash assistance programs to promptly schedule and hold such administrative hearings.

In determining whether a particular job is "appropriate" or whether the refusal to accept it was for "good cause" reference should be made to existing HHS regulation on this subject (see 45 CFR 224.34; 233.100). Furthermore, the welfare official is expected to consult closely with the local voluntary agency caseworker or case manager to determine whether a specific job offer may be consistent with any employability plan that has been developed for that particular refugee. In reaching a final decision, the welfare eligibility worker should recognize that refugees should be encouraged to accept "entry level" jobs, if necessary, and that welfare should serve only as a "last resort" in refugee resettlement planning.

A similar prohibition is included in the Committee amendment with regard to refugees who refuse to participate in an available and appropriate social services programs or who are full-time students in institutions of higher education.

The Committee does not believe that cash assistance should be used to subsidize one's college education, nor should it be available to those refugees who refuse to benefit from those supportive services (especially language training and job training and development), which will assist them in becoming self sufficient.

In a May 11 letter to Congressman Mazzoli, Chairman of the Subcommittee on Immigration, Refugees, and International Law, Thomas R. Donnelly, Jr., Assistant Secretary for Legislation, HHS, advised:

> We believe that further tightening of cash assistance requirements and procedures, together with specific requirements for communication between the public welfare and voluntary agencies, as proposed by the [Subcommittee] amendment, which you offered, is the appropriate step to take in the refugee program at this time.

### IMPACT AID STUDY

The Committee is disturbed that refugee resettlement in some areas of the United States is highly concentrated. As of September 30, 1981, for example, 10 states had 78 percent of the 547,700 Indochinese refugees in the United States. In addition, many counties had larger Indochinese refugee populations than a majority of the states combined. The Committee is concerned that this phenomenon may be placing unnecessary and intolerable strains upon the ability of certain states, counties, and municipalities to provide ef-

fective public welfare services not only to their native populations, but also to the refugee populations as well.

The Committee amendment addresses this concern by requiring the Director of ORR to conduct a study on the practicality and need for establishing an impact aid program for refugee concentrated areas. The Director is to furnish Congress a report on this study not later than January 1, 1983. In the course of such study, the Director should address the validity of ORR's method for allocating funds under the impact aid program proposed for fiscal year 1983.

### EXPENDITURES AND AUDITING

Under cooperative agreements with the State Department, thirteen voluntary resettlement agencies receive per capital funding for the reception and placement of newly arrived refugees. These funds are use to provide immediate services such as food, clothing, and shelter. They are also used for initial acculturation and orientation services.

The Committee is troubled to learn that some voluntary agencies have allowed these reception and placement funds to accumulate in bank accounts. In a February 1982 report by David North, Lawrence Lewin, and Jennifer Wagner entitled *Kaleidoscope* the authors found that total voluntary agency cash reserves "probably exceed $15,000,000." The authors also found that one voluntary agency had, since 1975, built up a cash reserve of $6,000,000.

Pursuant to the authors' statement that "there is a need to develop a more specific policy regarding the manner in which these reserves are to be used," the Committee conducted further oversight into the matter and concluded that legislative direction was necessary. Thus, the Committee amendment requires voluntary agencies to expend their reception and processing funds within two years of receipt. Funds may be held for a longer period only if the Federal contracting agency agrees. The Committee believes that this policy will place no undue burdens on the voluntary agencies, while at the same time ensuring that the utmost assistance is provided in a timely fashion.

At recent hearings the Committee received testimony from State Department officials who stated that no audit of the funds provided under the reception and placement agreements had been undertaken by any department or agency of the Executive branch.

The Committee firmly believes that it is essential for Congress to know whether federal money is being spent wisely and efficiently under the reception and placement agreements. The Committee amendment therefore requires GAO to conduct an annual audit of those federal funds, as opposed to any private funds that may be utilized by voluntary agencies or church organizations for resettling refugees.

### STUDY OF ALTERNATIVE REFUGEE SUPPORT MECHANISMS

The Refugee Act recognizes that no one resettlement strategy may be appropriate for all refugee groups under all circumstances. As a result, it provides the Director of ORR with the flexibility to establish resettlement mechanisms designed to accommodate differ-

17

ing problems and needs. Various voluntary resettlement agencies have supported the concept case management, which would expand the responsibilities of the voluntary agencies in various areas, including interim cash support, ongoing needs assessments, services, and monitoring the progress toward self-sufficiency of those they resettle.

The extent to which the implementation of this concept would require modification of the Refugee Act would, of course, depend on the particulars of the program under consideration. In any event, the Committee is convinced that the case management concept, particularly as it incorporates the policy of interim support as a substitute for traditional cash assistance mechanisms, is worthy of further study and evaluation.

The Committee amendment thus requires the Director of ORR to study the practicability and usefulness of adopting the case management approach. The Director shall report to Congress on this study not later than January 1, 1983.

Part II of the study and report will, as mandated by the Committee amendment, require an evaluation of the feasibility and advisability of establishing a mechanism for separating cash assistance from medical assistance.

Many individuals involved in the resettlement process have expressed the view that many refugees (especially those with entry level jobs) who originally desire to obtain only medical assistance coverage are required to qualify for cash assistance. For this reason the Refugee Act of 1980 authorized ORR to separate eligibility for cash and medical assistance. That authority, which was intended to reduce reliance on cash assistance, has never been exercised. Other individuals, equally knowledgeable, believe that this problem either does not exist or that its solution would not be cost effective. The Committee believes that further analysis of this issue is warranted, and therefore requires that it be included in the aforementioned study.

## DEPARTMENTAL POSITION

The Administration supports legislation to extend the funding authority for the domestic resettlement of refugees under the Refugee Act of 1980. In fact, the Administration's proposal, H.R. 5879, provided for a three year extension of such authority. On the other hand, the Committee amendment extends for one year the authorization of funds for domestic refugee assistance. The Administration has not commented on the Committee amendment and the Executive Communication transmitting its draft proposal is set forth below.

SECRETARY OF HEALTH AND
HUMAN SERVICES,
*Washington, D.C., March 11, 1982.*

Hon. THOMAS P. O'NEILL, Jr.,
*Speaker of the House of Representatives,*
*Washington, D.C.*

DEAR MR. SPEAKER: Enclosed for the consideration of the Congress is a draft bill "To amend the Immigration and Nationality

Act to extend for three years the authorization for appropriations
for refugee assistance, to make certain improvements in the oper-
ation of the program, and for other purposes." Additionally, a sec-
tion-by-section summary of this draft bill is included for your con-
venience.

The bill would extend, through fiscal year 1985, the authoriza-
tion of appropriations for the refugee assistance programs estab-
lished by the Refugee Act of 1980. Also, the bill would make im-
provements in various requirements, both substantive and adminis-
trative, in order to increase the efficiency and effectiveness of these
activities. We urge that the Congress give its favorable considera-
tion to the extension and improvement of this important social leg-
islation.

We are advised by the Office of Management and Budget that
enactment of the enclosed draft legislation would be in accord with
the program of the President.

    Sincerely,

DICK SCHWEIKER, *Secretary.*

ESTIMATE OF COST

The bill, as amended, provides a one year authorization for the
domestic resettlement assistance programs established in Title III
of the Refugee Act of 1980. The Congressional Budget Office has es-
timated that the legislation will cost $628 million. Pursuant to
clause 7, Rule XIII of the Rules of the House of Representatives,
the Committee states that it concurs with the cost estimate submit-
ted by the Congressional Budget Office and which is set forth
below. However, as noted earlier in this Report, the costs of cash
and medical assistance is dependent on a number of variables and
cannot, therefore, be estimated with precision. For this reason, the
Committee amendment authorizes "such sums" as may be neces-
sary for this purpose.

BUDGETARY INFORMATION

Clause 2(1)(3)(B) of Rule XI of the Rules of the House of Repre-
sentatives is inapplicable because the instant legislation does not
provide new budgetary authority. Pursuant to clause 2(1)(3)(C) of
Rule XI, the following estimate was prepared by the Congressional
Budget Office and submitted to the Committee.

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., May 13, 1982.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congres-
sional Budget Act of 1974, the Congressional Budget Office has pre-
pared the attached cost estimate for H.R. 5879, the Refugee Assist-
ance Amendments of 1982.

Should the Committee so desire, we would be pleased to provide further details on the attached cost estimate.

Sincerely,

ALICE M. RIVLIN, *Director*.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 5879.
2. Bill title: Refugee Assistance Amendments of 1982.
3. Bill status: As ordered reported by the House Judiciary Committee, May 12, 1982.
4. Bill purpose: The purpose of this bill is to amend the Refugee Act of 1980, which is under the Immigration and Nationality Act to extend for one year the authorization of refugee assistance, and for other purposes. This bill is subject to subsequent appropriation action.
5. Cost estimate:

[By fiscal year, in millions of dollars]

| 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| Estimated authorization level. | | | | |
| Refugee cash, medical and grant assistance          514 | | | | |
| Stated authorization levels· | | | | |
| Refugee social services....                          100 | | | | |
| State and local medical screening and treatment services ..               14 | | | | |
| Total authorization levels........... .......                  628 | | | | |
| Estimated total outlays .... . . . .      ........ ... . .              439 | 127 | 62 ......... .... | | |

The costs of this bill fall in budget function 600.

6. Basis for estimate: This bill authorizes a one year extension of current refugee programs and authorizes a new program to reimburse state and local costs for medical services.

The estimated authorization level for refugee cash, medical and grant assistance is based on projected 1983 average benefit levels and the rate of program participation by refugees entering the United States from 1981 through 1983. The 1981 average cost was $1,458 per person for such services, and is inflated by the appropriate price indices to achieve a 1983 average cost. Volunteer agencies receive a one time $1,000 grant per refugee serviced.

The estimate assumes 103,500 refugees enter the United States during 1983, as projected by the Administration. Of these 11,000 are expected to be placed with private nonprofit agencies for resettlement services and 80 percent of the remaining 92,500 refugees will require cash and medical assistance, according to the Office of Refugee Resettlement. In addition, approximately 184,500 refugees who entered the United States between 1981 and 1982 would continue to require cash and medical assistance in 1983. The Administration's estimate of $18 million for assistance for refugee children, $6 million for preventive health services, and $6 million for administrative costs, are also included in the total.

The authorization levels for social services and the state and local medical service cost reimbursement program are those specifi-

20

cally stated in the bill. Full appropriation of estimated authorization levels is assumed in this estimate.

Outlays for the state administered refugee programs, including cash and medical benefits and social services, are assumed to be 70 percent the first year, 20 percent the second and the remainder of the third year. Refugee voluntary agency grants program spendout rate is 50 percent, 43 percent and 7 percent respectively over three years. The remaining program outlays are spent out over two years.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Deborah Kalcevic and Stephen Pollak.

10. Estimate approved by: James L. Blum, Assistant Director for Budget Analysis.

### OVERSIGHT STATEMENTS

Pursuant to clause 2(1)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee states that the Subcommittee on Immigration, Refugees and International Law has maintained and will maintain close oversight with respect to those Departments responsible for administering the various provisions of this bill. In particular, the Subcommittee intends to monitor closely the role of the Departments of Justice and State in admitting refugees to this country and HHH's activites in resettling refugees.

Clause 2(1)(3)(D) of rule XI of the Rules of the Houses of Representatives is inapplicable since no oversight findings and recommendations have been received from the Committee on Government Operations.

### INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(1)(4) of rule XI of the rules of the House of Representatives, the Committee estimates that this bill will not have a significant inflationary effect on prices and costs in the operation of the national economy.

### COMMITTEE RECOMMENDATION

The Committee, after careful and detailed consideration of all the facts and circumstances involved in this legislation, is of the opinion that this bill should be enacted and accordingly recommends that H.R. 5879, as amended, do pass.

Changes in Existing Law Made by the Bill, As Reported.

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

### IMMIGRATION AND NATIONALITY ACT

\*          \*          \*          \*          \*          \*          \*

### TITLE IV—MISCELLANEOUS AND REFUGEE ASSISTANCE

\*          \*          \*          \*          \*          \*          \*

CHAPTER 2—REFUGEE ASSISTANCE

AUTHORIZATION FOR PROGRAMS FOR DOMESTIC RESETTLEMENT OF AND
ASSISTANCE TO REFUGEES

SEC. 412. (a) CONDITIONS AND CONSIDERATIONS.—(1)*(A)* In providing assistance under this section, the Director shall, to the extent of available appropriations, **[A]** *(i)* make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, **[B]** *(ii)* provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible, **[C]** *(iii)* insure that cash assistance is made available to refugees in such a manner as not to discourage their economic self-sufficiency, in accordance with subsection (e)(2), and **[D]** *(iv)* insure that women have the same opportunities as men to participate in training and instruction.

*(B) It is the intent of Congress that in providing refugee assistance under this section—*

*(i) employable refugees should be placed in jobs as soon as possible after their arrival in the United States;*

*(ii) social service funds should be focused on employment-related services, English-as-a-second-language training (in non-work hours where possible), and case-management services; and*

*(iii) local voluntary agency activities should be conducted in close cooperation and advance consultation with State and local governments.*

(2) *(A)* The Director, together with the Coordinator, shall consult regularly with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities.

*(B) The Director shall develop and implement, in consultation with representatives of voluntary agencies and State and local governments, policies and strategies for the placement and resettlement of refugees within the United States.*

*(C) Such policies and strategies, to the extent practicable and except under such unusual circumstances as the Director may recognize, shall—*

*(i) insure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the Director after consultation with such agencies and governments) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area, and*

*(ii) provide for a mechanism whereby representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States and localities.*

(3) In the provision of domestic assistance under this section, the Director shall make a periodic assessment, based on refugee population and other relevant factors, of the relative needs of refugees for assistance and services under this chapter and the resources available to meet such needs. *The Director shall compile and main-*

*tain data on secondary migration of refugees within the United States and, by State of residence and nationality, on the proportion of refugees receiving cash or medical assistance described in subsection (e).* In allocating resources, the Director shall avoid duplication of services and provide for maximum coordination between agencies providing related services.

      \*      \*      \*      \*      \*      \*      \*

(b) PROGRAM OF INITIAL RESETTLEMENT.—(1)(A) for—
    (i) fiscal years 1980 and 1981, the Secretary of State is authorized, and
    (ii) fiscal year 1982 and succeeding fiscal years, the Director (except as provided in subparagraph (B)) is authorized,
to make grants to, and contracts with, public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States. Grants to, or contracts with, private no profit voluntary agencies under this paragraph shall be made consistent with the objectives of this chapter, taking into account the different resettlement approaches and practices of such agencies. Resettlement assistance under this paragraph shall be provided in coordination with the Director's provision of other assistance under this chapter. ⟦The Secretary of State and the Director shall jointly monitor the assistance provided during fiscal years 1980 and 1981 under this paragraph.⟧ *Funds provided to agencies under such grants and contracts may only be obligated or expended during the fiscal year in which they are provided (or the subsequent fiscal year or such subsequent fiscal period as the Federal contracting agency may approve) to carry out the purposes of this subsection. Such grants and contracts shall provide that the agency shall provide (directly or through its local affiliate) notice to the appropriate county or other local welfare office at the time that the agency becomes aware that a refugee is offered employment and provide notice to the refugee that such notice has been provided. Such grants and contracts shall also provide that the agency shall assure that refugees, known to the agency as having been identified pursuant to paragraph (4)(B) as having medical conditions affecting the public health and requiring treatment, report to the appropriate county or other health agency upon their resettlement in an area.*

      \*      \*      \*      \*      \*      \*      \*

*(5) The Director is authorized to make grants to, and enter into contracts with, State and local health agencies for payments to meet their costs of providing medical screening and initial medical treatment to refugees.*
*(6) The Comptroller General shall conduct an annual audit of funds expended under grants and contracts made under this subsection.*

      \*      \*      \*      \*      \*      \*      \*

(e) CASH ASSISTANCE AND MEDICAL ASSISTANCE TO REFUGEES.—(1) The Director is authorized to provide assistance, reimbursement to States, and grants to, and contracts with, public or private nonprofit agencies for ⟦up to⟧ 100 per centum of the cash assistance and medical assistance provided to any refugee during the thirty-six

months period beginning with the first month in which such refugee has entered the United States and for the identifiable and reasonable administrative costs of providing this assistance.

(2) *(A)* Cash assistance provided under this subsection to an employable refugee is conditioned, except for good cause shown—

[(A)] *(i)* on the refugee's registration with an appropriate agency providing employment services described in subsection (c)(1), or, if there is no such agency available, with an appropriate State or local employment service; [and]

>*(ii) on the refugee's participation in any available and appropriate social service program (funded under subsection (c)) providing job or language training in the area in which the refugee resides; and*

[(B)] *(iii)* on the refugee's acceptance of appropriate offers of employment[;

[except that subparagraph (A) does not apply during the first sixty days after the date of the refugee's entry.]

*Such cash assistance provided to such a refugee shall be terminated (after opportunity for an administrative hearing) with the month in which the refugee refuses such an appropriate offer of employment or refuses to participate in such an available and appropriate social service program.*

*"(B) Cash assistance shall not be made available to refugees who are full-time students in institutions of higher education (as defined by the Director after consultation with the Secretary of Education).*

\*         \*         \*         \*         \*         \*         \*

*(6) As a condition for receiving assistance, reimbursement, or a contract under this subsection and notwithstanding any other provision of law, a State or agency must provide assurances that whenever a refugee applies for cash or medical assistance for which assistance or reimbursement is provided under this subsection, the State or agency must notify promptly the agency (or local affiliate) which provided for the initial resettlement of the refugee under subsection (b) of the fact that the refugee has so applied.*

CONGRESSIONAL REPORTS

Sec. 413. (a)(1) \* \* \*

\*         \*         \*         \*         \*         \*         \*

*(c) The Director shall study the feasibility and advisability of providing—*

>*(1) for interim support (to refugees who are not employment-ready upon arrival in the United States) for a period determined on a case-by-case basis through a mechanism (other than public assistance) that recognizes the primary role of case management through voluntary agencies at the local level, and*

>*(2) a mechanism (other than one associated with the provision of cash assistance) through which refugees, requiring medical (but not cash) assistance, are provided medical assistance,*

*and shall report to Congress on the study not later than January 1, 1983.*

*(d) The Director shall study, and report to Congress not later than January 1, 1983, on the feasibility and advisability of establishing a*

*program providing payments to States, counties, cities, and other
units of local government to reflect a net increase in outlays on edu-
cational, health, criminal justice, and other governmental services
resulting directly from the initial resettlement of refugees in, or sec-
ondary migration of refugees to, that State, county, city, or other
unit. Such study shall include an examination of the extent to
which the programs and assistance described in section 412 (particu-
larly under subsection (c) thereof) provide for such payments to im-
pacted areas and the extent to which increased outlays in these im-
pacted areas are offset by the provision of additional Federal funds
under other programs or authority or by increased taxes, revenues,
or other economic activity resulting from refugee resettlement in, or
migration, to these areas.*

### AUTHORIZATION OF APPROPRIATIONS

[SEC. 414. (a)(1) There are hereby authorized to be appropriated
for fiscal year 1980 and for each of the two succeeding fiscal years,
such sums as may be necessary for the purpose of providing initial
resettlement assistance, cash and medical assistance, and child wel-
fare services under subsections (b)(1), (b)(3), (b)(4), (d)(2), and (e) of
section 412.

(2) There are hereby authorized to be appropriated for fiscal year
1980 and for each of the two succeeding fiscal years $200,000,000,
for the purpose of carrying out the provisions (other than those de-
scribed in paragraph (1)) of this chapter.]

*Sec. 414. (a)(1) There are hereby authorized to be appropriated for
fiscal year 1983 such sums as may be necessary for the purpose of
carrying out the provisions (other than those described in para-
graphs (2) and (3)) of this chapter.*

*(2) There are hereby authorized to be appropriated for fiscal year
1983 $100,000,000 for the purpose of providing services with respect
to refugees under section 412(c).*

*(3) There are hereby authorized to be appropriated for fiscal year
1983 $14,000,000 for the purpose of carrying out section 412(b)(5).*

\*        \*        \*        \*        \*        \*        \*

DISSENTING VIEWS OF MR. CROCKETT, MR. CONYERS, MS. SCHROEDER, MR. EDWARDS OF CALIFORNIA, MR. WASHINGTON, AND MR. KASTENMEIER

We are deeply distressed that the language of the full Committee Report on H.R. 5879, the Refugee Assistance Amendments of 1982, does not adequately discuss the serious concerns shared by us, by members of the Congressional Black Caucus, and by others in the House, regarding the appearance of racial discrimination in the application of U.S. and United Nations laws pertaining to refugees seeking asylum in the United States.

When the issue of the definition of "refugee" was raised in the full Committee, a proposed amendment to clarify the language and legislative intent of this legislation was ruled non-germane. We are concerned that the extension of the authorization for appropriations contained in this legislation, without clarification and clear legislative intent, would result in the perpetuation of policies that have, to us, signalled an unjust and illegal application of the asylum laws.

The Committee has decided to defer an examination of the definition of refugee found in the Refugee Act of 1980—"a person   . who is persecuted or has a well founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

A person abroad who wishes to enter this country as a refugee must meet this definition. A person who has entered the United States and wishes to remain here as an asylee has to meet the same definition. These determinations must be made on a case-by-case basis.

The Committee has also rejected an attempt to amend the language of the legislation, by inserting the words "or economic" after "social" in the refugee definition, by which several members sought to clarify the legislative intent of this bill.

We believe that there is sufficient evidence that the current definition is not being uniformly applied.

While members of the full Committee have individually expressed their deep concerns over the lack of balance and uniformity in the application of the refugee definition, especially where the treatment of Haitian and Salvadoran refugees is compared with refugees from other nations, the Committee Report fails to note these concerns. It also fails to address the racial and political discrimination upon which such imbalances appear to be based. In addition, the Committee Report falls short in addressing the question of due process in the treatment of Haitian refugees, many of whom have been detained for up to 11 months.

From evidence collected by the Committee, it is clear that U.S. foreign policy toward a particular country, rather than whether the person actually meets the refugee definition, determines

whether an applicant is determined to be a refugee or an asylee. Instead of a true case-by-case determination of a person's submission, applications are being judged on what is, in essence, a blanket basis.

Last year, the Committee challenged the Administration when, for a time, it classified all people leaving Vietnam, Laos, and Kampuchea as refugees, regardless of whether they met the refugee definition. At the present time, there is a great deal of legitimate concern about the treatment of applicants for asylum who have left Haiti and El Salvador. The number of asylum cases processed for people from these countries has been minimal—both because of legal entanglements and because of a shortage of Administration personnel assigned to process the cases. Even with such a small number of cases, however, the refusal rate for such applicants has been very high. This indicates to us that the refugee definition in the Refugee Act of 1980 is not being uniformly applied.

We are particularly concerned that the wide latitude of the Immigration and Naturalization Service in applying the term "refugee" may mask racial discrimination in the cloak of regulatory and political discretion, and that the selective detention of Haitian refugees is illegal and unjust.

Our concern over these questions is premised on several circumstances:

The INS, contending that Haitian refugees are fleeing economic hardship, not political persecution, have classified the great majority of Haitians in this country as not being eligible for political asylum. At the same time, refugees from other countries are routinely processed as political refugees and allowed to remain in the U.S. without detention.

In an analysis of the INS application of the detention rule, covering the treatment of illegal aliens between August 1 and November 1, 1981, it was found that all non-Haitians who sought political asylum after May 20, 1981, were released into the community regardless of their illegal status. At the same time, 93 percent of the Haitians entering Florida under the same conditions were detained.

The INS has accepted only seven of the more than 6,000 Haitians who have requested entry into the United States as political refugees. Approximately 5,600 cases of Haitian refugees seeking asylum are still pending.

The decision last August by the INS to strictly enforce the immigration regulations, which had been routinely waived by previous Administrations, particularly in the face of a large influx of refugees, was principally aimed at discouraging the Haitian refugees. This abrupt change in policy has, since August, been applied almost exclusively to Haitians.

There has been no detention policy for immigrants in the United States since 1954, when the INS closed the Ellis Island facility.

In a larger context, we are concerned that as of April 1982, only nine Latin American refugees have been admitted to the United States, despite a refugee allocation of 3,000 admission slots.

Additionally, we are deeply distressed at the continued lack of U.S. recognition of the plight of African refugees, who comprise half the world's refugee population. The six million men, women

and children who live as refugees on the African continent continue to receive a low priority in terms of admissions and processing in comparison to refugees from other areas of the world.

The treatment by the U.S. of Haitian and other non-white asylum-seekers appears to be in violation of United Nations Protocol relating to the status of refugees, to which the United States is a party, and to the Refugee Act of 1980. Evidence exists, in the case of both Haitians and others, to suggest that the asylum laws are being applied in a discriminatory fashion. For example, the present detention policy, which is applicable only to Haitian nationals, stands in direct contradiction to Article 3 of the 1951 Convention relating to the status of refugees which states:

> The contracting states shall apply provisions of this Convention to refugees without discrimination on the basis of race, religion or country of origin.

Given the socio-political dynamics in Haiti and the pattern and practice of human rights abuses within Haiti, it is reasonable to assume that numbers of Haitian nationals applying for asylum or refugee status would have been found to have meritorious asylum claims and to quality under the Refugee Act of 1980 if there had been fair hearings and due process.

The U.S. treatment of Haitians also appears to violate Article 33 of the 1951 Convention, which mandates that "no contracting states shall expel or return (refouler) a refugee in any manner, whatsoever, to the frontiers or territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

A historical and legal commitment to equal protection of the law and of offering asylum to those fleeing persecution requires that our domestic laws, as well as observance of international legal obligations, be applied in a non-discriminatory fashion.

Article 31 of the 1951 Convention requires that "refugees unlawfully in the country of refuge" shall not be punished for their presence in the country of refuge:

> The contracting states shall not impose penalties on account of their illegal entry or presence on refugees who coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

We are concerned that eleven months of detention for Haitian asylum-seekers does not injury also to out national commitment to equal protection under the law. No other nationality or race of refugees or asylees has suffered such systematic, long-term detention in U.S. history.

We also believe that the evidence of gross due process violations by the Immigration and Naturalization Service against Haitian and other asylum-seekers warrants full investigation. Such actions are unacceptable, and must be prevented.

We urge the Administration to end its discriminatory policy of detention against Haitians. We also urge the Administration, and especially the Attorney General, to work with other relevant gov-

ernment agencies, and public interest groups concerned about the detained asylum applicants, to develop a controlled, sponsor release program which would allow the asylum applicants to reside in the community pending consideration of the claim, but would still give the Attorney General reasonable assurance that the applicants would appear for administrative and judicial proceedings when their cases are scheduled.

We urge the Administration to respect the principle of non-refoulement of refugees, and to re-examine its policies regarding the non-white refugees of the world.

Finally, we urge this Committee to take prompt action to examine the processes under which "refugee" status is determined, and to take appropriate steps to ensure that the implementation of U.S. refugee policy is carried out uniformly and judiciously. We urge the Committee to convene thorough oversight hearings on this question at the earliest possible time.

> GEO. W. CROCKETT.
> JOHN CONYERS, Jr.
> PAT SCHROEDER.
> DON EDWARDS.
> HAROLD WASHINGTON.
> ROBERT W. KASTENMEIER.

○

Attachment 5


United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

SOUTHERN DISTRICT *of* TEXAS

**Department of Justice**

U.S. Attorney's Office

Southern District of Texas

FOR IMMEDIATE RELEASE                           Thursday, January 7, 2016

# Texas Man Charged with Attempting to Provide Material Support to ISIL

HOUSTON – Omar Faraj Saeed Al Hardan, 24, a Palestinian born in Iraq, has been charged in a three-count indictment alleging that he attempted to provide material support to the Islamic State of Iraq and the Levant (ISIL), a designated foreign terrorist organization.

U.S. Attorney Kenneth Magidson, Assistant Attorney General for National Security John P. Carlin, Special Agent in Charge Perrye K. Turner of the FBI's Houston Division and Special Agent in Charge Brian M. Moskowitz of Homeland Investigations (HSI) in Houston made the announcement.

The three-count indictment was returned Jan. 6, 2016 and unsealed tonight. He will have his initial appearance tomorrow at 10:00 a.m CST in Houston before U.S. Magistrate Judge John R. Froeschner.

Al Hardan entered the United States as an Iraqi refugee on or about Nov. 2, 2009. He was granted legal permanent residence status on or about Aug. 22, 2011, and resides in Houston.

He is charged with one count each of attempting to provide material support to ISIL, procurement of citizenship or naturalization unlawfully and making false statements.

The indictment alleges that Al Hardan attempted to provide material support and resources, including training, expert advice and assistance, and personnel – specifically himself – to a known foreign terrorist organization. According to the allegations, he also knowingly responded, certified and swore untruthfully on his formal application when applying to become a naturalized U.S. citizen. He allegedly represented that he was not associated with a terrorist organization when, in fact, he associated with members and sympathizers of ISIL throughout 2014, according to the charges. The indictment further alleges that during an interview in October 2015, Al Hardan

Attachment 5

falsely represented that he had never received any type of weapons training, when he allegedly received automatic machine gun training.

The charge of attempting to provide material support to terrorists carries a maximum sentence of 20 years in federal prison and a maximum fine of $250,000. The charge of false citizenship procurement carries a maximum sentence of 25 years in prison (if the offense was committed to facilitate an act of international terrorism). The charge of making false statements carries a maximum sentence of eight years in prison. If convicted, any potential sentence will be determined by the court after review of factors unique to this case, including the defendant's prior criminal history, if any, the defendant's role in the offense and the characteristics of the violation.

The charges are the result of an investigation conducted by the FBI's Joint Terrorism Task Force and HSI with the assistance of the Houston Police Department. Assistant U.S. Attorney Ralph Imperato is prosecuting the case along with Trial Attorney Kashyap Patel of the National Security Division's Counterterrorism Section.

*An indictment is a formal accusation of criminal conduct, not evidence.*
*A defendant is presumed innocent unless convicted through due process of law.*

---

National Security & Homeland Security

Download alhardan_indictment.pdf (253.62 KB)

USAO - Texas, Southern

Updated January 9, 2016

Attachment 6

Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order.

# UNITED STATES DISTRICT COURT <span style="color:red">UNSEALED 1/7/16</span>
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | **16 CR 003** |
| V. | § § | CRIMINAL NO.: |
| | § § | FILED UNDER SEAL |
| OMAR FARAJ SAEED AL HARDAN, | § § § | |
| **Defendant** | § | |

United States Courts
Southern District of Texas
FILED

JAN 06 2016

David J. Bradley, Clerk of Court

## INDICTMENT

## THE GRAND JURY CHARGES THAT:

### Introduction

1. At all times material to this Indictment:

   a. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

   b. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under

1

section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.   Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it through its history.   In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of its name to the Islamic State ("IS").   To date, ISIL remains a designated FTO.

c. On December 11, 2012, the Secretary of State amended the designation of AQI to include the following aliases: al-Nusrah Front (ANF), Jabhat al-Nusrah, Jahbet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.   Also, on May 15, 2014, the Secretary of State, in response to the evolving nature of the relationships between ANF and AQI, amended the FTO designation of AQI to remove all aliases associated with al-Nusrah Front. Separately, the Secretary of State then designated al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet al-Nusrah, also

2

known as The Victory Front, also known as Al-Nusrah Front for the People of the Levant, also known as Al-Nusrah Front in the Lebanon, also known as Support Front for the People of the Levant, and also known as Jabaht al-Nusrah li-Ahl al-Sham min Mujahedi al-sham fi Sahat al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 132224.   To date, ANF remains a designated FTO.

d. The defendant, **OMAR FARAJ SAEED AL HARDAN,** is a Palestinian national; born in Iraq on or about December 25, 1991; entered the United States of America as a refugee on or about November 2, 2009; granted Legal Permanent Residence status in the United States on or about August 22, 2011; and currently resides in the Southern District of Texas.

## COUNT 1

**Attempting to Provide Material Support to a Designated Foreign Terrorist Organization**
**(Title 18, United States Code, Section 2339B)**

Beginning in or about May 2014, and continuously thereafter, up to and including the date of this indictment within the Southern District of Texas, and elsewhere, the defendant,

**OMAR FARAJ SAEED AL HARDAN,**

did unlawfully and knowingly attempt to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b)(1), including personnel, specifically himself, training, and expert advice and assistance, to a foreign terrorist organization, namely, the Islamic State of Iraq and the Levant ("ISIL"), knowing that the organization is a designated foreign terrorist organization, and knowing that ISIL engages in, and has engaged in terrorist activity and terrorism; all in violation of Title 18, United States Code, Section 2339B(a)(1) and Title 18, United States Code, Section 2.

## COUNT 2

**Procurement of citizenship or naturalization unlawfully**
**(Title 18, United States Code, Section 1425(a))**

On or about August 18, 2014, in the Southern District of Texas and elsewhere, the defendant,

4

## OMAR FARAJ SAEED AL HARDAN,

knowingly procured and attempted to procure, contrary to law, naturalization, to wit:

in applying to become a naturalized American Citizen, the defendant, did respond,

certify, and swear untruthfully on his formal application for naturalization, Form

N-400, dated August 18, 2014.   Specifically, when responding to question 10C, the

defendant represented that he was not in any way associated (either directly or

indirectly) with a terrorist organization, whereas in truth, the defendant knew he

associated either directly or indirectly with a terrorist organization, to wit: ISIL

throughout 2014, and al-Nusrah Front during 2013 throughout 2014; all in violation

of Title 18, United States Code, Section 1425(a).

## COUNT 3

### False Statement or Representation Made to an Agency of the United States (18 U.S.C. § 1001(a)(1))

On or about October 27, 2015, in the Southern District of Texas,

## OMAR FARAJ SAEED AL HARDAN,

defendant herein, did willfully and knowingly falsify, conceal, and cover up by trick,

scheme, and device a material fact in a matter within the jurisdiction of the executive

branch of the government of the United States; to wit: defendant participated in an

interview with an agent from the U.S. Immigration and Customs

Enforcement-Homeland Security Investigations and when questioned about his

application for naturalization, Form N-400, dated August 18, 2014, defendant failed to disclose during that interview specifically that he, in question 19, represented that he had never received any type of weapons training, whereas in truth and in fact as the defendant well knew, he had received weapons training, specifically on an automatic machine gun; all in violation of Title 18, United States Code, Section 1001(a)(1).

**A TRUE BILL**

ORIGINAL SIGNATURE ON FILE

FOREPERSON OF THE GRAND JURY

**KENNETH MAGIDSON**
**United States Attorney**
**Southern District of Texas**

By: _____
    RALPH IMPERATO
    Assistant United States Attorney

By: _____
    KASHYAP P. PATEL
    Trial Attorney, Counterterrorism Section, U.S. Department of Justice

Attachment 7

# Media Monitoring Suite



**Log In** > Transcript

**Log In**

Log In

## Transcript

**CSPAN - U.S. Cable**
**U.S. House of Representatives Legislative Business**

**CSPAN 12/08/2015 03:56:57 PM:** ...gentleman yields back the balance of his time. the gentlelady from california reserves. the chair recognizes the gentleman from virginia. mr. goodlatte: mr. speaker, at this time i'm pleaseed to yield three minutes to the gentleman from texas, the chairman of the homeland security committee, mr. mccaul. the speaker pro tempore: the gentleman from texas is recognized for three minutes. mr. mccaul: thank you, mr. speaker. i rise in support of this bill, the visa waiver program improvement and terrorist travel prevention act. our nation faces the highest terror threat environment since 9/11. and we must do everything possible to shut down terrorist pathways into this country. working hard -- we're working hard to do just that with this bill. last month the house voted overwhelmingly to pass bipartisan legislation drafted to prevent terrorists from entering the united states posing as refugees. they've already done this to attack paris. and this year the office of the director of national intelligence warned me that the national counterterrorism center has identified, quote, individuals with ties to terrorist groups in syria attempting to gain entry into the united states through the u.s. refugee program. i ask unanimous consent to submit an additional statement on this issue for the record. the speaker pro tempore: without objection. mr. mccaul: we must go further. more than 30,000 individuals from 100 countries have gone to syria to join jihadist groups and 5,000 of them have western passports. this includes several of the paris attackers who could have traveled to the united states without a visa. that's why this legislation is so important, before us here today. it will close security gaps in the visa waiver program, to keep terrorists from entering our country undetected. it also includes several recommendations from the bipartisan task force on combating terrorists and foreign fighter travel, which i created earlier this year. this member-led panel uncovered gaping security weaknesses overseas, including the fact that some countries are not sharing intelligence on terrorists, many are not screening travelers against critical counterterrorism databases, and too few of them are cracking down on passport fraud. this bill will help close those security gaps, to keep terrorists from crossing borders. and would implement several of the task force's top recommendations to ensure visa waiver program countries are living up to their obligations and ramping up security. so with that, mr. speaker, i want to thank the chairman of judiciary, i also want to thank those on the other side of the aisle for working in a bipartisan spirit and a cooperative nature on what i consider to be one of the biggest security gaps we have facing this country after the paris attacks and after san bernardino. and i want to thank our colleagues on the other side of the aisle. with that i yield back. the speaker pro tempore: the gentleman yields back the balance of his time. the gentleman from virginia reserves. the chair recognizes the gentlelady from california. ...

Copyright ©1999 – 2016 TVEyes, Inc. All rights reserved.
Questions, comments, or suggestions? Send us feedback.
Privacy Policy

Attachment 7

Attachment 8

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                         Thursday, January 7, 2016

# California Man Arrested for Making False Statements in a Terrorism Investigation

A Sacramento, California, resident was arrested today on a federal charge of making a false statement involving international terrorism. Aws Mohammed Younis Al-Jayab, 23, is charged in a complaint that was unsealed today in the U.S. District Court of the Eastern District of California following his arrest. He will have his initial appearance tomorrow at 2:00 p.m. PST in Sacramento.

The arrest was announced by Assistant Attorney General for National Security John P. Carlin, U.S. Attorney Benjamin B. Wagner of the Eastern District of California and Special Agent in Charge Monica M. Miller of the FBI's Sacramento Division.

"Aws Mohammed Younis Al-Jayab allegedly traveled overseas to fight alongside terrorist organizations and lied to U.S. authorities about his activities," said Assistant Attorney General Carlin. "The National Security Division's highest priority is protecting the nation from terrorism, and we will continue to hold accountable those who seek to join or aid the cause of terrorism, whether at home or abroad."

"According to the allegations in the complaint, the defendant traveled to Syria to take up arms with terrorist organizations and concealed that conduct from immigration authorities," said U.S. Attorney Wagner. "While he represented a potential safety threat, there is no indication that he planned any acts of terrorism in this country. I commend the FBI's Joint Terrorism Task Force for their dedicated work on this matter."

"In today's complex terrorism environment, our Joint Terrorism Task Force plays an important role in combating the threat of terrorism. The collaboration is stronger than ever and essential to protect our communities from harm," said Special Agent in Charge Miller. "The public plays an equal, if not more important, role in protecting the community. We encourage those who encounter individuals who express an intent to do harm or claim allegiance to a terrorist group – whether in person or online – to voice their concerns to law enforcement."

According to the complaint, Al-Jayab is a Palestinian born in Iraq, who came to the United States as an Iraqi refugee in October 2012. Between October 2012 and November 2013, while living in Arizona and Wisconsin, he communicated over social media with numerous other individuals about his intent to return to Syria to fight for terrorist organizations. In those communications, according to the complaint, Al-Jayab discussed his previous experience with firearms and with fighting against the regime in Syria. On Nov. 9, 2013, he flew from Chicago to Turkey, and then traveled to Syria. Between November 2013 and January 2014, Al-Jayab allegedly reported on social media that he was in Syria fighting with various terrorist organizations, including Ansar al-Islam, a designated foreign terrorist organization since 2004. He returned to the United States on Jan. 23, 2014, and settled in Sacramento.

Attachment 8

The complaint alleges that on Oct. 6, 2014, Al-Jayab was interviewed by U.S. Citizenship and Immigration Services and responded in the negative to numerous questions, including whether he had ever been a member of any rebel group or militia; whether he had ever provided material support for any person or group engaged in terrorist activity; and whether he had ever been a member of a group, or assisted in a group, which used or threatened the use of weapons against others. Al-Jayab also allegedly stated during the interview that he had traveled to Turkey in late 2013 and early 2014 to visit his grandmother. The complaint alleges that all of those answers were materially false.

If convicted, Al-Jayab faces a maximum statutory penalty of eight years in prison and a $250,000 fine. Any potential sentence will be determined by the court after review of factors unique to this case, including the defendant's prior criminal history, if any, the defendant's role in the offense and the characteristics of the violation.

The charges are only allegations; the defendant is presumed innocent until and unless proven guilty beyond a reasonable doubt.

The ongoing investigation is being conducted by the FBI's Joint Terrorism Task Force. The case is being prosecuted by Assistant U.S. Attorney Jill Thomas of the Eastern District of California and Trial Attorney Andrew Sigler of the National Security Division's Counterterrorism Section.

Al-Jayab Complaint (Has Been Unsealed)

---

16-020
Counterterrorism

National Security Division (NSD)
USAO - California, Eastern

*Updated January 7, 2016*

Attachment 9

AO 91 (Rev. 11/11) Criminal Complaint

SEALED

ORIGINAL
FILED

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

JAN - 6 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| | ) | **2:16 - MJ - 1 — EFB** |
| AWS MOHAMMED YOUNIS AL-JAYAB | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, Elizabeth Buckmiller, the complainant in this case, state that the following is true to the best of my knowledge and belief.

In or about the date(s) of **October 6, 2014** in the county of **Sacramento** in the **Eastern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 | Providing materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of an agency of the United States, an offense involving international terrorism as defined in 18 U.S.C. § section 2331 |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Elizabeth Buckmiller, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-6-2016

_____
*Judge's signature*

City and state: Sacramento, CA

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

Attachment 9

## AFFIDAVIT

I, Elizabeth Buckmiller, being duly sworn, hereby state as follows:

## I.   INTRODUCTION AND AFFIANT'S BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since February 2013.  I am currently assigned to the Sacramento Field Office.  I have training in the preparation, presentation, and service of criminal complaints and arrest and search warrants.  I have participated in numerous investigations into terrorism-related activities and am familiar with tactics, methods, tradecraft, and techniques of terrorists and their agents.  I have received training regarding counterterrorism investigations, operations, and strategies, and have knowledge of various extremist groups, their ideologies, and their involvement in terrorist activity.  I am involved in the investigation of offenses against the United States, including crimes of terrorism as set forth in Title 18, United States Code, Section 2331, *et seq.*

2.      This affidavit is submitted for the limited purpose of establishing probable cause to support a criminal complaint charging the subject – Aws Mohammed Younis Al-Jayab – (hereinafter Al-Jayab) – with knowingly providing and attempting to provide materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States, in violation of Title 18, United States Code, Section 1001.  This affidavit does not purport to set forth all of my knowledge of, or investigation into, this matter.

3.      The facts set forth in this affidavit are based on, among other things:  my personal knowledge gathered from participation in the investigation of Al-Jayab; information obtained from the investigative activities of other law enforcement officers; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information obtained from interviews of Al-Jayab by United States government personnel.

4.      Certain quotations herein are taken from draft transcripts of written communications that transpired primarily in Arabic and were translated by FBI language analysts.  Additional quotations herein are taken from draft transcripts of recorded conversations that transpired in English and Arabic and were translated contemporaneously with the assistance of an interpreter.

Unless specifically indicated otherwise, all conversations described or quoted in this affidavit are related in substance and part only. For example, the use of an ellipsis within brackets denotes text which was not included in this affidavit for the sake of brevity and clarity. The conversations and other events described herein occurred on or about the referenced dates. In addition, the identities of Al-Jayab's associates and others have been redacted by replacing names with the word "Individual" followed by a letter.

5.      For the reasons stated herein, I respectfully assert that there is probable cause to believe that on or about October 6, 2014, Al-Jayab, a person who currently resides in the United States, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States, specifically the United States Citizenship and Immigration Services (USCIS), a component of the United States Department of Homeland Security (DHS), and an agency of the executive branch, and the offense involved international terrorism as defined in Title 18, United States Code, Section 2331, all in violation of Title 18, United States Code, Section 1001.

## II.      SUBJECT: AWS MOHAMMED YOUNIS AL-JAYAB

6.      As confirmed by photo identification and USCIS records, Al-Jayab is a 23-year-old male who currently resides in Sacramento, California. Al-Jayab was born in Iraq, and he emigrated from Syria to the United States as a refugee in October 2012. Travel, bank, and electronic communications records establish that Al-Jayab resided in the United States from approximately October 2012 to November 2013 and again from January 2014 to the present.[1]  He remains in refugee status to the present date, and as such, he is subject to the jurisdiction of USCIS for purposes of this offense.

---

[1]      After arriving in the United States as a refugee in October 2012, Al-Jayab resided in Tucson, Arizona and Milwaukee, Wisconsin. He first began to reside in Sacramento, within the Eastern District of California, upon his return from Syria in late January 2014.

## III.   SUMMARY OF THE INVESTIGATION

7.     USCIS officers conducted an interview of Al-Jayab on October 6, 2014, at the Sacramento USCIS office, with the assistance of an Arabic language interpreter.[2]  Al-Jayab was advised it was unlawful to provide false statements to the interviewers.  Specifically, Al-Jayab was placed under oath and the following statement was read to him: "Title 18 USC makes it against the law to provide false statements to the government.  If you knowingly and willfully provide false information or conceal a material fact, you are subject to criminal penalties.  It is against criminal law to lie or cover up information during the interview."  Al-Jayab acknowledged he understood this statement.

8.     During the October 6, 2014 interview with USCIS, Al-Jayab made the following statements:

a)     When directed to list the countries he visited during the last time he traveled outside the United States, in 2013 to 2014, Al-Jayab responded that he went to Turkey, and from Turkey he went to Britain and returned to the United States.

b)     When asked the purpose of his trip, Al-Jayab responded he went to Turkey to see his grandmother and to visit the place.

c)     Al-Jayab responded, "No," to the following inquiries:

i.     if he had ever been a member of any rebel group, militia, or insurgent organization,

ii.     if he had ever assisted any rebel group, militia, or insurgent organization,

iii.     if he had ever solicited membership or funds for any terrorist group or organization,

iv.     if he had ever provided any type of material support to any person or group that engages in terrorist activity,

---

[2]     An FBI language analyst fluent in the Iraqi dialect of the Arabic language (spoken by Al-Jayab) was available to and used by Al-Jayab telephonically during the interview.

     v.     if he had ever called for, helped with, or committed the killing of any person,

     vi.     if he had ever called for, helped with, or committed the intentional and severe injury of any person,

     vii.     if he had ever been a member of a group of any kind in which he used or threatened to use any type of weapon against any person, and

     viii.     if he had ever assisted in a group where other people used or threatened to use a weapon against any person.

9.     As supported by the facts outlined below, there is probable cause to believe that Al-Jayab's statements and representations to USCIS listed above were materially false.

## IV.  EVIDENCE OF THE OFFENSE

### A.     Activity prior to travel

10.     The investigation has established the following facts concerning Al-Jayab's activities from approximately October 2012 to October 2013.

a)     According to records of Al-Jayab's online social media communications obtained pursuant to search warrant, beginning as early as mid-October 2012, Al-Jayab told multiple family members and associates that he intended to travel to Syria.  Al-Jayab expressed his desire to return to Syria to "work,"[3] identified Turkey as a probable transit point, and sought to arrange the finances and logistics for his travel.

b)     On October 13, 2012, Al-Jayab communicated with Individual A, who was then located in Iraq, according to Individual A's communications with Al-Jayab.  Al-Jayab wrote, "I want to go back.  God is my witness. […] I'll go to Turkey and enter smuggled

---

[3]     Based on the tenor and content of Al-Jayab's extensive electronic communications, in this context I believe the term "work" referred to assisting in and supporting violent jihad.

4

to Syria," and advised Individual A, "When I come, I'll call.  Don't go with anyone except the Front. [...] Go with Ansar or with the Front only." [4]

c)      On October 30, 2012, Al-Jayab communicated with Individual B, who was likely located in Syria based on the content of his communications with Al-Jayab.  Al-Jayab wrote, "My return will cost me much. [...] Tell [Individual C] if I come to Turkey to find me a way to enter into Syria."

d)      On October 31, 2012, Al-Jayab wrote to Individual B, "Tell [Individual C] I want them to help me financially so I can return."  Individual B replied, "He said, 'If he wants to come through Turkey, we could get him in.'"

e)      On January 20, 2013, Al-Jayab communicated with Individual D, who was likely located in Syria based on his communications with Al-Jayab.  Individual D asked, "When are you coming?" and Al-Jayab replied, "As a matter of fact, money I do not have." Individual D wrote, "[Individual C] will send you." Individual D wrote that he was afraid that he would die and not see Al-Jayab and explained he (Individual D) had been shot twice in the hand and side.  Al-Jayab wrote, "I have someone in Turkey.  He wants to come to Syria and pull the trigger.  Do you understand? Via the Turkish borders. [...] Tell [Individual C] about him."  Individual D advised Al-Jayab, "Tell [Individual B] to tell [Individual C]."  Individual D wrote, "Tell me how much you need so we can plan ahead for you before you arrive. [...] [Individual C] once asked how much you need so he can send you.  I will tell him now to send you.  [...] Do not worry, [Individual C] will manage."

f)      On February 1, 2013, Al-Jayab communicated with Individual E.  Al-Jayab wrote, "I was told by the young men to talk with you so that you could arrange my return." Individual E wrote, "You just tell us and we will do it," and explained that another

---

[4]      "Front" is likely a reference to al Nusrah Front.  According to the *United States Department of State Country Reports on Terrorism 2013*, Al-Qa'ida in Iraq (AQI) was established in 2004 by long-time Sunni extremist Abu Mus'ab al-Zarqawi, who the same year pledged his group's allegiance to Osama Bin Laden.  On December 17, 2004, the Department of State designated AQI as a foreign terrorist organization (FTO) and Specially Designated Global Terrorist (SDGT).  On December 11, 2012, the Department of State amended the designation of AQI to include the al Nusrah Front (ANF)/ Jabhat al Nusrah (JAN) as aliases of AQI.  The Department of State's finding in support of amending the AQI designation was that ANF and JAN committed hundreds of terrorist attacks in Syria.

individual "told me to find out how much you need." Al-Jayab responded, "Whatever God enables," and Individual E advised, "Make arrangements with [Individual F] to send you the money."

g)      On February 5, 2013, Al-Jayab communicated with Individual F, who was likely located in Syria, based on his communications with Al-Jayab.  Individual F wrote, "I'll go to Damascus to transfer the money to you," and provided wire transfer details to Al-Jayab.  Later that same day, Al-Jayab discussed the wire transfer from Individual F with Individual B.

h)      According to records from Western Union, on February 5, 2013, an individual believed to be Individual F sent Al-Jayab $231 from Damascus, Syria. This individual also sent $450 in the name of one of Al-Jayab's associates, who, along with Al-Jayab, was then residing in Arizona.  Both wire transfers were received at a Western Union agent in Arizona.  On February 7, 2013, Al-Jayab confirmed to Individual F, "I received the transfer [...] the total 681."

i)      On March 13, 2013, Individual F wrote to Al-Jayab, "Just come to Turkey without a passport and enter Aleppo from there. [5] Tell them you are Syrian." Al-Jayab replied, "I'll come with temporary American passport."  Individual F wrote, "I'll show you the way, because [an associate] knows someone in Aleppo and I asked him to help you."  Al-Jayab asked, "How to enter Syrian borders if my passport is American?" and Individual F and Al-Jayab discussed various options for travel routes to Syria.

j)      On March 23, 2013, Al-Jayab communicated with Individual G, who was likely located in Iraq, based on his communications with Al-Jayab.  Al-Jayab wrote, "I am coming to Syria [...] I have planned a route and everything. [...] The most important is the duty of the path."  Al-Jayab offered, "If you want in Iraq, I will arrange it for you.  I will arrange it for you in Syria also.  I will take you with me at your convenience, so decide what you want to do. [...] Only the Jabhat al-Nusrah group.  It is impossible that we go with others."

---

[5]      Aleppo is a city located in northwestern Syria.

6

k)      Also on March 23, 2013, Al-Jayab communicated with Individual H, who was then likely residing in Turkey according to his communications with Al-Jayab. Al-Jayab explained that he wanted to travel to Turkey to enter Syria, and he asked Individual H to pick him up at the airport. Individual H asked if Al-Jayab "want[ed] Al-Nusra Front," and Al-Jayab responded, "that's for sure." Individual H advised, "You know those who arrive to Syria from Turkey, most of them are citizens of Sweden and Australia and others, because war is to advance and retreat. [...] Syria is one hour away from where I am now and smuggling takes place in our area." When Al-Jayab told Individual H that he would be traveling to Turkey with a United States travel document, Individual H reminded Al-Jayab of the importance of maintaining the ability to travel legally. Al-Jayab proposed, "I'll go to the American Embassy in Turkey. I will tell them that due to circumstances, I can't return now. [...] I'll say tourism, or I'll tell him my grandmother is sick in Turkey and I wanted to be with her."

l)      On April 8, 2013, Al-Jayab wrote to Individual F about Individual I's desire to travel to Syria, and noted that Individual I was "recommended" to Al-Jayab by an "active brother." Individual F wrote, "I'll send you [Individual C]'s number and you tell him about [Individual I]'s affair. [...] You explain to him [Individual I] if he comes here, he shouldn't go back [to America]. Either victory or martyrdom." Al-Jayab replied, "When I arrive, I'll arrange with [Individual C]. [...] America will not isolate me from my Islamic duty. Only death will do us part. My only wish is to see you and start the action."

m)      On April 9, 2013, Al-Jayab communicated with Individual I, who resided in Texas according to immigration records. Al-Jayab informed Individual I, "[Individual F] spoke with me. He told me, 'Tell your friend to come and not return.'" Al-Jayab discussed various weapons with Individual I, to include the PKC, GC, Glock, and M16.[6] Individual I wrote to Al-Jayab, "I need to learn from your weapon expertise." Individual I asked, "If God makes it easier and wills it, would they place me at a center that would suit me or do I get to choose?" Al-Jayab responded, "No, they will arrange things for

---

[6]       I believe PKC, GC, Glock, and M16 are references to various firearms, including the Soviet-designed PK machine gun and the M16 assault rifle.

you. If you arrive and I am still there, I will train you. And once you are done [training], I will submit a request to the person in charge so you would come and work with me." Individual I asked, "So they will assign me to a certain job according to my abilities, which they see," and Al-Jayab explained, "No, we will make your abilities very strong." Individual I asked, "In your opinion, what kind of job [will they] assign me to?" Al-Jayab replied, "Let us arrive and we will arrange there. Our concern now is only to arrive there. [...] When you arrive to al-Sham [Syria] you will be trained."

n)   On April 13, 2013, Al-Jayab wrote to Individual l, "O God, grant us martyrdom for your sake while engaged in fighting and not retreating; a martyrdom that would make you satisfied with us." Individual I wrote, "It is better if we leave together when the Turkish route is open, so that if we are confronted by any resistance from the enemy, there is the two of us [...] I mean we would help each other." Individual I related that he learned from a Syrian associate, "He who enters illegally from Turkey to Al-Sham [Syria] does not have to pass through checkpoints." Al-Jayab wrote, "When I arrive in Turkey, I will call our youth in Turkey, and they will solve the situation for me. [...] We just arrive to Turkey, everything would be solved."

o)   On April 16, 2013, Al-Jayab communicated with Individual J. Individual J wrote, "I am in Damascus, but I also work in Jirmanah."[7] Al-Jayab wrote, "God willing, I'll return soon. [...] I am coming to you." Individual J wrote, "Do you know that we just killed ten of the Syrian militia, the Shabihah. Hahaha, with an IED." Al-Jayab wrote, "I was told that you and I will work together." Individual J wrote, "I wish, come, let us do the killing together." Al-Jayab asked, "What do you do now? Using IEDs or fighting," and Individual J responded, "Both." Al-Jayab wrote, "Hey man, please do not die: wait for me to come. [...] Do you not want us to work together?" Individual J replied, "Of course." Al-Jayab wrote, "I do not want anything in the world, just to get to Syria safely and find you there, you and [Individual F], [Individual D], and [Individual C] [...] I am eager to see blood."

---

[7]   Jirmanah is a suburb or neighborhood of Damascus, Syria.

p)       On April 21, 2013, Individual I wrote to Al-Jayab, "Do you know that I have never sprayed fire with a Kalashnikov?" Al-Jayab replied, "God willing, you will have your chance to shoot [...] The most shots I made with it in my life was in the biggest battle I participated in. Seven magazines in one breath. [...] Just shooting, spraying, spraying." Individual I clarified, "You mean you were there during the battle against the Assadists?" and Al-Jayab confirmed, "Yes. Certainly." Al-Jayab wrote, "Brother, God willing, you will be bored of shooting with guns. I have not seen anything better than the Glock. All my work was with the Glock and a nine Tariq[8] and also its silencer [...] Once it hits someone, you would think the person fainted right before your eyes. It does not look like you killed him." Individual I asked, "Are there operations conducted with silencers in Damascus?" Al-Jayab replied, "Yes. We were using silencers in Damascus [on] control checkpoints, officers, everything." Individual I asked what "Assad's soldiers scream when you raid," and Al-Jayab replied, "They fall silent. They stiffen. I remember once I went down together with a brother. We executed [...] three. As for the brother who was with me, he shot two. The third one aimed the Russian at the brother [...] and would not unlock the safety. He was so scared, he could not do it." Individual I interjected, "God is great! And you silenced him." Al-Jayab replied, "Yes. At the time, the operation was without the use of silencer [...] in the chest, in the head. And when he falls, we shoot again." Al-Jayab continued, "Do you remember the national security headquarters building in Syria? The mujahidin, Al-Nusra Front struck it. [...] Those suicide bombers they want to break in. There is a control checkpoint that would stop them. Their call is full of ammunition and suicide vests, its booby traps were visible, so they would stop them and arrest them. We got down and overran the control checkpoint and opened the way for them to raid, and we retreated." Individual I confirmed, "You mean you were there during the raid?" and Al-Jayab replied, "Yes. Look, God is with the Mujahidin."

q)       On April 25, 2013, Individual I wrote to Al-Jayab, "O God please do not deprive me, my brothers, and my brother Aws from the blessings of Jihad in Syria," and asked,

---

[8]       I believe "nine Tariq" is a reference to the Iraqi-manufactured copy of the Beretta M1951 pistol. The Tariq was the service pistol of the Iraqi Army from approximately the 1980s to 2003, according to open-source information.

"Tell me, when did you join?" Al-Jayab wrote, "I was a little over 16 years old. My tribe, half of them are Mujahidin. I did not find any difficulty to get to Al-Jihad," and further explained, "This group that I worked with […] those were from Saddam's era in Kurdistan. Their Emir['s] name is Mullah Krikar […] their name was Ansar al-Sunnah and now they are called Ansar al-Islam."[9]

r)      On May 21, 2013, Al-Jayab communicated with Individual K. Individual K informed Al-Jayab that Individual B and two others had been arrested by the Syrian government. Individual K wrote, "They are accused of working for Al-Nusra Front. They were arrested in Jaramana."

s)      On May 26, 2013, Al-Jayab informed Individual I that "the brothers" had been arrested. Al-Jayab wrote, "I really did not want to disturb you. For some time I knew. I did not want you to feel uneasy about Jihad and be concerned with being detained."

t)      On June 30, 2013, Al-Jayab wrote to Individual L, "I am at the shooting club. I want to learn long range shooting," and sent photos from an identified gun range in Wisconsin, as well as photos of Al-Jayab with various weapons.

u)      On July 9, 2013, Al-Jayab pleaded with Individual D, "Try to raise some funds for me. Otherwise I am going to explode. [. . .] I need money, I want to come."

v)      On July 11, 2013, Al-Jayab wrote again to Individual D, "Try to manage the money this week, my dear. You and [Individual C]."

w)      On August 18, 2013, Al-Jayab wrote to Individual D, "I have left $400 until I come there. I want that you plan for me a route quickly."

x)      On August 19, 2013, Al-Jayab communicated with Individual M, who was likely residing in Syria based on his communications with Al-Jayab, as well as Individual M's social media account profile, which stated that he lived in Damascus, Syria. Al-Jayab

---

[9]      According to the *United States Department of State Country Reports on Terrorism 2014*, Ansar al-Islam, also known as Ansar al-Sunna among other aliases, is a Sunni terrorist group which has vowed to establish an independent Islamic state in Iraq. Ansar al-Islam originated in Iraqi Kurdistan and was founded by Mullah Krekar. Ansar al-Islam became a designated foreign terrorist organization on March 22, 2004.

wrote, "Finally, light at the end of the tunnel.  I need $400 and I will come.  I want you to plan a route. [...] I need people in Turkey to take me to Aleppo."

y)      On August 26, 2013, Al-Jayab communicated with Individual N.  Based on records obtained via search warrant, Individual N's social media account appeared to be used to distribute ISIL propaganda and to communicate with individuals who are believed to be affiliated with ISIL and other terrorist organizations.[10]  Individual N told Al-Jayab, "May God protect you and grant success through you. [...] Haji, keep our job in your mind.  And think.  And it is tedious a little bit.  We ask God to reward you."  Al-Jayab responded, "Okay.  By God, I am trying."

z)      On August 30, 2013, Al-Jayab told Individual N, "The most important thing is to send me money to return. [...] I want to come.  God has facilitated the work before. [...] I will come."

aa)     On September 8, 2013, Al-Jayab wrote to Individual D, "I am burning with desire to come there and work," after which he and Individual D discussed a photo of various weapons including a gray gun and Kalashnikov rifle that Individual D claimed belonged to Individual D.  Individual D wrote to Al-Jayab, "When you arrive here, we will give you better ones [...] along with five magazines, one of which holds 30."  Al-Jayab replied, "I wish you will not die until I come."

bb)     On October 26, 2013, Al-Jayab wrote Individual N, "Sheikh, I need a path." Individual N replied on October 29, "I tasked [Individual D] and I will provide him with the money so he would transfer it to you."

### B.      Travel to Turkey and Syria

11.     The investigation has established the following facts concerning Al-Jayab's activities from approximately November 2013 to January 2014.

---

[10]      According to the *United States Department of State Country Reports on Terrorism 2014* and information published by the National Counterterrorism Center, AQI publicly re-named itself the Islamic State in Iraq in October 2006.  In April 2013, AQI's leader Abu Bakr al-Baghdadi changed the group's public name to the Islamic State of Iraq and the Levant (ISIL), to reflect its operational expansion into the Syrian conflict.  In May 2014, the Department of State amended the FTO designation of AQI to include the alias ISIL as its primary name.

a)    In early November 2013, Al-Jayab was residing in Milwaukee, Wisconsin according to travel, bank, and electronic communications records.  Bank records indicate Al-Jayab received approximately $4,500 from an auto insurance settlement on November 6, 2013.

b)    On November 7, 2013, Al-Jayab wrote to Individual N, "Haji, I managed to get money and everything, I do not want money from you, just find me a way, I beg you. Make arrangements for me, my Sheikh […] I will be going to Turkey and it is very important that you provide me with a telephone number."

c)    On November 8, 2013, Al-Jayab purchased an airline ticket in Chicago, Illinois. Travel records establish that Al-Jayab flew directly from Chicago to Istanbul, Turkey on November 9, 2013.

d)    Al-Jayab maintained contact with several of his family members and associates while he was outside of the United States between November 2013 and January 2014 and kept them apprised of his movements and wellbeing.

e)    I have reviewed electronic communications records of Internet Protocol (IP) addresses that Al-Jayab utilized to connect to the internet to access social media and email accounts during his travel to Syria.  Analysis of those IP addresses and other information establishes that Al-Jayab accessed the internet in the time period at issue through a satellite that covered both eastern Turkey and areas of northern Syria.

f)    On November 10, 2013, Al-Jayab communicated Individual O, who was then residing in Cyprus, and explained that he (Al-Jayab) was in Turkey, planned to enter Syria, and would be "going with the Mujahidin."

g)    On November 19, 2013, Al-Jayab informed Individual O that he [Al-Jayab] had safely arrived in Syria and was in Aleppo.

h)    On November 26, 2013, Al-Jayab told Individual N (see paragraphs 10(y, z, bb) and 11(b), above) that he (Al-Jayab) was in Aleppo and provided a telephone number that began with the numbers 0992 to Individual N in order to contact him (Al-Jayab).  Based

on publicly available information, this phone number corresponds to a Syrian telephone number.

i)      On November 28, 2013, Individual O advised Al-Jayab to avoid using his phone because it showed "that [Al-Jayab was] writing from Aleppo." Al-Jayab replied, "Okay." Individual O wrote, "Aws, I need you to get out of Syria as soon as possible," and noted Al-Jayab's phone "will reveal that you are in Syria […] and this is dangerous to your situation over there."

j)      On December 10, 2013, Individual O informed Al-Jayab, "It shows that you are typing from Al-Hasakah."[11]  Al-Jayab responded, "How did you know?"  Individual O wrote, "I am telling you, it [is] shown to me that you are writing from Al-Hasakah," and Al-Jayab replied, "Okay."  Shortly thereafter, Al-Jayab wrote to Individual O, "Forgive me, I might become a martyr."

k)      On December 17, 2013, Al-Jayab told Individual O he was "afraid of being imprisoned in America [because] the government is alert for everything, [and] my trip here constitutes a charge."

l)      On December 23, 2013, Al-Jayab wrote to Individual O, "I have m16." Based on my training and experience as well as communications between Al-Jayab and his associates during his travel, I believe "m16" is a reference to the M16 assault rifle. On the same day, Al-Jayab informed Individual O that he (Al-Jayab) was returning to Aleppo.

m)      On December 25, 2013, Individual O told Al-Jayab to remove a picture that "shows that you are wearing military uniform."

n)      On December 28, 2013, Al-Jayab communicated with Individual P, who was then located in Indonesia according to his communications with Al-Jayab.  Al-Jayab informed Individual P that he (Al-Jayab) was in Aleppo.  Al-Jayab explained that he joined Ansar al-Sham, "the same as Ansar al-Islam, just with another name."[12]  Al-Jayab continued,

---

[11]     Al-Hasakah is a city located in northern Syria.
[12]     On December 28, 2013, Al-Jayab expressed to Individual P his understanding that, "Ansar al-Islam and Ansar al-Sham have one and the same faith and approach." Al-Jayab explained, "Ansar al-Sham and the Ansar al-

"It is the one that leads the new Islamic Front formed after merging with Jabhat al-Nusrah," but he noted that the alliance was not publicly declared. Al-Jayab wrote, "The Army of Islam and Ahrar al-Sham and Al-Tawhid Brigade became the al-Jabhah al-Islamiyyah.[13] When they engage in battles [they are] led by Jabhat al-Nusrah and Ansar al-Sham." Al-Jayab detailed the cooperation and "joint action" that existed between certain Sunni extremist groups engaged in the conflict against the Syrian regime. When Individual P encouraged Al-Jayab to not "be harsh on the State,"[14] Al-Jayab wrote that the State "have killed many from Jabhat al-Nusrah and hundreds of mujahidin [are detained] by the State." Al-Jayab wrote, "I came to Syria. [...] I fight alongside." He then expressed concern over conflict that was occurring amongst some of the Islamic groups in the area: "Brother, this is the blood of Muslims shed at the hands of the State," and continued, "If it weren't for the State's bloodletting, I would have been the first one to join it. [That's] why I joined the al-Ansar even though there's little action; the al-Ansar, at least they don't kill Muslims."[15] Al-Jayab continued, "Brother, I'll join al-Nusrah shortly [...] and if any sedition arises, I'll leave my weapon and go to Turkey."

o)      On January 2, 2014, Al-Jayab wrote to Individual O, "I have been thinking of joining the State and abandon[ing] the al-Ansar." Al-Jayab explained he was familiar with Ansar al-Islam because he "used to work with them in Iraq," and his "commander" came to Syria from Iraq. Al-Jayab wrote, "I came to him." Al-Jayab also asked Individual O's opinion of al-Ansar.

---

Islam are but one. Its Emir is Abu Hashim." According to the *United States Department of State Country Reports on Terrorism 2014,* Ansar al-Islam is a Sunni terrorist group which has vowed to establish an independent Islamic state in Iraq. Ansar al-Islam became a designated FTO on March 22, 2004. Abu Hashim Muhammad bin Abdul Rahman al Ibrahim became the leader of Ansar al-Islam in December 2011. See also footnote 9, above.

[13]      Al-Jabhah al-Islamiyyah is an Arabic phrase that translates to "the Islamic Front." According to open source reporting, the Islamic Front was an umbrella organization of Sunni Salafist groups fighting to depose the Syrian regime and seeking to establish an Islamic state in Syria. In late November 2013, founding members of the Islamic Front included Ansar al-Sham, Ahrar al-Sham, the Tawhid Brigade, and the Army of Islam, among others.

[14]      Based on my training and experience as well as open source information, I believe "the State" is shorthand commonly used to refer to ISIL.

[15]      Based on my training and experience as well as the content of Al-Jayab's electronic communications, I believe Al-Jayab's reference to "Muslims" excludes Shia Muslims. Al-Jayab refers to Shiites using terms such as "rafidah," meaning rejectionists or rejectors; this is a derogatory term commonly used by Sunni extremists when discussing Shia.

p)      On January 6, 2014, Al-Jayab wrote to Individual M (see paragraph 10(x) above), that Al-Jayab was in "Haritan, Aleppo, a fighting zone [between] the State and the Free Army."[16]   When Individual M asked if Al-Jayab was with "the Free now," Al-Jayab replied, "No. Ansar al-Islam." Individual M asked, "Who do they belong to?" and Al-Jayab replied, "Ansar al-Islam in Iraq." Al-Jayab discussed the infighting that occurred between various Islamic extremist groups engaged in the Syrian conflict.

q)      On January 7, 2014, Al-Jayab wrote to Individual P, "Brother, we do not sit and watch. [...] Our headquarters is next to the State exactly, and we are against the Free Army.  We have prevented the Free Army from entering the area and attacking the State's headquarters.  And if the Free Army advances, we will fight it.  [...] We installed the Doshkas[17] in the street and spread among all of our headquarters because we are at the entrance of Aleppo.  The Free Army is under the control of our forces." Al-Jayab concluded, "I swear that the State is killing [members of] al-Ansar and al-Nusrah.  They are our brothers, but they are making a mistake. And we are going to stand with the State against the [Free Army]." That same day, Al-Jayab wrote to Individual M, "I might withdraw. [...] When the seditious acts are over, I will return. [...] I did not come to fight for the sake of sedition."

C.      **Return to Turkey and the United States**

12.     The investigation has established the following facts concerning Al-Jayab's activities during approximately January 2014.

a)      On January 8, 2014, Al-Jayab informed Individual O the border crossing with Turkey was closed and he (Al-Jayab) remained in Aleppo.

b)      On January 9 and 13, 2014, according to telephone toll records, the Syrian phone number Al-Jayab provided to Individual N (see paragraph 11(h), above) was also in

---

[16]     According to open source information, the Free Syrian Army (FSA) was established in 2011 by Syrian military defectors, and it has since become an umbrella organization for various armed opposition groups fighting to depose the Syrian regime of Bashar al-Assad.  Elements of the FSA have historically stated support for secular governance in Syria.

[17]     I believe "Doshkas" is a reference to the DShK heavy machine gun, or variant, commonly referred to as "dushka" and widely used in the Syrian conflict.

contact with one of Al-Jayab's family members, who was then residing in Sacramento, California.

c)      On January 17, 2014, Al-Jayab informed Individual P that he would "leave in two hours [for Turkey]." Al-Jayab added, "Once I arrive in Turkey I will call you." Several hours later that day, Al-Jayab's social media account was accessed from an IP address which resolved to Turkey.

d)      Travel records confirm Al-Jayab returned to Sacramento, California via London, United Kingdom and Los Angeles, California on January 23, 2014. Upon his return to the United States, Al-Jayab's Customs Declaration Form made no mention of his travel to Turkey and Syria; "Jordan," and "U.K." were the only entries in the "countries visited" field.

e)      Materials gathered in the course of the investigation show that Al-Jayab made no reference to visiting his grandmother during communications he exchanged with family members or associates from mid-November 2013 to mid-January 2014.

## D.      USCIS and FBI Interviews

13.     On July 29, 2014, Al-Jayab was interviewed by USCIS in conjunction with his application for adjustment of his immigration status. During that interview, Al-Jayab said that he had traveled to Turkey and returned to the United States about six months earlier. Six months before was January 2014.

14.     As outlined in paragraph 8, Al-Jayab was interviewed by USCIS a second time on October 6, 2014.

15.     On June 18, 2015, Al-Jayab voluntarily and without solicitation from the FBI, was interviewed by FBI agents regarding problems he experienced at the airport when traveling. During that interview Al-Jayab stated he had traveled to Turkey for a vacation. He denied traveling to Syria.

16.     The foregoing establishes probable cause to believe that Al-Jayab lied during his
interview with USCIS officers on October 6, 2014.  There is probable cause to believe that,
contrary to what he stated in the interview:

      a)     Al-Jayab traveled to Syria and his travel was not confined to Turkey and Britain
before returning to the United States;

      b)     he went to Turkey to get to Syria and for reasons other than to visit his
grandmother;

      c)     he was a member of and assisted a rebel group, militia, or insurgent organization;

      d)     he solicited membership for a terrorist group or organization and provided
material support to a person or group that engages in terrorist activity;

      e)     he called for, helped with, or committed the killing and intentional and severe
injury of any person;

      f)     he was a member of a group in which he used or threatened to use a weapon
against any person; and

      g)     he assisted in a group where other people used or threatened to use a weapon
against any person.

17.     Based on my training and experience as well as discussions with USCIS and Homeland
Security Investigations (HSI) personnel, Al-Jayab's statements were material to the
determination by USCIS of Al-Jayab's eligibility for immigration benefits.  If Al-Jayab admitted
to being in Syria, USCIS would have asked additional questions and Al-Jayab's file may have
been subjected to further process.  If Al-Jayab admitted to supporting terrorist activities or a
terrorist group, Al-Jayab's refugee status may have been subject to termination.  In addition,
intentional misstatements to USCIS, if proven, could negatively impact a refugee's ability to
remain in the United States and may subject the individual to removal proceedings or criminal
prosecution.

## V.  CONCLUSION

18.     Based on the foregoing, I respectfully assert that there is probable cause to believe Aws Mohammed Younis Al-Jayab knowingly and willfully provided and attempted to provide materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States, specifically United States Citizenship and Immigration Services, a component of the United States Department of Homeland Security, and the offense involved international terrorism as defined in Title 18, United States Code, Section 2331, all in violation of Title 18, United States Code, Section 1001.

## VI.     REQUEST FOR SEALING

19.     I further request that the Court seal the arrest warrant, the affidavit, and the criminal complaint in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the Federal Bureau of Investigation, federally deputized state and local law enforcement officers, and other government and contract personnel



acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.  These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation at this time. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.  Sealing these documents will also better ensure the safety of agents and others.

Elizabeth Buckmiller
Special Agent, FBI

Reviewed and approved as to form.
Dated: 1/6/16

Jill M. Thomas
Assistant United States Attorney

SUBSCRIBED and SWORN to before me
this 6th day of January 2016.

HONORABLE EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

Attachment 10



United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

EASTERN DISTRICT *of* CALIFORNIA

U.S. Attorneys » Eastern District of California » News

**Department of Justice**

U.S. Attorney's Office

Eastern District of California

FOR IMMEDIATE RELEASE                    Thursday, January 7, 2016

# Sacramento Man Arrested for Terrorism Offense

SACRAMENTO, Calif. — A Sacramento resident was arrested today on a federal charge of making a false statement involving international terrorism. Aws Mohammed Younis Al-Jayab, 23, is charged in a criminal complaint that was unsealed today in the U.S. District Court for the Eastern District of California following his arrest. He is in custody and will be making an initial appearance Friday in federal court in Sacramento at 2:00 PM.

The arrest was announced by Assistant Attorney General for National Security John P. Carlin, United States Attorney Benjamin B. Wagner of the Eastern District of California, and Special Agent in Charge Monica M. Miller of the FBI's Sacramento Division.

"Aws Mohammed Younis Al-Jayab allegedly traveled overseas to fight alongside terrorist organizations and lied to U.S. authorities about his activities," said Assistant Attorney General Carlin. "The National Security Division's highest priority is protecting the nation from terrorism, and we will continue to hold accountable those who seek to join or aid the cause of terrorism, whether at home or abroad."

"According to the allegations in the complaint, the defendant traveled to Syria to take up arms with terrorist organizations and concealed that conduct from immigration authorities," said U.S. Attorney Wagner. "While he represented a potential safety threat, there is no indication that he planned any acts of terrorism in this country. I commend the FBI's Joint Terrorism Task Force for their dedicated work on this matter."

"In today's complex terrorism environment, our Joint Terrorism Task Force plays an important role in combating the threat of terrorism. The collaboration is stronger than ever and essential to protect our communities from harm," said Special Agent in Charge Monica M. Miller of the Federal Bureau of Investigation Sacramento Field Office. "The public plays an equal, if not more important, role in protecting the community. We encourage those who encounter individuals who

Attachment 10

express an intent to do harm or claim allegiance to a terrorist group—whether in person or online—to voice their concerns to law enforcement."

According to the complaint, Al-Jayab is a Palestinian born in Iraq, who emigrated from Syria to the United States as a refugee in October 2012. Between October 2012 and November 2013, while living in Arizona and Wisconsin, he communicated over social media with numerous other individuals about his intent to return to Syria to fight for terrorist organizations. In those communications, according to the complaint, Al-Jayab discussed his previous experience with firearms and with fighting against the regime in Syria. On Nov. 9, 2013, he flew from Chicago to Turkey, and then traveled to Syria. Between November 2013 and January 2014, Al-Jayab allegedly reported on social media that he was in Syria fighting with various terrorist organizations, including Ansar al-Islam, a designated foreign terrorist organization since 2004. He returned to the United States on Jan. 23, 2014, and settled in Sacramento.

The complaint alleges that on October 6, 2014, Al-Jayab was interviewed by U.S. Citizenship and Immigration Services and responded in the negative to numerous questions, including whether he had ever been a member of any rebel group or militia; whether he had ever provided material support for any person or group engaged in terrorist activity; and whether he had ever been a member of a group, or assisted in a group, which used or threatened the use of weapons against others. Al-Jayab also allegedly stated during the interview that he had traveled to Turkey in late 2013 and early 2014 to visit his grandmother. The complaint alleges that all of those answers were materially false.

If convicted, Al-Jayab faces a maximum statutory penalty of eight years in prison and a $250,000 fine. Any sentence, however, would be determined at the discretion of the court after consideration of any applicable statutory factors and the Federal Sentencing Guidelines, which take into account a number of variables.

The charges are only allegations; the defendant is presumed innocent until and unless proven guilty beyond a reasonable doubt.

This case is the product of an investigation by the Federal Bureau of Investigation and the Sacramento Joint Terrorism Task Force (JTTF), a team of federal, state, and local law enforcement agents and officers investigating domestic and international terrorism. Assistant United States Attorney Jill Thomas and Trial Attorney Andrew Sigler of the National Security Division's Counterterrorism Section are prosecuting the case. The investigation is ongoing.

---

National Security & Homeland Security
Download criminal_complaint.pdf (1.1 MB)

USAO - California, Eastern

Updated January 7, 2016

Attachment 11

 Official website of the Department of Homeland Security

     

Home   About DHS   Organization   Components, Directorates, and Offices   Office of Intelligence and Analysis   **State and Major Urban Area**   Share / Email
**Fusion Centers**

### State & Major Urban Area Fusion Centers

Building Law Enforcement and DHS Partnerships

Fact Sheet

Fusion Center Performance Program

Fusion Centers Handout

Locations and Contact Information

Success Stories

Support of National Strategies and Guidance

# State and Major Urban Area Fusion Centers

State and major urban area fusion centers (fusion centers) serve as focal points within the state and local environment for the receipt, analysis, gathering, and sharing of threat-related information between the federal government and state, local, tribal, territorial (SLTT) and private sector partners.

## National Network of Fusion Centers

Located in states and major urban areas throughout the country, fusion centers are uniquely situated to empower front-line law enforcement, public safety, fire service, emergency response, public health, critical infrastructure protection, and private sector security personnel to understand local implications of national intelligence, thus enabling local officials to better protect their communities. Fusion centers provide interdisciplinary expertise and situational awareness to inform decision-making at all levels of government. They conduct analysis and facilitate information sharing while assisting law enforcement and homeland security partners in preventing, protecting against, and responding to crime and terrorism.

Fusion centers are owned and operated by state and local entities with support from federal partners in the form of deployed personnel, training, technical assistance, exercise support, security clearances, connectivity to federal systems, technology, and grant funding.

## The Current Threat Environment and Role of Fusion Centers in National Security

Both at home and abroad, the United States faces an adaptive enemy in an asymmetric threat environment. Events since May 2009 have demonstrated that the threat to the homeland is not abating. The National Network of Fusion Centers (National Network) is uniquely situated to empower front-line law enforcement, public safety, emergency response, and private sector security personnel to lawfully gather and share information to identify emerging threats. The national security enterprise must reach beyond the capabilities of the federal government and national Intelligence Community to identify and warn about impending plots that could impact the homeland, particularly when the individuals responsible for the threats operate within the United States and do not travel or communicate with others overseas. By building trusted relationships and collaborating with SLTT and private sector partners, fusion centers can gather and share the information necessary to pursue and disrupt activities that may be indicators of, or potential precursors to, terrorist activity. With timely, accurate information on potential terrorist threats, fusion centers can directly contribute to and inform investigations initiated and conducted by federal entities, such as the Joint Terrorism Task Forces led by the Federal Bureau of Investigation.

According to the 2010 National Security Strategy *(PDF, 60 pages - 1.52 MB)*, the federal government must continue to integrate and leverage fusion centers to enlist all of our intelligence, law enforcement, and homeland security capabilities to prevent acts of terrorism on American soil. Efforts to protect the homeland require the timely gathering, analysis, and sharing of threat-related information. Fusion centers provide a mechanism through which the federal government, SLTT, and private sector partners come together to accomplish this purpose. Beginning in 2003, the federal government, in cooperation with state and local entities, published guidance to enable fusion centers to operate at a baseline level of capability and to form a robust and fully integrated National Network. The National Network allows the federal government, SLTT, and private sector partners to participate as full contributors to, and beneficiaries of, the homeland security enterprise.

This strategic vision can be realized only when fusion centers demonstrate institutionalized levels of capability that enable efficient and effective information sharing and analysis across the National Network. This will help link the federal government with SLTT and private sector

**Across the Agencies**

Role of Fusion Centers in Countering Violent Extremism

DHS/DOJ Fusion Process Technical Assistance Program and Services

Attachment 11

entities to more effectively share information. Given the evolving threat environment, it is vital that fusion centers quickly achieve their roles, as explained in the National Strategy for Information Sharing (NSIS), as the focal points within the SLTT environment for the receipt, analysis, gathering, and sharing of threat-related information.

## Enhancing Department Resources to Support Fusion Centers

The Department of Homeland Security (DHS) has expedited the deployment of resources to fusion centers to enhance their ability to perform their mission. The DHS Office of Intelligence and Analysis (I&A), the Department's lead for support to fusion centers, has deployed over 90 personnel, including Intelligence Officers and Regional Directors, to the field. I&A also worked aggressively to deploy Homeland Secure Data Network (HSDN) to over 60 fusion centers. HSDN provides SECRET-level connectivity to enhance the ability of state and local partners to receive federally generated classified threat information.

Additionally, the Department significantly expanded training and technical assistance opportunities for fusion center personnel. Through its long-standing partnership with the Department of Justice (DOJ), the Department has conducted more than 300 training and technical assistance deliveries, workshops, and exchanges on topics including risk analysis, security, and privacy, civil rights, and civil liberties since 2007. By providing these resources, the Department supports fusion centers to address some of the nation's most significant homeland security challenges.

## Expanding the Nationwide Suspicious Activity Reporting (SAR) Initiative (NSI)

To provide guidance regarding how and where to report suspicious activities, state, local, and federal agencies worked collaboratively to develop a Unified Message that provides clear guidance regarding how to report suspicious activities, encourages agencies to work with DHS to utilize the "If You See Something, Say Something™" campaign, and emphasizes the importance of training frontline personnel.

The Department is working closely with the DOJ-led Nationwide Suspicious Activity Reporting Initiative Program Management Office to establish a standard process to identify and report suspicious activity in jurisdictions across the country. Under the leadership of I&A, the Department has made it a priority to participate in and support the implementation of the NSI while also integrating SAR processes across the National Network of Fusion Centers. The integration of NSI within both the Department and the fusion centers is a key element of fusion center outreach to law enforcement at all levels of government.

The Department has also launched the "If You See Something, Say Something™" campaign in order to engage the public to identify and report indicators of terrorism, crime, and other threats.

## The Path Ahead

Working closely with interagency partners and Fusion Center Directors, the Department supports an annual nationwide, in-depth assessment of fusion centers to evaluate their capabilities and to establish strategic priorities for federal government support. The assessment focuses primarily on four Critical Operational Capabilities (Receive, Analyze, Disseminate, and Gather) and four Enabling Capabilities (Privacy/Civil Rights and Civil Liberties Protections, Sustainment Strategy, Communications and Outreach, and Security) as well as additional priority areas for the year. Leveraging data collected from the Annual Fusion Center Assessment, the Department coordinates efforts to build fusion center capabilities and mitigate identified gaps. These gap mitigation efforts are designed to assist fusion centers in becoming centers of analytic excellence that serve as focal points within the state and local environment for the receipt, analysis, gathering, and sharing of threat-related information.

For further information, please contact the Department of Homeland Security Office of Public Affairs, 202-282-8010.

*Last Published Date: September 14, 2015*

### Was this page helpful?

Yes    No

Submit

Attachment 12



## U.S. Refugee Admissions Program FAQs

**Fact Sheet**
**Bureau of Population, Refugees, and Migration**
**Washington, DC**
**May 31, 2013**

Every year, the United States provides resettlement opportunities to thousands of the world's most vulnerable refugees, in a program endorsed by the President (and every President since 1980) through an annual determination. The U.S. Refugee Admissions Program (USRAP), which resettled over 58,000 refugees in the United States in 2012, reflects our own tradition as a nation of immigrants and refugees. It is an important, enduring and ongoing expression of our commitment to international humanitarian principles. The United States remains the largest resettlement country in the world, receiving more than half of all refugees resettled worldwide each year through the United Nations High Commissioner for Refugees (UNHCR).

The Bureau of Population, Refugees, and Migration (PRM) is committed to improving the effectiveness of the U.S. Refugee Admissions Program, and regularly assesses refugee populations worldwide to ensure that the program is responsive to the resettlement needs of the most vulnerable among them that require this solution.

#### Who exactly is eligible for resettlement?

The **United Nations High Commissioner for Refugees** (UNHCR) has the international mandate to provide refugee assistance and to determine if resettlement in a third country - be it the United States or another country - is the right solution.

Less than one percent of refugees worldwide are ever resettled in a third country. UNHCR uses six criteria to determine if resettlement is appropriate. For more information on UNHCR standards and criteria for determining resettlement as the appropriate solution for refugees, please refer to the UNHCR Resettlement Handbook, available online at **http://www.unhcr.org/4a2ccf4c6.html** .

#### Tell me more about how the resettlement program works.

The UNHCR, a U.S. Embassy, or an authorized non-governmental organization (NGO) can refer a refugee to the U.S. Refugee Admissions Program (USRAP). Once a referral is made, a Resettlement Support Center (RSC) funded and managed by PRM prepares the case for presentation to the U.S. Department of Homeland Security (DHS).

The RSC helps the refugee and his /her family (if applicable) prepare their case file - taking photos, checking the facts in the files, collecting information for the security clearance process, etc. Applicants are then interviewed by an officer of DHS' United States Citizenship and Immigration Services (USCIS).

The interviewer adjudicates the case. If approved, the applicant and his/her family undergo medical exams, which are standard for all applicants seeking to reside permanently in the United States.

A non-governmental organization (NGO) working under agreement with PRM in the U.S. then agrees to be the refugee's sponsor. Refugees approved for admission are offered a short cultural orientation program to introduce them to life in the United States. Once all security and health checks are complete, refugees are scheduled for travel to the US.

#### How much time does the entire process typically require?

Worldwide, the average processing time is about one year to 18 months. But every case is different, and processing times vary.

#### How do you decide who gets in to the United States under this program and who doesn't?

The Department of Homeland Security has the authority to make this decision. Under U.S. law, a refugee must have a well-founded fear of persecution based on one of the five "protected grounds":

- Religion

- Political opinion

- Race

- Nationality

- Membership in a particular social group

Furthermore, a refugee must be deemed admissible to the U.S. and not be firmly resettled in a third country. For a list of grounds that would disqualify a refugee from resettling in the United States, please visit the U.S. Citizenship and Immigration Services website at **http://www.uscis.gov/portal/site/uscis**

Attachment 12

**Is my nuclear and/or extended family eligible to join me?**

Generally a "case" consists of the principal applicant, his or her spouse, and unmarried children under the age of 21. Additional relatives may be considered on a case by case basis. Please see the **Frequently Asked Questions (FAQs) Regarding the P-2 for Approved Iraqi 130 Beneficiaries** for more information.

Once a refugee arrives in the United States and would like to petition for other members of his/her immediate family to join them, a number of avenues are available. Under Priority Three (P-3) processing, a refugee or asylee who is at least 18, and been in the U.S. in refugee or asylee status for no more than five years can file an Affidavit of Relationship (AOR) for a spouse, parents, and unmarried children under the age of 21. This form must be submitted to the Department of State through a resettlement agency affiliate in the refugee's geographic area. This program is only open to designated nationalities, set by the Bureau in consultation with DHS/USCIS at the beginning of each fiscal year. DNA testing refugees/asylees and certain family members overseas is a requirement of this program. The P-3 program has been operating since October 15, 2012 following a four year suspension of the program after high rates of relationship fraud were discovered. A refugee who has arrived in the United States, or a person granted asylum in the United States, can also file a Form I-730 (Visa 93) for spouse and unmarried children under the age of 21. There are no restrictions on nationalities that can file this petition, but it must be filed with USCIS within two years of arrival in the United States. The Form I-730 may be downloaded from the USCIS website ( **www.uscis.gov** ) and can be submitted directly to USCIS without the aid of a resettlement agency. However, a refugee may consult with a resettlement agency in his/her geographic location for details about this program.

Lastly, a refugee has the option of filing a Form I-130 Petition for Alien Relative upon arrival in the United States. However, only U.S. citizens or refugees with Permanent Resident Alien status are eligible to file this petition. Depending on their legal status in the U.S. applicants may apply on behalf of spouses, children, parents, and siblings. Please visit the **USCIS website** for eligibility requirements and filing instructions.

**What if someone in my family doesn't get the visa? Can he or she reapply?**

Approved refugees do not get visas. They receive a packet of documents and information that allows them to enter the U.S.

Anyone whose resettlement application is denied can request that DHS reconsider his/her case.

**If I go to the U.S. as a refugee, do I automatically become a U.S. citizen?**

No. Refugees are admitted to the U.S. as refugees and remain in that status for 12 months. They are, however, authorized and expected to work during this time. After 12 months, they are required to adjust their status to that of Permanent Resident Alien. They can apply for citizenship after having been resident in the United States for five years.

**What benefits do I get in the US?**

For more information about the State Department Refugee Reception and Placement Program, and what is expected of new arrivals, please click the **Refugee Admissions Reception and Placement Program One Pager** . For more information on Department of Health and Human Services (HHS) administered refugee benefits, please visit the **HHS website**.

Attachment 13



# NATIONAL SECURITY STRATEGY

## May 2010



Attachment 13



**THE WHITE HOUSE**

WASHINGTON

Time and again in our Nation's history, Americans have risen to meet — and to shape — moments of transition. This must be one of those moments. We live in a time of sweeping change. The success of free nations, open markets, and social progress in recent decades has accelerated globalization on an unprecedented scale. This has opened the doors of opportunity around the globe, extended democracy to hundreds of millions of people, and made peace possible among the major powers. Yet globalization has also intensified the dangers we face — from international terrorism and the spread of deadly technologies, to economic upheaval and a changing climate.

For nearly a decade, our Nation has been at war with a far-reaching network of violence and hatred. Even as we end one war in Iraq, our military has been called upon to renew our focus on Afghanistan as part of a commitment to disrupt, dismantle, and defeat al-Qa'ida and its affiliates. This is part of a broad, multinational effort that is right and just, and we will be unwavering in our commitment to the security of our people, allies, and partners. Moreover, as we face multiple threats — from nations, nonstate actors, and failed states — we will maintain the military superiority that has secured our country, and underpinned global security, for decades.

Yet as we fight the wars in front of us, we must see the horizon beyond them — a world in which America is stronger, more secure, and is able to overcome our challenges while appealing to the aspirations of people around the world. To get there, we must pursue a strategy of national renewal and global leadership — a strategy that rebuilds the foundation of American strength and influence.

Our strategy starts by recognizing that our strength and influence abroad begins with the steps we take at home. We must grow our economy and reduce our deficit. We must educate our children to compete in an age where knowledge is capital, and the marketplace is global. We must develop the clean energy that can power new industry, unbind us from foreign oil, and preserve our planet. We must pursue science and research that enables discovery, and unlocks wonders as unforeseen to us today as the surface of the moon and the microchip were a century ago. Simply put, we must see American innovation as a foundation of American power.

We must also build and integrate the capabilities that can advance our interests, and the interests we share with other countries and peoples. Our Armed Forces will always be a cornerstone of our security, but they must be complemented. Our security also depends upon diplomats who can act in every corner of the world, from grand capitals to dangerous outposts; development

experts who can strengthen governance and support human dignity; and intelligence and law enforcement that can unravel plots, strengthen justice systems, and work seamlessly with other countries.

The burdens of a young century cannot fall on American shoulders alone — indeed, our adversaries would like to see America sap our strength by overextending our power.  In the past, we have had the foresight to act judiciously and to avoid acting alone.  We were part of the most powerful wartime coalition in human history through World War II, and stitched together a community of free nations and institutions to endure a Cold War.  We are clear-eyed about the challenge of mobilizing collective action, and the shortfalls of our international system.  But America has not succeeded by stepping outside the currents of international cooperation.  We have succeeded by steering those currents in the direction of liberty and justice — so that nations thrive by meeting their responsibilities and face consequences when they don't.

To do so, we will be steadfast in strengthening those old alliances that have served us so well, while modernizing them to meet the challenges of a new century.  As influence extends to more countries and capitals, we will build new and deeper partnerships in every region, and strengthen international standards and institutions.  This engagement is no end in itself.  The international order we seek is one that can resolve the challenges of our times — countering violent extremism and insurgency; stopping the spread of nuclear weapons and securing nuclear materials; combating a changing climate and sustaining global growth; helping countries feed themselves and care for their sick; resolving and preventing conflict, while also healing its wounds.

In all that we do, we will advocate for and advance the basic rights upon which our Nation was founded, and which peoples of every race and region have made their own.  We promote these values by living them, including our commitment to the rule of law.  We will strengthen international norms that protect these rights, and create space and support for those who resist repression.  Our commitment to human dignity includes support for development, which is why we will fight poverty and corruption.  And we reject the notion that lasting security and prosperity can be found by turning away from universal rights — democracy does not merely represent our better angels, it stands in opposition to aggression and injustice, and our support for universal rights is both fundamental to American leadership and a source of our strength in the world.

As a Nation made up of people from every race, region, faith, and culture, America will persist in promoting peace among different peoples and believes that democracy and individual empowerment need not come at the expense of cherished identities.  Indeed, no nation should be better positioned to lead in an era of globalization than America — the Nation that helped bring globalization about, whose institutions are designed to prepare individuals to succeed in a competitive world, and whose people trace their roots to every country on the face of the Earth.

As a citizen, Senator, and President, I have always believed that America's greatest asset is its people — from the awe I felt as a child watching a space capsule pulled out of the Pacific, to the strength I drew from workers rebuilding their lives in Illinois, to the respect that I have for the generation of Americans who serve our country today.  That is why I also believe that we must foster even deeper connections among Americans and peoples around the globe.  Our long-term

security will come not from our ability to instill fear in other peoples, but through our capacity to speak to their hopes.  And that work will best be done through the power of the decency and dignity of the American people — our troops and diplomats, but also our private sector, nongovernmental organizations, and citizens.  All of us have a role to play.

From the birth of our liberty, America has had a faith in the future — a belief that where we're going is better than where we've been, even when the path ahead is uncertain.  To fulfill that promise, generations of Americans have built upon the foundation of our forefathers — finding opportunity, fighting injustice, and forging a more perfect Union.  We have also created webs of commerce, supported an international architecture of laws and institutions, and spilled American blood in foreign lands — not to build an empire, but to shape a world in which more individuals and nations could determine their own destiny, and live with the peace and dignity that they deserve.

In 2010, America is hardened by wars, and inspired by the servicemen and women who fight them.  We are disciplined by a devastating economic crisis, and determined to see that its legacy is a new foundation for prosperity; and we are bound by a creed that has guided us at home, and served as a beacon to the world.  America's greatness is not assured — each generation's place in history is a question unanswered.  But even as we are tested by new challenges, the question of our future is not one that will be answered for us, it is one that will be answered by us.  And in a young century whose trajectory is uncertain, America is ready to lead once more.



# Table of Contents

I. Overview of National Security Strategy . . . . . . . . . . . . . . . . . 1

II. Strategic Approach . . . . . . . . . . . . . . . . . . . . . . . . 7

    The Strategic Environment—The World as It Is . . . . . . . . . . . . . 7

    The Strategic Approach—The World We Seek . . . . . . . . . . . . . . 9

        Building Our Foundation . . . . . . . . . . . . . . . . . . 9

        Pursuing Comprehensive Engagement . . . . . . . . . . . . . . 11

        Promoting a Just and Sustainable International Order . . . . . . . . . 12

        *Strengthening National Capacity—A Whole of Government Approach* . . . . . . . 14

III. Advancing Our Interests . . . . . . . . . . . . . . . . . . . . 17

    Security . . . . . . . . . . . . . . . . . . . . . . . . . 17

        Strengthen Security and Resilience at Home . . . . . . . . . . . . 18

        Disrupt, Dismantle, and Defeat Al-Qa'ida and its Violent Extremist Affiliates in
        Afghanistan, Pakistan, and Around the World . . . . . . . . . . . 19

        *Use of Force* . . . . . . . . . . . . . . . . . . . . . 22

        Reverse the Spread of Nuclear and Biological Weapons and Secure Nuclear Materials . . 23

        Advance Peace, Security, and Opportunity in the Greater Middle East . . . . . . . 24

        Invest in the Capacity of Strong and Capable Partners . . . . . . . . . . 26

        Secure Cyberspace . . . . . . . . . . . . . . . . . . . . 27

    Prosperity . . . . . . . . . . . . . . . . . . . . . . . . 28

        Strengthen Education and Human Capital . . . . . . . . . . . . . 29

        Enhance Science, Technology, and Innovation . . . . . . . . . . . . 30

        Achieve Balanced and Sustainable Growth . . . . . . . . . . . . 31

        Accelerate Sustainable Development . . . . . . . . . . . . . . 33

        Spend Taxpayers' Dollars Wisely . . . . . . . . . . . . . . . 34

Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    Strengthen the Power of Our Example . . . . . . . . . . . . . . . . . . 36

    Promote Democracy and Human Rights Abroad . . . . . . . . . . . . . . 37

    Promote Dignity by Meeting Basic Needs . . . . . . . . . . . . . . . . . 39

International Order. . . . . . . . . . . . . . . . . . . . . . . . . 40

    Ensure Strong Alliances . . . . . . . . . . . . . . . . . . . . . . 41

    Build Cooperation with Other 21st Century Centers of Influence . . . . . . . . . . 43

    Strengthen Institutions and Mechanisms for Cooperation . . . . . . . . . . . 46

    Sustain Broad Cooperation on Key Global Challenges . . . . . . . . . . . . . 47

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . 51



# I. Overview of National Security Strategy

At the dawn of the 21st century, the United States of America faces a broad and complex array of challenges to our national security. Just as America helped to determine the course of the 20th century, we must now build the sources of American strength and influence, and shape an international order capable of overcoming the challenges of the 21st century.

## The World as It Is, A Strategy for the World We Seek

To succeed, we must face the world as it is. The two decades since the end of the Cold War have been marked by both the promise and perils of change. The circle of peaceful democracies has expanded; the specter of nuclear war has lifted; major powers are at peace; the global economy has grown; commerce has stitched the fate of nations together; and more individuals can determine their own destiny. Yet these advances have been accompanied by persistent problems. Wars over ideology have given way to wars over religious, ethnic, and tribal identity; nuclear dangers have proliferated; inequality and economic instability have intensified; damage to our environment, food insecurity, and dangers to public health are increasingly shared; and the same tools that empower individuals to build enable them to destroy.

The dark side of this globalized world came to the forefront for the American people on September 11, 2001. The immediate threat demonstrated by the deadliest attacks ever launched upon American soil demanded strong and durable approaches to defend our homeland. In the years since, we have launched a war against al-Qa'ida and its affiliates, decided to fight a war in Iraq, and confronted a sweeping economic crisis. More broadly, though, we have wrestled with how to advance American interests in a world that has changed—a world in which the international architecture of the 20th century is buckling under the weight of new threats, the global economy has accelerated the competition facing our people and businesses, and the universal aspiration for freedom and dignity contends with new obstacles.

Our country possesses the attributes that have supported our leadership for decades—sturdy alliances, an unmatched military, the world's largest economy, a strong and evolving democracy, and a dynamic citizenry. Going forward, there should be no doubt: the United States of America will continue to underwrite global security—through our commitments to allies, partners, and institutions; our focus on defeating al-Qa'ida and its affiliates in Afghanistan, Pakistan, and around the globe; and our determination to deter aggression and prevent the proliferation of the world's most dangerous weapons. As we do, we must recognize that no one nation—no matter how powerful—can meet global challenges alone. As we did after World War II, America must prepare for the future, while forging cooperative approaches among nations that can yield results.

Our national security strategy is, therefore, focused on renewing American leadership so that we can more effectively advance our interests in the 21st century. We will do so by building upon the sources of our strength at home, while shaping an international order that can meet the challenges of our time. This strategy recognizes the fundamental connection between our national security, our national competitiveness, resilience, and moral example. And it reaffirms America's commitment to pursue our interests through an international system in which all nations have certain rights and responsibilities.

This will allow America to leverage our engagement abroad on behalf of a world in which individuals enjoy more freedom and opportunity, and nations have incentives to act responsibly, while facing consequences when they do not.

## Renewing American Leadership—Building at Home, Shaping Abroad

Our approach begins with a commitment to build a stronger foundation for American leadership, because what takes place within our borders will determine our strength and influence beyond them. This truth is only heightened in a world of greater interconnection—a world in which our prosperity is inextricably linked to global prosperity, our security can be directly challenged by developments across an ocean, and our actions are scrutinized as never before.

At the center of our efforts is a commitment to renew our economy, which serves as the wellspring of American power. The American people are now emerging from the most devastating recession that we have faced since the Great Depression. As we continue to act to ensure that our recovery is broad and sustained, we are also laying the foundation for the long term growth of our economy and competitiveness of our citizens. The investments that we have made in recovery are a part of a broader effort that will contribute to our strength: by providing a quality education for our children; enhancing science and innovation; transforming our energy economy to power new jobs and industries; lowering the cost of health care for our people and businesses; and reducing the Federal deficit.

Each of these steps will sustain America's ability to lead in a world where economic power and individual opportunity are more diffuse. These efforts are also tied to our commitment to secure a more resilient nation. Our recovery includes rebuilding an infrastructure that will be more secure and reliable in the face of terrorist threats and natural disasters. Our focus on education and science can ensure that the breakthroughs of tomorrow take place in the United States. Our development of new sources of energy will reduce our dependence on foreign oil. Our commitment to deficit reduction will discipline us to make hard choices, and to avoid overreach. These steps complement our efforts to integrate homeland security with national security; including seamless coordination among Federal, state, and local governments to prevent, protect against, and respond to threats and natural disasters.

Finally, the work to build a stronger foundation for our leadership within our borders recognizes that the most effective way for the United States of America to promote our values is to live them. America's commitment to democracy, human rights, and the rule of law are essential sources of our strength and influence in the world. They too must be cultivated by our rejection of actions like torture that are not in line with our values, by our commitment to pursue justice consistent with our Constitution, and by our steady determination to extend the promise of America to all of our citizens. America has always been a beacon to the peoples of the world when we ensure that the light of America's example burns bright.

Building this stronger foundation will support America's efforts to shape an international system that can meet the challenges of our time. In the aftermath of World War II, it was the United States that helped take the lead in constructing a new international architecture to keep the peace and advance prosperity—from NATO and the United Nations, to treaties that govern the laws and weapons of war; from the World Bank and International Monetary Fund, to an expanding web of trade agreements. This

architecture, despite its flaws, averted world war, enabled economic growth, and advanced human rights, while facilitating effective burden sharing among the United States, our allies, and partners.

Today, we need to be clear-eyed about the strengths and shortcomings of international institutions that were developed to deal with the challenges of an earlier time and the shortage of political will that has at times stymied the enforcement of international norms. Yet it would be destructive to both American national security and global security if the United States used the emergence of new challenges and the shortcomings of the international system as a reason to walk away from it. Instead, we must focus American engagement on strengthening international institutions and galvanizing the collective action that can serve common interests such as combating violent extremism; stopping the spread of nuclear weapons and securing nuclear materials; achieving balanced and sustainable economic growth; and forging cooperative solutions to the threat of climate change, armed conflict, and pandemic disease.

The starting point for that collective action will be our engagement with other countries. The cornerstone of this engagement is the relationship between the United States and our close friends and allies in Europe, Asia, the Americas, and the Middle East—ties which are rooted in shared interests and shared values, and which serve our mutual security and the broader security and prosperity of the world. We are working to build deeper and more effective partnerships with other key centers of influence—including China, India, and Russia, as well as increasingly influential nations such as Brazil, South Africa, and Indonesia—so that we can cooperate on issues of bilateral and global concern, with the recognition that power, in an interconnected world, is no longer a zero sum game. We are expanding our outreach to emerging nations, particularly those that can be models of regional success and stability, from the Americas to Africa to Southeast Asia. And we will pursue engagement with hostile nations to test their intentions, give their governments the opportunity to change course, reach out to their people, and mobilize international coalitions.

This engagement will underpin our commitment to an international order based upon rights and responsibilities. International institutions must more effectively represent the world of the 21st century, with a broader voice—and greater responsibilities—for emerging powers, and they must be modernized to more effectively generate results on issues of global interest. Constructive national steps on issues ranging from nuclear security to climate change must be incentivized, so nations that choose to do their part see the benefits of responsible action. Rules of the road must be followed, and there must be consequences for those nations that break the rules—whether they are nonproliferation obligations, trade agreements, or human rights commitments.

This modernization of institutions, strengthening of international norms, and enforcement of international law is not a task for the United States alone—but together with like-minded nations, it is a task we can lead. A key source of American leadership throughout our history has been enlightened self-interest. We want a better future for our children and grandchildren, and we believe that their lives will be better if other peoples' children and grandchildren can live in freedom and prosperity. The belief that our own interests are bound to the interests of those beyond our borders will continue to guide our engagement with nations and peoples.

## Advancing Top National Security Priorities

Just as our national security strategy is focused on renewing our leadership for the long term, it is also facilitating immediate action on top priorities. This Administration has no greater responsibility than the safety and security of the American people. And there is no greater threat to the American people than weapons of mass destruction, particularly the danger posed by the pursuit of nuclear weapons by violent extremists and their proliferation to additional states.

That is why we are pursuing a comprehensive nonproliferation and nuclear security agenda, grounded in the rights and responsibilities of nations. We are reducing our nuclear arsenal and reliance on nuclear weapons, while ensuring the reliability and effectiveness of our deterrent. We are strengthening the Nuclear Non-Proliferation Treaty (NPT) as the foundation of nonproliferation, while working through the NPT to hold nations like Iran and North Korea accountable for their failure to meet international obligations. We are leading a global effort to secure all vulnerable nuclear materials from terrorists. And we are pursuing new strategies to protect against biological attacks and challenges to the cyber networks that we depend upon.

As we secure the world's most dangerous weapons, we are fighting a war against a far-reaching network of hatred and violence. We will disrupt, dismantle, and defeat al-Qa'ida and its affiliates through a comprehensive strategy that denies them safe haven, strengthens front-line partners, secures our homeland, pursues justice through durable legal approaches, and counters a bankrupt agenda of extremism and murder with an agenda of hope and opportunity. The frontline of this fight is Afghanistan and Pakistan, where we are applying relentless pressure on al-Qa'ida, breaking the Taliban's momentum, and strengthening the security and capacity of our partners. In this effort, our troops are again demonstrating their extraordinary service, making great sacrifices in a time of danger, and they have our full support.

In Iraq, we are transitioning to full Iraqi sovereignty and responsibility—a process that includes the removal of our troops, the strengthening of our civilian capacity, and a long-term partnership to the Iraqi Government and people. We will be unwavering in our pursuit of a comprehensive peace between Israel and its neighbors, including a two-state solution that ensures Israel's security, while fulfilling the Palestinian peoples' legitimate aspirations for a viable state of their own. And our broader engagement with Muslim communities around the world will spur progress on critical political and security matters, while advancing partnerships on a broad range of issues based upon mutual interests and mutual respect.

As we rebuild the economic strength upon which our leadership depends, we are working to advance the balanced and sustainable growth upon which global prosperity and stability depends. This includes steps at home and abroad to prevent another crisis. We have shifted focus to the G-20 as the premier forum for international economic cooperation, and are working to rebalance global demand so that America saves more and exports more, while emerging economies generate more demand. And we will pursue bilateral and multilateral trade agreements that advance our shared prosperity, while accelerating investments in development that can narrow inequality, expand markets, and support individual opportunity and state capacity abroad.

I. OVERVIEW OF NATIONAL SECURITY STRATEGY

These efforts to advance security and prosperity are enhanced by our support for certain values that are universal. Nations that respect human rights and democratic values are more successful and stronger partners, and individuals who enjoy such respect are more able to achieve their full potential. The United States rejects the false choice between the narrow pursuit of our interests and an endless campaign to impose our values. Instead, we see it as fundamental to our own interests to support a just peace around the world—one in which individuals, and not just nations, are granted the fundamental rights that they deserve.

In keeping with the focus on the foundation of our strength and influence, we are promoting universal values abroad by living them at home, and will not seek to impose these values through force. Instead, we are working to strengthen international norms on behalf of human rights, while welcoming all peaceful democratic movements. We are supporting the development of institutions within fragile democracies, integrating human rights as a part of our dialogue with repressive governments, and supporting the spread of technologies that facilitate the freedom to access information. And we recognize economic opportunity as a human right, and are promoting the dignity of all men and women through our support for global health, food security, and cooperatives responses to humanitarian crises.

Finally, our efforts to shape an international order that promotes a just peace must facilitate cooperation capable of addressing the problems of our time. This international order will support our interests, but it is also an end that we seek in its own right. New challenges hold out the prospect of opportunity, but only if the international community breaks down the old habits of suspicion to build upon common interests. A global effort to combat climate change must draw upon national actions to reduce emissions and a commitment to mitigate their impact. Efforts to prevent conflicts and keep the peace in their aftermath can stop insecurity from spreading. Global cooperation to prevent the spread of pandemic disease can promote public health.

Implementing this agenda will not be easy. To succeed, we must balance and integrate all elements of American power and update our national security capacity for the 21st century. We must maintain our military's conventional superiority, while enhancing its capacity to defeat asymmetric threats. Our diplomacy and development capabilities must be modernized, and our civilian expeditionary capacity strengthened, to support the full breadth of our priorities. Our intelligence and homeland security efforts must be integrated with our national security policies, and those of our allies and partners. And our ability to synchronize our actions while communicating effectively with foreign publics must be enhanced to sustain global support.

However, America's greatest asset remains our people. In an era that will be shaped by the ability to seize the opportunities of a world that has grown more interconnected, it is the American people who will make the difference—the troops and civilians serving within our government; businesses, foundations, and educational institutions that operate around the globe; and citizens who possess the dynamism, drive, and diversity to thrive in a world that has grown smaller. Because for all of its dangers, globalization is in part a product of American leadership and the ingenuity of the American people. We are uniquely suited to seize its promise.

Our story is not without imperfections. Yet at each juncture that history has called upon us to rise to the occasion, we have advanced our own security, while contributing to the cause of human progress. To continue to do so, our national security strategy must be informed by our people, enhanced by the contributions of the Congress, and strengthened by the unity of the American people. If we draw on that spirit anew, we can build a world of greater peace, prosperity, and human dignity.



# II. Strategic Approach

*"More than at any point in human history—the interests of nations and peoples are shared. The religious convictions that we hold in our hearts can forge new bonds among people, or tear us apart. The technology we harness can light the path to peace, or forever darken it. The energy we use can sustain our planet, or destroy it. What happens to the hope of a single child—anywhere—can enrich our world, or impoverish it."*

*—President Barack Obama, United Nations General Assembly, September 22, 2009*

—

The United States must renew its leadership in the world by building and cultivating the sources of our strength and influence. Our national security depends upon America's ability to leverage our unique national attributes, just as global security depends upon strong and responsible American leadership. That includes our military might, economic competitiveness, moral leadership, global engagement, and efforts to shape an international system that serves the mutual interests of nations and peoples. For the world has changed at an extraordinary pace, and the United States must adapt to advance our interests and sustain our leadership.

American interests are enduring. They are:

- The security of the United States, its citizens, and U.S. allies and partners;

- A strong, innovative, and growing U.S. economy in an open international economic system that promotes opportunity and prosperity;

- Respect for universal values at home and around the world; and

- An international order advanced by U.S. leadership that promotes peace, security, and opportunity through stronger cooperation to meet global challenges.

Currently, the United States is focused on implementing a responsible transition as we end the war in Iraq, succeeding in Afghanistan, and defeating al-Qa'ida and its terrorist affiliates, while moving our economy from catastrophic recession to lasting recovery. As we confront these crises, our national strategy must take a longer view. We must build a stronger foundation for American leadership and work to better shape the outcomes that are most fundamental to our people in the 21st century.

## The Strategic Environment—The World as It Is

In the two decades since the end of the Cold War, the free flow of information, people, goods and services has accelerated at an unprecedented rate. This interconnection has empowered individuals for good and ill, and challenged state based international institutions that were largely designed in the wake of World War II by policymakers who had different challenges in mind. Nonstate actors can have a dramatic influence on the world around them. Economic growth has alleviated poverty and led to new centers of influence. More nations are asserting themselves regionally and globally. The lives of our citizens—their safety and prosperity—are more bound than ever to events beyond our borders.

Within this environment, the attacks of September 11, 2001, were a transformative event for the United States, demonstrating just how much trends far beyond our shores could directly endanger the personal safety of the American people. The attacks put into sharp focus America's position as the sole global superpower, the dangers of violent extremism, and the simmering conflicts that followed the peaceful conclusion of the Cold War. And they drew a swift and forceful response from the United States and our allies and partners in Afghanistan. This response was followed by our decision to go to war in Iraq, and the ensuing years have seen America's forces, resources, and national security strategy focused on these conflicts.

The United States is now fighting two wars with many thousands of our men and women deployed in harm's way, and hundreds of billions of dollars dedicated to funding these conflicts. In Iraq, we are supporting a transition of responsibility to the sovereign Iraqi Government. We are supporting the security and prosperity of our partners in Afghanistan and Pakistan as part of a broader campaign to disrupt, dismantle, and defeat al-Qa'ida and its violent extremist affiliates.

Yet these wars—and our global efforts to successfully counter violent extremism—are only one element of our strategic environment and cannot define America's engagement with the world. Terrorism is one of many threats that are more consequential in a global age. The gravest danger to the American people and global security continues to come from weapons of mass destruction, particularly nuclear weapons. The space and cyberspace capabilities that power our daily lives and military operations are vulnerable to disruption and attack. Dependence upon fossil fuels constrains our options and pollutes our environment. Climate change and pandemic disease threaten the security of regions and the health and safety of the American people. Failing states breed conflict and endanger regional and global security. Global criminal networks foment insecurity abroad and bring people and goods across our own borders that threaten our people.

The global economy is being reshaped by innovation, emerging economies, transition to low-carbon energy, and recovery from a catastrophic recession. The convergence of wealth and living standards among developed and emerging economies holds out the promise of more balanced global growth, but dramatic inequality persists within and among nations. Profound cultural and demographic tensions, rising demand for resources, and rapid urbanization could reshape single countries and entire regions. As the world grows more interconnected, more individuals are gaining awareness of their universal rights and have the capacity to pursue them. Democracies that respect the rights of their people remain successful states and America's most steadfast allies. Yet the advance of democracy and human rights has stalled in many parts of the world.

More actors exert power and influence. Europe is now more united, free, and at peace than ever before. The European Union has deepened its integration. Russia has reemerged in the international arena as a strong voice. China and India—the world's two most populous nations—are becoming more engaged globally. From Latin America to Africa to the Pacific, new and emerging powers hold out opportunities for partnership, even as a handful of states endanger regional and global security by flouting international norms. International institutions play a critical role in facilitating cooperation, but at times cannot effectively address new threats or seize new opportunities. Meanwhile, individuals, corporations, and civil society play an increasingly important role in shaping events around the world.

The United States retains the strengths that have enabled our leadership for many decades. Our society is exceptional in its openness, vast diversity, resilience, and engaged citizenry. Our private sector and civil society exhibit enormous ingenuity and innovation, and our workers are capable and dedicated. We have the world's largest economy and most powerful military, strong alliances and a vibrant cultural appeal, and a history of leadership in economic and social development. We continue to be a destination that is sought out by immigrants from around the world, who enrich our society. We have a transparent, accountable democracy and a dynamic and productive populace with deep connections to peoples around the world. And we continue to embrace a set of values that have enabled liberty and opportunity at home and abroad.

Now, the very fluidity within the international system that breeds new challenges must be approached as an opportunity to forge new international cooperation. We must rebalance our long-term priorities so that we successfully move beyond today's wars, and focus our attention and resources on a broader set of countries and challenges. We must seize on the opportunities afforded by the world's interconnection, while responding effectively and comprehensively to its dangers. And we must take advantage of the unparalleled connections that America's Government, private sector, and citizens have around the globe.

## The Strategic Approach—The World We Seek

In the past, the United States has thrived when both our nation and our national security policy have adapted to shape change instead of being shaped by it. For instance, as the industrial revolution took hold, America transformed our economy and our role in the world. When the world was confronted by fascism, America prepared itself to win a war and to shape the peace that followed. When the United States encountered an ideological, economic, and military threat from communism, we shaped our practices and institutions at home—and policies abroad—to meet this challenge. Now, we must once again position the United States to champion mutual interests among nations and peoples.

### *Building Our Foundation*

Our national security begins at home. What takes place within our borders has always been the source of our strength, and this is even truer in an age of interconnection.

First and foremost, we must renew the foundation of America's strength. In the long run, the welfare of the American people will determine America's strength in the world, particularly at a time when our own economy is inextricably linked to the global economy. Our prosperity serves as a wellspring for our power. It pays for our military, underwrites our diplomacy and development efforts, and serves as a leading source of our influence in the world. Moreover, our trade and investment supports millions of American jobs, forges links among countries, spurs global development, and contributes to a stable and peaceful political and economic environment.

Yet even as we have maintained our military advantage, our competitiveness has been set back in recent years. We are recovering from underinvestment in the areas that are central to America's strength. We have not adequately advanced priorities like education, energy, science and technology, and health care—all of which are essential to U.S. competitiveness, long-term prosperity, and strength. Years of rising fiscal and trade deficits will also necessitate hard choices in the years ahead.

That is why we are rebuilding our economy so that it will serve as an engine of opportunity for the American people, and a source of American influence abroad. The United States must ensure that we have the world's best-educated workforce, a private sector that fosters innovation, and citizens and businesses that can access affordable health care to compete in a globalized economy. We must transform the way that we use energy—diversifying supplies, investing in innovation, and deploying clean energy technologies. By doing so, we will enhance energy security, create jobs, and fight climate change.

Rebuilding our economy must include putting ourselves on a fiscally sustainable path. As such, implementing our national security strategy will require a disciplined approach to setting priorities and making tradeoffs among competing programs and activities. Taken together, these efforts will position our nation for success in the global marketplace, while also supporting our national security capacity—the strength of our military, intelligence, diplomacy and development, and the security and resilience of our homeland.

We are now moving beyond traditional distinctions between homeland and national security. National security draws on the strength and resilience of our citizens, communities, and economy. This includes a determination to prevent terrorist attacks against the American people by fully coordinating the actions that we take abroad with the actions and precautions that we take at home. It must also include a commitment to building a more secure and resilient nation, while maintaining open flows of goods and people. We will continue to develop the capacity to address the threats and hazards that confront us, while redeveloping our infrastructure to secure our people and work cooperatively with other nations.

America's example is also a critical component of our foundation. The human rights which America has stood for since our founding have enabled our leadership, provided a source of inspiration for peoples around the world, and drawn a clear contrast between the United States and our democratic allies, and those nations and individuals that deny or suppress human rights. Our efforts to live our own values, and uphold the principles of democracy in our own society, underpin our support for the aspirations of the oppressed abroad, who know they can turn to America for leadership based on justice and hope.

Our moral leadership is grounded principally in the power of our example—not through an effort to impose our system on other peoples. Yet over the years, some methods employed in pursuit of our security have compromised our fidelity to the values that we promote, and our leadership on their behalf. This undercuts our ability to support democratic movements abroad, challenge nations that violate international human rights norms, and apply our broader leadership for good in the world. That is why we will lead on behalf of our values by living them. Our struggle to stay true to our values and Constitution has always been a lodestar, both to the American people and to those who share our aspiration for human dignity.

Our values have allowed us to draw the best and brightest to our shores, to inspire those who share our cause abroad, and to give us the credibility to stand up to tyranny. America must demonstrate through words and deeds the resilience of our values and Constitution. For if we compromise our values in pursuit of security, we will undermine both; if we fortify them, we will sustain a key source of our strength and leadership in the world—one that sets us apart from our enemies and our potential competitors.

## *Pursuing Comprehensive Engagement*

Our foundation will support our efforts to engage nations, institutions, and peoples around the world on the basis of mutual interests and mutual respect.

Engagement is the active participation of the United States in relationships beyond our borders. It is, quite simply, the opposite of a self-imposed isolation that denies us the ability to shape outcomes. Indeed, America has never succeeded through isolationism. As the nation that helped to build our international system after World War II and to bring about the globalization that came with the end of the Cold War, we must reengage the world on a comprehensive and sustained basis.

Engagement begins with our closest friends and allies—from Europe to Asia; from North America to the Middle East. These nations share a common history of struggle on behalf of security, prosperity, and democracy. They share common values and a common commitment to international norms that recognize both the rights and responsibilities of all sovereign nations. America's national security depends on these vibrant alliances, and we must engage them as active partners in addressing global and regional security priorities and harnessing new opportunities to advance common interests. For instance, we pursue close and regular collaboration with our close allies the United Kingdom, France, and Germany on issues of mutual and global concern.

We will continue to deepen our cooperation with other 21st century centers of influence—including China, India, and Russia—on the basis of mutual interests and mutual respect. We will also pursue diplomacy and development that supports the emergence of new and successful partners, from the Americas to Africa; from the Middle East to Southeast Asia. Our ability to advance constructive cooperation is essential to the security and prosperity of specific regions, and to facilitating global cooperation on issues ranging from violent extremism and nuclear proliferation, to climate change, and global economic instability—issues that challenge all nations, but that no one nation alone can meet.

To adversarial governments, we offer a clear choice: abide by international norms, and achieve the political and economic benefits that come with greater integration with the international community; or refuse to accept this pathway, and bear the consequences of that decision, including greater isolation. Through engagement, we can create opportunities to resolve differences, strengthen the international community's support for our actions, learn about the intentions and nature of closed regimes, and plainly demonstrate to the publics within those nations that their governments are to blame for their isolation.

Successful engagement will depend upon the effective use and integration of different elements of American power. Our diplomacy and development capabilities must help prevent conflict, spur economic growth, strengthen weak and failing states, lift people out of poverty, combat climate change and epidemic disease, and strengthen institutions of democratic governance. Our military will continue strengthening its capacity to partner with foreign counterparts, train and assist security forces, and pursue military-to-military ties with a broad range of governments. We will continue to foster economic and financial transactions to advance our shared prosperity. And our intelligence and law enforcement agencies must cooperate effectively with foreign governments to anticipate events, respond to crises, and provide safety and security.

Finally, we will pursue engagement among peoples—not just governments—around the world. The United States Government will make a sustained effort to engage civil society and citizens and facilitate increased connections among the American people and peoples around the world—through efforts ranging from public service and educational exchanges, to increased commerce and private sector partnerships. In many instances, these modes of engagement have a powerful and enduring impact beyond our borders, and are a cost-effective way of projecting a positive vision of American leadership. Time and again, we have seen that the best ambassadors for American values and interests are the American people—our businesses, nongovernmental organizations, scientists, athletes, artists, military service members, and students.

Facilitating increased international engagement outside of government will help prepare our country to thrive in a global economy, while building the goodwill and relationships that are invaluable to sustaining American leadership. It also helps leverage strengths that are unique to America—our diversity and diaspora populations, our openness and creativity, and the values that our people embody in their own lives.

## *Promoting a Just and Sustainable International Order*

Our engagement will underpin a just and sustainable international order—just, because it advances mutual interests, protects the rights of all, and holds accountable those who refuse to meet their responsibilities; sustainable because it is based on broadly shared norms and fosters collective action to address common challenges.

This engagement will pursue an international order that recognizes the rights and responsibilities of all nations. As we did after World War II, we must pursue a rules-based international system that can advance our own interests by serving mutual interests. International institutions must be more effective and representative of the diffusion of influence in the 21st century. Nations must have incentives to behave responsibly, or be isolated when they do not. The test of this international order must be the cooperation it facilitates and the results it generates—the ability of nations to come together to confront common challenges like violent extremism, nuclear proliferation, climate change, and a changing global economy.

That is precisely the reason we should strengthen enforcement of international law and our commitment to engage and modernize international institutions and frameworks. Those nations that refuse to meet their responsibilities will forsake the opportunities that come with international cooperation. Credible and effective alternatives to military action—from sanctions to isolation—must be strong enough to change behavior, just as we must reinforce our alliances and our military capabilities. And if nations challenge or undermine an international order that is based upon rights and responsibilities, they must find themselves isolated.

We succeeded in the post-World War II era by pursuing our interests within multilateral forums like the United Nations—not outside of them. We recognized that institutions that aggregated the national interests of many nations would never be perfect; but we also saw that they were an indispensable vehicle for pooling international resources and enforcing international norms. Indeed, the basis for international

cooperation since World War II has been an architecture of international institutions, organizations, regimes, and standards that establishes certain rights and responsibilities for all sovereign nations.

In recent years America's frustration with international institutions has led us at times to engage the United Nations (U.N.) system on an ad hoc basis. But in a world of transnational challenges, the United States will need to invest in strengthening the international system, working from inside international institutions and frameworks to face their imperfections head on and to mobilize transnational cooperation.

We must be clear-eyed about the factors that have impeded effectiveness in the past. In order for collective action to be mobilized, the polarization that persists across region, race, and religion will need to be replaced by a galvanizing sense of shared interest. Swift and effective international action often turns on the political will of coalitions of countries that comprise regional or international institutions. New and emerging powers who seek greater voice and representation will need to accept greater responsibility for meeting global challenges. When nations breach agreed international norms, the countries who espouse those norms must be convinced to band together to enforce them.

We will expand our support to modernizing institutions and arrangements such as the evolution of the G-8 to the G-20 to reflect the realities of today's international environment. Working with the institutions and the countries that comprise them, we will enhance international capacity to prevent conflict, spur economic growth, improve security, combat climate change, and address the challenges posed by weak and failing states. And we will challenge and assist international institutions and frameworks to reform when they fail to live up to their promise. Strengthening the legitimacy and authority of international law and institutions, especially the U.N., will require a constant struggle to improve performance.

Furthermore, our international order must recognize the increasing influence of individuals in today's world. There must be opportunities for civil society to thrive within nations and to forge connections among them. And there must be opportunities for individuals and the private sector to play a major role in addressing common challenges—whether supporting a nuclear fuel bank, promoting global health, fostering entrepreneurship, or exposing violations of universal rights. In the 21st century, the ability of individuals and nongovernment actors to play a positive role in shaping the international environment represents a distinct opportunity for the United States.

Within this context, we know that an international order where every nation upholds its rights and responsibilities will remain elusive. Force will sometimes be necessary to confront threats. Technology will continue to bring with it new dangers. Poverty and disease will not be completely abolished. Oppression will always be with us. But if we recognize these challenges, embrace America's responsibility to confront them with its partners, and forge new cooperative approaches to get others to join us in overcoming them, then the international order of a globalized age can better advance our interests and the common interests of nations and peoples everywhere.

## Strengthening National Capacity—A Whole of Government Approach

To succeed, we must update, balance, and integrate all of the tools of American power and work with our allies and partners to do the same. Our military must maintain its conventional superiority and, as long as nuclear weapons exist, our nuclear deterrent capability, while continuing to enhance its capacity to defeat asymmetric threats, preserve access to the global commons, and strengthen partners. We must invest in diplomacy and development capabilities and institutions in a way that complements and reinforces our global partners. Our intelligence capabilities must continuously evolve to identify and characterize conventional and asymmetric threats and provide timely insight. And we must integrate our approach to homeland security with our broader national security approach.

We are improving the integration of skills and capabilities within our military and civilian institutions, so they complement each other and operate seamlessly. We are also improving coordinated planning and policymaking and must build our capacity in key areas where we fall short. This requires close coopera-tion with Congress and a deliberate and inclusive interagency process, so that we achieve integration of our efforts to implement and monitor operations, policies, and strategies. To initiate this effort, the White House merged the staffs of the National Security Council and Homeland Security Council.

However, work remains to foster coordination across departments and agencies. Key steps include more effectively ensuring alignment of resources with our national security strategy, adapting the education and training of national security professionals to equip them to meet modern challenges, reviewing authorities and mechanisms to implement and coordinate assistance programs, and other policies and programs that strengthen coordination.

- **Defense:** We are strengthening our military to ensure that it can prevail in today's wars; to prevent and deter threats against the United States, its interests, and our allies and partners; and prepare to defend the United States in a wide range of contingencies against state and nonstate actors. We will continue to rebalance our military capabilities to excel at counterterrorism, counterinsurgency, stability operations, and meeting increasingly sophisticated security threats, while ensuring our force is ready to address the full range of military operations. This includes preparing for increasingly sophisticated adversaries, deterring and defeating aggression in anti-access environments, and defending the United States and supporting civil authorities at home. The most valuable component of our national defense is the men and women who make up America's all-volunteer force. They have shown tremendous resilience, adapt-ability, and capacity for innovation, and we will provide our service members with the resources that they need to succeed and rededicate ourselves to providing support and care for wounded warriors, veterans, and military families. We must set the force on a path to sustainable deployment cycles and preserve and enhance the long-term viability of our force through successful recruitment, retention, and recognition of those who serve.

- **Diplomacy:** Diplomacy is as fundamental to our national security as our defense capability. Our diplo-mats are the first line of engagement, listening to our partners, learning from them, building respect for one another, and seeking common ground. Diplomats, development experts, and others in the United States Government must be able to work side by side to support a common agenda. New skills are needed to foster effective interaction to convene, connect, and mobilize not only other governments and international organizations, but also nonstate actors such as corporations, foundations, nongovern-mental organizations, universities, think tanks, and faith-based organizations, all of whom increasingly have a distinct role to play on both diplomatic and development issues. To accomplish these goals our

diplomatic personnel and missions must be expanded at home and abroad to support the increasingly transnational nature of 21st century security challenges. And we must provide the appropriate authorities and mechanisms to implement and coordinate assistance programs and grow the civilian expeditionary capacity required to assist governments on a diverse array of issues.

• **Economic:** Our economic institutions are crucial components of our national capacity and our economic instruments are the bedrock of sustainable national growth, prosperity and influence. The Office of Management and Budget, Departments of the Treasury, State, Commerce, Energy, and Agriculture, United States Trade Representative, Federal Reserve Board, and other institutions help manage our currency, trade, foreign investment, deficit, inflation, productivity, and national competitiveness. Remaining a vibrant 21st century economic power also requires close cooperation between and among developed nations and emerging markets because of the interdependent nature of the global economy. America—like other nations—is dependent upon overseas markets to sell its exports and maintain access to scarce commodities and resources. Thus, finding overlapping mutual economic interests with other nations and maintaining those economic relationships are key elements of our national security strategy.

• **Development:** Development is a strategic, economic, and moral imperative. We are focusing on assisting developing countries and their people to manage security threats, reap the benefits of global economic expansion, and set in place accountable and democratic institutions that serve basic human needs. Through an aggressive and affirmative development agenda and commensurate resources, we can strengthen the regional partners we need to help us stop conflicts and counter global criminal networks; build a stable, inclusive global economy with new sources of prosperity; advance democracy and human rights; and ultimately position ourselves to better address key global challenges by growing the ranks of prosperous, capable, and democratic states that can be our partners in the decades ahead. To do this, we are expanding our civilian development capability; engaging with international financial institutions that leverage our resources and advance our objectives; pursuing a development budget that more deliberately reflects our policies and our strategy, not sector earmarks; and ensuring that our policy instruments are aligned in support of development objectives.

• **Homeland Security:** Homeland security traces its roots to traditional and historic functions of government and society, such as civil defense, emergency response, law enforcement, customs, border patrol, and immigration. In the aftermath of 9/11 and the foundation of the Department of Homeland Security, these functions have taken on new organization and urgency. Homeland security, therefore, strives to adapt these traditional functions to confront new threats and evolving hazards. It is not simply about government action alone, but rather about the collective strength of the entire country. Our approach relies on our shared efforts to identify and interdict threats; deny hostile actors the ability to operate within our borders; maintain effective control of our physical borders; safeguard lawful trade and travel into and out of the United States; disrupt and dismantle transnational terrorist, and criminal organizations; and ensure our national resilience in the face of the threat and hazards. Taken together, these efforts must support a homeland that is safe and secure from terrorism and other hazards and in which American interests, aspirations, and way of life can thrive.

• **Intelligence:** Our country's safety and prosperity depend on the quality of the intelligence we collect and the analysis we produce, our ability to evaluate and share this information in a timely manner, and our ability to counter intelligence threats. This is as true for the strategic intelligence that informs executive decisions as it is for intelligence support to homeland security, state, local, and tribal govern-

ments, our troops, and critical national missions. We are working to better integrate the Intelligence Community, while also enhancing the capabilities of our Intelligence Community members. We are strengthening our partnerships with foreign intelligence services and sustaining strong ties with our close allies. And we continue to invest in the men and women of the Intelligence Community.

• Strategic Communications: Across all of our efforts, effective strategic communications are essential to sustaining global legitimacy and supporting our policy aims. Aligning our actions with our words is a shared responsibility that must be fostered by a culture of communication throughout government. We must also be more effective in our deliberate communication and engagement and do a better job understanding the attitudes, opinions, grievances, and concerns of peoples—not just elites—around the world. Doing so allows us to convey credible, consistent messages and to develop effective plans, while better understanding how our actions will be perceived. We must also use a broad range of methods for communicating with foreign publics, including new media.

• The American People and the Private Sector: The ideas, values, energy, creativity, and resilience of our citizens are America's greatest resource. We will support the development of prepared, vigilant, and engaged communities and underscore that our citizens are the heart of a resilient country. And we must tap the ingenuity outside government through strategic partnerships with the private sector, nongovernmental organizations, foundations, and community-based organizations. Such partnerships are critical to U.S. success at home and abroad, and we will support them through enhanced opportunities for engagement, coordination, transparency, and information sharing.



# III. Advancing Our Interests

To achieve the world we seek, the United States must apply our strategic approach in pursuit of four enduring national interests:

- **Security:** The security of the United States, its citizens, and U.S. allies and partners.

- **Prosperity:** A strong, innovative, and growing U.S. economy in an open international economic system that promotes opportunity and prosperity.

- **Values:** Respect for universal values at home and around the world.

- **International Order:** An international order advanced by U.S. leadership that promotes peace, security, and opportunity through stronger cooperation to meet global challenges.

Each of these interests is inextricably linked to the others: no single interest can be pursued in isolation, but at the same time, positive action in one area will help advance all four. The initiatives described below do not encompass all of America's national security concerns. However, they represent areas of particular priority and areas where progress is critical to securing our country and renewing American leadership in the years to come.

## Security

*"We will not apologize for our way of life, nor will we waver in its defense. And for those who seek to advance their aims by inducing terror and slaughtering innocents, we say to you now that our spirit is stronger and cannot be broken—you cannot outlast us, and we will defeat you."*

—President Barack Obama, Inaugural Address, January 20, 2009

—

The threats to our people, our homeland, and our interests have shifted dramatically in the last 20 years. Competition among states endures, but instead of a single nuclear adversary, the United States is now threatened by the potential spread of nuclear weapons to extremists who may not be deterred from using them. Instead of a hostile expansionist empire, we now face a diverse array of challenges, from a loose network of violent extremists to states that flout international norms or face internal collapse. In addition to facing enemies on traditional battlefields, the United States must now be prepared for asymmetric threats, such as those that target our reliance on space and cyberspace.

This Administration has no greater responsibility than protecting the American people. Furthermore, we embrace America's unique responsibility to promote international security—a responsibility that flows from our commitments to allies, our leading role in supporting a just and sustainable international order, and our unmatched military capabilities.

The United States remains the only nation able to project and sustain large-scale military operations over extended distances. We maintain superior capabilities to deter and defeat adaptive enemies and

to ensure the credibility of security partnerships that are fundamental to regional and global security. In this way, our military continues to underpin our national security and global leadership, and when we use it appropriately, our security and leadership is reinforced. But when we overuse our military might, or fail to invest in or deploy complementary tools, or act without partners, then our military is overstretched, Americans bear a greater burden, and our leadership around the world is too narrowly identified with military force. And we know that our enemies aim to overextend our Armed Forces and to drive wedges between us and those who share our interests.

Therefore, we must continue to adapt and rebalance our instruments of statecraft. At home, we are integrating our homeland security efforts seamlessly with other aspects of our national security approach, and strengthening our preparedness and resilience. Abroad, we are strengthening alliances, forging new partnerships, and using every tool of American power to advance our objectives—including enhanced diplomatic and development capabilities with the ability both to prevent conflict and to work alongside our military. We are strengthening international norms to isolate governments that flout them and to marshal cooperation against nongovernmental actors who endanger our common security.

## Strengthen Security and Resilience at Home

At home, the United States is pursuing a strategy capable of meeting the full range of threats and hazards to our communities. These threats and hazards include terrorism, natural disasters, large-scale cyber attacks, and pandemics. As we do everything within our power to prevent these dangers, we also recognize that we will not be able to deter or prevent every single threat. That is why we must also enhance our resilience—the ability to adapt to changing conditions and prepare for, withstand, and rapidly recover from disruption. To keep Americans safe and secure at home, we are working to:

Enhance Security at Home: Security at home relies on our shared efforts to prevent and deter attacks by identifying and interdicting threats, denying hostile actors the ability to operate within our borders, protecting the nation's critical infrastructure and key resources, and securing cyberspace. That is why we are pursuing initiatives to protect and reduce vulnerabilities in critical infrastructure, at our borders, ports, and airports, and to enhance overall air, maritime, transportation, and space and cyber security. Building on this foundation, we recognize that the global systems that carry people, goods, and data around the globe also facilitate the movement of dangerous people, goods, and data. Within these systems of transportation and transaction, there are key nodes—for example, points of origin and transfer, or border crossings—that represent opportunities for exploitation and interdiction. Thus, we are working with partners abroad to confront threats that often begin beyond our borders. And we are developing lines of coordination at home across Federal, state, local, tribal, territorial, nongovernmental, and private-sector partners, as well as individuals and communities.

Effectively Manage Emergencies: We are building our capability to prepare for disasters to reduce or eliminate long-term effects to people and their property from hazards and to respond to and recover from major incidents. To improve our preparedness, we are integrating domestic all hazards planning at all levels of government and building key capabilities to respond to emergencies. We continue to collaborate with communities to ensure preparedness efforts are integrated at all levels of government with the private and nonprofit sectors. We are investing in operational capabilities and equipment, and

improving the reliability and interoperability of communications systems for first responders. We are encouraging domestic regional planning and integrated preparedness programs and will encourage government at all levels to engage in long-term recovery planning. It is critical that we continually test and improve plans using exercises that are realistic in scenario and consequences.

Empowering Communities to Counter Radicalization: Several recent incidences of violent extremists in the United States who are committed to fighting here and abroad have underscored the threat to the United States and our interests posed by individuals radicalized at home. Our best defenses against this threat are well informed and equipped families, local communities, and institutions. The Federal Government will invest in intelligence to understand this threat and expand community engagement and development programs to empower local communities. And the Federal Government, drawing on the expertise and resources from all relevant agencies, will clearly communicate our policies and intentions, listening to local concerns, tailoring policies to address regional concerns, and making clear that our diversity is part of our strength—not a source of division or insecurity.

Improve Resilience Through Increased Public-Private Partnerships: When incidents occur, we must show resilience by maintaining critical operations and functions, returning to our normal life, and learning from disasters so that their lessons can be translated into pragmatic changes when necessary. The private sector, which owns and operates most of the nation's critical infrastructure, plays a vital role in preparing for and recovering from disasters. We must, therefore, strengthen public-private partnerships by developing incentives for government and the private sector to design structures and systems that can withstand disruptions and mitigate associated consequences, ensure redundant systems where necessary to maintain the ability to operate, decentralize critical operations to reduce our vulnerability to single points of disruption, develop and test continuity plans to ensure the ability to restore critical capabilities, and invest in improvements and maintenance of existing infrastructure.

Engage with Communities and Citizens: We will emphasize individual and community preparedness and resilience through frequent engagement that provides clear and reliable risk and emergency information to the public. A key part of this effort is providing practical steps that all Americans can take to protect themselves, their families, and their neighbors. This includes transmitting information through multiple pathways and to those with special needs. In addition, we support efforts to develop a nationwide public safety broadband network. Our efforts to inform and empower Americans and their communities recognize that resilience has always been at the heart of the American spirit.

## Disrupt, Dismantle, and Defeat Al-Qa'ida and its Violent Extremist Affiliates in Afghanistan, Pakistan, and Around the World

The United States is waging a global campaign against al-Qa'ida and its terrorist affiliates. To disrupt, dismantle and defeat al-Qa'ida and its affiliates, we are pursuing a strategy that protects our homeland, secures the world's most dangerous weapons and material, denies al-Qa'ida safe haven, and builds positive partnerships with Muslim communities around the world. Success requires a broad, sustained, and integrated campaign that judiciously applies every tool of American power—both military and civilian—as well as the concerted efforts of like-minded states and multilateral institutions.

We will always seek to delegitimize the use of terrorism and to isolate those who carry it out. Yet this is not a global war against a tactic—terrorism or a religion—Islam. We are at war with a specific network, al-Qa'ida, and its terrorist affiliates who support efforts to attack the United States, our allies, and partners.

Prevent Attacks on and in the Homeland: To prevent acts of terrorism on American soil, we must enlist all of our intelligence, law enforcement, and homeland security capabilities. We will continue to integrate and leverage state and major urban area fusion centers that have the capability to share classified information; establish a nationwide framework for reporting suspicious activity; and implement an integrated approach to our counterterrorism information systems to ensure that the analysts, agents, and officers who protect us have access to all relevant intelligence throughout the government. We are improving information sharing and cooperation by linking networks to facilitate Federal, state, and local capabilities to seamlessly exchange messages and information, conduct searches, and collaborate. We are coordinating better with foreign partners to identify, track, limit access to funding, and prevent terrorist travel. Recognizing the inextricable link between domestic and transnational security, we will collaborate bilaterally, regionally, and through international institutions to promote global efforts to prevent terrorist attacks.

Strengthen Aviation Security: We know that the aviation system has been a particular target of al-Qa'ida and its affiliates. We must continue to bolster aviation security worldwide through a focus on increased information collection and sharing, stronger passenger vetting and screening measures, the development and development of advanced screening technologies, and cooperation with the international community to strengthen aviation security standards and efforts around the world.

Deny Terrorists Weapons of Mass Destruction: To prevent acts of terrorism with the world's most dangerous weapons, we are dramatically accelerating and intensifying efforts to secure all vulnerable nuclear materials by the end of 2013, and to prevent the spread of nuclear weapons. We will also take actions to safeguard knowledge and capabilities in the life and chemical sciences that could be vulnerable to misuse.

Deny Al-Qa'ida the Ability to Threaten the American People, Our Allies, Our Partners and Our Interests Overseas: Al-Qa'ida and its allies must not be permitted to gain or retain any capacity to plan and launch international terrorist attacks, especially against the U.S. homeland. Al Qa'ida's core in Pakistan remains the most dangerous component of the larger network, but we also face a growing threat from the group's allies worldwide. We must deny these groups the ability to conduct operational plotting from any locale, or to recruit, train, and position operatives, including those from Europe and North America.

Afghanistan and Pakistan: This is the epicenter of the violent extremism practiced by al Qa'ida. The danger from this region will only grow if its security slides backward, the Taliban controls large swaths of Afghanistan, and al-Qa'ida is allowed to operate with impunity. To prevent future attacks on the United States, our allies, and partners, we must work with others to keep the pressure on al-Qa'ida and increase the security and capacity of our partners in this region.

In Afghanistan, we must deny al-Qa'ida a safe haven, deny the Taliban the ability to overthrow the government, and strengthen the capacity of Afghanistan's security forces and government so that they can take lead responsibility for Afghanistan's future. Within Pakistan, we are working with the government to address the local, regional, and global threat from violent extremists.

III. ADVANCING OUR INTERESTS

We will achieve these objectives with a strategy comprised of three components.

- First, our military and International Security Assistance Force (ISAF) partners within Afghanistan are targeting the insurgency, working to secure key population centers, and increasing efforts to train Afghan security forces. These military resources will allow us to create the conditions to transition to Afghan responsibility. In July 2011, we will begin reducing our troops responsibly, taking into account conditions on the ground. We will continue to advise and assist Afghanistan's Security Forces so that they can succeed over the long term.

- Second, we will continue to work with our partners, the United Nations, and the Afghan Government to improve accountable and effective governance. As we work to advance our strategic partnership with the Afghan Government, we are focusing assistance on supporting the President of Afghanistan and those ministries, governors, and local leaders who combat corruption and deliver for the people. Our efforts will be based upon performance, and we will measure progress. We will also target our assistance to areas that can make an immediate and enduring impact in the lives of the Afghan people, such as agriculture, while supporting the human rights of all of Afghanistan's people—women and men. This will support our long-term commitment to a relationship between our two countries that supports a strong, stable, and prosperous Afghanistan.

- Third, we will foster a relationship with Pakistan founded upon mutual interests and mutual respect. To defeat violent extremists who threaten both of our countries, we will strengthen Pakistan's capacity to target violent extremists within its borders, and continue to provide security assistance to support those efforts. To strengthen Pakistan's democracy and development, we will provide substantial assistance responsive to the needs of the Pakistani people, and sustain a long-term partnership committed to Pakistan's future. The strategic partnership that we are developing with Pakistan includes deepening cooperation in a broad range of areas, addressing both security and civilian challenges, and we will continue to expand those ties through our engagement with Pakistan in the years to come.

Deny Safe Havens and Strengthen At-Risk States: Wherever al-Qa'ida or its terrorist affiliates attempt to establish a safe haven—as they have in Yemen, Somalia, the Maghreb, and the Sahel—we will meet them with growing pressure. We also will strengthen our own network of partners to disable al-Qa'ida's financial, human, and planning networks; disrupt terrorist operations before they mature; and address potential safe-havens before al-Qa'ida and its terrorist affiliates can take root. These efforts will focus on information-sharing, law enforcement cooperation, and establishing new practices to counter evolving adversaries. We will also help states avoid becoming terrorist safe havens by helping them build their capacity for responsible governance and security through development and security sector assistance.

Deliver Swift and Sure Justice: To effectively detain, interrogate, and prosecute terrorists, we need durable legal approaches consistent with our security and our values. We adhere to several principles: we will leverage all available information and intelligence to disrupt attacks and dismantle al-Qa'ida and affiliated terrorist organizations; we will bring terrorists to justice; we will act in line with the rule of law and due process; we will submit decisions to checks and balances and accountability; and we will insist that matters of detention and secrecy are addressed in a manner consistent with our Constitution and

laws. To deny violent extremists one of their most potent recruitment tools, we will close the prison at Guantanamo Bay.

**Resist Fear and Overreaction:** The goal of those who perpetrate terrorist attacks is in part to sow fear. If we respond with fear, we allow violent extremists to succeed far beyond the initial impact of their attacks, or attempted attacks—altering our society and enlarging the standing of al-Qa'ida and its terrorist affiliates far beyond its actual reach. Similarly, overreacting in a way that creates fissures between America and certain regions or religions will undercut our leadership and make us less safe.

**Contrast Al-Qa'ida's Intent to Destroy with Our Constructive Vision:** While violent extremists seek to destroy, we will make clear our intent to build. We are striving to build bridges among people of different faiths and regions. We will continue to work to resolve the Arab-Israeli conflict, which has long been a source of tension. We will continue to stand up for the universal rights of all people, even for those with whom we disagree. We are developing new partnerships in Muslim communities around the world on behalf of health, education, science, employment, and innovation. And through our broader emphasis on Muslim engagement, we will communicate our commitment to support the aspirations of all people for security and opportunity. Finally, we reject the notion that al-Qa'ida represents any religious authority. They are not religious leaders, they are killers; and neither Islam nor any other religion condones the slaughter of innocents.

---

**Use of Force**

Military force, at times, may be necessary to defend our country and allies or to preserve broader peace and security, including by protecting civilians facing a grave humanitarian crisis. We will draw on diplomacy, development, and international norms and institutions to help resolve disagreements, prevent conflict, and maintain peace, mitigating where possible the need for the use of force. This means credibly underwriting U.S. defense commitments with tailored approaches to deterrence and ensuring the U.S. military continues to have the necessary capabilities across all domains—land, air, sea, space, and cyber. It also includes helping our allies and partners build capacity to fulfill their responsibilities to contribute to regional and global security.

While the use of force is sometimes necessary, we will exhaust other options before war whenever we can, and carefully weigh the costs and risks of action against the costs and risks of inaction. When force is necessary, we will continue to do so in a way that reflects our values and strengthens our legitimacy, and we will seek broad international support, working with such institutions as NATO and the U.N. Security Council.

The United States must reserve the right to act unilaterally if necessary to defend our nation and our interests, yet we will also seek to adhere to standards that govern the use of force. Doing so strengthens those who act in line with international standards, while isolating and weakening those who do not. We will also outline a clear mandate and specific objectives and thoroughly consider the consequences —intended and unintended—of our actions. And the United States will take care when sending the men and women of our Armed Forces into harm's way to ensure they have the leadership, training, and equipment they require to accomplish their mission.

## Reverse the Spread of Nuclear and Biological Weapons and Secure Nuclear Materials

The American people face no greater or more urgent danger than a terrorist attack with a nuclear weapon. And international peace and security is threatened by proliferation that could lead to a nuclear exchange. Indeed, since the end of the Cold War, the risk of a nuclear attack has increased. Excessive Cold War stockpiles remain. More nations have acquired nuclear weapons. Testing has continued. Black markets trade in nuclear secrets and materials. Terrorists are determined to buy, build, or steal a nuclear weapon. Our efforts to contain these dangers are centered in a global nonproliferation regime that has frayed as more people and nations break the rules.

That is why reversing the spread of nuclear weapons is a top priority. Success depends upon broad consensus and concerted action, we will move forward strategically on a number of fronts through our example, our partnerships, and a reinvigorated international regime. The United States will:

Pursue the Goal of a World Without Nuclear Weapons: While this goal will not be reached during this Administration, its active pursuit and eventual achievement will increase global security, keep our commitment under the NPT, build our cooperation with Russia and other states, and increase our credibility to hold others accountable for their obligations. As long as any nuclear weapons exist, the United States will sustain a safe, secure, and effective nuclear arsenal, both to deter potential adversaries and to assure U.S. allies and other security partners that they can count on America's security commitments. But we have signed and seek to ratify a landmark New START Treaty with Russia to substantially limit our deployed nuclear warheads and strategic delivery vehicles, while assuring a comprehensive monitoring regime. We are reducing the role of nuclear weapons in our national security approach, extending a negative security assurance not to use or threaten to use nuclear weapons against those nonnuclear nations that are in compliance with the NPT and their nuclear nonproliferation obligations, and investing in the modernization of a safe, secure, and effective stockpile without the production of new nuclear weapons. We will pursue ratification of the Comprehensive Test Ban Treaty. And we will seek a new treaty that verifiably ends the production of fissile materials intended for use in nuclear weapons.

Strengthen the Nuclear Non-Proliferation Treaty: The basic bargain of the NPT is sound: countries with nuclear weapons will move toward disarmament; countries without nuclear weapons will forsake them; and all countries can access peaceful nuclear energy. To strengthen the NPT, we will seek more resources and authority for international inspections. We will develop a new framework for civil nuclear cooperation. As members of the Global Nuclear Energy Partnership have agreed, one important element of an enhanced framework could be cradle-to-grave nuclear fuel management. We will pursue a broad, international consensus to insist that all nations meet their obligations. And we will also pursue meaningful consequences for countries that fail to meet their obligations under the NPT or to meet the requirements for withdrawing from it.

Present a Clear Choice to Iran and North Korea: The United States will pursue the denuclearization of the Korean peninsula and work to prevent Iran from developing a nuclear weapon. This is not about singling out nations—it is about the responsibilities of all nations and the success of the nonproliferation regime. Both nations face a clear choice. If North Korea eliminates its nuclear weapons program, and Iran meets its international obligations on its nuclear program, they will be able to proceed on a path to greater

political and economic integration with the international community. If they ignore their international obligations, we will pursue multiple means to increase their isolation and bring them into compliance with international nonproliferation norms.

Secure Vulnerable Nuclear Weapons and Material: The Global Nuclear Security Summit of 2010 rallied 47 nations behind the goal of securing all nuclear materials from terrorist groups. By the end of 2013, we will seek to complete a focused international effort to secure all vulnerable nuclear material around the world through enhanced protection and accounting practices, expanded cooperation with and through international institutions, and new partnerships to lock down these sensitive materials. To detect and intercept nuclear materials in transit, and to stop the illicit trade in these technologies, we will work to turn programs such as the Proliferation Security Initiative and the Global Initiative to Combat Nuclear Terrorism into durable international efforts. And we will sustain broad-based cooperation with other nations and international institutions to ensure the continued improvements necessary to protect nuclear materials from evolving threats.

Support Peaceful Nuclear Energy: As countries move increasingly to tap peaceful nuclear energy to provide power generation while advancing climate goals, the world must develop an infrastructure in the countries that seek to use nuclear energy for their energy security needs and climate goals to ensure that nuclear energy is developed in a safer manner. We will do so by promoting safety through regulatory bodies and training of operators, promoting physical security to prevent terrorist acts, and assuring safe and secure handling of fuel at the front and back ends of the nuclear fuel cycle.

Counter Biological Threats: The effective dissemination of a lethal biological agent within a population center would endanger the lives of hundreds of thousands of people and have unprecedented economic, societal, and political consequences. We must continue to work at home with first responders and health officials to reduce the risk associated with unintentional or deliberate outbreaks of infectious disease and to strengthen our resilience across the spectrum of high-consequence biological threats. We will work with domestic and international partners to protect against biological threats by promoting global health security and reinforcing norms of safe and responsible conduct; obtaining timely and accurate insight on current and emerging risks; taking reasonable steps to reduce the potential for exploitation; expanding our capability to prevent, attribute, and apprehend those who carry out attacks; communicating effectively with all stakeholders; and helping to transform the international dialogue on biological threats.

## Advance Peace, Security, and Opportunity in the Greater Middle East

The United States has important interests in the greater Middle East. They include broad cooperation on a wide range of issues with our close friend, Israel, and an unshakable commitment to its security; the achievement of the Palestinian people's legitimate aspirations for statehood, opportunity, and the realization of their extraordinary potential; the unity and security of Iraq and the fostering of its democracy and reintegration into the region; the transformation of Iranian policy away from its pursuit of nuclear weapons, support for terrorism, and threats against its neighbors; nonproliferation; and counterterrorism cooperation, access to energy, and integration of the region into global markets.

At the same time, our engagement must be both comprehensive and strategic. It should extend beyond near-term threats by appealing to peoples' aspirations for justice, education, and opportunity and by pursuing a positive and sustainable vision of U.S. partnership with the region. Furthermore, our relationship with our Israeli and Arab friends and partners in the region extends beyond our commitment to its security and includes the continued ties we share in areas such as trade, exchanges, and cooperation on a broad range of issues.

Complete a Responsible Transition as We End the War in Iraq: The war in Iraq presents a distinct and important challenge to the United States, the international community, the Iraqi people, and the region. America's servicemen and women, along with our coalition partners, have performed remarkably in fighting determined enemies and have worked with our civilians to help the Iraqi people regain control of their own destiny. Going forward, we have a responsibility, for our own security and the security of the region, to successfully end the war through a full transition to Iraqi responsibility. We will cultivate an enduring relationship with Iraq based on mutual interests and mutual respect.

Our goal is an Iraq that is sovereign, stable, and self-reliant. To achieve that goal, we are continuing to promote an Iraqi Government that is just, representative, and accountable and that denies support and safe haven to terrorists. The United States will pursue no claim on Iraqi territory or resources, and we will keep our commitments to Iraq's democratically elected government. These efforts will build new ties of trade and commerce between Iraq and the world, enable Iraq to assume its rightful place in the community of nations, and contribute to the peace and security of the region.

We are pursuing these objectives with a strategy that has three core components.

- **Transition Security:** First, we are transitioning security to full Iraqi responsibility. We will end the combat mission in Iraq by the end of August 2010. We will continue to train, equip, and advise Iraqi Security Forces; conduct targeted counterterrorism missions; and protect ongoing civilian and military efforts in Iraq. And, consistent with our commitments to the Iraqi Government, including the U.S.-Iraq Security Agreement, we will remove all of our troops from Iraq by the end of 2011.

- **Civilian Support:** Second, as the security situation continues to improve, U.S. civilian engagement will deepen and broaden. We will sustain a capable political, diplomatic, and civilian effort to help the Iraqi people as they resolve outstanding differences, integrate those refugees and displaced persons who can return, and continue to develop accountable democratic institutions that can better serve their basic needs. We will work with our Iraqi partners to implement the Strategic Framework Agreement, with the Department of State taking the lead. This will include cooperation on a range of issues including defense and security cooperation, political and diplomatic cooperation, rule of law, science, health, education, and economics.

- **Regional Diplomacy and Development:** Third, we will continue to pursue comprehensive engagement across the region to ensure that our drawdown in Iraq provides an opportunity to advance lasting security and sustainable development for both Iraq and the broader Middle East. The United States will continue to retain a robust civilian presence commensurate with our strategic interests in the country and the region. We are transforming our relationship to one consistent with other strategic partners in the region.

**Pursue Arab-Israeli Peace:** The United States, Israel, the Palestinians, and the Arab States have an interest in a peaceful resolution of the Arab-Israeli conflict—one in which the legitimate aspirations of Israelis and Palestinians for security and dignity are realized, and Israel achieves a secure and lasting peace with all of its neighbors.

The United States seeks two states living side by side in peace and security—a Jewish state of Israel, with true security, acceptance, and rights for all Israelis; and a viable, independent Palestine with contiguous territory that ends the occupation that began in 1967 and realizes the potential of the Palestinian people. We will continue to work regionally and with like-minded partners in order to advance negotiations that address the permanent-status issues: security for Israelis and Palestinians; borders, refugees, and Jerusalem. We also seek international support to build the institutions upon which a Palestinian state will depend, while supporting economic development that can bring opportunity to its people.

Any Arab-Israeli peace will only be lasting if harmful regional interference ends and constructive regional support deepens. As we pursue peace between Israelis and Palestinians, we will also pursue peace between Israel and Lebanon, Israel and Syria, and a broader peace between Israel and its neighbors. We will pursue regional initiatives with multilateral participation, alongside bilateral negotiations.

**Promote a Responsible Iran:** For decades, the Islamic Republic of Iran has endangered the security of the region and the United States and failed to live up to its international responsibilities. In addition to its illicit nuclear program, it continues to support terrorism, undermine peace between Israelis and Palestinians, and deny its people their universal rights. Many years of refusing to engage Iran failed to reverse these trends; on the contrary, Iran's behavior became more threatening. Engagement is something we pursue without illusion. It can offer Iran a pathway to a better future, provided Iran's leaders are prepared to take it. But that better pathway can only be achieved if Iran's leaders change course, act to restore the confidence of the international community, and fulfill their obligations. The United States seeks a future in which Iran meets its international responsibilities, takes its rightful place in the community of nations, and enjoys the political and economic opportunities that its people deserve. Yet if the Iranian Government continues to refuse to live up to its international obligations, it will face greater isolation.

## Invest in the Capacity of Strong and Capable Partners

Where governments are incapable of meeting their citizens' basic needs and fulfilling their responsibilities to provide security within their borders, the consequences are often global and may directly threaten the American people. To advance our common security, we must address the underlying political and economic deficits that foster instability, enable radicalization and extremism, and ultimately undermine the ability of governments to manage threats within their borders and to be our partners in addressing common challenges. To invest in the capacity of strong and capable partners, we will work to:

**Foster Security and Reconstruction in the Aftermath of Conflict:** The United States and the international community cannot shy away from the difficult task of pursuing stabilization in conflict and post-conflict environments. In countries like Iraq and Afghanistan, building the capacity necessary for security, economic growth, and good governance is the only path to long term peace and security. But we have also learned that the effectiveness of these efforts is profoundly affected by the capacity of governments and

the political will of their leaders. We will take these constraints into account in designing appropriate assistance strategies and will facilitate the kind of collaboration that is essential—within our government and with international organizations—in those instances when we engage in the difficult work of helping to bring conflicts to an end.

Pursue Sustainable and Responsible Security Systems in At-Risk States: Proactively investing in stronger societies and human welfare is far more effective and efficient than responding after state collapse. The United States must improve its capability to strengthen the security of states at risk of conflict and violence. We will undertake long-term, sustained efforts to strengthen the capacity of security forces to guarantee internal security, defend against external threats, and promote regional security and respect for human rights and the rule of law. We will also continue to strengthen the administrative and oversight capability of civilian security sector institutions, and the effectiveness of criminal justice.

Prevent the Emergence of Conflict: Our strategy goes beyond meeting the challenges of today, and includes preventing the challenges and seizing the opportunities of tomorrow. This requires investing now in the capable partners of the future; building today the capacity to strengthen the foundations of our common security; and modernizing our capabilities in order to ensure that we are agile in the face of change. We have already begun to reorient and strengthen our development agenda; to take stock of and enhance our capabilities; and to forge new and more effective means of applying the skills of our military, diplomats, and development experts. These kinds of measures will help us diminish military risk, act before crises and conflicts erupt, and ensure that governments are better able to serve their people.

## Secure Cyberspace

Cybersecurity threats represent one of the most serious national security, public safety, and economic challenges we face as a nation. The very technologies that empower us to lead and create also empower those who would disrupt and destroy. They enable our military superiority, but our unclassified government networks are constantly probed by intruders. Our daily lives and public safety depend on power and electric grids, but potential adversaries could use cyber vulnerabilities to disrupt them on a massive scale. The Internet and e-commerce are keys to our economic competitiveness, but cyber criminals have cost companies and consumers hundreds of millions of dollars and valuable intellectual property.

The threats we face range from individual criminal hackers to organized criminal groups, from terrorist networks to advanced nation states. Defending against these threats to our security, prosperity, and personal privacy requires networks that are secure, trustworthy, and resilient. Our digital infrastructure, therefore, is a strategic national asset, and protecting it—while safeguarding privacy and civil liberties—is a national security priority. We will deter, prevent, detect, defend against, and quickly recover from cyber intrusions and attacks by:

Investing in People and Technology: To advance that goal, we are working across the government and with the private sector to design more secure technology that gives us the ability to better protect and to improve the resilience of critical government and industry systems and networks. We will continue to invest in the cutting-edge research and development necessary for the innovation and discovery we need to meet these challenges. We have begun a comprehensive national campaign to promote

cybersecurity awareness and digital literacy from our boardrooms to our classrooms and to build a digital workforce for the 21st century.

Strengthening Partnerships: Neither government nor the private sector nor individual citizens can meet this challenge alone—we will expand the ways we work together. We will also strengthen our international partnerships on a range of issues, including the development of norms for acceptable conduct in cyberspace; laws concerning cybercrime; data preservation, protection, and privacy; and approaches for network defense and response to cyber attacks. We will work with all the key players— including all levels of government and the private sector, nationally and internationally—to investigate cyber intrusion and to ensure an organized and unified response to future cyber incidents. Just as we do for natural disasters, we have to have plans and resources in place beforehand.

# Prosperity

"The answers to our problems don't lie beyond our reach. They exist in our laboratories and universities; in our fields and our factories; in the imaginations of our entrepreneurs and the pride of the hardest-working people on Earth. Those qualities that have made America the greatest force of progress and prosperity in human history we still possess in ample measure. What is required now is for this country to pull together, confront boldly the challenges we face, and take responsibility for our future once more."

—President Barack Obama, Address to Joint Session of Congress, February 24, 2009

—

The foundation of American leadership must be a prosperous American economy. And a growing and open global economy serves as a source of opportunity for the American people and a source of strength for the United States. The free flow of information, people, goods, and services has also advanced peace among nations, as those places that have emerged more prosperous are often more stable. Yet we have also seen how shocks to the global economy can precipitate disaster—including the loss of jobs, a decline in standards of living in parts of our country, and instability and a loss of U.S. influence abroad. Meanwhile, growing prosperity around the world has made economic power more diffuse, creating a more competitive environment for America's people and businesses.

To allow each American to pursue the opportunity upon which our prosperity depends, we must build a stronger foundation for economic growth. That foundation must include access to a complete and competitive education for every American; a transformation of the way that we produce and use energy, so that we reduce our dependence on fossil fuels and lead the world in creating new jobs and industry; access to quality, affordable health care so our people, businesses, and government are not constrained by rising costs; and the responsible management of our Federal budget so that we balance our priorities and are not burdened by debt. To succeed, we must also ensure that America stays on the cutting edge of the science and innovation that supports our prosperity, defense, and international technological leadership.

This new foundation must underpin and sustain an international economic system that is critical to both our prosperity and to the peace and security of the world. We must reinvigorate and fortify it for the 21st century: by preventing cycles of boom and bust with new rules of the road at home and abroad; by saving more and spending less; by resisting protectionism and promoting trade that is free and fair; by coordinating our actions with other countries, and reforming international institutions to give emerging economies a greater voice and greater responsibility; and by supporting development that promotes good governance, unleashes the potential of different populations, and creates new markets overseas. Taken together, these actions can ensure inclusive growth that is balanced and sustained.

## Strengthen Education and Human Capital

In a global economy of vastly increased mobility and interdependence, our own prosperity and leadership depends increasingly on our ability to provide our citizens with the education that they need to succeed, while attracting the premier human capital for our workforce. We must ensure that the most innovative ideas take root in America, while providing our people with the skills that they need to compete. That means we must:

Improve Education at All Levels: The United States has lost ground in education, even as our competitiveness depends on educating our children to succeed in a global economy based on knowledge and innovation. We are working to provide a complete and competitive education for all Americans, to include supporting high standards for early learning, reforming public schools, increasing access to higher education and job training, and promoting high-demand skills and education for emerging industries. We will also restore U.S. leadership in higher education by seeking the goal of leading the world in the proportion of college graduates by 2020.

Invest in Science, Technology, Engineering, and Math Education (STEM): America's long-term leadership depends on educating and producing future scientists and innovators. We will invest more in STEM education so students can learn to think critically in science, math, engineering, and technology; improve the quality of math and science teaching so American students are no longer outperformed by those in other nations; and expand STEM education and career opportunities for underrepresented groups, including women and girls. We will work with partners—from the private-sector and nonprofit organizations to universities—to promote education and careers in science and technology.

Increase International Education and Exchange: The pervasiveness of the English language and American cultural influence are great advantages to Americans traveling, working, and negotiating in foreign countries. But we must develop skills to help us succeed in a dynamic and diverse global economy. We will support programs that cultivate interest and scholarship in foreign languages and intercultural affairs, including international exchange programs. This will allow our citizens to build connections with peoples overseas and to develop skills and contacts that will help them thrive in the global economy. We must also welcome more foreign exchange students to our shores, recognizing the benefits that can result from deeper ties with foreign publics and increased understanding of American society.

Pursue Comprehensive Immigration Reform: The United States is a nation of immigrants. Our ability to innovate, our ties to the world, and our economic prosperity depend on our nation's capacity to welcome and assimilate immigrants, and a visa system which welcomes skilled professionals from around the

world. At the same time, effective border security and immigration enforcement must keep the country safe and deter unlawful entry. Indeed, persistent problems in immigration policy consume valuable resources needed to advance other security objectives and make it harder to focus on the most dangerous threats facing our country. Ultimately, our national security depends on striking a balance between security and openness. To advance this goal, we must pursue comprehensive immigration reform that effectively secures our borders, while repairing a broken system that fails to serve the needs of our nation.

## Enhance Science, Technology, and Innovation

Reaffirming America's role as the global engine of scientific discovery and technological innovation has never been more critical. Challenges like climate change, pandemic disease, and resource scarcity demand new innovation. Meanwhile, the nation that leads the world in building a clean energy economy will enjoy a substantial economic and security advantage. That is why the Administration is investing heavily in research, improving education in science and math, promoting developments in energy, and expanding international cooperation.

Transform our Energy Economy: As long as we are dependent on fossil fuels, we need to ensure the security and free flow of global energy resources. But without significant and timely adjustments, our energy dependence will continue to undermine our security and prosperity. This will leave us vulnerable to energy supply disruptions and manipulation and to changes in the environment on an unprecedented scale.

The United States has a window of opportunity to lead in the development of clean energy technology. If successful, the United States will lead in this new Industrial Revolution in clean energy that will be a major contributor to our economic prosperity. If we do not develop the policies that encourage the private sector to seize the opportunity, the United States will fall behind and increasingly become an importer of these new energy technologies.

We have already made the largest investment in clean energy in history, but there is much more to do to build on this foundation. We must continue to transform our energy economy, leveraging private capital to accelerate deployment of clean energy technologies that will cut greenhouse gas emissions, improve energy efficiency, increase use of renewable and nuclear power, reduce the dependence of vehicles on oil, and diversify energy sources and suppliers. We will invest in research and next-generation technology, modernize the way we distribute electricity, and encourage the usage of transitional fuels, while moving towards clean energy produced at home.

Invest in Research: Research and development is central to our broader national capacity. Incidents like the outbreak of H1N1 influenza and the challenge of identifying new, renewable sources of energy highlight the importance of research in basic and applied science. We are reversing the decades-long decline in federal funding for research, including the single largest infusion to basic science research in American history. Research and innovation is not something government can do on its own, which is why we will support and create incentives to encourage private initiatives. The United States has always excelled in our ability to turn science and technology into engineering and products, and we must continue to do so in the future.

III. ADVANCING OUR INTERESTS

Expand International Science Partnerships: America's scientific leadership has always been widely admired around the world, and we must continue to expand cooperation and partnership in science and technology. We have launched a number of Science Envoys around the globe and are promoting stronger relationships between American scientists, universities, and researchers and their counterparts abroad. We will reestablish a commitment to science and technology in our foreign assistance efforts and develop a strategy for international science and national security.

Employ Technology to Protect our Nation: Our renewed commitment to science and technology—and our ability to apply the ingenuity of our public and private sectors toward the most difficult foreign policy and security challenges of our time—will help us protect our citizens and advance U.S. national security priorities. These include, for example, protecting U.S. and allied forces from asymmetric attacks; supporting arms control and nonproliferation agreements; preventing terrorists from attacking our homeland; preventing and managing widespread disease outbreaks; securing the supply chain; detecting weapons of mass destruction before they reach our borders; and protecting our information, communication, and transportation infrastructure.

Leverage and Grow our Space Capabilities: For over 50 years, our space community has been a catalyst for innovation and a hallmark of U.S. technological leadership. Our space capabilities underpin global commerce and scientific advancements and bolster our national security strengths and those of our allies and partners. To promote security and stability in space, we will pursue activities consistent with the inherent right of self-defense, deepen cooperation with allies and friends, and work with all nations toward the responsible and peaceful use of space. To maintain the advantages afforded to the United States by space, we must also take several actions. We must continue to encourage cutting-edge space technology by investing in the people and industrial base that develops them. We will invest in the research and development of next-generation space technologies and capabilities that benefit our commercial, civil, scientific exploration, and national security communities, in order to maintain the viability of space for future generations. And we will promote a unified effort to strengthen our space industrial base and work with universities to encourage students to pursue space-related careers.

## Achieve Balanced and Sustainable Growth

Balanced and sustainable growth, at home and throughout the global economy, drives the momentum of the U.S. economy and underpins our prosperity. A steadily growing global economy means an expanding market for exports of our goods and services. Over time, deepening linkages among markets and businesses will provide the setting in which the energies and entrepreneurship of our private sector can flourish, generating technologies, business growth, and job creation that will boost living standards for Americans. United States economic leadership now has to adapt to the rising prominence of emerging economies; the growing size, speed, and sophistication of financial markets; the multiplicity of market participants around the globe; and the struggling economies that have so far failed to integrate into the global system.

To promote prosperity for all Americans, we will need to lead the international community to expand the inclusive growth of the integrated, global economy. At the same time, we will need to lead international efforts to prevent a recurrence of economic imbalances and financial excesses, while managing the

many security threats and global challenges that affect global economic stability. To promote growth that can be balanced and sustained, we will:

**Prevent Renewed Instability in the Global Economy:** The recent crisis taught us the very high cost of the boom and bust cycle that has plagued the global economy and has served neither the United States nor our international partners. Once Americans found themselves in debt or out of work, our demand for foreign goods fell sharply. As foreign economies weakened, their financial institutions and public finances came under stress too, reinforcing the global slowdown. We must prevent the reemergence of imbalanced growth, with American consumers buying and borrowing, and Asian and other exporting countries selling and accumulating claims. We must pursue reform of the U.S. financial system to strengthen the health of our economy and encourage Americans to save more. And we must prevent the reemergence of excesses in our financial institutions based on irresponsible lending behavior, and abetted by lax and uncoordinated regulation.

**Save More And Export More:** Striking a better balance at home means saving more and spending less, reforming our financial system, and reducing our long-term budget deficit. With those changes, we will see a greater emphasis on exports that we can build, produce, and sell all over the world, with the goal of doubling U.S. exports by 2014. This is ultimately an employment strategy, because higher exports will support millions of well-paying American jobs, including those that service innovative and profitable new technologies. As a part of that effort, we are reforming our export controls consistent with our national security imperatives.

**Shift To Greater Domestic Demand Abroad:** For the rest of the world, especially in some emerging market and developing countries, a better balance means placing greater emphasis on increasing domestic demand as the leading driver of growth and opening markets. Those countries will be able to import the capital and technologies needed to sustain the remarkable productivity gains already underway. Rebalancing will provide an opportunity for workers and consumers over time to enjoy the higher standards of living made possible by those gains. As balanced growth translates into sustained growth, middle-income, and poor countries, many of which are not yet sufficiently integrated into the global economy, can accelerate the process of convergence of living standards toward richer countries—a process that will become a driver of growth for the global economy for decades to come.

**Open Foreign Markets to Our Products and Services:** The United States has long had one of the most open markets in the world. We have been a leader in expanding an open trading system. That has underwritten the growth of other developed and emerging markets alike. Openness has also forced our companies and workers to compete and innovate, and at the same time, has offered market access crucial to the success of so many countries around the world. We will maintain our open investment environment, consistent with our national security goals. In this new era, opening markets around the globe will promote global competition and innovation and will be crucial to our prosperity. We will pursue a trade agenda that includes an ambitious and balanced Doha multilateral trade agreement, bilateral and multilateral trade agreements that reflect our values and interests, and engagement with the transpacific partnership countries to shape a regional agreement with high standards.

As we go forward, our trade policy will be an important part of our effort to capitalize on the opportunities presented by globalization, but will also be part of our effort to equip Americans to compete. To make

trade agreements work for Americans, we will take steps to restore confidence, with realistic programs to deal with transition costs, and promote innovation, infrastructure, healthcare reform and education. Our agreements will contain achievable enforcement mechanisms to ensure that the gains we negotiate are in fact realized and will be structured to reflect U.S. interests, especially on labor and environment.

Build Cooperation with Our International Partners: The United States has supported the G-20's emergence as the premier forum for international economic cooperation. This flows from the recognition that we need a broader and more inclusive engagement with the countries responsible for most of global output and trade. U.S. leadership in the G-20 will be focused on securing sustainable and balanced growth, coordinating reform of financial sector regulation, fostering global economic development, and promoting energy security. We also need official international financial institutions to be as modern and agile as the global economy they serve. Through the G-20, we will pursue governance reform at the International Monetary Fund (IMF) and World Bank. We will also broaden our leadership in other international financial institutions so that the rapidly growing countries of the world see their representation increase and are willing to invest those institutions with the authority they need to promote the stability and growth of global output and trade.

Deterring Threats to the International Financial System: Today's open and global financial system also exposes us to global financial threats. Just as we work to make the most of the opportunities that globalization brings, the actors that pose a threat to our national security—terrorists, proliferators, narcotics traffickers, corrupt officials, and others—are abusing the global financial system to raise, move, and safeguard funds that support their illicit activities or from which they derive profit. Their support networks have global reach and are not contained by national borders. Our strategy to attack these networks must respond in kind and target their illicit resources and access to the global financial system through financial measures, administration and enforcement of regulatory authorities, outreach to the private sector and our foreign partners, and collaboration on international standards and information sharing.

## Accelerate Sustainable Development

The growth of emerging economies in recent decades has lifted people out of poverty and forged a more interconnected and vibrant global economy. But development has been uneven, progress is fragile, and too many of the world's people still live without the benefits that development affords. While some countries are growing, many lag behind—mired in insecurity, constrained by poor governance, or overly dependent upon commodity prices. But sustained economic progress requires faster, sustainable, and more inclusive development. That is why we are pursuing a range of specific initiatives in areas such as food security and global health that will be essential to the future security and prosperity of nations and peoples around the globe.

Increase Investments in Development: The United States has an interest in working with our allies to help the world's poorest countries grow into productive and prosperous economies governed by capable, democratic, and accountable state institutions. We will ensure a greater and more deliberate focus on a global development agenda across the United States Government, from policy analysis through policy implementation. We are increasing our foreign assistance, expanding our investments in effective multilateral development institutions, and leveraging the engagement of others to share the burden.

Invest in the Foundations of Long-Term Development: The United States will initiate long-term investments that recognize and reward governments that demonstrate the capacity and political will to pursue sustainable development strategies and ensure that all policy instruments at our disposal are harnessed to these ends. And we will provide our support in multiple ways—by strengthening the ability of governments and communities to manage development challenges and investing in strong institutions that foster the democratic accountability that helps sustain development. This will expand the circle of nations—particularly in Africa—who are capable of reaping the benefits of the global economy, while contributing to global security and prosperity.

Exercise Leadership in the Provision of Global Public Goods: Our approach needs to reflect the fact that there are a set of development challenges that strongly affect the likelihood of progress, but cannot be addressed by individual countries acting alone. Particularly in Africa, these challenges—such as adaptation to global warming, the control of epidemic disease, and the knowledge to increase agricultural productivity—are not adequately addressed in bilateral efforts. We will shape the international architecture and work with our global partners to address these challenges, and increase our investments and engagement to transition to a low-carbon growth trajectory, support the resilience of the poorest nations to the effects of climate change, and strengthen food security. We must also pursue potential "game changers" for development such as new vaccines, weather-resistant seed varieties, and green energy technologies.

## Spend Taxpayers' Dollars Wisely

The United States Government has an obligation to make the best use of taxpayer money, and our ability to achieve long-term goals depends upon our fiscal responsibility. A responsible budget involves making tough choices to live within our means; holding departments and agencies accountable for their spending and their performance; harnessing technology to improve government performance; and being open and honest with the American people. A responsible budget also depends upon working with our global partners and institutions to share burdens and leverage U.S. investments to achieve global goals. Our national security goals can only be reached if we make hard choices and work with international partners to share burdens.

Reduce the Deficit: We cannot grow our economy in the long term unless we put the United States back on a sustainable fiscal path. To begin this effort, the Administration has proposed a 3-year freeze in nonsecurity discretionary spending, a new fee on the largest financial services companies to recoup taxpayer losses for the Troubled Asset Relief Program (TARP), and the closing of tax loopholes and unnecessary subsidies. The Administration has created a bipartisan fiscal commission to suggest further steps for medium-term deficit reduction and will work for fiscally responsible health insurance reform that will bring down the rate of growth in health care costs, a key driver of the country's fiscal future.

Reform Acquisition and Contracting Processes: Wasteful spending, duplicative programs, and contracts with poor oversight have no place in the United States Government. Cost-effective and efficient processes are particularly important for the Department of Defense, which accounts for approximately 70 percent of all Federal procurement spending. We will scrutinize our programs and terminate or restructure those that are outdated, duplicative, ineffective, or wasteful. The result will be more relevant,

capable, and effective programs and systems that our military wants and needs. We are also reforming Federal contracting and strengthening contracting practices and management oversight with a goal of saving Federal agencies $40 billion dollars a year.

Increase Transparency: Americans have a right to know how their tax dollars are spent, but that information can be obscured or unavailable. In some instances, incomplete accounting of the budget has been used to conceal the reality of our fiscal situation. To uphold our commitment to a transparent budget process, we are simultaneously requesting both base budget and overseas contingency operations costs, with the same amount of justification and explanatory material for each, so that Americans can see the true cost of our war efforts and hold leaders accountable for decisions with all of the facts.

# Values

"We uphold our most cherished values not only because doing so is right, but because it strengthens our country and keeps us safe. Time and again, our values have been our best national security asset—in war and peace, in times of ease, and in eras of upheaval. Fidelity to our values is the reason why the United States of America grew from a small string of colonies under the writ of an empire to the strongest nation in the world."

—President Barack Obama, National Archives, May 21, 2009

—

The United States believes certain values are universal and will work to promote them worldwide. These include an individual's freedom to speak their mind, assemble without fear, worship as they please, and choose their own leaders; they also include dignity, tolerance, and equality among all people, and the fair and equitable administration of justice. The United States was founded upon a belief in these values. At home, fidelity to these values has extended the promise of America ever more fully, to ever more people. Abroad, these values have been claimed by people of every race, region, and religion. Most nations are parties to international agreements that recognize this commonality. And nations that embrace these values for their citizens are ultimately more successful—and friendly to the United States—than those that do not.

Yet after an era that saw substantial gains for these values around the world, democratic development has stalled in recent years. In some cultures, these values are being equated with the ugly face of modernity and are seen to encroach upon cherished identities. In other countries, autocratic rulers have repressed basic human rights and democratic practices in the name of economic development and national unity. Even where some governments have adopted democratic practices, authoritarian rulers have undermined electoral processes and restricted the space for opposition and civil society, imposing a growing number of legal restrictions so as to impede the rights of people to assemble and to access information. And while there has been substantial progress in combating poverty in many parts of the world, too many of the world's people still lack the dignity that comes with the opportunity to pursue a better life.

The United States supports those who seek to exercise universal rights around the world. We promote our values above all by living them at home. We continue to engage nations, institutions, and peoples in pursuit of these values abroad. And we recognize the link between development and political progress. In doing so, our goals are realistic, as we recognize that different cultures and traditions give life to these values in distinct ways. Moreover, America's influence comes not from perfection, but from our striving to overcome our imperfections. The constant struggle to perfect our union is what makes the American story inspiring. That is why acknowledging our past shortcomings—and highlighting our efforts to remedy them—is a means of promoting our values.

America will not impose any system of government on another country, but our long-term security and prosperity depends on our steady support for universal values, which sets us apart from our enemies, adversarial governments, and many potential competitors for influence. We will do so through a variety of means—by speaking out for universal rights, supporting fragile democracies and civil society, and supporting the dignity that comes with development.

## Strengthen the Power of Our Example

More than any other action that we have taken, the power of America's example has helped spread freedom and democracy abroad. That is why we must always seek to uphold these values not just when it is easy, but when it is hard. Advancing our interests may involve new arrangements to confront threats like terrorism, but these practices and structures must always be in line with our Constitution, preserve our people's privacy and civil liberties, and withstand the checks and balances that have served us so well. To sustain our fidelity to our values—and our credibility to promote them around the world—we will continue to:

Prohibit Torture without Exception or Equivocation: Brutal methods of interrogation are inconsistent with our values, undermine the rule of law, and are not effective means of obtaining information. They alienate the United States from the world. They serve as a recruitment and propaganda tool for terrorists. They increase the will of our enemies to fight against us, and endanger our troops when they are captured. The United States will not use or support these methods.

Legal Aspects of Countering Terrorism: The increased risk of terrorism necessitates a capacity to detain and interrogate suspected violent extremists, but that framework must align with our laws to be effective and sustainable. When we are able, we will prosecute terrorists in Federal courts or in reformed military commissions that are fair, legitimate, and effective. For detainees who cannot be prosecuted—but pose a danger to the American people—we must have clear, defensible, and lawful standards. We must have fair procedures and a thorough process of periodic review, so that any prolonged detention is carefully evaluated and justified. And keeping with our Constitutional system, it will be subject to checks and balances. The goal is an approach that can be sustained by future Administrations, with support from both political parties and all three branches of government.

Balance the Imperatives of Secrecy and Transparency: For the sake of our security, some information must be protected from public disclosure—for instance, to protect our troops, our sources and methods of intelligence-gathering or confidential actions that keep the American people safe. Yet our democracy depends upon transparency, and whenever possible, we are making information available to the

American people so that they can make informed judgments and hold their leaders accountable. For instance, when we invoke the State Secrets privilege, we will follow clear procedures so as to provide greater accountability and to ensure the privilege is invoked only when necessary and in the narrowest way possible. We will never invoke the privilege to hide a violation of law or to avoid embarrassment to the government.

Protect Civil Liberties, Privacy, and Oversight: Protecting civil liberties and privacy are integral to the vibrancy of our democracy and the exercise of freedom. We are balancing our solemn commitments to these virtues with the mandate to provide security for the American people. Vigorous oversight of national security activities by our three branches of government and vigilant compliance with the rule of law allow us to maintain this balance, affirm to our friends and allies the constitutional ideals we uphold.

Uphold the Rule of Law: The rule of law—and our capacity to enforce it—advances our national security and strengthens our leadership. At home, fidelity to our laws and support for our law enforcement community safeguards American citizens and interests, while protecting and advancing our values. Around the globe, it allows us to hold actors accountable, while supporting both international security and the stability of the global economy. America's commitment to the rule of law is fundamental to our efforts to build an international order that is capable of confronting the emerging challenges of the 21st century.

Draw Strength from Diversity: The United States has benefited throughout our history when we have drawn strength from our diversity. While those who advocate on behalf of extremist ideologies seek to sow discord among ethnic and religious groups, America stands as an example of how people from different backgrounds can be united through their commitment to shared values. Within our own communities, those who seek to recruit and radicalize individuals will often try to prey upon isolation and alienation. Our own commitment to extending the promise of America will both draw a contrast with those who try to drive people apart, while countering attempts to enlist individuals in ideological, religious, or ethnic extremism.

## Promote Democracy and Human Rights Abroad

The United States supports the expansion of democracy and human rights abroad because governments that respect these values are more just, peaceful, and legitimate. We also do so because their success abroad fosters an environment that supports America's national interests. Political systems that protect universal rights are ultimately more stable, successful, and secure. As our history shows, the United States can more effectively forge consensus to tackle shared challenges when working with governments that reflect the will and respect the rights of their people, rather than just the narrow interests of those in power. The United States is advancing universal values by:

Ensuring that New and Fragile Democracies Deliver Tangible Improvements for Their Citizens: The United States must support democracy, human rights, and development together, as they are mutually reinforcing. We are working closely with citizens, communities, and political and civil society leaders to strengthen key institutions of democratic accountability—free and fair electoral processes, strong legislatures, civilian control of militaries, honest police forces, independent and fair judiciaries, a free and independent press, a vibrant private sector, and a robust civil society. To do so, we are harnessing

our bilateral and multilateral capabilities to help nascent democracies deliver services that respond to the needs and preferences of their citizens, since democracies without development rarely survive.

**Practicing Principled Engagement with Non-Democratic Regimes:** Even when we are focused on interests such as counterterrorism, nonproliferation, or enhancing economic ties, we will always seek in parallel to expand individual rights and opportunities through our bilateral engagement. The United States is pursuing a dual-track approach in which we seek to improve government-to-government relations and use this dialogue to advance human rights, while engaging civil society and peaceful political opposition, and encouraging U.S. nongovernmental actors to do the same. More substantive government-to-government relations can create permissive conditions for civil society to operate and for more extensive people-to-people exchanges. But when our overtures are rebuffed, we must lead the international community in using public and private diplomacy, and drawing on incentives and disincentives, in an effort to change repressive behavior.

**Recognizing the Legitimacy of All Peaceful Democratic Movements:** America respects the right of all peaceful, law-abiding, and nonviolent voices to be heard around the world, even if we disagree with them. Support for democracy must not be about support for specific candidates or movements. America will welcome all legitimately elected, peaceful governments, provided they govern with respect for the rights and dignity of all their people and consistent with their international obligations. Those who seek democracy to obtain power, but are ruthless once they do, will forfeit the support of the United States. Governments must maintain power through consent, not coercion, and place legitimate political processes above party or narrow interest.

**Supporting the Rights of Women and Girls:** Women should have access to the same opportunities and be able to make the same choices as men. Experience shows that countries are more peaceful and prosperous when women are accorded full and equal rights and opportunity. When those rights and opportunities are denied, countries often lag behind. Furthermore, women and girls often dispropor- tionally bear the burden of crises and conflict. Therefore the United States is working with regional and international organizations to prevent violence against women and girls, especially in conflict zones. We are supporting women's equal access to justice and their participation in the political process. We are promoting child and maternal health. We are combating human trafficking, especially in women and girls, through domestic and international law enforcement. And we are supporting education, employment, and micro-finance to empower women globally.

**Strengthening International Norms Against Corruption:** We are working within the broader international system, including the U.N., G-20, Organization for Economic Cooperation and Development (OECD), and the international financial institutions, to promote the recognition that pervasive corruption is a violation of basic human rights and a severe impediment to development and global security. We will work with governments and civil society organizations to bring greater transparency and accountability to government budgets, expenditures, and the assets of public officials. And we will institutionalize transparent practices in international aid flows, international banking and tax policy, and private sec- tor engagement around natural resources to make it harder for officials to steal and to strengthen the efforts of citizens to hold their governments accountable.

**Building a Broader Coalition of Actors to Advance Universal Values:** We are working to build support for democracy, rule of law, and human rights by working with other governments, nongovernmental organizations, and multilateral fora. The United States is committed to working to shape and strengthen existing institutions that are not delivering on their potential, such as the United Nations Human Rights Council. We are working within the broader U.N. system and through regional mechanisms to strengthen human rights monitoring and enforcement mechanisms, so that individuals and countries are held accountable for their violation of international human rights norms. And we will actively support the leadership of emerging democracies as they assume a more active role in advancing basic human rights and democratic values in their regions and on the global stage.

**Marshalling New Technologies and Promoting the Right to Access Information:** The emergence of technologies such as the Internet, wireless networks, mobile smart-phones, investigative forensics, satellite and aerial imagery, and distributed remote sensing infrastructure has created powerful new opportunities to advance democracy and human rights. These technologies have fueled people-powered political movements, made it possible to shine a spotlight on human rights abuses nearly instantaneously, and increased avenues for free speech and unrestricted communication around the world. We support the dissemination and use of these technologies to facilitate freedom of expression, expand access to information, increase governmental transparency and accountability, and counter restrictions on their use. We will also better utilize such technologies to effectively communicate our own messages to the world.

## Promote Dignity by Meeting Basic Needs

The freedom that America stands for includes freedom from want. Basic human rights cannot thrive in places where human beings do not have access to enough food, or clean water, or the medicine they need to survive. The United States has embraced the United Nation's Millennium Development Goals and is working with others in pursuit of the eradication of extreme poverty—efforts that are particularly critical to the future of nations and peoples of Africa. And we will continue to promote the dignity that comes through development efforts such as:

**Pursuing a Comprehensive Global Health Strategy:** The United States has a moral and strategic interest in promoting global health. When a child dies of a preventable disease, it offends our conscience; when a disease goes unchecked, it can endanger our own health; when children are sick, development is stalled. That is why we are continuing to invest in the fight against HIV/AIDS. Through the Global Health Initiative, we will strengthen health systems and invest in interventions to address areas where progress has lagged, including maternal and child health. And we are also pursuing the goal of reducing the burden of malaria and tuberculosis and seeking the elimination of important neglected tropical diseases.

**Promoting Food Security:** The United States is working with partners around the world to advance a food security initiative that combats hunger and builds the capacity of countries to feed their people. Instead of simply providing aid for developing countries, we are focusing on new methods and technologies for agricultural development. This is consistent with an approach in which aid is not an end in itself—the purpose of our foreign assistance will be to create the conditions where it is no longer needed.

**Leading Efforts to Address Humanitarian Crises:** Together with the American people and the international community, we will continue to respond to humanitarian crises to ensure that those in need have the

protection and assistance they need. In such circumstances, we are also placing a greater emphasis on fostering long-term recovery. Haiti's devastating earthquake is only the most recent reminder of the human and material consequences of natural disasters, and a changing climate portends a future in which the United States must be better prepared and resourced to exercise robust leadership to help meet critical humanitarian needs.

## International Order

"As President of the United States, I will work tirelessly to protect America's security and to advance our interests. But no one nation can meet the challenges of the 21st century on its own, nor dictate its terms to the world. That is why America seeks an international system that lets nations pursue their interests peacefully, especially when those interests diverge; a system where the universal rights of human beings are respected, and violations of those rights are opposed; a system where we hold ourselves to the same standards that we apply to other nations, with clear rights and responsibilities for all."

—President Barack Obama, Moscow, Russia, July 7, 2009

—

The United States will protect its people and advance our prosperity irrespective of the actions of any other nation, but we have an interest in a just and sustainable international order that can foster collective action to confront common challenges. This international order will support our efforts to advance security, prosperity, and universal values, but it is also an end that we seek in its own right. Because without such an international order, the forces of instability and disorder will undermine global security. And without effective mechanisms to forge international cooperation, challenges that recognize no borders—such as climate change, pandemic disease, and transnational crime—will persist and potentially spread.

International institutions—most prominently NATO and the United Nations—have been at the center of our international order since the mid 20th century. Yet, an international architecture that was largely forged in the wake of World War II is buckling under the weight of new threats, making us less able to seize new opportunities. Even though many defining trends of the 21st century affect all nations and peoples, too often, the mutual interests of nations and peoples are ignored in favor of suspicion and self-defeating competition.

What is needed, therefore, is a realignment of national actions and international institutions with shared interests. And when national interests do collide—or countries prioritize their interests in different ways—those nations that defy international norms or fail to meet their sovereign responsibilities will be denied the incentives that come with greater integration and collaboration with the international community.

No international order can be supported by international institutions alone. Our mutual interests must be underpinned by bilateral, multilateral, and global strategies that address underlying sources of insecurity and build new spheres of cooperation. To that end, strengthening bilateral and multilateral

cooperation cannot be accomplished simply by working inside formal institutions and frameworks. It requires sustained outreach to foreign governments, political leaderships, and other critical constituencies that must commit the necessary capabilities and resources to enable effective, collective action. And it means building upon our traditional alliances, while also cultivating partnerships with new centers of influence. Taken together, these approaches will allow us to foster more effective global cooperation to confront challenges that know no borders and affect every nation.

## Ensure Strong Alliances

The foundation of United States, regional, and global security will remain America's relations with our allies, and our commitment to their security is unshakable. These relationships must be constantly cultivated, not just because they are indispensable for U.S. interests and national security objectives, but because they are fundamental to our collective security. Alliances are force multipliers: through multinational cooperation and coordination, the sum of our actions is always greater than if we act alone. We will continue to maintain the capacity to defend our allies against old and new threats. We will also continue to closely consult with our allies as well as newly emerging partners and organizations so that we revitalize and expand our cooperation to achieve common objectives. And we will continue to mutually benefit from the collective security provided by strong alliances.

Although the United States and our allies and partners may sometimes disagree on specific issues, we will act based upon mutual respect and in a manner that continues to strengthen an international order that benefits all responsible international actors.

**Strengthening Security Relationships:** Our ability to sustain these alliances, and to build coalitions of support toward common objectives, depends in part on the capabilities of America's Armed Forces. Similarly, the relationships our Armed Forces have developed with foreign militaries are a critical component of our global engagement and support our collective security.

We will continue to ensure that we can prevail against a wide range of potential adversaries—to include hostile states and nonstate actors—while broadly shaping the strategic environment using all tools to advance our common security. We will continue to reassure our allies and partners by retaining our ability to bring precise, sustained, and effective capabilities to bear against a wide range of military threats and decisively defeat the forces of hostile regional powers. We will work with our allies and partners to enhance the resilience of U.S. forward posture and facilities against potential attacks. Finally, we will strengthen our regional deterrence postures—for example, through phased, adaptive missile defense architectures—in order to make certain that regional adversaries gain no advantages from their acquisition of new, offensive military capabilities.

**European Allies:** Our relationship with our European allies remains the cornerstone for U.S. engagement with the world, and a catalyst for international action. We will engage with our allies bilaterally, and pursue close consultation on a broad range of security and economic issues. The North Atlantic Treaty Organization (NATO) is the pre-eminent security alliance in the world today. With our 27 NATO allies, and the many partners with which NATO cooperates, we will strengthen our collective ability to promote security, deter vital threats, and defend our people. NATO's new Strategic Concept will provide an opportunity to revitalize and reform the Alliance. We are committed to ensuring that NATO is able to

address the full range of 21st century challenges, while serving as a foundation of European security. And we will continue to anchor our commitment in Article V, which is fundamental to our collective security.

Building on European aspirations for greater integration, we are committed to partnering with a stronger European Union to advance our shared goals, especially in promoting democracy and prosperity in Eastern European countries that are still completing their democratic transition and in responding to pressing issues of mutual concern. We will remain dedicated to advancing stability and democracy in the Balkans and to resolving conflicts in the Caucasus and in Cyprus. We will continue to engage with Turkey on a broad range of mutual goals, especially with regard to pursuit of stability in its region. And we will seek to strengthen existing European institutions so that they are more inclusive and more effective in building confidence, reducing tensions, and protecting freedom.

**Asian Allies:** Our alliances with Japan, South Korea, Australia, the Philippines, and Thailand are the bedrock of security in Asia and a foundation of prosperity in the Asia-Pacific region. We will continue to deepen and update these alliances to reflect the dynamism of the region and strategic trends of the 21st century. Japan and South Korea are increasingly important leaders in addressing regional and global issues, as well as in embodying and promoting our common democratic values. We are modernizing our security relationships with both countries to face evolving 21st century global security challenges and to reflect the principle of equal partnership with the United States and to ensure a sustainable foundation for the U.S. military presence there. We are working together with our allies to develop a positive security agenda for the region, focused on regional security, combating the proliferation of weapons of mass destruction, terrorism, climate change, international piracy, epidemics, and cybersecurity, while achieving balanced growth and human rights.

In partnership with our allies, the United States is helping to offer a future of security and integration to all Asian nations and to uphold and extend fundamental rights and dignity to all of its people. These alliances have preserved a hard-earned peace and strengthened the bridges of understanding across the Pacific Ocean in the second half of the 20th century, and it is essential to U.S., Asian, and global security that they are as dynamic and effective in the 21st century.

**North America:** The strategic partnerships and unique relationships we maintain with Canada and Mexico are critical to U.S. national security and have a direct effect on the security of our homeland. With billions of dollars in trade, shared critical infrastructure, and millions of our citizens moving across our common borders, no two countries are more directly connected to our daily lives. We must change the way we think about our shared borders, in order to secure and expedite the lawful and legitimate flow of people and goods while interdicting transnational threat that threaten our open societies.

Canada is our closest trading partner, a steadfast security ally, and an important partner in regional and global efforts. Our mutual prosperity is closely interconnected, including through our trade relationship with Mexico through NAFTA. With Canada, our security cooperation includes our defense of North America and our efforts through NATO overseas. And our cooperation is critical to the success of international efforts on issues ranging from international climate negotiations to economic cooperation through the G-20.

With Mexico, in addition to trade cooperation, we are working together to identify and interdict threats at the earliest opportunity, even before they reach North America. Stability and security in Mexico are

indispensable to building a strong economic partnership, fighting the illicit drug and arms trade, and promoting sound immigration policy.

## Build Cooperation with Other 21st Century Centers of Influence

The United States is part of a dynamic international environment, in which different nations are exerting greater influence, and advancing our interests will require expanding spheres of cooperation around the word. Certain bilateral relationships—such as U.S. relations with China, India, and Russia—will be critical to building broader cooperation on areas of mutual interest. And emerging powers in every region of the world are increasingly asserting themselves, raising opportunities for partnership for the United States.

**Asia:** Asia's dramatic economic growth has increased its connection to America's future prosperity, and its emerging centers of influence make it increasingly important. We have taken substantial steps to deepen our engagement in the region, through regional organizations, new dialogues, and high-level diplomacy. The United States has deep and enduring ties with the countries of the region, including trade and investment that drive growth and prosperity on both sides of the Pacific, and enhancing these ties is critical to our efforts to advance balanced and sustainable growth and to doubling U.S. exports. We have increasing security cooperation on issues such as violent extremism and nuclear proliferation. We will work to advance these mutual interests through our alliances, deepen our relationships with emerging powers, and pursue a stronger role in the region's multilateral architecture, including the Association of Southeast Asian Nations (ASEAN), the Asia Pacific Economic Cooperation forum, the Trans-Pacific Partnership, and the East Asia Summit.

We will continue to pursue a positive, constructive, and comprehensive relationship with China. We welcome a China that takes on a responsible leadership role in working with the United States and the international community to advance priorities like economic recovery, confronting climate change, and nonproliferation. We will monitor China's military modernization program and prepare accordingly to ensure that U.S. interests and allies, regionally and globally, are not negatively affected. More broadly, we will encourage China to make choices that contribute to peace, security, and prosperity as its influence rises. We are using our newly established Strategic and Economic Dialogue to address a broader range of issues, and improve communication between our militaries in order to reduce mistrust. We will encourage continued reduction in tension between the People's Republic of China and Taiwan. We will not agree on every issue, and we will be candid on our human rights concerns and areas where we differ. But disagreements should not prevent cooperation on issues of mutual interest, because a pragmatic and effective relationship between the United States and China is essential to address the major challenges of the 21st century.

The United States and India are building a strategic partnership that is underpinned by our shared interests, our shared values as the world's two largest democracies, and close connections among our people. India's responsible advancement serves as a positive example for developing nations, and provides an opportunity for increased economic, scientific, environmental, and security partnership. Working together through our Strategic Dialogue and high-level visits, we seek a broad-based relationship in which India contributes to global counterterrorism efforts, nonproliferation, and helps promote poverty-reduction, education, health, and sustainable agriculture. We value India's growing leadership

on a wide array of global issues, through groups such as the G-20, and will seek to work with India to promote stability in South Asia and elsewhere in the world.

**Russia:** We seek to build a stable, substantive, multidimensional relationship with Russia, based on mutual interests. The United States has an interest in a strong, peaceful, and prosperous Russia that respects international norms. As the two nations possessing the majority of the world's nuclear weapons, we are working together to advance nonproliferation, both by reducing our nuclear arsenals and by cooperating to ensure that other countries meet their international commitments to reducing the spread of nuclear weapons around the world. We will seek greater partnership with Russia in confronting violent extremism, especially in Afghanistan. We also will seek new trade and investment arrangements for increasing the prosperity of our peoples. We support efforts within Russia to promote the rule of law, accountable government, and universal values. While actively seeking Russia's cooperation to act as a responsible partner in Europe and Asia, we will support the sovereignty and territorial integrity of Russia's neighbors.

**Emerging Centers of Influence:** Due to increased economic growth and political stability, individual nations are increasingly taking on powerful regional and global roles and changing the landscape of international cooperation. To achieve a just and sustainable order that advances our shared security and prosperity, we are, therefore, deepening our partnerships with emerging powers and encouraging them to play a greater role in strengthening international norms and advancing shared interests.

The rise of the G-20, for example, as the premier international economic forum, represents a distinct shift in our global international order toward greater cooperation between traditional major economies and emerging centers of influence. The nations composing the G-20—from South Korea to South Africa, Saudi Arabia to Argentina—represent at least 80 percent of global gross national product, making it an influential body on the world stage. Stabilizing our global economy, increasing energy efficiency around the globe, and addressing chronic hunger in poor countries are only three examples of the broad global challenges that cannot be solved by a few countries alone.

Indonesia—as the world's fourth most populous country, a member of the G-20, and a democracy—will become an increasingly important partner on regional and transnational issues such as climate change, counterterrorism, maritime security, peacekeeping, and disaster relief. With tolerance, resilience, and multiculturalism as core values, and a flourishing civil society, Indonesia is uniquely positioned to help address challenges facing the developing world.

In the Americas, we are bound by proximity, integrated markets, energy interdependence, a broadly shared commitment to democracy, and the rule of law. Our deep historical, familial, and cultural ties make our alliances and partnerships critical to U.S. interests. We will work in equal partnership to advance economic and social inclusion, safeguard citizen safety and security, promote clean energy, and defend universal values of the people of the hemisphere.

We welcome Brazil's leadership and seek to move beyond dated North-South divisions to pursue progress on bilateral, hemispheric, and global issues. Brazil's macroeconomic success, coupled with its steps to narrow socioeconomic gaps, provide important lessons for countries throughout the Americas and Africa. We will encourage Brazilian efforts against illicit transnational networks. As guardian of a unique national environmental patrimony and a leader in renewable fuels, Brazil is an important partner

in confronting global climate change and promoting energy security. And in the context of the G-20 and the Doha round, we will work with Brazil to ensure that economic development and prosperity is broadly shared.

We have an array of enduring interests, longstanding commitments and new opportunities for broadening and deepening relationships in the greater Middle East. This includes maintaining a strong partnership with Israel while supporting Israel's lasting integration into the region. The U.S. also will continue to develop our key security relationships in the region with such Arab states as with Egypt, Jordan, and Saudi Arabia and other Gulf Cooperation Council (GCC) countries—partnerships that enable our militaries and defense systems to work together more effectively.

We have a strategic interest in ensuring that the social and economic needs and political rights of people in this region, who represent one of the world's youngest populations, are met. We will continue to press governments in the region to undertake political reforms and to loosen restrictions on speech, assembly and media. We will maintain our strong support for civil society groups and those individuals who stand up for universal rights. And we will continue to foster partnerships in areas like education, economic growth, science, and health to help expand opportunity. On a multilateral basis, we seek to advance shared security interests, such as through NATO's Istanbul Cooperation Initiative with the GCC, and common interests in promoting governance and institutional reform through participating in the Forum for the Future and other regional dialogues.

The diversity and complexity of the African continent offer the United States opportunities and challenges. As African states grow their economies and strengthen their democratic institutions and governance, America will continue to embrace effective partnerships. Our economic, security, and political cooperation will be consultative and encompass global, regional, and national priorities including access to open markets, conflict prevention, global peacekeeping, counterterrorism, and the protection of vital carbon sinks. The Administration will refocus its priorities on strategic interventions that can promote job creation and economic growth; combat corruption while strengthening good governance and accountability; responsibly improve the capacity of African security and rule of law sectors; and work through diplomatic dialogue to mitigate local and regional tensions before they become crises. We will also reinforce sustainable stability in key states like Nigeria and Kenya that are essential subregional linchpins.

The United States will work to remain an attractive and influential partner by ensuring that African priorities such as infrastructure development, improving reliable access to power, and increased trade and investment remain high on our agenda. South Africa's inclusion in the G-20 should be followed by a growing number of emerging African nations who are charting a course toward improved governance and meaningful development. South Africa's vibrant democracy, combined with its regional and global leadership roles, is a critical partner. From peacemaking to climate change to capacity-building, South Africa brings unique value and perspective to international initiatives. With its strong, diversified, well-managed economy, it often serves as a springboard to the entire African continent, and we will work to pursue shared interests in Africa's security, growth, and the development of Africa's human capital.

## *Strengthen Institutions and Mechanisms for Cooperation*

Just as U.S. foresight and leadership were essential to forging the architecture for international cooperation after World War II, we must again lead global efforts to modernize the infrastructure for international cooperation in the 21st century. Indeed, our ability to advance peace, security, and opportunity will turn on our ability to strengthen both our national and our multilateral capabilities. To solve problems, we will pursue modes of cooperation that reflect evolving distributions of power and responsibility. We need to assist existing institutions to perform effectively. When they come up short, we must seek meaningful changes and develop alternative mechanisms.

Enhance Cooperation with and Strengthen the United Nations: We are enhancing our coordination with the U.N. and its agencies. We need a U.N. capable of fulfilling its founding purpose—maintaining international peace and security, promoting global cooperation, and advancing human rights. To this end, we are paying our bills. We are intensifying efforts with partners on and outside the U.N. Security Council to ensure timely, robust, and credible Council action to address threats to peace and security. We favor Security Council reform that enhances the U.N.'s overall performance, credibility, and legitimacy. Across the broader U.N. system we support reforms that promote effective and efficient leadership and management of the U.N.'s international civil service, and we are working with U.N. personnel and member states to strengthen the U.N.'s leadership and operational capacity in peacekeeping, humanitarian relief, post-disaster recovery, development assistance, and the promotion of human rights. And we are supporting new U.N. frameworks and capacities for combating transnational threats like proliferation of weapons of mass destruction, infectious disease, drug-trafficking, and counterterrorism.

Pursue Decisions though a Wide Range of Frameworks and Coalitions: We need to spur and harness a new diversity of instruments, alliances, and institutions in which a division of labor emerges on the basis of effectiveness, competency, and long-term reliability. This requires enhanced coordination among the United Nations, regional organizations, international financial institutions, specialized agencies, and other actors that are better placed or equipped to manage certain threats and challenges. We are attempting to forge new agreement on common global challenges among the world's leading and emerging powers to ensure that multilateral cooperation reflects the sustained commitment of influential countries. While we are pursuing G-8 initiatives with proven and long-standing partners, have begun to shift the focus of our economic coordination to the G-20, which is more reflective of today's diffusion of power and the need to enlist the efforts of a broader spectrum of countries across Asia to Europe, Africa to the Middle East, and our neighbors in the Americas. We are also renewing U.S. leadership in the multilateral development banks and the IMF, and leveraging our engagement and investments in these institutions to strengthen the global economy, lift people out of poverty, advance food security, address climate and pandemics, and secure fragile states such as Afghanistan and Haiti.

Invest in Regional Capabilities: Regional organizations can be particularly effective at mobilizing and legitimating cooperation among countries closest to the problem. Regional organizations—whether NATO, the Organization for Security Cooperation in Europe, the Organization of the Islamic Conference, the African Union, Organization of American States, or ASEAN, and the Gulf Cooperation Council—vary widely in their membership, constitutions, histories, orientation, and operational capabilities. That variety needs to inform a strategic approach to their evolving roles and relative contributions to global security.

The United States is encouraging continued innovation and development of enhanced regional capabilities in the context of an evolving division of labor among local, national, and global institutions that seeks to leverage relative capacities. Where appropriate, we use training and related programs to strengthen regional capacities for peacekeeping and conflict management to improve impact and share burdens. We will also encourage a more comprehensive approach to regional security that brings balanced focus to issues such as food security, global health, and education; access to more affordable and greener forms of energy; access to fair and efficient justice; and a concerted effort to promote transparency at all levels and to fight the corrosive effect of corruption.

## Sustain Broad Cooperation on Key Global Challenges

Many of today's challenges cannot be solved by one nation or even a group of nations. The test of our international order, therefore, will be its ability to facilitate the broad and effective global cooperation necessary to meet 21st century challenges. Many of these challenges have been discussed previously, including violent extremism, nuclear proliferation, and promotion of global prosperity. In addition, other key challenges requiring broad global cooperation include:

Climate Change: The danger from climate change is real, urgent, and severe. The change wrought by a warming planet will lead to new conflicts over refugees and resources; new suffering from drought and famine; catastrophic natural disasters; and the degradation of land across the globe. The United States will therefore confront climate change based upon clear guidance from the science, and in cooperation with all nations—for there is no effective solution to climate change that does not depend upon all nations taking responsibility for their own actions and for the planet we will leave behind.

- **Home:** Our effort begins with the steps that we are taking at home. We will stimulate our energy economy at home, reinvigorate the U.S. domestic nuclear industry, increase our efficiency standards, invest in renewable energy, and provide the incentives that make clean energy the profitable kind of energy. This will allow us to make deep cuts in emissions—in the range of 17 percent by 2020 and more than 80 percent by 2050. This will depend in part upon comprehensive legislation and its effective implementation.

- **Abroad:** Regionally, we will build on efforts in Asia, the Americas, and Africa to forge new clean energy partnerships. Globally, we will seek to implement and build on the Copenhagen Accord, and ensure a response to climate change that draws upon decisive action by all nations. Our goal is an effective, international effort in which all major economies commit to ambitious national action to reduce their emissions, nations meet their commitments in a transparent manner, and the necessary financing is mobilized so that developing countries can adapt to climate change, mitigate its impacts, conserve forests, and invest in clean energy technologies. We will pursue this global cooperation through multiple avenues, with a focus on advancing cooperation that works. We accept the principle of common but differentiated responses and respective capabilities, but will insist that any approach draws upon each nation taking responsibility for its own actions.

Peacekeeping and Armed Conflict: The untold loss of human life, suffering, and property damage that results from armed conflict necessitates that all responsible nations work to prevent it. No single nation

can or should shoulder the burden for managing or resolving the world's armed conflicts. To this end, we will place renewed emphasis on deterrence and prevention by mobilizing diplomatic action, and use development and security sector assistance to build the capacity of at-risk nations and reduce the appeal of violent extremism. But when international forces are needed to respond to threats and keep the peace, we will work with international partners to ensure they are ready, able, and willing. We will continue to build support in other countries to contribute to sustaining global peace and stability operations, through U.N. peacekeeping and regional organizations, such as NATO and the African Union. We will continue to broaden the pool of troop and police contributors, working to ensure that they are properly trained and equipped, that their mandates are matched to means, and that their missions are backed by the political action necessary to build and sustain peace.

In Sudan, which has been marred by violent conflict for decades, the United States remains committed to working with the international community to support implementation of outstanding elements of the Comprehensive Peace Agreement and ensure that the referendum on the future of Southern Sudan in 2011 happens on time and that its results are respected. In addition, we will continue to engage in the efforts necessary to support peace and stability after the referendum, and continue to work to secure peace, dignity, and accountability in Darfur.

- **Prevent Genocide and Mass Atrocities:** The United States and all member states of the U.N. have endorsed the concept of the "Responsibility to Protect." In so doing, we have recognized that the primary responsibility for preventing genocide and mass atrocity rests with sovereign governments, but that this responsibility passes to the broader international community when sovereign governments themselves commit genocide or mass atrocities, or when they prove unable or unwilling to take necessary action to prevent or respond to such crimes inside their borders. The United States is committed to working with our allies, and to strengthening our own internal capabilities, in order to ensure that the United States and the international community are proactively engaged in a strategic effort to prevent mass atrocities and genocide. In the event that prevention fails, the United States will work both multilaterally and bilaterally to mobilize diplomatic, humanitarian, financial, and—in certain instances—military means to prevent and respond to genocide and mass atrocities.

- **International Justice:** From Nuremberg to Yugoslavia to Liberia, the United States has seen that the end of impunity and the promotion of justice are not just moral imperatives; they are stabilizing forces in international affairs. The United States is thus working to strengthen national justice systems and is maintaining our support for ad hoc international tribunals and hybrid courts. Those who intentionally target innocent civilians must be held accountable, and we will continue to support institutions and prosecutions that advance this important interest. Although the United States is not at present a party to the Rome Statute of the International Criminal Court (ICC), and will always protect U.S. personnel, we are engaging with State Parties to the Rome Statute on issues of concern and are supporting the ICC's prosecution of those cases that advance U.S. interests and values, consistent with the requirements of U.S. law.

Pandemics and Infectious Disease: The threat of contagious disease transcends political boundaries, and the ability to prevent, quickly detect and contain outbreaks with pandemic potential has never been so

important. An epidemic that begins in a single community can quickly evolve into a multinational health crisis that causes millions to suffer, as well as spark major disruptions to travel and trade. Addressing these transnational risks requires advance preparation, extensive collaboration with the global community, and the development of a resilient population at home.

Recognizing that the health of the world's population has never been more interdependent, we are improving our public health and medical capabilities on the front lines, including domestic and international disease surveillance, situational awareness, rapid and reliable development of medical countermeasures to respond to public health threats, preparedness education and training, and surge capacity of the domestic health care system to respond to an influx of patients due to a disaster or emergency. These capabilities include our ability to work with international partners to mitigate and contain disease when necessary.

We are enhancing international collaboration and strengthening multilateral institutions in order to improve global surveillance and early warning capabilities and quickly enact control and containment measures against the next pandemic threat. We continue to improve our understanding of emerging diseases and help develop environments that are less conducive to epidemic emergence. We depend on U.S. overseas laboratories, relationships with host nation governments, and the willingness of states to share health data with nongovernmental and international organizations. In this regard, we need to continue to work to overcome the lack of openness and a general reluctance to share health information. Finally, we seek to mitigate other problem areas, including limited global vaccine production capacity, and the threat of emergent and reemergent disease in poorly governed states.

Transnational Criminal Threats and Threats to Governance: Transnational criminal threats and illicit trafficking networks continue to expand dramatically in size, scope, and influence—posing significant national security challenges for the United States and our partner countries. These threats cross borders and continents and undermine the stability of nations, subverting government institutions through corruption and harming citizens worldwide. Transnational criminal organizations have accumulated unprecedented wealth and power through trafficking and other illicit activities, penetrating legitimate financial systems and destabilizing commercial markets. They extend their reach by forming alliances with government officials and some state security services. The crime-terror nexus is a serious concern as terrorists use criminal networks for logistical support and funding. Increasingly, these networks are involved in cyber crime, which cost consumers billions of dollars annually, while undermining global confidence in the international financial system.

Combating transnational criminal and trafficking networks requires a multidimensional strategy that safeguards citizens, breaks the financial strength of criminal and terrorist networks, disrupts illicit trafficking networks, defeats transnational criminal organizations, fights government corruption, strengthens the rule of law, bolsters judicial systems, and improves transparency. While these are major challenges, the United States will be able to devise and execute a collective strategy with other nations facing the same threats.

Safeguarding the Global Commons: Across the globe, we must work in concert with allies and partners to optimize the use of shared sea, air, and space domains. These shared areas, which exist outside exclusive national jurisdictions, are the connective tissue around our globe upon which all nations' security

and prosperity depend. The United States will continue to help safeguard access, promote security, and ensure the sustainable use of resources in these domains. These efforts require strong multilateral cooperation, enhanced domain awareness and monitoring, and the strengthening of international norms and standards.

We must work together to ensure the constant flow of commerce, facilitate safe and secure air travel, and prevent disruptions to critical communications. We must also safeguard the sea, air, and space domains from those who would deny access or use them for hostile purposes. This includes keeping strategic straits and vital sea lanes open, improving the early detection of emerging maritime threats, denying adversaries hostile use of the air domain, and ensuring the responsible use of space. As one key effort in the sea domain, for example, we will pursue ratification of the United Nations Convention on the Law of the Sea.

Many of these goals are equally applicable to cyberspace. While cyberspace relies on the digital infrastructure of individual countries, such infrastructure is globally connected, and securing it requires global cooperation. We will push for the recognition of norms of behavior in cyberspace, and otherwise work with global partners to ensure the protection of the free flow of information and our continued access. At all times, we will continue to defend our digital networks from intrusion and harmful disruption.

Arctic Interests: The United States is an Arctic Nation with broad and fundamental interests in the Arctic region, where we seek to meet our national security needs, protect the environment, responsibly manage resources, account for indigenous communities, support scientific research, and strengthen international cooperation on a wide range of issues.



# IV. Conclusion

*"It's easy to forget that, when this war began, we were united, bound together by the fresh memory of a horrific attack and by the determination to defend our homeland and the values we hold dear. I refuse to accept the notion that we cannot summon that unity again. I believe with every fiber of my being that we, as Americans, can still come together behind a common purpose, for our values are not simply words written into parchment. They are a creed that calls us together and that has carried us through the darkest of storms as one nation, as one people."*

*—President Barack Obama, West Point, New York, December 2, 2009*

—

This strategy calls for a comprehensive range of national actions, and a broad conception of what constitutes our national security. Above all, it is about renewing our leadership by calling upon what is best about America—our innovation and capacity; our openness and moral imagination.

Success will require approaches that can be sustained and achieve results. One of the reasons that this nation succeeded in the second half of the 20th century was its capacity to pursue policies and build institutions that endured across multiple Administrations, while also preserving the flexibility to endure setbacks and to make necessary adjustments. In some instances, the United States has been able to carry forward this example in the years since the Cold War. But there are also many open questions, unfinished reforms, and deep divisions—at home and abroad—that constrain our ability to advance our interests and renew our leadership.

To effectively craft and implement a sustainable, results-oriented national security strategy, there must be effective cooperation between the branches of government. This Administration believes that we are strong when we act in line with our laws, as the Constitution itself demands. This Administration is also committed to active consultation with Congress, and welcomes robust and effective oversight of its national security policies. We welcome Congress as a full partner in forging durable solutions to tough challenges, looking beyond the headlines to take a long view of America's interests. And we encourage Congress to pursue oversight in line with the reforms that have been enacted through legislation, particularly in the years since 9/11.

The executive branch must do its part by developing integrated plans and approaches that leverage the capabilities across its departments and agencies to deal with the issues we confront. Collaboration across the government—and with our partners at the state, local, and tribal levels of government, in industry, and abroad—must guide our actions.

This kind of effective cooperation will depend upon broad and bipartisan cooperation. Throughout the Cold War, even as there were intense disagreements about certain courses of action, there remained a belief that America's political leaders shared common goals, even if they differed about how to reach them. In today's political environment, due to the actions of both parties that sense of common purpose is at times lacking in our national security dialogue. This division places the United States at a strategic

disadvantage. It sets back our ability to deal with difficult challenges and injects a sense of anxiety and polarization into our politics that can affect our policies and our posture around the world. It must be replaced by a renewed sense of civility and a commitment to embrace our common purpose as Americans.

Americans are by nature a confident and optimistic people. We would not have achieved our position of leadership in the world without the extraordinary strength of our founding documents and the capability and courage of generations of Americans who gave life to those values—through their service, through their sacrifices, through their aspirations, and through their pursuit of a more perfect union. We see those same qualities today, particularly in our young men and women in uniform who have served tour after tour of duty to defend our nation in harm's way, and their civilian counterparts.

This responsibility cannot be theirs alone. And there is no question that we, as a nation, can meet our responsibility as Americans once more. Even in a world of enormous challenges, no threat is bigger than the American peoples' capacity to meet it, and no opportunity exceeds our reach. We continue to draw strength from those founding documents that established the creed that binds us together. We, too, can demonstrate the capability and courage to pursue a more perfect union and—in doing so—renew American leadership in the world.

Attachment 14



Attachment 15

| | Grand Total | AFGHANISTAN | ALGERIA | ARMENIA | AZERBAIJAN | BAHRAIN | BANGLADESH | BELARUS | BHUTAN | BRAZIL | BURMA | BURUNDI | CAMBODIA | CAMEROON | CENTRAL AFRICAN REPUBLIC | CHAD | CHINA | COLOMBIA | CONGO | CUBA | DEM. REP. CONGO | DJIBOUTI | ECUADOR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA | 107 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 0 | 0 |
| ALASKA | 141 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 24 | 0 | 0 |
| ARIZONA | 2,964 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 76 | 0 | 287 | 11 | 0 | 2 | 1 | 0 | 0 | 7 | 0 | 78 | 532 | 0 | 0 |
| ARKANSAS | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALIFORNIA | 6,108 | 162 | 0 | 9 | 0 | 0 | 0 | 12 | 55 | 1 | 247 | 6 | 12 | 2 | 0 | 0 | 13 | 5 | 0 | 47 | 102 | 0 | 0 |
| COLORADO | 1,813 | 10 | 0 | 0 | 0 | 0 | 0 | 2 | 222 | 0 | 447 | 5 | 0 | 0 | 6 | 0 | 7 | 0 | 1 | 24 | 151 | 0 | 0 |
| CONNECTICUT | 543 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 75 | 1 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 6 | 61 | 0 | 1 |
| DISTRICT OF COLUMBIA | 29 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 7 | 0 | 0 |
| FLORIDA | 3,519 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 376 | 4 | 0 | 0 | 0 | 0 | 0 | 54 | 8 | 2,177 | 155 | 0 | 2 |
| GEORGIA | 2,694 | 51 | 2 | 0 | 0 | 0 | 0 | 0 | 550 | 0 | 744 | 1 | 0 | 0 | 2 | 1 | 1 | 9 | 0 | 64 | 218 | 0 | 0 |
| HAWAII | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IDAHO | 978 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 113 | 0 | 122 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 3 | 156 | 0 | 0 |
| ILLINOIS | 2,578 | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 214 | 0 | 749 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 38 | 171 | 0 | 0 |
| INDIANA | 1,613 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 31 | 0 | 1,270 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 36 | 0 | 0 |
| IOWA | 692 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 108 | 0 | 408 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 4 | 18 | 0 | 0 |
| KANSAS | 490 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36 | 0 | 189 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 33 | 0 | 0 |
| KENTUCKY | 1,849 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 265 | 0 | 420 | 7 | 0 | 1 | 2 | 0 | 0 | 0 | 2 | 160 | 177 | 0 | 0 |
| LOUISIANA | 211 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 25 | 31 | 0 | 0 |
| MAINE | 388 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 18 | 0 | 0 |
| MARYLAND | 1,227 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 130 | 0 | 366 | 0 | 3 | 0 | 0 | 0 | 0 | 16 | 1 | 35 | 125 | 0 | 1 |
| MASSACHUSETTS | 1,941 | 10 | 0 | 0 | 0 | 0 | 0 | 6 | 291 | 0 | 113 | 0 | 4 | 0 | 0 | 0 | 1 | 3 | 0 | 17 | 213 | 0 | 1 |
| MICHIGAN | 4,006 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 184 | 0 | 409 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 225 | 0 | 0 |
| MINNESOTA | 2,232 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 111 | 0 | 720 | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 3 | 6 | 20 | 0 | 0 |
| MISSISSIPPI | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| MISSOURI | 1,392 | 26 | 0 | 0 | 0 | 0 | 0 | 0 | 137 | 0 | 233 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 96 | 161 | 0 | 0 |
| NEBRASKA | 1,076 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 257 | 0 | 501 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 |
| NEVADA | 569 | 0 | 0 | 0 | 15 | 0 | 0 | 0 | 18 | 0 | 22 | 0 | 0 | 0 | 0 | 0 | 5 | 16 | 0 | 206 | 32 | 0 | 1 |
| NEW HAMPSHIRE | 345 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 109 | 0 | 24 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 108 | 0 | 0 |
| NEW JERSEY | 363 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 172 | 0 | 0 | 1 |
| NEW MEXICO | 163 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 20 | 26 | 0 | 0 |
| NEW YORK | 4,082 | 69 | 0 | 0 | 0 | 0 | 0 | 0 | 860 | 0 | 1,107 | 3 | 5 | 0 | 0 | 0 | 15 | 0 | 0 | 88 | 216 | 0 | 0 |
| NORTH CAROLINA | 2,443 | 38 | 0 | 0 | 0 | 0 | 0 | 0 | 354 | 0 | 806 | 3 | 0 | 0 | 6 | 21 | 3 | 8 | 1 | 128 | 201 | 0 | 0 |
| NORTH DAKOTA | 582 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 278 | 0 | 4 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 |
| OHIO | 2,815 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,248 | 0 | 182 | 3 | 0 | 0 | 5 | 0 | 1 | 0 | 0 | 11 | 111 | 0 | 0 |
| OKLAHOMA | 389 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 352 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 |
| OREGON | 1,019 | 20 | 0 | 0 | 0 | 0 | 0 | 3 | 98 | 0 | 197 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 12 | 66 | 0 | 0 |
| PENNSYLVANIA | 2,739 | 7 | 0 | 0 | 0 | 0 | 2 | 0 | 983 | 0 | 414 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 67 | 205 | 0 | 1 |
| PUERTO RICO | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| RHODE ISLAND | 188 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 30 | 7 | 0 | 0 | 0 | 0 | 0 | 14 | 0 | 0 | 27 | 0 | 0 |
| SOUTH CAROLINA | 121 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 46 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SOUTH DAKOTA | 523 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 161 | 0 | 115 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 45 | 0 | 0 |
| TENNESSEE | 1,467 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 215 | 0 | 276 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 92 | 79 | 0 | 1 |
| TEXAS | 7,214 | 83 | 0 | 0 | 0 | 0 | 0 | 0 | 607 | 0 | 2,132 | 5 | 2 | 0 | 0 | 0 | 1 | 8 | 1 | 248 | 337 | 0 | 0 |
| UTAH | 1,085 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 93 | 0 | 126 | 8 | 1 | 0 | 0 | 0 | 1 | 4 | 0 | 17 | 108 | 0 | 0 |
| VERMONT | 317 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 170 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 |
| VIRGINIA | 1,310 | 21 | 0 | 0 | 0 | 1 | 0 | 0 | 150 | 0 | 49 | 2 | 5 | 0 | 0 | 0 | 0 | 14 | 0 | 62 | 83 | 0 | 0 |
| WASHINGTON | 2,483 | 17 | 0 | 0 | 0 | 0 | 0 | 10 | 122 | 0 | 334 | 7 | 0 | 0 | 0 | 1 | 0 | 20 | 0 | 55 | 131 | 1 | 0 |
| WEST VIRGINIA | 28 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WISCONSIN | 1,132 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30 | 0 | 557 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 15 | 41 | 0 | 0 |
| Total | 69,986 | 758 | 2 | 9 | 15 | 1 | 2 | 43 | 8,316 | 1 | 14,577 | 84 | 45 | 5 | 25 | 23 | 57 | 243 | 29 | 4,063 | 4,502 | 1 | 9 |

Attachment 15

| EGYPT | ERITREA | ETHIOPIA | GABON | GEORGIA | GHANA | GUINEA | HAITI | INDIA | INDONESIA | IRAN | IRAQ | IVORY COAST | JORDAN | KAZAKHSTAN | KENYA | KOREA, NORTH | KUWAIT | KYRGYZSTAN | LAOS | LEBANON | LIBERIA | LIBYA | MALI | MAURITANIA | MOLDOVA | MOROCCO | NEPAL | NIGERIA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 36 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 0 | 88 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 62 | 967 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 49 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,668 | 3,049 | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 35 | 0 | 1 | 0 |
| 0 | 79 | 52 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 12 | 418 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 8 | 0 | 4 | 0 |
| 0 | 40 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 144 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 36 | 27 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 30 | 425 | 4 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 83 | 66 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 75 | 305 | 2 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 8 | 0 | 5 | 2 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 19 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 287 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 4 | 31 | 16 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 68 | 1,057 | 4 | 2 | 0 | 0 | 2 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 |
| 0 | 18 | 14 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 10 | 125 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 30 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 74 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 3 | 0 |
| 0 | 30 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 7 | 68 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 0 | 0 | 4 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 7 | 398 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 0 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 190 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 102 | 38 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 | 226 | 0 | 2 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 4 | 0 | 0 | 3 | 0 |
| 1 | 27 | 7 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 7 | 777 | 1 | 3 | 11 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 0 | 3 | 0 |
| 0 | 42 | 13 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 11 | 2,751 | 2 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| 0 | 11 | 66 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 179 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 |
| 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 31 | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 271 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 31 | 190 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 0 | 46 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 49 | 64 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 63 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 80 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 47 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 57 | 31 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 37 | 659 | 2 | 3 | 1 | 0 | 0 | 1 | 5 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 19 | 0 |
| 0 | 67 | 38 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 26 | 343 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 11 | 0 | 1 | 1 |
| 0 | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 157 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| 0 | 81 | 50 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 8 | 488 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 1 | 0 | 16 | 0 |
| 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 11 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37 | 287 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 |
| 2 | 45 | 43 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 3 | 443 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 24 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 37 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 49 | 2 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 10 | 9 | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 458 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 8 | 0 |
| 0 | 150 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 358 | 2,445 | 3 | 8 | 0 | 0 | 0 | 0 | 5 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 0 | 14 | 0 |
| 0 | 26 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 17 | 290 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| 0 | 31 | 6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 87 | 626 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 1 | 69 | 66 | 0 | 13 | 0 | 0 | 0 | 0 | 1 | 108 | 704 | 0 | 1 | 6 | 3 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 36 | 0 | 2 | 0 |
| 0 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 263 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| **27** | **1,445** | **754** | **2** | **13** | **2** | **9** | **4** | **26** | **17** | **2,833** | **19,651** | **42** | **41** | **22** | **24** | **8** | **10** | **13** | **2** | **13** | **32** | **1** | **2** | **4** | **141** | **2** | **148** | **4** |

| PAKISTAN | PALESTINE | PHILIPPINES | REPUBLIC OF SOUTH SUDAN | RUSSIA | RWANDA | SAUDI ARABIA | SIERRA LEONE | SINGAPORE | SOMALIA | SOUTH AFRICA | SRI LANKA | SUDAN | SYRIA | TANZANIA | THAILAND | THE GAMBIA | TOGO | TUNISIA | TURKMENISTAN | UGANDA | UKRAINE | UNKNOWN | UZBEKISTAN | VIETNAM | WEST BANK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 | 0 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 5 | 1 | 10 | 2 | 5 | 0 | 0 | 0 | 666 | 0 | 0 | 62 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 21 | 53 | 0 | 0 | 33 | 0 | 0 | 0 | 0 | 249 | 0 | 17 | 25 | 32 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 132 | 0 | 26 | 7 | 1 |
| 0 | 0 | 0 | 0 | 5 | 8 | 0 | 0 | 0 | 287 | 0 | 2 | 45 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 10 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 114 | 0 | 4 | 18 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 6 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 75 | 0 | 3 | 89 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 5 | 0 |
| 39 | 1 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 363 | 0 | 8 | 51 | 6 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 9 | 0 | 3 | 2 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 146 | 0 | 0 | 67 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 21 | 11 | 0 | 5 | 6 | 0 | 0 | 0 | 1 | 32 | 0 | 0 | 53 | 7 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 1 | 11 | 0 | 1 | 5 |
| 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 58 | 0 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | 19 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 327 | 0 | 0 | 20 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 |
| 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 148 | 0 | 0 | 8 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | 1 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 35 | 0 | 0 | 77 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 |
| 4 | 4 | 0 | 0 | 11 | 2 | 0 | 0 | 0 | 307 | 0 | 0 | 44 | 2 | 0 | 0 | 0 | 6 | 0 | 1 | 0 | 33 | 0 | 1 | 4 | 0 |
| 1 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 273 | 0 | 6 | 24 | 6 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 9 | 0 | 0 | 5 | 0 | 0 | 1 | 0 | 1,046 | 3 | 5 | 7 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 339 | 0 | 0 | 62 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 52 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 |
| 0 | 0 | 2 | 0 | 0 | 4 | 0 | 0 | 0 | 48 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 17 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 | 1 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 14 | 1 | 0 | 27 | 7 | 0 | 0 | 0 | 705 | 0 | 1 | 56 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 62 | 0 | 12 | 0 | 0 |
| 9 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 275 | 0 | 0 | 68 | 11 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 11 | 0 |
| 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 23 | 3 | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 503 | 0 | 0 | 41 | 4 | 0 | 2 | 0 | 7 | 0 | 0 | 0 | 11 | 0 | 0 | 5 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 215 | 0 | 0 | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 8 | 0 | 0 |
| 6 | 0 | 0 | 12 | 12 | 0 | 0 | 5 | 3 | 360 | 0 | 1 | 55 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 6 | 3 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 |
| 0 | 6 | 0 | 6 | 0 | 2 | 0 | 0 | 0 | 223 | 0 | 0 | 34 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | 1 | 0 | 1 | 0 | 12 | 0 | 0 | 0 | 636 | 0 | 6 | 61 | 10 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 |
| 5 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 279 | 0 | 4 | 58 | 1 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 8 | 0 | 13 | 1 | 4 | 0 | 0 | 0 | 72 | 0 | 0 | 50 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 4 | 0 |
| 15 | 4 | 0 | 2 | 11 | 5 | 0 | 0 | 0 | 534 | 0 | 1 | 45 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 134 | 0 | 4 | 17 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 181 | 0 | 0 | 19 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| **239** | **158** | **5** | **52** | **147** | **60** | **2** | **9** | **3** | **9,011** | **3** | **58** | **1,307** | **132** | **1** | **6** | **1** | **26** | **3** | **2** | **8** | **493** | **1** | **68** | **80** | **1** |

| YEMEN | ZIMBABWE |
|---|---|
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 2 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 1 |
| 1 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 3 | 0 |
| 0 | 1 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 4 | 4 |